# Deputy Joe Huddleston

June 04, 2015

NANCY ROELL

v.

HAMILTON COUNTY, OHIO/BOARD OF COMMISSIONERS, et al.

1:14-CV-637



513.233.3000
877.233.4403
Fax: 513.233.2310
depo@elitereportingagency.com

```
 1            UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF OHIO

 3                 WESTERN DIVISION

 4

 5   _____
                                    )
 6   NANCY ROELL                    )
     as executrix of the estate of  )
 7   GARY L. ROELL, SR.,            )
                                    )
 8        Plaintiff,                )
                                    ) CASE NO.
 9             vs.                  ) 1:14-CV-637
                                    )
10   HAMILTON COUNTY, OHIO/BOARD OF )
     COMMISSIONERS, et al.          )
11                                  )
          Defendants.               )
12   _____)

13

14

15        Deposition of:  DEPUTY JOE HUDDLESTON

16        Pursuant to:    Notice

17        Date and Time:  Thursday, June 4, 2015
                              10:02 a.m.
18        Place:          Hamilton County
                          Prosecutor's Office
19                        230 East Ninth Street
                          Suite 4000
20                        Cincinnati, Ohio  45202

21        Reporter:       Wendy Haehnle
                          Notary Public - State
22                                    of Ohio

23        Videographer:   John Bonavita

24

25
```

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3           For the plaintiff:

 4                Alphonse A. Gerhardstein, Esq.
                       and
 5                Jacklyn Gonzales-Martin, Esq.
                       of
 6                Gerhardstein & Branch Co., LPA
                  432 Walnut Street
 7                Suite 400
                  Cincinnati, Ohio  45202
 8                513.621.9100, Ext. 13
                  agerhardstein@gbfirm.com
 9                jgmartin@gbfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1    APPEARANCES OF COUNSEL:

 2

 3        For the defendants:

 4                Jerome A. Kunkel, Esq.
                         and
 5                Pamela J. Sears, Esq.
                         of
 6                Office of Hamilton County
                    Prosecuting Attorney
 7                230 East Ninth Street
                  Suite 4000
 8                Cincinnati, Ohio  45202
                  513.946.3082
 9                pam.sears@hcpros.org
                  jerry.kunkel@hcpros.org
10                       and
11                Linda L. Woeber, Esq.
12                       of
                  Montgomery Rennie & Jonson, LPA
13                36 East Seventh Street
                  Suite 2100
14                Cincinnati, Ohio  45202
                  513.768.5239
15                lwoeber@mrjlaw.com

16

17        Also Present:

18                Gus Flottman
                  Katie Cornelius
19                Nancy Roell
                  Deputy Matthew Alexander
20                Deputy Willy Dalid

21

22                       - - -

23

24

25
```

4

```
 1                      I N D E X

 2

 3    DEPUTY JOE HUDDLESTON                    PAGE

 4        EXAMINATION BY MR. GERHARDSTEIN       5
          EXAMINATION BY MS. SEARS            169
 5        FURTHER EXAMINATION
            BY MR. GERHARDSTEIN              265
 6

 7
      EXHIBITS                    MARKED   REFERENCED
 8
          DEPOSITION EXHIBIT  1     90         91
 9        DEPOSITION EXHIBIT  2     94         94
          DEPOSITION EXHIBIT  3    122        122
10        DEPOSITION EXHIBIT  4    137        137
          DEPOSITION EXHIBIT  5    139        139
11        DEPOSITION EXHIBIT  6    147        147
          DEPOSITION EXHIBIT  7    150        150
12        DEPOSITION EXHIBIT  8    156        156

13        DEPOSITION EXHIBIT  9    162          -
          DEPOSITION EXHIBIT 10    162        163
14        DEPOSITION EXHIBIT 11    163          -
          DEPOSITION EXHIBIT 12    164        164
15        DEPOSITION EXHIBIT 13    164        164
          DEPOSITION EXHIBIT 14    165        165
16        DEPOSITION EXHIBIT 15    166        166

17        DEPOSITION EXHIBIT  A    176        176
          DEPOSITION EXHIBIT  B    202        202
18        DEPOSITION EXHIBIT  C    205        205
          DEPOSITION EXHIBIT  D    207        207
19        DEPOSITION EXHIBIT  E    208        208
          DEPOSITION EXHIBIT  F    209        209
20
          DEPOSITION EXHIBIT  G    210        210
21        DEPOSITION EXHIBIT  H    214        214
          DEPOSITION EXHIBIT  I    215        215
22        DEPOSITION EXHIBIT  J    222        222
          DEPOSITION EXHIBIT  K    250        251
23        DEPOSITION EXHIBIT  L    261        261

24

25                      - - -
```

```
 1                     DEPUTY JOE HUDDLESTON
 2   a defendant herein, having been duly sworn, was
 3   examined and deposed as follows:
 4                          EXAMINATION
 5   BY MR. GERHARDSTEIN:
 6        Q.    Good morning.
 7              State your name, please.
 8        A.    Deputy Joe Huddleston.
 9        Q.    What's your highest level of
10   education?
11        A.    High school.
12        Q.    Where did you graduate from?
13        A.    Oak Hills.
14        Q.    What year?
15        A.    2004.
16        Q.    What's your present job?
17        A.    I'm employed with the Hamilton County
18   Sheriff's Department.
19        Q.    And you're a deputy?
20        A.    Correct.
21        Q.    And you started with the Hamilton
22   County Sheriff's Office on April 7th, 2005?
23        A.    Yes.
24        Q.    And that was in corrections?
25        A.    Yes.
```

1      Q.   And then you went to the road patrol on

2  November 7th, 2012 --

3      A.   Yes.

4      Q.   -- is that right?

5      A.   Yes.

6      Q.   And how did you get from corrections to

7  the road patrol?

8      A.   Took the road patrol exam, went through

9  the interview process, and got promoted.

10      Q.   Do -- in your experience, do all the

11  road patrol positions get filled by going through

12  corrections first?

13      A.   They do now -- or not -- not

14  corrections.  But you have to be employed with

15  the Hamilton County Sheriff's Department now.

16      Q.   So what did --

17      A.   Prior, you did not have to.

18      Q.   Prior meaning when?

19      A.   When Simon Leis was still in office

20  back in 2012, you could have been a special.

21      Q.   Oh, like auxiliary?

22      A.   Yes.

23      Q.   All right.  And what are the other

24  options for being employed with the Hamilton

25  County Sheriff's Office, other than being in

```
 1   corrections, if you wanted to take the road

 2   patrol exam?

 3        A.   You could go to court services.

 4        Q.   Okay.

 5        A.   You could go to EMD.

 6        Q.   What's that?

 7        A.   Electronic Monitoring.

 8             There's numerous things; records.

 9        Q.   Okay.  How old are you?

10        A.   Twenty-nine.

11        Q.   Are you married?

12        A.   Yes.

13        Q.   Any kids?

14        A.   Got one and one on the way.

15        Q.   Congratulations.

16        A.   Thank you.

17        Q.   Have you ever sued anyone or been

18   sued?

19        A.   No.

20        Q.   Have you ever filed for bankruptcy?

21        A.   No.

22        Q.   Have you taken any medications today?

23        A.   No.

24        Q.   You're five-ten?

25        A.   About six foot.
```

8

```
 1        Q.   Six foot?  Okay.

 2             And how much do you weigh?

 3        A.   Roughly 190.

 4        Q.   And was that your height and weight on

 5   August 13th, 2013?

 6        A.   I believe so.

 7        Q.   What did you do to get ready for this

 8   deposition?

 9        A.   Just met with the lawyers.

10        Q.   All right.  Now, I don't want you to

11   tell me what you said to the lawyers and what

12   they said to you.

13             But what documents did you review?

14        A.   Reviewed my statement, the complaint.

15        Q.   Anything else?

16        A.   Discussed Taser policy.

17        Q.   Anything else?

18        A.   Not that I recall.

19        Q.   You said you reviewed your statement.

20   What's that look like?

21        A.   It was a piece of paper with everything

22   I said.

23        Q.   Did you write a statement?

24        A.   I did not.

25             MS. SEARS:  For the record --
```

9

```
 1   BY MR. GERHARDSTEIN:

 2        Q.   So --

 3             MS. SEARS:  For the record, we had the

 4        written statements transcribed --

 5             MS. WOEBER:  The video --

 6             MS. SEARS:  -- the video statements we

 7        had transcribed.

 8             MR. GERHARDSTEIN:  Okay.

 9             MS. SEARS:  He looked at that

10        transcription and -- and looked at the

11        videotape, just to clar -- you know --

12             MR. GERHARDSTEIN:  All right.  That's

13        helpful.

14             MS. SEARS:  -- to clarify.  Yeah.  I

15        don't want to waste your time.

16             MR. GERHARDSTEIN:  We should have

17        cooperated on that.  We would have saved

18        some money.

19             MS. SEARS:  Yeah.  Maybe the next time.

20             MR. GERHARDSTEIN:  Yeah, right.  Think

21        about it --

22             MS. SEARS:  Live and learn, I guess.

23             MR. GERHARDSTEIN:  Yeah.

24   BY MR. GERHARDSTEIN:

25        Q.   Prior to August 13th, 2013, had you
```

1    ever discharged a firearm at a suspect?

2        A.    No.

3        Q.    Since August 13th, 2013, have you ever

4    discharged a firearm at a --

5        A.    No.

6        Q.    -- suspect?

7              Prior to August 13th, 20 --

8              MS. SEARS:  Can I just caution him to

9        let Mr. Gerhardstein finish his question?

10        The court reporter needs that, you know, so,

11        you know, make sure he's finished before you

12        respond.

13              I'm sorry, Al.  I didn't mean to

14        interrupt you.  Pardon me.

15              MR. GERHARDSTEIN:  That's all right.

16              But, you know, if she's going to object

17        to you before she objects to me, we got --

18        we're going to have a long day.

19              MS. SEARS:  It will.  It probably will

20        be.

21    BY MR. GERHARDSTEIN:

22        Q.    Prior to August 13th, 2013, had you

23    ever discharged a Taser at a subject?

24        A.    Yes.

25        Q.    All right.  Tell me about that.

11

```
 1        A.    It was in the jail.

 2        Q.    All right.  Tell me about that.

 3        A.    It was -- I was ordered to by a

 4   lieutenant.  It was on the CERT team to gain

 5   control of a suspect -- or an inmate.

 6              Nobody else on the team at the time I

 7   was working was certified in the Taser.  So he

 8   had me come up to the floor and tase the -- the

 9   inmate after he gave them several verbal

10   orders.

11        Q.    What year was that?

12        A.    I do not recall.

13        Q.    You were first certified on an X26,

14   right?

15        A.    Correct.

16        Q.    And that was 2010?

17        A.    I'm not sure what year exactly.

18        Q.    But it was obviously after you were

19   certified?

20        A.    Yes.

21        Q.    Do you remember the name of the

22   inmate?

23        A.    I do not.

24        Q.    If I wanted to get -- and you filled

25   out a -- a report regarding that use of force
```

12

```
1    inside the jail, right?

2         A.   Most likely, yes.

3         Q.   How would I describe that incident in

4    order to secure a copy of that report?

5         A.   It was probably a -- a CERT callout.

6         Q.   And how do you spell CERT?

7         A.   C-E-R-T.

8         Q.   And what's that stand for?

9         A.   Corrections Emergency Response Team.

10        Q.   And were you on the response team?

11        A.   Not at the time of that.

12        Q.   You eventually were?

13        A.   Yes.

14        Q.   And the lieutenant that ordered you to

15   use the Taser, what was his name?

16        A.   He is now a captain -- it's Captain

17   Daniel Sheffer -- Schleffer.

18        Q.   How do you spell that?

19        A.   S-c-h-e-l -- S-c-h-l-e-f-f-e-r, I

20   believe.

21        Q.   And do you remember what block or

22   location in the jail that Taser deployment was?

23        A.   I believe it was the -- the third

24   floor.  It was a female housing unit.

25        Q.   What was the inmate doing that caused
```

13

1    the CERT team to be called out?

2         A.   I don't recall 100 percent why they

3    were called.  I wasn't up on the floor at the

4    time.

5              Said it was just a word -- she was

6    refusing to -- refusing their commands.

7              When I got there, they handed me the

8    Taser that they used.  They were still refusing

9    the commands.  And I tased her.

10        Q.   The command to an inmate who is in a

11   cell is probably to cuff up, right?

12             MS. SEARS:  Objection.  Objection.

13             MR. GERHARDSTEIN:  You can --

14             MS. SEARS:   If you know.  I mean, if

15        you know of a command like that.

16        A.   I don't know.

17   BY MR. GERHARDSTEIN:

18        Q.   Well, you worked in the jail, right?

19        A.   Right.

20        Q.   So when you -- the inmate was alone in

21   the cell, right?  Is that correct?

22             MS. SEARS:   Which inmate?  Are you

23        talking about this inmate?

24             MR. GERHARDSTEIN:  No, no.  I'm talking

25        about the inmate that he tased.

1          A.    Yes.

2     BY MR. GERHARDSTEIN:

3          Q.    Okay.  So if you want to get control of

4     that inmate, you want the inmate to put her hands

5     through the cuff port --

6          A.    Right.

7          Q.    -- so that you can cuff them, right?

8          A.    Correct.

9          Q.    Is that the command you were giving --

10         A.    I wasn't giving the commands.

11         Q.    -- before you tased her?

12               Is that the command that was given to

13    her --

14         A.    I don't recall.

15         Q.    -- before you tased her?

16               MS. SEARS:  Again, make sure you let

17         Mr. Gerhardstein --

18               THE WITNESS:  Sorry.

19               MS. SEARS:  -- finish his question.

20               THE WITNESS:  Okay.

21               MS. SEARS:  Okay?  Because you're

22         talking over him.

23    BY MR. GERHARDSTEIN:

24         Q.    So, at any rate, you tased her.

25               Where did the prongs land on her?

15

```
1        A.   I don't recall.

2        Q.   Did you tase her in the front or the

3   back?

4        A.   I believe it was the back.

5        Q.   And did the Taser take effect?

6        A.   It did.

7        Q.   And then what happened?

8        A.   Then the CERT team went in and grabbed

9   her and cuffed her up.

10        Q.   And did they cuff her while she was

11   under power?

12        A.   I do not recall.

13        Q.   Have you tased anyone else?

14        A.   Prior?

15        Q.   Yes.

16        A.   No.

17        Q.   How about since August 13th, 2013?

18        A.   Yes.

19        Q.   Since the incident with Mr. Roell, have

20   you tased anyone?

21        A.   Yes.

22        Q.   Tell me about that.

23        A.   It was a pursuit, the subject driving a

24   stolen vehicle.  He crashed, took off on foot

25   trying to flee.
```

1       Q.   When was this?

2       A.   I don't remember.

3       Q.   Was it this year?

4       A.   No.

5       Q.   Was it between the tasing of Mr. Roell

6   and the end of 2013?

7       A.   I don't believe so.

8       Q.   So it was in 2014?

9       A.   Yes.

10      Q.   And what was the subject's name?

11      A.   I don't remember off the top of my

12  head.

13      Q.   Do you know the location?

14      A.   I believe it was Reading Road.

15      Q.   And you filled out a -- did you fill

16  out any paperwork with respect to that use of

17  force?

18      A.   I just filled out the -- the NIBRS --

19      Q.   What's NIBRS?

20      A.   -- report.

21           It's our report.

22      Q.   What's NIBRS mean?

23      A.   It's just our report that we do.

24      Q.   You fill it out on a computer?

25      A.   No, by hand.

1     Q.   How do you spell NIBRS?

2     A.   N-i-b-e-r-s (sic).

3     Q.   Is that a report specific to tasing?

4     A.   No.

5     Q.   It's just the supplemental --

6     A.   Right.

7     Q.   -- use of force report?

8     A.   It's just a -- it's a -- it's a report.

9 That's -- that's our report.

10    Q.   And if I wanted to get a copy of that

11 report, do you know how it's filed or

12 identified?

13    A.   I believe everything goes down to

14 records.

15    Q.   Okay.  Was it in the winter or the

16 spring or the summer?

17    A.   I believe it was probably -- probably

18 around the fall.

19    Q.   Was the suspect injured?

20    A.   Yes.

21    Q.   How so?

22    A.   Just had little cuts on his face.

23    Q.   Where did you tase the suspect?

24    A.   In the back.

25    Q.   Any other tasings?

18

```
 1        A.    No.

 2        Q.    Have you had any experiences, other

 3   than Mr. Roell and the ones we've talked about,

 4   when you arrested a suspect and the suspect was

 5   injured during the arrest?

 6        A.    Can you repeat the question?

 7        Q.    Have you had any experiences where the

 8   suspect was injured during the arrest, other than

 9   the ones we've talked about?

10        A.    Yeah.

11        Q.    Tell me about those.

12        A.    I don't recall.

13        Q.    How many?

14        A.    I do not recall.  If they're injured,

15   we'll -- we'll call for a squad.

16        Q.    What's the most serious injury you've

17   experienced, other than Mr. Roell?

18             MS. SEARS:  I'm going to object to the

19        characterization of that as an injury

20        regarding Mr. Roell.

21             But you can answer, certainly, the

22        question.

23        A.    I -- I don't recall 100 percent.  I --

24   I don't know.

25   BY MR. GERHARDSTEIN:
```

19

```
 1        Q.    Any other deaths in custody?

 2        A.    No.

 3        Q.    Any hospitalizations --

 4        A.    No.

 5        Q.    -- of suspects?

 6              Have you been disciplined since you've

 7  been on the road patrol?

 8        A.    No.

 9        Q.    Any discipline while you were in

10  corrections?

11        A.    No.

12        Q.    Any written warnings or verbal warnings

13  while you were in corrections?

14        A.    Yes.

15        Q.    Tell me about those.

16        A.    For parking on the street at

17  Queensgate, trying to go to work, and removing my

18  name from the overtime list while at Queensgate

19  working in the jail.

20        Q.    Anything else?

21        A.    No.

22        Q.    Give me some idea -- give me a summary

23  of the training you've received since you've

24  joined the Hamilton County Sheriff's Office.

25        A.    What kind of training are you looking
```

1   for?

2        Q.   All the training.

3        A.   I mean, we do --

4        Q.   Start with corrections.

5             Did you go -- did you go to any academy

6   or anything to get into corrections?

7        A.   Corrections, they run their own

8   academy.  The sheriff's department runs their own

9   academy.

10            It's a two-month long academy, I

11  believe.

12       Q.   And that was in 2005?

13       A.   Correct.

14       Q.   And were there written tests --

15       A.   Yes, there were.

16       Q.   -- in that academy?

17       A.   Yes.

18       Q.   And was there scenario-based training

19  in that academy?

20       A.   I believe so.

21       Q.   Were you graded in that academy?

22       A.   Yes.

23       Q.   So is there a training file or a -- I

24  don't see any record of that in your personnel

25  file.

1          Where would I find the records of your

2    training at the corrections academy?

3          A.   You'd have to go with the records

4    department, I guess.

5          Q.   All right.  But you recall that there

6    was graded training in 2005?

7          A.   I believe so, yes.

8          Q.   All right.  Have you ever seen any

9    summary of all the course work you've taken?

10         A.   I have not.

11         Q.   Is there a database that you have

12   access to where you can look up all the training

13   you've done?

14         A.   No.

15         Q.   All right.  So you did the sheriff

16   academy when you joined corrections.

17         And then what other training did you

18   have after that?

19         A.   After that, I went to Butler Tech

20   Police Academy.

21         Q.   And that was 2010?

22         A.   Correct.

23         Q.   Between 2005 and 2010 at Butler Tech,

24   did you have any training, any in-service or any

25   other training?

```
 1        A.   I don't recall.

 2        Q.   And Butler Tech was the OPOTA patrol

 3   officer course, right?

 4        A.   Right.

 5        Q.   And you graduated from that.  Was that

 6   graded?

 7        A.   Yes.

 8        Q.   How about since the Butler Tech course,

 9   have you had any other training?

10        A.   Just the requalifications through the

11   sheriff's department.

12        Q.   Tell me about those.

13        A.   Well, we get requalified on the

14   Taser --

15        Q.   Okay.

16        A.   -- requalified on your weapons,

17   everything you carry while on duty.

18        Q.   In order to -- well, first of all, you

19   didn't get Taser certified through Butler Tech,

20   right?

21        A.   Right.

22        Q.   That was a separate course?

23        A.   Right.

24        Q.   And who taught that?

25        A.   Sheriff's department.
```

23

 1      Q.   And do you know who in the sheriff's

 2   department?

 3      A.   Lee Edwards.

 4      Q.   Is he still there?

 5      A.   Yes.

 6      Q.   Do you know his title?

 7      A.   He doesn't -- just a range master.

 8      Q.   Is he a master Taser trainer?

 9      A.   He's a Taser trainer.  I don't know if

10   he's a master Taser trainer.

11      Q.   And he -- he taught the X26 course?

12      A.   Yes.

13      Q.   Do you know what version of the Taser

14   materials he used?

15      A.   I do not know.

16      Q.   There's a series of PowerPoints, right?

17      A.   Right.

18      Q.   And you took those in 2010.  Is that

19   version 18?

20      A.   (Indicating.)

21      Q.   Okay.

22      A.   I don't recall.

23      Q.   As part of the X26 training, most

24   courses include an opportunity to actually shoot

25   the Taser.

24

1          Did you have that?

2     A.   Yes.

3     Q.   Was that graded?

4     A.   I don't -- I don't remember.

5     Q.   Describe for me the exercise that you

6  went through in terms of shooting the Taser in

7  order to qualify.

8     A.   It was a -- it was a hands-on exercise.

9  They had -- my particular one, they had a subject

10 in the bathroom.  He was in a RedMan suit, so he

11 couldn't get injured.  But he came out and he

12 came towards us with a baseball bat in hand,

13 refused commands, and kept coming towards us and

14 we pulled our Taser.

15    Q.   Were you stationary at the time you

16 shot the Taser?

17    A.   In the training?

18    Q.   Yeah.

19    A.   I don't remember.

20    Q.   And then when you shot at the person

21 who was holding the baseball bat, where did you

22 -- where did the prongs strike him?

23    A.   I -- I don't recall.

24    Q.   When you qualified on the X26, did you

25 learn anything about how to measure the amount of

25

1    energy your particular unit was outputting?

2        A.    No.

3        Q.    At any time, whether you were using an

4    X26 or an X2, have you ever been asked by the

5    Hamilton County Sheriff to use any device that

6    would measure the amount of energy your Taser

7    unit is putting out?

8        A.    No.

9        Q.    Other than shooting at the person who

10   was in protective clothing, did you have to do

11   anything else in terms of demonstrating your

12   proficiency with respect to shooting the Taser?

13       A.    No.

14       Q.    Since 2010, have you had to shoot the

15   X26 any other -- in any other setting in order to

16   requalify to carry the weapon?

17       A.    No.

18       Q.    So your certification from 2010

19   continues to authorize you to carry an X26; is

20   that right?

21       A.    Back in 2010, yes.

22       Q.    All right.  And what about in 2011?

23   Did you have to do anything special to --

24       A.    Just requalify.

25       Q.    Okay.  So what's that mean,

1   requalify?

2          A.   Go sit through the -- the Taser

3   training again and deploy the Taser.

4          Q.   Do you only shoot it once as part of

5   that requalification?

6          A.   I don't -- I don't remember.  I don't

7   recall 100 percent.

8               I -- I don't think so.  I think you

9   shoot it twice.

10         Q.   Do you ever include in your training an

11  opportunity to run up some stairs and then shoot

12  or -- or -- or do some aerobic exercise and then

13  have to shoot right away?

14         A.   Now I think we do.

15         Q.   How about prior to August 13, 2013?

16  Did you have to do any aerobic exercise as part

17  of your shooting of the Taser when you were

18  requalifying?

19         A.   I -- I don't recall.

20         Q.   And who was in charge of your

21  requalifying?

22         A.   It was the same guy, Lee Edwards.

23         Q.   Do you know what records are maintained

24  to document your requalification on the Taser?

25         A.   I don't -- I do not.

1      Q.   Prior to August 13th, 2010, were you

2   instructed at all about the preferred target

3   zone?

4      A.   2010?

5      Q.   Yeah.  I'm -- I'm sorry.  Thank you.

6           Prior to August 13th, 2013, were you

7   instructed at all about the preferred target

8   zone?

9      A.   Yeah.

10     Q.   Tell me about that.

11     A.   Tell you about the prefer areas?

12     Q.   Yeah.

13     A.   The preferred areas are from the

14   breastbone down on the front side or the back.

15     Q.   And why are those the preferred

16   areas?

17     A.   Because they like you to stay away from

18   the upper chest, the heart area.

19     Q.   And why is that?

20     A.   Just because they'd rather not have the

21   electrodes going in the area of the upper -- the

22   chest.

23     Q.   Because there's some risk of a cardiac

24   event, right?

25     A.   There could be, yes.

1      Q.   Right.  And you learned that in your

2  Taser training, right?

3      A.   Yes.

4      Q.   And that's true whether you're using

5  the X26 or the X2, right?

6      A.   Correct.

7      Q.   What's the difference between the X26

8  and the X2?

9      A.   It's just the X -- X2 has two

10  cartridges already ready to go.  The X26, in

11  order to reload, you have to take the one off,

12  grab the other one, and put it back on.

13      Q.   And do they discharge the same type of

14  cartridge?

15      A.   The X2 or --

16      Q.   The X26 and the X2?

17      A.   I mean, they're different -- different

18  looking cartridges.  But it's the same -- same

19  principle, yes.

20      Q.   Okay.  You were certified

21  November 13th, 2012 on the X2, right?

22      A.   I believe so, yeah.

23      Q.   And who was your instructor for that?

24      A.   I'm not sure if it was Lee Edwards or

25  Tony Orue.

29

```
 1         Q.    Did that course also involve going

 2    through Taser supplied PowerPoints and then

 3    discharging the X2?

 4         A.    Correct.

 5         Q.    And were you graded in your

 6    certification on the X2?

 7         A.    Yes.

 8         Q.    Do you know if there's a separate set

 9    of records maintained by Tony Orue or Lee Edwards

10    reflecting the training that they've done for all

11    of you?

12         A.    I don't.

13         Q.    When you went to the road patrol in

14    November of 2012, was there a period when there

15    was a field training opportunity?

16         A.    Yes.

17         Q.    Did you have a field training officer

18    assigned to you?

19         A.    Yes.

20         Q.    Who was that?

21         A.    I had three.  Actually, I had four.

22         Q.    Okay.

23         A.    My primary was Corporal Viner, Rob

24    Viner.

25         Q.    How do you spell that?
```

```
 1        A.    V-i-n-e-r.

 2        Q.    Okay.

 3        A.    The second one was

 4   Corporal Ken Mullins, M-u-l-l-i-n-s.

 5        Q.    Okay.

 6        A.    I had Corporal Bryan Robben for a few

 7   days, R-o --

 8        Q.    Okay.

 9        A.    R-o-b-b-e-n, I believe.

10        Q.    All right.

11        A.    And then I had Deputy Steve Boster.

12        Q.    Foster?

13        A.    Boster, B.

14        Q.    Okay.

15        A.    B-o-s-t-e-r.

16              And then I went back to

17   Corporal Viner.

18        Q.    When did your field training

19   conclude?

20        A.    I believe it was February 2013.

21        Q.    And were there records kept of your

22   field training work?

23        A.    Yes.

24        Q.    And where are those records?

25        A.    Most likely with Tony Orue or the
```

1    training division.

2            MR. GERHARDSTEIN:  We don't have any of

3        that, do we?

4    BY MR. GERHARDSTEIN:

5        Q.   Prior to August 13, 2013, who in the

6    Hamilton County Sheriff's Office was responsible

7    for training on use of force generally?

8        A.   Probably somebody in the training

9    department, probably Lee Edwards or -- I don't

10   know.

11       Q.   Were there trainers other than Tony

12   Orue and Lee Edwards?

13       A.   I'm sure there are.

14       Q.   Is there a training -- is there a boss

15   in charge of training?

16       A.   There is now, but I'm not sure who it

17   is.

18       Q.   On August 13, 2013, were there any

19   deputies who were specifically assigned to

20   respond to mentally ill people?

21       A.   That I don't know.

22       Q.   You didn't know about them?

23       A.   Right.

24       Q.   Some probate courts have deputies

25   assigned to them to execute their orders and

1    warrants.

2         Does -- do you know whether the

3    sheriff's office has deputies assigned to the

4    probate court?

5         A.   I'm sure they do.

6         Q.   And do you know any of those

7    deputies?

8         A.   I do not.

9         Q.   Have you ever done any of that work?

10        A.   No.

11        Q.   So what specific training did you have

12   regarding handling mentally ill people prior to

13   August 13th, 2013?

14        A.   In the police academy.

15        Q.   Okay.  That's Butler Tech?

16        A.   Correct.

17        Q.   Anything else?

18        A.   Not that I recall.

19        Q.   Prior to August 13th, 2013, did you

20   ever pink-slip any citizen?

21        A.   Probably.

22        Q.   Tell me about that.

23        A.   I don't recall who.  I don't recall

24   who.

25        Q.   But you -- you had encounters with

1  mentally ill people --

2       A.    Yes.

3       Q.    -- prior to August 13, 2013, right?

4       A.    Yes.

5       Q.    Are there any encounters in particular

6  that you recall?

7       A.    No.

8       Q.    Are there any mentally ill people that

9  you took into custody that you can recollect

10  right now?

11      A.    No.

12      Q.    Did you have any situations prior to

13  August 13th, 2013 where you had to use force on

14  people who were experiencing mental health

15  episodes?

16      A.    No.

17      Q.    How about since August 13th, 2013?  Did

18  you have any situations where you had to use

19  force on persons experiencing mental health

20  episodes?

21      A.    No.

22           MS. SEARS:  I'm just going to object to

23           the term mental health episodes, as to what

24           that is.

25           But if you understand the question, you

34

```
 1         can answer it.  You clearly do, because you

 2         just answered it.

 3              So go ahead.

 4         A.   No.

 5    BY MR. GERHARDSTEIN:

 6         Q.   What about when you worked in

 7    corrections?  Did you encounter mentally ill

 8    inmates?

 9         A.   Yes.

10         Q.   Did you ever work the psych unit?

11         A.   Yes.

12         Q.   Tell me about that.  Was that a regular

13    assignment or did you rove or how did that --

14         A.   It was a regular assignment for me.

15              They pretty much -- it's pretty much

16    selective who goes down there.

17         Q.   And how long did you work that?

18         A.   It was -- worked there a while.  I

19    don't know the exact timeframe.

20              They have different buildings.  You're

21    assigned to a certain building.

22         Q.   And why did you -- did you volunteer to

23    work in the psych unit?

