Title:   Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:   Training
Version:   2.0
Release Date:   10-12-2009



⚠ WARNING
Electronic Control Device

# New Medical Research Disproves the Acidosis Theory of Liability Used in the Heston Case
## *TASER ECD Does not Cause Dangerous Levels of Acidosis*

**Background.** TASER International periodically provides updates on medical research findings regarding the physiologic effects of electronic control devices (ECDs) on human and animal subjects. This Training Bulletin contains the most recent research findings as of the date of release.

## Synopsis

Law enforcement personnel are frequently called upon to deal with individuals in crisis who are physiologically compromised and are at a heightened risk of serious injury or death, regardless of actions taken by law enforcement. In addition, the restraint and arrest process can introduce additional physiologic changes that may worsen a person's baseline physiology. These changes may include significant acidosis, cardiac arrest, or other medical conditions.

**Acidosis:**

- Recent human medical research determined that muscle contractions from TASER ECD exposures for up to 10 and 15 seconds in rested human subjects resulted in minimal increases in acidosis that did not approach a dangerous level and was clinically not noticed by the test subjects.

- This research also showed that application of a TASER device for up to 15 seconds to an exerted, already acidotic person did not worsen the acidosis that was already present.

- This medical research disproves the "straw that broke the camel's back theory" of worsening acidosis that theorizes that the physiologic effect from a TASER device discharge on an already acidotic person was an added acidosis "straw" that contributed to death from acidosis. This was essentially the theory of liability used in the *Betty Lou Heston, et al. v. City of Salinas, et al.* (CA) lawsuit. This new research reveals the flaws in this jury verdict since application of a TASER device for up to 15 seconds to an exerted, already acidotic person did not worsen the acidosis that was already present.

- In comparing volitional actions by the individual, the top two worst things that a criminal suspect could do with regard to acidosis are resist and flee – in that order. These two volitional actions produce profound metabolic acidosis that can make the suspect very ill (in addition to any other volitional behaviors that they may have undertaken such as abuse of illicit drugs or consuming a significant amount of alcohol). When compared with a TASER device application, this research data indicates that a continued, prolonged resistive struggle or a foot chase is more dangerous.

- The TASER device, with a good probe spread may represent the best option that will allow quick restraint and EMS care.

**Cardiac:**

- Human research has shown that the immediate induction of ventricular fibrillation, an arrhythmia that can be fatal without intervention, by the direct electrical effects of the TASER X26 on the normal adult heart is unlikely and that the induction of delayed cardiac arrest by this mechanism is extremely unlikely.

- Researchers have concluded that the a close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. This risk is judged to be extremely low in field use.




Δ π EXHIBIT 1
Deponent Huddleston
Date 6-4-15 Rptr. WH
WWW.DEPOBOOK.COM

Page 1 of 12

| | |
|---|---|
| Title: Training Bulletin 15.0 Medical Research Update and Revised Warnings | |
| Department: Training |  ⚠ WARNING |
| Version: 2.0 | Electronic Control Device |
| Release Date: 10-12-2009 | |

- The risk of an adverse cardiac event related to a TASER ECD discharge is deemed to be extremely low. However, it is not possible to predict nor test against the entire spectrum of potential human physiologies or conditions such as unpredictable combinations of drugs of unknown concentration or origin in the presence of underlying cardiac or other disease. Furthermore, a law enforcement officer will have no means to diagnose these factors in any event.

- Sudden Cardiac Arrest (SCA) is a leading cause of death in the United States, claiming an estimated 325,000 lives each year. These deaths occur on golf courses, in airports, during physical exertions, from startle or other stimuli, or just about anywhere. Should Sudden Cardiac Arrest occur in a scenario involving a TASER discharge to the chest area – it would place the law enforcement agency, the officer, and TASER International in the difficult situation of trying to ascertain what role, if any, the TASER ECD could have played in a unique situation that cannot be replicated in human clinical safety evaluations. In order to reduce the risk of such an event, and in light of the fact that frontal applications of TASER ECDs have been found to be more effective when the probes are targeted at the lower torso (engaging the balancing muscles of the pelvic triangle) we have lowered the recommended point of aim from the center of mass to the lower center of mass for frontal discharges. We believe this recommendation will improve the effective use of TASER ECDs while also further increasing safety margins and enhancing the ability to defend such cases in post event legal proceedings.

## Overview and Training Implications

1. **We have issued a new TASER Targeting Guide that will apply for the new XREP impact munition as well as ECDs such as the X26, M26 and X3.** Note, we have lowered the recommended point of aim from center of mass to lower-center of mass for front shots. The blue highlighted area in the adjacent target man represents the preferred target area. There are three reasons:

    a. Simplify targeting for all TASER systems to one easy to remember map, avoiding chest shots when possible and the risk of a head/eye shot in a dynamic situation, as is standard for impact munitions

    **Preferred Target Areas in Blue**

    

    b. When possible, avoiding chest shots with ECDs avoids the controversy about whether ECDs do or do not affect the human heart.

    c. Close-spread ECD discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region.

    **Back shots remain the preferred area when practical.**

2. **When dealing with exhausted individuals or persons exhibiting symptoms of distress or agitated/excited delirium:**

    a. **Once officers engage in capture procedures, it is important to minimize the duration of the physical struggle.** New research shows that physical struggle, simulated by punching a heavy bag at full intensity, can cause acidosis that can reach dangerous levels in only 45 seconds of intense exertion, starting from a resting state. Accordingly, officers engaging subjects in a physical struggle or in an exhaustive state should develop a plan to capture and restrain the subject as expeditiously as possible to minimize

 TASER

Title: Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department: Training
Version: 2.0
Release Date: 10 12 2009



the duration of struggle and the adverse physiological effects. The physiologic effects of a TASER ECD discharge of up to 15 seconds was significantly less than that of either fleeing (simulated with a sprint) or fighting (simulated with the heavy bag). This research shows that the TASER ECD, as part of an overall capture plan, is a viable option to help minimize the duration of the struggle.

b. **When encountering subjects exhibiting symptoms of exhaustion, distress or agitated/excited delirium, refer to your agency's guidelines for proper response.** These subjects are at significant risk of arrest-related death. Immediate medical attention may reduce this risk.

3. **The primary risk of serious injury or death during ECD deployment is risk related to falls. Users should be reminded to avoid deploying ECDs on persons on elevated platforms or other places where a fall can be more injurious.**

**This bulletin should be distributed to all ECD-certified officers.**

Title:  Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:  Training
Version:  2.0
Release Date:  10 12 2009

⚠ WARNING
Electronic Control Device

## Medical Research Update Details

Recent human medical research continues to affirm the general safety of TASER® electronic control devices (ECDs or devices).[1] In 2008 alone, over 30 new medical studies were published in paper, abstract, or poster form on TASER technology. Some of these studies presented ground breaking research in the areas of human physiological changes and cardiac safety. In addition, several new ECD field-use epidemiological studies were published.[2] Dr. James Jauchem published a new article on deaths in custody[3] focusing on excited delirium and ECDs.[4] Two new books were published, one solely dedicated to ECDs[5] and one with a significant chapter on ECDs.[6] Some of these studies provided substantial evidence confirming generally held beliefs regarding the effects of law enforcement force and restraint in the areas of human physiological changes and cardiac safety.

### Physiologic Changes[7]

Law enforcement personnel are frequently called upon to deal with individuals in crisis who are physiologically compromised[8] and are at a heightened risk of serious injury or death. The restraint and arrest process can introduce additional physiologic changes that may worsen a person's baseline physiology. These changes may include significant acidosis, cardiac arrest, or other medical conditions[9]. Recent US Bureau of Justice Statistics showed 2,002 US arrest-related deaths for the period 2003-2005; 55% of which were homicides, 13% involved drugs or alcohol, and 0.1% involved use of a baton or TASER device.

### A.   Acidosis

Acidosis refers to a condition of decreasing pH (usually measured in blood plasma). Although numerous conditions can cause acidosis, law enforcement personnel commonly confront individuals who are susceptible to developing acidosis because of the individual's behaviors that may include: illicit or prescription drug use, intoxication, agitation, delirium, physical exertion, fighting, resisting arrest and restraint, or fleeing from officers. Many of these behaviors occur in combination and may be additive.

Acidosis is a condition that occurs across a spectrum. While both a pH of 7.35 and 6.20 indicate an acidotic state; these 2 pH levels are clinically very different. The lower value of 6.20 is likely to be lethal and the upper value of 7.35 would likely not even be physically noticeable to an individual. An individual can be acidotic (by definition) but NOT be in any danger physiologically. For instance, briskly walking up flights of stairs would make most people acidotic, but would not put one in any medical danger.

Recent human medical research investigated the physiologic health risks associated with physical exertion similar to resisting arrest or fleeing from police officers, as well as, those risks associated with certain law enforcement control tools. The three law enforcement control tools tested for their effects on causing acidosis were law enforcement canine for capture and restraint, oleoresin capsicum (OC) spray exposure to the face and neck, and TASER ECD exposure for 10 and 15 seconds to the torso. The researchers measured acidosis changes associated with the above physical exertion and police tools and found the following:

- Muscle contractions from TASER device exposures for up to 10 and 15 seconds in **rested** human subjects resulted in minimal increases in acidosis that did not approach a dangerous level and was clinically not noticed by the test subjects.
- Physical activity similar to fighting and resisting or fleeing from law enforcement produced the worst and most clinically significant acidosis. This volitional activity was clearly the most potentially harmful from a physiologic standpoint and the test subjects clinically felt ill following this activity.
- Canine takedown and restraint had the highest increase of acidosis levels of the **law enforcement tools tested.**
- OC spray had the least increase in acidosis levels of the **law enforcement tools tested.** This was expected since TASER device application stimulates muscles and OC spray does not. The researchers opined that since OC spray does not usually incapacitate a focused person or a person intoxicated on drugs or alcohol, **the fight or flight is likely to continue and may result in**

 TASER

Title:    Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:    Training
Version:    2.0
Release Date:    10-12-2009



worsening acidosis. It is likely that OC spray, while not directly causing acidosis, could indirectly make it worse.

Following is a pH graph that depicts these results. The least amount of decrease in pH is the safest.



Title: Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department: Training
Version: 2.0
Release Date: 10-12-2009



- Recent human medical research also investigated the physiologic health risks associated with a TASER discharge on an already acidotic person. This research showed that application of a TASER device for up to 15 seconds to an exerted, already acidotic person did not worsen the acidosis that was already present. The following graph depicts these test results:



- This medical research disproves the "straw that broke the camel's back theory" of worsening acidosis that theorizes that the physiologic effect from a TASER device discharge was an added acidosis "straw" that contributed to death from acidosis. This was essentially the theory of liability used in the *Betty Lou Heston, et al. v. City of Salinas, et al.* (CA) lawsuit which resulted in a jury finding that the TASER device contributed 15% to Heston's death while his own actions, which included methamphetamine intoxication, prolonged physical exertion and resisting arrest; contributed 85% to his death. This new research reveals the flaws in this jury verdict since application of a TASER device for up to 15 seconds to an exerted, already acidotic person did not worsen the acidosis that was already present.

In comparing volitional actions by the individual, the top two worst things that a criminal suspect could do with regard to acidosis are resist and flee – in that order. These two volitional actions produce profound metabolic acidosis that can make the suspect very ill (in addition to any other volitional behaviors that they may have undertaken such as abuse of illicit drugs or consuming a significant amount of alcohol). When compared with a TASER device application, this research data indicates that a continued, prolonged resistive struggle or a foot chase is more dangerous. It appears that it is these physical actions of resisting and fleeing that will most worsen acidosis. While the scientific studies were able to demonstrate this profound effect on acidosis with only 45 seconds of exertion, many arrest-related struggles last much longer.



Title:    Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:    Training
Version:    2.0
Release Date:    10-12-2009



Based on the research data referenced above, by the time the officers arrive, many suspects are already significantly acidotic from their own volitional actions – likely with lower pH levels resulting in an increased chance of injury, worsening condition, or possibly death, independent of any other action taken by the police officers. Potential danger exists in allowing the suspect to continue with agitated or resistive behavior. Prolonging restraint by allowing a fight or a fleeing situation may only serve to worsen the suspect's condition. The TASER device, with a good probe spread may represent a tool that will allow quick restraint and EMS care.

Human medical tests have, for the most part, been limited to 15-second ECD applications. Recent animal research tested the physiological effects of ECD exposures up to 30 minutes on anesthetized swine and concluded that "The dose does not seem to be cumulative. We did not observe an accumulation of the TASER® [ECD] effect to a 'toxic' level. There was no increased mortality with longer durations of TASER [ECD] exposure".[10]

Please see "Attachment A" for a summary of related human medical research.