24         A.   Yeah.

25         Q.   And why did you volunteer to do that?
```

35

1        A.   Because I like helping those -- those

2   individuals.

3        Q.   So what was the selection process?

4        A.   It's just your -- how you talk to

5   inmates, how you deal with inmates, how you can

6   calm situations down.

7        Q.   Did you go through some exercises or

8   testing in order to get selected to work on the

9   psych unit?

10       A.   No.

11       Q.   Were there any special policies or

12   procedures that you were to follow when

13   interacting with mentally ill inmates?

14       A.   Not that I can think of off the top of

15   my head.

16       Q.   Are there any general principles that

17   you tried to follow when you were interacting

18   with a mentally ill inmate?

19       A.   No.

20       Q.   Were there any techniques that you

21   would try to utilize that you found to be

22   effective with mentally ill inmates?

23       A.   Just more patience with the mentally

24   ill.

25       Q.   Tell me about that.

1        A.    I mean, you have more patience with a

2   mentally ill person than you do with a -- a

3   normal inmate.

4        Q.    Why?

5        A.    Just because you know that they're not

6   100 percent there.

7        Q.    So how do you -- so contrast that for

8   me.

9             Let's say you're trying to get a

10  mentally ill inmate to cuff up versus a regular

11  inmate.  When you say you use more patience, tell

12  me what that -- how would that -- how would that

13  play out?

14       A.    I mean, you -- you ask a regular inmate

15  to cuff up and he tells you no a hundred times

16  and you know he's totally competent, versus a

17  mentally ill person who tells you no and you know

18  that they're not totally there.  They don't 100

19  percent get what you're trying to get them to do.

20       Q.    Okay.  So what techniques then do you

21  use with the mentally ill?

22       A.    You use more patience and try to

23  persuade them.

24       Q.    Do you find when you're working with a

25  mentally ill inmate that it's good to have lots

1    of people giving the mentally ill inmate

2    instructions or just one?

3         A.   It's better for one, just like any

4    other person.

5         Q.   And when you're working with a mentally

6    ill inmate, do you find that it's better to be

7    loud and commanding or have a softer tone --

8              MS. SEARS:  You mean all the time in

9         every circumstance?

10   BY MR. GERHARDSTEIN:

11        Q.   -- generally?

12        A.   Generally?  Soft.  You're going to talk

13   to a normal person soft.

14        Q.   In your experience working with

15   mentally ill inmates, did you ever have to use

16   force on them?

17        A.   Yes.

18        Q.   And when you did -- and I take it that

19   you would try to be patient and do all the type

20   of verbal things you've described before you use

21   force, right?

22        A.   Right.

23        Q.   And did you try to use verbal

24   deescalation when you were dealing with an inmate

25   who was mentally ill and experiencing

1    agitation?

2        A.    Yes.

3        Q.    And what is --

4              MS. SEARS:  Objection as to the term

5        deescalation.

6    BY MR. GERHARDSTEIN:

7        Q.    What is deescalation?

8        A.    When you try to bring someone who's way

9    up here (indicating) and try to bring them back

10   down.

11       Q.    And how do you do that?

12       A.    By talking to them --

13       Q.    And what kind of --

14       A.    -- persuading them, not yelling at

15   them.

16       Q.    Okay.  And when that doesn't work and

17   you have to the use force, is there any

18   principles you would follow before you use force,

19   any techniques or strategies?

20       A.    Well, if it's just me, I'd like to have

21   someone else there.

22       Q.    Okay.  And then you'd come up with a

23   plan, right?

24             MS. SEARS:  Objection.

25   BY MR. GERHARDSTEIN:

1     Q.   Is that right?

2     A.   If it -- if it allows -- if time

3  allows, yes.

4  BY MR. GERHARDSTEIN:

5     Q.   Okay.  Did you ever have any experience

6  in the jail when the inmate you were working with

7  was delusional?

8     A.   Sure there was.

9     Q.   And in that situation, if the

10  delusional inmate was having some sort of crisis,

11  would you ever involve the medical staff?

12     A.   Yes.

13     Q.   Tell me -- give me an example.

14     A.   Well, in the psych ward --

15     Q.   Yeah.

16     A.   -- at the Justice Center, they actually

17  had a medical unit attached to the psych ward.

18     Q.   Okay.  So what's an example of a

19  situation where you would involve the medical

20  staff in working with the psych -- psych patient

21  inmate?

22     A.   I -- I don't know off the top of my

23  head.  I mean, it's been a couple years since

24  I've been down there.

25     Q.   Did you ever have a situation where,

1    when you were working with that type of inmate,

2    you would have a plan where you would restrain

3    the inmate and the medical staff would sedate the

4    inmate?

5         A.   Yes.

6         Q.   Give me an example of that type of

7    situation.

8         A.   We put them in what we call the

9    restraint chair.

10        Q.   Okay.

11        A.   And then the medical staff would come

12   in and sedate the inmate.

13        Q.   And when you use that strategy, would

14   you have the medical staff standing by so that

15   they could administer the sedation promptly?

16             MS. SEARS:  Objection as to the form of

17        the question that he was directing the

18        medical staff as to what to do.

19             You can answer if you understand.

20        A.   The medical staff, usually, are the

21   ones that tell us that they need to be in the

22   chair so they can sedate the inmate.

23   BY MR. GERHARDSTEIN:

24        Q.   Okay.  But when you implemented a plan

25   like that, would the medical staff be present so

1   that they could do the sedation promptly after

2   the inmate was in the restraint chair?

3        A.   Not all the time.

4        Q.   So sometimes the inmate would just sit

5   in the restraint for a long time before the

6   medical staff would get to it?

7        A.   Not a long time, no.

8             Once you put somebody in the restraint

9   chair, you have to get medical and have them come

10  and check the restraints.

11       Q.   Okay.  And if he was going to be

12  sedated, they would do it then?

13       A.   Correct.

14       Q.   Okay.

15       A.   Or they might go back and get the

16  medications.

17       Q.   Did you know the diagnosis of any of

18  the inmates that you were working with in the

19  jail?

20       A.   No.

21       Q.   Did you know of anybody who had

22  schizoaffective disorder?

23       A.   I'm sure there were some in there.

24  They -- it's not my knowledge to know their

25  medical records, really.

42

1      Q.    Was there any staff member who worked

2  the psych ward regularly that you worked with at

3  the jail?

4      A.    Yes.

5      Q.    Tell me who -- what's their names?

6      A.    Well, one's sitting here right now,

7  Matthew Alexander; had Brad Buchanan.  But he is

8  now a lieutenant.

9      Q.    Still in corrections?

10      A.    Yes.   There was -- there was numerous

11  people there.  There were -- I think there were

12  five of us there at that time, four or five.

13      Q.    What about on the medical staff,

14  anybody that you recall that you worked with in

15  the psych unit?

16      A.    I don't recall.

17      Q.    Did NaphCare do the medical?

18      A.    That sounds familiar.

19      Q.    On August 13th, 2013, were you assigned

20  to any particular cruiser?

21      A.    Yes.

22      Q.    And were you alone in the cruiser, or

23  did you have a partner?

24      A.    I was alone.

25      Q.    Did the cruiser have a video camera?

1      A.   No.

2      Q.   Was there any audio -- was there any

3  capacity to capture the audio of your

4  interactions with citizens in the cruiser?

5      A.   No.

6      Q.   Did you have any kind of body camera?

7      A.   No.

8      Q.   Was there a mobile data terminal in the

9  cruiser?

10     A.   Yes.

11     Q.   And what kind of things would you use

12  the mobile data terminal for?

13     A.   That's how you get your details

14  dispatched to you, you can talk to one another,

15  you can talk to dispatch through it by writing

16  messages instead of going over the air.

17          That's how you run people's license

18  plates, driver's license, et cetera.

19     Q.   Did you have a radio?

20     A.   Yes.

21     Q.   Was the radio on your person?

22     A.   Yes.

23     Q.   When you talked to dispatch, was that a

24  recorded line?

25     A.   Yes.

44

1          Q.    And did all of your contact with

2     dispatch go through that recorded line?

3          A.    Yes.

4          Q.    Did you ever call dispatch on a cell

5     phone?

6          A.    No.

7          Q.    What about officer-to-officer when you

8     talked to another cruiser, was that on a recorded

9     line?

10         A.    It's on the MDCs, which are recorded.

11         Q.    The mobile data computer?

12         A.    Correct.

13         Q.    Now, that's the -- that would be what

14    you type in, right?

15         A.    Yes.

16         Q.    What if you wanted to just verbally

17    talk to another deputy?  Would that be on a

18    recorded radio line?

19         A.    You'd have to request a special

20    frequency that nobody's using through dispatch to

21    be able to do that.

22         Q.    So how do you normally just talk to

23    another deputy?  Is that --

24         A.    Send them a message.

25         Q.    Send them a message and then talk on a

1    cell phone then?

2          A.    If we need to.

3          Q.    And are those cell phones supplied by

4    the county?

5          A.    No.

6          Q.    So did you use your personal cell phone

7    as a Hamilton County sheriff deputy?

8          A.    Do I?  Yes.

9          Q.    And on August 13th, 2013, did you use

10   your cell phone during that shift?

11         A.    Probably.

12         Q.    Do you still have the same cell phone

13   number?

14         A.    I believe so.

15         Q.    Do you still have the same service

16   provider?

17         A.    I believe so.

18         Q.    Who's the service provider?

19         A.    AT&T.

20         Q.    And what's the cell phone number?

21         A.    513 --

22               MS. SEARS:  Can we go off the record on

23         that, please?

24               MR. GERHARDSTEIN:  Sure.  No problem.

25               (Off the record.)

```
 1              THE VIDEOGRAPHER:  Are we back on the

 2      record?

 3              MR. GERHARDSTEIN:  Yes.  Thank you.

 4      A.   I know my mom called me, because she

 5   heard it on the news, asked me if everything was

 6   all right.

 7   BY MR. GERHARDSTEIN:

 8      Q.   Did you talk to anybody else?

 9      A.   My wife.

10      Q.   Anybody else?

11      A.   Not that I recall.

12      Q.   Do you text?

13      A.   Yes.

14      Q.   And did you use the text feature with

15   respect to anyone regarding Mr. Roell?

16      A.   Not that I recall.

17      Q.   Are the texts preserved on your cell

18   phone?

19      A.   On my personal phone?

20      Q.   Yeah.

21      A.   Like do I save them?

22      Q.   Yeah.

23      A.   No.

24      Q.   You were in uniform --

25      A.   Yes.
```

47

1     Q.   -- on August 13, 2013?

2     A.   Yes.

3     Q.   And is your uni -- did your uniform

4   look anything like Mr. Dalid --

5          MR. GERHARDSTEIN:  How do you say your

6     name?

7          DEPUTY DALID:  Dalid.

8          MR. GERHARDSTEIN:  Dalid?

9  BY MR. GERHARDSTEIN:

10         -- Mr. Dalid's uniform?

11         MS. SEARS:  Deputy Dalid.  Deputy

12    Dalid.

13  BY MR. GERHARDSTEIN:

14     Q.   Deputy Dalid.

15         MS. SEARS:  Thank you.

16     A.   Yes.

17  BY MR. GERHARDSTEIN:

18     Q.   So you had gray pants and a black

19   shirt?

20     A.   Yes.

21     Q.   You had your firearm on your strong

22   side?

23     A.   Yes.

24     Q.   Are you right or left-handed?

25     A.   Right-handed.

1     Q.   And you had your Taser on your weak

2  side?

3     A.   Yes.

4     Q.   I'm sorry.  Which -- are you

5  right-handed did you --

6     A.   Yes.

7     Q.   Okay.  And is the X2 any larger than

8  the X26, or is it about the same size?

9     A.   It's about the same size.

10     Q.   And what other equipment did you have

11  on your duty belt?

12     A.   Had a CD21 -- which is our baton --

13  radio, and handcuffs.

14     Q.   Did you have any chemical weapons?

15     A.   I did not.

16     Q.   The radio is synced to the car?  Is

17  it -- is it the same radio frequency that you're

18  on when you leave the car as they are when you're

19  talking from the cruiser?

20     A.   It's the only one we -- we have.

21     Q.   Okay.  Oh, all right.  So there's

22  nothing built into the cruiser?

23     A.   Right.

24     Q.   Okay.  When a cartridge is deployed on

25  an X26, there are aphids that are sprinkled on

49

1   the ground at the site of the deployment,

2   right?

3       A.   Right.

4       Q.   Well, at the site where the operator is

5   standing, right?

6       A.   Right.

7       Q.   And is that same -- do those aphids

8   also deploy when an X2 cartridge is shot?

9       A.   I think so.

10      Q.   And just like in the X26, the X2

11  records all the trigger pulls and -- and the

12  electronic storage in the handle, right?

13      A.   Right.

14      Q.   And those can be downloaded through the

15  dataport, right?

16      A.   Right.

17      Q.   Have you ever gotten involved in

18  downloading the information from the X2?

19      A.   No.  Our supervisors do it.

20      Q.   And have you ever read the record that

21  is downloaded from the X2?

22      A.   I -- I've seen it, yes.

23      Q.   Did you carry a flashlight on

24  August 13th, 2013?

25      A.   I don't think so.

50

1    Q.  And did you use a flashlight at all on

2    the -- when you were interacting with respect to

3    Mr. Roell?

4    A.  I don't think so.

5    Q.  So on August 13th, 2013 in the early

6    morning hours, you encountered Mr. Gary Roell,

7    right?

8    A.  Correct.

9    Q.  And Mr. Roell appeared to be having a

10   mental health crisis when you encountered him,

11   right?

12   A.  It was undetermined at the time.

13   Q.  At any point before Mr. Roell lost

14   cardiac function, did you reach any kind of

15   conclusion that he was having a mental health

16   crisis?

17   A.  I did not.

18   Q.  Did you suspect that he was having a

19   mental health crisis?

20   A.  Yes.

21   Q.  And you suspected that promptly after

22   you initiated interaction with him, right?

23        MS. SEARS:  Objection as to the term

24        interaction.

25   A.  After we had him in -- after we had him

1    detained, yes.

2    BY MR. GERHARDSTEIN:

3        Q.   How about when you first encountered

4    him, did you suspect it?

5        A.   No.

6        Q.   You used force on Mr. Roell that

7    morning, right?

8        A.   Yes.

9        Q.   And he lost heart function while he was

10   at the scene, right?

11       A.   I guess.

12       Q.   And he died, right?

13       A.   I think he died in the squad, yes.

14       Q.   Were you criminally prosecuted for any

15   of your acts involving Mr. Roell?

16       A.   No.

17            MS. SEARS:  Objection.

18            You can answer.

19       A.   No.

20   BY MR. GERHARDSTEIN:

21       Q.   Were you disciplined by the Hamilton

22   County Sheriff's Department for the way you

23   handled the incident involving Mr. Roell?

24            MS. SEARS:  Objection.

25            You can answer.

```
 1        A.   No.

 2   BY MR. GERHARDSTEIN:

 3        Q.   Were you provided any retraining based

 4   on the way you handled the incident involving

 5   Mr. Roell?

 6             MS. SEARS:  Objection as to the term

 7        retraining.

 8             But you can answer if there was

 9        subsequent training that you received.

10        A.   There was training we received

11   afterwards, yes.

12   BY MR. GERHARDSTEIN:

13        Q.   And -- so tell me about that.

14        A.   We received excited delirium training

15   and numerous other trainings.

16        Q.   When you say, we received excited

17   delirium training, who are you referring to?

18        A.   The department.

19        Q.   And when you say, numerous other

20   trainings, what are referring?

21        A.   There was several other trainings

22   through PoliceOne and OHLEG that we have -- we

23   have done.

24        Q.   PoliceOne and --

25        A.   Policeone.com.
```

1      Q.    Those are online trainings?

2      A.    Yes.

3      Q.    Those involve handling mentally ill

4   people?

5      A.    Yes.

6      Q.    Do you know the name of that

7   training?

8      A.    I don't know off the top of my head.

9      Q.    Is there a written record of your

10   participation in that training?

11      A.    Yes.

12      Q.    When did you get that?

13          MS. SEARS:  When did he get what, the

14      written record or the training?

15          MR. GERHARDSTEIN:  The training.

16      A.    It was sometime after the incident.  I

17   don't recall when.

18   BY MR. GERHARDSTEIN:

19      Q.    And what was the OHLEG training?

20      A.    I'm not 100 percent sure.  I don't -- I

21   don't recall.

22      Q.    Was it online?

23      A.    Yes.

24      Q.    Was it graded?

25      A.    Yes.

54

```
 1        Q.   Are you aware of any policy changes at

 2   the Hamilton County Sheriff's Office based on the

 3   events regarding Mr. Roell?

 4        A.   No.

 5        Q.   On August 13, 2013, did you follow the

 6   Hamilton County Sheriff's Office use of force

 7   policy with respect to your interaction with

 8   Mr. Roell?

 9             MS. SEARS:  Objection.

10             You can answer if you can.

11        A.   I believe I did.

12   BY MR. GERHARDSTEIN:

13        Q.   On August 13th, 2013, did you follow

14   the Hamilton County Sheriff's Office electronic

15   control weapons policy with respect to your

16   interaction with Mr. Roell?

17             MS. SEARS:  Objection.

18             You can answer if you can.

19        A.   I believe I did.

20   BY MR. GERHARDSTEIN:

21        Q.   On August 13th, 2013, did you follow

22   the Hamilton County Sheriff's Office Taser

23   training or electronic stun device training with

24   respect to your use of force on Mr. Roell?

25        A.   I believe I did.
```

1       Q.   And on August 13th, 2013, did you

2  follow the Hamilton County Sheriff's Office

3  policy regarding encountering people with mental

4  illness --

5            MS. SEARS:  Objection.

6  BY MR. GERHARDSTEIN:

7       Q.   -- with respect to your interaction

8  with Mr. Roell?

9            MS. SEARS:  I apologize, Al.

10           Objection.

11           You can answer if you can.

12      A.   I believe so.

13  BY MR. GERHARDSTEIN:

14      Q.   On August 13, 2013, did you follow the

15  Hamilton County Sheriff's Office policy and

16  training with respect to excited delirium with

17  respect to your interaction with Mr. Roell?

18           MS. SEARS:  Objection as to policy.

19           You can answer if you can.

20      A.   I believe so.

21  BY MR. GERHARDSTEIN:

22      Q.   On August 13th, 2013, did you follow

23  the Hamilton County Sheriff's Office training and

24  policies with respect to restraints and cuffing

25  with -- with respect to your interaction with

56

1    Mr. Roell?

2              MS. SEARS:  Objection as to policy.

3              You can answer.

4        A.    I believe I did.

5    BY MR. GERHARDSTEIN:

6        Q.    Did you do anything wrong with respect

7    to your use of force on Mr. Roell?

8              MS. SEARS:  Objection as to the

9         characterization of wrong.

10             If you understand it, you can answer

11        it.

12       A.    I do not think I did anything wrong.

13   BY MR. GERHARDSTEIN:

14       Q.    On August 13th, 2013, what were you

15   doing when you first heard about the need to go

16   to the location where Mr. Roell was?

17       A.    I was assisting a Montgomery police

18   officer with a crash on Interstate Route 275 from

19   71 North, assisting with traffic.

20       Q.    So how far were you from the location

21   where Mr. Roell was?

22       A.    Two miles.

23       Q.    And what did you learn that caused you

24   to leave the scene of the crash that you were

25   assisting on?

1       A.    They had enough units on the scene,

2    Montgomery did.

3       Q.    Okay.

4       A.    They did not need us anymore.

5       Q.    So what did you hear over the radio

6    about what became the -- the Roell incident?

7       A.    I heard a Sycamore unit get dispatched

8    to a neighbor trouble run, a run off of Hetz

9    Drive.  It was a two -- two-man detail.

10            There was -- in Sycamore we have three

11    cars.  Two of them stay south and one stays

12    north.

13            And this was a northern detail.  He was

14    also assisting Montgomery with the crash.  So we

15    were both right there.

16      Q.    Who was the northern detail?

17      A.    It was Deputy Matt Alexander.

18      Q.    And were you one of the southern detail

19    people?

20      A.    I was not.  I was working Symmes

21    Township that night.

22      Q.    Is the county broken up into units or

23    beats or --

24      A.    Yes.

25      Q.    What do you call them?

58

1          A.    It's by township.

2          Q.    And do -- is there a code for the

3    various geographical work areas that you are

4    deployed to?

5          A.    Counties are 9 Sam -- or I mean,

6    9 units, start with 9.

7          Q.    Okay.

8          A.    Sycamore is Sam.  Symmes is a Paul

9    unit.  And you've got traffic, which are Tom

10   unit, Anderson and a Nor unit --

11         Q.    So even though you're assigned to

12   Symmes Township, you're still a Hamilton County

13   deputy?

14         A.    Correct.

15         Q.    And the Paul unit is simply something

16   to assist with radio identification?

17         A.    Correct.

18         Q.    All right.  So you're there.

19               You hear what over dispatch?

20         A.    I hear 9 Sam 32, which is the north

21   Sycamore car, and 9 Sam 33, which is the southern

22   Sycamore car, get dispatched to a neighbor

23   trouble run.

24               Instead of having Sam 33 drive seven

25   miles north to assist, I was right there, so I

59

1    responded with Sam 32 and just told the southern

2    Sycamore guy to say south.

3         Q.   And what did you learn about this

4    neighbor trouble run over the radio?

5         A.   I don't recall 100 percent exactly what

6    it was.

7              They're on a different frequency than

8    the Symmes Township units are.

9         Q.   Who's on a different frequency?

10        A.   Sycamore is on a different frequency

11   than Symmes Township.

12        Q.   And this is -- and when you say

13   frequency, you're talking about --

14        A.   Radio.

15        Q.   -- the Hamilton County dispatch?

16        A.   Yes, radio channels.

17        Q.   So did you actually hear the dispatch

18   to the neighbor trouble run?

19        A.   I believe I did through Sam 32's radio,

20   who was standing next to me on the highway.

21        Q.   And you heard the term neighbor

22   trouble.  But did you hear any details at all

23   about whether -- about the nature of the -- of

24   the problem?

25        A.   I don't think so.

60

1         Q.   Did you hear any relay of the facts

2    that the neighbor was acting crazy or any term

3    like that?

4         A.   No.

5         Q.   Is there anything that you learned

6    about this neighbor trouble run that you haven't

7    told me?

8         A.   Not that I recall.

9         Q.   Okay.  So you call off the south

10   Sycamore unit and travel to the Barrington Court

11   address, right?

12        A.   Correct.

13        Q.   How long did it take you to get

14   there?

15        A.   Two or three minutes.

16        Q.   And Deputy Alexander was traveling

17   there at the same time?

18        A.   Correct.

19        Q.   Were you following each other?

20        A.   I was following him, yes.

21        Q.   What happened when you arrived at the

22   scene?

23        A.   We arrived.  We were searching for the

24   address.  Deputy Alexander went one way looking

25   for the address.  I went the other way trying to

1  find the address.

2          And the complainant came out, was

3  yelling at her door.  So Deputy Alexander saw her

4  first before I got there.  And he started taking

5  off around the back of the house.

6      Q.   Did you see the complainant?

7      A.   Yes, I did.

8      Q.   And what did she look like?

9      A.   She was a female.  I don't know what

10 she was wearing.  I mean, I think she was

11 Asian.

12     Q.   And what did she say to you and what

13 did you say to her?

14     A.   I said, where is he, what is he

15 wearing?

16          She said, he's in the back breaking

17 things.

18     Q.   Did you have any other conversation

19 with her?

20     A.   I did not.

21     Q.   Did you make any observations of the

22 scene, either of her unit or the next door

23 unit?

24     A.   I did not.

25     Q.   Did you see anything out of the

1    ordinary as you drove up and had that brief

2    conversation with the complainant?

3         A.   I did not.

4         Q.   And she instructed that -- that the

5    individual was in the back, right?

6         A.   Yes.

7         Q.   When you traveled to the back, were you

8    on foot?

9         A.   Yes.

10        Q.   And in the back there was a privacy

11   fence, right?

12        A.   Yes.

13        Q.   You could see over it at your height?

14        A.   No.

15        Q.   What about at the gate?  Could you see

16   over that?

17        A.   No.

18        Q.   So when you traveled and walked back to

19   the -- to the area where the privacy fence was,

20   prior to encountering that privacy fence, did you

21   ever see any debris or things scattered around

22   where you parked your cruiser or where the other

23   cars were parked?

24        A.   No.

25        Q.   All right.  Did you get any kind of

63

1   history at all from this woman as to what was

2   happening with the individual?

3        A.   No.

4        Q.   So all you learned was that he was

5   breaking things?

6        A.   Yes.

7        Q.   Did you get any prior runs involving

8   that individual?  Did you get -- did you learn

9   anything about whether the sheriff's office had

10  responded to that household before?

11       A.   I have no idea.  I didn't get any,

12  no.

13       Q.   Would that have been something that

14  would be helpful had it been available to you?

15            MS. SEARS:  Objection as to helpful.

16            If you understand, you can answer.

17       A.   Depends what -- what they would tell

18  dispatch for dispatch to have logged in their --

19  in their system.

20  BY MR. GERHARDSTEIN:

21       Q.   So if you had -- are there any like

22  frequent flyers that -- addresses you respond to

23  on a regular basis?

24       A.   All the time, yes.

25       Q.   All right.  So it's helpful to know if

 1    this is a person that has lots of encounters with

 2    the sheriff's department, right?

 3         A.    Right.

 4         Q.    Because there's a -- a pattern and some

 5    tips that prior encounters can help you develop,

 6    right?

 7         A.    Correct.

 8         Q.    So if an address has had prior

 9    encounters with sheriff deputies, as a responding

10    officer, you would like to know that, right?

11              MS. SEARS:  Objection as to what he

12         would like to know.  I'm sure he would like

13         to know everything.

14              MR. GERHARDSTEIN:  You know what,

15         objection is fine.  But all this talk you

16         can try to restrain.

17              MS. SEARS:  I'll try to make --

18              MR. GERHARDSTEIN:  Okay.

19              MS. SEARS:  I'll try to

20         restrain myself.

21              MR. GERHARDSTEIN:  Thanks.

22              MS. SEARS:  But I'll make the record --

23    BY MR. GERHARDSTEIN:

24         Q.   Go ahead.

25              MS. SEARS:  -- I need to make to defend

1        the client.

2              MR. GERHARDSTEIN:  Yeah.  Well, you

3        don't need to do talking objections

4        educating him about what you think of my

5        question.

6    BY MR. GERHARDSTEIN:

7        Q.   You can answer.

8              MS. SEARS:  I understand.  I'll make

9        the record I think I need to make so that

10       the record's clear.

11       A.   Could you repeat the question?

12             MR. GERHARDSTEIN:  Read it back.

13             (The record was read.)

14       A.   It would be helpful, but they don't

15   always tell you what you're going there for.

16   BY MR. GERHARDSTEIN:

17       Q.   So what happened when you got to the

18   privacy fence?

19       A.   We, being myself and Deputy Alexander,

20   opened up the back gate and asked Mr. Roell what

21   he was doing.

22       Q.   So the back gate was closed?

23       A.   Yes.

24       Q.   And what did you have to do to open

25   it?

1       A.    There was a latch; push the latch and

2   open the door.

3       Q.    And it opened out?

4       A.    I believe so.  It opened outward.

5       Q.    And was it on any kind of spring so

6   that if you didn't hold it open, it would shut

7   again?  Or was it --

8       A.    I don't know.  I don't believe so.

9       Q.    And when you opened the gate, what did

10  you observe?

11      A.    I observed Mr. Roell standing there

12  with a hose in one hand, a garden basket in the

13  other, facing the inside of the neighbor's

14  house.

15      Q.    How far from the neighbor's house was

16  he?

17      A.    He was right at their -- their

18  window.

19      Q.    And what was he wearing?

20      A.    He was wearing a T-shirt.

21      Q.    What else?

22      A.    That's it.

23      Q.    So he was nude from the waist down?

24      A.    Correct.

25      Q.    Was he saying anything?

1          A.    I don't recall.

2          Q.    So you asked him what he was doing?

3          A.    Yes.

4          Q.    And what happened -- what did he say in

5     response?

6          A.    I don't recall what he said.

7                He turned around and started coming

8     toward myself and Deputy Alexander in an

9     aggressive manner.

10         Q.    Did he still have the hose in his

11     hand?

12         A.    He did.

13         Q.    Did he still have the garden basket?

14         A.    A hanging basket, yes.

15         Q.    And this hanging basket was one of

16     those that has peat moss in it and plants with a

17     piece of wire around it --

18         A.    Yeah, it was.

19         Q.    -- is that correct?

20         A.    Yes.

21         Q.    How far from you was he?

22         A.    At the time?

23         Q.    Right, when you first encountered him.

24         A.    Probably the length of this room.

25         Q.    So 15 feet?

1       A.   Roughly.

2       Q.   Did he say anything at all when he

3   turned around and observed you?

4       A.   I don't recall him saying anything.

5       Q.   Were there any lights on?

6       A.   Yes.

7       Q.   So you had a -- the opportunity to see

8   him?

9       A.   Yes.

10       Q.   And did you -- as he was coming towards

11   you, did you say anything else to him?

12       A.   I told him to drop what he had in his

13   hands and get on the ground.

14       Q.   And when you made -- gave him that

15   instruction, he was still in the patio area?

16       A.   Yes.

17       Q.   And was that patio area a concrete

18   surface --

19       A.   Yeah.

20       Q.   -- or a rock surface?

21       A.   Concrete.

22       Q.   When you told him to drop what he had

23   in his hand and get on the ground, at that point

24   did he say anything?

25       A.   Not that I recall.

1       Q.   So he was silent?

2       A.   I don't remember.

3       Q.   Okay.  So he may have spoken, you just

4  don't remember?

5       A.   Right.

6       Q.   As you observed him and gave him

7  commands, did you have an opportunity to look

8  around the patio at all?

9       A.   No.

10      Q.   Did you see that there was a broken

11  window?

12      A.   No.

13      Q.   Did you see that there were items

14  tipped over on the patio?

15      A.   No.

16      Q.   When you observed him holding a hose in

17  one hand and a basket in the other and nude from

18  the waist down, did you formulate any idea that

19  maybe he was having a mental health crisis?

20      A.   No.

21      Q.   So he came toward you and you gave him

22  a command.

23           What happened next?

24      A.   He refused and kept walking towards us

25  in an aggressive manner.

70

 1      Q.   So when you say he refused, did he say,

 2   I'm not going to do this, or are you just saying

 3   he didn't drop the things?

 4      A.   He didn't comply.

 5      Q.   Okay.  All right.  But he didn't say, I

 6   refuse, right?

 7      A.   Right.  And I don't remember what he

 8   said.

 9      Q.   Did you have any sense as to whether he

10   actually understood what you were saying?

11      A.   I don't -- no.

12      Q.   Were his eyes open?

13      A.   Yes.

14      Q.   At any point before you laid hands on

15   him, did he say anything?

16      A.   I don't remember.

17      Q.   He was in an enclosed area, right?

18      A.   Yes.

19      Q.   There was a -- there were three fence

20   walls and a house, right?

21      A.   Yes.

22      Q.   At the time you gave him the command to

23   the drop the fen -- the basket and the hose,

24   Deputy Alexander was with you?

25      A.   Yes.

1       Q.   Were there any other officers with

2   you?

3       A.   Not at the time, no.

4       Q.   To your knowledge, were there any other

5   officers on their way?

6       A.   Yes.

7       Q.   Who was on their way?

8       A.   Deputy Willy Dalid.

9       Q.   Did you observe any weapon on

10  Mr. Roell?

11          MS. SEARS:  Objection to the term

12      weapon.

13      A.   He could have used the hanging basket

14  as a weapon, yes.

15  BY MR. GERHARDSTEIN:

16      Q.   Is that the only potential weapon you

17  observed?

18      A.   That he had in his hand, yes.

19      Q.   And you didn't see any weapon on his

20  person, right?

21      A.   Right.

22      Q.   And he was nude from the waist down, so

23  he didn't have a place to put it, right?

24      A.   Right.

25      Q.   At any point prior to your putting your

1    hands on him, did he start yelling?

2        A.    I believe so.

3        Q.    And did the words he was yelling make

4    any sense?

5        A.    Not that I remember.

6        Q.    Did you, as you heard those words,

7    determine that he was acting bizarrely?

8        A.    I believe so.

9        Q.    And did you make that determination

10   before you put hands on him?

11       A.    I think so.

12       Q.    What did you say to Officer --

13   Deputy Alexander and what did he say to you

14   before you put any hands on Mr. Roell?

15       A.    I don't think we said anything.

16       Q.    So at the time you thought -- or at the

17   time you realized that Mr. Roell was acting

18   bizarrely and you observed him nude from the

19   waist down, holding a hose and this hanging

20   basket, at that point, did you formulate any

21   suspicion that he was having a mental health

22   crisis?

23       A.    I didn't really have time to formulate

24   any kind of plan or suspicion.

25       Q.    So the answer to my question is no?

1      A.   No.

2      Q.   Did you ask him to come through the

3  gate?

4      A.   No.

5      Q.   Did you ask him to present his hands to

6  you?

7      A.   Yeah.

8      Q.   So by asking him to present his hands

9  to you, you expected him to approach you,

10  right?

11      A.   No.

12      Q.   Well, you were going to put him in

13  cuffs, right?

14      A.   Potentially.

15      Q.   Okay.  Did you enter the patio after

16  telling him to put those items down and show the

17  hands and get on the ground?

18      A.   No.

19      Q.   You stayed at the gate?

20      A.   Yes.

21      Q.   Then what happened?

22      A.   He kept approaching us.

23      Q.   Okay.  Then what happened?

24      A.   And I had my Taser out, I pointed it at

25  him and said, stop, get on the ground or you're

74

1    going to get tased.

2        Q.    Okay.  So when you pointed the Taser at

3    Mr. Roell.  Did that deploy one or two laser

4    dots?

5        A.    Two.

6        Q.    Because it's an X2?

7        A.    Right.

8        Q.    And those dots would be the location

9    where the top prong would go, depending on which

10   cartridge you deployed, right?

11       A.    Where the top and the bottom were

12   supposed to go, yes.

13       Q.    And when you deploy those dots on him,

14   did he react in any way?

15       A.    No.

16       Q.    When you warned him to comply or that

17   he would be tased, did he respond in any way?

18       A.    No; just kept approaching us.

19       Q.    When did you take the Taser out?

20       A.    I believe I had it out the entire

21   time.

22       Q.    Going back to when you left your

23   cruiser, do you know where you parked the

24   cruiser?

25       A.    Yeah.

1        Q.    Where was it?

2        A.    It was on -- there's a corner house

3   over here.  I parked facing -- my headlights were

4   facing their -- their front porch, the front of

5   their house.

6        Q.    All right.  And where did Alexander

7   park his cruiser?

8        A.    He parked sideways where his driver's

9   door would be facing their front house.

10       Q.    And -- I'm sorry -- did you say when

11  you took your Taser out?

12       A.    I believe I had it out as I was running

13  around the side of the house.

14       Q.    And the straps that held the peat moss

15  in that basket, those are plastic straps, right,

16  not wire?

17       A.    I think so.

18       Q.    Okay.  You've ordered Mr. Roell to get

19  on the ground or be tased, right?

20             And then what happened?

21       A.    Then he kept approaching us.

22             I arced it.  There's an arc switch on

23  the new ones where it doesn't deploy anything, it

24  just makes a sound.  And you can also use that

25  for a drive stun mode.

76

1           I arced it, and he flinched.  And he --

2      Q.   How far was he from you at the point

3  when you arced it?

4      A.   Five feet.

5      Q.   Okay.  And then what happened?

6      A.   He continued at -- he flinched, then he

7  continued towards me.  So I arced it again, and

8  he flinched again.

9           And then I decided to put it away.

10     Q.   And when you say he flinched, what did

11 he do?

12     A.   He had the hanging basket in one hand,

13 the hose in the other hand, coming at us.

14          When I arced it, he flinched, he

15 stopped, kind of like froze for a second, and

16 then continued.

17     Q.   And earlier you said that he came -- he

18 approached you in an aggressive manner.  What do

19 you mean by that?

20     A.   His demeanor on his face.  He was

21 angry.  His hands were all balled up holding what

22 he's got and approaching us very quickly.

23     Q.   And what about the demeanor on his

24 face?

25     A.   He just looked very agitated, very

1   angry.

2        Q.   And his hands were holding those items,

3   right?

4        A.   Right.

5        Q.   Okay.  And those items were held out in

6   front of him?

7        A.   To his sides, out in front to the

8   sides, yeah.

9        Q.   And he was approaching you quickly?

10       A.   Yeah.

11       Q.   He flinched when you arced the Taser.

12            And then what happened?

13       A.   Arced it again.  He flinched.  I put

14   the Taser away.

15       Q.   And as of that point, were you giving

16   commands to him?

17       A.   The entire time, yes.

18       Q.   And what were you saying the entire

19   time?

20       A.   Telling him to get on the ground.

21       Q.   And as of that point, was Deputy

22   Alexander giving commands?

23       A.   I'm not sure.

24       Q.   And describe how you gave commands.

25   Give me an example of how -- just give the