B.    Cardiac

The conclusions of recently published human medical cardiac studies are summarized as follows:

- In summary, this review of the scientific literature suggests that the immediate induction of ventricular fibrillation by the direct electrical effects of the TASER X26 on the normal adult heart is unlikely and that the induction of delayed cardiac arrest by this mechanism is extremely unlikely.[11]

- Although heart rate increased in some cases, there were no cardiac dysrhythmias, or interval morphology changes in human subjects who received a TASER discharge based on a 12-lead ECG performed immediately before and within 1 minute after a TASER device activation.[12] The cardiac changes were also evaluated in acidotic, exhausted humans and the same conclusion was reached.[13]

- Prolonged 15-second ECD application in a physically exhausted adult human did not cause a detectable change in their 12-lead ECGs. Theories of CEW-induced dysrhythmias are not supported.[14]

- A 10-second ECD exposure in an ideal cardiac axis application did not demonstrate concerning tachyarrhythmias using human models. The swine model may have limitations when evaluating ECD technology.[15]

- In a resting adult population, the ECD did not affect the recordable cardiac electrical activity within a 24-hour period following a standard 5-second application. The authors were unable to detect any induced electrical dysrhythmias or significant direct cardiac cellular damage that may be related to sudden and unexpected death proximal to ECD exposure. Additionally, no evidence of dangerous hyperkalemia or induced acidosis was found. The authors recommended further study in the area of the in-custody death phenomenon to better understand its causes.[16]

- Human volunteers exposed to a single shock from a ECD did not develop an abnormal serum troponin I level 6 hours after exposure, suggesting that there was no myocardial necrosis or infarction.[17]

- CEW [Conducted Energy Weapon or ECD] exposure produced no detectable dysrhythmias and a statistically significant increase in heart rate. Overall, TASER CEW exposure appears to be safe and well tolerated from a cardiovascular standpoint in this population. This study increases the cumulative



Title:     Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:   Training
Version:     2.0
Release Date:     10-12-2009

⚠ WARNING
Electronic Control Device

human subject experience of CEW exposure with continuous ECG monitoring and includes 28 full 5-s exposures[18].

- Relatively large variations about the X26 operating level were found not to result in fibrillation or asystole[19].

- CEW exposure produced no detectable dysrhthmias and a statistically significant increase in heart rate. Overall, TASER CEW exposure appears to be safe and well tolerated from a cardiovascular standpoint in this population. This study increases the cumulative human subject experience of CEW exposure with continuous ECG monitoring and includes 28 full 5-s exposures[20].

**Conclusion regarding the potential for cardiac effects:**   Researchers have been able to demonstrate changes in heart rate and rhythm consistent with cardiac pacing and, in some cases, ventricular fibrillation (VF) in small swine, an arrhythmia that can be fatal without intervention, and have concluded that the close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. The threshold for VF has been estimated to be 12.6 times that for cardiac pacing[21]. This risk is judged to be extremely low in field use. In order to increase the safety margin and since field experience shows that ECD discharges are effective when deployed to the large muscles of the back, abdomen, legs and pelvic triangle, users should aim for the back or (when practical) toward the mid lower abdomen and avoid intentionally targeting the chest area with probe applications to increase effectiveness and avoid the remote potential risk of cardiac effect.

<u>Revised Warnings</u>
    Attached are the new Product Warnings which have been updated based on this new human medical research. Go to www.TASER.com for the complete Product Warnings document and glossary of terms for Law Enforcement.

    Any questions regarding this Training Bulletin should be directed to the TASER International Training Department at (800) 978-2737 or by email to Training@TASER.com.



Title: Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department: Training
Version: 2.0
Release Date: 10-12-2009



⚠ WARNING
Electronic Control Device

## ATTACHMENT A

### Acidosis

- Acidosis is worse from continued exertion when compared to a TASER device application. This does not support an association between TASER device applications and sudden death due to worsening acidosis. It does support a worsening acidosis from continued exertion independent of TASER device application.[22]

- The TASER XREP™ projectile is new technology that will be used to control dangerous, agitated or potentially violent persons in the community. It will allow greater law enforcement and suspect safety because of its ability to help control individuals from a greater distance. The initial investigation into the physiologic effect that this device will have on humans with regard to serum biomarkers was done with the unfinished product while under development. Prolonged ECD application with this initial design caused small but statistically insignificant changes in measured serum biomarkers. These small changes would likely result in limited clinical significance. It appears that the tested developmental XREP ECD represents an adequate risk/benefit ratio if used for its intended purpose.[23] Further testing of the final XREP product is now underway.

- There were no clinically significant or lasting statistically significant changes in cardiovascular, electrolyte, lactate or pH levels in human subjects after a 5 second TASER activation.[24]

- Markers of acidosis and cardiac injury were similar among acidotic subjects who underwent both sham and real prolonged CEW exposure. Prolonged CEW exposure in humans does not appear to have an effect with regard to worsening acidosis that is already present.[25]

- There were no worrisome changes in measured serum biomarkers. There was a significant decrease in serum lactate after exposure. This data does not support a causal relationship between ECD drive-stun applications and worsening physiology.[26]

- In this resting adult population, the TASER X26 device did not affect the recordable cardiac electrical activity within a 24-hour period following a standard five-second (s) application. The authors were unable to detect any induced electrical dysrhythmias or significant direct cardiac cellular damage that may be related to sudden and unexpected death proximal to CEW exposure. Additionally, no evidence of dangerous hyperkalemia or induced acidosis was found. Further study in the area of the in-custody death phenomenon to better understand its causes is recommended.[27]

- Cardio-respiratory and blood parameters were followed before and for 60 min after a 5 s TASER exposure on 21 men and women law enforcement officer volunteers.[28]

- …the repeated use of electro-muscular incapacitating devices in a short period of time is, at least, feasible, with the caveat that some medical monitoring of subjects may be required (to observe factors such as lactate and acidosis).[29]

- Three repeated TASER device exposures had only transient effects on blood factors, which all returned to pre-exposure levels, with the exception of hematocrit (which remained elevated after 3 h). Since the increase in this factor was less than that which may occur after short periods of exercise, it is unlikely that this would be an indicator of any serious harm.[30]

- Intoxicated adults with prolonged CEW exposure demonstrate small transient increases in measures of acidosis and no change in markers of cardiac injury. The increased acidosis was not clinically significant and self corrected.[31]



Title:    Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:   Training
Version:    2.0
Release Date:    10-12-2009



### Stress

- Alpha-amylase had the greatest increase from baseline at 10–15 min with the defensive tactics drill. Cortisol had the greatest increase at 15–20 min with O.C. spray. Cortisol remained most elevated at 40–60 min in the defensive tactics drill group. Our preliminary data suggests that physical exertion during custodial arrest may be most activating of the human stress response, particularly the sympathetic-adrenal-medulla axis. This may suggest that techniques to limit the duration of this exertion may be the safest means to apprehend subjects, particularly those at high-risk for in-custody death. Conducted electrical weapons were not more activating of the human stress response than other uses of force.[32]  Please see the following graph:



- A 5-second exposure of a TASER X26 [device] to healthy law enforcement personnel does not result in clinically significant changes of physiologic stress.[33]

M26, X3, X26, and Ⓧ are trademarks of TASER International, Inc., and TASER® is a registered trademark of TASER International, Inc., registered in the U.S. All rights reserved. © 2009 TASER International, Inc.

---

[1] For a complete listing see the most current Electronic Control Device Research Index posted on TASER International, Inc's (TASER) website at www.TASER.com.

[2] Bozeman WP, Hauda WE, 2nd, Heck JJ, Graham DD, Jr., Martin BP, Winslow JE. Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects. Ann Emerg Med. Jan 21 2009.

[3] For more information on excited delirium and custody related death issues see the Custody Related Death Research Index posted on TASER's website at www.TASER.com, and www.incustodydeath.com.

[4] Jauchem, PhD, James R., Deaths in custody: Are some due to electronic control devices (including TASER® devices) or excited delirium? Journal of Forensic and Legal Medicine, doi:10.1016/j.jflm.2008.05.011.

---



Title: Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department: Training
Version: 2.0
Release Date: 10-12-2009



[5] Mark W. Kroll (Editor), Jeffrey D. Ho (Editor). TASER® Electronic Control Devices: Physiology, Pathology, and Law. Springer.

[6] Edited by Raymond M. Fish and Leslie A. Geddes, Lawyers & Judges Publishing Company, Inc. Electrical Injuries: Medical and Bioengineering Aspects, Second Edition, Chapter 42: TASER Electronic Control Devices.

[7] "Physiologic changes" include, but are not limited to, changes in: heart rate; heart rhythm; stress hormones or other biochemical neuromodulators (e.g., catecholamines); respiration; adrenergic states; tissue temperature; myoglobin; potassium; creatine kinase; lactic acid, or pH.

[8] "Physiologically compromised" include those persons whose lives in rare circumstances may be at risk of arrest-related death due to excited or agitated delirium, acidosis, cardiac arrest, serotonin syndrome, neuroleptic malignant syndrome, sudden unexpected death in epilepsy, catecholamine release or buildup, compromised cardiac or pulmonary conditions, sickle cell compromise, and drug or alcohol use or withdrawal.

[9] Such as hyperkalemia, rhabdomyolysis, apnea, increased adrenergic states, or hypercarbia.

[10] Hughes E, Kennett M, Murray W, Werner J, Jenkins D. Electro-Muscular Disruption (EMD) bioeffects: A study of the Effects of Continuous Application of the TASER X26 Waveform on Swine: Penn State University Institute for Non-Lethal Defense Technologies; Nov 30 2007.

[11] Raymond Ideker, MD, PhD and Derek J. Dosdall, PhD; Can the Direct Cardiac Effects of the Electric Pulses Generated by the TASER X26 Cause Immediate or Delayed Sudden Cardiac Arrest in Normal Adults? The American Journal of Forensic Medicine and Pathology, Vol 28, No. 3, September 2007.

[12] Vilke GM, Sloane C, Levine S, Neuman T, Castillo E, Chan TC. Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the TASER X26. Am J Emerg Med. Jan 2008;26(1):1-4.

[13] Ho JD, Dawes DM, Heegaard WG, Calkins HG, Moscati RM and JR Miner. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon on Physically Exhausted Adults. J Emerg Med, 2009;In Press.

[14] Ho J, Dawes D, Calkins H, Johnson M. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults. Acad Emerg Med 2007;14(5):128-129.

[15] Ho JD, Dawes DM, Reardon RF, et al. Echocardiographic Evaluation of a TASER-X26 Application in the Ideal Human Cardiac Axis. Acad Emerg Med. Aug 10 2008.

[16] Ho JD, Miner JR, Lakireddy DR, Bultman LL, Heegaard WG. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med. Jun 2006;13(6):589-595.

[17] Sloane CM, Chan TC, Levine SD, Dunford JV, Neuman T, Vilke GM. Serum troponin measurement of subjects exposed to the TASER X-26. J Emerg Med. Jul 2008;35(1):29-32.

[18] Bozeman study Immediate cardiovascular effects of the TASER X26 conducted electrical weapon, W P Bozeman, D G Barnes, Jr, J E Winslow, III, J C Johnson, III, C H Phillips, and R Alson, Emerg. Med. J. 2009; 26(8): p. 567-570; http://emj.bmj.com/cgi/content/abstract/26/8/567?ct=ct.

[19] Beason CW, Jauchem JR, Clark CD, 3rd, Parker JE, Fines DA. Pulse variations of a conducted energy weapon (similar to the TASER X26 device): effects on muscle contraction and threshold for ventricular fibrillation. J Forensic Sci. Sep 2009;54(5):1113-1118.

[20] Bozeman WP, Barnes DG Jr, Winslow JE III, Johnson JC III, Phillips CH, Alson R. "Immediate cardiovascular effects of the TASER X26 conducted electrical weapon," Emerg. Med. J. 2009, 26; 567-570.



Title:   Training Bulletin 15.0 Medical Research Update and Revised Warnings
Department:   Training
Version:   2.0
Release Date:   10-12-2009



[21] Raymond Ideker, MD, PhD and Derek J. Dosdall, PhD; Can the Direct Cardiac Effects of the Electric Pulses Generated by the TASER X26 Cause Immediate or Delayed Sudden Cardiac Arrest in Normal Adults? *The American Journal of Forensic Medicine and Pathology*, Vol 28, No. 3, September 2007.

[22] Ho, J.D., et al., Can Prolonged TASER X26 Exposure or Continued Exertion Contribute to Sudden Cardiac Death Through Worsening Acidosis? 2009, CardioRythm, Hong Kong: Dept. of Emergency Medicine, Hennepin County Medical Center, Minneapolis, MN Dept. of Emergency Medicine, Lompoc Valley Medical Center, Lompoc, CA.