```
 1   command.

 2        A.   I said, stop --

 3        Q.   The way you did.

 4        A.   -- and get on the ground.  I mean --

 5        Q.   Is that -- did you say --

 6        A.   -- probably louder than that.

 7        Q.   Go ahead.  How loud do you think you

 8   said it?

 9        A.   When someone is approaching you, you

10   say, stop, get on the ground.

11        Q.   All right.  So you were using your

12   command presence, right?

13        A.   Right.

14        Q.   And you're using a higher volume than

15   you've just used --

16        A.   Right.

17        Q.   -- because you're trying to get his

18   attention, right?

19        A.   Exactly.

20        Q.   And he was not responding?

21        A.   Right.

22        Q.   And at least as he approached, you

23   began to formulate the idea that he was having a

24   mental health episode, right?

25             MS. SEARS:  Objection.
```

79

```
1    BY MR. GERHARDSTEIN:

2         Q.   Is that right?

3         A.   I was still unsure at the time, really.

4         Q.   All right.  But it was -- it was in

5    your mind at that point at least --

6              MS. SEARS:  Objection.

7    BY MR. GERHARDSTEIN:

8         Q.   -- right?

9         A.   That something wasn't right.

10        Q.   Okay.  Then what happened?

11        A.   I put the Taser away.  He continued at

12   me.  I reached out and grabbed his arm.

13        Q.   Okay.

14        A.   I was trying to get him to go to the

15   ground as he swung the hanging basket around and

16   tried to hit me with it; tried to get him on the

17   ground.  I don't know if he went down or not.

18   But he slipped off.

19             Next thing I know, he gets up, and he's

20   right near the -- the gate again.  And I pull my

21   Taser out and I tase him.

22             And then he flinched.  He buckles over

23   a little bit, like it's taking somewhat effect.

24   He shuts the gate as the Taser is still going its

25   five cycles.
```

     1          Q.    Uh-huh.

     2          A.    Myself and Deputy Alexander are

     3     fiddling to get the door open.  We finally get it

     4     open.

     5          Q.    Okay.  So when you grabbed his arm, did

     6     you experience -- did you sense that he was

     7     wet?

     8          A.    He was either wet or sweaty, yes.

     9          Q.    All right.  And was he hot?

    10          A.    I don't -- I don't remember.

    11          Q.    But -- but he was either wet or sweaty

    12     and there was a lot of -- he was slippery?

    13          A.    Yes.

    14          Q.    And did that interfere with your

    15     ability to hold onto him?

    16          A.    It did.

    17          Q.    And, in fact, he was able to slip out

    18     of your hand?

    19          A.    Yes.

    20          Q.    What side of him were you on, and what

    21     side of him was Deputy Alexander on?

    22          A.    I was on his left side; grabbed his

    23     left arm.

    24          Q.    So when you say that, you're facing

    25     him.

1            So let's go from your perspective.  Are

2    you on his -- his left, closer to the area that

3    you walked -- walked there from the car, or on

4    his right, closer to the area toward the condo

5    units?

6         A.   I'm on his right.

7         Q.   Okay.  His left, your -- as you look at

8    it, your right?

9         A.   Yes.

10        Q.   Okay.  And do you know what Deputy

11   Alexander did when you grabbed Mr. Roell's arm?

12        A.   I do not recall what he did.

13        Q.   Did you say anything to Deputy

14   Alexander about the plan or whatever you were

15   going to do?

16        A.   No.

17        Q.   And at the point you grabbed his arm,

18   was he outside the gate or inside the gate?

19        A.   Outside the gate.

20        Q.   Did he go down on the ground at that

21   point?

22        A.   Yes.

23        Q.   And when he went down on the ground,

24   what happened?

25        A.   He somehow got back up.

1     Q.   And at that point, was Deputy Dalid

2  there?

3     A.   I don't think he was there yet.

4     Q.   And did Mr. Roell get back up on his

5  feet?

6     A.   Yes.

7     Q.   Did -- at any point prior to grabbing

8  his arm, did Mr. Roell say, I'm not armed?

9     A.   No.

10     Q.   At any point prior to Mr. Roell going

11  back through the gate, did Mr. Roell display any

12  weapon, other than this peat moss basket and the

13  hose?

14     A.   Not that I saw.

15     Q.   When he got back up on his feet, you

16  unholstered the Taser again, right?

17     A.   Yes.

18     Q.   And where did those prongs hit him?

19     A.   I'm not sure.

20     Q.   Was it on his front or on his back?

21     A.   I don't recall.

22     Q.   The diagram that was filled out

23  pursuant to the Taser policy shows a deployment

24  to the chest.

25        Do you disagree with that?

 1        A.    I saw that.  I don't know where that

 2    came from.  I don't remember talking to

 3    Lieutenant Gramke about that.

 4        Q.    Have you ever asked him why he says

 5    there was a front shot?

 6        A.    I just saw those the other day, so, no,

 7    I haven't.

 8        Q.    Do you know if Deputy Alexander talked

 9    to him?

10        A.    I don't know.

11        Q.    Do you -- did you ever fill out any

12    kind of diagram showing where the prongs hit?

13        A.    No.

14        Q.    At the time of -- shortly after the

15    incident, when you were -- when your video

16    interview was done, did you draw any diagrams or

17    write any reports regarding your use of force on

18    Mr. Roell?

19        A.    No.

20        Q.    So the only record of your statement of

21    events is the video interview that was done; is

22    that correct?

23        A.    Yes.

24        Q.    When the Taser deployment, that first

25    Taser deployment, occurred, was he facing you?

```
 1        A.   I believe so.

 2        Q.   And what was his reaction to the --

 3   being struck by the Taser?

 4        A.   It looked like it took somewhat of an

 5   effect.

 6        Q.   And what does that mean?

 7        A.   It means it didn't take full effect.

 8        Q.   Okay.  But what did he do?

 9        A.   He hunched over like it hit him, but it

10   wasn't taking effect.

11        Q.   So -- and you were watching him?

12        A.   Yes.

13        Q.   And he was facing you?

14        A.   Yes.

15        Q.   How far away from you was he?

16        A.   Four feet, five feet.

17        Q.   So if he hunched over and was facing

18   you, that -- that's while you were -- that's

19   while he was under power, right?

20             MS. SEARS:  Objection as to under

21        power.

22   BY MR. GERHARDSTEIN:

23        Q.   That's while you were pulling the

24   trigger, right?

25        A.   Right.
```

1     Q.   So that makes it more likely that he

2  was shot at least on the front side, right?

3     A.   Not necessarily.

4     Q.   Did there come a time when he twirled

5  around in front of you?

6     A.   He -- he could have turned.

7     Q.   Right.

8     A.   He was all over the place.

9     Q.   You don't know?

10     A.   I don't know.

11     Q.   And did he back up through the gate or

12  turn around and walk frontways through the

13  gate?

14     A.   I backed up through the gate.

15     Q.   And you were still pulling the trigger,

16  right?

17     A.   I pulled the trigger one time, and it

18  shot the barbs.  It does a five-second cycle.

19     Q.   Okay.  And during that five-second

20  cycle, he backed up through the gate and closed

21  it, right?

22     A.   Yes.

23     Q.   Did the wires break when he closed the

24  gate?

25     A.   I don't know.

1          Q.   So, as of that point, when you had

2     experienced all of that with him, had you heard

3     him say anything?

4          A.   No.

5          Q.   Was he yelling?

6          A.   I think he was yelling.

7          Q.   Was he saying anything about water?

8          A.   At that point, I don't recall.  I

9     remember later.

10          Q.   And was he -- at any point up to the

11     moment when he backed up through the gate, did

12     what he was saying make any sense?

13          A.   Not that I can recall.

14          Q.   So at the time, did you conclude that

15     he was saying jibberish?

16          A.   You could say that.

17          Q.   Well, I'm asking you.

18          A.   I mean, you could say it was jibberish.

19     It was --

20          Q.   That's what it sounded like?

21          A.   It was -- you couldn't understand what

22     he was saying.

23          Q.   Okay.  So he was incoherent?

24          A.   Right.

25          Q.   Once he backed up through the gate and

1   had that reaction to the Taser, did you develop

2   any determination that he was having a serious

3   mental health episode?

4       A.   No.

5       Q.   That was very bizarre, right --

6       A.   What?

7       Q.   -- that he would be able to resist the

8   Taser like that?

9       A.   No.

10          MS. SEARS:  Oh, I'm sorry.

11  BY MR. GERHARDSTEIN:

12      Q.   And it was bizarre that he was nude

13  from the waist down, right?

14      A.   That's bizarre, yes.

15      Q.   And it was bizarre that he was talking

16  jibberish, right?

17      A.   Not necessarily.

18      Q.   Well, when you give a command to

19  somebody and you threaten them with tasing and

20  they talk jibberish back to you, that means that

21  he's having some sort of mental problem, right?

22      A.   No.  I've dealt with drunks before.

23      Q.   Well, drunks are inco -- have a mental

24  incapacity, right?

25      A.   Well --

```
1         Q.    Is that right?

2         A.    I guess you'd say so, yeah.

3         Q.    Okay.  And they sometimes don't have

4    all their faculties about them when you're

5    interacting, right?

6         A.    Right.

7         Q.    Did you have any sense that he was

8    exhibiting more strength than you expected?

9         A.    Yes.

10        Q.    What caused you to have that sense?

11        A.    When, eventually, all three of us had

12   our hands on and he was still able to flop around

13   and managed to get back up.

14        Q.    And even when two of you had your hands

15   on him, he was able to slip away, right?

16        A.    Correct.

17        Q.    And then he was able to endure the

18   Taser strike, right?

19        A.    Yes.

20        Q.    So when you saw that he was incoherent

21   and nude from the waist down and exhibiting

22   extraordinary strength, combative and sweaty, did

23   you recognize these as the signs of excited

24   delirium?

25        A.    No.
```

89

```
 1        Q.   But as of August 13, 2013, you were

 2   familiar with excited delirium, right?

 3        A.   I've heard the term, yes.

 4        Q.   And you've been trained in excited

 5   delirium, right?

 6        A.   Not that I recall.

 7        Q.   It was covered in your OPOTA class,

 8   right?

 9        A.   Correct.

10        Q.   Was it?

11        A.   I guess it was.

12             MS. SEARS:  Are you just agreeing with

13        Mr. Gerhardstein, or do you remember?

14        A.   I don't remember.

15   BY MR. GERHARDSTEIN:

16        Q.   And it was covered in in-service

17   materials at the Hamilton County Sheriff's

18   office, right?

19        A.   I don't remember.

20        Q.   And you talked about excited delirium

21   in the -- during the field training exercises,

22   right?

23        A.   No.

24        Q.   You talked about excited delirium in

25   your Taser training, right?
```

 1          A.   Yes.

 2          Q.   And, in fact, Taser specifically warns

 3    that there should be very quick uses of force

 4    followed by medical intervention in cases of

 5    excited delirium, right?

 6          A.   I don't remember.

 7               THE REPORTER:  Start with 1?

 8               MR. GERHARDSTEIN:  Yeah.

 9               And we'll do a single set of exhibits

10          for all the --

11               MS. SEARS:  Oh -- no, no.  That's more

12          than fine.  Thank you.

13               So when you said single -- I'm sorry.

14               MR. GERHARDSTEIN:  Well, we'll go --

15               MS. SEARS:  You just want to keep

16          going --

17               MR. GERHARDSTEIN:  Yes.

18               MS. SEARS:  -- or do you want to --

19               MR. GERHARDSTEIN:  Yes, through each

20          witness, you know, one in the same exhibits.

21               MS. SEARS:  Yeah.  Okay.  That's good.

22               I meant to tell you --

23               (Deposition Exhibit 1 was marked for

24               identification.)

25    BY MR. GERHARDSTEIN:

1          Q.    I'm going to show you what's been

2    marked as Exhibit 1.  This is a Taser training

3    bulletin dated 10/12/09.

4              Have you ever seen this?

5          A.    Not that I remember.

6          Q.    On the second page, there is a

7    description of the preferred target area,

8    right?

9          A.    Right.

10          Q.    And you've -- you're familiar with the

11    preferred target area, right?

12          A.    Right.

13          Q.    And then below it is a statement

14    about -- number 2 says, When dealing with

15    exhausted individuals or persons exhibiting

16    symptoms of distress or agitated, slash, excited

17    delirium.

18              Did I read that correctly?

19          A.    Yes.

20          Q.    And it goes on to say, It's important

21    to minimize the duration of physical struggle.

22              Did I read that correctly?

23          A.    Yeah.

24          Q.    And so the last two lines say,

25    Accordingly, officers engaging subjects in a

1   physical struggle or in an exhaustive state

2   should develop a plan to capture and restrain the

3   subject as expeditiously as possible to minimize

4   the duration of the struggle and the adverse

5   physiological effects.

6           Did I read that correctly?

7   A.   Yes.

8   Q.   And it goes on under B to say, These

9   subjects are at significant risk of

10  arrest-related death.  Immediate medical

11  attention may reduce this risk.

12          And they're referring to agitated,

13  slash, excited delirium subjects, right?

14  A.   Right.

15  Q.   So that warning was delivered to you

16  when you took your X26 class in 2010, right?

17  A.   I don't remember.  But I -- I believe

18  so.

19  Q.   And when you took your X26 class in

20  2010, you also discussed the signs and symptoms

21  of excited delirium, right?

22  A.   Not that I remember.

23  Q.   As you sit here today, you would agree

24  that, as of the time Mr. Roell backed onto the

25  patio and closed the gate, he had exhibited to

93

1   you the signs and symptoms of excited delirium,

2   right?

3        A.   No.

4        Q.   Well, let me be clear.

5             You now have taken even more course

6   work on excited delirium, right?

7        A.   Right.

8        Q.   So let's use all the knowledge you

9   have, even up through today.

10             And, now, let's go back and think about

11   the fact that Mr. Roell had exhibited that he was

12   incoherent, he was nude from the waist down, he

13   had extraordinary strength, he was combative, he

14   was wet or sweaty, and had backed away into the

15   gate.

16             As of that point, when you had had that

17   experience with him, and he was talking

18   gibberish, would you agree that he had the signs

19   and symptoms of excited delirium?

20        A.   I would agree that he had a -- a mental

21   illness, not specifically excited delirium, I

22   guess.

23        Q.   Okay.  So why do you -- what is it

24   about the excited delirium that makes you

25   hesitate to think that he had that?

 1     A.    Because you're just putting a term

 2  on a -- just because he backed up into the gate

 3  and was nude from the waist down, you're just

 4  putting a term that it was excited delirium, that

 5  he had to have had excited delirium.

 6     Q.    No.

 7     A.    Just putting a term -- just because he

 8  did that, that that's what he must have had at

 9  the time when he was coming at me.

10     Q.    Okay.

11     A.    He must have had excited delirium

12  because he was approaching me nude from the waist

13  down.

14     Q.    No.  I'm trying to help you remember

15  all the symptoms.

16          (Deposition Exhibit 2 was marked for

17          identification.)

18  BY MR. GERHARDSTEIN:

19     Q.    I'm going to show you what's been

20  marked as Exhibit 2.

21          You've seen this before, right?

22     A.    Yes.

23     Q.    And who's Sergeant Tony Orue?

24     A.    He's a -- he's a lieutenant now.  But

25  he does training -- or I don't know if he does

 1   training anymore.

 2       Q.   So let's go to Bates number --

 3   page 4489.  And this is your Hamilton County

 4   in-service training on excited delirium, right?

 5       A.   Right.

 6       Q.   And at page 4489, it tells you what to

 7   look for, right?

 8       A.   Right.

 9       Q.   And this is dated April 26th, 2012,

10   right --

11       A.   Right.

12       Q.   -- the training?

13           And the things to look for include

14   aggressiveness, combativeness; and Mr. Roell had

15   those, right?

16       A.   Right.

17       Q.   Hyperactivity; he was moving quickly

18   towards you, right?

19       A.   Right.

20           MS. SEARS:  Objection as to your --

21   BY MR. GERHARDSTEIN:

22       Q.   Extreme paranoia; did you think he was

23   understanding you?

24           MS. SEARS:  Objection as to that

25       question.

 1    BY MR. GERHARDSTEIN:

 2         Q.    Did you think he was understanding you?

 3         A.    Not 100 percent.

 4         Q.    Unexpected strength; did he have

 5    that?

 6         A.    Yeah.

 7         Q.    Incoherent shouting; did he have that?

 8         A.    Yeah.

 9         Q.    Shedding of clothes; did he have that?

10         A.    Yeah.

11         Q.    So he certainly had a number of signs

12    of excited delirium, right?

13         A.    Right.

14         Q.    And as of the time he went back through

15    the gate, did you talk with your fellow officer,

16    Deputy Alexander, about developing any kind of

17    plan to deal with him?

18         A.    No.

19         Q.    Why not?

20         A.    That's not what we're trained to do.

21    When the device is going off, you're trained to

22    get the subject under control.

23         Q.    Right.  But you only had five seconds,

24    and he's -- and that -- those five seconds are

25    gone, right?

```
 1        A.    Exactly.  And those five seconds that
 2   you're going to sit there and develop a plan,
 3   there goes your five seconds.
 4        Q.    Okay.  So we're done with the five
 5   seconds.  He's behind the gate.
 6              Did you then talk to your fellow
 7   officer, Deputy Alexander, about what to do next?
 8        A.    No.  Because as we opened the gate, the
 9   Taser was still running through its five-second
10   cycle.
11        Q.    And did you make contact with him again
12   while he was under power?
13        A.    Yes.
14        Q.    So the -- so you were able to get to
15   him while the five seconds were still running?
16        A.    Yes.
17        Q.    But from what you had observed, at
18   least with that deployment, the five -- the Taser
19   was not accomplishing neuromuscular
20   incapacitation, right?
21        A.    Right.
22        Q.    So the chances that you would be able
23   to secure his arms were reduced, because the
24   neuromuscular incapacitation wasn't happening,
25   right?
```

1          A.   Not necessarily.

2          Q.   So you went after him, and he was still

3     experiencing the deployment.

4               And then what happened?

5          A.   He was still experiencing -- myself,

6     Deputy Alexander, and Deputy Dalid -- he was

7     there at the time -- they ran in and tried to get

8     control of his arms.

9          Q.   Okay.  And how did that go?

10         A.   It didn't go very well.

11         Q.   What happened?

12         A.   He was kicking, thrashing around on the

13    ground.  He was on his stomach at this point.

14              I drive stunned him in the back of the

15    leg to try complete the cycle.  Because I figured

16    one barb was in him.  The other one must not have

17    been in him, that's why it didn't incapacitate

18    him.

19              So I was trying to complete the cycle

20    by drive stunning the back of his leg.

21         Q.   Okay.  So you figured that maybe one of

22    the barbs wasn't in him.  If you could drive stun

23    him in the back, that would complete the cycle

24    and maybe you would accomplish neuromuscular

25    incapacitation that way?

1      A.   Yes, the back of the leg.

2      Q.   Did that work?

3      A.   No, it did not.

4      Q.   So he was exhibiting a very strong

5  ability to overcome the Taser, right?

6      A.   No.

7      Q.   Well, it wasn't working, right?

8      A.   Well, it means that it wasn't

9  completing the cycle, which means that maybe the

10  barbs didn't connect.

11      Q.   Okay.  So at that point, you did the

12  deployment to the back of the leg, and the

13  officers were on either side of him; is that

14  right?

15      A.   Correct.

16      Q.   And what were they doing?

17      A.   Trying to control his arms.

18      Q.   And then what happened?

19      A.   Then I put the Taser away; trying to

20  assist by keeping his legs under control, keeping

21  him from getting up.

22           He somehow managed to slip out of all

23  three of us, get up, and was facing

24  Deputy Alexander face-to-face.  Deputy Alexander

25  has his back into the tree.

1           And I pulled the Taser out again and I

2     deployed it -- deployed two more barbs to his

3     back.

4           Q.   And as of that point, had Mr. Roell

5     said anything?

6           A.   Not that I remember.

7           Q.   Was he talking about water or any of

8     the gibberish that we described -- we discussed

9     earlier?

10          A.   I think when he was on the ground, at

11    that point, he stated how he wanted to get in

12    their house, because their house was dry and his

13    house was wet.

14          Q.   And did that make sense to you?

15          A.   No.

16          Q.   Did that confirm for you that he was

17    having a mental health problem?

18               MS. SEARS:   Objection.

19          A.   No.

20    BY MR. GERHARDSTEIN:

21          Q.   Well, that wasn't a very logical thing

22    to say, right?

23          A.   It didn't confirm that he was having a

24    mental health problem.

25               I thought -- we discussed earlier that

1  we noticed that he was having -- he wasn't all

2  there, that he was having some mental issues,

3  yes.

4       Q.   All right.  Was there any need to put

5  him in cuffs right then, given the experience you

6  had had to that point?

7       A.   Yes.

8       Q.   Why?

9       A.   Because the neighbor was already afraid

10  that he was breaking things in the back.  I

11  wasn't sure what he broke.

12          So if we leave him in there, who knows?

13  Then he could break into their house.  And then

14  you've got a possible hostage situation with the

15  family inside that can get hurt.

16       Q.   Well, you had the capacity to put an

17  officer in the house, right?

18       A.   Well, we could have.

19       Q.   Okay.  So was that discussed?

20       A.   No.

21       Q.   You had the capacity to ask the

22  neighbor to leave if you were afraid of her being

23  in her house, right?

24       A.   We could have, but no.

25       Q.   So at that point, you were in the

1    patio, right, or on the patio?

2        A.    Yes.

3        Q.    And you were able to observe that this

4    patio was an enclosed area, right?

5        A.    Right.

6        Q.    And did you discuss with your other

7    officers the idea of letting him be in the patio

8    until you could develop a better plan?

9        A.    No.

10        Q.    Did -- up to the point where you had

11    tased him a second time, had you called any

12    healthcare provider to be available?

13        A.    No.

14        Q.    Up to the point when you had tased him

15    a second time, had you called the mobile crisis

16    team?

17        A.    No.

18        Q.    Do you know what the mobile crisis team

19    is?

20        A.    Yes.

21        Q.    And those are healthcare professionals

22    available to officers who are dealing with

23    mentally ill people who are in crisis, right?

24        A.    Right.

25        Q.    There was -- there were no other

1   members of the public present on the patio,

2   right?

3        A.   Right.

4        Q.   And the only weapons that you were able

5   to observe were the hose and the moss-covered

6   plastic-wrapped plant holder, right?

7             MS. SEARS:  Objection to able to

8        observe; form of the question.

9        A.   Yes.

10            MS. SEARS:  At some point, can we take

11       a rest room break?

12            I don't know, Al.  Whenever -- we can

13       go for a little while if you're in the

14       middle of something.

15            But at some point, can we please do

16       that?

17            MR. GERHARDSTEIN:  Yeah.

18   BY MR. GERHARDSTEIN:

19       Q.   Did -- did he walk backwards through

20   the gate or crawl?

21       A.   He walked backwards.

22            MR. GERHARDSTEIN:  Okay.  Well, we can

23       take a break --

24            MS. SEARS:  Thank you.

25            MR. GERHARDSTEIN:  -- and change the

```
 1      tape.

 2              MS. SEARS:  Appreciate it.

 3              THE VIDEOGRAPHER:  We are off the

 4      record.  The time is 11:52 a.m.

 5          (Off the record.)

 6              MR. GERHARDSTEIN:  Back on the record.

 7              We good?

 8              THE VIDEOGRAPHER:  One second.

 9              You're good.

10   BY MR. GERHARDSTEIN:

11      Q.   The entire time from the moment you got

12   the call to the time Mr. Roell lost his cardiac

13   function and then EMS came, do you have any sense

14   of how long that took?

15      A.   The entire call?

16      Q.   Yeah.

17      A.   Probably two minutes, I'm guessing.  I

18   don't know.

19      Q.   So it was very fast?

20      A.   It was -- it was quick, yes.

21      Q.   And when you arrived at the gate, was

22   there one of you who took charge of the incident,

23   or were you and Alexander equal?