[23] Serum Biomarker Effects of Prolonged TASER XREP Device Exposure, Jeffrey D. Ho, MD, Donald M. Dawes, James R. Miner, MD,, NAME (National Association of Medical Examiners) 2008 Annual Conference (Louisville, Kentucky); European Society of Emergency Medicine Scientific Assembly, Munich Germany Sept 2008.

[24] Vilke G, Sloane C, Bouton K, et al. Cardiovascular and Metabolic Effects of the TASER on Human Subjects. *Acad Emerg Med* 2007;14(5):104-105.

[25] Ho J, Dawes D, Bultman L, et al. Physiologic Effects of Prolonged Conducted Electrical Weapon Discharge on Acidotic Adults. *Acad Emerg Med* 2007;14(5):63.

[26] Ho JD, Dawes DM, Lapine AL, et al. PROLONGED TASER® "DRIVE-STUN" EXPOSURE IN HUMANS DOES NOT CAUSE WORRISOME BIOMARKER CHANGES Hennepin County Medical Center: National Association of EMS Physicians; 2008.

[27] Ho JD, Miner JR, Lakireddy DR, Bultman LL, Heegaard WG. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. *Acad Emerg Med*. Jun 2006;13(6):589-595.

[28] Bouton K, Vilke G, Chan T, et al. Physiological Effects of a Five Second TASER Exposure. San Diego State University San Diego Heart Institute: Society for Academic Emergency Medicine; 2007.

[29] Jauchem JR, Sherry CJ, Fines DA, Cook MC. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of Sus scrofa following repeated TASER exposures. *Forensic Sci Int*. Aug 10 2006;161(1):20-30.

[30] Jauchem JR, Cook MC, Beason CW. Blood factors of Sus scrofa following a series of three TASER® electronic control device exposures. *Forensic Sci Int*. Jul 12 2007.

[31] Moscati R, Ho J, Dawes D, et al. Physiologic Effects of Prolonged Conducted Electrical Weapon Discharge on Intoxicated Adults. *Acad Emerg Med* 2007;14(5):63-64.

[32] Dawes D, Ho J, Miner J. The neuroendocrine effects of the TASER X26: a brief report. *Forensic Sci Int*. Jan 10 2009;183(1-3):14-19.

[33] Vilke GM, Sloane CM, Bouton KD, et al. Physiological Effects of a Conducted Electrical Weapon on Human Subjects. *Ann Emerg Med*. Aug 23 2007.





**TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement**



## IMPORTANT ECD PRODUCT SAFETY AND HEALTH INFORMATION

⚠ WARNING

These safety warnings are for your protection as well as the safety of others. Disregarding this information could result in death or serious injury.[1]

**Complete Training First.** Significant differences exist between each of the TASER International, Inc. ("TASER") Electronic Control Device ("ECD") models. Do not Use[2] or attempt to Use any ECD model unless you have been trained and certified by a Certified TASER Instructor[3] on that particular model.

**Read and Obey.** Read, study, understand, and follow all instructions, warnings, information, training bulletins and TASER training materials[4] before Using the ADVANCED TASER® M26™ ECD, TASER X3™ ECD, or TASER X26™ ECD. Failure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the User, force recipient, and others.

**Obey Applicable Laws.** Use the ECD only in accordance with applicable federal, state, local laws and other regulations or legal requirements. Your law enforcement agency's Guidance[5] must also be followed.[6] Any Use of an ECD must be legally justifiable. Resistance to law enforcement interaction incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of death or serious injury.



*This warning label appears on newer ECD models.*

These warnings are effective September 30, 2009, and supersede all prior revisions and relevant Training Bulletins. The most current warnings are online at www.TASER.com.

## SCOPE AND PURPOSE

This document presents important safety warnings, instructions, and information intended to reasonably minimize hazards associated with ECD deployment, intended Use, side effects, and environment of Use.

Confronting, apprehending, capturing, controlling, restraining, incapacitating, and taking persons into custody are high risk events that could result in death or serious injury.

---

[1] These warnings are state of the art but cannot address all possible ECD application circumstances or permutations. They are intended to inform Users about reasonably foreseeable potential risks of harm. The decision to Use the ECD in a particular manner or circumstance must follow applicable legal standards. These warnings do not create a standard of care. Herein, the singular is also the plural, the plural includes the singular, and the masculine is also the feminine.

[2] The terms "Use," "Used," "Using," or "User" include, but are not limited to: acquiring; accessing; entrusting; providing; possessing; storing; handling; manipulating; carrying; holstering; drawing; brandishing; displaying; deploying; utilizing; drive-stunning; using alligator or other types of clips or attachments; or discharging an ECD.

[3] A Certified TASER Instructor possesses and maintains a current TASER Instructor certification for the specific product model they are teaching, demonstrating, or Using and is required to be fully compliant with TASER's most current training requirements and materials.

[4] Current TASER Instructor Training materials may be obtained by contacting TASER's Training Department.

[5] Law enforcement agencies are force and force tools experts and are solely responsible for their own Guidance. "Guidance" includes, but is not limited to, policy, procedure, rule, order, directive, training, continuum, and standard. TASER has no power or authority to mandate or require Guidance, set policy, or establish standards of care or conduct.

[6] Law enforcement agencies, government entities, and Users are sophisticated purchasers, sophisticated users, and learned intermediaries with respect to law enforcement weapons (including ECDs), force, force use, legality of force use, and reporting.



TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement



When lawfully Used as directed, ECDs are designed in probe-deployment mode to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury. Any use of force, physical exertion, capture, control, restraint, or incapacitation involves risks that a person may get hurt or die.[7]

Within this document certain safety signals and signal words are used to call attention to safety messages:

⚠️ The safety alert symbol is used to alert Users to potential injury hazards. ALWAYS Obey all safety messages that follow this symbol to reasonably minimize the risk of death or serious injury when the ECD is Used and to enhance safe operation of the ECD.

⚠️WARNING The signal word WARNING indicates a hazardous situation which, if not avoided or heeded, could result in death or serious injury. It is intended to direct the User's attention to hazards that may not be obvious, but may be reasonably mitigated by heeding training and instructions, or avoiding certain actions, circumstances, or behaviors, thereby improving the safety of the ECD. WARNINGS may be followed by instructions and information integral to the WARNING.

## SAFETY INFORMATION: GENERAL PRECAUTIONS

⚠️WARNING

**Unintentional Deployment Hazard.** Unintentional ECD activation could result in death or serious injury to the User, force recipient, and others. Follow and comply with the following instructions to reduce the risk of unintentional Use, deployment, or activation.

**Store in a Secure Location.** Store ECDs, cartridges, and accessories in secure locations inaccessible to children and other unauthorized persons to prevent inappropriate Use, which may result in death or serious injury to the User, other persons, or animals. ECDs, cartridges, and accessories are not toys.

**Use of ECD Safety.** Always place the ECD safety switch in the down (SAFE) position when not in Use. Remember to place the ECD safety switch in the up (ARMED) position when you intend to Use the ECD.

**Assume ECD is Loaded.** Always assume that an ECD is loaded and capable of discharging. To avoid unexpected discharge, ensure that no live cartridge is in the ECD when inserting: a battery; CDPM™, DPM™, EPM™, TPM™, or XDPM™ battery pack; TASER CAM™ recorder; or while performing spark tests (except when spark testing the X3 ECD), maintenance, data downloading, or battery charging.

**Be Aware of ECD Deployment Mode.** Keep your finger off the trigger until it is legally justifiable to use the ECD. Be aware of the deployment mode (manual or semi-automatic) set on the X3 ECD before discharging that ECD.

**Keep Body Parts away from Front of ECD or Cartridge.** Keep your hands and body parts away from the front of the ECD and cartridge, unless instructed otherwise. A discharging ECD or cartridge could result in serious injury.

**Avoid Static Electricity.** Keep the cartridge away from sources of static electricity. Static electricity can cause the ECD or X26 or M26 cartridge to discharge unexpectedly, which could result in serious injury.

**Beware of Electronic Equipment Interference.** Interference from electronic transmission equipment in close proximity to the ECD could interfere with the proper operation of the ECD and cause the ECD to discharge. Keep the ECD at least several inches away from other electronic equipment. Place the ECD safety switch in the down (SAFE) position whenever it is immediately adjacent to electronic equipment (including transmitting radios and cell phones). Remember to place the ECD safety switch in the up (ARMED) position prior to attempting Use.

---

[7] "Almost every use of force, however minute, poses some risk of death." *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1280, n.12 (11th Cir. 2004).

ADVANCED TASER, CDPM, DPM, EPM, EVIDENCE.COM, M26, TASER CAM, TPM, X3, X26, XDPM, 'Protect Truth,' 'Protect Life,' and Ⓐ are trademarks of TASER International, Inc., and TASER ® is a registered trademark of TASER International, Inc., registered in the U.S. All rights reserved. © 2009 TASER International, Inc.

 TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement



**Avoid Dropping ECD or Cartridge.** If an ECD or cartridge is dropped or damaged it may unintentionally deploy or discharge, become inoperable, or fail to function, making it unsafe for continued use. If an ECD or cartridge has been dropped or damaged, refer to the procedure recommended in the current version of the TASER Instructor Training materials.

> ⚠WARNING
>
> Failure to maintain an ECD as instructed may cause the ECD to malfunction or fail to function optimally and could result in death or serious injury. Follow and comply with the following instructions to reduce the risk of ECD malfunction, including failure.

**Damaged ECD or Cartridge.** Do not use a cartridge with a missing blast door unless facing an immediate threat. ECD repair or modification by an unauthorized person may cause the ECD to fire or malfunction, will void the warranty, and may put the User or other person at risk of death or serious injury.

**Update ECD Software.** Some ECDs, including the TASER X26 and X3, have the capability for software updating. It is important to acquire, update, and maintain the latest ECD software update. Current ECD software may be obtained by contacting TASER's Customer Service Department or following instructions at the EVIDENCE.COM™ site.

**Use Only TASER-Approved Components, Batteries, Accessories, and Cartridges.** The ECD is a sophisticated electronic system. In order to provide proper function, only TASER-approved components, batteries, accessories, and cartridges are to be used with the ECD. Use of anything other than TASER-approved components, batteries, accessories, and cartridges will void the warranty, may cause malfunction, and may put the User or other person at risk of death or serious injury.

**Avoid Exposure to Wet Conditions.** If the ECD is drenched or immersed in water or other liquid, DO NOT Use the ECD until completing the procedure recommended in the current version of the TASER Instructor Training materials.

### SAFETY INFORMATION: ECD DEPLOYMENT AND USE

> ⚠WARNING
>
> **Perform Spark Test Prior to Each Shift.** ECDs must be safely spark tested prior to each shift.
>
> ⚠WARNING
>
> **Avoid Misuse.** Use an ECD only for its intended purpose, in legally justifiable situations, and in accordance with User's agency's Guidance.
>
> ⚠WARNING
>
> **Never Confuse Handgun with ECD.** Confusing a handgun with an ECD could result in death or serious injury. ALWAYS follow your agency's equipment carrying and holstering location Guidance and training regarding distinguishing between handguns, other weapons, and ECDs.
>
> ⚠WARNING
>
> **Be Aware that an ECD or Cartridge may Fail to Fire, Operate, or be Effective.** No weapons system, tool, technique, or ECD is always effective. If an ECD, cartridge, or accessory is inoperable, fails to function, or the intended ECD application is ineffective in achieving the desired effect, consider reloading and redeploying, using other force options, disengaging, or using other alternatives according to agency Guidance. The failure of the ECD to fire, operate, or be effective could result in death or serious injury.

**Prepare to Redeploy ECD or Use BackUp Plan.** Always prepare to redeploy the ECD or Use a backup plan. Be familiar with backup plans and acceptable alternatives in the event of ineffective deployment.

ADVANCED TASER, CDPM, DPM, EPM, EVIDENCE.COM, M26, TASER CAM, TPM, X3, X26, XDPM, 'Protect Truth, 'Protect Life,' and ⑦ are trademarks of TASER International, Inc., and TASER ® is a registered trademark of TASER International, Inc., registered in the U.S. All rights reserved. © 2009 TASER International, Inc.

 TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement 

---

**⚠WARNING**

**Probe or Electrode Injury or Infection Hazard.** ECD Use may cause a mark, burn, scar, penetration, other skin, or tissue damage or infection. Provide First Aid and medical care as needed.

**Scarring.** Use of an ECD may cause irritation, puncture, mark, abrasion, rash, burn, keloid, or other scarring that may be permanent. This risk may be increased when using the M26 or X26 in drive-stun mode with the cartridge removed or the X3 ECD in drive-stun mode due to the multiple sets of electrical contacts. The nature and severity of these effects depends on the area of exposure and method of application, individual susceptibility, and other circumstances surrounding ECD Use, exposure, and after care.