24              How did that work?

25      A.   I believe we were equal.  I don't -- I
```

1    was giving commands, so I'm sure he wasn't saying

2    anything.

3        Q.    You're sure he was not saying

4    anything?

5        A.    I'm sure if I'm talking, he's not going

6    to try to talk over me to have the subject do

7    something.

8        Q.    Do you know if he gave the same

9    commands.

10       A.    I don't know if he gave any commands.

11       Q.    Okay.  So there wasn't any discussion

12   about who was in charge?

13       A.    No.  And that's usually how we do it.

14       Q.    And when you got to the back of the

15   privacy fence and you first observed him, how

16   long did you observe him before you started

17   speaking to him?

18       A.    Two seconds.

19       Q.    You'd agree that excited delirium is a

20   medical emergency, right?

21       A.    Yes.

22       Q.    Returning to Exhibit 2, at Bates number

23   page 4491 --

24            MS. SEARS:  4491?

25            MR. GERHARDSTEIN:  Yes.

1   BY MR. GERHARDSTEIN:

2      Q.   The county materials have a page on how

3   to respond to an excited delirium emergency.

4         Do you see that?

5      A.   Yeah.

6      Q.   The first bullet point says that you

7   ask dispatch for EMS and have them staged nearby.

8         Did you do that?

9      A.   No.

10      Q.   And then it says, If the situation

11  permits, have EMS on scene before engaging the

12  subject.

13        Did you do that?

14     A.   The situation didn't permit.

15     Q.   Did you do that?

16     A.   No, because the situation didn't

17  permit.

18     Q.   And why is that?

19     A.   Just because we got the call to a

20  neighbor trouble, doesn't mean we got a call to

21  an excited delirium.

22     Q.   Okay.  So what I'm trying to get a

23  sense of is, if you had identified Mr. Roell as a

24  suspect with excited delirium symptoms, would you

25  have followed this -- these -- this protocol?

1       A.   If he wasn't in there breaking things

2   and wasn't in somebody else's area, we would try

3   to get him under control first and then call EMS.

4           EMS isn't going to respond until we get

5   him under control anyway.

6       Q.   Right.  But you want EMS staged if it's

7   excited delirium, right?

8       A.   Yeah.  But we still have to take

9   control before EMS will even step foot in

10  there.

11      Q.   Right.  But you would want EMS on scene

12  so they could step in right away if it's excited

13  delirium, right?

14      A.   If we knew at the time it was excited

15  delirium, in a perfect world, that would be

16  great, yes.

17          MS. SEARS:  Objection as to on the

18      scene and staging.

19          Are you saying they're the same things?

20  BY MR. GERHARDSTEIN:

21      Q.   If -- let's just start from the

22  beginning on that series.

23          Do you agree now that Mr. Roell was

24  suffering from excited delirium?

25      A.   Now that I know he was?  Do we agree

1   afterwards?  Yeah.

2       Q.   Okay.  And do you agree that the

3   symptoms you observed on August 13, 2013 were

4   consistent with excited delirium?

5       A.   What I know now?  Yeah.

6       Q.   And would you agree that you had been

7   trained to recognize those symptoms before

8   August 13th, 2013?

9       A.   Through Taser training, yeah.

10      Q.   And would you agree that if you -- as

11  of August 13th, 2013, if you as a deputy were

12  encountering a person with excited delirium

13  symptoms, it was the protocol to have EMS on

14  scene ready to assist with the subject as soon as

15  you had the subject under control --

16          MS. SEARS:  Objection.

17  BY MR. GERHARDSTEIN:

18      Q.   -- right?

19          MS. SEARS:  Objection.

20      A.   As soon as we had the subject under

21  control?  Yeah.  If we knew -- if we knew we were

22  going to an excited delirium call, sure.

23  BY MR. GERHARDSTEIN:

24      Q.   Okay.  And would you agree that on

25  August 13th, 2013 you did not call EMS until

1    after you had Mr. Roell already in cuffs and in

2    shackles, right?

3         A.    Right.  That's when time allowed, yes.

4         Q.    Well, are you saying that you didn't

5    call them because you didn't have time?

6         A.    Yeah.

7         Q.    And you didn't have time, because you

8    witnessed Mr. Roell on the scene of a neighbor's

9    property?

10        A.    He was on the scene of a neighbor's

11   property.  As soon as we opened the gate and made

12   contact with Mr. Roell --

13        Q.    Okay.

14        A.    -- he came at us.

15        Q.    Okay.  So you think that this was such

16   a dangerous situation that you didn't even have

17   time to call EMS before restraining Mr. Roell?

18        A.    I know -- I know it could have turned

19   into a dangerous situation, yes.

20        Q.    Okay.  And the fact that it could have

21   turned into a dangerous situation -- tell me what

22   you were worried about.

23        A.    I've already told you, I was worried

24   about him getting inside and getting that family.

25              He's already breaking things.  Who

1    knows if he'll breaking anything else and hurt

2    himself even more.

3         Q.   And you weren't worried about hurting

4    him more than those possibilities?

5         A.   What do you mean hurting him more?

6         Q.   Well, if you identified him as a

7    subject with excited delirium symptoms, you'd

8    realize that usually within minutes of being

9    restrained, the victim can lose all vital signs,

10   right?

11             MS. SEARS:  Objection.

12        A.   It says that, yes.

13   BY MR. GERHARDSTEIN:

14        Q.   And you learned that when you were

15   trained on excited delirium, right?

16        A.   Yes.

17        Q.   And so that's why it's so important to

18   have EMS ready right away when you restrain

19   someone, right?

20        A.   If time allows, yes.  But time did not

21   allow.

22             If we got called to an excited delirium

23   run, it would have been totally different.

24             But we got called to a neighbor trouble

25   run.

1     Q.   Okay.  But you had time --

2     A.   We did not have time.

3     Q.   -- to make observations of Mr. Roell

4  before you went hands-on, right?

5     A.   No.

6     Q.   You could have just closed the gate and

7  let him be in there while you came up with a

8  plan, right?

9     A.   No.  Let him be in there and destroy

10  things, let him break into someone's house,

11  terrorize the family?  Who knows what he was

12  going to do.

13     We're -- we're cops.  That's not what

14  we do.

15     Q.   Well, if you had closed the gate, you

16  could have made the family safe and -- right?

17     A.   No.

18     Q.   You don't think you could have

19  protected that family, which was behind a brick

20  wall?

21     A.   Which was behind a glass door --

22     Q.   Okay.

23     A.   -- when he already broke glass?  No.

24     Q.   Okay.  As you sit here today, having

25  reflected on it, would you agree that you could

1   have let him be on the patio and protected the

2   family and come up with a plan before you went

3   hands-on?

4       A.   No.  I would not have done anything

5   different.

6       Q.   Did you actually see him breaking

7   anything?

8       A.   I did not see him breaking anything.

9       Q.   And so while you were engaged with him,

10  he didn't break anything, right?

11      A.   Not that I saw.

12      Q.   And destroying property is not a valid

13  basis to put a person's life at risk, is it?

14          MS. SEARS:  Objection.  Objection.

15          That's combative and argumentative and

16      presupposes that these gentlemen intended to

17      kill him.

18          That's -- that's just totally

19      inappropriate.

20          I'm going to instruct him not to answer

21      that question.

22  BY MR. GERHARDSTEIN:

23      Q.   Let's go back to the factors you used

24  for the level of force you used, right?

25      A.   Okay.

113

```
1        Q.   You have to the look at the seriousness

2   of the crime, right?

3        A.   Okay.

4        Q.   Do you agree with that?

5        A.   Yeah.

6        Q.   All right.  And the seriousness of the

7   crime that you saw was destroying property,

8   right?

9        A.   He was destroying property, yeah.

10       Q.   And you can't kill somebody who

11  destroys property, right?

12       A.   First of all, I didn't kill anybody.

13       Q.   Okay.  But you -- but you can't use

14  deadly force against somebody who destroys

15  property, right?

16       A.   We didn't use deadly force.  Okay; but,

17  right.

18       Q.   Okay.  And then you look at whether the

19  person is putting a member of the public at risk

20  or a --

21       A.   Which he was.

22       Q.   -- or a -- officers at risk, right?

23       A.   Okay.

24       Q.   Is that right?

25       A.   Yeah.  He did both.
```

1    Q.   And so you need to measure the amount

2  of force you apply against the risk that the --

3  that the subject poses, right?

4    A.   Okay.  Yeah.

5    Q.   And you use more force with somebody

6  who's got a deadly weapon than you do with

7  somebody who doesn't have a deadly weapon, right?

8    A.   Obviously, yes.

9    Q.   And you use more force with somebody

10  who's deliberately being noncompliant than with

11  somebody who's having a mental health episode,

12  right?

13         MR. KUNKEL:  Objection.

14    A.   Not necessarily.

15  BY MR. GERHARDSTEIN:

16    Q.   Well, with somebody who's having a

17  mental health episode, first, you try to

18  deescalate, right?

19    A.   Okay.  But when someone's charging at

20  you, you kind of go from here to here

21  (indicating) and take a step up.

22         Just because he's mentally ill doesn't

23  mean you're not going to go hands-on with

24  somebody.

25    Q.   But at the time he went back through

1    the gate, you had an opportunity to reassess and

2    determine what strategy you would follow, right?

3              MS. SEARS:  Objection.

4              Now he's asked and answered this like

5         at least three times now.  I think this --

6         this line of questioning's been asked and

7         answered.

8    BY MR. GERHARDSTEIN:

9         Q.   You can answer.

10        A.   No.

11        Q.   When you had Mr. Roell in restraints

12   and you were waiting on EMS, what was your plan?

13   What were you going to do then?

14        A.   Hold him there until EMS arrived.

15        Q.   And then what?

16        A.   Then let EMS take care -- take care of

17   him.

18        Q.   Well, what did you expect EMS to do?

19        A.   To come and assess him.

20        Q.   And then what did you see as the

21   options?

22        A.   What do you --

23        Q.   Where did you think you would be taking

24   him?

25        A.   Wherever EMS would assess and decided

1    to take him, whether it was the hospital, whether

2    it was the psych ward.

3        Q.   So he could have been taken to

4    psychiatric emergency services at the hospital,

5    right?

6        A.   He could have, yes.

7        Q.   And you've worked intake at the

8    Hamilton County jail, right?

9        A.   Yes.

10       Q.   They wouldn't take an inmate in that

11   condition would they?

12       A.   No.

13           MS. SEARS:  Objection.

14           Into cardiac arrest (sic), you mean?

15           MR. GERHARDSTEIN:  No.  Before he had

16       cardiac arrest.

17           MS. SEARS:  Oh, okay.

18       A.   No.

19   BY MR. GERHARDSTEIN:

20       Q.   Now, while you were -- after you had

21   tased Mr. Roell the second time, how long did it

22   take before you got the cuffs on him?

23       A.   Are you talking about the second time

24   as the drive stun or the --

25       Q.   The drive stun.

1          A.    He -- he ended up getting up.

2          Q.    Okay.

3          A.    And that's when he was facing Deputy

4    Alexander face-to-face with Deputy Alexander's

5    back against the tree.

6          Q.    Okay.

7          A.    That's when I deployed the Taser again

8    at his back side.

9          Q.    Okay.  And then what happened?

10         A.    Then we managed to get him on the

11   ground -- that didn't take effect, either.

12               We managed to get him on the ground and

13   managed to get the cuffs on the front.  We had to

14   use two sets of cuffs on the front to control his

15   arms as best we could.

16         Q.    When you tased him on the back that --

17   in that prong deployment, using the second

18   cartridge, right?

19         A.    Right.

20         Q.    Did your lower prong actually hit below

21   the waist, or were both of the prongs above the

22   waist?

23         A.    I don't know.

24         Q.    If both of the prongs were above the

25   waist, one of the reasons he may not have

1    experienced neuromuscular incapacitation is that

2    that's too short a prong spread, right?

3          A.   Depends how far away you are.

4          Q.   Well -- but if you don't hit below the

5    waist and above the waist, it's harder to take a

6    guy down, right?

7          A.   No.

8          Q.   You think that two prongs above the

9    waist is just as likely to knock a person over as

10   one above and one below?

11         A.   Absolutely.

12         Q.   Okay.  And that's how you're trained?

13         A.   Yes.  I've been hit with it.  I know

14   what it's like.

15         Q.   When you tased him in the back and then

16   used the two sets of cuffs, did -- did you do any

17   of the cuffing, or were the other officers doing

18   the cuffing?

19         A.   I don't remember.

20         Q.   Was he cuffed when he was on his back

21   or on his stomach?

22         A.   On his back, because we were only able

23   to cuff him in the front.

24         Q.   And you had to use how many sets of

25   cuffs?

1       A.   Two set of handcuffs.

2       Q.   Okay.  And then how long -- and then

3   what happened after you got the cuffs on his

4   hands or his wrists?

5       A.   We put the cuffs on him.  We were

6   trying to control his -- control his legs,

7   because he was kicking.  He actually kicked me in

8   the groin.

9            We had him somewhat under control,

10  myself and Deputy Dalid.  And we told Deputy

11  Alexander to run to the car and get shackles so

12  we could control his feet.

13      Q.   And did he do that?

14      A.   He did.

15      Q.   And were you able to get the shackles

16  on his feet?

17      A.   We were.

18      Q.   And then were there any times after he

19  was in restraints that he was on his stomach?

20      A.   He was in restraints -- no, I don't

21  believe so.

22      Q.   And prior to being in restraints, was

23  he ever on his stomach?

24      A.   Yeah.  He was flopping everywhere,

25  stomach, side, back.

1        Q.   And after he was on his -- in

2    restraints, was he sat up, or was he still lying

3    down?

4        A.   He was lying down on his side.

5        Q.   On what side?

6        A.   His left side.

7        Q.   And was he still offering any

8    resistance?

9        A.   When we first put the shackles on, he

10   -- actually, when Deputy Alexander went to run to

11   get the shackles, he started snoring.

12            Me and Dalid were able to breath.

13   That's when I got on the radio and asked for a

14   squad to come, when we were finally all calmed

15   down and able to get him somewhat under control.

16            Alexander came back, put the shackles

17   on.

18            And then a short time later, 15 seconds

19   maybe, he started flailing around again, kicking,

20   fighting us.

21       Q.   Did you -- what did you make of the

22   fact that he started snoring?

23       A.   I didn't make anything of it.

24            I made that we were finally able to

25   take a break.

1       Q.   Did you identify that as a possible

2   sign of cardiac problems?

3       A.   No.

4       Q.   Since the incident, has anybody ever

5   advised you that when a person who's very

6   agitated then starts snoring, that that's a

7   possible sign of cardiac problems?

8       A.   No.

9       Q.   When he started snoring, was he on his

10  stomach for some period of time either right

11  before or right after that?

12      A.   No.

13      Q.   And are you sure of that?

14      A.   I'm sure when he was in cuffs, he was

15  shackled, he was on his left side.

16      Q.   And if there are other officers who say

17  he was on his stomach for part of that time,

18  you'd just disagree with them?

19      A.   I know what I saw.

20      Q.   Okay.  When you deployed the X2, did

21  aphids scatter at the points where you were

22  standing when you -- when you deployed each

23  cartridge?

24      A.   I'm not sure.

25      Q.   Is there any particular reason why you

1    didn't write your own narrative of what happened

2    that day?

3        A.    They didn't advise me to.

4            (Deposition Exhibit 3 was marked for

5            identification.)

6    BY MR. GERHARDSTEIN:

7        Q.    Okay.  I'm going to show you what's

8    been marked as Exhibit 3.

9            Do you recognize this?

10        A.    No.  I've seen it.  But these are for

11    supervisors to fill out.

12        Q.    Okay.  So this is a Taser -- an

13    electronic stun device incident report about the

14    incident with Mr. Roell, right?

15        A.    Yes.

16        Q.    And it's your testimony that you didn't

17    fill this out, right?

18        A.    Right.

19        Q.    Did you review this at all before this

20    lawsuit was filed?

21        A.    No.

22        Q.    This is signed by Lieutenant -- is it

23    Gramke?

24        A.    Yes.

25        Q.    And who's he, or she?

1      A.   He is -- he was a night shift district

2   lieutenant.  Now he works out of Green Township

3   as a lieutenant.

4      Q.   And did you ever talk to

5   Lieutenant Gramke?

6      A.   I don't remember talking to

7   Lieutenant Gramke.

8      Q.   Was Lieutenant Gramke at the scene?

9      A.   I do not remember.

10      Q.   Do you know which officers came to the

11   scene before Mr. Roell experienced the cardiac --

12   the -- the stopping of his cardiac function?

13      A.   Yes.

14      Q.   Who?

15      A.   There's Corporal Gilliland;

16   Matt Sewall -- he's a corporal now --

17   Corporal Sewall; a Montgomery officer, Jason

18   Alderman.

19           And Deputy Steers arrived when

20   Mr. Roell still had a pulse.

21      Q.   Okay.  So Gramke wasn't there?

22      A.   No.

23      Q.   Directing your attention to the

24   diagram, this shows prongs from the cartridge

25   number 1 a little bit above the rib cage and then

1    around the navel.

2         Do you see that?

3    A.   I see that, yes.

4    Q.   And do you agree that that's where

5    those prongs hit?

6    A.   No.  I don't know where they hit.

7    Q.   Do you have any reason to disagree with

8    this?

9    A.   I have -- I have no idea.

10   Q.   Okay.  And then on the -- for

11   cartridge 2, it has the prong striking on the

12   upper back, shortly -- a little bit to the right

13   of the midline and then a little bit -- and then

14   further over to left.

15        Do you see that?

16   A.   Yes.

17   Q.   And do you agree that that's where the

18   prongs from cartridge number 2 hit?

19   A.   I don't remember where they hit on his

20   back.

21   Q.   Do you agree that a Taser shot, such as

22   that described as number 2, would not be -- would

23   not normally be effective to accomplish

24   neuromuscular incapacitation?

25   A.   I agree.  But I don't agree with the

1   diagram.  Because I'd have to turn the Taser

2   sideways to shoot -- and I don't shoot Tasers or

3   guns that way.

4        Q.   Right.  So you would have to camp the

5   Taser in order for those to come in at that

6   angle, right?

7        A.   Yeah, if they're going to be

8   side-by-side.

9        Q.   Yeah.  Other -- because, normally, the

10  lower prong is discharged at an angle so that it

11  will be below the upper prong, right?

12       A.   Right.

13       Q.   So have you had any kind of opportunity

14  to review whether this is an accurate depiction

15  of where the prongs hit?

16       A.   Not really.  I mean --

17       Q.   Were you stable at the time you shot

18  the second cartridge?

19       A.   I don't believe I was moving, no.

20       Q.   Do you have, as we sit here today, a

21  present recollection of exactly how you were

22  positioned when you shot the second cartridge?

23       A.   I believe I was standing up, yes.

24       Q.   And how were you holding the Taser?

25       A.   Probably out in front of me, like I

126

 1   hold it every time I shoot it.

 2        Q.   Do you remember that, or is that just

 3   your norm?

 4        A.   That's my norm.  That's how I do it all

 5   the time.

 6        Q.   All right.  But you don't have a

 7   present recollection of doing it that night,

 8   right?

 9        A.   Right.  If that's how I do it, I'm sure

10   that's how I did it that night.

11        Q.   Have you reviewed the download record?

12        A.   I've looked over it, yes.

13        Q.   So there is a sequence number on the

14   left-hand side that's unique to each trigger

15   pull, right?

16        A.   I see that.

17        Q.   Okay.  So at 764, which is at 2:38:05,

18   according to the Taser timing -- and just for

19   your reference, at the end of this it says that

20   the Taser is, what, about -- 28 from 42, what is

21   that, 14 -- 14 minutes short of whatever they

22   thought was accurate.

23             Do you see that time sync at the end?

24             It says -- there's a line 780, time

25   sync, from August 20, 2013, 13:28:01 to August --

1   2/13, August, 2013, 13:42.

2          Do you see that?

3   A.   Yeah.

4   Q.   I think that means that this Taser is

5   actually about 14 sec -- 14 minutes behind the

6   standard.  Has that been discussed with you at

7   all?

8   A.   No.

9   Q.   All right.  Don't worry about it.

10          So you would trust that the time in

11  between these trigger pulls is accurate, right?

12  A.   I -- I guess.  I don't -- that's -- I

13  have no idea.

14  Q.   All right.  And the duration of the

15  trigger pull, would you trust that that's

16  accurately recorded?

17  A.   No reason to believe it's not.

18  Q.   Okay.  So at line 764, it shows the arc

19  where both cartridges are arcing.

20          Do you see that?

21  A.   Yes.

22  Q.   And it's still listing that you have

23  25-foot standard cartridges in, so you haven't

24  deployed it yet, right?

25  A.   I guess, yeah.

1      Q.   And then at 765 you arced it again.  Is

2   that your recollection, that you arced it twice

3   before you deployed it?

4      A.   I arced it twice before I deployed it,

5   yes.

6      Q.   Okay.  And then you put it away.  It

7   says, Safe at 766, right?

8      A.   Yeah.

9      Q.   And that's when you -- that's -- I

10  think that's when you tried to go hands-on,

11  right?

12     A.   I put it away and went hands-on, yes.

13     Q.   Okay.  And then you pulled it out again

14  at 767, and it then was armed, right?

15          MS. SEARS:  Are you asking him if this

16      report is what -- is what actually happened

17      or --

18  BY MR. GERHARDSTEIN:

19     Q.   I'm asking if this helps you recall how

20  he -- how it went down.

21          And I think you're consistent.  But I

22  just want to check it with the paper.

23     A.   Yeah.

24     Q.   Is that correct?

25     A.   Yeah.

1        Q.   And then you arced twice again before

2   you actually deployed it; is that right?

3        A.   I remember arcing it twice before I

4   deployed it, yeah.

5        Q.   All right.  But at 770, 2:38:53, you

6   deployed the first cartridge.  And that's a

7   five-second deployment, right?

8        A.   Right.

9        Q.   And that's consistent with your

10  recollection, right?

11       A.   Yeah.

12       Q.   And then at 772, this shows a

13  deployment of three seconds on the first

14  cartridge again.

15           Is that -- is that -- can you do that?

16  Can you re-energize a person who has the prongs

17  in him?

18       A.   Yeah.

19       Q.   And can you do it for less than five

20  seconds?

21       A.   Yes.

22       Q.   How does that work?

23       A.   You have arc switch on the side.  I can

24  fire the -- I can fire the darts and turn it off

25  right away, and you can only get one second.

1     Q.   Okay.

2     A.   So --

3     Q.   And you could fire the darts and deploy

4  it for longer than five seconds?

5     A.   No.  It auto -- it goes to five seconds

6  and shuts off.

7     Q.   All right.  But then you can

8  re-energize those darts if they are still in the

9  subject, right?

10     A.   Right.

11     Q.   Is that what happened here?

12     A.   That's my drive stun.

13     Q.   Oh, okay.  Okay.

14          And then you've got a one-second

15  deployment at 773.  Is that another drive stun?

16     A.   It's the same continuous drive stun.

17          I still had four seconds on the

18  timer.

19     Q.   And then at 774, you've got the other

20  cartridge, which is the back shot, correct?

21     A.   Yes.

22     Q.   And after that, it shows that you were

23  deploying both cartridges for a couple seconds.

24  Does that make sense?

25     A.   Not unless -- which one is this?

1       Q.    So look at 775.  It's got both

2   cartridges deploy and then you have a two-second

3   duration.  So what that -- what that seems to be

4   telling me is that you energized the subject for

5   two seconds through both cartridges.

6       A.    I don't recall doing that at all.  As

7   soon as I pulled the trigger on that -- the other

8   one, it started sparking funny from the end.  So

9   I know he wasn't really -- he wasn't getting

10  any -- it wasn't taking any effect.

11           So I turned it off and put it away.

12      Q.    Okay.  So that was -- when you talk

13  about sparking funny from the end, do you mean

14  from the back shot?

15      A.    From the end -- end of the Taser.

16      Q.    Well, I understand.  But which

17  deployment are we talking about?

18      A.    The last one, the back shot trigger

19  pull.

20      Q.    Okay.  So was it your feeling that that

21  trigger pull never really worked correctly?

22      A.    Yes.  It didn't take effect.

23      Q.    And according to the dataport, there

24  was another two seconds from both cartridges

25  after that.  And you're just saying you don't

1    recall?

2        A.    No, because I put it away.

3        Q.    Do you have some reason to disagree

4    with this?

5        A.    Yes.  Because I pulled the trigger and

6    it sparked funny.  So I turned it off and put it

7    away and went hands-on; never pulled it out

8    again; no need to.

9            It wasn't taking effect, so no need to.

10       Q.    Did you have the unit examined

11   afterwards?

12       A.    They took it from me and they examined

13   it.

14       Q.    Did they find anything wrong with it?

15       A.    I have no idea.

16       Q.    Did you ask about it?

17       A.    No, I didn't ask.

18       Q.    So according to this printout, there

19   were seven different deployments either by

20   pulling the trigger or drive stun or

21   re-energizing after deployment, right?

22       A.    According to the sheet, I guess.

23            I can't really tell you exactly what

24   goes on the sheet.  I can't read it for you.

25       Q.    And if I understand your testimony

1    correctly, the first deployment of the actual

2    first cartridge was outside the patio.  But all

3    the others were inside the patio?

4         A.   Yes.

5         Q.   Were the other officers holding him

6    during these deployments?

7         A.   They were trying to hold his arms when

8    I drive stunned his leg.  That's the only time

9    they had hands on him.

10         Q.   And what's your recollection of how

11    many drive stuns you did?

12         A.   One.

13         Q.   We looked at this diagram earlier and

14    looked at this depiction of the first cartridge

15    and where it landed, right?

16         A.   Right.

17         Q.   Would you agree that if the cartridge

18    was deployed in the manner depicted here, that

19    that actually -- that that top prong is higher

20    than it should be to be a proper front shot,

21    right?

22              MS. SEARS:  Objection.

23         A.   If -- if that's a little higher, yes.

24              It's not the preferred area.  Sometimes

25    you don't -- can't everything in that preferred

134

1    area.

2    BY MR. GERHARDSTEIN:

3        Q.    And you had been trained to avoid the

4    upper chest, right?

5            MS. SEARS:  Objection.

6            Asked and answered now.

7    BY MR. GERHARDSTEIN:

8        Q.    Is that right?

9        A.    We've been given the preferred areas to

10   hit, yes.

11       Q.    Did you know Mr. Roell's name when you

12   were engaged in trying to restrain him?

13       A.    No.

14       Q.    Did you know anything about him at

15   all?

16       A.    No.

17       Q.    Did you give him your name?

18       A.    No.

19       Q.    At any point when you were engaged with

20   Mr. Roell, did you give him the Miranda rights?

21       A.    No.

22       Q.    Did he ever say anything to you that

23   made any sense?

24       A.    All I heard was, like I told you

25   earlier, their house is dry, his house is wet.

1    He wanted to get in their house.

2        Q.   Do you know what positional

3   asphyxiation is?

4        A.   Yeah.

5        Q.   What is that?

6        A.   When they're laying in a certain

7   position and can't get air.

8        Q.   And what position do you want to

9   avoid?

10       A.   You obviously want to avoid laying on

11  their -- on their stomach and pushing down on

12  their backs.

13       Q.   And were you aware of that positional

14  asphyxiation on August 13th, 2013?

15       A.   He was on the side.  So it wouldn't

16  have made any difference.

17       Q.   But did you -- were you aware of the

18  issue around positional asphyxiation on that

19  day?

20       A.   I was just trying to get him in

21  custody, keep him under control, keep him from

22  fighting, yes.

23            So it wasn't a top priority to figure

24  out what position would be -- would be best for

25  him.

1       Q.    You knew about positional asphyxiation

2  as an issue to be concerned about on

3  August 13th, 2013, right?

4       A.    To be concerned about?

5       Q.    Yeah.  You knew of this issue and you

6  knew to be on the lookout for it, right?

7       A.    I have heard about it, yes.

8       Q.    And you've been trained on it, right?

9       A.    I don't remember.

10      Q.    Have you been trained on it since?

11      A.    I -- I don't -- I don't remember.

12      Q.    Is there any policy in the Hamilton

13  County Sheriff's Office that addresses it?

14           MS. SEARS:  Objection.

15           You can answer.

16      A.    I don't know.

17  BY MR. GERHARDSTEIN:

18      Q.    Are you familiar with the restraint

19  policy and the cuffing policy in the Hamilton

20  County Sheriff's Office?

21           MS. SEARS:  Objection.

22      A.    As to -- as to what?

23  BY MR. GERHARDSTEIN:

24      Q.    As to what you should do after you get

25  a person in cuffs.

1          A.   What do you -- what do you mean, get

2     them in cuffs?

3          Q.   Does your policy require that you sit

4     them up?

5          A.   No.

6               (Deposition Exhibit 4 was marked for

7               identification.)

8               MR. GERHARDSTEIN:  4?

9               THE REPORTER:  Yes.

10    BY MR. GERHARDSTEIN:

11         Q.   I'm showing you Exhibit 4.  This is a

12    page out of procedure memo 53, Prisoner

13    Transportation.  And I'm looking at D(1).

14    Handcuffing.  Do you recognize this?

15              MS. SEARS:  Objection as -- I'm -- I'll

16              just do an ongoing objection as to this

17              policy, Al, so I don't continue to interrupt

18              you.

19              MR. GERHARDSTEIN:  That's fine.

20         A.   Yeah.

21    BY MR. GERHARDSTEIN:

22         Q.   And it says D(1)(b), Do not leave

23    handcuffed individuals prone on the ground.  Once

24    individuals are under control, immediately move

25    them to a seated position as soon as possible.

1          Did I read that correctly?

2     A.    Yes.

3     Q.    And were you familiar with that policy

4 on August 13th, 2013?

5     A.    Yeah.  He wasn't prone, though.

6     Q.    And he wasn't moved to a seated

7 position either, right?

8     A.    He was on his side.

9     Q.    He wasn't moved to a seated position,

10 right?

11    A.    Right.  He was on his side.

12    Q.    Would you agree that on

13 August 13th, 2013, Mr. Roell was a mentally

14 handicapped person?

15         MS. SEARS:  Objection.

16    A.    Was I aware he was a mentally

17 handicapped person?

18 BY MR. GERHARDSTEIN:

19    Q.    Yeah.

20    A.    I was not aware.

21    Q.    And, given what you know today, would

22 you agree that he was a mentally handicapped

23 person?

24         MS. SEARS:  Objection as to mentally

25         handicapped.

```
 1        A.    No.

 2              (Deposition Exhibit 5 was marked for

 3              identification.)

 4   BY MR. GERHARDSTEIN:

 5        Q.    I'm going to show you Exhibit 5.

 6              Do you recognize that?

 7              MS. SEARS:  Objection to this policy

 8        and procedure.