**Penetration Injury.** The TASER probe has a small dart point which may cause a penetration injury to blood vessel, or internal organ (including lung, bone, or nerve). The probe or dart point (which may detach) can also puncture or become embedded into a bone, organ, or tissue, which may require immediate medical attention, surgical removal, or may result in scarring, infection, or other serious injury.

**Penetration Injury Care.** Injury due to penetration of the probe or dart point into a blood vessel, organ, nerve, or bone may require medical attention. A probe, dart point, or barb embedded in a sensitive area such as the eye, the genital area, breast, neck, throat, or vascular structure may cause serious injury and may require special medical attention and further evaluation.

**Probe Removal.** Probe removal may cause injury. Leaving a probe in the body may result in pain or injury. Follow your agency's Guidance and biohazard protocols for probe removal. In the case of embedment, organ or bone penetration, or probe, dart point, or barb detachment, immediate medical attention and possible surgical removal may be required.

**Skin, Wound, or Infection Treatment.** ECD Use may cause a skin irritation, puncture wound, abrasion, mark, rash, burn, keloid or other scar which may require medical attention and may be permanent. As with any injury of this type, infection or tetanus may occur in some circumstances.

**Biohazards.** Utilize appropriate biohazard protocols and personal protective equipment including Body Substance Isolation procedures, gloves, masks, and washing of hands and exposed areas as necessary. Follow your agency's Guidance and appropriate biohazard, waste, and evidence protocols when dealing with biohazards.

**Untethered Discharged Probe.** In probe deployment, it is possible that a discharged probe that does not impact a subject or target may become untethered from the wire and travel a significant distance. A loose, untethered probe can cause serious injury.

---

**⚠WARNING**

**Eye Injury Hazard.** If a TASER probe, electrode or electrical discharge contacts or comes into close proximity to an eye it could result in serious injury, including permanent vision loss. DO NOT intentionally aim an ECD at the eye of a person or animal without justification.



**LASER light could result in serious eye injury.** The ECD uses a LASER as a targeting aid. Avoid intentionally aiming the LASER at the eye of a person or animal without justification. NEVER aim the LASER at aircraft.

**⚠WARNING**

**Sensitive Body Part Hazard.** When possible, avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, chest/breast, or known pre-existing injury areas without legal justification. The preferred target areas are the lower center mass (below chest) for front shots and below the neck area for back shots.

---

ADVANCED TASER, CDPM, DPM, EPM, EVIDENCE.COM, M26, TASER CAM, TPM, X3, X26, XDPM, 'Protect Truth, 'Protect Life,' and Ⓩ are trademarks of TASER International, Inc., and TASER ® is a registered trademark of TASER International, Inc., registered in the U.S. All rights reserved. © 2009 TASER International, Inc.



TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement



---

⚠WARNING

**Minimize Repeated, Continuous, or Simultaneous[8] Exposures.** Reasonable efforts should be made to minimize the number of ECD exposures. ECD Users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should reassess the subject's resistance level before initiating or continuing the exposure.

**Control and Restrain Immediately.** Begin control and restraint procedures, including restraining the subject during ECD exposure, as soon as reasonably safe and practical to do so in order to minimize total ECD exposure. The ECD User, and those individuals assisting the User, should avoid touching the probes, wires, and the area between the probes to avoid accidental or unintended shock during ECD electrical discharge.

---

⚠WARNING

**Incapacitation, Falling, and Startle Hazard.** ECD Use may cause muscular contraction, Neuro Muscular Incapacitation ("NMI"), startling, and falling, which could result in death or serious injury.

---

**NMI and Secondary Injuries.** An ECD may cause NMI if probes are within sufficient proximity to complete a circuit, with sufficient spread, and an adequate circuit is completed and maintained rendering the subject temporarily unable to control movement and may cause a fall. Also, ECD use may cause a startle response. This loss of control or startle may increase risk of death or serious injury resulting from loss of balance, fall, change in momentum, drowning, or loss of control of any mode of transportation, conveyance, or machinery. Especially at risk is a person who:

- could fall and suffer impact injury to the head or other sensitive area;
- is on an elevated or unstable surface (*e.g.*, tree, roof, ladder, ledge, balcony, porch, bridge, crane, dock, chair, bunk bed, or stair);
- is less able to catch or protect self in a fall (*e.g.*, restrained, handcuffed, incapacitated, or immobilized);
- could fall on a sharp object (*e.g.*, holding a knife or other edged weapon or sharp object on ground);
- is running, in motion, or moving under momentum;
- is operating or riding in or on any mode of transportation (*e.g.*, vehicle, bus, bicycle, motorcycle, cart, train, or airplane), conveyance (*e.g.*, escalator, moving walkway, elevator, skateboard, skates, or rollerblades), or machinery;
- is located in water, mud, or marsh environment if the ability to move is restricted; or
- is physically infirm, elderly, or pregnant.

---

⚠WARNING

**Fire and Explosion Hazard.** ECD Use could result in a fire or explosion when flammable gases, fumes, vapors, liquids, or materials are present.

---

An ECD can ignite explosive and flammable clothing or materials, liquids, fumes, gases, or vapors (e.g., gasoline, vapor or gas found in sewer lines or methamphetamine labs, butane-type lighters, or flammable hair gels). Do not knowingly Use an ECD in the presence of any explosive or flammable substance without legal justification. Note that some self-defense sprays use a flammable carrier, such as alcohol.

## SAFETY INFORMATION: ECD KNOWN AND POTENTIAL SIDE EFFECTS

⚠WARNING

Always follow and comply with all instructions, warnings, information, and current TASER training materials to reasonably minimize the risks associated with possible Use and side effects listed below.

---

**Muscle Contraction or Strain-Related Injury.** ECDs can cause strong or moderate muscle contractions that may result in physical exertion, athletic, or sport-type injury, including, but not limited to, injury such as

---

[8] "Simultaneous" means delivery to the body of electrical charge by multiple ECDs or multiple completed circuits at the same time.

 

TASER® X3™, X26™, and M26™
ECD Warnings, Instructions, and
Information: Law Enforcement

hernia, rupture, dislocation, tear, or other injury to soft tissue, organ, muscle, tendon, ligament, nerve, bone, or joint. Fracture to bone, including compression fracture to vertebrae, may occur. These injuries may be more serious and more likely to occur in people with pre-existing injuries, conditions or special susceptibilities, which include but are not limited to, known or unknown: pregnancy; osteopenia; osteoporosis; spinal injury; or previous muscle, disc, ligament, joint, bone, or tendon damage or surgery. Such injuries may also occur when a person reacts to the ECD deployment or discharge by making a rapid movement.

**Neurocardiogenic Response (Fainting).** A person may experience an exaggerated response to an ECD exposure, or threatened exposure, which may result in a person fainting or falling with possible secondary injury.

**Seizure.** Repetitive stimuli (e.g., flashing light or electrical stimuli) can induce seizure in some people. This risk may be increased in a person with seizure history or if electrical stimuli pass through the head area. This may also result in a person falling with a possible secondary injury.

**Stress and Pain.** The ECD can cause temporary discomfort, pain, stress, panic, or startle which may be injurious to some people. Anticipation of ECD exposure can cause stress, trepidation, panic, startle, or fear, which may also be injurious to some people.

**Physiologic or Metabolic Effects.** The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium), heart rate and rhythm; lactic acid; myoglobin; pH; respiration; stress hormones or other biochemical neuromodulators (*e.g.*, catecholamines). Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects. In human studies of electrical discharge from a single ECD of up to 15 seconds, these effects on acidosis, CK, electrolytes, stress hormones, and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Adverse physiologic or metabolic effects may increase risk of death or serious injury.

**Higher Risk Populations.** ECD Use on a pregnant, infirm, elderly, small child, or low body-mass index (BMI) person could increase the risk of death or serious injury. ECD Use has not been scientifically tested on these populations. The ECD should not be Used on members of these populations unless the situation justifies possible higher risk of death or serious injury.

**Physiologically or Metabolically Compromised Persons.** Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD"). The factors that may increase susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal, sensitization to arrhythmias, etc), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD Use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

---

⚠️WARNING

**Hazardous Substances.** The ECD contains components that contain chemicals known to the State of California and others to cause cancer and birth defects or other reproductive harm. Do not disassemble. Refer to your agency's Guidance for proper handling and disposal.

---

# Excited Delirium and the Taser X26

## 2012 Roll Call Training

## Created by SGT Tony Orue

### April 26, 2012







Δ π EXHIBIT 2
Deponent Huddleston
Date 6-4-15 Rptr WH
WWW.DEPOBOOK.COM

004485

# What is Excited Delirium (ED)?

- This disorder is usually drug-related (cocaine or "crack", PCP or "angel dust", methamphetamine, amphetamine), but can occur in non-drug users as well.

- The presentation of excited delirium occurs with a sudden onset, with symptoms of bizarre and/or aggressive behavior, shouting, paranoia, panic, violence toward others, unexpected physical strength, and hyperthermia. Hyperthermia is a harbinger of death in these cases.

004486

# Excited Delirium



- Individuals suffering from ED should be viewed as psychiatric patients and require immediate medical attention. ***ED is a medical emergency***.

- Victims of excited delirium display sudden onset of paranoia and alternate between calm behavior and extreme agitation. When confronted by police, who are invariably called to the scene, the victim intensifies the violence and paranoia. An intense struggle ensues, when the victim exhibits incredible "superhuman" strength and is impervious to the usual police techniques of pain control, including pepper spray, peroneal baton strikes, and in certain cases, TASER deployment.

# Excited Delirium

- The intense struggle requires the efforts of many police officers, who are finally able to restrain the victim and apply ankle and/or wrist restraints. Usually, within minutes of being restrained, the victim loses all vital signs. Core body temperatures average 105 degrees.



004488

# Things to look for:



- Aggressiveness
- Combativeness
- Hyperactivity
- Extreme paranoia
- Unexpected Strength
- Incoherent shouting
- Shedding of clothes



004489



# Excited Delirium Facts

**ED is a medical emergency that presents itself as a law enforcement problem.**
- Early and advanced coordination with EMS is key.

**ED is not easy to recognize.**
- Training is important so that dispatch or other personnel recognize behavioral signs.

**ED containment requires backup personnel.**
- Do not approach until it is safe to do so and always ensure several officers are present.

**ED victims exhibit superhuman strength and are impervious to pain.**
- Restraint positions and use of electronic control devices (TASER) to override the CNS.

**ED is a life-threatening emergency.**
- Get the subject into acute medical care quickly

004490

# How to Respond to an ED Emergency



- If the detail you are responding to sounds like it may involve an ED patient, ask dispatch for EMS and have them stage nearby

- If the situation permits, have EMS on scene before engaging the subject

- A minimum of six officers is highly recommended before engaging the subject

- The team leader must quickly develop a plan to restrain the subject

004491

# How to Respond to an ED Emergency



- Remember that the subject may not respond to your verbal commands or pain compliance techniques such as the Taser drive stun

- When practical, the use of the Taser X26 in probe mode may be very effective in controlling the subject

- Only Taser deployments with a good probe spread will achieve neuro muscular incapacitation (NMI)

004492

# How to Respond to an ED Emergency



- You can go hands on with the subject during the 5 second cycle without feeling the effects of NMI

- Electricity follows the path of least resistance

- Do not place hands on or between the probes

- When feasible, move in and control the subject while the Taser is cycling and the subject is incapacitated

004493

# How to Respond to an ED Emergency



- Use each Taser cycle as a window of opportunity to attempt to establish control or handcuff
- The need for multiple cycles may be avoided by controlling and cuffing under power if contact officers are available
- As with any Taser deployment, only apply the number of cycles that is reasonably necessary to capture, control, or restrain the subject
- Once the subject is restrained, get them up and immediately turn them over to EMS

004494

# Video: ED Subject Restrained



- Now that you know the signs of an excited delirium incident, watch the following video



- Make note of the symptoms that the subject is exhibiting

- Be prepared to discuss what the officers did right and what they could have done better

004495



004496

# After Action Review

- What ED symptoms did you observe?

- What did the officers in the video do right?

- What could they have done better?

- What kind of tactics and planning would you discuss with a team of officers before engaging this subject?