 9   BY MR. GERHARDSTEIN:

10        Q.    This is procedure memo 45, right?

11        A.    Yes.

12        Q.    And it's the Hamilton County Sheriff's

13   Office procedure for the handling of handicapped

14   persons, right?

15        A.    Yeah.

16        Q.    And it includes in its definition of a

17   handicapped person, One who has a mental

18   impairment that substantially limits one or more

19   of the -- activities, right?

20        A.    Yes.

21        Q.    And under C(1), it says, This -- in the

22   second sentence it says, This procedure applies

23   to situations where a deputy encounters a person

24   who is suspected of having a mental handicap,

25   which could be mental illness or retardation.
```

1           Did I read that correctly?

2     A.   Yes.

3     Q.   And at least as of the time Mr. Roell

4  went back into the patio and closed the gate, you

5  did suspect that he had a mental handicap,

6  right?

7           MS. SEARS:  Objection.

8           He's asked and answered what he -- what

9     he --

10         MR. GERHARDSTEIN:  In light --

11         MS. SEARS:  -- what he thought at least

12     three or four times now.

13         MR. GERHARDSTEIN:  In the light of this

14     policy, I'm going to ask this question.

15  BY MR. GERHARDSTEIN:

16     Q.   You can answer.

17     A.   No.  I wasn't aware of that.

18     Q.   So you didn't suspect that he had a

19  mental handicap?

20     A.   I just knew something wasn't right

21  about him.

22     Q.   But as this -- pursuant to this policy,

23  you didn't suspect that he had a mental

24  handicap?

25     A.   No.

1           MS. SEARS:  Objection.

2           Now he's answered it -- this particular

3      question twice -- well, now three times.

4  BY MR. GERHARDSTEIN:

5      Q.   And do you agree, as we sit here today,

6  given all you know about Mr. Roell, that you

7  should have suspected that he had a mental

8  handicap?

9           MS. SEARS:  Objection.

10     A.   No.

11  BY MR. GERHARDSTEIN:

12     Q.   In any of your other encounters with

13  mentally ill citizens, did you ever call the

14  mental illness hotline or seek activation of the

15  mobile crisis team?

16          MS. SEARS:  Objection.

17     A.   I have not.

18  BY MR. GERHARDSTEIN:

19     Q.   After you had restrained Mr. Roell and

20  he started snoring, what happened?

21     A.   He started snoring, we were able to

22  take a -- take a breather.  We were able to relax

23  our grip on him and call for a squad.

24     Q.   And then what happened?

25     A.   And as we were waiting for a squad to

1   arrive, he came to, came out of his snore, and

2   started fighting and resisting us again.

3          Q.   And how long was he snoring?

4          A.   Probably ten seconds.

5          Q.   And when he started resisting, what did

6   he do?

7          A.   He started kicking, moving his hands

8   around again, flailing his arms.

9          Q.   And what did you and -- what did you do

10  when he started kicking and moving his hands

11  around again?

12         A.   Same thing I did before:  control his

13  legs.

14         Q.   How did you control his legs?

15         A.   I had my -- my knee on one of his legs

16  and was trying to control the other leg with my

17  arms.

18         Q.   So was he literally laying on his side?

19         A.   Literally on his left side.

20         Q.   And where were his arms?

21         A.   Out in front of him.

22         Q.   And where were his legs?

23         A.   On the ground.

24         Q.   Were they splayed or were they

25  together?

143

```
 1        A.    They were not together.  I was kneeling

 2   on one.  I was trying to get control of the other

 3   one.

 4        Q.    And what were the other officers doing?

 5        A.    I believe Dalid had his upper half,

 6   controlling him from the top.

 7        Q.    How was he doing that?

 8        A.    I have no idea.  I was too worried

 9   about getting kicked and trying to control his

10   legs.

11        Q.    And what about Deputy Alexander?

12        A.    I don't know what he was doing at the

13   time.

14        Q.    How long did you all restrain him

15   before EMS got there?

16        A.    By the time we called for the squad, he

17   was in cuffs probably -- we called for squad

18   while he was in cuffs.

19             But by the time the squad got there,

20   maybe two -- two minutes, three minutes by the

21   time the squad finally arrived.

22        Q.    And before the squad arrived, I think

23   you've told us that some other officers showed

24   up, right?

25        A.    Yes.
```

1          Q.   So when did you first notice that there

2    was a problem with Mr. Roell, a medical

3    problem?

4          A.   Probably when Deputy Dalid said

5    something, that he wasn't -- wasn't breathing.

6               I think he's the one who -- who noticed

7    it.  I don't know if -- he felt for a pulse, I

8    think.

9          Q.   And, at that point, were you holding

10   his legs?

11         A.   I was still on his legs.  But he --

12   when he was fighting with us, then he stopped

13   fighting with us, and we were able to relax our

14   grip again.

15         Q.   And what happened when the deputy said

16   that he didn't think he was breathing?

17         A.   We put him on his back and felt for a

18   pulse.

19         Q.   Who did that?

20         A.   I believe Steers.  That's when

21   Corporal Steers showed up.

22         Q.   And did you say anything to your other

23   officers and did they say anything to you at that

24   point?

25         A.   I don't remember.

145

1       Q.    So what happened?

2       A.    Corporal Steers started CPR, felt for a

3   pulse, saw that it was weak, started more CPR,

4   and notified Deputy Dalid --

5       Q.    Did you know how to do CPR?

6       A.    I did, yes.

7       Q.    And did Corporal Steers ask for any

8   help?

9       A.    No.

10       Q.    What did you do while they were doing

11   CPR?

12       A.    Stood there waiting for the squad to

13   arrive.

14       Q.    How long did Corporal Steers do CPR?

15       A.    I don't -- I don't know, maybe a

16   minute, two minutes, just until the squad got

17   there -- until the time the squad arrived.

18       Q.    And what did -- what was Alexander

19   doing?

20       A.    I don't know.

21       Q.    What happened once the squad got there?

22       A.    They put him on the cot and transported

23   him to the ambulance and took him over to the

24   hospital.

25       Q.    Now, you'd agree that as a deputy it's

146

1   foreseeable that you will have contact with

2   mentally ill citizens, right?

3        A.   Yes.

4        Q.   After Mr. Roell passed away, you were

5   interviewed with respect to the events of that

6   night.  And you've reviewed your video interview

7   and looked at the transcript, right?

8        A.   Right.

9        Q.   Did you ever go back to the scene with

10  anyone and do a walk-through?

11       A.   No.

12       Q.   So has there been any other

13  interrogation of you, other than that one video

14  interview?

15       A.   No.

16       Q.   You'd agree that as of

17  August 13th, 2013, it's appropriate to take the

18  symptoms of mental illness into account when

19  developing a strategy for taking a mentally ill

20  person into custody, right?

21            MS. SEARS:  Objection.

22            You can answer.

23       A.   If time allows, yes.

24  BY MR. GERHARDSTEIN:

25       Q.   You'd agree that any decision on the

1    amount of force that's going to be used is made

2    on an objective basis, what a reasonable officer

3    would do in that situation, right?

4            MS. SEARS.  Objection.

5            That calls for a legal standard and

6        legal conclusion.

7            If you understand it, you can answer

8        it.

9        A.   Could you repeat it?

10           MR. GERHARDSTEIN:  You can read it

11       back.

12           (The record was read.)

13       A.   Yeah.

14   BY MR. GERHARDSTEIN:

15       Q.   You learned that in your training,

16   right?

17       A.   Right.

18           (Deposition Exhibit 6 was marked for

19           identification.)

20   BY MR. GERHARDSTEIN:

21       Q.   I'm going to show you what's been

22   marked as Exhibit 6.  These are portions of the

23   human relations unit in the 2006 OPOTA materials.

24           And I'd like you to just look it over

25   and let me know if this is consistent with the

1    type of materials you studied in the academy when

2    you went to -- to Butler Tech.

3        A.    Looks like something we would have gone

4    over.

5        Q.    So on the first page, one of the goals

6    of this unit, about halfway down it says, The

7    student will know the behaviors to be avoided in

8    deescalation techniques.

9            And it also says right above it, The

10   student will know the types of deescalation

11   techniques.

12           Did I read that correctly?

13       A.    Yes.

14       Q.    And you've learned about deescalation

15   techniques, right?

16       A.    Right.

17       Q.    On the page that's marked 3, dash, 2,

18   dash 8, there's a section that's titled, 2,

19   Presentation.

20           Do you see that?

21       A.    Yes.

22       Q.    Officers are imbued with a take-charge

23   attitude and use command presence to help deal

24   with criminals, victims, and to handle problems

25   with which they have been called upon to deal,

1   1, this attitude can actually inflame the

2   situation and cause the mentally ill individual

3   to escalate his or her behavior.

4         Did I read that correctly?

5   A.   Yes.

6   Q.   And you'd agree with that, right?

7   A.   Sure.  Yeah.

8   Q.   And number 2, it says, You can have

9   more control and authority over the person in a

10   mental health crisis by using verbal and

11   nonverbal communication that signifies a desire

12   to help the person while still maintaining

13   officer safety.

14         Did I read that correctly?

15   A.   Yes.

16   Q.   Do you think in your encounter with

17   Mr. Roell that you used verbal and nonverbal

18   communication signifying a desire to help him?

19   A.   I tried to make contact with him, and

20   he came charging at me.  So --

21   Q.   Do you think in your communi -- in your

22   encounter with Mr. Roell, you used verbal and

23   nonverbal communication that signifies a desire

24   to help him?

25         MS. SEARS:  Objection.

1           I think he just answered the

2     question.

3           MR. GERHARDSTEIN:  No, he -- he didn't.

4   BY MR. GERHARDSTEIN:

5     Q.   You can answer.

6     A.   No.

7           (Deposition Exhibit 7 was marked for

8           identification.)

9   BY MR. GERHARDSTEIN:

10    Q.   I'm going to show you what's been

11  marked as Exhibit 7.  This is an in-service on

12  dealing with mentally ill citizens.

13          And do you recognize this?

14    A.    It looks somewhat familiar.

15    Q.   Have you taken this in-service as part

16  of your work at the sheriff's department?

17    A.   I don't remember.  I don't know.

18    Q.   Did you take it before

19  August 13th, 2013?

20    A.   I don't -- I don't know.

21    Q.   The first slide that we're looking at

22  here says that if the person is mentally

23  distressed, perpetrated the crime, then your job

24  is to deescalate the person first and investigate

25  the crime second, provided nobody's been injured.

1          Do I read that correctly?

2     A.   Yes.

3     Q.   Would you agree that you did not

4  deescalate the person first with respect to  Mr.

5  Roell?

6          MS. SEARS:  Objection.

7     A.   No.

8  BY MR. GERHARDSTEIN:

9     Q.   Well --

10    A.   You've got to deescalate the

11 situation --

12    Q.   And you did --

13    A.   -- and then investigate later.

14         But we were unable to do that.

15    Q.   Tell me what you did that you think

16 deescalated the encounter with Mr. Roell?

17    A.   We were unable to deescalate.

18    Q.   What did you try to do that would

19 deescalate?

20    A.   We tried to make contact with

21 Mr. Roell.  And he came charging at us.

22         So there was no deescalation at the

23 time, until he was on the ground.  Because he

24 kept on flailing around.  And we were telling him

25 to be calm; calm down.

1    Q.   And after he went back inside the gate

2    and the gate was closed, did you do anything to

3    deescalate the situation with Mr. Roell?

4    A.   We went in there to try to take care of

5    the situation and cuff his hands.

6    Q.   Af -- no.  My question was, after the

7    gate was closed, did you take any measures to

8    deescalate the situation with Mr. Roell?

9    A.   No.

10         MS. SEARS:  So what about lunch?

11         MR. GERHARDSTEIN:  We'll be done in a

12      minute.

13         MS. SEARS:  Well, I'm going to have a

14      few things to follow up on.  So I guess we

15      can do that after lunch.

16   BY MR. GERHARDSTEIN:

17    Q.   Would you agree that, all else being

18   equal, an officer is never allowed to needlessly

19   endanger a suspect?

20    A.   No.  Needlessly, right, yeah, we

21   done.

22    Q.   Would you agree that officers are

23   required to reevaluate the decision to use force

24   when circumstances change?

25    A.   If time prevails, yeah.

1    MR. GERHARDSTEIN:  All right.  So I've
2  got about 10, 15 minutes --
3    MS. SEARS:  Okay.
4    MR. GERHARDSTEIN:  -- and then, so -- I
5  mean, if you really need to take a lunch, we
6  can do that.
7    MS. SEARS:  Well, it's up to you.  I
8  have some follow-up.  So --
9    MR. GERHARDSTEIN:  Okay.  I'd rather
10  not take lunch at all.
11    MS. SEARS:  Yeah.  Well --
12    MR. GERHARDSTEIN:  -- because we got
13  started so late today.
14    MS. SEARS:  Yeah.  But I have to eat
15  lunch.
16    MR. GERHARDSTEIN:  Okay.  So how much
17  time do you need?
18    MS. SEARS:  I need at least 40 minutes.
19    MR. GERHARDSTEIN:  Okay.
20    MS. SEARS:  I bring my lunch.
21    MR. GERHARDSTEIN:  I'm saying if we
22  could start these --
23    MS. SEARS:  No.  I bring my lunch.
24    MR. GERHARDSTEIN:  -- before 10:00,
25  that would be great.

```
 1              MS. SEARS:  Okay.  But I am a lunch

 2         insister.

 3              MR. GERHARDSTEIN:  All right.  Let's

 4         take --

 5              MS. SEARS:  We don't have to take lunch

 6         now.  We can go forward.

 7              MR. GERHARDSTEIN:  Let's take 40

 8         minutes for lunch, and then let's come

 9         back.

10              THE VIDEOGRAPHER:  We're off the

11         record.  The time is 1:05 p.m.

12              (Off the record.)

13              THE VIDEOGRAPHER:  We are back on the

14         record.  The time is 1:50 p.m.

15    BY MR. GERHARDSTEIN:

16         Q.   Okay.  Take a look at Exhibit 2.  That

17    was the excited delirium roll call training from

18    2012, right?

19         A.   Yes.

20         Q.   And at page 4491, it talks about how to

21    respond to an excited delirium emergency.  And we

22    covered a couple of those points.

23              But the third bullet points says, A

24    minimum of six officers is highly recommended

25    before engaging a subject.
```

1          Did I read that correctly?

2     A.   Yes.

3     Q.   And you engaged Mr. Roell when you had

4   three officers, right --

5     A.   Yeah.

6     Q.   -- or, actually, two officers, right?

7     A.   Right.

8     Q.   Okay.  And then it says, The team

9   leader must quickly develop a plan to restrain

10   the subject.

11          Did you communicate any plan to Deputy

12   Alexander?

13     A.   Not that I'm aware of.

14     Q.   Okay.  The -- you talked about several

15   of the officers who came as you had Mr. Roell in

16   restraints.  And one of them was Corporal Steers,

17   right?

18     A.   Right.

19     Q.   And Corporal Steers said, as he came on

20   the scene, that he suspected excited delirium,

21   right?

22     A.   I guess.  I haven't talked to him about

23   it.

24     Q.   Okay.  Have you heard that he said

25   that?

156

1      A.    No.

2      Q.    Has anybody told you he said that?

3      A.    No.

4      Q.    When you were there, did he make that

5  statement to you?

6      A.    Not that I'm aware of.

7      Q.    How long was Corporal Steers on the

8  scene before he started CPR?

9      A.    Ten seconds.

10            (Deposition Exhibit 8 was marked for

11            identification.)

12            MS. SEARS:  Is this 8?

13            THE REPORTER:  Yes.

14  BY MR. GERHARDSTEIN:

15      Q.    I'm going to show you what's been

16  marked as Exhibit 8.  And this is from the

17  discovery materials and is a diagram that was

18  drawn during the county investigation of

19  Mr. Roell's death.

20            Do you recognize this?

21      A.    Not really.

22      Q.    Is it a diagram of the patio with the

23  privacy fence around it?

24      A.    I guess that's what they're trying to

25  draw her.

```
 1       Q.   Well, do you recognize it?

 2       A.   No.

 3            MS. SEARS:  Can you tell us what it is?

 4       Because no one here's ever seen it before.

 5            MS. WOEBER:  Was it part of a larger

 6       document?

 7            MR. GERHARDSTEIN:  It came out of all

 8       the county materials.

 9            MR. KUNKEL:  It was part of the

10       investigation.

11            MS. WOEBER:  Oh.

12            MR. KUNKEL:  It's in the --

13            MS. WOEBER:  It's part of the report?

14            MR. KUNKEL:  Yes.

15            MS. WOEBER:  Oh, okay.

16            MS. SEARS:  I guess I never -- I just

17       don't --

18  BY MR. GERHARDSTEIN:

19       Q.   So you're saying that you don't even

20  recognize this as the -- as a drawing of the

21  patio where Mr. Roell died?

22       A.   Right.  I mean, I'm trying to depict

23  where --

24       Q.   Okay.  So it looks like the gate is

25  here.
```

1       A.   Okay.

2       Q.   Take a minute and see if that helps

3  you.

4            MS. SEARS:  Where did you tell him the

5       gate was?  I'm so sorry.

6            MR. GERHARDSTEIN:  Right here.

7            MS. SEARS:  All right.

8            I just want to make sure.

9  BY MR. GERHARDSTEIN:

10      Q.   Does that help?

11      A.   Yeah.

12      Q.   Okay.  So the gate is in the lower

13 left-hand corner as we put this in front of us

14 with the punch holes on the top.

15           Can you, using that red pen, show me

16 where you first tased Mr. Roell?

17      A.   It would have been right outside.

18      Q.   All right.  So you've marked with an X

19 the first -- the site of the first tasing,

20 right?

21      A.   Right.

22      Q.   And then mark with a T the place where

23 you did the second tasing.

24      A.   The drive stun or the --

25      Q.   Well -- okay.

```
 1              In sequence, the drive stun was second.
 2   So put that down with a T.
 3       A.   Okay.  It was somewhere on the ground
 4   in here.
 5       Q.   So that would be toward the center of
 6   the --
 7       A.   Right.
 8       Q.   -- of the patio?
 9              And then mark with an S the site of the
10   second cartridge being deployed.
11       A.   Right in there.
12       Q.   All right.  And that's over by the
13   mulch, which is marked as mulch, which you said
14   had a -- a plant that --
15       A.   It was a tree, yes.
16       Q.   -- Officer -- or Deputy Alexander
17   was here.
18              Now, at the time Mr. Roell lost his
19   cardiac function, where was he located?  Why
20   don't you mark that with an R?
21       A.   It was back in the middle.
22       Q.   And were there any other events that
23   occurred inside the patio at different locations,
24   other than what you've marked here on
25   Exhibit 8?
```

```
 1        A.    Not while we were -- not while we were

 2   there.

 3        Q.    And the only egress and entry to the --

 4   to the patio was through the gate and into the

 5   house through a glass door, right?

 6        A.    Right.

 7        Q.    The other areas along the fence didn't

 8   have additional gates, right?

 9        A.    Right.

10        Q.    Okay.  At any point, did you observe

11   any glass on the surface of the patio?

12        A.    Not at the time, no.

13        Q.    I'm going to give you a blank piece of

14   paper and a pen.  And I'm going to ask you to

15   draw the driveway, how it was configured, and to

16   place your cruiser in it and Deputy Alexander's

17   cruiser in it.

18             So I'd like on the diagram the driveway

19   and then the condos, so that we can see where

20   they were in relationship to your cruisers when

21   you -- when you parked.

22        A.    This is your condos.

23        Q.    Okay.  But write the word condo there.

24        A.    (Witness complies.)

25        Q.    And put a divot as to which way the
```

1   front would be.

2       A.   (Witness complies.)

3       Q.   And where is the subject's condo, the

4   one that --

5       A.   This one.

6       Q.   Okay.  So --

7       A.   I came in this way, looking for the

8   address.

9       Q.   Do you know where north is on this?

10      A.   I believe it's up that way.

11      Q.   Okay.  Put the -- put N down.

12      A.   (Witness complies.)

13      Q.   Okay.  So you entered coming north and

14  then went east around -- is this an island of

15  some kind?

16      A.   It's -- it's a, I think, covered

17  garages, is what it really is.

18      Q.   Okay.

19      A.   Parked cars all -- all through here.

20      Q.   Okay.  And are there mailboxes along

21  there?

22      A.   I don't think so.  I think the

23  mailboxes were over here.

24      Q.   Okay.  And you can put the word

25  mailboxes there.

1           And put the carport where that is.

2           What's that?  Those are more condos

3    there?

4        A.   Yeah.

5        Q.   Okay.

6           MR. GERHARDSTEIN:  All right.  Let's

7        mark this.

8           (Deposition Exhibit 9 was marked for

9           identification.)

10          MS. SEARS:  Are you going to keep using

11       that, Al?  We can make a copy of it after.

12       I'll make a copy of it.

13   BY MR. GERHARDSTEIN:

14       Q.   Okay.  Can you just mark on here the

15   direction of your travel?  Just put some arrows

16   along the way that shows how you traveled.

17       A.   (Witness complies.)

18       Q.   All right.  And then the condo that

19   Mr. Roell had -- had gone to the back of, was

20   it at the very end on the north side of that set

21   of buildings, right?

22       A.   Right.

23       Q.   Okay.

24          (Deposition Exhibit 10 was marked for

25          identification.)

 1    BY MR. GERHARDSTEIN:

 2        Q.   I'm going to show you what's been

 3    marked as Exhibit 10.  Do you recognize this?

 4              MS. WOEBER:  Was the diagram 10?

 5              MS. SEARS:  No, it's not.

 6              That's 8, and this is 9.  I'll make a

 7         copy of this.

 8        A.   This is the carport.

 9    BY MR. GERHARDSTEIN:

10        Q.   This is the carport at the condo area

11    where you engaged Mr. Roell?

12        A.   Yeah.

13        Q.   So when you were entering the facility,

14    did you notice the mailboxes with all those

15    plants stuffed in them?

16        A.   No.

17              (Deposition Exhibit 11 was marked for

18              identification.)

19    BY MR. GERHARDSTEIN:

20        Q.   Did there come a time when you learned

21    that Mr. Roell was actually the next-door

22    neighbor to the complainant?

23        A.   Afterwards, yeah.

24        Q.   And when you came to the condo units,

25    did you notice that the condo next door to the

1  complainant was wide open and there was debris

2  scattered about in the open doorway?

3      A.  No.

4      Q.  This is a photograph of that condo

5  unit.  Does this refresh your recollection as to

6  what the scene was like when you came up?

7      A.  No.

8          (Deposition Exhibit 12 was marked for

9          identification.)

10 BY MR. GERHARDSTEIN:

11     Q.  And this is Exhibit 12.  Do you

12 recognize this?

13     A.  Yes.

14     Q.  Is this a photograph of the planter

15 with the peat moss base and the plastic wrapping

16 around it?

17     A.  Yeah.

18     Q.  And that's what you -- that's what

19 Mr. Roell was holding in one of his hands,

20 right?

21     A.  Correct.

22         (Deposition Exhibit 13 was marked for

23         identification.)

24         MR. GERHARDSTEIN:  Is this 13?

25         THE REPORTER:  Uh-huh.

1   BY MR. GERHARDSTEIN:

2       Q.   Do you recognize this?

3       A.   Yeah.

4       Q.   And is that the garden hose that he was

5   holding in the other hand?

6       A.   Yes.

7       Q.   And was the garden hose from the

8   neighbor's property, the complainant's property,

9   or was it from somewhere else?

10      A.   I believe it was the complainant's

11  property.

12      Q.   Was the water running when he was

13  holding it?

14      A.   I don't think so.

15      Q.   And at the top right there, you get a

16  little sense of the size of the gate opening,

17  right?

18      A.   Right.

19           (Deposition Exhibit 14 was marked for

20           identification.)

21  BY MR. GERHARDSTEIN:

22      Q.   I'm going to who you what's been marked

23  as Exhibit 14.  Is this the direction of travel

24  that you walked after you arrived at the scene in

25  order to get back to the patio where Mr. Roell

1    was located?

2        A.   Yeah, this area.  We ran back.

3        Q.   Okay.  And so that last unit that we

4    see on the left side of the photograph would be

5    the complainant's unit, right?

6        A.   Yes.

7        Q.   And that's the privacy fence that

8    surrounded the patio, right?

9        A.   Yes.

10       Q.   And do you know what officer that is?

11       A.   I have no idea.

12         (Deposition Exhibit 15 was marked for

13         identification.)

14    BY MR. GERHARDSTEIN:

15       Q.   And I'm going to show you Exhibit 15.

16    Is this a photograph of the patio area depicting

17    the gate and the privacy fence?

18       A.   Yes.

19       Q.   And would you agree that the plant that

20    Deputy Alexander was up against is -- you can see

21    the top of it above that privacy fence on the

22    left, right?

23       A.   Yeah.

24       Q.   And when you say he was up against

25    that, was he standing?

1      A.   He was standing.  His back was into the

2   tree there.

3      Q.   Okay.  And was he still holding

4   Mr. Roell?

5      A.   I think they had ahold of one another.

6   But I'm not 100 percent sure.

7      Q.   And what side of him was he on?

8      A.   Who?

9      Q.   What side of Mr. Roell was

10  Deputy Alexander on?

11     A.   Deputy Alexander's back was into the

12  tree.

13     Q.   Uh-huh.

14     A.   Mr. Roell was facing him.

15     Q.   Was facing him.  And then where was --

16     A.   So I guess his back would probably be

17  down the condos.

18     Q.   Okay.  And where was Dalid?

19     A.   I don't know where he was at that time;

20  somewhere in the back.

21     Q.   Where you were you?

22     A.   Behind all of them.

23     Q.   Were you off work for any period of

24  time as a result of the use of force

25  investigation of Mr. Roell's death?

168

```
 1        A.    They gave us a day off.   Then that
 2   followed into our off days.
 3        Q.    So you were only off of work day for
 4   one day?
 5        A.    Yes.
 6        Q.    And was that was a paid day?
 7        A.    Yes.
 8        Q.    Have you ever listened to any of the
 9   interviews of any of the other officers?
10        A.    No.
11        Q.    Have you ever read any of the
12   documentation surrounding the use of force
13   investigation?
14        A.    No.
15        Q.    Did you examine the incident recall
16   records with respect to this event?
17        A.    No.
18        Q.    Have you ever worked dispatch?
19        A.    No.
20        Q.    Did this encounter with Mr. Roell end
21   as you had planned it?
22             MS. SEARS:  Objection.  Objection.
23             What do you mean, with his death?
24        A.    No.
25   BY MR. GERHARDSTEIN:
```

169

1     Q.   What's surprised you?

2     A.   We're not there to intend to take

3  somebody's life, if that's what you're

4  implying.

5     Q.   Is there anything, as you think back

6  about it, that you would have done differently in

7  the way you approached Mr. Roell?

8     A.   No.

9     Q.   Okay.

10       MR. GERHARDSTEIN:  All right.  I don't

11     have any more questions.

12       MS. SEARS:  Do you mind if I just have

13     this diagram that he did, and we'll have it

14     out.

15       MS. WOEBER:  Copies?

16       MS. SEARS:  Gus can do it.  You all

17     want copies?

18       Two copies for them and two copies for

19     us, please.

20                  EXAMINATION

21  BY MS. SEARS:

22     Q.   Deputy Dalid (sic), I want to follow up

23  on a few things that Mr. Gerhardstein --

24       MS. SEARS:  Is that correct?  I'm

25     sorry.

```
 1              MR. GERHARDSTEIN:  That's fine.

 2              MS. SEARS:  I try very much not to

 3       mispronounce it.

 4  BY MS. SEARS:

 5       Q.  -- that Mr. Gerhardstein covered.

 6  Okay?

 7              Do you want some more water, or are you

 8  good?

 9       A.  No.  I'm good.

10       Q.  The testimony that you're giving here

11  today, is it, sir, to the best of your

12  recollection?

13       A.  Yes.

14       Q.  You had indicated to Mr. Gerhardstein

15  that you had reviewed a copy of your -- a

16  transcript of your statement given at the time,

17  as well as a videotape.  You did both of those

18  things, right?

19       A.  Yes.

20       Q.  To the extent that your testimony here

21  today may differ in some detail from what you

22  gave at the time, which -- which statement do you

23  think would be more accurate?

24              MR. GERHARDSTEIN:  Objection.

25  BY MS. SEARS:
```

1    Q.   Go ahead.

2         MR. GERHARDSTEIN:  You can answer.

3    A.   Probably the -- the video statement

4  right after the incident occurred.

5  BY MS. SEARS:

6    Q.   You talked with Mr. Gerhardstein a

7  little about your training.  And you referred to

8  your corrections training, right --

9    A.   Right.

10   Q.   -- your corrections academy?

11        And you indicated that was a two-month

12  academy?

13   A.   I believe so, yes.

14   Q.   And in your corrections academy, did

15  you have occasion to have any instruction or any

16  units on interpersonal communications?

17   A.   Yes.

18   Q.   And what can you recall about those

19  units, if anything, for me?

20   A.   Just -- basically, just the way you

21  talk to people, how you handle a situation.

22        Your mouth is your best tool.  You'd

23  rather talk things out than have to go physical

24  with -- with anybody.

25   Q.   In the jail population, you mean --

1          A.    Correct.

2          Q.    -- or in corrections?

3          A.    Pretty much everywhere; but in the

4     jail.

5          Q.    And in the -- in the interpersonal

6     communications training, was there content on how

7     to talk to people appropriately in high-risk

8     situations?

9          A.    Yes.

10         Q.    Was there instruction on how to make

11    inferences in certain situations as to the level

12    of risk and the appropriate response?

13         A.    Yes.

14         Q.    Was there instruction on how you

15    posture and how you conduct yourself to minimize

16    confrontation?

17         A.    Yes.

18         Q.    And you said your mouth is your best

19    tool; is that right?

20         A.    Correct.

21         Q.    Explain to us what you mean by that.

22         A.    I'd rather talk somebody out of a

23    situation, rather than go in there and go

24    hands-on, and just talk to them, deescalate, try

25    to get them to do what you want with your mouth,

173

1    instead of go in there, guns blazing and just try

2    to --

3         Q.    Now, when you say guns blazing, you

4    don't mean literally, do you, in a jail?

5         A.    No, no.

6         Q.    Because what are you equipped with in

7    the jail besides your mouth and your -- and your

8    hands, obviously?

9         A.    Just a radio.  That's it.

10        Q.    Just a radio?

11        A.    Radio and handcuffs.

12        Q.    And when you are in corrections, in a

13   particular pod, let's say, as opposed to -- there

14   is booth that you're assigned to; is that right?

15        A.    Yes.

16        Q.    And that's an enclosed area?

17        A.    Yes.

18        Q.    Inmates don't have access to that?  Or

19   do they?  I don't --

20        A.    No.

21        Q.    And there are something called rovers

22   or persons assigned to the pods; is that -- am I

23   correct about that?

24        A.    No.  A rover is just somebody that

25   transports inmates.

174

```
 1        Q.   Oh, okay.