004497

# Video Information



- This incident occurred in California during the summertime

- The subject suffered 2nd degree burns to his front because of the hot pavement

- His injuries from the Taser came only from the probes entering his skin

- He was grabbing his crotch not out of modesty, but because the lower Taser probe was shot into his genitals

# References



- http://exciteddelirium.org/
- Taser Training Academy Instructor Certification Lesson Plan, Version 18
- Video provided by Jerry Staton, Master Taser Instructor
- HCSO General Order 208

004499

# Questions?



- Direct any questions or comments to SGT Tony Orue
- 595-7479
- aorue@sheriff.hamilton-co.org



# HAMILTON COUNTY SHERIFF'S OFFICE
# ELECTRONIC STUN DEVICE INCIDENT REPORT

IA #:

District Three   Beat 9P32   Date 8/13/13   Time 0248   CAD # 0110   Location 10929 Barrington Court

## SUSPECT/ARRESTED INFORMATION

Name: Last : Roell          First: Gary          MI: L   Sex: M   Race: W   DOB: ▊

Address: 10927 Barrington Court   City: Cincinnati   State: OH   Zip:45242   Phone: Unk

Control #: 258932          OLN: RE955251          State: OH          Exp. Date: 4/2/14

Charges: N/A

If not charged, Why? Deceased

**OFFICER INFORMATION**   Number of officers involved: _3_   ☐ SUPPLEMENTAL WITNESS LIST ATTACHED
**Primary Officer Involved**

Name: (Last) Huddleston   (First) Joseph   Badge: 1549   Emp. ID# 14647   Sex: M   Race: W   Dist/Unit: 3/9P32
Duty Status: ☒ Uniform   ☐ Non-uniform   ☒ On Duty   ☐ Off Duty   ☐ Outside Employment Extension of Police Services

**Additional Officers Involved**

Name: (Last) Alexander   (First) Matthew Badge: 1541   Emp. ID# 14642   Sex: M   Race: W   Dist/Unit: 3/9S32
Duty Status: ☒ Uniform   ☐ Non-uniform   ☒ On Duty   ☐ Off Duty   ☐ Outside Employment Extension of Police Services

Name: (Last) Dalid   (First) Willy   Badge: 1410   Emp. ID# 13792   Sex: M   Race: U   Dist/Unit: 3/9P31
Duty Status: ☒ Uniform   ☐ Non-uniform   ☒ On Duty   ☐ Off Duty   ☐ Outside Employment Extension of Police Services

Name: (Last)   (First)   Badge:   Emp. ID#   Sex:   Race:   Dist/Unit:
Duty Status: ☐ Uniform   ☐ Non-uniform   ☐ On Duty   ☐ Off Duty   ☐ Outside Employment Extension of Police Services

Name: (Last)   (First)   Badge:   Emp. ID#   Sex:   Race:   Dist/Unit:
Duty Status: ☐ Uniform   ☐ Non-uniform   ☐ On Duty   ☐ Off Duty   ☐ Outside Employment Extension of Police Services

**WITNESS INFORMATION**   Number of witnesses: _1_   ☐ SUPPLEMENTAL WITNESS LIST ATTACHED

Name: (Last) Agarwal   First: Rachana   (MI):   Sex: F   Race: U   Cntl# or OLN/State: 14259384

Address: 10929 Barrington Ct   City: Cincinnati   State: Ohio   Zip Code: 45242

Phone: ▊   Relationship: Neighbor   Taped/Oral Interview: ☒ Yes ☐ No

Corroborate Officer's Statement: ☒ Yes ☐ No

If No, Explain:

Name: (Last)   First:   (MI):   Sex:   Race:   Cntl# or OLN/State:

Address:   City:   State:   Zip Code:

Phone:   Relationship:   Taped/Oral Interview: ☐ Yes ☐ No

Corroborate Officer's Statement: ☐ Yes ☐ No

If No, Explain:

Δ π EXHIBIT 3
Deponent
Date 6-4-15 Rptr. WH
WWW.DEPOBOOK.COM

Revised 09/09/10
001878

**Type of Activity by Deputy**

☒ Making Arrest ☒ Self Defense ☐ Defense of Other ☐ Preventing Escape

☐ Other:

---

**Weapons Involved**

Firearm ☐ Stun Device ☐D☐ Knife/Cutting Weapon ☐

Baton/PR/ASP ☐ Flashlight ☐ Chemical Agent ☐

Blunt Object ☐S☐ Hands/Feet/Fist ☐S/D☐

Other ☐

**\*\*Indicate "S" for SUBJECT OR "D" for DEPUTY**

---

**Injuries to Deputy (Noted or Alleged)**

☐ Head ☐ Back ☐ Leg ☒ Hand ☒ Groin ☐ Foot ☐ Shoulder ☐ Buttocks ☐ Arm

☒ Facial/Neck ☐ Chest ☐ Other: ☐ None

Treating Hospital: N/A            Doctor:

☐ Examined ☐ Treated ☐ Admitted ☐ Released

Photos taken: ☐ Yes ☒ No  Photos taken by: ☐  Witnessed by: ☐

No. of Photos Taken : N/A

---

**Injuries to Subject (Noted or Alleged)**

☐ Head ☒ Back ☒ Leg ☐ Hand ☐ Groin ☒ Foot ☐ Shoulder ☐ Buttocks ☐ Arm

☒ Facial/Neck ☐ Chest ☒ Other: Hips ☐ None

Injuries Before Police Contact ☐ Yes ☐ No  Treating Hospital: Bethesda North     Doctor: Dr. Seltzer
UNKNOWN

☐ Examined ☒ Treated ☐ Admitted ☐ Released

Voluntary Release of Medical records ☒ Obtained ☐ Refused
BY SUSPECTS WIFE
Request for Release of Medical Records (Form 604) Given to Facility Staff ☒ Yes ☐ No, If No, Why:

Name of Facility Staff Releasing Medical Records or Accepting Form 604: ☒

Photos taken: ☒ Yes ☐ No  Photos taken by: Det. Losekamp     Witnessed by: Det. Illing

No. of Photos Taken : 121

## TYPE OF DEPLOYMENT

Taser Dart ☒    Taser (Drive-Stun) ☒    Stun Device ☐    Stun Belt ☐

**Effectiveness**
- ☐ Immobilized
- ☐ No Effect
- ☒ Partial Effect
- ☐ Faulty Equipment
- ☐ Missed

**Number of Applications** 7
Duration of Applications/s: 5/5/3/1/5/2/3
Estimated Distance 4-5 feet
Probes removed at scene? ☐ Yes ☒ No
Probes removed by? EMS/ Coroner

Taser Download By: Sgt. Sabers
Unit Serial Number: X29007EE
Cartridge 1 Serial # N/A
Cartridge 2 Serial # N/A

**Verbalization**
- ☐ Asked
- ☐ Told
- ☐ Demanded
- ☐ None
- ☒ Warned of Pending Use of Force
  Total Times: 6-7

**Subject's Noncompliance**
- ☒ Resistive Tension
- ☐ Conspicuously Ignoring
- ☒ Exaggerated Movement
- ☒ Combative/Assaultive
- ☒ Armed
- ☒ Excessive Emotional Tension
- ☐ Ceased All Movement
- ☐ Flight

**Subject's Pre-Attack Posture**
- ☐ Hand Set
- ☐ Target Glance
- ☒ Fighting Stance
- ☐ Blank Stare
- ☐ Shoulder Shift
- ☐ None
- ☐ Other:

**Contributing Factors**
- ☒ Mental/Medical Condition
- ☐ Alcohol
- ☐ Drugs
- ☐ Violent History
- ☐ None

**Initial Contact**
- ☐ Courthouse
- ☐ Domestic Violence
- ☐ Fight/Crowd Control
- ☐ Traffic Stop/Incident
- ☒ Resisting Arrest
- ☒ Investigation
- ☐ Bar/Tavern
- ☐ Investigative Stop

**Degree of Injuries**
Fatal ....................................... ☐ S
Serious Visible ......................... ☐
Minor Visible ............................ ☐
Complained of Non-Visible ..... ☐ D
No Visible Injuries .................... ☐
*Indicate "S" for Subject or "D" for Deputy

**Liquor Permit Premise Involved**
☐ Yes    ☒ No    If yes,
Establishment Name:
Address:
Phone:

---

On-Scene Supervisor Name: Lt. Jay Gramke          Badge: 1017          Unit: 9A81

On-Scene Time: 0307                    Time Scene Cleared: 0730

---

## COMPLETED BY INVESTIGATING SUPERVISOR

The Officer's Use of Force as reported above, is consistent with Sheriff's Office training and in conformance with Departmental polices, procedures, general orders and state law: ☐ Yes ☐ No (If no, attach supplemental form).

Supervisor's Name: _____    Badge #:    District:    Unit #:

_____          Date

Supervisor's Signature

NOTE: In Deadly Force Investigations as provided for in Section 208.06 of General Order 208, this portion of the Use of Force Report is to be completed by C.I.S personnel responsible for the investigation

**ADMINISTRATION DISPOSITION**

____The responding Deputies were confronted with a subject who was aggressive and out of control. Deputy Huddleston was forced to use his taser by the aggressive actions of Mr. Roell. The Deputies used appropriate force to gain control of Mr. Roell, who refused to comply with their commands. The actions of the Deputies involved were within the guidelines of Departmental Policy and Procedure and within the laws of the state of Ohio. Upon review by both the Hamilton County Sheriff's Criminal Investigative Section and the Hamilton County Prosecutors Office there was no criminal violation on the part of the Deputies involved in this Incident.

Signature _____  Date  8-19-2013

Watch Commander: Concur/Non-Concur : Name:_____ Badge#_____ Date: _____

District/Unit Commander: Concur/Non-Concur :Name_____ Badge#_____ Date: _____

Section Commander: Concur/Non-Concur                    Initials _____ Date: _____

Division Commander: Concur/Non-Concur                    Initials _____ Date: _____

Reviewed by Internal Affairs Section: Concur/Non-Concur    Initials _____ Date: _____

Reviewed by Chief Deputy: Concur/Non-Concur              Initials _____ Date: _____

Sheriff's Review: ☐ Approved  ☐ Referred

Sheriff's Signature _____

Date _____

**Attached Forms (Check all, Which apply)**
☒ Offense Report  ☐ CAD Printout  ☐ Radio Traffic  ☒ 911 Call  ☒ Medical Records  ☒ Form 604 (Copy)

☐ Media Release  ☐ BWC Report/s  ☒ Photographs  ☐ Other:_____

NARRATIVE: On August 13, 2013 while en route to 10929 Barrington Court reference an Officer involved use of force, I was contacted by Cpl. Mike Steers who advised that Deputies Huddleston, Dalid and Alexander were involved in a use of force and that the suspect stopped breathing. Cpl. Steers stated that once he arrived on the scene he noticed the suspect went limp, and stopped breathing. Cpl. Steers began performing chest compressions. I arrived on the scene at approximately 0307 hours and was met by Cpl. Steers who stated that EMS transported the suspect and were actively performing CPR when they left en route to Bethesda North. He advised that Cpl. Jeff Gilliland followed the squad to Bethesda North. I contacted Cpl. Gilliland via cell phone and told him to keep me updated as to the condition of the suspect.

Cpl. Steers walked me to the rear of 10929 Barrington Court where Deputy Matt Sewall was positioned to make sure the scene was secure. The scene was adequately contained with police tape and Deputy Sewall had a visual on the crime scene as well. Deputy Sewall was tasked with keeping track of the movements in and out of the crime scene. Steers explained that the suspect, later identified as Gary Roell, had broken the rear window of his next door neighbor using a hanging plant. The neighbor called 911 and when the three Officers responded they encountered Roell in the rear of 10929 Barrington Court in the fenced in patio area. He was combative and punched and kicked deputies. Deputy Huddleston energized Roell an unknown number of times to gain compliance but Roell continued to resist. The Deputies finally gained control of Roell and at this time Cpl. Steers arrived. He noticed that Roell was not breathing and told the Deputies to turn him onto his back and he began CPR until being relieved by EMS. He then said he notified me of the situation.

After talking to Cpl. Steers, I briefly talked to the three Officers involved who were isolated in three separate cruisers. I asked them if they were okay physically and explained what was going to happen as it pertains to the investigation. Due to the fact that I was unaware if the suspect would live or die I did not ask the involved Officer's any questions. The Deputies stated they did not need medical attention but all were obviously shaken by the preceding events.

I then contacted Major Horton, Captain Neville, Sergeant Rarrick (Internal Affairs), Sergeant Stapleton (CIS), and Jim Knapp (Office of Media and Public Relations). Shortly after doing so, Cpl. Gilliland contacted me and stated that the suspect had been pronounced dead at Bethesda North.

After the arrival of CIS personnel, Internal Affairs personnel and command staff personnel I left the scene at approximately 0730 hours and concluded my shift. The three Officers were interviewed by CIS personnel at Headquarters and placed on administrative leave per policy.