 2             So how many deputies would there be

 3   assigned to a particular pod?

 4        A.   To one unit, just two.

 5        Q.   Two deputies to how many inmates?

 6        A.   You've got up to -- I forget how many

 7   cells there are.  But usually it's double-cell.

 8   I think there's 56 cells, if I'm -- so about --

 9   over 100.

10        Q.   All right.

11        A.   Maybe over 100.

12        Q.   Okay.  I won't call you on the --

13        A.   Right.

14        Q.   -- detail.  But -- okay.

15             So you're just estimating based on your

16   recollection --

17        A.   Right.

18        Q.   -- that there are about 100 --

19   potentially 100 inmates in a pod --

20        A.   Correct.

21        Q.   -- to two deputies; is that correct?

22        A.   Yes.

23        Q.   So is it a fair statement to say that

24   any -- at any time, you're outmanned --

25        A.   Oh, absolutely.
```

1    Q.    -- or outwomaned --

2    A.    Absolutely.

3    Q.    -- depending on the situation?  All

4  right.

5          In your IPC -- IPC unit -- is that --

6  is that what you call it, your interpersonal

7  communications unit that you had in the -- in the

8  corrections academy?  That's what you guys refer

9  to it as, IPC?

10    A.    IPC skills is what it's called.

11    Q.    Okay.  So can I just call it IPC and

12  we'll know what I'm --

13    A.    Yeah.

14    Q.    -- you'll know what I'm talking about?

15          Okay.  So in your IPC unit, were you

16  also instructed how to, I guess, read a person's

17  affect, their body language, their appearance,

18  including what they did -- what they verbally

19  said, and, of course, their nonverbals in order

20  to assess the risk and the level of tension or --

21  or risk involved in the situation?

22    A.    Yes.

23    Q.    In your IPC unit, were you taught or

24  instructed or given some techniques on how to

25  formulate an appropriate response to the risk

1  that you assessed in order not to, I guess,

2  accentuate the risk, but rather defuse it?

3      A.   I don't -- I don't remember.

4      Q.   Okay.  Were you -- if you recall --

5  were you given some techniques or tools as to how

6  to apply the behavior that -- or the skills that

7  you were taught in IPC in the corrections

8  setting, if you recall?

9      A.   I -- I don't really recall.

10     Q.   Now, this training, was this

11  scenario-based training and/or lecture-based

12  training, if you recall?

13     A.   I know it was lecture-based.  I don't

14  know if it was scenario-based or not.  I can't

15  remember.

16     Q.   Can't remember?

17          MS. SEARS:  If we could mark this as

18          Exhibit A, please.

19          (Deposition Exhibit A was marked for

20          identification.)

21          MS. SEARS:  And then, Al, I have one

22          for you that's in a Redweld so you don't --

23          you can go along with these other two.

24          These will be our next two exhibits.

25          So this will be A.

1    BY MS. SEARS:

2         Q.   So, Deputy Huddleston, I'll just ask

3    you to look -- I'm not going to ask you to read

4    this.  I think it's about 345 pages or so.  I

5    don't know.  I can't remember how many it is.

6    Let's see how good of a memory I have; 342.

7              So I'm just -- I know Mr. Gerhardstein

8    offered you kind of a curriculum that was the

9    peace officer training curriculum portion.  And

10   there are similarities in the -- in the way that

11   they're designed.

12             But can you just maybe take a glance at

13   the first couple pages and tell me if you -- if

14   this appears to be the curriculum that -- on IPC,

15   interpersonal communications corrections

16   training, that you took prior to becoming a

17   corrections officer for Hamilton County?

18        A.   Yeah; looks familiar.

19        Q.   Okay.  And then when you -- I think you

20   indicated to Mr. Gerhardstein that you -- you

21   were graded in that academy.  And you were

22   successful in completing that academy; is that

23   right?

24        A.   Yes.

25        Q.   Okay.

```
 1              MS. SEARS:  I'm sorry.  You know what I
 2         was going to do for you is give you a
 3         Redweld.  I'll just give you this Redweld so
 4         you don't have to worry about losing some of
 5         that.  Because -- do you want to put that in
 6         there, Exhibit A?  You want to put that in
 7         that Redweld there?
 8              THE WITNESS:  Oh.
 9              MS. SEARS:  -- for the court reporter?
10         It's a littler easier for her to take.
11    BY MS. SEARS:
12    Q.   So -- oh.
13              MS. SEARS:  I'm sorry.  I'm really bad
14         about handing you things and then keep
15         talking --
16              THE REPORTER:  Okay.
17              MS. SEARS:  -- and forgetting that you
18         have -- exactly.  I'm bad at it.  I'm really
19         bad at it.
20              I get in my own little world.  So don't
21         hesitate -- you're in charge of me.  So
22         don't hesitate to throw the high sign and
23         tell me to be quiet until you get ready to
24         type.
25              THE REPORTER:  Okay.
```

1    BY MS. SEARS:

2        Q.   All right.  So, Deputy, I think you

3    indicated to Mr. Gerhardstein -- stein that you

4    were able -- you passed that academy, that

5    corrections academy, and you became a corrections

6    officer for Hamilton County; is that right?

7        A.   Yes.

8        Q.   Okay.  So remind me again how long you

9    worked in corrections.  I know you told

10   Mr. Gerhardstein, but I didn't write it down.

11   I'm sorry.

12       A.   I believe I was there seven-and-a-half

13   years.

14       Q.   Okay.  And while you were in

15   corrections, did you have the opportunity to

16   employ the skills that you've been taught in your

17   IPC training on a daily basis?

18       A.   Yes.

19       Q.   And were you able to diffuse a

20   situation using your -- your verbal skills and

21   the skills that you were taught?

22       A.   Yes.

23       Q.   Now, while you were in corrections

24   during this time, did you have a -- did you have

25   an opportunity to practice these interpersonal

1    skills on a daily basis?

2         A.    In the jail?  Yes.

3         Q.    And did you have occasion to have

4    scenarios that maybe you were not certain how to

5    respond to them, to run them by supervisors to

6    maybe get the benefit of some sort of on-the-job

7    training?

8         A.    Some of the time.

9         Q.    You told Mr. Gerhardstein, or you

10   mentioned something about the CERT team,

11   Corrections Emergency Response Team.

12        A.    Right.

13        Q.    That's what I wrote down.

14              Can you tell me what exactly that is?

15        A.    It's just an emergency response team.

16   It's a group of guys who get all dressed up with

17   protective clothing, protective gear, to go in

18   and handle situations where the inmate's not

19   going to comply, no matter who's there and who's

20   talking to them.

21              Then we have to go in there and deal

22   with the situation.

23        Q.    Now, is the CERT team composed only of

24   men?

25        A.    There's women on it.

1      Q.    There are?

2      A.    Yes.

3      Q.    Okay.  And they use a CERT -- they wear

4    protective gear?

5      A.    Yes.

6      Q.    And do they have those -- those masks?

7      A.    Yes.

8      Q.    You know, the plastic in the front and

9    they look -- I mean, the gear kind of makes you

10   look a little menacing, as I'm thinking of what

11   it is.

12     A.    Yeah.  It's --

13     Q.    Like all black?

14     A.    All black.  You've got kneepads, elbow

15   pads, body -- body vests, helmet.

16     Q.    Okay.  Any other -- any other weapons

17   or anything, any sticks or anything like that, or

18   batons or --

19     A.    I think there's certain people that

20   stand in the back that carry pepper ball guns,

21   just in case.

22          You've got mace and stuff you carry.

23   But you try to go hands-on first before we use

24   any of that stuff.

25     Q.    And is one of the concerns in

1    corrections, even on the CERT team, is that

2    whatever you may have on you that could be

3    converted into a weapon you maintain under your

4    control?

5         A.    Right.

6         Q.    And is there some concern about making

7    sure the things that you do have on your person

8    can be controlled, even if an inmate couldn't get

9    control of them?

10        A.    Yeah.

11        Q.    Is that right?

12        A.    Yes.

13        Q.    And why is there a CERT team, do you

14   know?

15        A.    Just we're the ones that go in there

16   and deal with the stuff that other officers

17   can't, or just go in there and control -- control

18   the situation, to show force, force by numbers,

19   and --

20        Q.    And when -- what kinds of events or

21   scenarios would exist where a CERT team would be

22   called, as opposed to just the deputies on pod,

23   or maybe some reinforcements handling it?

24        A.    There's numerous -- there's inmates

25   refusing commands, refusing orders, refusing to

1    go back to their cell, destroying the pod.

2            Or we have other situations where

3    you've got inmates that need to come out of their

4    cells because they're -- they're smearing feces

5    and stuff on the side of the walls.  And we've

6    got to go in there and get them out, as well.

7        Q.   And is there a tactical consideration

8    or a safety -- an officer safety consideration of

9    sending one or two deputies in there as opposed

10   to maybe having a show of force?

11       A.   Yes.

12       Q.   And what is that?

13       A.   We send -- I think there's at least

14   four, four or five on a team.

15            They go in -- it's not just one -- one

16   guy at a time, not just two guys at a time.  We

17   all go in.

18       Q.   Now, are there some, I guess, adverse

19   tactical considerations for having, you know, six

20   or seven officers on -- in one scenario?

21       A.   Right.

22       Q.   And what would those adverse

23   technical -- or tactical considerations be?

24       A.   In the jail setting?  Just coming in

25   different doors.  If -- setting up differently,

1    maybe three and four.

2            You just separate -- separate guys.

3        Q.   So I'm not understanding you.

4            So I'm talking about a reason why you

5    wouldn't want six or seven guys.

6        A.   Oh.

7        Q.   Yes.  That's what -- sorry.

8        A.   I'm sorry.

9        Q.   No.  It's my fault.  If you don't

10   understand a question, it's always my fault.

11           I meant were there -- are there any

12   negative reasons why you wouldn't want six or

13   seven guys in a certain unit, or any other unit,

14   going in and handling the situation?

15       A.   It's just -- it's just too many people.

16   It's easier just to have a small group in there

17   to get ahold of the subject, rather than having

18   20 arms in there trying to fight for the same

19   limb.

20       Q.   Uh-huh.  And is there a tactical

21   consideration of officers, a sort of a friendly

22   fire kind of situation?

23       A.   Yeah, kind of.

24       Q.   So is it fair to say -- or correct me

25   if I'm wrong -- that the CERT unit is a

1    specialized unit?

2         A.    It is.

3         Q.    And how is it that you become a member

4    of the CERT -- how are you chosen to become one

5    of those people?

6         A.    You've got to be physically fit.

7    You've got to go through a physical training.

8         Q.    What kind of physical training?

9         A.    You've got to do your run, push-ups,

10   sit-ups in a certain amount of time.

11        Q.    Okay.

12        A.    You have to take a test, have to sit

13   through -- I think it's a week-long -- I think

14   it's a -- now it's a week-long, or was a

15   week-long course you have to sit through.

16             And you have to take a test at the end.

17        Q.    Okay.  In your corrections academy, do

18   you have a unit on subject control?

19        A.    Yes.

20        Q.    And is -- is that a physical unit where

21   you -- you actually engage in subject control

22   maneuvers and techniques?

23        A.    Yes.

24        Q.    And are you taught sort of hands-on

25   physical control?

1        A.   Yes.

2        Q.   And can you tell me what some of the

3   hands-on physical control techniques that you

4   were taught would be appropriate to use in the

5   corrections center?

6        A.   You've got the arm bar, arm bar

7   takedown grab the arm and take them down, just

8   get them to the ground as good as you can, and

9   then try to get -- try to get each arm; control

10  them, just control the limbs and stuff like that,

11  so they can't fight, kick; along those lines.

12       Q.   Okay.  And in this physical control

13  unit, are you taught techniques that are designed

14  to take control of the subject as expeditiously

15  or as quickly as possible?

16       A.   Yes.

17       Q.   Are there tactical considerations for

18  taking control of the subject as quickly as

19  possible?

20       A.   Yes.

21       Q.   And what are those tactical

22  considerations?

23       A.   Get them into custody as quickly as you

24  can to prevent injury to yourself or others.

25       Q.   And what about the subject?

1       A.    Yeah, and the subject.

2       Q.    To prevent injuries to the subject?

3       A.    To prevent injury to the subject.

4       Q.    And are there -- are you taught

5  tactical considerations of using the least amount

6  of force to gain subject control?

7       A.    Yes.

8       Q.    Now, can you tell me the difference

9  between hands-on physical maneuvers and what are

10  called and sometimes referred to as hard-hands?

11          What are hard-hands?

12      A.    Hard-hands is like your fist.  It's

13  going to be your batons.  It's going to be your

14  Taser, your mace, intermediate weapons.

15      Q.    Okay.  So correct me if I'm wrong.  If

16  I'm going hands-on with somebody, I might grab

17  their arm and try to bring it behind their back

18  and force them to the ground?

19      A.    Right.

20      Q.    Would that be a hands-on technique?

21      A.    That would be your -- your physical

22  force, you're grabbing on the arms.

23      Q.    If they're coming at me and I just cold

24  cock them with my fist right in the nose and

25  knock them on their rear end, is that a

1    hard-hands technique?

2        A.   Yeah.

3        Q.   If I take my heel -- my heel of my hand

4    and strike them in their calf area or some other

5    place to gain pain compliance, is that a

6    hard-hands technique?

7        A.   Yeah.

8        Q.   Are pain compliant techniques used with

9    a Taser, for example, the stun -- the drive stun

10   gun; is that a pain compliance technique?

11       A.   Yes.

12       Q.   Are those all considered hard-hands

13   techniques?

14       A.   Yes.

15       Q.   Okay.  So we've established that the

16   CERT is a specified -- a special unit that not

17   everyone is -- is invited to join; is that

18   correct?

19       A.   Correct.

20       Q.   And do you know how it is -- well, let

21   me ask you this.

22            How long were you in corrections before

23   they -- before you joined CERT?

24            I don't know how you came to be on

25   CERT.  I guess I should ask you that next.

1         A.    I don't remember how long I was on,

2    maybe two or three years -- three years maybe.

3         Q.    Three years in corrections before you

4    went to CERT -- before you became part of the

5    CERT --

6         A.    Maybe four, a little longer.

7         Q.    Do you recall how it is that you became

8    part of CERT?  Did someone ask you to?  Did you

9    apply for it?  How did that -- how did --

10        A.    I think it all started with the

11   initial -- having that lieutenant call me up to

12   tase that one girl.

13             And then I asked to be on the team.

14   Then they set up a -- a program to get on the

15   team, the test, and all those requirements.

16        Q.    And when you went through that CERT

17   program to be on the team, were you the only one

18   going through the program at that time, or were

19   there other --

20        A.    No.  There was a handful of people.

21        Q.    Was Deputy Alexander in that group at

22   that time?

23        A.    I think so, yes.

24        Q.    And on CERT, once you were on a team,

25   did you receive some specialized training on

1    different -- different types of scenarios while

2    you were on CERT; I'm thinking, for example,

3    counter-terrorism training that you had.

4         A.    Counter-terrorism?  I don't know.

5         Q.    You don't remember?

6         A.    We did do some other specialized

7    tactical training.

8         Q.    Okay.  And was it -- this tactical

9    training, was it specifically designed for the --

10   for the jail context?

11        A.    Yes.

12        Q.    And so this tactical training, did

13   it -- did it have a component building on or some

14   aspects of this interpersonal communication piece

15   that we talked about?  Or was it mostly just the

16   physical kind of tactical maneuvers?

17        A.    No.  It had the IPC skills involved.

18        Q.    As well as physical tactical maneuvers?

19        A.    Correct.

20        Q.    And how many of those kind of

21   specialized units or trainings, in-service,

22   whatever you want to call them -- how many of

23   those would you have over the course of your time

24   in corrections that you had the benefit of

25   participating in?

1          A.   I think they do it once a month.

2          Q.   Once a month?

3          A.   Yeah.

4          Q.   And these trainings, would they be on

5    specialized topics, or -- I mean, how -- how did

6    that work?

7          A.   It would -- it was for four hours, once

8    a month.

9          Q.   Uh-huh.

10         A.   You go to a certain cell --

11         Q.   Uh-huh.

12         A.   -- or a certain pod.

13         Q.   Yes.

14         A.   They clear out all the inmates.  And

15   we'd do tactical stuff in there about getting

16   inmates out of cells or -- or going in pods if an

17   inmate's refusing to go into a cell and was just

18   out in the middle of the pod; how to take care of

19   that.

20         Q.   So these were scenario-based trainings?

21   Am I --

22         A.   Scenario-based, and we also had -- at

23   the end, the last hour was like test-based

24   questions.

25         Q.   Were you evaluated on your performance,

1    like given feedback?

2            As you did something, would the

3    instructor go, wow, that was great, this is how I

4    would do it differently?  Was it sort of give and

5    take?

6        A.   Yeah.  It was verbal feedback.

7        Q.   And on -- while you were in

8    corrections, if you can tell us, how many CERT

9    incidents, actually, were you called upon to

10   participate in?

11       A.   I -- I can't recall.  It was probably

12   ten, ten or more.

13       Q.   Okay.  And in those CERT incidents, was

14   anyone hospitalized as a result of what you had

15   to do?

16       A.   No.

17       Q.   Was anyone injured, to your

18   knowledge?

19       A.   No.

20       Q.   And is that sort of the goal of the

21   whole thing --

22       A.   Yes.

23       Q.   -- to not injure anyone?

24            Now, let's translate that for just a

25   heartbeat to the real world and not the jail

1   setting.  Okay?

2            Are there some differences, from your

3   perspective as a tactical -- from a tactical

4   standpoint, from a CERT team going into a cell

5   and, for example, you and Deputy Alexander and

6   Dalid responding to a neighbor trouble run?

7        A.   Is there a difference?

8        Q.   Yes, from a tactical standpoint.

9        A.   Just a little bit, because it's --

10       Q.   What would that be?

11       A.   It's more real world.

12            You have a chance of weapons on the --

13   on the outside, rather than you do on the --

14   in -- in jail.

15       Q.   Uh-huh.

16       A.   So you've got to be -- pay a little

17   more attention to that.  But it's basically --

18   it's basically the same.

19       Q.   Would you say that in the jail context

20   that there are less variables that are out of

21   your control than there are in the real-world

22   context?

23       A.   Yes.

24       Q.   Would you say so?

25       A.   Yeah.

1     Q.   All right.  So then you talked to

2   Mr. Gerhardstein a little bit about -- stein -- a

3   little bit about the psych ward.  You said you

4   worked in the psych ward.

5          When in the course of your employment

6   with the sheriff's department, and in

7   corrections, I guess -- how long had you been on

8   before you went and worked in the psych ward?

9     A.   I -- I can't remember; maybe saying

10   about four years.

11     Q.   And were you chosen to work in the

12   psych ward?  Or did you ask like you did with

13   CERT?

14          How did it come to be that you worked

15   in the psych ward?

16     A.   I asked to go down there.  I asked to

17   work down there.

18     Q.   And I think you answered this to

19   Mr. Gerhardstein, why you wanted to go down

20   there.  But tell me that again, because I didn't

21   write it down.  I'm sorry.

22     A.   I like -- like dealing with those type

23   of people and trying to help them out.

24     Q.   Had you had any involvement or dealings

25   with people that had mental health issues and

```
 1    mental health problems prior to working in the

 2    sheriff's department?

 3         A.   No, not really.

 4         Q.   And while you were in the

 5    corrections -- you know, out in the general --

 6    call it general population.  Is that -- can I

 7    say --

 8         A.   Yeah.

 9         Q.   -- that?

10         Did you come into contact with people

11    who -- that it was determined had mental health

12    issues?

13         A.   Yes.

14         Q.   Did you come into contact with people

15    who had substance abuse issues?

16         A.   Yes.

17         Q.   Did you have to come into contact with

18    people who we call dually diagnosed, having both

19    substance abuse issues and mental health

20    issues?

21         A.   Yes.

22         Q.   Did you come into contact with people

23    who were currently intoxicated?

24         A.   Yes.

25         Q.   Did you come into contact with people
```

1    who were currently under the influence of drugs?

2        A.    Yes.

3        Q.    Did you ever come into contact with

4    anyone that was under the -- under some other

5    kind of medical, I guess, adverse situation, like

6    an epileptic seizure or a diabetic coma or some

7    other kind of what turned out to be a medical

8    problem that mimicked intoxication?

9        A.    Yeah.

10       Q.    And at the time you observed the

11   behavior, were you able to determine, boy, this

12   is -- this is intoxication, this is, you know

13   withdrawal from psychotropic medication?  Were

14   you able to make those distinctions when you

15   observed the person?

16       A.    No.

17       Q.    Did you rely on medical personnel to

18   make those determinations?

19       A.    Yes.

20       Q.    So you asked to go down to the psych

21   unit --

22       A.    Yes.

23       Q.    -- to work down there?

24             And how did that process occur and how

25   were you approved or selected, or how did that

1    happen?

2         A.   Like I said, there was about four or

3    five officers that worked in there.  And I guess

4    they were short one weekend or -- and they put me

5    down there to fill.

6              And after a while, I just stayed.

7         Q.   And is that -- is that because -- I

8    mean, why is that, do you know?

9         A.   I liked it.  They knew I did a good job

10   down there.

11        Q.   In the psych ward as opposed to the

12   general population, tell me what similarities

13   there were in your role in -- in terms of the IPC

14   skills.

15             What was similar in those two

16   populations?

17        A.   I mean, you still have to -- to talk to

18   them to get them to calm down.  I mean, they

19   still get agitated like a normal person.  But you

20   still got to get them to calm down.

21             And it might take a little longer, but

22   you just -- you just know how they are and how

23   they act and --

24        Q.   You got to know them; is that what

25   you --

```
 1        A.    Yeah.  You get to -- you get to know
 2   them.
 3        Q.    And were there some people in the psych
 4   ward that were on their medications?
 5        A.    Yes.
 6        Q.    Were there some people in that psych
 7   ward that were off their medications?
 8        A.    Yes.
 9        Q.    Was there a similarity between the two
10   populations in reading nonverbal skills to make
11   assessments as to whether the situation was going
12   to be high-risk, low-risk, medium-risk, or
13   whether there was going to be some physical
14   altercation?
15        A.    Yeah.
16        Q.    In the actual psych ward itself, can
17   you tell me how -- how that was staffed?
18              So like let's say -- I don't know what
19   the shifts are.
20              But let's say you're in a shift and
21   you're in the psych ward.  How many deputies are
22   in the psych ward?
23        A.    I think there is four or five.
24        Q.    Okay.  Can you -- do you know, if you
25   recall, where they might be located?  Did they
```

1   have particular assignments?

2       A.   One's in the booth.  There was like a

3   two-hour rotation.

4       Q.   Okay.

5       A.   One's in the booth, door -- on the

6   door, opening up the doors, computer, phone.

7       Q.   Is this the same as general, the

8   inmates don't have passes?

9       A.   Right.

10      Q.   Okay.

11      A.   One guys's in B Pod, which is a suicide

12  watch pod.  He's got to walk around and check

13  inmates ten -- every ten minutes.

14      Q.   Okay.

15      A.   And then, I guess, it's just two other

16  guys.  I guess there's only four.

17           Then the two other guys are the -- the

18  floaters, walking around checking on all the

19  other inmates and helping medical staff give out

20  medications and whatnot.

21      Q.   Okay.  So there's the -- there are

22  three or four pods, right?

23      A.   Yes.

24      Q.   And in C Pod -- how many people would

25  be in C Pod at any particular time?

```
 1        A.    That's -- that's the biggest, so
 2   maybe -- I can't remember; 36, 30.
 3        Q.    Okay.  And while you were in the --
 4   working in the psych unit, did you have occasion
 5   to utilize the interpersonal skills that you
 6   learned in the academy and then -- and then, I
 7   guess, used on a daily basis while you were in
 8   the general population corrections?
 9        A.    Yes.
10        Q.    And was there ever an incident that you
11   weren't able to handle using your interpersonal
12   skills that got out of control?  Or is there
13   anything like that that had ever happened?
14        A.    Yeah.
15        Q.    Okay.  Tell us about that.
16        A.    I just remember one time I was trying
17   to get this guy to calm down and got back into
18   his cell.  And he -- he came at me.  So we had to
19   go hands-on again --
20        Q.    Okay.
21        A.    -- had to take control of the
22   situation.
23        Q.    All right.  And was this someone that
24   you had had some contact with before this
25   incident?
```

```
1          A.    I believe so.

2          Q.    And so this is someone that maybe you

3    knew their name and you had a relationship --

4          A.    Yeah.

5          Q.    -- somewhat of a relationship with

6    them?

7                Nevertheless, they became agitated for

8    some reason?

9          A.    Right.

10         Q.    And you weren't able to defuse that?

11         A.    Right.

12         Q.    Did you try to defuse it?

13         A.    I did.

14         Q.    And -- but you weren't successful --

15         A.    Right.

16         Q.    -- in that particular situation?

17               So you had to go hands-on?

18         A.    Hands-on.

19         Q.    And was that hard-hands or just

20   hands-on?

21         A.    Just hands-on.

22         Q.    I think that Mr. Gerhardstein asked you

23   about the patrol academy.  And you indicated you

24   attended Butler Tech's patrol academy --

25         A.    Yes.
```

1      Q.   -- is that right?

2           And were you also working at the

3      sheriff's department while you attended that

4      academy?

5      A.   I was.

6           Now, Mr. Gerhardstein showed you --

7           MS. SEARS:  Well, before I do that, let

8      me -- this would be B.

9           (Deposition B was marked for

10          identification.)

11     BY MS. SEARS:

12     Q.   I'll show you what I've marked as

13     Exhibit B for purposes of your deposition.

14          This purports to be an Ohio peace

15     officer training curriculum, basic training

16     curriculum.  Could you just look at it, just

17     glance at it?

18          I don't expect you to read it or -- or

19     take too much time with it.  And just let me know

20     when you've accomplished that.

21     A.   Okay.

22     Q.   You have?

23          Do these topics appear to be the topics

24     that you would have taken in the basic police

25     officer academy course?

1        A.   Yes.

2        Q.   And is this academy course curriculum,

3   if you know -- is it mandated by OPOTA?

4        A.   Yes.

5        Q.   And at the close of the academy, I

6   think you told Mr. Gerhardstein, you have to take

7   a test, right?

8        A.   Correct.

9        Q.   And that's a state-administered OPOTA

10  test.  Am I right about that?

11       A.   Yes.

12       Q.   And there's a physical component.  Is

13  there -- and a written component?

14       A.   Yes.

15       Q.   And you passed that on the first try?

16       A.   Yes.

17       Q.   If I could just call your attention to

18  the top, it says -- this particular Exhibit B

19  says this curriculum was 558 hours.  Does that

20  seem right to you, or do you not recall?

21       A.   It seems right.  I thought it was

22  longer.

23       Q.   Were you doing a day academy or doing

24  it at night?

25       A.   Daytime.

1      Q.   And can -- and just Unit 1,

2  Administration, if I could call your attention to

3  5 or -- 5 and 6, there's a unit here on ethics

4  and professionalism in community policing; is

5  that right?

6      A.   Yes.

7      Q.   Did you take those units --

8      A.   Yes.

9      Q.   -- to your knowledge?

10          In terms of the legal unit, 77 hours,

11  if I could call your attention to the next page,

12  3, 4, 5, and 6, Laws of Arrest, Search and

13  Seizure, Legal Aspects of Interview and

14  Interrogation, and Civil Liability and Use of

15  Force; did you take those units?

16      A.   Yes.

17      Q.   And then the Human Relations unit,

18  Unit 3, Handling the Special Needs Population; do

19  you see that?

20      A.   Yes.

21      Q.   Now, Mr. Gerhardstein -- if I could ask

22  you to look at Exhibit 6 -- it's in that pile

23  right there.

24          MS. MARTIN:  It might be in the book.

25          MS. SEARS:  Oh, it's in -- maybe in the

1      book.  Oh, I'm so sorry.

2           I didn't realize there was a book.

3  BY MS. SEARS:

4      Q.  Is that the -- is that what

5  Mr. Gerhardstein showed you is the -- I guess,

6  the portion of the Interacting with the Special

7  Needs Population that you took while you were in

8  the patrol academy --

9      A.  Right.

10     Q.  -- is that right?

11     A.  Yes.

12         MS. SEARS:  Can I have this marked as

13         C, please?

14             And I've given you a copy of it

15         already.

16             (Deposition Exhibit C was marked for

17             identification.)

18         MR. GERHARDSTEIN:  I have Crisis

19         Intervention.

20         MS. SEARS:  You should have it, as

21         well.  I gave them both to you.

22             They were all in the folder.

23         MR. GERHARDSTEIN:  Maybe it's in here.

24         MS. SEARS:  I apologize.  The paralegal

25         was supposed to make -- that's the IPC.

1           What's that right below there?

2           MR. GERHARDSTEIN:  This is Crisis

3       Intervention.

4           MS. SEARS:  And what's this right here?

5           That's -- that's --

6           MR. GERHARDSTEIN:  That's the

7       original.

8           MR. GERHARDSTEIN:  Is this --

9           MS. SEARS:  Maybe I have --

10          MR. GERHARDSTEIN:  Do you have Special

11      Needs?  Okay.

12          Here, let me have that.  We got it.

13          MS. SEARS:  Okay.  Good.

14  BY MS. SEARS:

15      Q.   All right.  So I've asked you to look

16  at what's been marked as Exhibit C.

17          MS. SEARS:  I don't know where my copy

18      is now.  It's here somewhere.  Here it is.

19      I mismarked it.

20  BY MS. SEARS:

21      Q.   And just compare that with -- if you

22  would, with Mr. Gerhardstein's Exhibit 6.

23          Does that -- do the first pages of that

24  appear to be same --

25      A.   Yes.

1      Q.    -- Deputy?

2      A.    Yes.

3      Q.    Mr. Gerhardstein's exhibit consists of,

4   I guess, nine pages -- or let me look at it --

5   eleven pages of curriculum and a couple

6   overheads; is that right?

7            Can you look at that time?

8      A.    Yeah.

9      Q.    Is that right?

10     A.    (Nodding head.)

11     Q.    And then the curriculum that I've shown

12  you that's Exhibit C, that has -- if you don't

13  mind looking at it -- about 154 pages -- well,

14  not a curriculum, there's a test at the end.

15           There's -- let's see -- 148 pages of

16  curriculum.

17           Do you see that?

18     A.    Yes.

19           MS. SEARS:  And then if I could have

20        this marked as Exhibit D, please.

21           (Deposition Exhibit D was marked for

22           identification.)

23  BY MS. SEARS:

24     Q.    I'm showing you something that's marked

25  as Exhibit D for purposes of your deposition.