On August 18, 2013 I contacted Deputy Huddleston on his cell phone to ascertain details of the night in question. I also met with Deputies Huddleston, Alexander and Dalid that night and the following is a synopsis of what occurred the night in question per the Deputies involved:

On August 13, 2013 at approximately 0248 hours Deputies were dispatched to 10929 Barrington Court in reference to neighbor trouble. The Complainant, Rachana Agarwal, reported that an individual was breaking out the windows in the rear patio area of her residence. Deputies Joe Huddleston, Matt Alexander and Willy Dalid were the first to arrive and encountered the suspect, later identified as Gary Roell in the rear fenced-in area of the residence holding a hose in one hand and a potted plant in the other. Mr. Roell was ordered to drop what was in his hands and to get on the ground.

At this point Roell approached the Deputies in an aggressive manner and Deputy Huddleston arched his Taser, warning him that if he did not comply he would be "tased". Mr. Roell backed away from Officers but had to be warned again as he refused to comply. Deputy Huddleston holstered his Taser and decided to attempt to place Mr. Roell into custody. The Deputies struggled to place Mr. Roell in custody and he threw the plant at the Deputies and managed to pull away. Mr. Roell again came at the Deputies at which time Deputy Huddleston deployed his Taser and struck Roell with two taser darts. He buckled and backed into the patio area shutting the gate while being energized. The Deputies went inside the gated area and continued to struggle with Mr. Roell and again energized him. As the fight continued Deputy Huddleston drive stunned Mr. Roell in the leg while attempting to control his lower half while Deputies Alexander and Dalid tried to control Roell's upper body. During this the suspect kicked Deputy Huddleston in the groin and Deputy Alexander was punched in the face. Roell was able to get to his feet and turned away from the Officers and was again struck with taser probes in his backside by Deputy Huddleston. The Deputies were able to gain control and handcuffed Roell in the front using two sets of cuffs.

He then seemed to calm down as the Deputies controlled him while awaiting leg shackles. Deputy Alexander went to retrieve the leg shackles, returned and placed the leg shackles on Mr. Roell. Mr. Roell again became agitated and started kicking and resisting again. A few minutes later he went limp and Cpl. Mike Steers, who had just arrived, began CPR immediately. A short time later EMS arrived on scene, took over CPR and transported Mr. Roell to Bethesda North where he was pronounced dead.

Revised 09/09/10

001882

# HAMILTON COUNTY SHERIFF'S OFFICE
# ELECTRONIC STUN DEVICE
# INCIDENT REPORT

| | |
|---|---|
| Subject | Gary Roell |
| Cntl# | 258932 |
| Date | August 12, 2013 |
| Time | 0248 |
| Location | 10929 Barrington Ct |

Mark location of barbs on body outline for each cartridge deployment. Use #1 for cartridge 1 and #2 for cartridge 2, etc.

Mark location on body outline for drive stun location using the letters DS.

Utilize the "click and drag" function with the icons below.



Revised 09/09/10

001883

| Seq # | Local Time [dd:mm::yyyy Hr:min:Sec] | Event [Event Type] | Cartridge Information [Bay/length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 745 | 18 Jul 2013 19:37:27 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 37<br>37 | 78<br>78 |
| 746 | 18 Jul 2013 19:37:29 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | 37<br>37 | 78<br>78 |
| 747 | 18 Jul 2013 23:27:04 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 33<br>33 | 78<br>78 |
| 748 | 18 Jul 2013 23:27:05 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | 33<br>33 | 78<br>78 |
| 749 | 18 Jul 2013 23:27:07 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 33<br>33 | 78<br>78 |
| 750 | 18 Jul 2013 23:27:08 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | 33<br>33 | 78<br>78 |
| 751 | 20 Jul 2013 20:43:30 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 31<br>31 | 78<br>78 |
| 752 | 20 Jul 2013 20:43:31 | Safe | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | 31<br>31 | 78<br>78 |
| 753 | 25 Jul 2013 22:16:54 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29<br>29 | 78<br>78 |
| 754 | 25 Jul 2013 22:16:54 | Safe | C1: 25' Standard<br>C2: 25' Standard | 0<br>0 | 30<br>30 | 78<br>78 |
| 755 | 29 Jul 2013 00:01:14 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 21<br>21 | 78<br>78 |
| 756 | 29 Jul 2013 00:01:17 | Safe | C1: 25' Standard<br>C2: 25' Standard | 3<br>3 | 22<br>22 | 78<br>78 |
| 757 | 29 Jul 2013 00:04:58 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 21<br>21 | 78<br>78 |
| 758 | 29 Jul 2013 00:05:09 | Safe | C1: 25' Standard<br>C2: 25' Standard | 11<br>11 | 21<br>21 | 78<br>78 |
| 759 | 29 Jul 2013 23:18:04 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29<br>29 | 78<br>78 |
| 760 | 29 Jul 2013 23:18:08 | Safe | C1: 25' Standard<br>C2: 25' Standard | 5<br>5 | 28<br>28 | 78<br>78 |
| 761 | 08 Aug 2013 23:11:10 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29<br>29 | 78<br>78 |
| 762 | 08 Aug 2013 23:13:02 | Safe | C1: 25' Standard<br>C2: 25' Standard | 111<br>111 | 35<br>35 | 78<br>78 |
| 763 | 13 Aug 2013 02:37:59 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 29<br>29 | 78<br>78 |
| 764 | 13 Aug 2013 02:38:05 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | | 78<br>78 |
| 765 | 13 Aug 2013 02:38:16 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | | 78<br>78 |
| 766 | 13 Aug 2013 02:38:25 | Safe | C1: 25' Standard<br>C2: 25' Standard | 26<br>26 | 30<br>30 | 78<br>78 |
| 767 | 13 Aug 2013 02:38:32 | Armed | C1: 25' Standard<br>C2: 25' Standard | | 31<br>31 | 78<br>78 |
| 768 | 13 Aug 2013 02:38:39 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | | 78<br>78 |
| 769 | 13 Aug 2013 02:38:50 | Arc | C1: 25' Standard<br>C2: 25' Standard | 1<br>1 | | 78<br>78 |
| 770 | 13 Aug 2013 02:38:53 | Trigger | C1: Deployed | 5 | | 78 |
| 771 | 13 Aug 2013 02:39:01 | Arc | C1: Deployed<br>C2: 25' Standard | 8<br>8 | | 78<br>78 |

28

001884

| Seq # | Local Time [dd:mm::yyyy Hr:min:Sec] | Event [Event Type] | Cartridge Information [Bay:length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 772 | 13 Aug 2013 02:39:30 | Arc | C1: Deployed<br>C2: 25' Standard | 3<br>3 | | 77<br>77 |
| 773 | 13 Aug 2013 02:39:33 | Arc | C1: Deployed<br>C2: 25' Standard | 1<br>1 | | 77<br>77 |
| 774 | 13 Aug 2013 02:39:57 | Trigger | C2: Deployed | 5 | | 77 |
| 775 | 13 Aug 2013 02:40:15 | Arc | C1: Deployed<br>C2: Deployed | 2<br>2 | | 77<br>77 |
| 776 | 13 Aug 2013 02:40:20 | Safe | C1: Deployed<br>C2: Deployed | 107<br>107 | 36<br>36 | 76<br>76 |
| 777 | 13 Aug 2013 04:02:40 | Armed | C1: Deployed<br>C2: Deployed | | 28<br>28 | 76<br>76 |
| 778 | 13 Aug 2013 04:02:43 | Safe | C1: Deployed<br>C2: Deployed | 3<br>3 | 27<br>27 | 76<br>76 |
| 779 | 13 Aug 2013 13:27:58 | USB Connected | | | | 0 |
| 780 | 13 Aug 2013 13:28:01 | Time Sync | From '13 Aug 2013 13:28:01' to '13 Aug 2013 13:42:46' | | | |

29

001885

**PROCEDURE MEMO #53**
**PRISONER TRANSPORTATION**
**PAGE 2**

Procedure Memo. Alien and Foreign National includes resident living in the United States permanently and are in possession of the resident alien card ("green card") issued by the Immigration and Naturalization Services (I.N.S.).

**Handicapped Person:** Any person who has a physical or mental impairment, which substantially limits one or more major life activities, who has a record of such impairment, or who is regarded as having such impairment.

**Physical or Mental Impairment:** Any medically recognized disorder that is physiological or psychological, or both mental and physical such as: anatomical loss or disfigurement; neurological, musculoskeletal, respiratory, blood or heart disorders; mental retardation and mental illness; visual, hearing, and speech impediments; etc.

**Place of Detention:** A jail, police or sheriff's station, holding cell, state correctional institution, local correctional facility, or department of youth services facility. A "place of detention" does not include law enforcement vehicles.

**Strip Search:** An inspection of the genitalia, buttocks, breasts, or undergarments of a person that is preceded by the removal or rearrangement of some or all of the person's clothing directly covering the person's genitalia, buttocks, breasts, or undergarments and that is conducted visually, manually, by means of any instrument, apparatus, or object, or in any manner while the person is detained or arrested for a criminal or traffic offense.

**Weapon:** Includes inherently dangerous objects such as a gun or knife; everything defined by statute *2923.11 O.R.C.*, and any object used as a weapon in the commission of any crime.

**D.    PROCEDURE**

The purpose of restraining devices is to minimize the chance of attack and escape by those persons in custody of the Hamilton County Sheriff's Office and reduce the risk of injury to those persons who are in our custody.

The following are effective and acceptable restraint devices, which may be utilized by deputies:
- Issued handcuffs
- Leg shackles
- Prisoner restraint belts
- Flex-cuffs
- Hobbles
- Straight jackets and medical strap restraints for use on any injured, ill, mentally or physically impaired prisoners

**1.    Handcuffing**

a.    When possible, handcuff all prisoners with their hands behind their back. Apply handcuffs between the hand and protruding wrist bone with the prisoner's palms facing out and the keyholes facing up.

   1)    Apply handcuffs directly over the skin. Never apply them over clothing or jewelry. They should be reasonably snug and double locked.

b.    Do not leave handcuffed individuals prone on the ground. Once individuals are under control, immediately move them to a seated position as soon as possible.



Δ π EXHIBIT    4

Deponent_____

Date__4·4·15__ Rptr. WH

WWW.DEPOBOOK.COM

001828

# HAMILTON COUNTY SHERIFF'S PATROL

# OPERATING PROCEDURE MANUAL

**SUBJECT: HANDLING OF HANDICAPPED PERSONS**　　　　**PROCEDURE MEMO #45**

**ISSUED:** 4/1/99　　　**REVISED: 05/02/05**　　　**REV. NO. 1**　　　**EFFECTIVE: 05/02/05**

A.　　**PURPOSE:**

　　1.　　This procedure is to provide for uniform definition and procedures for the handling of situations involving handicapped persons.

B.　　**DEFINITIONS:**

　　1.　　"Handicapped Person", means any person who has a physical or mental impairment, which substantially limits one or more major life activities, who has a record of such impairment, or who is regarded as having such impairment.

　　2.　　"Physical or Mental Impairment", means any medically recognized disorder that is physiological or psychological, or both mental and physical such as : anatomical loss or disfigurement; neurological, musculoskeletal, respiratory, blood or heart disorders; mental retardation and mental illness; visual, hearing, and speech impediments; etc.

　　3.　　"Major Life Activities", means functions like caring for ones self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

C.　　**MENTALLY HANDICAPPED PERSONS:**

　　1.　　The following procedure pertains to the handling of the mentally handicapped persons who are not subject to custody of Probate Court Order of Detention or Reconvene, which are subject to specific procedures within General Order #404 (Warrants and Court Orders). This procedure applies to situations where a Deputy encounters a person who is suspect of having a mental handicap which could be mental illness or retardation, and the circumstance of encounter is one that could result in harm to that person, or possibly to others, including the Deputy, and a responsible person is unavailable, or unable to control the mentally handicapped person. The Deputy's primary responsibility is to secure safety and assistance for the mentally handicapped person. This can generally be accomplished through return to responsible person or guardian; or return to a treatment facility from which person may be absent or leave; or through emergency admission for evaluation/treatment at Psychiatric Emergency Services (PES) at University Hospital; or through providing information on psychiatric crisis services available; or any combination thereof; through use of the following resources:

　　　　a.　　Emergency admission for Psychiatric Evaluation shall be accomplished as provided for in ORC 5122.10, through completion of the required Application for Emergency Admission Form and delivery of subject to PES Units. University Hospital will be the primary location for Emergency Admission. Other hospitals accepting persons considered for Emergency Admission are Good Samaritan, Christ, Providence, and Children's (for juveniles). Locations other than University of Cincinnati should be contacted for availability prior to transportation.