```
 1            Does this appear to be an OPOTA, peace
 2    officers training curriculum on crisis
 3    intervention?
 4        A.   Yes.
 5        Q.   When we're looking at Exhibit B, which
 6    is the -- the outline of the curriculum, in
 7    unit 3 it says, Handling of Special Needs
 8    Population and Crisis Intervention.
 9            Do you recall taking both of those
10    units, Deputy?
11        A.   Yes.
12            MS. SEARS:  If we could mark this as E,
13        please.
14            (Deposition Exhibit E was marked for
15            identification.)
16    BY MS. SEARS:
17        Q.   Deputy Huddleston, can you identify
18    this document for me?
19        A.   Yes.  It's the student sign-in sheet
20    from Butler Tech.
21        Q.   For what -- what unit?
22        A.   Interacting with special needs.
23        Q.   Is your signature on that page?
24        A.   It is.
25        Q.   And what number is that?
```

1        A.    Number 10.

2              MS. SEARS:  If I could have this marked

3        as F, please.

4              (Deposition Exhibit F was marked for

5              identification.)

6              MR. GERHARDSTEIN:  That is the same.

7              I think you meant to -- to do one of

8        the others.

9              MS. SEARS:  Let me see.

10             No.  This is -- this is a different

11       date.  If you see, this is 2/22, and the

12       other was 2/18.

13             MR. GERHARDSTEIN:  Oh, I see.

14             MS. SEARS:  It's an -- it's a 16-hour

15       unit.

16       BY MS. SEARS:

17       Q.   When you look at -- what did we say

18       that is, F?

19       A.   Yeah.

20       Q.   When you look at F, is this a sign-in

21       sheet from the Butler Tech police officer

22       training academy from February 22nd, '10?

23       A.   It is.

24       Q.   And is your signature on that page?

25       A.   It is.

1      Q.    And that is a crisis intervention unit

2    that you signed in for that class; is that right?

3      A.    Yes.

4            MR. GERHARDSTEIN:  Special needs.

5            MS. SEARS:  Special needs.  Thank

6        you.

7            (Deposition Exhibit G was marked for

8            identification.)

9    BY MS. SEARS:

10     Q.    Deputy, I'm handing you what's been

11    marked Exhibit G for purposes of your deposition.

12            Is this a sign-in sheet from Butler

13    Tech Police Academy --

14     A.    Yes.

15     Q.    -- dated 2/19/10; is that right, at the

16    top?

17     A.    2/22/10.

18     Q.    2/22/10.  Okay.  I had them confused.

19            And is this a sign-in sheet for

20    interacting -- let me see; make sure I'm on the

21    right page -- crisis intervention, right?

22     A.    Yes.

23     Q.    Am I on the right page now?

24     A.    Yes.

25     Q.    Okay.  And is that your signature on

1    Number 10?

2         A.   It is, yes.

3         Q.   Mr. Gerhardstein asked you about your

4    training once you got to the patrol division and

5    asked you to list all of your training.

6              Did you bring a list of all your

7    training with you today?

8         A.   I did not.

9         Q.   Did you -- did you attempt to testify,

10   to the best of your recollection, to the various

11   trainings you had?

12        A.   I did.

13        Q.   The sheriff -- you communicated to

14   Mr. Gerhardstein the sheriff's department may

15   have a record of those trainings; is that right?

16        A.   Yes.

17        Q.   But, specifically, you listed firearms.

18             I'm not sure about this; did you list

19   use of force?

20        A.   Training.

21        Q.   Yeah.  Did you?  I wasn't sure.  I

22   wanted to make sure I didn't write something down

23   that you didn't say.

24             And you indicated excited delirium,

25   right?

1       A.   I don't recall.

2       Q.   Okay.  And Taser training?

3       A.   Yes.

4       Q.   While we're talking about that, if you

5  don't mind looking at Exhibit --

6            MS. SEARS:  Is this in the bind -- is

7            this in the book then, the excited delirium

8            training that you all had as an exhibit?

9            Would it be in your book?

10           MR. GERHARDSTEIN:  The originals are

11           all in that book.

12           MS. SEARS:  Exhibit 2.  It's in this

13           book, here.

14           Oh, it's not.  Okay.  I'm sorry.

15  BY MS. SEARS:

16      Q.   All right.  Are you looking at

17  Exhibit 2 now?

18      A.   Yeah.

19      Q.   Now, I think you discussed this with

20  Mr. Gerhardstein.  This is a roll call training,

21  right?

22      A.   Correct.

23      Q.   And do you recall when you took this

24  roll call training?

25      A.   I don't remember the exact date.

1          Q.    Was it before or after the incident

2     with Mr. Roell?

3          A.    I've taken them before with the X2 -- I

4     mean X26.

5               I've also taken one with the X2.

6          Q.    You've taken -- you've taken some Taser

7     recertification trainings, correct?

8          A.    Yes.

9          Q.    And you've taken roll call trainings,

10    as well?

11         A.    Yes.

12         Q.    So this roll call training, Exhibit 2,

13    you remember taking this training?

14         A.    Yes.

15         Q.    Okay.  Do you remember when you took

16    it?

17         A.    I don't recall.

18         Q.    Where were you in -- when you were in

19    the patrol academy, did you do -- did you have a

20    unit on physical control of subjects?

21         A.    Yes.

22         Q.    And did you have a unit on first aid?

23         A.    Yes.

24         Q.    Did you have a unit on responding to

25    crimes in progress?

```
 1          A.   Yes, I believe so.

 2          Q.   Did you have a unit on controlling

 3    nonviolent crowds and confronting possible crowds

 4    of people?

 5          A.   Yes.

 6          Q.   Did you have an -- did you have a unit

 7    on interview and interrogation techniques?

 8          A.   Yes.

 9               MS. SEARS:  H.

10               (Deposition Exhibit H was marked for

11               identification.)

12    BY MS. SEARS:

13          Q.   I think you discussed this with

14    Mr. Gerhardstein.

15               Is this your certificate from your

16    Taser X2 training -- or X26 training?

17          A.   Yes.

18          Q.   And you indicated Carl Edwards was your

19    instructor?

20          A.   Yes.

21          Q.   And this is 12/16, 2010?

22          A.   Yes.

23          Q.   Were you still in corrections when you

24    had this training?

25          A.   Yes.
```

```
1         Q.    Were you approved to use your Taser on

2    off-duty details?

3         A.    Yes.

4         Q.    Did you ever have occasion to use the

5    Taser on an off-duty detail?

6         A.    No.

7         Q.    What's your preference, in terms of

8    subject control?  What -- how do you prefer to

9    control a subject, if possible?  Do you have a

10   preference?

11        A.    The least possible way to -- injury for

12   myself or others.

13        Q.    Who controls what level of force that

14   is necessary for you to use in any encounter with

15   a subject?

16        A.    The subject does.

17             (Deposition Exhibit I was marked for

18              identification.)

19   BY MS. SEARS:

20        Q.    I'm showing you what's been marked as

21   Exhibit I for purposes of your deposition.  I

22   think you discussed this with Mr. Gerhardstein,

23   as well -- stein, as well.

24             This appears to be -- unless I'm

25   mistaken -- your certificate for your X2
```

1    certification for your Taser; is that right?

2         A.   Yes.

3         Q.   And I think you indicated to

4    Mr. Gerhardstein that Sergeant Orue -- who's now

5    Lieutenant Orue -- conducted your training; is

6    that right?

7         A.   Yes.

8         Q.   And it says November 13th, 2012, right?

9         A.   Correct.

10        Q.   Now, did I understand you correctly,

11   that you indicated to Mr. Gerhardstein that you

12   are recertified -- recertified on this device

13   once a year?

14        A.   Yes.

15        Q.   And do you know the purpose of that

16   recertification?

17        A.   Just to get all the updates for

18   Tasers.

19        Q.   And do those updates -- do they

20   encompass the technical aspects of the use of the

21   device, as well as the tactical use of the

22   device?

23        A.   Yes.

24        Q.   And I believe you explained the

25   differences between the X26 and the X2 to

1    Mr. Gerhardstein.

2            With regard to the X2, do you know if

3    it has any capabilities -- enhanced conductivity

4    capabilities, as opposed to the X26?

5        A.    (Shaking head.)

6        Q.    You don't know --

7        A.    No.

8        Q.    -- anything about that?

9            With regard to the Taser X2 -- this

10   might sound like it's kind of a dumb question.

11   But Lieutenant -- or Sergeant Orue at the time,

12   Lieutenant Orue now -- he is a supervisor with

13   the Hamilton County Sheriff's Department; is that

14   correct?

15       A.    Yes.

16       Q.    And did the Hamilton County Sheriff's

17   Department issue you this Taser X2?

18       A.    They did.

19       Q.    And did the Hamilton County Sheriff's

20   Department authorize you to use this X2 in the

21   course of your employment?

22       A.    They did.

23       Q.    Did they train you on the use of the

24   device in -- for use in your employment?

25       A.    They did.

1        Q.    Where was this training conducted?

2        A.    Down at the range.

3        Q.    And where is that out -- out on

4   Hamilton Avenue?

5        A.    It's on -- oh, I can't --

6        Q.    I'm sorry.

7        A.    I can't think of the street name.

8        Q.    I won't ask you your kids' birthdays.

9              All right.  Just strike that; doesn't

10   really matter.

11             The range, is it -- is that a function

12   or entity controlled by the Hamilton County

13   Sheriff's Department?

14       A.    Yes, it is.

15       Q.    Were you required to treat -- complete

16   this mandatory training in the sheriff's

17   department before you could use this X2 device in

18   your scope of your employment?

19       A.    Yes.

20       Q.    In addition to the Taser use report

21   that you talked about with Mr. Gerhardstein, is

22   there also a use-of-force report that a

23   supervisor has to complete when you are involved

24   in a subject-control incident where you use

25   force?

1        A.   Yes.

2        Q.   And does that use-of-force report -- is

3    it mandated in a situation where you're using

4    subject control techniques, such as just grabbing

5    someone's arm and -- and getting them cuffed?

6             Is that considered a use-of-force, to

7    your knowledge, that triggers the production of

8    that use-of-force report?

9        A.   No.

10       Q.   Does the use of the Taser trigger the

11   use-of-force report?

12       A.   Yes.

13       Q.   Now, am I correct in understanding that

14   a Taser is considered to be intermediate force

15   under your continuum of force policy?

16       A.   It is, yes.

17       Q.   And so would any hard-hands you've

18   already defined for use, use of baton, the heel

19   of the hand, the fist, would those be uses of

20   force that would trigger that use-of-force

21   report?

22       A.   Yes.

23       Q.   What about pepper spray and chemical

24   irritants, would they trigger a use-of-force

25   report?

220

```
 1          A.    Yes.

 2          Q.    Just tell -- take me through the use of

 3    force without necessarily looking at the policy.

 4                What's your understanding -- what's

 5    your lowest level -- what's your lowest level of

 6    asserting your command or authority for a

 7    particular situation where it's legally

 8    appropriate?

 9          A.    Verbal -- verbal commands.

10          Q.    Okay.  And then what's the next step up

11    from there, if necessary?

12          A.    Show of force.

13          Q.    Show of force; that would be what?

14          A.    That would be more officers.

15          Q.    Okay, for an example.

16                Okay.  What's the next step up from

17    there?

18          A.    It would be hands-on, physical.

19          Q.    And that's what you described as the

20    arm bar --

21          A.    Just the arm bar, grabbing.

22          Q.    Grabbing extremities kind --

23          A.    Right.

24          Q.    -- of thing?

25                And then the next up from there?
```

```
 1        A.    Is the intermediate force.

 2        Q.    And that -- you do --

 3        A.    Would be hard-hands, the baton, mace,

 4   Taser.

 5        Q.    Okay.  And then up from that?

 6        A.    Is the deadly force.

 7        Q.    Okay.  And you've already indicated,

 8   from your perspective, it's the subject that

 9   dictates the level of force that you use --

10        A.    Yes.

11        Q.    -- in an encounter?

12              All right.  So you've been on the

13   patrol for how long now, since '12 or '13?

14        A.    Since 2012.

15        Q.    2012?

16        A.    Three, almost three years.

17        Q.    Almost three years?

18              And how many occasions have there been

19   that there's a use-of-force report that's had to

20   be drafted in response to your contact with a

21   subject?

22        A.    Just one other time.

23        Q.    One other, in addition to Mr. Roell?

24        A.    Yes.

25        Q.    And what was that all about?
```

1       A.   That was the pursuit.  The subject

2   crashed and took off running.

3       Q.   That's the one you already talked

4   about --

5       A.   Yes.

6       Q.   -- with Mr. Gerhardstein?

7       A.   Yes.

8       Q.   Other than these two incidents, there's

9   never been an incident where -- where it was

10  called upon for a supervisor to evaluate your use

11  of force because you went beyond hands-on to

12  intermediate force?

13      A.   No.

14      Q.   Is that what you're saying?

15      A.   Yes.

16      Q.   Is that because you're not arresting

17  anybody?

18      A.   No.

19      Q.   Okay.

20           MS. SEARS:  This is J.

21           (Deposition Exhibit J was marked for

22           identification.)

23           MR. GERHARDSTEIN:  You know, we did ask

24           for all this stuff in discovery and did not

25           get it.

1          MS. SEARS:  I thought you had -- I

2     really didn't know that this was the version

3     in effect.

4          I thought you had all this.  That was

5     my understanding.  I apologize.

6  BY MS. SEARS:

7          Can you identify what I've -- what I've

8  identified for purposes -- purposes of your

9  deposition as Exhibit J?

10     A.    Yes.  The Taser training.

11     Q.    This is version 18, and this the

12  version that Mr. Gerhardstein actually referred

13  to you in your -- in his questioning before,

14  isn't it?

15     A.    I -- I believe so.  I don't recall.

16     Q.    You don't recall that he said

17  version 18?

18     A.    Right.

19     Q.    With regard to your certificate, which

20  is Exhibit I, where you were trained on the X2

21  Taser -- in looking at Exhibit J, do you know, as

22  you sit here, whether this was the particular

23  version you were trained on when you got this

24  certificate, which is Exhibit I?

25     A.    I -- I don't recall.

1      Q.   Now, this particular -- particular

2   version 18 was released in July 2011, or so it

3   says.

4           Do you see that on the first line?

5      A.   Yes.

6      Q.   As you're looking at Exhibit J, do you

7   recall in your Taser training being exposed to

8   PowerPoint presentations?

9      A.   Yes.

10      Q.   And you'll see that below these, what

11   appear to be slides there's some other

12   information, in smaller type sometimes.

13           When you were being exposed to the

14   PowerPoint presentation in your Taser training,

15   was it just the slide as it would appear at the

16   top of the page, or did you have this whole page,

17   with this writing below, if you recall?

18      A.   It was just the slide.

19      Q.   Just the slides?  Okay.

20           The first few slides, I think, let's

21   say 2 through 7, have to do with some -- I guess

22   I would summarize it as physicality or

23   physiological or metabolic effects of the use

24   of -- I always say Taser, but I guess that's

25   probably not the right word.  I should say

1    electronic control device.

2          But you say Taser.  You know that's a

3    copyrighted term, right?

4        A.   Right.

5        Q.   But -- so the first few slides have to

6    do with the physiological or metabolic impact or

7    involvement of an ECD with the subject.  Is that

8    a fair statement?

9        A.   Yes.

10       Q.   Do you recall being trained  on those

11   concepts?

12       A.   Yes.

13       Q.   Now, I think you told Mr. Gerhardstein

14   that in your training -- that you had been

15   exposed to some excited delirium concepts; is

16   that right?

17       A.   Right.

18       Q.   If I can call your attention to the

19   slides -- slide on page 7, Physiologically or

20   Metabolically Compromised Persons, sometimes law

21   enforcement is called upon to deal with such

22   people that are compromised that could -- and

23   those people may be susceptible to an

24   arrest-related death; is that right?

25       A.   Yes.

```
 1          Q.   Do you recall being exposed to the

 2    concept that different people may be susceptible

 3    to an arrest-related death?

 4          A.   Yes.

 5          Q.   And down here in the comments on

 6    page 7, if you'll see in the first paragraph

 7    there's a sentence -- I guess it's the second

 8    sentence -- that says, The factors that may

 9    increase susceptibility.

10               Do you see that sentence?

11          A.   Uh-huh.

12          Q.   And then if you read further in that

13    sentence, it describes several -- several states

14    of metabolic or physiological impairment that

15    could increase that susceptibility.

16               Do you see that?

17          A.   Yes.

18          Q.   And one of the those things is excited

19    delirium, right?

20          A.   Yes.

21          Q.   One, two, three, four, five, six,

22    seven, eight, nine, ten, eleven, twelve,

23    thirteen -- I -- I count twelve, with another,

24    pathological conditions.

25               Do you remember whether or not you were
```

1    exposed to these particular types of

2    susceptibilities?  Do any of them sound familiar

3    to you?

4            MR. GERHARDSTEIN:  In addition to

5        excited delirium, or including?

6            MS. SEARS:  Yeah, including --

7        there's -- there's 12 of them listed here,

8        and other.  And one of them is excited

9        delirium.

10           So I wasn't -- I didn't mean to excise

11       out excited delirium if that was the

12       concern.

13   BY MS. SEARS:

14       Q.   I just wondered if these sounded

15   familiar to you at all.

16       A.   Yes.

17       Q.   So you recall being exposed to these

18   various kinds of states, correct?

19       A.   Yes.

20       Q.   Can you tell me how you might determine

21   whether somebody is having autonomic

22   dysregulation as opposed to the excited

23   delirium?

24       A.   I have no idea.

25       Q.   Can you tell me how someone might be

1    having a toxic withdrawal from, for example

2    psychotropic medication or PCP or heroin and how

3    that might be differentiated in its affect from

4    excited delirium; can you tell me that?

5        A.    Just --

6        Q.    Can -- can you tell the difference?

7        A.    Not really, no.

8        Q.    And for purposes of taking a subject

9    under control, does it matter what the difference

10   is --

11       A.    No, it doesn't.

12       Q.    -- from a law enforcement

13   perspective?

14       A.    No.

15       Q.    Does it matter from a tactical

16   perspective?

17       A.    No.

18       Q.    If you made the decision that you need

19   to take someone under -- under control, is that

20   the decision that controls you, or is there some

21   other --

22       A.    That's the decision.

23       Q.    The very first -- or no, Number 4,

24   Physiological and Metabolic Effects --

25             MR. GERHARDSTEIN:  Where are you?

1           MS. SEARS:  Page 4 -- I'm sorry --

2      page 4, Physiological and Metabolic Effects.

3  BY MS. SEARS:

4      Q.   Reasonable efforts should be made to

5  minimize the number of ECD exposures.

6           Have you been exposed to that concept,

7  sir, that -- that you should be sensitive to that

8  piece?

9      A.   Yes.

10     Q.   That should be a variable that you

11 should consider?

12     A.   Right.  Yes.

13     Q.   If you go back a page, page 3 -- you

14 explained to Mr. Gerhardstein that you were aware

15 of the preferred target area.  Do you recall

16 having that conversation with him?

17     A.   Yes.

18     Q.   This slide seems to explain, perhaps,

19 why that is the case, the heart-to-dart --

20 heart-to-dart distance.

21          Do you recall being exposed to this

22 concept when you were having your Taser

23 training?

24     A.   Yes.

25     Q.   If I could call your attention to

1    page 5, Physiological and Metabolic Effects

2    again.  This slide indicates that, Studies show

3    that ECD effects are comparable or less than

4    struggling or resisting, fighting, or fleeing.

5            Do you see that?

6        A.    Yes.

7        Q.    So from your perspective as a law

8    enforcement officer, particularly from a tactical

9    perspective, what is the -- what is the use of

10   the Taser?  Why are you using it and when are you

11   using it and what are you hoping to accomplish

12   with the use of it?

13       A.    To gain control of a subject, gain

14   compliance.

15       Q.    And -- okay.  So you can use it to gain

16   control, or you can use it for pain compliance?

17       A.    For pain compliance, yes.

18       Q.    In terms of getting control of a

19   subject, what are the tactical considerations of

20   the use of a Taser as opposed to other techniques

21   you can use to get a subject under control?

22       A.    It's a --

23       Q.    How is it better, how is it worse; what

24   do you think?

25       A.    It has less side effects; punch

1    somebody, you might have bruises, you might break

2    their arms, you might break your hand, rather

3    than the Taser is just once -- once it's done,

4    it's done.

5        Q.   What do you mean, once it's done, it's

6    done?

7        A.   Once the five cycles -- once the five

8    seconds cycle, it's finished.  The pain is over,

9    and you can go back to normal.

10       Q.   You break somebody's arm, that's the

11   difference --

12       A.   That's -- yes.

13       Q.   -- from your standpoint?

14       A.   Correct.

15       Q.   And what about the -- the pain

16   compliance?  What about that, in terms of an

17   advantage or a disadvantage over other hands-on

18   techniques?

19            Because the pain compliance is a

20   hands-on technique; am I right?

21       A.   Right.

22       Q.   Okay.  I want to make sure.  Because

23   I'm just learning about this stuff.

24            So what is the advantage, if there is

25   one -- or disadvantage, I should say -- of the

1    Taser as opposed to pain compliance techniques --

2    other pain compliance techniques, from a tactical

3    perspective?

4         A.   Once again, you can -- you can break

5    your hand -- officer's hand, your -- you can

6    seriously injure the subject, rather than just

7    using the Taser as pain compliance.

8         Q.   Have you been tased with the Taser in

9    the pain compliance mode?

10        A.   Yes.

11        Q.   Tell me what that feels like.

12        A.   Feels like a thousand bee stings.

13        Q.   A thousand bee sting?

14        A.   Yes.

15        Q.   And unlike a -- well -- well, I've been

16   stung by a wasp before.  And even after the wasp

17   is dead and gone -- if I could find the -- find

18   the guy -- it hurts for a long time.

19             Is -- what effect does the Taser in its

20   drive stun mode have after you apply it?

21        A.   Nothing.

22        Q.   What you do mean nothing?

23        A.   It's like a thousand bee stings, and

24   it's -- it's done.  Once it's off, it's off and

25   it's back to normal.

1          Q.   If I could call your attention to

2     page 11, please, To use the ECD in probe mode, an

3     officer must reasonably perceive the subject to

4     be an immediate threat of harm or injury.

5               Do you see that?

6          A.   Yes.

7          Q.   Now, with regard to Mr. Roell, you used

8     the ECD in a probe mode, didn't you?

9          A.   Yes.

10         Q.   Did you perceive yourself or anyone

11    else to be in an immediate threat of harm or

12    injury?

13         A.   Yes, I did.

14         Q.   And what -- who did you perceive to be

15    in the position of immediate threat of harm or

16    injury?

17         A.   The first time of the tasing, it was

18    myself --

19         Q.   Okay.

20         A.   -- and Deputy Alexander.

21         Q.   All right.  And what if Mr. Roell had

22    been successful in reaching you before you

23    initiated the Taser?  What would have been your

24    response at that point?

25         A.   What would have been my response?

1        Q.   Yes.

2        A.   Open fists or whatever I had readily

3   available.

4        Q.   Now, fists are hard-hands, right?

5        A.   Yes.

6        Q.   So if he -- if he, in this scenario, as

7   you've described it to us, he's coming at you,

8   not stopping?

9        A.   Right.

10       Q.   If he had continued to come at you and

11  not stopped, are you saying to us, at that

12  point -- it would be potentially hard-hands at

13  that point?

14       A.   Yes.

15       Q.   And Mr. Gerhardstein talked about the

16  plant.  And the hose was also being held by

17  Mr. Roell you've indicated, right?

18       A.   Yes.

19       Q.   Could that hose be a weapon if

20  Mr. Roell was able to engaged your personal

21  space?

22       A.   Could be, yes.

23       Q.   In what way?

24       A.   He can hit it with the metal end, or if

25  he was able to get it wrapped around.

```
 1        Q.   Now, Mr. Gerhardstein asked about that
 2   planter, or the plant, and about what crime had
 3   occurred.
 4            And -- and the -- and you had indicated
 5   to Mr. Gerhardstein that the crime that you may
 6   have perceived having been occurred is one of the
 7   variables that you consider, right?
 8        A.   Right.
 9        Q.   Is that the only variable you
10   consider?
11        A.   No.
12        Q.   In -- when a subject is coming at you
13   and they refuse to stop and you're not able to
14   stop them before they're in your space, meaning
15   having contact with you, is that a deadly force
16   situation, sir?
17        A.   No.
18        Q.   What about the fact that your firearm
19   is on your -- on your waist at that point?
20            The subject is able to gain control of
21   your person and starts struggling with you
22   personally; is that a deadly force situation?
23        A.   No.
24        Q.   What if they reach for your gun?
25        A.   Yeah.
```

1      Q.   Yes?  All right.

2          So I think I interrupted you.

3          You indicated that you -- the first

4  time you deployed the probe in the -- in the

5  probe mode, the ECD in the probe mode, you

6  perceived a threat to yourself; is that correct?

7      A.   Yes.

8      Q.   And a potential injury to yourself?

9      A.   Yes.

10     Q.   And what about a potential injury to

11  Mr. Roell?

12     A.   Yes.

13     Q.   At some point, though, Mr. Roell did

14  not keep coming at you.  He -- he stopped, and

15  you elected to put your Taser back and go

16  hands-on; is that right?

17     A.   He continued at me, but I put it away.

18     Q.   Okay.  So let me ask you this.

19         If -- if he had continued at you in

20  a -- in a pace to get his hands on you, you could

21  have gone hard-hands at that point?

22     A.   Right.

23     Q.   But in this situation, you didn't go

24  hard-hands?

25     A.   Right.

```
 1        Q.   And why is that?

 2        A.   Because I didn't want -- I didn't want

 3   to tase him.  I didn't want to injure him with

 4   the hard-hands.

 5             I'd rather just get him on the ground

 6   as peaceful as -- as peacefully as we could.

 7        Q.   So even though Mr. -- Mr. Roell was

 8   coming at you in an aggressive way, did you

 9   believe that the three of you could get him under

10   control without -- without the Taser or without

11   hard-hands?

12        A.   Yes.

13             MR. GERHARDSTEIN:  Objection.

14   BY MS. SEARS:

15        Q.   Can I call your attention to page 23,

16   please?

17             I think you discussed this with

18   Mr. Gerhardstein, too.  So is it -- is my

19   understanding correct that the space differential

20   between you and the subject that you are tasing

21   affects the proximity of the probes as they enter

22   the subject, if you're effective in hitting him?

23        A.   Right.

24        Q.   And you had a conversation with

25   Mr. Gerhardstein about the fact that the further
```

1    away from -- the two probes are from one another,

2    then the higher degree of the NMI, the

3    neuromuscular in -- you know, involvement; is

4    that right?

5         A.    Yes.

6         Q.    In your two probe deployments regarding

7    Mr. Roell, how close would you say you were --

8    well, let's take the first one.

9              If you could guesstimate for us how

10   close were you to Mr. Roell when you deployed the

11   first cartridge in the probe mode?

12        A.    Roughly four feet.

13        Q.    I'm sorry.  And the second -- the

14   second deployment in probe mode -- taking aside

15   the -- the drive stun that you did for

16   connectivity purposes.

17        A.    It was probably the same, four feet.

18        Q.    You indicated that your observations

19   of -- to Mr. Gerhardstein -- your observations of

20   Mr. Roell indicated to you that the -- that the

21   Taser did not take full effect; is that right?

22        A.    Yes.

23        Q.    And with regard to your first

24   deployment, am I correct that you indicated to

25   Mr. Gerhardstein that you felt one of the probes

1    might have attached in the reaction of

2    Mr. Roell, so you went to the hand-held sort of

3    drive stun method in order to try to create --

4    complete the circuit?

5         A.   Yes.

6         Q.   Is that right?

7         A.   Yes.

8         Q.   Can I call your attention to page 35,

9    please?

10             I think you discussed both of these

11   to -- 35 and 36 with Mr. Gerhardstein.

12             But you had indicated you were familiar

13   with the preferred target area; is that right?

14        A.   Yes.

15        Q.   In the comments below it says, The

16   nonpreferred target zones are not prohibited,

17   rather, they should be avoided when practical.

18             Is that your understanding of how you

19   were -- how you were trained?

20        A.   Yes.

21        Q.   What does practical mean to you, from a

22   tactical standpoint, officer?

23        A.   When -- when available, when you're

24   able to -- when a guy's just standing still

25   letting you tase him, that would be practical.

1    Q.   Okay.  What would be impractical?

2    A.   When he's coming at you and you're not

3  able to get the darts exactly where they're

4  supposed to split the hemisphere.

5    Q.   Can I ask you to look at page 41,

6  please?  This slide says, Silence is golden.  No

7  change in the subject's behavior and a loud arc

8  was a bad connection.

9         Were you trained to -- to key in on the

10  subject's behavior in order to evaluate whether

11  or not the probe deployment had reached

12  connectivity?

13   A.   Yes.

14   Q.   And what about this noise?  Do you --

15  do you know what they're -- do you know what

16  they're talking about there?  Can you hear a

17  difference?

18   A.   Yes.

19   Q.   Do you recall whether, in this incident

20  with Mr. Roell, that you were tuned into that --

21  that sound difference?

22   A.   No.

23   Q.   I'm sorry?

24   A.   No.  I can't remember.

25   Q.   The next page, 42, Tactical

1    considerations and practical attempts to gain

2    compliance using verbal commands; do you agree

3    that that's -- that that's an appropriate

4    tactical -- tactical consideration?

5        A.   Yes.

6        Q.   What does practical mean to you from a

7    tactical standpoint?

8        A.   If you're -- if it allows -- pretty

9    much, if it allows you to gain compliance using

10   verbal commands.

11       Q.   What's it?

12       A.   If the subject allows you to use verbal

13   commands and complies with your verbal commands,

14   that's practical.

15       Q.   Okay.  And then, Display of Taser,

16   turning on the laser or arc display may gain

17   compliance.

18            Do you see that?

19       A.   Yes.

20       Q.   Is that what you attempted to do with

21   Mr. Roell on this date --

22       A.   Yes.

23       Q.   -- on the date in question?

24            Below, it says, Tasers are not a

25   substitute for common sense and good

1    communication.

2            Do you agree with that statement?

3        A.   Yes.

4        Q.   It says, One of the greatest advantages

5    of the Taser is its ability to sometimes stop

6    aggressive behavior simply by pointing it and the

7    laser on the subject.  Do you agree with that?

8        A.   Yes.

9        Q.   Have you had occasion to arc your

10   Taser, even though you had to tase someone to

11   gain compliance?

12       A.   No.

13       Q.   No?  Okay.

14           Do you recall, you know, being exposed

15   to these tactical considerations when you were

16   being trained?

17       A.   Yes.

18       Q.   Page 46, please.  These are more

19   tactical considerations, right?

20       A.   Yes.

21       Q.   Avoid Taser over-dependence.  Do you

22   agree that overly depending on a Taser could be a

23   wrong tactical move to make, sir?

24       A.   Yes.

25       Q.   Why would that be?