Δ π EXHIBIT 5

Deponent

Date 6-4-15 Rptr. WH)

WWW.DEPOBOOK.COM

001540

**PROCEDURE MEMO #45**
**HANDLING OF HANDICAPPED PERSONS**
**PAGE 2**

    b.    Mental Illness "Hotline" (558-8200), can provide information on known psychiatric persons; information on available mental health assistance; and activation of Mobile Crisis Team (MCT).

    c.    MCT may be available to provide an on-site response to the location of the situation of encounter with mentally handicapped person.

    d.    Arrest may occur where a criminal offense has been committed by the person, resulting in the placement of the person in the Hamilton County Jail, or in PES, with a "Police Hold".

        1)    Placement in jail will require the arresting Deputy to notify Intake Personnel of mental impairment, if known.

D.    PHYSICALLY HANDICAPPED PERSON:

    1.    Every effort must be taken to render assistance to physically handicapped persons, when requested.

E.    TRANSPORTATION AND RESTRAINT OF HANDICAPPED PERSONS:

    1.    Transportation of and use of restraints on handicapped prisoners will be dictated by the limitations of the handicapped person. Discretion regarding the form of transportation and use of restraints on the handicapped prisoner will be the responsibility of the transporting Deputy. Minimal inconvenience for this prisoner will be exercised with the maximum safety to both prisoner and transporting Deputies. Common sense will dictate restraint used, based upon the severity of the handicap and the ability of the prisoner to effect an escape. Caution must be taken to prevent any injury to the handicapped prisoner during transportation.

    a.    Those options available to transport handicapped persons are:

        1)    Cruiser
        2)    Sheriff's Office vans
        3)    Life Squad (arresting or transporting Deputy must accompany prisoner).

    b.    Refer to General Order #403 (Arrest) for further procedures on use of restraints.

F.    DEATH INVESTIGATION OF MRDD PERSONS:

The Hamilton County Coroner's Office will be notified when any mentally retarded person or developmentally disabled person dies regardless of the circumstances.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**UNIT 3:** **HUMAN RELATIONS**

**TOPIC 2:** **INTERACTING WITH THE SPECIAL NEEDS POPULATION**

**GOAL:** THE STUDENT WILL KNOW ASPECTS OF INTERACTING WITH THE SPECIAL NEEDS POPULATION.

**SUB-GOALS:**

The student will know the symptoms displayed by a person with "major depression."

The student will be able to define the term "mental illness."

The student will know the symptoms of "bipolar disorder in the manic phase."

The student will know the signs of "schizophrenia."

The student will know the symptoms of "schizophrenia."

The student will know the signs of a person with an "anxiety disorder."

The student will know the types of "de-escalation techniques."

The student will know the behaviors to be avoided in "de-escalation techniques."

The student will know the "phrases of communication."

The student will know the indicators of "suicidal thought."

The student will know methods of responding to chemical abusers.

The student will know the indicators of a person with "autism."

The student will know intellectual abilities affected by dementia.

The student will know the signs of a person with "alzheimer's disease."

The student will know the categories of life changes regarding the elderly - mentally/physically challenged.

The student will know the interaction skills needed for dealing with elderly persons.

The student will know the interaction skills for the vision impaired.

The student will know the interaction skills for the hearing impaired.

The student will know the options for emergency admission due to mental illness.



Δ π EXHIBIT ___
Deponent___
Date___ Rptr ___
WWW.DEPOBOOK.COM

**REQUIRED HOURS:** SIXTEEN (16) HOURS

**STUDENT PERFORMANCE OBJECTIVES:**

1. Given a multiple choice question, **the student will choose the option which states 4 of the common symptoms displayed by a person with "Major Depression,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

2. Given a multiple choice question, **the student will choose the option which defines the term "Mental Illness"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

3. Given a multiple choice question, **the student will choose the option which states 6 of the symptoms of "Bipolar Disorder in the Manic Phase"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

4. Given a multiple choice question, **the student will choose the option which states 4 of the common signs of "Schizophrenia,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

5. Given a multiple choice question, **the student will choose the option which states 2 of the symptoms of "Schizophrenia,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

6. Given a multiple choice question, **the student will choose the option which states 3 signs of "Anxiety Disorder",** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

7. Given a multiple choice question, **the student will choose the option which states 5 of the De-escalation Techniques,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

8. Given a multiple choice question, **the student will choose the option which states 5 behaviors that should be avoided when engaged in De-escalation,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

9. Given a multiple choice question, **the student will choose the option which states 4 of the phrases to aid in communication,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

10. Given a multiple choice question, **the student will choose the option which states 2 of the Indicators of Suicidal Thought,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

11. Given a multiple choice question, **the student will choose the option which states 3 Methods of Responding to Chemical Abusers,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

PEACE OFFICER BASIC TRAINING CURRICULUM

12. Given a multiple choice question, **the student will choose the option which states 2 of the indicators of "Autism,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

13. Given a multiple choice question, **the student will choose the option which states the 3 intellectual abilities affected by Dementia,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

14. Given a multiple choice question, **the student will choose the option which states 5 signs of "Alzheimer's Disease,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

15. Given a multiple choice question, **the student will choose the option which states 5 categories of life changes regarding the elderly-mentally/physically challenged,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

16. Given a multiple choice question, **the student will choose the option states 4 interaction skills needed in dealing with elderly persons,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

17. Given a multiple choice question, **the student will choose the option which states 2 of the Interaction Skills for the Vision Impaired,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

18. Given a multiple choice question, **the student will choose the option which states 2 of the Interaction Skills for the Hearing Impaired,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

19. Given a multiple choice question, **the student will choose the option which states the 4 criterion for Emergency Admission,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

20. Given a multiple choice question containing a narrative situation, **the student will choose the option that identifies the underlying concept or the best course of action to be taken by a peace officer,** based on the application of the SPOs in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## INSTRUCTOR REFERENCES:

National Institutes of Health: "Cerebral Palsy: Hope Through Research," NINDS. Publication date July 2001. NIH Publication No. 93-159.

Butler MG. Prader-Willi Syndrome: current understanding of cause and diagnosis. AM J Med Genet. 1990 Mar; 35(3): 319-32.

Yeargin-Allsopp M, Rice C, Karapurkar T, Doernberg N, Boyle C, Murphy C. Prevalence of Autism in a U.S. Metropolitan Area. *Journal of the American Medical Association,* 2003.

The Harvard Mental Health Letter. Sept. 2002.

National Institutes of Health Publication No. 3879 – Anxiety Disorders.

National Institute of Mental Health, "Facts about Anxiety Disorder," Fact Sheet Publication No. OM-99 4152. Printed January, 1999.

U.S. Department of Health and Human Services. *Mental health: a report of the Surgeon General.* Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services, National Institutes of Health, National Institute of Mental Health, 1999.

The Ohio Police Chief, "A Police Officer's Guide: When in Contact With People Who Have Mental Retardation"

The Ohio Police Chief, "Dealing With Special Populations: Some Guiding Principles"

The Ohio Police Chief, "Protecting and Serving Those with Alzheimer's Disease" by Chief Philip K. Potter, CLEE

Closing The Gap: The Help-Seeking Behavior of Minorities; Julia Mayo, PhD, Chief, Clinical Studies; Department of Psychiatry, Saint Vincent's Hospital and Medical Center; New York, NY http://www.omhrc.gov/ctg/full-mhm.htm

Gilliand B. & James, R. (1996). Listening and responding in CIT - crisis intervention, In Memphis C.I.T. Manual, Memphis Police Department: Memphis, Tenn. 158 – 165

Kausch, O., Resnick, P.J., "Psychiatric Assessment of the Violent Offender," Handbook of Psychological Approaches with Violent Offenders: Contemporary Strategies and Issues, V.B. Van Hasselt & M. Herson (Eds.), Klewer Academic/Plenum Publishers, New York, p. 439-457, 1999

Scott, C.L.: "Juvenile Violence," The Psychiatric Clinics of North America, 22:71-83, 1999

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION |

PEACE OFFICER BASIC TRAINING CURRICULUM

## Websites of Interest:

www.nami.org

www.psychiatrymatters.md

www.ncjrs.org

www.mentalhealth.org

www.psych.org

www.mh.state.oh.us

www.surgeongeneral.gov

www.psychlaws.org

www.suicidology.org

## TEACHING AIDS:

Handouts
Chalk/Chalkboard
Lectern
Overhead Projector
Prepared Overheads
Multimedia Projector

**STUDENT REFERENCES:**

| | |
|---|---|
| Handout #1 | Ohio Revised Code §5122.01 |
| Handout #2 | Ohio Revised Code §5122.10 |
| Handout #3 | Types of Personality Disorders |
| Handout #4 | Anxiety Disorders: The Most Commonly Diagnosed Psychiatric Conditions |
| Handout #5 | Dementia **(SPO #13)** |
| Handout #6 | Guidelines when Communicating with a Person who has (or seems to have) Alzheimer's Disease or Some Other Form of Dementia |
| Handout #7 | State and Federal Victims Services |
| Handout #8 | Commonly Prescribed Psychotropic Medications |
| Handout #9 | Application for Emergency Admission (Form DMH-0025) |
| Handout #10 | Fisher v. Harden: 398 F. 3D 837 |
| Handout #11 | Five Indicators of Suicidal Thought **(SPO #10)** |
| Handout #12 | Steps for Responding to a Person in a Suicidal Crisis |
| Handout #13 | Stages of Alcohol Withdrawal |
| Handout #14 | Ohio Revised Code §2901.21 |
| Handout #15 | Ohio Revised Code §5126.30 – 5126.34 |
| Handout #16 | Methods for Responding to Chemical Abusers **(SPO #11)** |
| Handout #17 | Other Indicators that a Person may have Autism |
| Handout #18 | Other Developmental Disabilities |
| Handout #19 | Ohio Revised Code §2305.51 |

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

I. **PREPARATION**

   A. Introduction

      1. Instructor

      2. Course

   B. Purpose of this section of your training:

      1. To explain interaction skills for mentally disturbed, developmentally disabled and mentally ill people

      2. To explain some of the problem areas faced by elderly and mentally/physically challenged persons

      3. To explain some of the disorders that afflict all levels of society

   C. SPOs

II. **PRESENTATION**

   A. Officers are imbued with a take charge attitude and use command presence to help deal with criminals, victims, and to handle problems with which they have been called upon to deal

      1. This attitude can actually inflame the situation and cause the mentally ill individual to escalate his/her behavior

      2. You can have more control and authority over the person in a mental health crisis by using verbal and non-verbal communication that signifies a desire to help the person, while still maintaining officer safety.

      3. The effective officer is one, who, at times, is able to camouflage his/her combat readiness

   B. **MENTAL ILLNESS CAN BE DEFINED AS: A SUBSTANTIAL DISORDER OF THOUGHT, MOOD, PERCEPTION, ORIENTATION, OR MEMORY THAT GROSSLY IMPAIRS JUDGMENT, BEHAVIOR, CAPACITY TO RECOGNIZE REALITY, OR ABILITY TO MEET THE ORDINARY DEMANDS OF LIFE.**

      SPO #2
      OVERHEAD #1

1. The first observations of mental illness were made by Dorothea Dix prior to the Civil War

2. Mental illness was noted in homeless people on the streets, or in jails or prisons

3. Reform movements to create institutions were established

4. Institutionalization was supposed to allow for more humane methods to be employed

5. In the 1950's, societal perception turned away from institutionalization

   a. Institutional scandals

   b. Advent of medications

   c. Outcry from civil liberty organizations

6. De-institutionalization became a "battle cry" or "call to arms"

   a. Mentally ill persons were placed into communities with the expectation of continuing treatment and support

   b. It was found, however, that resources and treatments were more challenging to provide in a decentralized environment compared to a centralized institution