```
 1        A.   Because you're relying on one weapon.
 2    If it fails, then you've got to find something
 3    else.
 4        Q.   So what are you saying?  You should
 5    have some other tools available to you --
 6        A.   Yes.
 7        Q.   -- that you're comfortable using?
 8        A.   Yes.
 9        Q.   If I could ask you to look at page 49,
10    please.  These are some slides that have to do
11    with optimum  probe placement, it looks like to
12    me 48, 49, 50, 51.
13             Page 49 says, Preferred range is
14    7 to 15 feet for officer safety and accuracy.
15             Can you tell me what the tactical
16    considerations might be from an officer's safety
17    perspective of keeping a subject 7 to 15 feet --
18    7 to 15 feet from you?
19             Why would you want to keep a subject
20    7 to 15 feet away from you?
21        A.   Because you want to limit the risk of
22    injury to yourself if he decides to throw
23    something at you.
24             Distance is key.
25        Q.   Distance is key to what?
```

 1        A.    It's the key to anybody's safety;

 2   officer safety, with the subject further away

 3   than close.

 4        Q.    What's -- this says, A lousy officer

 5   may remain outside of the reactionary gap.  Do

 6   you know what that means?

 7        A.    Where is it?

 8        Q.    In these comments on page 49, the very

 9   last sentence.

10             These factors seems to be the best

11   overall compromise, because a lousy officer may

12   remain outside the reactionary gap.

13             Are they talking about the -- the

14   ability of the subject?  I don't -- or do you

15   know -- to get to you?

16        A.    They're talking about within that seven

17   feet, he can like pull a knife or something on

18   you before you can even react and grab your Taser

19   and whatnot.

20        Q.    Oh, so within seven feet, there's --

21   there's a gap in your ability to react to them?

22        A.    Right.

23        Q.    Oh.  I didn't know that's what they

24   meant.

25             Is that another reason to try to keep

1    the subject beyond seven feet from you?

2        A.    Right.

3        Q.    Could I ask you to look at slide 54 --

4    or page 54, more properly -- I'm sorry --

5    Controlling, Cuffing Under Power.  This is a

6    concept that you discussed with Mr. Gerhardstein.

7            Can you correct me?  If I understand

8    that, cuffing under power means you've deployed

9    probes and it's effective and the person is

10   incapacitated and you've got maximum NMI at that

11   point and you can cuff them because they're

12   powerless to resist?

13           Is that right?

14       A.    Yes.

15       Q.    This particular slide, EDPs, focused,

16   intoxicated, excited delirium individuals may not

17   comply with verbal commands.

18           Do you see that?

19       A.    Yes.

20       Q.    Do you recall being exposed to that in

21   your training?

22       A.    Yes.

23       Q.    This -- I have a question about 55.

24           Again, Tactical Considerations, the

25   third bullet, If only one probe hits, or low

1    probe spread, consider a drive stun follow-up

2    with the cartridge still in place.

3           Is -- I wasn't sure, is that what you

4    did the second time, is this --

5    A.    (Nodding head.)

6    Q.    Okay.

7    A.    Yes.

8    Q.    I wasn't sure.

9           The last sentence there, A small -- on

10   the comments, A small or limited probe spread may

11   not achieve NMI in drive stun follow-up away from

12   the impact site, should increase the

13   effectiveness of the deployment.

14          Do you remember being exposed to this

15   in your training?

16   A.    Yes.

17   Q.    Is that what you were trying to do with

18   Mr. Roell?

19   A.    Yes.

20   Q.    Slide -- or I should say page 56, Look

21   for a change in behavior.

22          This looks like another slide or

23   another training point that tells you to focus on

24   the subject to determine effectiveness of the

25   device; is that right?

1      A.   Yes.

2      Q.   In your training, did you practice with

3   the device itself?

4      A.   Yes.

5      Q.   And did -- you may have discussed this

6   with Mr. Gerhardstein.  I'm sorry if I'm beating

7   it -- you know, beating it to death.  That's -- I

8   don't remember exactly what you all talked about.

9           Did you practice looking  at the

10   changes in the behavior of the persons who were

11   effectively deployed with probe device?  Did

12   you -- did you look at them and did the

13   instructor talk about what the changes were and

14   you had sort of a hands-on experience with that?

15      A.   Yes.  They laid us down and they'd clip

16   us, clip one probe here, and they would clip on

17   there, so they get a good shot with it.

18      Q.   Uh-huh.

19      A.   And then they turn it off for a second

20   and you can feel it.  And you can also see the

21   other individuals take it, as well.

22           And they also put it close together, so

23   you can see how they -- how they react to that

24   still, as well.

25      Q.   Did you watch videos --

1        A.    Yeah.

2        Q.    Off different people being tased and

3   examine probe placement and that sort of thing --

4        A.    Yes.

5        Q.    -- to see the differences?

6        A.    Yes.

7        Q.    I'm -- I'm thinking from what you're

8   saying is they didn't have anybody stand up and

9   fall down, because --

10       A.    Right.

11       Q.    -- then you might get hurt?

12       A.    Right.

13       Q.    But I guess my questions was, were

14   you -- did you watch videos --

15       A.    Yes.

16       Q.    -- where you saw that?  Okay.

17       A.    Watched videos, yes.

18       Q.    Page 58, If no change in the behavior,

19   employ other force options.  Other alternatives

20   are disengage; is that right?

21       A.    Yes.

22       Q.    Do you see that?

23            Now, with regard to Mr. Roell, did you

24   employ other force options?

25       A.    Just the hands-on.

```
1        Q.   Did you ever go hard-hands with him?

2        A.   I didn't, no.

3        Q.   Did you ever see anyone else go

4   hard-hands with him?

5        A.   No, I didn't.

6        Q.   Do you use your baton?

7        A.   No, I didn't.

8        Q.   Did you mace him?

9        A.   No, I didn't.

10        Q.   And it says, Or disengage.

11             Do you see that?

12        A.   Yes.

13        Q.   Now, Mr. Gerhardstein has asked you

14   some questions about why you simply dis -- did

15   not disengage.  Did you think that that, from a

16   tactical standpoint, was an appropriate

17   response?

18        A.   No.

19        Q.   Why?

20        A.   Like I said, we can -- he's already

21   fighting with us, he apparently already broke

22   things in the back.  It was undetermined what he

23   broke.

24             But he could easily go inside and hurt

25   the family or break other things and hurt
```

1    himself.

2              MS. SEARS:  Sorry.  I just want to

3         check something out.

4              Can you go ask Karen to make a copy of

5         that, please?

6              I won't wait until that's done.

7         I'll -- I'll keep on.  And then I'll come

8         back to that so we don't take up too much

9         time.

10             I'm at a terrible age where I have to

11        take off my glasses to read and put them

12        back on so I don't break my neck.  So I

13        apologize.

14             I guess this would be J.

15             THE REPORTER:  K.  Yeah, K.

16             THE WITNESS:  K.

17             MS. SEARS:  Oh, it would be K?  Okay.

18        I'm sorry.

19             That's the other thing I don't do, is

20        keep track.  I'm a high-maintenance lawyer.

21             (Deposition Exhibit K was marked for

22             identification.)

23   BY MS. SEARS:

24        Q.   I've -- I've given you a bound set of

25   photographs, Officer, that have been marked as

```
1    Exhibit K for purposes of your deposition.  Some
2    of these have already been marked by
3    Mr. Gerhardstein.  So I'm not going to beat these
4    to death.  I -- I would like to go over them kind
5    of briefly with you, though.
6              When we look at the first photograph
7    here -- I'm disappointed because -- okay.
8              MS. SEARS:  They do have numbers, guys.
9         The court reporter's copy has nice numbers
10        in white.
11             Our numbers are -- you can see them.
12        They're right down here if you can discern
13        them.
14             Can you see that, Jaci?  Sorry about
15        that.
16             MS. MARTIN:  Oh.
17             MS. SEARS:  Yeah.
18             But the court reporter's copy has a
19        nice -- nice ones in little boxes that we
20        did by hand.
21             At any rate --
22    BY MS. SEARS:
23        Q.   I just want to ask you generally about
24    these photographs here, Deputy Huddleston.
25             They appear fairly well lit to me.  Is
```

1    this the lighting of the scene as you all

2    approached it that night?

3         A.    No, it was not.

4         Q.    I'm sorry?

5         A.    No.

6         Q.    And how is it different?  Can you tell

7    me?

8         A.    My recollection, it was a lot darker.

9         Q.    Do -- did you take these pictures?

10        A.    I did not.

11        Q.    All right.  So were you there when they

12   were taken?

13        A.    I don't think so.

14        Q.    So if there was extra lighting that was

15   placed by whoever took these pictures to light up

16   the scene for law enforcement investigation

17   purposes, you wouldn't know that, necessarily,

18   would you?

19        A.    No.

20        Q.    There -- in the third picture, there

21   does appear to be a streetlight in that picture.

22        A.    Right.

23        Q.    Were the streetlights lit, if you

24   recall?

25        A.    I don't recall.

253

```
 1        Q.   If I can draw you to the third picture,

 2   number 3 -- and I think Mr. Gerhardstein may have

 3   asked you about this one -- that condo to the far

 4   right, I guess it is maybe 10929.

 5             Do you see that?

 6        A.   Yes.

 7        Q.   Was that door open or closed?

 8        A.   It was open.

 9        Q.   And you indicated to Mr. Gerhardstein

10   that you didn't notice 102 -- 10927 as being

11   open.

12        A.   Right.

13        Q.   Were -- were you dispatched to 102 -- I

14   can't read this -- 10929?

15        A.   Yes.

16        Q.   And as you're responding, is finding

17   10929 your focus?

18        A.   Yes.  The complainant was actually at

19   the door -- that's why it was open -- yelling at

20   me to go to the back.

21        Q.   And then if we flip to page -- to

22   picture 5, this is what you discussed with

23   Mr. Gerhardstein.

24             Is this the way that you went to the

25   back of the condo complex?
```

```
1        A.   Yes.

2        Q.   Do you see any landscaping or anything

3   disturbed there?

4        A.   No.

5        Q.   Now, was this lit at all when you ran

6   back that way?

7        A.   No.

8        Q.   Okay.  So -- I mean, how were you able

9   to make your way?

10            Mr. Gerhardstein asked you about a

11  flashlight.  How were you able to make your way

12  back there?

13       A.   I think the back -- back porch light

14  was on or back -- I think they have a spotlight

15  in the back --

16       Q.   Okay.

17       A.   -- that was on.

18            So it was just somewhat lit up in the

19  back.  You could see the -- the back of the

20  house.

21       Q.   So you could kind of see where you were

22  going to?

23       A.   Correct.

24       Q.   I think Mr. Gerhardstein asked you

25  about these next couple of pictures.  So I
```

1    won't -- we won't beat these things to death.

2              But the next pictures like 8, 9, 10,

3    11, those next few pictures, do you recognize

4    that as the patio of the complainant?

5         A.   Yes.

6         Q.   Now, other than -- well, let me ask you

7    this.

8              On picture 8, now that -- how that

9    we're looking at it, can you see that broken

10   window right there?

11        A.   Yes.

12        Q.   And you see that screen on the floor?

13        A.   Yes.

14        Q.   Do you remember observing that when you

15   first went onto the patio with Mr. Roell?

16        A.   No.

17        Q.   There seems to be some kind of

18   something under that window on siding or the -- I

19   don't know if that's siding, wood, or what.

20             Do you see that?  It looks like mud or

21   dirt or something?  I don't know.

22        A.   Yes.

23        Q.   Do you see that?

24        A.   Yes.

25        Q.   Did you happen to notice that?

 1     A.   No.

 2     Q.   Now, all the -- it looks to me like all

 3  the chairs and other plantings are upright and

 4  undisturbed.  Is that your -- what you see, as

 5  well?

 6     A.   It's what I see.  I don't know if it

 7  was --

 8     Q.   I mean, do you see any chairs tipped

 9  over or anything undisturbed --

10     A.   No.

11     Q.   -- or anything disturbed particularly

12  than stands out to you in this other one we just

13  looked a?

14     A.   No.

15     Q.   And there are some pots on the ground

16  that are upright and undisturbed.

17       Do you see those?

18     A.   Yes.

19     Q.   If I could call your attention to 6 --

20  page 16, this is past the couple of photographs

21  that Mr. Gerhardstein already showed you.  So I

22  won't bother you with those.

23       But this at least appears to be the

24  inside -- the next two pictures -- the inside of

25  that window that was broken.

1            Did you ever go inside and see the

2    inside of the inside here?  Have you ever seen

3    this before?

4        A.    No.

5        Q.    The next picture, 17, that looks like

6    a -- some kind of ceramic pot or something on the

7    ground.  Is that -- does it look like that to

8    you?

9        A.    Yes.

10        Q.    You nev -- you never saw that?

11        A.    No.

12        Q.    Now, the next series of pictures, 18,

13    19, 20, and on, 22; did you ever see -- did you

14    ever see this patio?

15        A.    No, I had not.

16        Q.    You have no idea whether this is

17    Mr. Roell's patio or not?

18        A.    Right.

19        Q.    You never had occasion --

20        A.    I have --

21        Q.    Did you ever go to Mr. Roell's

22    apartment or his patio then?

23        A.    I have not.

24        Q.    The next pictures, I think, are

25    pictures -- well, at least the first picture, 25,

1    Mr. Gerhardstein showed you.  And I think you

2    told him you didn't see these mailboxes.

3             Is that -- am I right, that you told

4    him that?

5        A.   Correct.

6        Q.   And so the next few pictures are sort

7    of the same idea.  And as we go through like

8    through 31, we see some cars on the ground and in

9    the carport.

10            As you glance through those pictures,

11   did you notice or observe any of that before --

12   before you came into contact with Mr. Roell in

13   the patio area that night?

14       A.   I did not.  I was looking to the right

15   the entire way around, looking at the

16   addresses.

17       Q.   Okay.  And then if we could just flip

18   to page 48 --

19            MR. GERHARDSTEIN:  38?

20            MS. SEARS:  48.  And tell me when

21       you've got it, Al, because -- I apologize.

22       It's a little hard to see in the corner

23       there.

24            MS. SEARS:  Oh, I can't see that.

25            Ten minutes.  I'm sorry.

1    BY MS. SEARS:

2        Q.    Just, beginning with that picture, sort

3    of flipping through those pictures, did you have

4    any occasion to go into Mr. Roell's condo --

5    Mr. Roell's condo that night?

6        A.    I did not.

7        Q.    And as we flip through these pictures

8    through -- keep flipping through 56, 57, and on

9    through, did you observe any of this disturbance

10   or destruction in the Roells' condo that night?

11       A.    I did not.  This is the first time I'm

12   seeing it.

13       Q.    It's the first time you've seen any of

14   this?

15       A.    Yes.

16       Q.    Do you know who took these pictures?

17       A.    I have no idea.

18       Q.    And just keep flipping through.  If you

19   can just kind of flip through and just -- if you

20   see anything that looks familiar to you -- if

21   you'll just let me know.

22           And then when you get to like 91, there

23   are some more outside pictures.  I just want to

24   see if you recall seeing anything that was

25   outside.

          1                Okay.  And did you -- on page 91, it

          2     looks like a water -- water faucet that's

          3     running.  Did you --

          4                MR. GERHARDSTEIN:  So wait a minute.

          5                Can he answer your question?

          6                MS. SEARS:  Oh, yes.

          7                MR. GERHARDSTEIN:  So from 48 to 91,

          8          you never saw any of that?

          9                THE WITNESS:  No.  This is the first

         10          time I've seen any of these pictures.

         11                MS. SEARS:  I'm sorry.  That was

         12          probably --

         13                MR. GERHARDSTEIN:  That's okay.

         14                MS. SEARS:  I inartfully asked that

         15          question.  I apologize.

         16     BY MS. SEARS:

         17          Q.   91 is a -- it looks like a faucet with

         18     water running.  Did you observe a faucet with

         19     water running that night?

         20          A.   No.

         21          Q.   And then If you'll just flip through

         22     the rest of these -- and there's some outside and

         23     inside -- and just tell me if you've ever seen

         24     any of those pictures before.

         25          A.   I have not seen any of those.

1     Q.   Okay.

2         (Deposition Exhibit L was marked for

3         identification.)

4  BY MS. SEARS:

5     Q.  I'll just show you what's been marked

6  as Exhibit L for purposes of your deposition.

7         Are you familiar with the general

8  order -- 316 Taser -- excuse me.  It's not

9  Taser -- electronic stun gun -- stun device

10  policy?

11     A.  Yes.

12     Q.  If I could call your attention to

13  216.05, 10, which is -- which is the portion

14  right before 216.06.  It's page 6 at the top.

15         I'm sorry.  How's that?

16     A.  Yeah.

17     Q.  How about page numbers?  That might

18  help us.

19         Do you see number --

20         MR. GERHARDSTEIN:  Wait a minute.  I'm

21    not there yet.

22         MS. SEARS:  Page 6, when you're ready.

23         You ready, Al; page 6?

24         MR. GERHARDSTEIN:  Yeah.

25  BY MS. SEARS:

1       Q.    Do you see .10?

2       A.    Yes.

3       Q.    Applications of the device are to be in

4    accordance with the departmental training

5    program and application techniques.

6             Do you see that?

7       A.    Yes.

8       Q.    Is that your understanding, that you

9    needed to use the Taser in accordance with your

10   training?

11      A.    Yes.

12      Q.    Okay.  And then if I can call your

13   attention to page 8, this would be 216.06, Post

14   Use Action Required, 1(e) do you see e,

15   application of the Taser stun device will require

16   medical treatment if?

17      A.    Yes.

18      Q.    Do you see that?

19      A.    Yes.

20      Q.    Can you look at number 5 for me?  The

21   subject has exhibited signs of extreme

22   uncontrolled agitation or hyperactivity prior to

23   the device application.

24             Do you see that?

25      A.    Yes.

1          Q.    Did Mr. Roell exhibit some uncontrolled

2      agitation to you?

3          A.    Yes.

4          Q.    Did you call for a medical squad?

5          A.    Yes.

6                MS. SEARS:  Oh, is it five minutes?

7                Should we break five minutes, or should

8          I keep going?

9                MR. GERHARDSTEIN:  You're asking the

10         questions.

11               MS. SEARS:  Well, I don't know.

12               Do you want me to keep going?

13               MR. GERHARDSTEIN:  No.  Why don't you

14         just --

15               MS. SEARS:  Yeah.  Let's take a break.

16         Because you know if I keep going, we'll run

17         out of tape.

18               But I'm almost done.

19               THE VIDEOGRAPHER:  We are off the

20         record.  The time is 3:39 p.m.

21               (Off the record.)

22     BY MS. SEARS:

23         Q.    Can I call your attention to Exhibit 7,

24     which is Mr. Gerhardstein's Exhibit 7?  This is

25     the attorney general's -- Mike DeWine's

264

1    PowerPoint on deescalation, right,        Deputy

2    Huddleston?

3         A.   Yes.

4         Q.   If you go about one, two, three -- four

5    pages into that -- I don't know if there's page

6    numbers or not -- there's something called a

7    deescalation decision tree.

8              Do you see that?

9         A.   Yes.

10        Q.   Do you see that?

11        A.   Yes.

12        Q.   Have you ever seen this before?

13        A.   I think so, yes.

14        Q.   And so there's a -- there's one little

15   box that says Conflict.  And there's the next box

16   that says Threat Assessment.

17             Do you see that?

18        A.   Yes.

19        Q.   And if you assess a -- I guess, if the

20   officer assesses a threat and they answer yes to

21   that, you're supposed to go to the use-of-force

22   continuum.

23             Do you see that?

24        A.   Yes.

25        Q.   If you don't assess a threat, then

265

1    you -- looks like you go no, and you go up to

2    whether this is a medical encounter.

3              Do you see that?

4        A.   Yes.

5        Q.   And then if you say yes or no there's

6    some commands or at least some training

7    recommendations about deescalation.

8              Do you see that?

9        A.   Yes.

10       Q.   In terms of your interaction with

11   Mr. Roell, did you assess a threat, that

12   Mr. Roell was threatening you?

13       A.   Yes.

14       Q.   And did you move then into the use of

15   force continuum?

16       A.   Yes.

17             MS. SEARS:  Okay.  That's all.

18                  FURTHER EXAMINATION

19   BY MR. GERHARDSTEIN:

20       Q.   You said that the officer responds to

21   the suspect in terms of trying to figure out how

22   much force to use, right?

23       A.   Yes.

24       Q.   But the officer also is the one in

25   charge of how fast and how rapidly to move the

1    situation along, right?

2        A.    No.

3        Q.    So if you are in a situation and you're

4    the one who says to the suspect, show me your

5    hands, get down on the ground, you're -- you want

6    something done right then, right, you want that

7    response right then?

8        A.    Yes.

9        Q.    Okay.  And you're the first one to

10   speak when you encountered Mr. Roell, right?

11       A.    I'm not sure if I was or

12   Deputy Alexander was.

13       Q.    All right.  But either way, it was an

14   officer who gave a command, right?

15       A.    Yes.

16       Q.    And then you saw a man with a flower

17   pot -- or a flower hanger and a hose.

18            Those are not the most serious weapons

19   you've ever seen, right?

20            MS. SEARS:  Objection.

21       A.    They're not the most serious weapons,

22   no.

23   BY MR. GERHARDSTEIN:

24       Q.    Okay.  And he didn't swing either of

25   those things until you grabbed him, right?

1      A.    Until I grabbed his arm.

2      Q.    Right.

3      A.    Swung the hanging basket at me, yes.

4      Q.    And he never kicked until you were

5  trying to subdue him, right?

6      A.    Once he was on the ground and I tried

7  putting him in handcuffs, yes.

8      Q.    And the kicking was more in the nature

9  of flailing and just being out of control, right?

10     A.    Being combative, yes.

11     Q.    Trying to not be restrained, right?

12     A.    Yes; resisting.

13     Q.    And when you look at this diagram that

14  we were just looking at, and you do a threat

15  assessment on those facts, and you look at the

16  man who's naked from the waist down, holding this

17  flower holder and hose, at that point, you don't

18  see a clear and present danger, right?

19     A.    As he's charging at me with them, yes,

20  I do.

21     Q.    Well, he is -- he's coming toward you

22  after you say, show me your hands, right?

23     A.    We asked him what he was doing.  And he

24  turned around and started coming at us.

25     Q.    And you said, show me your hands and

1    get down on the ground, right?

2         A.   Yes.

3         Q.   And you had a gate between you and him,

4    right?

5         A.   Right.

6         Q.   And you could close the gate, right?

7         A.   I could have.

8         Q.   And there came a time during the

9    encounter when the gate was closed and he was on

10   the other side, right?

11        A.   Right.

12        Q.   So when you think about disengaging,

13   you disengage, as you learned in your Taser

14   training, when the tactics you've chosen are not

15   working, right?

16        A.   I also learned in my Taser training, as

17   the five-second cycle is going, to go in there

18   and try to handle the threat.

19        Q.   Right.  But you don't have to?

20        A.   I don't have to --

21        Q.   Okay.

22        A.   -- do anything.

23        Q.   Right.

24        A.   But I was called there for a reason, to

25   do something.

1        Q.   Well, right.  But you weren't called

2    there for a reason to do something within the

3    first minute that you saw him, right?

4             MS. SEARS:  Objection.

5    BY MR. GERHARDSTEIN:

6        Q.   You were called to handle the situation

7    as peacefully as possible, right?

8        A.   Yeah.

9        Q.   And you didn't see Mr. Roell attack any

10   citizen, right?

11       A.   I didn't see him.

12       Q.   And you didn't see him even hurting any

13   property when you were there, right?

14       A.   I didn't see him hurting.

15       Q.   So if you had chosen to look at all the

16   factors in front of you, regroup, and formulate a

17   plan consistent with the excited delirium

18   training, you would have had time to do that,

19   right?

20       A.   No.

21            MS. SEARS:  Objection.

22   BY MR. GERHARDSTEIN:

23       Q.   You have no idea whether he was going

24   to just stand there on the other side of the gate

25   or whether he was going to do any property

1    damage, right?

2         A.    Exactly.

3               He already did property damage, so who

4    knows how far he could have escalated the

5    situation?

6         Q.    And if he had done property damage on

7    your watch, you could have responded to that,

8    right?

9         A.    But he was breaking  things already.

10   So he did property damage.

11        Q.    But he wasn't when you were there?

12        A.    According to the home owner, he was

13   back there breaking things.

14        Q.    Right.

15        A.    Right.

16        Q.    But you had the opportunity to develop

17   a safer plan, and you chose not to do it --

18             MS. SEARS:  Objection.

19   BY MR. GERHARDSTEIN:

20        Q.    -- right?

21             MS. SEARS:  Objection.

22        A.    No.

23   BY MR. GERHARDSTEIN:

24        Q.    So in all of this training that you've

25   just reviewed, is there anything that you wanted

1    to learn that you didn't get a chance to learn

2    before you were deployed on the road patrol?

3              Is there anything you asked to take a

4    class in and you weren't allowed to do it or

5    didn't get to do it?

6         A.   No.

7         Q.   And did you feel that your training was

8    adequate for the encounters that you had on the

9    road patrol?

10        A.   Yes.

11        Q.   And did you feel that you needed any

12   more training at all with respect to handling

13   mentally ill suspects and those that exhibit the

14   signs of excited delirium before you were ready

15   to deal with somebody like Mr. Roell?

16             MS. SEARS:  Objection.

17        A.   It's always nice to get more training.

18   BY MR. GERHARDSTEIN:

19        Q.   Did you think you had enough in order

20   to competently assess the situation that you

21   faced with Mr. Roell and then deal with it

22   appropriately?

23        A.   Yes.

24        Q.   Now, you were asked some questions

25   about Mr. Roell.

```
 1              He never reached for your weapon,

 2    right?

 3         A.   No.  I never said he did.

 4         Q.   Okay.  And --

 5              MS. SEARS:  Hey, Al, I'm sorry.

 6              These guys have to pick up their kids.

 7         Matt has to pick up his kids by 4:00.

 8              Willy has to be gone by 4:30.

 9              So we were wondering if we could let

10         them go and maybe start a little earlier

11         tomorrow to try to get them done.  So --

12              MR. GERHARDSTEIN:  All right.  Can we

13         start at 8:00?

14              MS. SEARS:  You don't have to work

15         tomorrow, do you?

16              Well, yeah.  They work tomorrow night.

17         So maybe we can get them done so they can

18         get home and get some sleep.  That's the

19         only thing I'm concerned about.

20              They -- they don't work tonight, right?

21              But they work --

22              MR. GERHARDSTEIN:  We can go off the

23         record.

24              THE REPORTER:  Off?

25              THE VIDEOGRAPHER:  We are off the
```

273

 1          record at 3:57 p.m.

 2                  (Off the record.)

 3                  We are back on the record at 4:10 p.m.

 4     BY MR. GERHARDSTEIN:

 5          Q.   When you arrived at the complainant's

 6     condo, you said Officer Alexander was already

 7     there, right?

 8          A.   He had just pulled in right in front of

 9     me, yes.

10          Q.   And did he exit his cruiser first, or

11     did you?

12          A.   He did.

13          Q.   At what point did you take out your

14     Taser?

15          A.   As I was running around the side of the

16     house, when the complainant said he was out back

17     breaking things.

18                  I looked at Deputy Alexander.  He

19     either had his gun out or hand on his gun or he

20     was -- I thought he had gotten his gun out.

21                  So I don't know what she said to him

22     prior.

23                  That's what I thought.

24          Q.   And when Deputy Alexander got to the

25     gate and was standing next to you, before he

274

1    opened the gate, did he have his gun out?

2         A.   I don't -- I don't know.

3         Q.   At that point, did you think he had his

4    gun out?

5         A.   I thought he might still have his gun

6    out.

7         Q.   Did you talk to him about why he had

8    his gun out?

9         A.   No.

10        Q.   But based on your interpretation that

11   he had his gun out, you had your Taser out?

12        A.   Right.

13        Q.   As we sit here today, do you know now

14   that he had neither his gun nor his Taser out?

15        A.   I don't know.

16        Q.   So your Taser was out before you ever

17   opened the gate and started encountering Gary

18   Roell, right?

19        A.   Right.

20             MR. GERHARDSTEIN:  All right.  Anything

21        else?

22             I don't have any other questions.

23             MS. SEARS:  No follow-up.  Thank you.

24             THE VIDEOGRAPHER:  You have the option

25        to read through your transcript.  Would you

```
 1    like to do that, or would you like to waive?

 2         MS. SEARS:  We'll take signature.

 3         THE VIDEOGRAPHER:  And you also have

 4    the option to view your video before a court

 5    or jury sees it.

 6         Would you like to do that, or would you

 7    like to waive that right?

 8         MS. SEARS:  We'll do that, too, as long

 9    as we're doing signature.

10         THE VIDEOGRAPHER:  Then we're off the

11    record at 4:12 p.m.

12

13

14                    DEPUTY JOE HUDDLESTON

15

16                         -  -  -

17         DEPOSITION ADJOURNED AT 4:12 P.M.

18                         -  -  -

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3    STATE OF OHIO        :
                          :  SS
4    COUNTY OF HAMILTON   :

5              I, Wendy Haehnle, the undersigned, a

6    duly qualified and commissioned notary public

7    within and for the State of Ohio, do certify that

8    before the giving of his deposition, DEPUTY JOE

9    HUDDLESTON was by me first duly sworn to depose

10   the truth, the whole truth and nothing but the

11   truth; that the foregoing is the deposition given

12   at said time and place by DEPUTY JOE HUDDLESTON;

13   that I am neither a relative of nor employee of

14   any of the parties or their counsel, and have no

15   interest whatever in the result of the action.

16             IN WITNESS WHEREOF, I hereunto set my hand

17   and official seal of office at Cincinnati, Ohio,

18   this 15th day of June 2015.

19

20

21        Wendy Haehnle
          Notary Public - State of Ohio
22        My commission expires September 3, 2017

23

24

25

277

```
 1                E R R A T A   S H E E T

 2        DEPOSITION OF:  DEPUTY JOE HUDDLESTON
                 TAKEN:  JUNE 4, 2015
 3
     Please make the following corrections to my
 4   deposition transcript:

 5

 6   Page  Line Number           Correction Made

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   Witness Signature            7.8.15
                                  Date
```