7. In 2005 modern society                                    OVERHEAD #2

   a. Mentally ill people represent a large segment of the population in most communities

   b. Mentally ill people represent approximately 1/3rd of the homeless population

   c. 16% of jail and prison populations suffer from mental illness

   d. 7% - 10% of all calls involve mental illness

   e. 22% of the U.S. population suffer from mental illness (1 in 5 adults)

| | |
|---|---|
| 8. Society has come full circle on what actions should be taken with mental illness | |
| 9. Law enforcement has become the defacto mental health first responder in society | |
| 10. Training in this area has traditionally been limited | |
| 11. The results have been problematic for law enforcement and mentally ill people | |
| 12. People with mental illness are 4 times more likely to die in encounters with the police than are members of the general population | O.R.C. 2305.51 HANDOUT #19 |
| 13. The first call of your career may be this type of situation | |
| 14. Each call will be unpredictable | |
| 15. Proper preparation with training will increase your readiness and safety awareness | |
| 16. Injuries and death decrease due to training | |
| 17. Law Enforcement is increasing the training component | |
| 18. Mental health resources have been generally unknown to law enforcement | |
| 19. Incarceration had been a frequent recourse for the mentally ill | |
| 20. Collaborations have been formed to change this pattern and provide the necessary help for those who are mentally ill | |
| 21. Public safety resources must, by necessity, exceed resources for other social services | |
| C. Mental illness can be manifested in many forms | |
|     1. They may be grouped into four (4) major categories: | OVERHEAD #3 |
|       a. Mood | |

|  |  |
|---|---|
| b. Thought | |
| c. Personality | |
| d. Other | |
| 2. Mental illness can occur in one or more categories | |
| D. Depression can be defined as: a feeling of sadness, the "blues," feeling down, or not enjoying activities that once provided enjoyment | OVERHEAD #4 |
|   1. Usually these feelings are related to some life event | |
|     a. Problem or loss | |
|     b. Refers to an illness | |
|     c. A disorder of the brain in which a change in the chemical balance of the brain causes serious symptoms | |
|   2. COMMON SYMPTOMS DISPLAYED BY A PERSON WITH MAJOR DEPRESSION INCLUDE, BUT ARE NOT LIMITED TO: | SPO #1<br>OVERHEAD #5 |
|     a. Profound feelings of sadness, "blues": | |
|       1. Lasting more than a few days | |
|       2. Maybe even weeks | |
|     b. Deep feelings of helplessness and hopelessness; profound pessimism | |
|     c. Thoughts and feelings of guilt and self-blaming | |
|     d. Diminished feelings of self-worth | |
|     e. Lack of energy or ability to do normal activities, sometimes even including simple and routine activities | |
|     f. Loss of interest in normal activities, such as family, friends, hobbies, etc., and tendency toward isolation | |
|     g. Feelings of irritability | |

## INTERACTING WITH THE MENTALLY ILL

- MAKE THE SCENE SAFE

- IDENTIFY SIGNS OR SYMPTOMS OF MENTAL ILLNESS

- DETERMINE WHETHER A SERIOUS CRIME HAS BEEN COMMITTED

- EVALUATE THE NEED FOR IMMEDIATE TRANSPORT TO:

  o MENTAL HEALTH FACILITY

  o JAIL

- USE PERSUASION RATHER THAN FORCE WHENEVER POSSIBLE

- ARRIVING AT THE SCENE

  o ASSESS THE SITUATION

  o GATHER INFORMATION

    ♦ INDIVIDUALS

    ♦ BYSTANDERS

    ♦ FAMILY MEMBERS

- LOCATE THE PERSON IN CRISIS AND BEGIN INTERACTION

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## OVERHEAD 24A

### SPO #7

## DE-ESCALATION TECHNIQUES

## OFFICER'S SHOULD:

- REMAIN CALM AND AVOID OVERREACTING AND UNDERREACTING

- PROVIDE OR OBTAIN ON-SCENE EMERGENCY AID WHEN TREATMENT OF AN INJURY IS URGENT

- FOLLOW PROCEDURES INDICATED ON MEDICAL ALERT BRACELETS OR NECKLACES

- INDICATE A WILLINGNESS TO UNDERSTAND AND HELP

- SPEAK SIMPLY AND BRIEFLY, AND MOVE SLOWLY

- REMOVE DISTRACTIONS, UPSETTING INFLUENCES, AND DISRUPTIVE PEOPLE FROM THE SCENE

- UNDERSTAND THAT A RATIONAL DISCUSSION MAY NOT TAKE PLACE

- RECOGNIZE THAT THE PERSON MAY BE OVERWHELMED BY SENSATIONS, THOUGHTS, FRIGHTENING BELIEFS, SOUNDS ("VOICES"), OR THE ENVIRONMENT

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

OVERHEAD 24B

- BE FRIENDLY, PATIENT, ACCEPTING, AND ENCOURAGING, BUT REMAIN FIRM AND PROFESSIONAL

- BE AWARE THAT A UNIFORM, GUN, AND HANDCUFFS MAY FRIGHTEN THE PERSON WITH MENTAL ILLNESS, AND REASSURE THE PERSON THAT NO HARM IS INTENDED

- RECOGNIZE AND ACKNOWLEDGE THAT A PERSON'S DELUSIONAL OR HALLUCINATORY EXPERIENCE IS REAL TO HIM OR HER

- ANNOUNCE ACTIONS BEFORE INITIATING THEM

- GATHER INFORMATION FROM FAMILY OR BYSTANDERS

- IF THE PERSON IS EXPERIENCING A PSYCHIATRIC CRISIS, ASK THAT A REPRESENTATIVE OF A LOCAL MENTAL HEALTH ORGANIZATION RESPOND TO THE SCENE

SPO #8

## BEHAVIORS TO AVOID WHILE ENGAGED IN DE-ESCALATION

- MOVING SUDDENLY, GIVING RAPID ORDERS OR SHOUTING

- FORCING DISCUSSION

- MAINTAINING DIRECT, CONTINUOUS EYE CONTACT

- TOUCHING THE PERSON (UNLESS ESSENTIAL TO SAFETY)

- CROWDING THE PERSON OR MOVE INTO HIS OR HER ZONE OF COMFORT

- EXPRESSING ANGER, IMPATIENCE OR IRRITATION

- ASSUMING THAT A PERSON WHO DOES NOT RESPOND CANNOT HEAR

- USING INFLAMMATORY LANGUAGE, SUCH AS "CRAZY," "PSYCHO", "MENTAL", OR "MENTAL SUBJECT"

- CHALLENGING DELUSIONAL OR HALLUCINATORY STATEMENTS

- MISLEADING THE PERSON TO BELIEVE THAT OFFICERS ON THE SCENE THINK OR FEEL THE WAY THE PERSON DOES



## The EAR Model: Assess

Check to see if a crime has been committed. If it has, determine whether the mentally distressed individual has been victimized or has committed the crime. If the person perpetrated the crime, then your job is to de-escalate the person first and investigate the crime second (provided that no one has been injured).

back | forward

Course Menu | Resources | Page 70 of 83



Δ π EXHIBIT ___7___

Deponent _____

Date _____ Rptr. __VUH__

WWW.DEPOBOOK.COM



# MIKE DeWINE
### OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## Defining Command and Control

Command and control techniques are a set of skills that officers use to restore order in a normal crisis situation.

1. Command the citizen to perform a specific action (e.g. drop the weapon, move away from an object or area, etc.).

2. Look for compliance.

3. Decide if physical control over the subject is necessary.

While these techniques enable officers to resolve most crisis situations, that is not always the case when dealing with a mental health crisis.

Command and control techniques may actually escalate mental health crises, putting officers in danger.

Course Menu    Resources    Page    37 of 83



## The EAR Model: Engage



The first 10 seconds of a special populations encounter are critical in setting the tone for de-escalation. In this span of time, you are presenting yourself to an emotionally distressed individual for the first time. Your body language, tone of voice, and the actual words you choose to say all communicate a message and you are in control of that message.

Body language typically has the largest impact on the person, which is why you should take a calm, sympathetic stance upon your first meeting with the individual. In doing this, you are setting the "vibe" of the encounter and the person will often mirror your attitude.

◄ back    forward ►



# The De-Escalation Decision Tree





# MIKE DeWINE
### OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health
Crises

## Creating a De-Escalation Mindset

**Patience:**

Having patience puts you in control of the special populations encounter. When you recognize that de-escalation takes time, then you become more effective at diffusing a mental health crisis. Taking the time to listen and to repeat the person's statements relieves tension and allows you to assess the person's willingness to negotiate.





# MIKE DEWINE
## OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## Confrontation Leads to Legal Issues

- Wasn't there something else that could have been done?

- What steps were taken to avoid the use of force in the situation?

- When possible, using non-confrontational options to de-escalate a person in a mental health crisis will increase safety.

- Federal courts have ruled that officers must take a person's diminished capacity into account when using reasonable force to exert control.





# MIKE DEWINE
### OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## A Non-Confrontational Approach



close X

Taking a less physical, less authoritative, less controlling, less confrontational approach to mental health crises can increase the probability of getting you home at night. A non-confrontational approach gives you time to think, act, and understand the situation immediately in front of you.

Course Menu    Resources    Page    44 of 83    ◄    ↻    ►



# MIKE DeWINE
### OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## A Non-Confrontational Approach



close X

Being non-confrontational is a dramatic shift from routine control techniques because you have to approach situations in a completely different manner. In a mental health crisis, empathy absorbs tension.

Course Menu    Resources    Page   44 of 83



# MIKE DEWINE
## OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## Why are Special Population Encounters Different?

- Special population encounters with police are not the same as other encounters.

- A person experiencing a mental health crisis does not always think in a logical manner and the person's actions may not be rational.

- This is why command and control techniques can escalate a mental health situation you are trying to diffuse.

- If the person in crisis feels in any way threatened or frightened, the situation could escalate, compromising officer safety.

Course Menu    Resources    Page    41 of 83    ◄    ⟳    ►



# MIKE DeWINE
## OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

### The LOSS Model: Perspective

**Loss of Perspective:**

- Anxiety/Worry/Nervousness
- Euphoric
- Energetic
- Restlessness/Pacing
- Verbal, Rapid Speech
- Apprehension/Dread
- Grandiose Ambitions
- Panic
- Physical Discomfort

Your goal during an encounter with a person who has lost perspective is to calm the person down using negotiation and empathetic listening.

We will discuss how to engage this type of citizen in Lesson 4.

Course Menu    Resources    Page    29 of 63



# MIKE DeWINE
## OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## De-Escalating Loss of Control

**Loss of Control:**

May be the most difficult mental health confrontation.

Anger, hostility, and tension characterize the encounter.

**Loss of Control: Engagement**

• Be calm, but firm.
• Model the behavior you want to see.
• Use appropriate tone of voice and body language.
• Allow the person time to vent.
• Acknowledge the person's anger.
• Don't take it personally.
• Use the person's name often.
• Use "I" statements to deflect personal attacks. (e.g. "I hear what you are saying, but you will need to quit yelling at me for me to help you."

Course Menu    Resources         Page    61 of 83



MIKE DeWINE
OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## The LOSS Model: Reality

**Loss of Reality:**

• Fright/Confusion
• False Beliefs Exhibited
• Disorganized Thinking
• Hearing or Seeing Things
• Odd Behaviors or Mannerisms
• Suspicious/Paranoid/Fearful Behavior
• Withdrawn
• Highly Distractible/Disoriented

Your goal when assessing loss of reality is to cut through the fear and confusion caused by the mental illness and get the subject to voluntarily comply with your requests.

We will discuss this further in Lesson 4.

Course Menu    Resources    Page    26 of 83



# MIKE DEWINE
OHIO ATTORNEY GENERAL

Exit

De-Escalating Mental Health Crises

## De-Escalating Loss of Reality

**Loss of Reality:**
Characterized by fear and confusion.

Individuals may:
- Hear things that are not there;
- See things that are not there;
- Have false beliefs.

**Loss of Reality: Engagement**
- Cut through the person's fear.
- Be genuine and direct.
- Do not validate the person's psychosis.
- Do not deny person's psychosis.
- Ground the person in the here and now.
- State your name early.
- Ask for the subject's name.
- Ask simple questions.
- Check for weapons.
- Validate the person's feelings, but not the story.
- Assure the person you are there to help.

Course Menu    Resources    Page    57 of 83



# MIKE DEWINE
## OHIO ATTORNEY GENERAL

De-Escalating Mental Health Crises

## Evaluating Your Perceptions



When it comes to a special populations encounter, situations are often unpredictable and you will need to adjust how you make decisions.



Δ π EXHIBIT
Deponent Huddleston
Date 6-4-15  Rptr WH
WWW.DEPOBOOK.COM

000778



Δ π EXHIBIT
Deponent Huddleston
Date 6-4-15 Rptr WH
WWW.DEPOBOOK.COM

000778



Δ π EXHIBIT
Deponent Huddleston
Date 6-4-15 Rptr WH
WWW.DEPOBOOK.COM

000778



Δ π EXHIBIT

Deponent Huddleston

Date 6-4-15  Rptr WH

WWW.DEFOBOOK.COM

000778



Δ π EXHIBIT 82

Deponent Huddleston

Date 6-4-15 Rptr WH

WWW.DRPOBOOK.com

000778



Δ π EXHIBIT
Deponent Huddleston
Date 6·4·15 Rptr WH
WWW.DEPOBOOK.COM

000778



Δ π EXHIBIT 10
Deponent Huddleston
Date 4-15 Rptr HW

003243



0003236

Δ π EXHIBIT  12
Deponent Huddleston
Date 6-14-15 Rpt. KH
WWW.DEPOBOOK.COM



003124

Δ π EXHIBIT 13
Deponent Huddleston
Date 4.15 Rptr LM
WWW.DEPOBOOK.COM





Δ π EXHIBIT 15
Deponent Huddleston
Date 4.15 Rptr. LVH
WWW.DEPOBOOK.COM

003113