**UNIT 4:**    **HUMAN RELATIONS**

**TOPIC 1:**    **INTERPERSONAL COMMUNICATION (I.P.C.)**

**GOAL:**    THE STUDENT WILL UNDERSTAND INTERPERSONAL COMMUNIICATION

**REQUIRED HOURS:** FOURTEEN (14) HOURS

**STUDENT PERFORMANCE OBJECTIVES:**

1. Given a multiple choice question, the student **will choose the option which identifies the 3 basic components of the IPC Model** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

2. Given a multiple choice question, the student **will choose the option which identifies 2 of the 3 purposes of the IPC training module** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

3. Given a multiple choice question, the student **will choose the option which identifies 2 of the 4 "sizing up" skills** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

4. Given a multiple choice question, the student **will choose the option which identifies the 2 major elements of positioning** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

5. Given a multiple choice question, the student **will choose the option which identifies 2 of the 3 major parts of positioning** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

6. Given a multiple choice question, the student **will choose the option which defines the term "Posturing"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

7. Given a multiple choice question, the student **will choose the option which identifies 2 of the 3 components of good posturing** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

8. Given a multiple choice question, the student **will choose the option which identifies 2 of the 4 elements of observing** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

Δ π EXHIBIT 4
Deponent Huddleston
Date 6-4-15 Rptr. WH
WWW.DEPOBOOK.COM

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

9. Given a multiple choice question, the student **will choose the option which identifies 2 or the 3 aspects to be considered during the first part of observing** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

10. Given a multiple choice question, the student **will choose the option which identifies 2 of the 4 "clues" that can be used to develop inferences** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

11. Given a multiple choice question, the student **will choose the option which identifies 2 of the 4 steps in listening** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

12. Given a multiple choice question, the student **will choose the option which identifies the three items that may be used to determine intensity** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

13. Given a multiple choice question, the student **will choose the option which identifies 2 add-on skills used in interpersonal communication** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

14. Given a multiple choice question, the student **will choose the option which defines the term "responding to content"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

15. Given a multiple choice question, the student **will choose the option which identifies the 2 steps in responding to content** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

16. Given a multiple choice question, the student **will choose the option which identifies the 2 steps in responding to feeling** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

17. Given a multiple choice question, the student **will choose the option which defines the term "responding to feeling,"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

18 Given a multiple choice question, the student **will choose the option which defines the term "Responding to feeling and meaning"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

19. Given a multiple choice question, the student **will choose the option which identifies the appropriate time to refer the inmate to a mental health worker or other specialist** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

20. Given a multiple choice question, the student **will choose the option which identifies the 2 techniques used in asking questions** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

21. Given a multiple choice question, the student **will choose the option which identifies 2 of the 3 applications skills used in controlling behavior** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

22. Given a multiple choice question, the student **will choose the option which identifies the 2 steps in handling requests** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

23. Given a multiple choice question, the student **will choose the option which identifies 2 of the 3 reasons for giving an inmate an explanation for an officer's response** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

24. Given a multiple choice question, the student **will choose the option which defines the term "A mild format"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

25. Given a multiple choice question, the student **will choose the option which defines the term "A direct format"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

26. Given a multiple choice question, the student **will choose the option which defines the term "Reinforcing Behavior"** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

27. Given a multiple choice question, the student **will choose the option which identifies the 2 parts of reinforcing behavior** as stated in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

OHIO PEACE OFFICER TRAINING COMMISSION                TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

**INSTRUCTOR REFERENCES:**

IPC:  Interpersonal Communication Skills for Correctional Management, Blakeman, J.D., Pierce, R.M., Knelling, T., and Carkhuff, R.R., HRD Press, Inc., Amherst, Mass., 1977.

IPC:  Interpersonal Communication Skills for Correctional Management Trainer's Guide, Blakeman, J.D., Pierce, R.M., Knelling, T., and Carkhuff, R.R., HRD Press, Inc., Amherst, Mass., 1977.

Interpersonal Communications in a Correctional Setting, National Academy of Corrections Outreach Program, National Institute of Corrections, 1790 30th Street, Suite 430, Boulder, Colorado, 80301.

Lesson Plan "G", Local Corrections Basic Training Curriculum, B.S.S.A. Training Committee, 1992.

Unpublished edit notes, Commander Jeff Eiser, Sub-Committee on Corrections Training, B.S.S.A., Summer, 2000.

**TEACHING AIDS:**

Chalkboard
Chalk
Eraser
Lectern
Flip-chart
Prepared Overheads
Overhead Projector
Video tape-player and monitor

**STUDENT REFERENCES:**

Student Worksheets
Student Manual:        "Interpersonal Communications in the Correctional Setting"

Video:  "Interpersonal Communications in a Correctional Setting", National Academy of Corrections

**NOTE TO INSTRUCTORS:**

THE INSTRUCTOR'S GUIDE FOR I.P.C. IS IN A DIFFERENT FORMAT.  THIS FORMAT IS AN EXCEPTION TO THE NORMAL FORMAT FOR LOCAL CORRECTIONS BASIC TRAINING CURRICULUM.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# INSTRUCTOR'S GUIDE

---

## INTERPERSONAL COMMUNICATIONS
## IN THE
## CORRECTIONAL SETTING

This project was provided under
Grant #EP-4 To
Capitol Communication systems, Inc.
from

## U.S. DEPARTMENT OF JUSTICE

## NIC  National Institute
of Corrections

Points of view expressed herein are those of the authors and
do not necessarily reflect the policies of the
Department of Justice
May, 1983

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# ACKNOWLEDGEMENT:

*The basic communication skills model used in this training was, originally, developed by Dr. Robert R. Carkhuff, Chairman of the Board of Directors, Carkhuff Institute of Human Technology and his associates.*

# TABLE OF CONTENTS

| SESSION | TITLE | INSTRUCTOR'S GUIDE | STUDENT MANUAL |
|---|---|---|---|
| | Video Contents | 9 | |
| | Preface to the Trainer | 12 | |
| | Teaching the Course | 15 | |
| | Training Suggestions | 18 | |
| 1 | Introduction to the IPC Model | 21 | 224 |
| 2 | The Basics: Sizing Up the Situation | 27 | 226 |
| 3 | Positioning | 34 | 232 |
| 4 | Posturing | 45 | 238 |
| 5 | Observing | 55 | 244 |
| 6 | Listening | 73 | 256 |
| 7 | Summary of the Basics | 83 | 262 |
| 8 | The Add-Ons: Communicating with Inmates | 85 | 264 |
| 9 | Responding to Content | 92 | 269 |
| 10 | Responding to Feeling | 100 | 274 |

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

| SESSION | TITLE | INSTRUCTOR'S GUIDE | STUDENT MANUAL |
|---------|-------|--------------------|----------------|
| 11 | Responding to Feeling & Meaning | 109 | 280 |
| 12 | Asking Questions | 127 | 291 |
| 13 | Summary of the Add-Ons | 139 | 299 |
| 14 | The Applications: Controlling Behavior | 142 | 302 |
| 15 | Handling Requests | 148 | 307 |
| 16 | Making Requests | 160 | 316 |
| 17 | Reinforcing Behavior | 170 | 323 |
| 18 | Summary of the Applications | 183 | 331 |

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Total:   58:00 min.

# VIDEO CONTENTS

| FOOTAGE COUNTER | SESSION # | TITLE | TIME |
|---|---|---|---|
| _____ | 1 | Introduction to IPC Model | 3:40 |
| _____ | 2 | Introduction to the Basics | 1:54 |
| _____ | 3 | Introduction to Positioning | 3:17 |
| _____ | 3 | Scene:  *"Hall Duty"* | :38 |
| _____ | 3 | Scene:  *"The Dayroom"* | 1:20 |
| _____ | 4 | Introduction to Posturing | 2:04 |
| _____ | 4 | Scene:  *"The Keys"* | :40 |
| _____ | 4 | Scene:  *"On Duty"* | :35 |
| _____ | 5 | Introduction to Observing | 2:57 |
| _____ | 5 | Scene:  *"The Pick"* | 1:34 |
| _____ | 6 | Introduction to Listening | 1:37 |
| _____ | 6 | Scene:  *"Old Bag"* | :26 |
| _____ | 6 | Scene:  *"Gone for Good"* | :45 |
| _____ | 6 | Scene:  *"Tough Number"* | :28 |
| _____ | 8 | Introduction to the Add-Ons | 2:10 |
| _____ | 9 | Introduction to Responding to Content | 1:29 |
| _____ | 9 | Scene:  *"The New Job"* | :28 |
| _____ | 9 | Scene:  *"The Transfer"* | :35 |
| _____ | 10 | Introduction to Responding to Feeling | 2:30 |
| _____ | 10 | Scene:  *"The Appeal"* | :27 |
| _____ | 10 | Scene:  *"Going Home"* | :17 |

OHIO PEACE OFFICER TRAINING COMMISSION                   TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

| FOOTAGE COUNTER | SESSION # | TITLE | TIME |
|---|---|---|---|
| _____ | 11 | Introduction to Responding to Feeling and Meaning | 2:41 |
| _____ | 11 | <u>Scene:</u>  *"The Writ"* | :32 |
| _____ | 11 | <u>Scene:</u>  *"The New Job"* | :26 |
| _____ | 11 | <u>Scene:</u>  *"The Transfer"* | :20 |
| _____ | 11 | <u>Scene:</u>  *"The Appeal"* | :22 |
| _____ | 11 | <u>Scene:</u>  *"Going Home"* | :17 |
| _____ | 12 | Introduction to Asking Questions | 2:54 |
| _____ | 12 | <u>Scene:</u>  *"The Fight"* | :31 |
| _____ | 12 | <u>Scene:</u>  *"Another Fight"* | :54 |
| _____ | 12 | <u>Scene:</u>  *"The Stolen Letter"* | 1:09 |
| _____ | 14 | Introduction to the Applications | 1:39 |
| _____ | 15 | Introduction to Handling Requests | 1:56 |
| _____ | 15 | <u>Scene:</u>  *"Second Helping"* | :41 |
| _____ | 15 | <u>Scene:</u>  *"The Library Pass"* | :17 |
| _____ | 15 | <u>Scene:</u>  *"The Legal Paper"* | :27 |
| _____ | 16 | Introduction to Making Requests | 1:56 |
| _____ | 16 | <u>Scene:</u>  *"The Clean Up"* | :40 |
| _____ | 16 | <u>Scene:</u>  *"The Mess"* | :46 |

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

| FOOTAGE COUNTER | SESSION # | TITLE | TIME |
|---|---|---|---|
| _____ | 17 | Introduction to Reinforcing Behavior | 2:06 |
| _____ | 17 | <u>Scene:</u>  *"The Clean Up"* | :19 |
| _____ | 17 | <u>Scene:</u>  *"The Mess"* | :50 |
| _____ | 17 | <u>Scene:</u>  *"A Visit to the Chaplain"* | 1:06 |
| _____ | 18 | Postscript and Credits | 1:55 |

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# PREFACE TO THE TRAINER

## *TRADITIONAL TRAINING IN CORRECTIONS:*

Most training programs for correctional staff have focused on what could be best described as security skills: conducting a count, shakedown procedures, riot control and report writing. Even with such specific skill training, most correctional people would concede that the employee learns the "real" skills, for better or worse, from experienced staff he or she initially encounters and by trial and error on the job.

In addition to security responsibilities, staff are required to "supervise" inmates. The typical employee becomes a logistics specialist, keeping track of the whereabouts of inmates in his or her assigned area and ensuring that the inmates get to and from a variety of activities within the institution. In addition, correctional staff serves as postal workers, sanitation inspectors, etc.

## *ROLE OF LINE STAFF:*

Recently, much concern has been voiced about the "role" of line employees--especially correctional officers--in carrying out correctional programs. Recognizing both the ratio of line staff to inmates and their physical closeness and impact, correctional administrators and officials are beginning to voice their concerns about such employees' responsibilities in the programming area. David Glaser ("The Effectiveness of a Prison and Parole System", Bobs-Merrill, 1964) conducted a thorough investigation into the factors influencing inmates in correctional settings and found that more than half of the releases studied cited either correctional officers or work supervisors as the most influential force in their successful adjustment after release.

## *OMISSION OF SKILLS TRAINING:*

Training programs developed for correctional staff often omit "skills" training that focuses on enhancing the relationships between line staff and inmates and between correctional workers and their peers.

This omission occurs in spite of the obvious importance of human relations skills. Even when training does attempt to effect positive relations between staff and inmates, it tends to be conceptually based rather than skills based. Such training usually involves lecturing to staff about what they "should" think and how they "should" act. Typically, little opportunity is provided for staff to "try out" new ways of handling inmates which might help reconstruct the inmate's attitudes and contribute to an eventually successful adjustment in the institution and on the street. Such training leads to correctional staff attitudes about inmates that typically remain either what they were prior to training (frequently negative) or unduly influenced by the staff whom they encounter during their probationary period (also, frequently negative).

When there is any form of human management skill presented in the correctional training provided line staff, it tends to be of short duration (seldom more than 20 hours), and often is given low priority, even though the realities of institutional supervision will place inmates and staff in frequent daily interpersonal contact for better or worse.

## LACK OF FOLLOW-THROUGH:

An additional problem confronting those who offer such training is the lack of follow-through to ensure that the learning which is translated into employee behavior, is sufficiently rewarded.  Too often, the trainee hears the statement from an old hand:

> *"You can forget all that philosophizing they did at the training academy; you'll learn how to handle these inmates from me!"*

It is apparent that those who wish the employee to be skilled must pay the price to ensure that those in positions of formal and informal authority also learn and accept the skills as well.  You cannot be anointed with these skills.  They must be learned and they must be accepted as valid by a majority of the employee's peers and supervisors.

## THE NEED FOR SKILLS TRAINING:

There is no need to restate that correctional institutions can be--and often are--stressful places to be, for staff and inmates alike.  The number of riots, injuries, deaths and escapes in the last 10 to 15 years has remained consistently high.

Training in interpersonal management skills will make a difference in correctional institutions for staff and inmates.  The techniques presented in this program go beyond the traditional interpersonal skills that should have been taught in the past, but, never were.  Now, through your training experience, employees (and especially new employees) can acquire these new skills that they need to do the job you want them to do.  In the past, staff have been asked to put themselves on the line without all the knowledge and skills they really needed.  They have had to cope with ever-increasing legal, physical and emotional demands.  Now, by equipping staff with these skills, we will keep more of the control where it belongs; with the line employee.

## SOURCES OF THE IPC COURSE:

This IPC course is based on correctional training programs that have been systematically implemented in federal and state correctional systems for several years.  The materials are derived from nearly two decades of research into the effectiveness of staff interpersonal skills training intended to provide meaningful assistance to inmate and other populations in need of help.  This program itself is an application of such skills training and is designed to aid staff in managing inmate populations.  The course is the end result of the teaching and learning experiences of thousands of individuals who are deeply concerned with improving the interpersonal climate in correctional institutions.  You and the trainees you will be working with will share the benefits of all the effort that has gone into the development of these materials.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## METHOD OF TRAINING:

The basic format for teaching the IPC course is "Tell-Show-Do-Input." Using this format, you will first tell the trainees about the skills they will be expected to learn. Then you will show your trainees the skill by use of video segments and by demonstrating the skill yourself. Then the trainees will do the steps necessary to learn the skills by working through exercises in their Manuals and by participating in activities you will direct from the Instructor's Guide. Finally, trainees will have the opportunity to contribute input about the training since you will ask for feedback about their experience and carefully listen to their comments. By using this "Tell-Show-Do-Input" approach, you will ensure that all types of learners will acquire the skills. The remainder of this Guide will show you step-by-step how to conduct a successful training class using this format.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# TEACHING THE COURSE

## *COURSE MATERIALS:*

All of the materials necessary for teaching, "Interpersonal Communications in the Correctional Setting", (with the exception of the video-tape which must be obtained from N.I.C.) are contained in this package. The materials necessary for teaching the course are the following:

1.     *INSTRUCTOR'S GUIDE.* This resource is a step-by-step handbook that will provide you with detailed instructions for conducting each session. It is divided into 18 sessions which constitute the course. Appropriate pages from the Student Manual for each session are incorporated into this Guide so that you may teach from a single reference.

2.     *STUDENT MANUAL.* Each student should have his/her own Manual since it is a personal workbook as well as a reference book. The Manual is designed specifically to be used during the training. Headings indicate video segments, background information, written exercises and class activities. Students are to use space provided in the Manual to record their responses to questions and activities. Instructions in the Instructor's Guide are clearly keyed by page number to the Student Manual so that you can guide the trainees' use of the Manual during the class.

3.     *VIDEO TAPE.* (Must be obtained from N.I.C.) The video segments of the course of two types--narrative introductions to the individual skills and dramatized scenes from prison life that demonstrate the presence or absence of the specific skill under study. Notes in the instructor's Guide explain when and how to use each segment. Discussion questions are included in the Guide as well as in the Student Manual.

     A counter index is not provided on the Video Content Sheet due to variations among machines. A space has been provided for you to note the footage counter for each scene on the playback machine you are using.

4.      *COMPETENCY TEST.*  A sample test and answer are provided in this Guide.  Multiple copies of the test are not provided as local reproduction is permitted if necessary.  Instructors should exercise care that the test is not compromised.  The answer key must be carefully controlled and all copies of the test should be collected, if used.  N.B.:  (The student performance objectives in this Guide are the information upon which students will be tested when they sit for the final exam for this Basic Training Course.)

In preparing to teach the course, you should study all these materials carefully.  They have been tested and have proven effective with a variety of correctional groups.  By using these materials coupled with your own enthusiasm, experience and creativity, you should be able to conduct a dynamic and successful training program.  *IT IS STRONGLY RECOMMENDED THAT YOU COMPLETE THE IPC INSTRUCTORS' COURSE OFFERED UNDER THE SPONSORSHIP OF OPOTC BEFORE INSTRUCTING THIS COURSE ON YOUR OWN!!!*

## ORGANIZATION OF INSTRUCTOR'S GUIDE.

The remainder of this Instructor's Guide is divided into the 18 sessions which comprise this course.  You will find that the materials for each session contain the following parts:

1.      *Student Performance Objectives for the Session.*  The Objectives are the points which need to be stressed by the instructor.  The students have been provided with a Student Worksheet in order copy the information over which they will be tested.  There are Overheads, which must be used by the instructor for each session, which are keyed to the Student Worksheets.  If necessary, there is also provided an Answer Key to the Worksheets for the instructor's use in checking to determine if the students are obtaining the information upon which they will be tested.  Other portions of the course may also be stressed, but the Objectives listed in the front of this lesson plan MUST be covered in order for students to pass the final exam.

2.      *Training Suggestions.*  This outline contains ideas for explanatory remarks, notes for when to use the Student Manual exercises and video scenes, possible answers to discussion questions and instructions for group activities.  The notes are keyed to the Student Manual and the video tape segment to assist you in coordinating the class.  No time frames are given for specific activities since the needs, background and interest level of different groups will vary widely.  You should use your best judgement to establish time frames.  If possible, gather information about your group prior to the beginning of the training program to assist you in laying out a schedule, keeping in mind that adjustments may have to be made after the class begins.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

3.      *Sections from the Student Manual.*  The appropriate sections from the Student Manual are incorporated into this Guide for each session so that you can teach from one book.  In preparing for a session you should review all of the materials in the Instructor's Guide, in the Student Manual, and on the video tape.  You may wish to write additional teaching notes in your own Guide.  These should be actual situations, incidents and examples from your own experience.  Personalizing the course in this way will make you more credible as an instructor and make the training more relevant for the students.

*EVALUATION:* N.B.: STUDENTS' GRADE IS <u>NOT</u> DETERMINED BY THIS EVALUATION AND IS TO BE USED <u>ONLY</u> AS AN IN-CLASS EXERCISE.

Pre and Post evaluation of the training is essential to meet the following needs:
<u>Pre-training Evaluation:</u>

1.      Determining the strength and weakness of entry-level skills.

2.      Identifying areas that need emphasis during the course.

3.      Raising trainees' awareness of their own skill level.

<u>Post-training Evaluation:</u>

1.      Demonstrating change or growth in trainee skill level.

2.      Bolstering trainee confidence by showing skills development.

3.      Determining areas of the course that need improvement.

Students should be informed that the test which will determine their grade for the course as a whole will be administered at the end of the Basic Training session and will consist of the student performance objectives for this section.

# TRAINING SUGGESTIONS

The following ideas come from the experience of other IPC trainers.  You may find them helpful in planning for your class.  Of course, every class is different; teaching techniques must be adapted to local conditions.  However, after thinking over these ideas, you may find some that you wish to incorporate into your own methods.

## *PRACTICE WHAT YOU TEACH:*

The IPC course, first and foremost, is a <u>skills</u> course.  Students need good models from which to learn.  Your example is the best model they have.  Therefore, it is imperative that in planning for each session, you look for ways to <u>demonstrate</u> the skill under study during the class.  For instance, in the session on responding to feeling, you may consciously greet students as they arrive with a responding observation like, "You seem up today, John, things must be going your way," or "Gwen, you look tired this afternoon..."

Further, as you become familiar with the IPC model, you will begin to incorporate the concepts and techniques into your own interpersonal style.  The more you practice the skills, both in class and out, the more likely your students are to learn from you and to take the training seriously.

## *LEADING CLASS DISCUSSIONS:*

One of the ways that students integrate what has been presented to them--by you, by the video tape, by their Manual--is by talking about it.  By talking, they personalize concepts for themselves, they make them their own.  Thus, class discussions are very important.  Your role as a group discussion leader is a primary responsibility.  The individual exercise section of the Student Manual provides excellent material for group discussion.  Normally, trainees will be eager to share what they have written down, to compare their answers with each other.

*In leading group discussions, here are some pointers:*

*       In the initial stages of a discussion period, avoid making judgements about what an individual has to offer.  Your job, particularly in the beginning, is to get ideas out into the open, not to tell the student whether he or she is right or wrong.  Encourage trainees to challenge one another's ideas.  This stimulates the kind of give-and-take and in-depth questioning that is at the heart of real learning.

*       Encourage all members of the class to participate.  Do not let a few individuals dominate the group.  You may have to call on reluctant members to get them to actively participate.  When doing this, try to ask questions which you know the reluctant trainee can answer successfully, then offer positive reinforcement for good performance.  The idea is to provide opportunities for all students to be successful so that they will feel comfortable in participating voluntarily rather than hanging back.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

\*     When you feel that a topic has been sufficiently explored and that all trainees have been given the chance to contribute what they want, you can conclude the discussion period by formulating a consensus statement. A consensus statement sounds like this, "It seems that most of you are saying that...While a few seem to think that..." Getting total agreement from a class is often not possible nor is it particularly desirable. However, accurately summarizing the various positions expressed is important to let all students know you have heard and respect their point of view. Once this has been done, the group is usually ready to move on.

## SEATING.

A good seating arrangement can contribute to setting a positive climate for an IPC session. A semi-circular arrangement in which all participants can see each other is preferable to the typical "row-behind-row" arrangement of most classrooms.

## MAKING A FOOTAGE CHART OF THE VIDEO MATERIAL.

A footage chart of the video material is not included because of the wide differences among playback machines. In preparing for the course, you should make you own footage chart to assist you in locating scenes when you need them.

You will find a list of the scenes with their titles and space for your own footage notations on the Video Content Sheet on page 9-11 of this Guide. When initially viewing the cassette, zero the counter at the beginning of the tape. Then write the footage on the chart as each scene appears. During the various sessions you can use your own footage chart to find the scenes as needed. (NOTE: You must rewind the tape to the beginning and zero the counter if others have used the playback machine in the intervening time.)

## CONDUCTING THE ROLE PLAY ACTIVITIES.

People learn by doing! The only way your trainees are going to actually put the IPC skills to use is by practicing them. Practice in the non-threatening environment of the classroom provides the confidence they need to try the skills on the job. The role play activities described in the Manual provide the opportunity for this essential practice. Here are some suggestions for conducting role plays successfully.

\*     Give the role play activities top priority. If you find that they are getting short shrift because of time, then your planning is faulty.

\*     To initiate a role play activity, particularly at the beginning of the course, select individuals to begin the activity whom you know to be cooperative and competent. This should get the activity off to a good start.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

\*       Make it a clear policy that all trainees participate in the role play, not just volunteers. If you establish this as a standard procedure, then those who are reluctant (who probably need practice the most) will not feel singled out when required to participate.

\*       Initially the role plays should be done by one officer/inmate pair in front of the whole class.  You, as the instructor, should involve the rest of the class as observers and solicit feedback from them on points provided in the Manual.  After soliciting group feedback, you should provide feedback as well.  As the class gains experience in role playing, you might wish to divide them up into triads (groups of three).  Members of the triads then change roles as inmate/officer/observer.  This gives trainees more opportunities for practice.  Your role in this configuration is to circulate among the groups to offer advice or feedback as necessary.

## *KEYS TO SUCCESS.*

The two essential prerequisites for a successful IPC course are:

(a)      Your conviction that the skills work and

(b)      Good planning for each session.

If you bring these two ingredients to the classroom each time the group meets, you can be sure that, like hundreds of other workers who have participated in similar programs, your trainees will leave better equipped to handle their job with less stress and more likely to achieve greater personal satisfaction from their work.  You can be proud of the important role you play in achieving these praiseworthy goals.  Congratulations and good luck!!!

OHIO PEACE OFFICER TRAINING COMMISSION — TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# INTRODUCTION TO THE IPC MODEL

# SESSION 1

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 1:
{REFER TO OVERHEADS 1-2}

1.      Given a multiple choice question, the student will choose the option which identifies the 3 basic components of the IPC Model as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

2.      Given a multiple choice question, the student will choose the option which identifies 2 of the 3 purposes of the IPC training module, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## EXPLANATION:

Establish the basic arrangements and procedures for the training:

1.      Introduce yourself

2.      Class administration:

        *       Breaks

        *       Coffee

        *       Smoking arrangements

3.      Administer pre-test

4.      Introduce course:

        This course is composed of three primary elements:  your Student Manual, a video tape which complements your manual and the instructor.  As instructor, my job is to serve as a catalyst who can bring together the first two elements and help you combine them with your own experiences, ideas and good common sense.

        A word about the video tape may be useful.  It includes overview material which would help you understand the concepts addressed in this program.  More importantly, it includes a great many vignettes or situations drawn from actual correctional incidents which will give you practice in applying IPC concepts.

5.      Build a base and skill training:

        The most important aspect of this program is that it gives you actual skills that you
        apply on the job.  It is far more critical that you be able to relate to/communicate with
        people than it is for you to be able to "parrot back" terminology.  Hopefully, this
        program will both give you the skills and help you understand and apply the
        terminology.

6.      Skills explanation personalized:

        The skills we discuss in this program fall into three primary areas.  There is nothing
        "magical" or "mystical" about them.  They are based on simple common sense and
        are used all the time by people who are effective in dealing with others.  Those skills
        will be discussed in greater detail in a few minutes.

7.      Management model--not "helping" model

        Many of you have already had training in using these skills in a "helping" or
        "counseling" role (or you may have heard the program referred to as a "counseling"
        program)  This program takes a somewhat different approach--it equips you to use
        the same skills in managing people--specifically, people who are housed in and/or
        work in correctional facilities.  Since we must first communicate with people before
        we can manage them, it is relatively easy to make the step from "communicating
        interpersonally" to "managing interpersonally"

8.      Interpersonal dynamics in everything we do.

        To summarize the overall purpose of this program:  In order to accomplish anything,
        we must communicate with other people.  The more effectively we can do so, the
        more we can "build success" into our efforts as correctional professionals and as
        functional human beings.

## INDIVIDUAL EXERCISE:

Have students read preface on pp. 4-5 of Student Manual.

## VIDEO TAPE:

"Introduction to the IPC Model"

## *INDIVIDUAL EXERCISE:*

1.      Tell students to read pp. 6-7 in Student Manual

2.      Tell students to do the exercise on p. 7.

## *CLASS DISCUSSION:*

1.      Have class discuss the exercise.

2.      Write their responses on board or flip chart
        This is the trainer's opportunity to demonstrate interpersonal skills and to get student
        involvement.  Do not try to change students' initial opinions but rather use this time to build
        relationships and demonstrate your skills.  You build your relationships and demonstrate
        your skills in using IPC techniques by providing a model of what you want the student to do.
        For example, listen to what the students are saying and demonstrate that you understand by
        reflecting back to them and asking questions, etc.  Reinforce their contributions by smiling,
        verbal approval, etc.  Initially, watch your own positioning and posture and eye contact and -
        by doing so - demonstrate your interest in what's going on.

3.      Your board may have the following:

        *       Feels like part of the organization
        *       Gives orders respectfully
        *       Fairness
        *       Feeling appreciated
        *       Backs you up
        *       Predictable--consistent
        *       Listener
        *       Has job knowledge
        *       Good role model

4.      Select a student (whom you have sized up as having a fairly good skill level) for a quick
        demonstration of skills.

        Set up a low intensity situation.  A typical example of a low intensity situation would be to
        ask the students to respond to a feeling of discontent about being in training.  Get student
        reaction.

# PREFACE TO THE STUDENT

The course which you are about to take is probably unlike any other course you have ever taken.  It is different because it is skills oriented.  Unlike so much other training which is theoretical and is filled with "shoulds" and "oughts," this training is practical, immediately applicable and teaches real skills.

You will find that the materials you will be using in the course are extensive and interesting.  This manual will provide you with background material on the skills you are studying.  It will also be your step-by-step guide during the training sessions themselves.  There are also videotape materials which have been produced specifically for the course.  Some segments present information about the skills; others are dramatic scenes that show the skills in action.  Most require your participation either by writing a response, by suggesting an alternate course of action or by reenacting the scene with a different ending.  Another resource is your instructor, who will tell you about, demonstrate and lead you through dozens of exercises that will help you acquire the skills under study.

The final and most important resource which you bring to the course is your own motivation and attitude.  This is a course in Interpersonal Communications.  You will learn these skills only if you communicate--with your instructor and with your fellow students.  This is a very active course - it will require your constant input and participation.  If you enthusiastically contribute that participation, you can be sure that, like hundreds of other correctional employees, your job performance will improve and your job satisfaction will increase.

# INTRODUCTION TO THE IPC MODEL

{1}

In the first video segment, TV instructor Roger Frazier introduces himself and the IPC course.  He points out that during the training program, you will learn many skills that will help you manage the inmates in your charge more effectively.  The skills to be taught come out of the experiences of correctional officers such as yourself who have gone through similar training programs all over the country.  He then presents the Interpersonal Communications model around which this course is designed.  The model looks like this:

THE APPLICATIONS:
Controlling
Behavior



THE ADD-ONS:
Communicating
With
Inmates

1. Handle Requests
2. Make Requests
3. Reinforce

THE  BASICS
Sizing up the
Situation

1. Respond
2. Ask Questions

1. Position
2. Posture
3. Observe
4. Listen

Traditionally, the training given to correctional officers has been aimed at their heads--it was filled with theories and ideas.  Sure, there was some skills training, but that was usually in firearms or self-defense.  Another thing about the training was that it was almost exclusively concerned with security-contraband, key control, cell searches and the like.  While these are obviously legitimate concerns, this orientation doesn't take into account the fact that correctional officers spend much (if not most) of their time interacting with inmates -- and with each other.  Officers traditionally have been trained to keep the institution secure, but not to get along with inmates effectively.  More importantly, they haven't been trained in how to get the inmates to do what the officer wants them to do, which is what the job is really all about.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

This training program is an effort to change that orientation.  It's based on work done by trainers and researchers in the field of corrections over the past 15 years.  It's known as Human Resource Development.  It's based on a careful study of the skills that truly effective correctional officers demonstrate.  Techniques for identifying those skills have been developed, and now there are techniques for teaching others, like you, how to acquire and use those skills.

This training program is designed around the Human Resource Development model.  A model is like a road map: it shows you where you're going.  As you can see from the diagram on the previous page, the IPC model has three major sections.

THE BASICS are pre-management skills that give you information that helps you decide what action to take in any given situation.  Another name for the Basics is Sizing Up Skills.

THE ADD-ONS are communicating skills that will help you get an inmate to explore and share information with you.  These skills are the key to finding out what's really going on in a situation.

THE APPLICATIONS are skills that will help you control inmate behavior in a respecting way -- so that you get what you want done with minimal hassles.

During this training program, you'll get a chance to learn about and practice all of these skills.  Think back on your own experience in being supervised.  You've probably had bosses that you thought did a good job in managing you, and others that you felt did a bad job.  Think about the good bosses.  What qualities or skills did they demonstrate that made them effective in managing you -- that made them successful in motivating you to do a good job?  List those qualities and skills below:

_____

_____

_____

_____

_____

# THE BASICS:
# SIZING UP THE SITUATION

# SESSION 2

## *STUDENT PERFORMANCE OBJECTIVES FOR SESSION 2:*
{REFER TO OVERHEAD 3}

3.   Given a multiple choice question, the student will choose the option which identifies 2 of the 4 "sizing up" skills as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *VIDEO TAPE:*

"Introduction to the Basics"

Time:          1:54

## *INDIVIDUAL EXERCISE:*

1.   Tell students to read pp. 8-12.

2.   Observe class and answer questions.

In teaching this segment of the program, an instructor should be aware of the situations that have occurred at the trainees' institutions which illustrate breakdowns in communication between staff and inmates, staff and staff, etc.  Use these to add credibility/validity to the training program.  Among typical questions that one can expect are:

*"Isn't it possible to come across as "phony" if I concentrate on the skills?"*

It probably is, unless the individual practices the skills until they become natural to him/her.

*"What's wrong with just being myself?"*

Nothing--so long as you make sure you cover the sizing up skills adequately.

*"Do you always use the sizing up skills?"*

You should try to, but common sense should prevail.  If it is obvious that what would normally be a good position makes the individual to whom you are talking uncomfortable, then shift position.

3.      Instruct the student to complete the exercise on pp. 12-13.


## CLASS DISCUSSION:

1.      Have class discuss the exercise on pp. 12-13.

2.      Why do you think that sizing up the situation is important?

        *        To know what's going on
        *        To be able to spot trouble before it starts

3.      If you were to walk the area of your responsibility prior to going on duty, what are some of the things for which you would look?

        *        Changes in routines
        *        Noise level
        *        Grouping of inmates
        *        Physical changes

4.      Which of the basic skills do you think would be most helpful for you to get that information?

        *        Observing
        *        Listening

# THE BASICS:
# SIZING UP THE SITUATION

## (2)

The Basics are sizing up skills that help you know what's happening in any situation.  Sizing up helps you avoid costly mistakes and maximizes the chances that your decisions and actions will be effective and accurate.  Sizing up works because it gets you ready to take and use information to manage and often prevent problems.  Using the Basics is always appropriate because you always need to size up whatever situation you're in.

## THE BASICS:
## Sizing up the Situation

```
                                        Listen   _____
                            Observe   _____
                Posture   _____
    Position  _____
```

An inmate comes into the correctional supervisor's area -- he is restless, breathing quickly, repeatedly clenching and unclenching his hands.  His eyes are wide open and his lips are twitching slightly.  But the officer doesn't notice these signs.  He's busy going over the morning call-out sheet.  His work table is situated so that the inmate is not in full view.  The officer would have to make a $90^0$ turn to see the inmate fully.

The inmate asks if he can speak with the officer.  Deep in his work, the officer indicates that he is busy and asks the inmate to come back later.  Suddenly and without warning, the inmate jumps the officer and proceeds to beat him unmercifully.  It takes two other officers to restrain the inmate.  The officer who received the beating suffers broken ribs, a fractured skull and numerous abrasions.  He is off work for two weeks.  The inmate is cuffed and taken to segregation.  Eventually found guilty of assault, he is given an additional year to run concurrently with his sentence.  There is considerable uneasiness and unrest in the population as a result of the incident.

This attack came as a real shock to everyone.  The inmate had a good record with no history of violence.  The officer in question was not known to have had problems with inmates.  What happened?

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## WHAT HAPPENED?

First, we all know that every officer in a correctional setting is vulnerable to the impulsive acts of inmates.  Being locked up, removed from the freedom of their homes and the familiar streets, subjected to rigorous controls, forced to interact with many uneasy and even desperate human beings--all of these things put enormous pressure upon individual inmates.  When they lash out uncontrollably, the person who is most vulnerable and available often becomes the object of their frustration.

Second, we know that situations like the preceding one are not really predictable.  Inmates who set out to "get" an officer may find many more subtle ways to carry out their grudge.  Yet their feelings toward an officer are often visible.  The officer who _sizes up the situation_ and recognizes these feelings will be more cautious in the presence of such inmates.

Third, we must recognize that officers always have the option to handle a given situation in a way that is for better - or for worse.  The officer in this situation, for example, might well have handle things in such a way as to avoid the beating he received.

## ANOTHER EXAMPLE:

Consider a second set of circumstances.  An officer on the unit has a long list of names on his call-out sheet.  Inmates are heading in every direction - to see their case manager, to see the chaplain or a counselor, or to meet work details and so on.  The officer has all the information on a clip-board: names, assignments, time out and time in.  He has positioned himself beside the gate so that the inmates pass by him in profile, giving him only a side-view.

After a few minutes the officer's sheet is relatively clear and he has a lull before the next group of inmates must leave.  Then an inmate who had just left for a work detail appears and informs the officer the lieutenant sent him back to his cell to change his shirt.  The following sequence of events takes place.

## HASSLES!

The inmate is written up by the correctional supervisor for wearing "free world" clothes.

The unit officer is reprimanded by the shift lieutenant for the slip-up.

The officer chews out the inmate for getting him into hot water with the lieutenant.

No big deal - nothing like the earlier account of a violent attack.  But look at all the hassle; the wasted energy!!

## *SIZING THINGS UP:*

In general, of course, both of the officers in the previous accounts could have handled things better rather than worse if they had sized up the situation more accurately. The ability to do just this - to assess what's really going on and decide what, if any, action should be taken - is perhaps the most critical part of an officer's job. Only the officer who really knows what's going on can choose and take the best possible course of action in managing inmates.

However, the "sizing-up ability" is not an ability with which an officer is born. Nor is it always an ability that an officer develops through experience alone. After all, both of the officers in the previous situations were quite experienced. Therefore, sizing things up requires some very definite skills.

## *FOUR BASIC SKILLS:*

Sizing up any situation involves four, very basic skills:

    1.  Positioning
    2.  Posturing
    3.  Observing
    4.  Listening

### *WHY BASIC?*

The word "basic" is important here. The four skill areas are basic and fundamental to everything you will learn in Sections II and III of this manual - and to everything you actually do on the job. You cannot hope to communicate safely and effectively with an inmate or inmates until you have used these skills to *size up the situation.* Nor can you hope to control inmates unless you have first sized up the situation. On the other hand, by learning to make continual use of these four basic skills, you can maximize your chances of making the right response in situations where a wrong response could be very costly indeed!

## *USE ALL THE BASICS:*

The four basic skills are cumulative in that each new skill builds on each previous one. For example, posturing yourself effectively means that you should already be in an effective position, observing accurately means that you should have already gotten into an effective position and posture and so on. In other words, you don't simply use one skill at a time. Instead, you size up a situation by making maximum possible use of all four basic skills.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *GETTING READY TO GO ON DUTY:*

In general, of course, the skilled officer always systematically sizes things up on his shift, whether he is responsible for work-detail supervision or walking the tiers or units. Here are some ways an officer sizes things up before actually going on duty:

    a.    Checks with the supervisor and reviews the log book to see what has happened during the last shift;

    b.    Reads the log book of the officer he is replacing and asks for a briefing about the conditions in his area of responsibility;

    c.    Determines if there are items that need priority attention (like shaking down a recently vacated living area) and makes a note about taking care of them; and

    d.    Walks the area of responsibility to take a reading of what is going on, who is where, who is doing what and to test the general atmosphere of the area.

It is in this final phase of pre-duty activity, and in the actual duty which follows, that the officer puts his four basic skills to maximum use.

## *STUDENT EXERCISE:*

Why do you think that sizing up the situation is important?

_____

_____

_____

_____

_____

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

If you were to walk the area of your responsibility prior to going on duty, for what would you be looking?

_____

_____

_____

_____

_____

_____

_____

_____

Which of the basic skills do you think would be most help for you to get that information?

_____

_____

_____

_____

_____

_____

_____

_____

# POSITIONING

# SESSION 3

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 3:
{REFER TO OVERHEAD 4 & 5}

4.      Given a multiple choice question, the student will choose the option which identifies the 2 major elements of positioning as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

5.      Given a multiple choice question, the student will choose the option which identifies 2 of the 3 major parts of positioning as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## EXPLANATION:

Positioning means putting yourself in the best possible position to see and hear individuals and groups. You should distance yourself (i.e., place yourself far enough away to be safe) while still remaining close enough to see and hear what is going on. Obviously, there is no absolute rule regarding how far or how close you position yourself--as an experienced staff member, use your experience, knowledge of the situation and/or individuals involved, and common sense to pick an appropriate distance.

## VIDEO TAPE:

"Introduction to Positioning"

Time:           3:17

## CLASS DISCUSSION:

1.      Ask one student to take a position to supervise a group of inmates.

2.      Lead discussion about the officer's positioning skills.

3.      *Distancing* -- Should be adequate to allow for both safety and seeing/hearing a particular situation.

4.	*Facing Squarely* -- Positioned for the most effective line of vision; i.e., so that the officer can observe everything necessary

5.	*Looking Directly* -- In order to really understand what is happening, the officer needs to look directly at a situation.  In addition, such direct observation{eye-to-eye contact with inmates, for example} gives a very positive psychological message:  "I am not afraid; I am going to find out what's going on", etc.  Looking directly allows for closer observation; closer observation provides clues to use in analyzing situations (the inmate's facial expression, for example)

## *INDIVIDUAL EXERCISE:*

1.	Tell students to read pp. 14-15.

2.	Observe class and be available for questions.  Questions you can anticipate might include:

	*"Are there certain cultural traits that affect eye contact?"*

		Yes, it is important to know something about the various groups with whom you come into contact, for example, native Hawaiians and some other cultural groups consider close eye contact to be very inappropriate behavior.

	*"If an inmate is upset, emotional, has a dull, vacant stare, etc. what do you do about eye contact?"*

		Use your common sense; if trying to establish eye contact further upsets an individual, don't worry about eye contact until the situation has gotten less tense.  Remember, it is not a staring contest--it is an attempt to establish your presence with the other individual.  Establishing that presence may not take a great deal of time.

		(Prior to training, it is a good idea to identify specific areas in the local institution where positioning and observing are difficult.  Such areas can be addressed in class, along with techniques for overcoming the positioning problems they present.)

3.	Instruct students to complete the exercise on p. 16.

## CLASS DISCUSSION:

1.      Have class discuss the exercise on p. 16.

2.      You probably have duty stations other than units.  Think of some of these other stations.  Describe where you would position yourself to size up the situation.

        *       Recreation yard
        *       Back against a wall where you can see as much as possible

3.      List two situations in which you think it would be a good idea to look an inmate directly in the eye.

        *       When you want the inmate to know that you mean business
        *       When you want to know what is going on

4.      List two situations in which you think it would <u>not</u> be a good idea to look an inmate directly in the eye.


## EXPLANATION:

We can sometimes set up a self-fulfilling prophecy by looking an inmate directly in the eye.  We say to ourselves, "Ill bet this guy is about to blow up," and we look into the eyes of the inmate, noticing that it seems to produce a lot of hostility.  If we keep looking, the inmate does blow up--and we have proven ourselves right.  Being right, in this case, can also be wrong!!!

Watching too much is as phony and unproductive as never looking at the individual; the key is to balance your eye contact so that you and the other party are both comfortable with it.

In some cases, another individual will not want any eye contact.  Don't force it.  Try, from time to time, to establish such contact.  When the individual is comfortable with you, eye contact can occur between the two of you.  Give some time for a level of comfort to develop before you get extremely concerned about eye contact.


## VIDEO TAPE:

"Hall Duty"

Time:           :38

## *Scene Summary:*

Officer Lopez is on duty in the hallway.  Inmates file past him in profile.  Officer Lopez is concentrating on his clipboard, and from time to time, looks up to observe inmates filing past.  We see that one inmate has a questionable item in his hand which is away from the officer.

1.    Have students write responses to questions on p. 17.

2.    Discuss the questions with the class.

3.    How could Officer Lopez's position be improved?

4.    What were the consequences of bad positioning in this case?


## *VIDEO TAPE:*

"The Dayroom"

Time:           1:20

## *Scene Summary:*

Officer Donelli enters the dayroom during his rounds.  There are three inmates in the room:  one reading and two playing cards.  Officer Donelli walks through the room and checks things out, then takes up a position near the door.

Inmate Chico Juarez enters the room, approaches Donelli stealthily, gets very close to him and whispers, "Officer Donelli, I gotta' talk to you..."  Donelli turns and looks at Chico.

1.    Have students write responses to questions on p. 18.

2.    Discuss the questions with the class.

3.    Describe Officer Donelli's position in relation to the card players.

   *Is this position appropriate or inappropriate?*

      Given that it isn't an obviously hostile situation, Donelli seems to be positioned adequately as far as safety and ability to see and hear are concerned.  He can look at both inmates in a fairly direct manner and face them squarely with little body movement.  Again, this is not a situation which required a totally squared, direct approach.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*Did Donelli position himself properly to talk to Chico?*

> Donelli placed himself face-to-face with Chico, thus establishing a position where he was facing squarely and looking directly.  He was able to give his undivided attention to Chico.  Some might feel he put Chico "on front street."  A more appropriate reaction might be to conduct the interview with Chico later in private.

3.      Conduct the class activity from p. 19 of the Student Manual.

> Select one trainee to role play an inmate.  Instruct the "inmate" to do something normally done in the day-room.  Select another trainee to role play as an officer.  When you give the signal, the officer positions correctly.  After 20-30 seconds solicit evaluation and feed back from the group on distancing, facing squarely and looking directly.  Have all trainees role play inmate and officer.

## *ROLE-PLAY RESPONSIBILITIES:*

| INMATE | OFFICER | GROUP |
| --- | --- | --- |
| Role play inmate for 20 seconds | Position for 20 seconds | Judge each officer on distance: yes/no |
| | | Facing squarely: yes/no |
| | | Looking directly: yes/no |
| | | If no, Why? |

# POSITIONING

## (3)

<u>Positioning</u> means putting yourself in the best possible place to see and hear individuals or groups. This helps you get information you need to manage inmates and to prevent minor incidents from becoming major problems.

The three parts of Positioning are:

## THE BASICS:
Sizing Up the Situation



Listening

Observing

Posturing

Positioning

1. Distancing
2. Facing Squarely
3. Looking Directly

## *THE FIRST BASIC SKILL:*

Physically positioning yourself in relationship to an individual or group is very important in the effective management of inmates.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *THREE PARTS OF POSITIONING:*

There are several different principles or activities that you may feel are important to effective positioning. The three basic parts of positioning which we will focus on in this section are establishing an appropriate distance, facing squarely and looking directly.

As an effective officer, you need to position yourself where you can see and hear problems. Being in a good position helps you to know just what's going down and, therefore, to nip problems in the bud. Then, too, inmates who think they are not being observed are always more of a problem because they tend to live by the rule "We'll get away with as much as we can -- or with as much as you let us." As you know, it's impossible for you to be everywhere at once. It is also very difficult to catch inmates in certain acts because of "look-outs." Yet, the more you use positioning skills to see and hear (when making rounds, for example) the less likely it is that the inmates will get involved in things that are against the rules.

Now, let's take a look a the three specific skills or procedures just outlined.

---

## *THE FIRST PART OF POSITIONING:*

Distancing: The first principle of distancing is to keep it safe. Yet, while safety is foremost it is not enough. You could be safely in your office while inmates are doing some pretty negative things.

### *Safety Sight:*

This distance must be safe but you must also be able to see what is going on, and you must be able to hear what is being said whenever possible. *Positioning* means distancing yourself far enough to be safe, but close enough to see and hear.

---

OHIO PEACE OFFICER TRAINING COMMISSION        TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## THE SECOND PART OF POSITIONING:

<u>Facing Squarely:</u>  Facing squarely or fully ensures that your position gives you the most effective line of vision.  Your left shoulder should be lined up with the left boundary line of the area you are watching and your right shoulder should be lined up with the right boundary line of the area you are watching.

*See Everything:*  When you move your head to either side so that your chin is right above either shoulder, you should be able to see the entire field for which you are responsible.  *Positioning* <u>means facing the inmate or inmates squarely.</u>

*Be Unpredictable:*  Sometimes the sheer size of the area for which you are responsible (for example, the yard) makes it impossible to remain squared in one position.  In this sort of situation, you must rotate yourself so that by successive movements you will have squarely faced all the area or persons for whom you are responsible.  In rotating, as in all behaviors, it is always important for you to change the order of doing things so that your behavior cannot be predicted easily.  At the same time, of course, you must be thorough regardless of the pattern you employ.  Facing fully helps you to size up a situation.  You can see best when you are directly facing inmates.  When your goal is communication with inmates (Section II) this also lets them know you are open to hearing them.

## STUDENT EXERCISE:

You probably have duty stations other than units.  Think of some of these other stations.  Describe where you would position yourself to size up the situation.

Station:      _____

Position:     _____

             _____


Station:      _____

Position:     _____

             _____

OHIO PEACE OFFICER TRAINING COMMISSION  TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

List two situations in which you think it would be a good idea to look an inmate directly in the eye:

_____

_____


_____

_____


List two situations in which you think it would not be a good idea to look an inmate directly in the eye:

_____

_____


_____

_____


## *THE THIRD PART OF POSITIONING:*

Looking Directly:  When positioning yourself, you should look directly at the area or person(s) you are managing.  Unless you look directly, you will not be on top of the situation even if you are in the right position and are facing squarely.  Looking directly at a group often involves looking at their eyes.  When questioning inmates, for example, you will be able to get important clues by observing their eyes and their facial expressions closely.  In addition to the information you can get, your direct look tells inmates that you mean business and are not threatened.  This doesn't mean you get involved in a staring contest.  But many inmates believe that a man who won't look you in the eyes is afraid of you.

Positioning means looking directly at the area and person or people you're managing.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *Eye Contact to Communicate:*

Eye contact may also be the best way of communicating interest. Inmates become aware of our efforts to make contact with them when they see us looking directly at their faces. Of course, looking directly at inmates will also provide you with valuable information about them. Inmates who keep shifting their eyes while talking to you signal that, at the very least, they are either uncomfortable with you or with what is being said. This kind of information is important in managing inmates.

## *Summary of Video Scene--"Hall Duty"*

Officer Lopez is on duty in the hallway. Inmates file past him in profile. Officer Lopez is concentrating on his clipboard, and from time to time looks up to observe inmates filing past. We see that one inmate has a questionable item in his hand which is away from the officer.

## *Questions After Viewing:*

How could Officer Lopez's position be improved?

_____

_____

_____

What were the consequences of bad positioning in this case?

_____

_____

_____

## Summary of Video Scene--"The Dayroom"

Officer Donnel enters the dayroom during his rounds. There are three inmates in the room: one reading and two playing cards. Officer Donnel walks through the room and checks things out, then takes up a position near the door. Inmate Chico Juarez enters the room, approaches Donnell stealthily, gets very close to him and whispers, "Officer Donnell, I gotta' talk to you...", Donnell turns and looks at Chico.

## Questions After Viewing:

Describe Officer Donnell's position in relation to the card players.

_____

_____

_____


Did Donnell position himself properly to talk to Chico?

_____

_____


## Role-Play Responsibilities:

| INMATE | OFFICER | GROUP |
|--------|---------|-------|
| Role-play inmate for 20 seconds. Give Feedback to officer | Position for | Judge each officer 20 seconds on Distance: yes/no Looking Directly: yes/no If no, why? |

# POSTURING

# SESSION 4

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 4:
{REFER TO OVERHEADS 6 & 7}

6.      Given a multiple choice question, the student will choose the option which defines the term "Posturing" as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

7.      Given a multiple choice question, the student will choose the option which identifies 2 of the 3 components of good posturing as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## VIDEO TAPE:

"Introduction to Posturing"

Time:           2:04

## INDIVIDUAL EXERCISE:

1.      Tell students to read pp. 21-23.

2.      Instruct them to complete the exercise on p. 23.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## CLASS DISCUSSION:

1.      Have Class discuss the exercise on p. 23.

2.      List some distracting behaviors that <u>other staff</u> sometimes display.

> *       Leaning against a ledge, wall, etc.
> *       Too rigid
> *       Exaggerates shifting
> *       Eye contact

3.      What are some distracting behaviors that <u>you</u> sometimes display?

        Write trainee responses on board and see if others agree that they are distracting.  Add behaviors that you exhibit as well.


## VIDEO TAPE:

"The Keys"

Time:           :40

## Scene Summary:

Officer Wilson is on duty at a station in the hallway.  He leans against the podium and tosses his keys as inmates walk by.


## Questions After Viewing:(from p. 24)

1.      Describe Officer Wilson's posture.

2.      How could the officer improve his posture?

3.      What distracting behaviors did the officer exhibit?

4.      What kind of impression would this officer make on inmates?


## VIDEO TAPE:

"On Duty"

Time:           :35

OHIO PEACE OFFICER TRAINING COMMISSION                TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## Scene Summary:

Officer Andrews is on duty at the same station in the hallway.  He sees inmate Joe Carson go by and calls him back, saying "Hey, Joe, come here for a sec...I want to talk to you."

## Questions After Viewing:

1.      Describe Officer Andrew's posture on duty.

2.      Describe Officer Andrew's posture as he gets ready to talk to Joe.

3.      What distracting behavior did he eliminate?

4.      What impression do you think the officer's posture would make on Joe?

# POSTURING

## {4}

Posturing means holding your body in a way that shows strength, confidence, interest and control.  When you appear strong and confident, inmates will believe you are strong and confident.

The three steps of Posturing are:

## THE BASICS:
Sizing Up the Situation



Listening

Observing

Posturing

1. Standing Erect
2. Eliminating Distracting
   Behaviors
3. Inclining Slightly Forward

Positioning

Your Posture - how you carry yourself - tells an inmate a lot.  It can make an inmate think that you're confident of yourself or that you're really pretty worried about what might happen.  Your aim, of course, is to show your real confidence.

## *Three Parts of Posturing:*

As with positioning, there are several ways in which you can use posturing when you are sizing up the situation.  Here, we'll focus on three specific procedures:  1) Standing erect; 2) Eliminating distracting behaviors; 3) Inclining slightly forward.

## *Standing Erect & Eliminating Distracting Behaviors:*

The way in which the first two procedures show confidence should be obvious.  When you stand erect and get rid of distracting behaviors, you let inmates know that you're in full physical control--control not only of your own body but of the whole situation.  That's essential!!  Many inmates will try to intimidate any officer who doesn't look as if he is confident about what he's doing.  If an inmate thinks he can scare you, you're in real trouble.  Any officer without the respect of the inmates is open to embarrassment and abuse.

## *Example:*

There was one officer who was known to run at the first sign of trouble.  Other officers felt really uncomfortable with him guarding the rear.  He always stayed by the door of the dining room.  But while the officers disliked this man, the inmates were all over him!  They always managed to get what they wanted and still embarrassed him.  Finally, he quit.  Maybe you'll say, "Fine, he shouldn't have been an officer in the first place!"  His case, however, is just an extreme example of what happens when any officer allows him or herself to be intimidated, or simply looks as though he or she could be intimidated.

## *Inclining Forward:*

By standing erect and eliminating distracting habits, you can do a lot to show your strength and confidence.  The third part of the posturing skills outlined here, inclining yourself forward, can also show confidence by reinforcing the idea that all your attention and potential energy is riveted on the inmate or inmates.  Inclining yourself forward, as you will see in Section II, can also help you to communicate your interest.

Used in this way, such a posture says to an inmate, "I am inclined to listen, to pay attention, to be interested."

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

A closer look at the three parts of Posturing:

_____

## *The First Part of Posturing:*

Standing Erect: Each of you knows how important standing erect is. You probably heard it as a child; if you were ever in the service, you heard it there: "Stand up to your full height," "Be proud, stand up straight," "Stick out that chest," "Pull in that gut." Standing erect takes muscle tone and practice. Look in the mirror and check yourself out. Are your shoulders straight? Is you chest caved in? How do you feel? Ask someone else for his or her reaction. Which way does that individual experience you as stronger, more confident?

Posturing means standing erect to show strength and confidence.

_____

## *The Second Part of Posturing:*

Eliminating Distracting Behaviors: An officer who can't stand steady is seen as nervous. Biting nails, foot-tapping and other distracting behaviors do not communicate confidence and control. But standing stiff like a board doesn't either. You should feel tension in your body after you have eliminated distracting behaviors.

Posturing means eliminating all distracting behaviors.

_____

## *The Third Part of Posturing:*

Inclining Forward: Your intention here must be to communicate interest and concern by shifting your weight forward so that the inmates become more aware of your "inclination" to communicate and supervise them with respect. You can do this by placing one foot slightly forward of the other with your weight on the forward foot. This does communicate "moving close" without actually moving you much closer or making any physical contact.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Since this position shows you to be more alert, it also gives you more control over the situation. Lean your weight away from another person.  What do you experience?  Probably a "laid back" sort of remoteness.  You're simply not as involved.

Posturing <u>means inclining yourself forward to show that your attention is really focused.</u>

## STUDENT EXERCISE:

List some distracting behaviors that other officers sometimes show.

_____

_____

_____

_____

What are some distracting behaviors that you sometimes show?

_____

_____

_____

_____

## Summary of Video Scene: "The Keys".

Officer Wilson is on duty at a station in the hallway.  He leans against the podium and tosses his keys as inmates walk by.

## *Questions After Viewing:*

Describe Officer Wilson's posture.

_____

_____

_____

How could the officer improve his posture?

_____

_____

_____

What distracting behaviors did the officer exhibit?

_____

_____

_____

What kind of impression would this officer make on inmates?

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*Summary of Video Scene: "On Duty"*

Officer Andrews is on duty at the same station in the hallway. He sees inmate Joe Carson go by and calls him back, saying, "Hey, Joe, come here for a sec....I want to talk to you."

*Questions After Viewing:*

Describe Officer Andrews' posture on duty:

_____

_____

_____

Describe Officer Andrews' posture as he gets ready to talk to Joe:

_____

_____

_____

What distracting behavior did he eliminate?

_____

_____

_____

What impression do you think the officer's posture would make on Joe?

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*Summary of Video Scene:  "On Duty"*

Officer Andrews is on duty at the same station in the hallway.  He sees inmate Joe Carson go by and calls him back, saying, "Hey, Joe, come here for a sec....I want to talk to you."

*Questions After Viewing:*

Describe Officer Andrews' posture on duty:

_____

_____

_____

Describe Officer Andrews' posture as he gets ready to talk to Joe:

_____

_____

_____

What distracting behavior did he eliminate?

_____

_____

_____

What impression do you think the officer's posture would make on Joe?

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION            TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# OBSERVING

## SESSION 5

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION # 5:
{REFER TO OVERHEADS 8-10}

8.     Given a multiple choice question, the student will choose the option which identifies 2 of the 4 elements of observing, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

9.     Given a multiple choice question, the student will choose the option which identifies 2 of the 3 aspects to be considered during the first part of observing as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

10.    Given a multiple choice question, the student will choose the option which identifies 2 of the 4 "clues" that can be used to develop inferences as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *EXPLANATION:*

Not all communication is verbal; in fact, a considerable amount of the information to which we react during the course of a day is non-verbal.  For example, when an inmate fails to carry out a job assignment, that is a fairly strong statement.  Why the inmate failed to carry it out is subject to interpretation and analysis.  The purpose of this session is to give trainees some observation techniques that will help them develop a good base for conducting such an analysis.

1.     We look carefully for non-verbal cues, such as lack of performance, body language, facial expressions, changes in normal or expected behaviors, etc.  (The inmate acted angry through his job assignment.)

2.     Based on a collection of information, coupled with our past experience and common sense, we make an inference as to what the inmate is communicating and what is likely to happen as a result.  (The inmate has normally been a good worker, but he recently got a "Dear John" letter from his wife.)

3.      In considering the information we make an assumption, again based on prior experience, that a situation is either normal or abnormal and that we can expect either trouble or no trouble in carrying out our duties. (The inmate's world is suddenly different; there may be a feeling of insecurity or lack of control over life. He's going to need assistance to handle his wife's actions.)

4.      Making inferences is not a skill that be directly taught. What can be taught is the value of observing and of basing any inferences that are made on as much factual material as possible. This is especially critical in a correctional setting since many inmates are not known for their honesty in communicating desires, intentions or information.

## VIDEO TAPE:

"Introduction to Observing"

Time: 2:57

## INDIVIDUAL EXERCISE:

1.      Tell students to read pages 26-28.

2.      Observe class and be available for questions.

3.      Instruct them to complete the exercises on pages, 28, 29, 30, 31 & 32.

## CLASS DISCUSSION:

Have the class discuss the exercises

Exercise # 1--from page 28

*What feeling word would you apply to the following examples?*

     a.      An inmate is sitting on her bed, head hanging down, slowly rocking back and forth.

          (Feeling words: negative -- "depressed", "blue", "withdrawn")

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

    b.    In shop, an inmate is holding up a chair he made.  He is pointing to it while standing erect.  Now he puts it down and points to the other inmates to sit down in the chair.

    (Feeling words:  positive -- "proud", "elated", "happy"

**Exercise # 2**--From pp. 29-30

a.    List two behaviors and/or appearances that would tell you that two inmates have a negative relationship.

    1.    Name calling, verbal attacks, giving "finger", hitting
    2.    Refusing to make eye contact, etc.

b.    What might result from these behaviors and/or appearances?

c.    List two behaviors and/or appearances that would tell you that two inmates have a positive relationship.

    1.    Engage in activities together
    2.    Laugh and joke a lot with each other

**Exercise # 3**--From p. 30

a.    List two behaviors that show a high energy level.

    1.    Participation in activities
    2.    Good posture

b.    List two behaviors that show a low energy level.

    1.    Sleeping
    2.    No activity

c.    List two special times that might cause inmate energy levels to change

    1.    Visits
    2.    Holidays

<u>Exercise # 4--</u>From p. 31

List three things, in relation to environment, that might reflect inmate values:

1.    Hygiene
2.    Personal appearance
3.    Involvement


<u>Exercise # 5--</u>From p. 32

1.    Write down the feelings of the young inmate, his relationship to the group and his
      energy level.

2.    Cite reasons for your inferences.  The reasons should be descriptions of the
      appearances and behaviors demonstrated.

Feeling:    _____
            (Angry, Scared, Happy, Sad)

Reason:     _____

            _____


Relationship: _____
              (Positive, Negative, Neutral)

Reason:     _____

            _____


Energy-
level:    _____
          (High, Moderate, Low)


Reason:     _____

            _____

## *VIDEO TAPE*

"The Pick"

Time:  1:34

## *QUESTIONS AFTER VIEWING:*--From pp. 34-37

1.     What inferences would you make about the TV watchers?  Include reasons based on visible clues about behavior, appearances and environment:

      a.     Inferences about relationship
      b.     Reasons
      c.     Inferences about energy levels
      d.     Reasons

2.     What inferences would you make about the card players?  Again, include reasons based on observed clues: (p. 35)

      a.     Inferences about relationship
      b.     Reasons
      c.     Inferences about energy levels
      d.     Reasons

3.     What inferences would you make about Billy? (p. 36)

      a.     Feelings
      b.     Reasons
      c.     Relationship to Chico
      d.     Reasons
      e.     Chico's relationship to him
      f.     Reasons
      g.     Energy level
      h.     Reasons

4.     Concerning the business of the missing pick:

      a.     What clues do you have that this situation is either normal or abnormal?

      b.     What clues do you have that this situation is either trouble or no trouble?

## *ROLE PLAY:*

Have trainees set up their papers using the following format (p. 37).

A.    Feeling_____ Reason_____

_____

B.    Relationship_____ Reason_____

_____

C.    Energy level_____ Reason_____

_____

D.    What knowledge or principles do you have that would apply to the situation?

_____

_____

_____

_____

E.    Normal or abnormal?_____

F.    Trouble or no trouble?_____

Role play an inmate in a cell for 20-30 seconds.  Be very sad, with a low energy level. Mutter negative references about a correctional officer or correctional staff member.

Go over class responses A through F (above) from their recorded data.

After your demonstration, select trainees to carry out the role play.  Have class use the evaluation format for each pair.

# OBSERVING

## {5}

Observing is the ability to notice and understand inmate appearances, behavior and environment.  Careful observation of inmate actions will tell you most of what you need to know about them, their feelings and their problems.

The four steps in observing are:


THE BASICS:

Sizing Up the Situation



Listening

Observing

1. Looking carefully
2. Making inferences about
   feelings, relationships
   and energy level
3. Deciding normal/abnormal
4. Deciding trouble/no trouble

Posturing

Positioning


*THE FIRST PART OF OBSERVING*

Looking at Behavior, Appearance and Environment.  A "behavior" is a nonverbal cue provided by something that the inmate does while conscious and active.  For example, an officer might observe any or all of the following behaviors:  two inmates holding hands; one inmate bumping another inmate; one inmate reading.  An "appearance" is a nonverbal cue that an inmate might display even if he were unconscious or dead.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

For example, an officer might observe the following appearances: one inmate is black, another inmate didn't wear clean clothes today; a third inmate is an older person.

## Environment:

Environment, of course, means the particular people and things which an inmate has around the inmate in a particular place. When observing an inmate, you should try to answer mental questions like:

*Behavior:*          "What's he doing right now?"

*Appearance:* "What are the important things about how she looks?"

*Environment:* "What's important about where he is and who he's with?"

Once you're able to answer these questions, you're ready to draw some inferences about the inmate.

OBSERVING means looking at inmate behavior, appearances, and environment.
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

## *THE SECOND PART OF OBSERVING:*

Draw Inferences: Inferences are the initial conclusions you come to as the result of observing inmates. You take in visual cues related to inmate appearances, behavior and environment. these cues are really "clues" which show you something about inmate feelings, inmate relationships, inmate energy levels and inmate values. The more observations you make, the more inferences you can draw - and the more accurate these inferences will be.

OBSERVING means drawing inferences about inmate feelings, relationships, energy levels and values.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

Drawing Inferences About Feelings: The officer can use observing skills to draw inferences about how an individual inmate or an entire unit of inmates if feeling. Knowing how a person is feeling is critical in determining where a person really is. For example, you might use the feeling word "happy" to describe an inmate who is exercising and smiling. For an inmate who is pacing while wringing his hand, you might apply the feeling word "tense." You might use the term "uptight" to describe a group of inmates who are tightly clustered and are speaking with each in a well-guarded hesitant manner.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*STUDENT EXERCISE:*

What feeling word would you apply to the following examples?

a.      An inmate is sitting on her the bed, head hanging down, slowly rocking back and forth.

   *Feeling word:*_____

b.      In shop, an inmate is holding up a chair just completed.  The inmate is pointing to it while standing erect.  Now the inmate puts it down and points to the other inmates to sit down in the chair.

   *Feeling word:*_____

*Drawing Inferences About Relationships:*  Besides being aware of the nonverbal cues that indicate the feelings of the inmate, the officer can further increase his effectiveness in correctional management by looking for cues that indicate the nature of the relationship between himself and the inmates and between the inmates themselves.  The relationship between the officer and the inmates and among the inmates themselves who serves as a good indicator of future action.  An inmate who has a good relationship with an officer may provide him with valuable information about potential breaks in security.  An inmate who has a bad relationship with either an officer or another inmate may be a source of violence.

In general, you can categorize relationships and feelings as <u>Positive,</u> <u>Negative</u> or <u>Neutral</u>. Inmates who do things to make your job easier (e.g., arrive on time) probably have or want to have a positive relationship with you.  An inmate who always tries to hassle you (e.g., uses abusive language, refuses to obey orders) doesn't have or doesn't want to have a positive relationship with you.

## EXAMPLES:

Among inmates, relationships of power are critical.  Usually inmates form their own group with a leader.  Knowing the relationship within and between groups is crucial.  For example, a bumping between members of different groups can mean real trouble.  In addition, homosexual relationships, drug relationships, extortion relationships and gambling relationships are sources of great problems.  You might observe that two inmates who have had a close relationship are no longer "hanging" together.  You might further observe that one of the inmates is with some new inmates.  This could mean a problem is brewing.

## STUDENT EXERCISE:

List two behaviors and/or appearances that would tell you that two inmates have a <u>negative relationship</u>:

1. _____

2. _____


What might result from these behaviors and/or appearances?

1. _____

2. _____


List two behaviors and/or appearances that would tell you that two inmates have a <u>positive relationship</u>:

1. _____

2. _____

## *ENERGY:  HIGH?  LOW?  MEDIUM?*

<u>Inferences About Energy Level.</u>  Energy level tells us a great deal about how much and what type of trouble an inmate can and/or will cause.  For example, inmates with a low energy level are reluctant to initiate anything.  Many inmates have a low energy level.  They look and act defeated.  Their movements are slow, their heads hang down and every move seems like an effort.  These inmates spend a good part of their time sleeping.  Inmates with moderate energy levels actively engage in most activities (playing cards, talking, eating) while high energy inmates not only participate in all that is required but also make use of physical fitness equipment and other optional activities.  The danger of high energy, of course, is that this energy needs to be used constructively so that it does not become a source of danger.  In general, it is important to keep all inmates occupied and involved in activities; but with high energy types, it is absolutely essential.

While it is important to observe basic levels of energy, changes in energy level are even more critical.  Energy levels are usually constant for inmates except at special times (e.g., visiting hours, holidays).  Changes from high to low or low to high may indicate trouble such as drugs or imminent violence (to self or others).

## *STUDENT EXERCISE:*

List two behaviors that show a high energy level.

1.  _____

2.  _____

List two behaviors that show a low energy level.

1.  _____

2.  _____

List two special items that might cause inmate energy levels to change:

1.  _____

2.  _____

<u>Inferences About Inmate Values:</u>  It is also important to understand what a given inmate values.  Here is where observing the inmate's environment comes in.  Every inmate has three basic environments:  <u>The place where the inmate lives</u> (unit), <u>the place where the inmate works</u> (shop), <u>the place where the inmate learns</u> (school).  In each of these settings, the actual "environment" will include not only physical materials but people -- the people that the inmate "runs with."  You can learn a great deal about an inmate by carefully observing his environment.  A general rule is:  What a person gives his energy to, is of value to that person; the more energy, the higher the value.

Your observations should help you find out how the inmate relates to his environment.  Does the inmate have friends?  Who are they?  Remember, birds of a feather definitely do flock together!!  An inmate who hangs out with a drug crowd is telling you something.  What are the things that are important for the inmate?  You should look for things in the environment that reflect this inmate's interests and values (e.g., neatness, reading material).  Knowing what an inmate values has real implications for effective management.  When you know what an individual wants or doesn't want, you've got an edge in managing that individual when necessary.

## *STUDENT EXERCISE:*

List three things (in relation to environment) that might reflect inmate values:

1.  _____

2.  _____

3.  _____

The reasons for your inferences should be visual cues, related to behaviors, appearances and environment.  Inference stand the best chance of being accurate if they are based on detailed and concrete observations rather than on vague and general ones.  Inferences are based on your previous observations of behaviors and appearances.  The more concrete you can be in describing the appearances and behaviors to yourself and to others with whom you might share them, the more likely it is that your inferences will be correct.

## *STUDENT EXERCISE:*

Read the following incident carefully.  Be ready to give reasons (descriptions of appearances and behaviors) for some inferences you will be asked to draw.

### *Incident:*

November 10, 4:30 p.m., The Yard.  Shortly after visiting hours, a group of large inmates approached a new, young inmate who was about 5'6", 125 lbs.  They went up to him and surrounded him.  One of the larger men put his arm around the young inmate's neck and shoulder and pulled him abruptly to him while looking directly into his face.  The young inmate grimaced and tried to pull away.  The group laughed.  After a few minutes the young inmate gave them something.  He then pulled away, head down, barely moving.

### *Directions:*

Write down the feelings of the young inmate, his relationship to the group and his energy level.  Cite reasons for your inferences.  (The reasons should be descriptions of the appearances and behaviors demonstrated).

*Feeling:*_____
              (angry, scared, happy, sad)


*Reason:*_____

       _____


*Relationship:*_____
          (positive, negative, neutral)

*Reason:*_____

       _____


*Energy Level:*_____
              (high, moderate, low)

*Reason:*_____

       _____

OHIO PEACE OFFICER TRAINING COMMISSION                 TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *THE THIRD PART OF OBSERVING:*

<u>Deciding Whether Things Are Normal or Abnormal:</u>  Once you've been on the job for awhile, of course, you get to know how individual inmates tend to function.  One guy is easy-going and hardly ever hassles others.  A second guy always looks like he's mad at the world.  A third always seems to be feeling sorry for himself.  Your observations and the inferences you've drawn can help you determine whether a particular inmate is in a "normal" or an "abnormal" condition at any point in time.

OBSERVING <u>means determining if things are normal or abnormal.</u>

In determining whether things are normal or abnormal for a given inmate at a given time, compare your present observations of the inmate with any past ones and/or with any comments which other officers may have made about the inmate.  For example, you may observe an inmate arguing loudly with another inmate.  The inmate may even be making threats of one kind or another.  If this is normal behavior for this inmate, you probably need to exercise only the usual amount of caution.  But, if the appearance and behavior of the angry inmate are highly unusual or abnormal,  you'll know it's a potentially violent situation.
------------------------------------------------------------------

## *THE FOURTH PART OF OBSERVING:*

<u>Deciding Whether There is Trouble/No Trouble:</u>  This decision should be based on your observations and your knowledge of prison life.  With your knowledge of prison life in general, you should be able to generate certain principles that will be useful in making this decision (e.g. "birds of a feather flock together"; "a very depressed person usually withdraws from activities and other people"; "when 10% to 15% of a group of inmates are down, tense or hostile, it can affect the entire group;" "abrupt and/or major changes in behavior and/or appearances means trouble"; "a guy who has used a shank before in prison has a greater likelihood of stabbing someone else").

OBSERVING <u>means deciding whether it's a "trouble" or a "no trouble" situation.</u>

OHIO PEACE OFFICER TRAINING COMMISSION                TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *EXAMPLE:*

Take the situation where you observe a homosexual with a different inmate from the one with whom he'd been keeping company.  This homosexual's first partner has been shouting at you and others lately, staying up at night and following the "new couple."  Given these observations, you can infer that the first partner is angry (shouting), has a negative relationship with his former partner (there is a new partner) and has a higher energy level (not sleeping, following the new couple around).  You combine these inferences with your knowledge that inmates will harm other inmates when a homosexual relationship breaks down.  You suspect that the first partner is going to try to get even with the new partner for stealing his lover and ruining his image.  You decide this is a trouble situation.

### *Conclusion:*

Observing inmate appearance and behavior is usually the quickest and most accurate way to detect whether or not a given individual is really having a problem.  Inmates are usually reluctant to talk about problems.  Your observations will allow you to anticipate problems so that you can prepare for their possible impact upon the inmate, on other inmates, even on you and other officers.

### *Summary of Video Scene:  "THE PICK"*

Officer Davis is on duty in the dayroom, observing inmate activities.  There are four inmates in the room -- two watching TV and two playing cards.  A fifth inmate (Billy) enters, carrying on about his lost pick.  He approaches the TV watchers, who tell him to get lost and he approaches the card players, one of whom becomes angry while the other calms things down.  Billy wanders over and slumps down into a chair muttering to himself.

## *STUDENT EXERCISE:*

What inferences would you make about the TV watchers?  Include reasons based on visible clues about behavior, appearance and environment.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*Inferences about relationships:*_____

_____

_____

*Reasons:*_____

*Inferences about energy levels:*_____

_____

_____

*Reasons:*_____

What inferences would you make about the card players?  Again, include reasons based on observed clues.

*Inferences about relationships:*_____

_____

_____

*Reasons:*_____

*Inferences about energy levels:*_____

_____

_____

*Reasons:*_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

What inferences would you make about Billy?

*Feelings:*_____

*Reasons:*_____

*Relationship to Chico:*_____

*Reasons:*_____

*Chico's relationship to him:*_____

*Reasons:*_____

*Energy Level:*_____

*Reasons:*_____

What clues do you have that this situation is either normal or abnormal?

_____

_____

What clues do you have that this situation is either trouble or no trouble?

_____

_____

## STUDENT EXERCISE:

Your instructor will guide the group through role playing activities that will give you more practice in using the skill of Observing.

A.    *Feeling_____Reason_____*

B.    *Relationship_____Reason_____*

C.    *Energy Level_____Reason_____*

D.    What knowledge or principles do you have that would apply to the situation?

_____

_____

_____

_____

E.    *Normal or abnormal?_____*

F.    *Trouble or no trouble?_____*

# LISTENING

# SESSION 6

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION # 6:
{REFER TO OVERHEAD 11 & 12}

11.    Given a multiple choice question, the student will choose the option which identifies 2 of the 4 steps in Listening, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

12.    Given a multiple choice question, the student will choose the option which identifies the three items that may be used to determine intensity as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *VIDEO TAPE:*

"Introduction to Listening"

Time:  1:37

## *INDIVIDUAL EXERCISE:*

1.    Tell students to read pp. 38-42

2.    Observe and be available for questions.

3.    The kinds of questions you are likely to get regarding listening skills are such things as:

I frequently have seen (or heard of) mental health types who never say anything when talking to somebody except "uh huh," or something similar.  Is that a good approach?

It is a good idea to allow the person talking enough freedom and time too say what the individual wants and/or needs to say.  At some point, there is absolutely nothing wrong with asking questions, trying to get additional information, etc.  Don't jump right in, however, and begin making suggestions

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

or remarks that might be considered "turn offs" like "That will never work," "That's a stupid way to feel," etc.

Reinforce the idea that to listen correctly, you have to concentrate on what's being said.  In some cases--especially if a problem is really complex--you may have to ask the inmate to come back at a time when you can give the concentration deserved.  If, for example, you are supervising a particularly sensitive area, you may not be able to immediately focus all of your attention on a particular inmate.  Let common sense and your own experience be your guide.

4.  Instruct students to complete the exercise on p. 41.

## CLASS DISCUSSION:

List some words or phrases that signal danger or trouble in your own particular environment.

> Rat, skin, wrapper;
> Balloons, space shot, burnout, shank, kite;
> sissy, murder, rape, get him

## VIDEO TAPE

"Old Bag"

Time:  :26

## QUESTIONS AFTER VIEWING: (From page 42)

From the inmate's statement, identify:

Key words:   Get her; She'll be sorry; Old bag; Touch me

Mood:   Negative

Intensity:   High (signs--breath, high tone)

## VIDEO TAPE

"Gone for Good"

Time: :45

## QUESTIONS AFTER VIEWING: (From page 42)

From the inmate's statement, identify:

> Key words:    What's the use; She's gone
>
> Mood:        Negative (depression)
>
> Intensity:    High (signs--wavering voice, emotional delivery)

## VIDEO TAPE

"Tough Number"

Time: :28

## ROLE PLAY:

In the following small group assignment, have one student play an inmate, another play a staff member and one or more students play observers. The "inmate" will decide on a setting ("I'm working in food service," "I'm in the visiting room," etc.) and describe it to the staff member and observer(s). The various role players will then proceed through steps one to six.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

-------------------------------------------------------------

| INMATE | OFFICER | GROUP |
|---|---|---|

-------------------------------------------------------------

| INMATE | OFFICER | GROUP |
|---|---|---|
| 1. Describe setting | 1. Position, Posture Observe, Suspend judgement, Say NOTHING | 1. Position for paying attention |
| 2. Role-play inmate for 20-30 seconds | 2. Pull out key words | 1. Write own answers |
| 3. Provide verbal cues for conveying information | 3. Identify intensity (high, medium, low) | 3. Rate officer on sizing up Skills (# 1) |
| | 4. Define Mood (positive, negative, neutral) | 4. Rate officer on # 2-6 (yes/no) |
| | 5. Mood normal, abnormal | |
| | 6. Why | |

# LISTENING

## {6}

Listening <u>is the ability to hear and understand what inmates are saying.</u>  Listening helps you hear the danger signals from inmates while things are still at the verbal stage so you can take appropriate action to manage situations before they get out of hand.

The four steps in Listening are:

### THE BASICS
Sizing Up the Situation



Listening
_____
1. Suspend judgement
2. Pick out key words
3. Identify intensity
4. Reflect on mood

Observing

Posturing

Positioning

*Verbal Cues and Signals:*

Inmates often go through a verbal stage before the action begins.  If you can hear the danger signals, you can cut off the trouble before it really breaks out.  Listening involves the officer's ability to hear and accurately recall all the important verbal cues used by the inmates.

"Important" here means stated or implied signals of trouble or problems.  The danger may be an inmate's intention to inflict personal harm or to harm another inmate, the intention to inflict harm on an officer or even the intention to attempt a possible prison break.  You can listen for cues that mean violence is occurring or that violence is possible if preventive action is not taken soon.  For example, an officer on one shop heard some furniture moving around rapidly.  When he investigated, he found an inmate chasing another inmate with a razor blade.  The victim was using the furniture to block the attacking inmate.

Complaints from inmates are common, of course--but they're also important.  An effective officer listens to complaints and recognizes when a complaint arises from a usually uncomplaining inmate.  An officer especially listens for changes; silence when there is usually noise (dining area); or noise when there is usually silence (3 a.m. in the unit).  Once again, the officer asks the question: "Is there trouble here?"


Position, Posture, Observe:

As indicated before, you should get ready for listening by using the basic positioning, posturing and observing skills whenever possible.  A good position will obviously help you hear better.  Posturing, while perhaps less important in terms of listening for management, is essential when you're listening to an inmate who really wants to talk to you; your posture can signal the inmate that you're focusing all your attention on that inmate.  Finally, your observing skills cannot always be used to promote better listening--i.e., you may overhead something that inmates are talking about around a corner.  But, when possible, visual observations help you to understand the implications of what you're hearing.  An inmate who sounds angry but turns out to be leaning back in his chair and grinning may have only been telling a story to others; an inmate whose angry voice fits with his or her tense, uptight appearance presents quite a different situation.


Concentration:

One more preliminary thing: you can't listen effectively to an inmate or to inmates if you've got other things on your mind.  If you're thinking about home or other job responsibilities, you may miss a lot of what is said and what it really means.  You've got to focus on the inmate to whom you're listening--and this takes a good deal of concentration.

You can work to develop this kind of concentration by reviewing what you're going to do and whom you're going to see before you assume your post.  Then you'll really be ready to start using the four specific procedures which skilled listening involves:  Suspend Judgement; Pick out Key Words; Identify intensity; Reflect on Mood

_____

## *THE FIRST PART OF LISTENING:*

<u>Suspend Judgement:</u>  This is very difficult to do in relation to any inmate since society itself has passed judgement on him or her.  Yet most officers agree that it's important to judge a person on what they do now in prison rather than on what was done on the outside.  It is still hard at times to listen without immediate judgement because most of the inmates either complain about other inmates, the prison or you or demand to be given something.  Despite this, it will severely hurt your management efforts if you do not suspend judgement because you will never hear the real verbal cues you need to hear to prevent the danger or assist someone.

LISTENING <u>means suspending your own judgement temporarily so you can really hear what's being said.</u>

All complaints sound the same after awhile -- but they are not all the same!!  Some are just the normal negatives of inmates while others are real warning signals of danger.  Just let the inmate's message sink in before making any decisions about it.  Of course, certain situations within the prison call for quick action; but if you develop your nonjudgemental listening ability now, you will hear better and be able to take appropriate action more quickly when necessary.

_____

## *THE SECOND PART OF LISTENING:*

<u>Pick Out Key Words:</u>  There are key words and phrases to listen for.  Here are a few; add some of your own:  "kill", "depressed," "snitch," "honky", "waste", "hawk", "crow", "nigger", "blackman".  Other words to listen for:  "You'll pay", "Get out of here", "hostage".  Of course, everything you hear and see must be considered in terms of who the inmate is that did or said it.  Some inmates are always threatening or sounding off.  In addition to the key words, you'll need to pick out the person who is involved.

LISTENING means picking out key words and phrases like "get" or "shank" or "that S.O.B."

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## STUDENT EXERCISE:

List some words or phrases that signal danger or trouble in your own particular environment.

_____

_____

_____

_____

_____

## THE FOURTH PART OF LISTENING:

Reflect On What The Mood Is

"Mood" here means, at a very simple level, what the inmates are feeling.  One question you may ask to determine mood is "What kinds of feelings are being expressed or implied (positive, negative, neutral)?"  Another question you want to answer is "Is this mood normal or abnormal for this time and place?"  Sure, there are always exceptions.  For example, a man can say "I'm going to kill you" quietly and without emotion yet still mean it.  This is why it is so important to know your prisoners and to continue to observe and listen for other cues.

LISTENING means determining whether an inmate's mood is positive, negative or neutral and whether this mood is normal or abnormal.

## Reasons:

When you answer the question, "Is this normal or abnormal?", you should try to formulate the reason why this is the case.  "Normal" means "as it usually is."  This can apply to one inmate as well as to a large group of inmates.

Inmates are usually quite consistent in their behaviors in the various settings of the institution, e.g., it's not normal for inmates to be really up when they are not occupied; therefore, if your inmates are flying when there are no visiting hours due, no work, no shop, etc., then things are not normal and the possibility of danger exists.

## *Summary of Video Scene:  "Old Bag"*

An inmate says, "If that old bag tries to touch me one more time, she'll be sorry.  It'll be a long time before she tries that with anybody else again.  Keep her away from me or I'll get her."

## *Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

## *Summary of Video Scene:  "Gone for Good"*

An inmate says, "Oh, what's the use?  My life's a mess.  She's gone for good this time, and I'm stuck here and can't do a damn thing about it.  What's the use of going on?"

## *Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

## *Summary of Video Scene:  "Tough Number"*

An inmate says, "Your pal, Officer Adams, really thinks he's a tough number.  If he keeps riding our asses the way he's been doing - well, he'll see.  He'll find out just how tough he really is."

## *Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

Responsibilities:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*INMATE*                          *OFFICER*                          *GROUP*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1. Describe setting

2. Role-play inmate
   for 20-30 seconds

3. Provide verbal
   cues for conveying
   information

1. Position, Posture
   Observe, Suspend
   judgement, Say
   NOTHING

2. Pull out key words

3. Identify intensity
   (high, medium, low)

4. Define Mood
   (positive, negative,
   neutral)

5. Mood normal, abnormal

6. Why

1. Position
   for paying
   attention

1. Write own
   answers

3. Rate officer
   on sizing up
   Skills (# 1)

4. Rate officer
   on # 2-6
   (yes/no)

# SUMMARY OF THE BASICS

## {7}

Now--What have you got?

It wasn't that long since Harry had finished his training and gone on the job. His lack of experience, however, really didn't bother him too much. He had a lot going for him. For one thing, he had some good basic skills.

He walked the unit halfway through his shift. In one cubicle two older inmates played checkers, their usual game. He'd watched them before. They'd play for an hour--no more, no less. All part of their own little routine. So long as they stuck to it, Harry knew things were probably all right.

In another room, a young guy lay on his bed reading. His roommate, an older man named Dan, paced back and forth. Tension. Dan was usually a quiet, relaxed guy.

"Hi, Dan." Harry stopped three or four feet from the other man and faced squarely. To one side he could see Dan's roommate watching him over the top of his book. "How's it going?"

"All right--no problems. I'm just upset not getting any mail from my wife. It's been a couple of weeks."

"I'm sorry to hear that. Maybe, tomorrow, huh?"

The older man nodded and went back to pacing. Harry turned to face the younger inmate. "How're things, Jay?"

Jay looked away. "Shove off, huh?" But there was no anger in his voice. He sounded nervous if anything. There was no way he was going to meet Harry's gaze.

Something happening there, all right. Harry made a mental note to ask the other officers on duty about Jay. He'd also swing past again in a few minutes, break his normal routine and maybe learn a little more about what was going on.

Yes, Harry had a lot going for him with his basic skills. Now you've got the same skills working for you. Being able to size things up means being able to know when things are going smoothly--and when they're not. This in turn means being able to minimize risk and maximize your effectiveness on the job. Being a correctional officer is never easy.

OHIO PEACE OFFICER TRAINING COMMISSION       TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

It is, however, nearly impossible if all you have to go on is impulse and habit!  Now you can move beyond these limited capabilities and start to put some real professionalism into your work!

All right...You've had a chance to learn the four basic skills you need to size up a situation-- to manage your job and the inmates more effectively.  You've practiced positioning, posturing, observing and listening.  But as you know, there's far more to being an effective officer than being able to size things up.  There will be times when you will choose to manage by communicating with inmates.  You'll want to defuse a troublesome situation or get important information.  You may want to get involved with inmates' concerns.

In the second major section of this manual, we'll consider the skills you'll need to communicate with inmates.  The skills in this second section, while optional when it comes to helping inmates with personal problems, are absolutely essential when dealing with tense situations--situations where strong feelings may get out of control unless you're able to communicate with inmates.  Sizing things up just lets you know what's happening and what may happen.  To change things for the better--and that's what effective management requires--you need to add-on communication skills!!

THE ADD-ONS

1. Responding
2. Asking Questions

THE BASICS

1. Position
2. Posture
3. Observe
4. Listen

# THE ADD-ONS:
# COMMUNICATING WITH INMATES

# SESSION 8

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION # 8:
{REFER TO OVERHEAD 13}

13.    Given a multiple choice question, the student will choose the option which identifies 2 add-on skills used in interpersonal communication, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *VIDEO TAPE:*

"Introduction to the Add-Ons"

Time:  2:10

## *INDIVIDUAL EXERCISE:*

1.    Tell students to read pp 46-50 in Student Manual.

2.    Tell students to complete the exercise on p. 50.

## *CLASS DISCUSSION:*

Have class discuss the exercise.

OHIO PEACE OFFICER TRAINING COMMISSION    TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

We have all met officers who are better at communicating with inmates than other officers. What qualities or skills did these good communicators have that made them effective?   List two.

      Good listener
      Genuine concern
      Not over reacting
      Posture
      Asks questions
      Relaxed

# THE ADD-ONS:
# COMMUNICATING WITH INMATES

## {8}

Add-on skills help you open up communication with inmates. They provide you with the ability to get another person to tell you more about what he knows or thinks. You'll find the add-on communicating skills invaluable whenever you need to get more information about a situation, or when you choose to become involved with an inmate.

The two Add-on communicating skills are:

THE ADD-ONS:
Communicating with inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
3. Responding to feeling
   and meaning

It's been said that the only thing worse than a young guy who thinks he knows it all is an old guy who's sure he knows it--but doesn't!

## *EXAMPLE:*

Some of you may be new to corrections. Others of you may have some correctional experience.

Whatever your situation, you've probably run across one or two officers who have gotten themselves stuck in the traditional hard-line approach.  To these officers, an inmate is an inmate--period.  They're right, of course--but only up to a point.  Two older officers at a large institution found this out to their considerable embarrassment.  It seems a young officer started work.  He was cheerful enough but he didn't say much.  Even so, the two experienced men figured him for a staff training center whiz kid who thought he had all the answers.  He didn't, of course.  But as it turned out, neither did they.

One day the three happened to be on duty together.  An inmate named Larry got one of the two older men aside and tipped him off about some contraband that Jess, another inmate, had stashed in his room.  Minutes later, the two experienced officers had Jess out and were conducting a thorough search.  Sure enough, they found a small vial of "coke" hidden in his bedding.

"That's kind of hard to believe," the young officer said to the older guys once Jess had been written up.

"Yeah?  How's that?"

"Well, I've seen Jess around--and I've watched who he hangs out with.  He doesn't seem like the kind of guy who's into drugs."

One of the older officers shrugged.  "Who knows?  All that counts is that we found this in his bed.  He can try to deny that it's his, but there's no getting around the facts."

Jess did deny it.  He swore that he knew nothing about the "coke."  In the end the officers just figured he was lying.  They restricted his privileges and shifted him to a different unit.

The next day another inmate requested to be moved in with Ray, Jess's former roommate.  The officers agreed and the move was made.  Less than a week later, Ray "fell down" and got a deep gash in his head.  Although he, himself, said it was an accident, the officers knew he was clamming up.  They tried to get the inmate to talk.  They tried to get the new roommate to talk.  No one, however, would say anything but "accident."  Eventually, the two officers just dropped the whole thing.

## Skill Makes the Difference!

"It could have been an accident," one of them said.  "Sure," the other agreed.  "But it could also have been a set-up right from the start.  They could have framed Jess to get him out of Ray's room and get their own man in."

"Yeah, I guess.  But they may have just seen a chance when we busted Jess and moved in."

It was a mystery the two older officers never solved.  What bothered them most was the knowledge that something might have been put over on them.  But it didn't have to turn out this way.  The officers probably could have gotten Jess, Ray and the other inmate to really open up if they had possessed some effective communication skills.

Just what is communication all about?  We know that some officers can really talk with inmates and others can't.

## Why It's Important to Communicate:

Although you see and hear inmates every working day, chances are you're never really sure what's going on inside them. At the most fundamental level, officers and inmates are all human beings.  Many times it seems that the similarities stop right there.  This is understandable, of course, since in the end it's obvious that inmates are not the same as officers.

## Understanding Means Effectiveness:

The gulf between you and any one inmate may often be frustrating.  In one way you feel that you know this inmate but in another way you're sure you don't.  Knowing the inmate is important.  The better your understanding of any inmate, the more effective you can be in terms of inmate management.

## Communication Promotes Understanding:

This is where communication skills become important add-ons.  When you choose to use these skills, you can find out a great deal more about where individual inmates are.  You can add to your understanding and action in ways that will help you defuse tension, decrease the chances of trouble and increase your ability to handle any and all situations more effectively.

The basic skills covered in Section I let you size up the situation. The add-on communication skills presented in Section II let you understand the full implications of that situation and act constructively.

## What Are the Skills?

Once you choose to communicate with an inmate or a group of inmates, you begin by putting all of the four basic skills to use: <u>positioning</u>, <u>posturing</u>, <u>observing</u> and <u>listening</u>. As the communicative process develops, you use the new skills in two important areas.

---------------------------------------------------------------

*THE TWO SKILLS:    RESPONDING TO INMATES*
*                   ASKING RELEVANT QUESTIONS*

---------------------------------------------------------------

As the materials which follow make clear, responding to inmates means a good deal more than just answering a greeting--although this, too, can be important. You need to take the initiative in developing effective responses. By the same token, asking relevant questions means more than a simply "Hey, what's going on?' Here in Section II you'll have a chance to learn the specific procedures involved in responding and asking questions effectively.

## Getting Ready By Using the Basics: Position

As noted earlier, communicating with inmates must begin with your use of all the basic skills. You position yourself at the best possible distance from the inmate--three to four feet when you are working with a single person (although this could certainly increase if danger was imminent). This puts you close enough to see and hear everything yet not so close that you seem overly threatening. You face the inmate squarely, your left shoulder squared with the inmate's right and your right with the inmate's left. You look directly at the inmate, making frequent eye contact to let the inmate know you're really "right there."

## Posture---Observe---Listen:

You <u>posture</u> yourself so as to communicate both confidence and real attention. You <u>observe</u> the inmate's appearance and behavior, using visual cues to draw inferences about the inmate's feelings, relationship with you and general energy level.

You <u>listen</u> carefully, making sure you take in all the key words and verbal indications of intensity so that you can determine just what the inmate's mood really is. Only after you have really mastered and put to use the basic skills will you be able to use the add-on communication skills effectively.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Like the basic skills, communication skills involve a step-by-step approach.  First, you respond to the inmate.  Then you ask any relevant questions you need to ask.  Then you respond again, this time to the inmate's answers.  You would usually not, in other words, just jump in and start asking questions--at least not if you're trying to get the inmate to open up and communicate with you voluntarily.

## STUDENT EXERCISE:

We have all met some officers who are skilled at communicating with inmates.  What qualities or skills did these good communicators have that made them effective?  List two:

1._____

2._____

# RESPONDING TO CONTENT

## SESSION 9

### STUDENT PERFORMANCE OBJECTIVES FOR SESSION # 9:
{REFER TO OVERHEAD 14 & 15}

14.     Given a multiple choice question, the student will choose the option which defines the term "Responding to Content" as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

15.     Given a multiple choice question, the student will choose the option which identifies the 2 steps in responding to content as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.


### *VIDEO TAPE:*

"Introduction to Responding to Content"

Time:  1:29

### *INDIVIDUAL EXERCISE:*

1.     Have students read pp 51-54 in Student Manual.

2.     Have students complete the exercise on p. 53 of Student Manual.


### *CLASS DISCUSSION:*

Have class discuss the exercise.

List two examples of situations in which you might respond to content in order to get more information.

1.     _____

2.     _____

## VIDEO TAPE:

"The New Job"

Time:  :28

An inmate complains about a job request he has made.  Officer Lopez responds to the content of the inmate's statement.

## QUESTIONS AFTER VIEWING: (From p. 54)

What other responses could be made to the content of the inmate's statement?

## CLASS DISCUSSION:

1.      Ask several students to read their response

2.      Critique--look for key words

## VIDEO TAPE:

"The Transfer"

Time:  :35

Officer Juan Lopez asks Officer Jim Wilson about how long it took him to get a transfer. Juan says he's been waiting quite a while.

## QUESTIONS AFTER VIEWING: (From p. 54)

How would you respond to Juan (Responding to content?)

## CLASS DISCUSSION:

1.      Ask several students to read their responses.

2.      Critique--Look for key words

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *ROLE PLAY:*

1.      Pair students off.

2.      Have each pair role play.

3.      Remind them that the goal is to "hear and reflect."

4.      Role play exercise on page 55 of student manual.

5.      Critique

_____

| INMATE | OFFICER | GROUP |
|---|---|---|

_____

| INMATE | OFFICER | GROUP |
|---|---|---|
| 1.Gives the setting | 1.Attends | 1.Position, observe, listen |
| 2.Role-plays 20-30 seconds | 2.Waits 30 seconds | 2.Write own responses |
| | 3.Gives responses: "You're saying_____" "You look (it looks)_____" | 3.Rate officer's response. "Yes" if accurate, "No" if not accurate |
| | | 4.Rate officer's use of basics |

# RESPONDING TO CONTENT

## {9}

Responding to content is the skill of seeing and hearing what is really happening and the ability to reflect that understanding back to the inmate. You're letting the inmate know you heard accurately and are on top of the situation.

There are two steps to responding to content:

## THE ADD-ONS:
Communicating With Inmates

Asking Questions

Responding

1. Responding to content:
   * Reflecting on what was seen and heard
   * Use responding format

----------------------------------------------------------------

*THREE LEVELS OF RESPONDING:*

    *To Content*
    *To Feeling + Meaning*
----------------------------------------------------------------

Responding means just that--showing a clear reaction to something which you have seen or heard. A response gives evidence that you have listened. In this Section we'll take a look at several levels of responding. At the simplest level, you can respond to content by summarizing and expressing what an inmate or group of inmates has said or done. At the next level, you can respond to the feelings shown in an inmate's words or reflected in actions. Finally, you can respond to both the particular feelings and reasons for these feelings.

Each new level of responding does more to show an inmate that you are really on top of things, really seeing, hearing and understanding the inmate in terms of where the inmate is.

Probably more than anything else in this training, responding is going to seem strange to you. It's new, and you may be doubtful about its worth. There are two things to remember here.

*First*, this is a skill to be added to what you already do rather than a skill to replace what you do. The more responses you have to choose from the more effective you can be. *Second*, by practicing the skill, you will learn the best places and ways to use it.

— — — — — — — — — — — — — — — — —

## *THE FIRST LEVEL OF RESPONDING:*

While your use of the basic skills establishes a relationship in which inmates are more likely to cooperate with and talk to you, responding is a tool you can use at the moment to communicate with inmates. Responding to content is the first part of responding to the total problem or situation involving inmates. It shows an inmate that you have heard or seen what he said or did. When any person, including an inmate, knows that you are seeing and/or hearing him accurately, the inmate will tend to talk more freely. This is critical because talking gives you more of the information you need while allowing the inmate to get things out in the open and ventilate them.

RESPONDING at the simplest level reflects content:

"You're saying_____."

## *Respond to Content:*

When responding to content, you are focusing on what the inmates are either saying or doing. Using what you have learned, you focus by positioning yourself for observing and/or listening to the inmates. Next, you reflect on what you have seen and heard: "What are the inmates doing?" and "What is the inmate saying?" In answering both questions, stick close to what is actually going on and/or what is being said. Finally, after taking it all in and reflecting on it, you summarize what the inmates are saying or doing in your own words. You respond to the content by saying to an inmate either: "You look (it looks) _____" or "You're saying_____."

(For example: "You look pretty busy" or "You're saying, you're pretty busy.")

You respond to content when you want more information to aid you in management. This may occur when you are interrogating an inmate or when you notice unusual behavior in an inmate or a group of inmates and would like to get some information from them about what they are doing. For example, you might notice a group of usually talkative inmates being very quiet. You could say to them: "You people seem pretty quiet today." This gives them the opportunity to respond to you while also letting them know that you are observing them and observing them accurately. Unlike other approaches to getting information, responding to content doesn't automatically put an inmate on the defensive.

## *STUDENT EXERCISE:*

List two examples of situations in which you might respond to content in order to get more information.

1._____

2._____

— — — — — — — — — — — — — — — —

## *Get Inmates to Talk Instead of Act!*

The typical inmate attitude is "the inmate vs. the officer." Although there is a lot of truth in this, responding can alter the "me against them" belief enough to open communication with inmates. An inmate who is committed to some destructive action and who has done destructive things in the past will probably not be affected by responding to content. But such responses will give many other inmates an opportunity to talk it out, to share it rather than keep it inside.

## *Example:*

One inmate might say "I really can't stand him. He pushes me and pushes me. Every time I see him, I want to get even." Put aside your desire to question such an inmate ("Why do you want to do something foolish?") and your desire to push him into something positive by stating a negative ("You really want to do some more time!") Instead, give him a response to content: "You're saying you really want to get back at him."

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

This response will encourage talk and help you get the information you need to really understand the situation before you push for or take any action.  Instead of switching to a hostile or defensive way to counter what he might see as an officer's usual hassling, the inmate relaxes.  You're not pushing.  You're not hassling.  Instead, you're playing along and giving him a chance to tell about something and thereby lessen the probability that he will do that thing.  In addition, the more an inmate talks, the more you learn about his values.  The more you know about his values, the easier it is to manage him.

## Summary of Video Scene:  "The New Job"

An inmate complains about a job request he's made:  Officer Lopez responds to the content of the inmate's statement.

## Questions After Viewing:

What other response could be made to the content of the inmate's statement?

_____

_____

## Summary of Video Scene:  "The Transfer"

Officer Juan Lopez asks Officer Jim Wilson about how long it took him to get a transfer.  Juan says he's been waiting quite awhile.

## Questions After Viewing:

How would you respond to Juan (responding to content?)

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION            TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

--------------------------------------------------------------

| *INMATE* | *OFFICER* | *GROUP* |
|---|---|---|

--------------------------------------------------------------

| INMATE | OFFICER | GROUP |
|---|---|---|
| 1. Gives the setting | 1. Attends | 1. Position, observe, listen |
| 2. Role-plays 20-30 seconds | 2. Waits 30 seconds | 2. Write own responses |
|  | 3. Gives responses: "You're saying_____" "You look (it looks)_____" | 3. Rate officer's response. "Yes" if accurate, "No" if not accurate |
|  |  | 4. Rate officer's attending |

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# RESPONDING TO FEELING

## SESSION 10

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 10:
{REFER TO OVERHEADS 16 & 17}

16.    Given a multiple choice question, the student will choose the option which identifies the 2 steps in responding to feeling, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

17.    Given a multiple choice question, the student will choose the option which defines the term "Responding to Feeling," as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

*VIDEO TAPE:*

"Introduction to Responding to Feeling"

Time: 2:30

*INDIVIDUAL EXERCISE:*

1.    Tell students to read pp. 56-59 in Student Manual.

2.    Tell students to complete exercise on pp. 58 & 59.

*CLASS DISCUSSION:*

1.    Have class discuss the exercise on p. 58.

List two situations where it would be important and useful to defuse negative feelings.

*       Threat of physical harm
*       Severely depressed person

2.     Have the class discuss the exercise on p. 59.

3.     Take each of the five basic feeling words (happy, angry, confused, sad and scared) and write a high, medium and low intensity word for each.

<u>Feeling Words:</u>

|          | HIGH | MEDIUM | LOW |
|----------|------|--------|-----|
| Happy    | _____ | _____ | _____ |
| Angry    | _____ | _____ | _____ |
| Confused | _____ | _____ | _____ |
| Sad      | _____ | _____ | _____ |
| Scared   | _____ | _____ | _____ |

## VIDEO TAPE:

"The Appeal"

Time:  :27

## QUESTIONS AFTER VIEWING (From p. 60)

Did Officer Davis respond to the feeling correctly?

What other feeling word(s) would be appropriate?

## CLASS DISCUSSION:

1.     Ask the group if the response was accurate
2.     Ask the group for other feeling words.
3.     Ask the group about any positive benefits of responding to feeling.

## VIDEO TAPE:

"Going Home"

Time: :17

## QUESTIONS AFTER VIEWING (From p. 60)

Identify the feeling and intensity of the inmate's statement.

How would you respond (responding to feeling)?

## ROLE PLAY:

Have students do the class activity on p. 61.

| Communicator | Responder | Group |
|---|---|---|
| 1.Shares real problem | 1.Positions, observes listens | 1.Positions, observes listens |
| 2.Rates responses after group rating | 2.Pauses 10-20 seconds | 2.Writes own "You feel_____" |
| | 3."You feel____" | 3.Rate "Yes/No" on officer's response and why |
| | | 4.Give individual response to group |
| | | 5.Rate Yes/No on sizing up |

# RESPONDING TO FEELING

## {10}

Responding to feeling <u>is the ability to capture in words the specific feeling experience being presented by an inmate.</u>  By responding to, or reflecting back, the inmate's feeling, you show that you understand that feeling.  This encourages the inmate to talk, to release his feelings.

The two steps in responding to feeling are:

## THE ADD-ONS
Communicating With Inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
   * Reflect on feeling and intensity
   * Respond to feeling

------------------------------------------------------------------

## THE SECOND LEVEL OF RESPONDING:

------------------------------------------------------------------

Every person has feelings that affect what they say and do.  The nature and strength of these feelings usually determine what a person is going to do.  When you respond to an inmate's feeling, you are reaching inside the inmate and encouraging the individual to share personal feelings with you.  The skill of responding to feelings has important implications for the management of inmates.

RESPONDING at the next level reflects feelings:

"You feel_____"


*Understanding Can Defuse Bad Feelings:*

Showing you understand how an inmate feels can be even more powerful than showing
you understand the content of the inmate's actions and/or words.  Showing an inmate that
you understand negative feelings can usually defuse those negative feelings.  By
responding to feelings at the verbal or "symbolic" behavior level, you keep the inmate's
words from turning to action.  Also, responding to feelings at a verbal level can give you the
necessary clues to determine the inmate's intention.  If the inmate clams up after you have
responded to the inmate's feelings, the inmate is probably telling you that he or she is going
to act on them; on the other hand, if the inmate goes with it verbally, the inmate is telling
you that he or she wants to talk it out instead of acting on it.  You all know the difference
between a talking fight where the parties are looking for a way out ("Yeah!" vs. "Oh, yeah!")
and a real fight where the fists will be flying any second.


Greater Understanding:

Besides being able to defuse negative feelings so that words don't become actions,
responding to feelings leads to greater understanding of--and by--the inmate.  The inmate
can't always link up feelings with the situation and is often at a loss to understand where he
or she is.  In addition, when you respond to positive feelings, these feelings get reinforced
(unlike negative feelings).  There's nothing mysterious about this.  We don't enjoy our
negative feelings so we get rid of them by sharing them -- "talking it out".  But we do enjoy
our positive feelings.  They only become stronger when they're shared with another person.
You can begin to strengthen the positive feelings that will help an inmate to act more
positively simply by recognizing and responding to these feelings.  As a general rule, a
person who feels positive personally will try to do positive things while a person who feels
negative personally will try to do negative things.  If you push this out into a general
principle, you get something like "people tend to act in ways consistent with the way other
people see them."

If you put together an inmate's low self-image and the fact that others have a low image of
him as well, you can predict that the inmate will act accordingly, i.e. negatively.  Now you
can't pretend that an inmate is positive when obviously, the inmate is not.  However, if the
inmate feels positive or does something that is positive, then recognizing that will help.

## STUDENT EXERCISE:

List two situations where it would be important and useful to defuse negative feelings.

1._____

2._____

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### *Respond to Feelings:*

For responding to feeling, you position and posture yourself, then observe and listen.  Then you reflect for the feeling (happy, angry, sad, scared, etc.) and its intensity (high, medium, low).  Finally, you respond by saying, "You feel_____."  For example, "You feel angry."

### *Basic Types of Feelings:  Happy?  Sad?  Angry?  Scared?  Confused?*

Here the new skill involves reflecting for feeling and intensity.  Adding a new skill doesn't mean discarding the old skills, of course.  When reflecting for feeling, you are really asking yourself "Given what I see and hear, how does the inmate basically feel?"  Is the inmate happy, angry, sad, scared or confused?  The inmate's behavior and words will let you make a good guess at the feeling.  For example, an inmate who yells at another inmate, "You stupid idiot, look what you did to my bed!", while the inmate waves his or her arms and turns red in the face, is obviously feeling some level of anger.

## *Intensity of Feelings:  High?  Medium?  Low?*

After you have picked out the feeling word, you must reflect on the intensity of the feeling. For example, anger can be high in intensity (boiling mad), medium in intensity (frustrated) or low in intensity (uptight).  The more accurately your feeling word reflects the intensity, the more effective your response will be.  That is, your response will be more accurate and will do the job better, e.g., defuse the negative feelings.  You wouldn't choose "concerned" for the example given on the previous page because the term is too weak to describe an inmate yelling, turning red in the face and waving his or her arms around.  Such an understatement would probably only make the inmate more angry.  But "You feel furious", would fit fine.

## *STUDENT EXERCISE:*

Take each of the five basic feeling words (happy, angry, confused, sad and scared) and write a high, medium and low intensity word for each.

## *FEELING WORDS*

|  | HIGH | MEDIUM | LOW |
|---|---|---|---|
| Happy | _____ | _____ | _____ |
| Angry | _____ | _____ | _____ |
| Confused | _____ | _____ | _____ |
| Sad | _____ | _____ | _____ |
| Scared | _____ | _____ | _____ |

## *Summary of Video Scene:  "The Appeal"*

Inmate Carson is talking about the work he's done on his appeal; Officer Davis responds to Carson's feelings.

Questions After Viewing:

Did Officer Davis respond to the feeling correctly?

_____

What other feeling word(s) would be appropriate?

_____

*Summary of Video Scene: "Going Home":*

An inmate is talking about getting out soon.

*Questions After Viewing:*

Identify the feeling and intensity in the inmate's statement:

_____

_____

How would you respond (responding to feeling)?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

| *Communicator* | *Responder* | *Group* |
|---|---|---|
| 1. Shares real problem | 1. Positions, observes listens | 1. Positions, observes listens |
| 2. Rates responses after group rating | 2. Pauses 10-20 seconds | 2. Writes own "You feel_____" |
| | 3. "You feel____" | 3. Rate "Yes/No" on officer's response and why |
| | | 4. Give individual response to group |
| | | 5. Rate Yes/No on sizing up |

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# RESPONDING TO FEELING
# AND MEANING

# SESSION 11

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 11:
{REFER TO OVERHEADS 18 & 19}

18.    Given a multiple choice question, the student will choose the option which defines the term "Responding to feeling and meaning," as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

19.    Given a multiple choice question, the student will choose the option which identifies the appropriate time to refer the inmate to a mental health worker or other specialist, as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *VIDEO TAPE:*

"Introduction to Responding to Feeling and Meaning"

Time: :24

## *INDIVIDUAL EXERCISE:*

1.    Tell students to read pp. 62-66.

2.    Tell students to complete the exercise on p. 65.

## *CLASS DISCUSSION:*

Have class discuss the exercise.

    a.    An inmate had been a "snitch" for a particular officer until the
          day the inmate suspected that word had leaked out about his
          activities.  He confronted the officer, his eyes narrowed and his
          hands trembling.  "You rotten fink!  You promised me you
          wouldn't give me up!  Now they know about me.  You really
          screwed me over!"

    b.    Identify the intensity and category of this feeling and pick an
          accurate "feeling" word to describe the inmate's emotion.

_____

_____

    c.    Now supply the reason for the inmate's feeling.  What does this
          situation really mean to him?  Who is he blaming?  Why is all of
          this so important to him?  To understand what's going on, you
          have to forget that you may not have leaked anything; forget
          that you had your reasons if you did tell someone; forget the
          inmate's words and tone and language.  What does this mean to
          him?  Recognizing the meaning, formulate a response.

          RESPONSE TO FEELING AND MEANING:

"You feel_____because_____

_____

## *VIDEO TAPE:*

"The Writ"

Time:  :32

An inmate is talking about the writ he's been working on for some time.

## *QUESTIONS AFTER VIEWING* (From p. 67)

Identify:

    Feeling_____

    Intensity_____

    Reason for Feeling_____

Who is responsible for the inmate's feeling?

How would you respond to this inmate (responding to feeling and meaning)?

## *VIDEO TAPE:*

"The New Job"

Time:  :26

An inmate is talking about a job request he made awhile ago.

## *QUESTIONS AFTER VIEWING* (From pp. 67-68)

Identify:

    Feeling_____

    Intensity_____

    Reason for Feeling_____

Who is responsible for the inmate's feeling?

How would you respond to this inmate (responding to feeling and meaning)?

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *VIDEO TAPE:*

"The Transfer"

Time:  :20

Officer Juan Lopez asks Officer Jim Wilson about how long it took him to get a transfer. Juan says he's been waiting quite a while.

## *QUESTIONS AFTER VIEWING* (From p. 68)

Identify:

Feeling_____

Intensity_____

Reason for Feeling_____


Who is responsible for the officer's feeling?

How would you respond to this officer (responding to feeling and meaning)?


## *VIDEO TAPE:*

"The Appeal"

Time:  :22

An inmate is talking about the work he's done on his appeal.

## *QUESTIONS AFTER VIEWING* (From p. 69)

Identify:

Feeling_____

Intensity_____

Reason for Feeling_____

Who is responsible for the inmate's feeling?

How would you respond to this inmate (responding to feeling and meaning)?

## *VIDEO TAPE:*

"Going Home"

Time: :17

An inmate is talking about getting out soon.

## *QUESTIONS AFTER VIEWING* (From p. 69-70)

Identify:

     Feeling_____

     Intensity_____

     Reason for Feeling_____

Who is responsible for the inmate's feeling?

How would you respond to this inmate (responding to feeling and meaning)?

## *ROLE-PLAY*

Have students do the class activity on p. 71.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *EXERCISE # 1*

----------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|

----------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|
| 1. Gives real stimulus | 1. Positions, observes, listens | 1. Position observe listen |
| 2. Gives spontaneous reply following each each response | 2. Pause 10-20 seconds | 2. Write down own response |
| 3. Rates responder after group rating | 3. Gives response: | 3. Rate:"Yes/No" last response If no, Why? |
| | 4. Pause 10-20 seconds | 4. Give individual response to group |
| | 5. Gives response: "You feel_____ because_____." | 5. Feedback on sizing up |

----------------------------------------------------------------

## *EXERCISE # 2*

-----------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|

-----------------------------------------------------------------

<u>Trainer: Stop interchange if two in a row are off and restructure.</u>

| Communicator | Responder | Group |
|---|---|---|
| 1. Gives stimulus | 1. Positions, observes, listens | 1. Position, observe, listen |
| 2. Give feedback | 2. Pauses 10-20 seconds | 2. Writes own response |
| | 3. Responds: "You feel _____" | 3. Rates helper "Yes/No" in each response |
| | 4. Pauses 10-20 seconds | 4. Give individual response |
| | 5. Responds: "You feel_____ because_____" | 5. Feedback on sizing up |

-----------------------------------------------------------------

# RESPONDING TO FEELING AND MEANING

## {11}

Responding to feeling and meaning combines the two previous skills.  Responding to feeling and meaning _requires you to paraphrase the content of an inmate's statement in such a way as to provide a meaningful reason for the inmate's feeling._

The two steps in responding to feeling and meaning are:

THE ADD-ONS:
Communicating With Inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
3. Responding to feeling and meaning
  * Reflect on feeling & reason
  * Respond to feeling & meaning

_THE THIRD LEVEL OF RESPONDING:_

_Meaning is the Reason for the Feeling:_

Learning how to respond to content and how to respond to feeling has prepared you to respond to feeling and meaning.  Now your responses at this new level can put everything together.  Here you will capture effectively where the inmate is at the moment.

By adding the meaning to the feeling, you will help yourself and the inmate understand the reason for his feelings about the situation.  The reason is simply the personal meaning for the inmate about what is happening.  For example, an inmate in danger of being pulled into a fight when his record is clean and his parole is due, might feel "scared" because "the fight could blow my chances to get out."  The personal meaning of the potential fight for this inmate is that it might blow his chances for parole.  That is one reason why he is scared.

RESPONDING at the highest level reflects both feeling and meaning.
"You feel_____because_____."

By putting together the feeling and meaning and responding to both, you show the inmate you understand the present experience for the inmate.  This increases the chances of the inmate talking to you about the thing in which you are interested.  In addition, for interrogation purposes, you will be able to learn more about what the inmate values and fears so that you can get a handle on the inmate and, if necessary, use the values and fears to apply pressure in order to manage the inmate.  For example, one officer might be confronted with a hostile inmate who is refusing to let the officer shake down the inmate's cell.

Inmate:          "No way.  You're not going to shake this cell down because
                 some snitch told you some crap.  There's nothing in here."

Officer:         "You feel angry because we're going to mess up your cell when
                 there's nothing there."

Inmate:          "That's right.  I knew some damn snitch was going to run to you
                 to get me, but I told all the guys that I'm not going to let nobody
                 in here for no good reason."

Officer:         "You feel tense because your reputation is on the line and
                 you're gonna' make us take you out even if it costs you."

Inmate:          "That's right, man."  (Then yells to other inmates), "You ain't
                 taking me."

By now the officer has the picture.  This inmate has backed himself into a corner with his peers and now he can't give up.  The officer wisely clears the cells immediately around the inmate's cell and then tells the inmate that they are going to take him out physically so everybody can see but that there's going to be no rough stuff.  The responding gave the officer enough extra information to avoid a confrontation.

In another situation, an inmate asks the officer a question about his work detail.

Inmate: "Why do I have to be in the kitchen? The steam and the odors suffocate me."

Officer: "You feel concerned because the conditions over there are hard for you to work in."

Inmate: "Yeah. I get this heavy feeling in my chest and I begin to wheeze after about thirty minutes. I know the kitchen supervisor thinks I'm running a game, but man, I need to get out of there!"

Officer: "You feel worried about your situation because you think something is wrong in your chest that the smells in the kitchen make worse and you can't convince the detail supervisor that you're leveling with him."

Inmate: "Right, it's getting worse, all the time and I don't know what to do."

Officer: How about going to the infirmary in the morning to get it checked? The doctor can authorize a work detail change if there is evidence that your condition needs it."

The officer understands clearly where the inmate is in the situation, where he wants (or needs) to be and is able to suggest a possible solution. This became possible because he was able to attach an understanding of meaning to the feelings of the inmate.

## *Respond to Feeling Plus Meaning:*

What we need to focus on here, of course, is an inmate's reason (personal meaning) for his or her feeling. Supplying the reason means you must understand why what happened is important.

You do this by rephrasing the content in your own words to capture that importance. You are actually giving the reason for the feeling. In this way, you make the inmate's feeling clearer and more understandable. It is also important to capture whether the inmate feels personally responsible or sees someone else as responsible. Your response should reflect where the inmate sees the responsibility in the beginning, even though you may not agree. By doing this you will have a better chance of opening the inmate up. You can always disagree when it becomes necessary and effective to do so.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*STUDENT EXERCISE:*

An inmate had been a "snitch" for a particular officer until the day the inmate suspected that word had leaked out about this activity.  The inmate confronted the officer with narrowed eyes and hands trembling.

"You rotten fink!! You promised you wouldn't rat!  Now they know about me.  You really screwed me over!"

Identify the intensity and category of this feeling and pick an accurate "feeling" word to describe the inmate's emotion:

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

Now supply the reason for the inmate's feeling.  What does this situation really mean to the inmate?  Who is the inmate blaming?  Why is all of this so important to the inmate?  To understand what's going on, you have to forget that you may not have leaked anything; forget that you had your reasons if you did tell someone; forget the inmate's words and tone and language.  What does this mean to the inmate?  Recognizing the meaning, formulate a response.

RESPONSE TO FEELING AND MEANING:  "You feel_____ because_____."

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

*EXPLANATION:*

The officer who was actually involved knew how to initiate communication with an inmate in a tense situation like this -- and he recognized that failure to do so could mean real trouble.

He knew that the inmate's basic feeling was anger.  He knew that the intensity of this feeling was high and that the inmate was really furious.  He knew that the inmate was blaming him for risking his life -- the real meaning of the situation for the inmate.  Knowing all of this, the officer was able to respond effectively to the inmate's feeling and to what his feeling meant.

*"You feel furious because I put your life in danger."*

This response caught the inmate flat-footed. He had expected the officer to either deny everything, to tell him to shut his mouth, or to ignore the whole thing. He certainly hadn't expected the officer to respond to his situation at the same level that he, the inmate, was experiencing it!!

Because the officer knew how to respond at this level, he was able to keep the inmate talking openly. In a tense situation, this can mean the difference between effective management and genuine danger!

*Referral:*

When responding to feeling and meaning, a communication interchange may sometimes go deeper than you feel you can handle. If this happens, you must consider the option of a referral. With your added understanding, your referral will be that much more specific and beneficial. Many times your added understanding will provide you with the information you need to really manage the inmate. The payoff for you and the inmate will be rewarding. Many officers put in their time with the inmates but don't get the payoff because they lack some of the skills needed to finish off the good start that they make by being decent and fair. Responding is one way to ensure the payoff.

Practice your responding skills with inmates with whom you have been communicating. When you practice the skill, don't just give one response and say to yourself, "Well, I did it." Keep using your responding skills over and over again when you are trying to understand the inmate. When you feel he has said all he is going to say, or when you know all you need to know, then you can take action. Be careful about giving advice too soon. A lot of times an inmate will hold back part of the problem until it becomes apparent how you will react. If you tell the inmate what to do too early, it may not be good advice.

*Summary of Video Scene: "The Writ"*

An inmate is talking about the writ he's been working on for some time.

*Questions After Viewing:*

Identify

Feeling:_____

Intensity:_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

*Summary of Video Scene: "The New Job"*

An inmate is talking about a job request he made awhile ago.

*Questions After Viewing:*

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

*Summary of Video Scene:  "The Transfer"*

*Questions After Viewing:*

Officer Juan Lopez asks Officer Jim Wilson how long it took him to get a transfer.  Juan says he's been waiting quite awhile.

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the officer's feeling?

_____

How would you respond to this officer (responding to feeling and meaning)?

_____

_____

*Summary of Video Scene:  "The Appeal"*

An inmate is talking about the work he's done on his appeal.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *Questions After Viewing:*

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the officer's feeling?

_____

How would you respond to this officer (responding to feeling and meaning)?

_____

_____

## *Summary of Video Scene: "Going Home"*

An inmate is talking about getting out soon.

## *Questions After Viewing:*

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

## *EXERCISE # 1*

------------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|

------------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|
| 1.Gives real stimulus | 1.Positions, observes, listens | 1.Position observe listen |
| 2.Gives spontaneous reply following each each response | 2.Pause 10-20 seconds | 2.Write down own response |
| 3.Rates responder after group rating | 3.Gives response: | 3.Rate:"Yes/No" last response If no, Why? |
| | 4.Pause 10-20 seconds | 4. Give individual response to group |
| | 5.Gives response: "You feel_____ because_____." | 5.Feedback on sizing up |

------------------------------------------------------------------

## EXERCISE # 2

------------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|

------------------------------------------------------------------

<u>Trainer:  Stop interchange if two in a row are off and restructure.</u>

| Communicator | Responder | Group |
|---|---|---|
| 1.Gives stimulus | 1.Positions, observes, listens | 1.Position, observe, listen |
| 2.Give feedback | 2.Pauses 10-20 seconds | 2.Writes own response |
| | 3.Responds:"You feel _____" | 3.Rates helper "Yes/No" in each response |
| | 4.Pauses 10-20 seconds | 4.Give individual response |
| | 5.Responds: "You feel_____ because_____" | 5.Feedback on sizing up |

------------------------------------------------------------------

OHIO PEACE OFFICER TRAINING COMMISSION       TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# ASKING QUESTIONS

# SESSION 12

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 12:
{REFER TO OVERHEAD 20}

20.     Given a multiple choice question, the student will choose the option which identifies the 3 techniques used in asking questions as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *VIDEO TAPE:*

"Introduction to Asking Questions"

Time: 2:54

## *INDIVIDUAL EXERCISE:*

1.     Tell students to read pp. 73-77 in Student Manual

2.     For each of the following situations, first make a response and then ask an appropriate question.

    a.     You have found an inmate with lots of extra "goodies" in his cell. You know he couldn't have enough commissary money of his own to purchase all that stuff. When you inquire about the "goodies," the inmate says the following:

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

"Jesus, man! Can't a fellow buy some things without being persecuted? I used my commissary money to buy these things. I've been saving these goodies for a while. You just haven't looked before. A guy can't even take care of himself here. Why don't you find something else to do?" (From p. 76)

Respond:     "You feel_____"
                 because_____."

Question: (5WH):"_____
                       _____."

b.     "I know I'm stuck on the stuff. I know it's killing me." (From p. 76)

Respond:     "_____
               _____."

Question: (5WH):"_____
                       _____."

c.     "School is really moving. I read my first novel the other day. Really good stuff. I never knew reading could be exciting." (From p. 76)

Respond:     "_____
               _____."

Question: (5WH):"_____
                       _____."

## *VIDEO TAPE:*

"The Fight"

Time:  :31

Officer Donelli is questioning inmate Joe Carson about a fight that took place earlier in the yard.

## *QUESTIONS AFTER VIEWING* (From p. 78)

What does Officer Donelli learn from this exchange?

How could the officer improve his questioning techniques?

## *VIDEO TAPE:*

"Another Fight"

Time:  :54

Officer is questioning inmate Lincoln about the same fight which took place earlier in the yard.

## *QUESTIONS AFTER VIEWING* (From p.78)

What does Officer Donelli learn from this exchange?

Where in his questioning does he use responding skills?

Where in his questioning does he use the 5WH technique?

## *VIDEO TAPE:*

"The Stolen Letter"

Time:  1:09

An inmate is upset about a letter stolen from his cell.  Officer Wilson questions him, trying to find out exactly what happened and how much the inmate knows.

## QUESTIONS AFTER VIEWING (From p.79)

What does Officer Wilson learn from this exchange?

Where does he respond to the content of the inmate's statements?

Where does he respond to the feeling and meaning of the inmate's statement?

Where does he use the 5WH technique?

What has the officer accomplished through this communication?

## ROLE PLAY:

--------------------------------------------------------------

| Inmate/Staff | Communicator | Group |
|---|---|---|
| 1. Role-plays or real stimulus | 1. Positions, observes, listens | 1. Position observe, listen |
| 2. Reacts to responses & answers questions | 2. Pause & respond | 2. Reflects own re-sponse & questions |
| 3. Give feedback | 3. Ask question after reflecting (5WH) | 3. Rates officer reflecting |
| | 4. Pause, reflects & responds again on answer to question | 4. Question attached to reflection "Yes/No" |
| | | 5. Present each response & question |
| | | 6. Feedback on sizing up |

# ASKING QUESTIONS

## {12}

You ask questions in order to get useful answers.  Some questions get better answers than others:  the skill of asking questions will help you increase your information and enhance your ability to manage inmates well.

The three techniques in asking questions are:

## THE ADD-ONS:
Communicating with Inmates

Asking Questions

1. Using the 5WH method
2. Thinking about what was said
   or not said
3. Responding to the answer

Responding

As the following materials make clear, there are really three basic steps involved in asking relevant questions in an effective way.  <u>First</u>, you must develop one or more questions of the "5WH" type: Who, What, Where, When, Why and How.  <u>Second</u>, you must think about the answer or answers given by the inmate to make sure you fully understand all the implications.  <u>Third</u>, respond to the inmate by reflecting back his/her answer.

Asking questions will help you manage an inmate.  If an inmate answered our questions, we would be all set. After all, we have all the right questions.  The reality, however, is that for a variety of reasons (e.g., lack of trust, the inmate's own guilt) the inmate does not answer many questions.  In fact, questions will sometimes have the opposite effect.  That is, they will shut off communication with inmates rather than open it up.  This is because questions are often seen as the bullets of the enemy ("Cover up, here they come").  The only way questions can be really effective in opening up an inmate is when they are used in addition to the basic skills plus responding.

## *Use the Basics, Plus Responding:*

Use of the basics plus responding can get an inmate to the point where there can be open communication. It is then that questions can make their contribution by getting some of the necessary specifics (who, what, when, where, why and how -- the 5WH system)

_____

## *THE FIRST STEP IN ASKING QUESTIONS:*

Asking 5WH Questions:  Answers to questions will give you the detail you need to manage inmates effectively.  The more details you know, the better you can understand what is going on.  You always want to know who is involved, what they are doing or going to do, when and where something happened or will happen, how it's going to be done or how it was done, and why it did or will take place.

## *5WH:*

"Where were you?"
"Who were you with?"
"Why were you there?"
"What did you actually do?"
"When did all this happen?"
"How was it handled?"

_____

## *THE SECOND STEP IN ASKING QUESTIONS:*

Thinking About What Was Said or Not Said:  It's not enough just to ask good questions. You also have to be able to make sense out of the answers you get (and recognize as well, perhaps, the answers you're still not getting).  An inmate may be leveling with you and giving you the information you need to manage things or even to provide assistance.  The inmate may be leveling with you as best that is possible but perhaps not giving you all the information you need.  The inmate may be covering something up, which means he/she is still not fully open, still not really communicating with you.

_____

*How Does the Inmate Look?   What's The Inmate Doing?*
*What Did the Inmate Say?   What Didn't the Inmate Say?*

In thinking about the inmate's answer to you question, you can consider four specific things:
How the inmate looks upon answering (relaxed, uncomfortable); What is the inmate doing
when answering (facing you and making eye contact; looking away; looking down at the
ground); What the inmate actually said (the informational content of the answer); What the
inmate may have failed to say (any "gaps" in the way the answers fit with your questions).
By reflecting on these four areas of concern, you can make sure that you fully understand
all the implications of the inmate's answer.  Once you've responded to this answer, you can
ask additional questions to get the rest of the information you need.

_____

*THE THIRD STEP IN ASKING QUESTIONS:*

<u>Responding to Answers:</u>  Responding to answers means reflecting back to the inmate what
he or she has said in terms of content, feeling and/or meaning -- all the skills you learned
previously.  Responding opens up the inmate and gives you a chance to make sure you
understand what is being said.  It also builds up trust with the inmate.  For these reasons,
you should always try to respond to an inmate's actions or words at the highest possible
level before and after you actually start asking questions.  Questions then fill in the details
of the picture.  Often details (reasons) come from responding skills alone.  If they do not,
questions are appropriate.  It's as simple as that.
_____

*STUDENT EXERCISE:*

For each of the following situations, first make a response, then ask an appropriate
question.

a.      *You have found an inmate with lots of extra "goodies" in his cell.  You know he*
        *couldn't have enough tickets of his own to purchase all that stuff.  When you inquire*
        *about the "goodies" the inmate says the following:*

        *"Jesus, man, can't a fellow buy some things without being persecuted?  I*
        *used my tickets to buy these things.  I've been saving these tickets and*
        *goodies for awhile.  You just haven't looked before.  A guy can't even take*
        *care of himself here.  Why don't you find something else to do?"*

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

b.    *"I know I'm stuck on the stuff.  I know it's killing me."*

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

c.    *"School is really moving.  I read my first novel the other day.  Really good stuff.  I never knew reading could be exciting."*

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

## *EXAMPLE:*

Let's imagine that you're talking with a young inmate who hasn't been inside too long. You've recognized that he's really scared stiff because of the way other inmates have been pushing him around.

You've been able to respond to him at the level of feeling and meaning: "So you really feel terrified because these guys just want to take you right over."  Now you're set to ask a question.  "Who are the guys that have been hassling you the most?"

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

The inmate looks around quickly, then looks down at his feet.  When his answer comes, it is given in a low, unclear voice.  "Oh, just some of the guys in the yard."

You look at his appearance and see he's really uptight.  He won't look you in the eye--he won't even speak up in a clear voice.  On top of this, he's answered your question with only the vaguest kind of information.  In the end, his answer leaves out far more details than it includes.  Upon reflection, you realize that the guy is not only scared in general but is really frightened right now in case some of the inmates who have been after him should catch him talking to you.  In other words, your reflecting lets you know that this isn't a guy who's trying to play it smart with you.  He's not clamming up on purpose.  Instead, he's just living in fear right there in front of you.  Realizing all of this, you're able to respond even more fully and immediately to him.

"You're scared stiff right now because whoever's hassling you might get wind of us talking together."

The inmate looks up, surprised.  He didn't know any officer could really see and hear him as he actually is.  You've just grown about six inches in his eyes--maybe to the point where you suddenly seem stronger than the threat of those inmates who have been hassling him!  Instead of clamming up, the young inmate keeps on talking, answering your next questions more fully, which is just what you want him to do.  Because in the end, you know you can gain his confidence and learn the information you need to get.

_____

## Summary of Video Scene:  "The Fight"

Officer Donelli is questioning Inmate Joe Carson about a fight that took place earlier in the yard.

## Questions After Viewing:

What does Officer Donelli learn from the exchange?

_____

_____

How could the officer improve his questioning technique?

_____

_____

## Summary of Video Scene:  "Another Fight"

Officer Donneli is questioning Inmate Lincoln about the same fight which took place earlier.

## Questions After Viewing:

What does Officer Donelli learn from the exchange?

_____

_____

Where in his questioning does he use responding skills?

_____

_____

Where in his questioning does he use the 5WH technique?

_____

_____

## Summary of Video Scene:  "The Stolen Letter"

An inmate is upset about a letter stolen from his cell.  Officer Wilson questions him, trying to find out exactly what happened and how much the inmate knows.

What does Officer Wilson learn from this exchange?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Where does he respond to the content of the inmate's statements?

_____

_____

Where does he respond to the feeling and meaning of the inmate's statement?

_____

_____

What has the officer accomplished through his communication?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

---------------------------------------------------------------

| *Inmate/Staff* | *Communicator* | *Group* |
|---|---|---|

---------------------------------------------------------------

| | | |
|---|---|---|
| 1.Role-plays or real stimulus | 1.Positions, observes, listens | 1.Position observe, listen |
| 2.Reacts to responses & answers questions | 2.Pause & respond | 2.Reflects own response & questions |
| 3.Give feedback | 3.Ask question after reflecting (5WH) | 3.Rates officer reflecting |
| | 4.Pause, reflects & responds again on answer to question | 4.Question attached to reflection "Yes/No" |
| | | 5.Present each response & question |
| | | 6.Feedback on sizing up |

# SUMMARY OF THE ADD-ONS

## SESSION 13

There are no specific objectives for this session.  This is a review of Sessions 8 through 12. As a start, have students read the "Summary of the Add-Ons" on pp. 81-82 of the Student Manual.  Ask questions to ascertain that they understand and can use the skills.

# SUMMARY OF THE
# ADD-ONS

## {13}

Jimmy was an inmate whom everyone -- officers and other inmates alike -- invariably referred to as "a bad mother." There was a lot of respect in this phrase. You learned respect around Jimmy. How could you help it? He was 6'5", 275 pounds and a former sergeant in the Green Berets. To top it off, he had a temper like a bear just coming out of hibernation and found the ground still frozen solid!

Jimmy didn't like officers. In his time he'd sent more than a few to the hospital. By now the officers had figured out a drill. When they wanted Jimmy out of his cell, six of them went in and brought him out. Even then it wasn't easy. He just naturally loved to crack heads: a "bad mother".

One day a new officer came on duty. The old hands were happy to show him around. "Listen," they said, "you gotta' meet Jimmy."

"Jimmy?" The new guy didn't have a whole lot of experience on the job but he knew a set-up when he saw one. "Who's he? What's his story?"

Half a dozen seasoned officers accompanied the new man to Jimmy's cell, grinning and nudging each other. Oh, they wouldn't let the new guy get hurt or anything. But it sure would be something to see his face when Jimmy tried to crush his head like a grapefruit!

"Hey, Jimmy--you got someone to see you," one of the officers told the huge inmate, unlocking the cell and moving back quickly.

Jimmy's only answer was a grunt. He had been sleeping. Now he emerged slowly from his cell, scowling and rubbing his eyes.

"What do you miserable creeps want now? Man, I'm gonna' tear you into small pieces if you come close enough!" His eyes focused on the new guy for the first time. "What this, some kinda' bait or somethin'?"

The older officers expected the new guy to back off when he saw Jimmy tower over him. Instead, the new officer stuck out his hand.

"I'm Ben," he said. "I guess you're really ripped at us because we just barged in on you."

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

The other officers saw Jimmy's brow furrow.  He'd been about to swing and they'd been all tensed up to jump in.  But now Jimmy seemed unsure.  He didn't shake, but neither did he swing.

Then his face cleared.  In another moment he flung his head back and laughed out loud.

"Whoooeee!"  He calmed down at last and looked at the new guy.  "I knew it!  I knew if I just hung around this place long enough they'd have to send a real man to handle me!"

That was all.  In choosing to initiate communication instead of using force, the new officer had taken Jimmy off guard.  This was a new approach.  More than that, it was an indication to an inmate full of anger and hostility that maybe there still were people out there who could talk to him--even listen to him.  That knowledge made all the difference in the world to Jimmy!

What enabled the new officer to make this kind of difference, of course, was his communication skills--in particular, responding.  These are the same skills you yourself have begun to master.

In the first section of this manual, you learned the skills you need to size up the situation. Now, working through this second section, you've learned the skills you need in order to initiate meaningful communication to improve your management responsibilities--the skills involved in responding and asking questions.  These skills are designed to help you manage inmates by communication.  Now it's time to move on--to go beyond sizing up and communicating and consider what's involved in really controlling the situation.  We'll concentrate on this topic and the skills it requires in the final section of the manual.



The Applications:

Controlling
Behavior

The Add-ons:

Communicating with
Inmates

The Basics

Sizing Up the
Situation

# THE APPLICATIONS: CONTROLLING BEHAVIOR

## SESSION 14

### STUDENT PERFORMANCE OBJECTIVE FOR SESSION 14:
{REFER TO OVERHEAD 21}

21.     Given a multiple choice question, the student will choose the option which identifies 2 of the 3 applications skills used in controlling behavior, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

*VIDEO TAPE:*

"Introduction to the Applications: Controlling Behavior"

Time: 1:39

*INDIVIDUAL EXERCISE:*

1.     Tell students to read pp. 83-87 in the Student Manual.

2.     Have them complete the exercise on p. 87.

*CLASS DISCUSSION:*

Why is control important for inmate management?

What does an inmate gain when he or she learns to control personal behavior?

# THE APPLICATIONS:
# CONTROLLING BEHAVIOR

## {14}

The application skills combine the basic and the add-on skills, and are aimed at controlling inmate behavior.  These skills are important in helping you maintain control and manage inmates well.

The Applications include three specific skills:

## THE APPLICATIONS:
Controlling Behavior



An officer whose responsibility was to control 100 inmates in a unit had many assignments to delegate, many requests to answer and many orders to give inmates on almost each shift.  He consistently interrupted "bull" sessions and "rap" groups to give orders to inmates. His usual approach to inmates was to be very direct in his behavior--no social amenities.  A typical request was made by simply interrupting a group or an inmate's sleep by saying, "Watson, we need to get this area policed up, go grab a mop and get with it."  If something unusual was needed, there was never an explanation or reason, just the order.  Inmates grew to resent this of the officer and complained.  The officer successfully defended his behavior on the grounds that this was no "country club' and that to be courteous would be to demean his authority.  He would lose respect by being so "candy" in the way he appeared to the inmates.  Respect grows of toughness was his philosophy.  If inmates approached him with concerns, they were normally handled in an abrasive manner.  No reasons were given if requests were denied.  The officer wanted a reputation as a no-nonsense officer who does not coddle persons who couldn't make it on the street without breaking the law.  The officer was a victim of the depression era and had managed to get where he was without acting in immoral ways.

If inmates completed tasks willingly or initiated helpful ideas, his attitude was either that was what is expected of them or that they were just setting up a "con." The atmosphere in his unit was tense although the "lid" was always on. He was a severe disciplinarian. His reputation as tough was widely known. He even made things tough on new officers who sometimes tried to communicate with inmates or brought up new ideas that they learned at the Staff Training Center.

One evening after chow, four inmates unbolted the motor which was used to drive the ventilation fan or top of the unit and let it drop on the roof of the office outside the unit while this officer was filling out his log book. The motor crashed through the roof and completely severed the officer's desk. Weighing 600 lbs., it was meant to crush the officer as he worked. Fortunately for him, he had turned from his work at his desk momentarily when the motor struck. The message that was communicated was clear to the institutional administration. Although the perpetrators were never found, the officer's supervisors had the good sense to transfer the officer to other correctional duty. It is uncertain whether he ever got the message.

## *What Went Wrong?*

This is just one of hundreds of stories which make a similar point; not all the ways in which officers try to control inmates are good; some are actually dangerous and more than a few have proven disastrous. Many ineffective methods of control have been based on the myths and folktales passed down through different generations of correctional workers. The problem with the majority of these is that they treat anything other than a show of pure force as a sign of official weakness. Yet the fear of looking fearful in the eyes of inmates has actually caused many officers to take greater risks -- like the officer in the story quoted above. One thing is certain; as soon as an officer begins to develop effective interpersonal management skills, he begins to experience the real reward of being able to control situations with less tension, less force--and a lot less risk to himself!

But, let's go back to the story for a moment. There are a number of things the officer could have done to avoid creating the situation into which he forced himself.

For one thing, he could have consistently used the basic sizing- up-the-situation skills we covered in Section I. By using these skills - and especially those involving observation and listening - he would have had a far more complete understanding of the situation among his hundred inmates. Even more importantly, of course, he could have responded to his inmates. This, more than anything else, would have let them know - in constructive rather than antagonistic terms - that he was really aware of each and every one of them. Yet, even effective use of basic skills plus use of communicating skills would probably not have been enough. This officer, like every officer, needed specific, yet constructive, ways of

controlling inmate behavior.  This section of the manual will outline a number of such ways - the "applications" which any officer should have open to him.

## Control is the Key:

Controlling behavior simply means taking charge.  This is what it's all about in an institution. Without the ability to control behavior, all the other efforts are wasted.  An officer has to do everything possible to ensure appropriate behavior, first in the officer's own interests as well as those of the institution and in the interest of the inmate.  The same holds true for the inmate.  Learning to control personal behavior leads to a secure institution.  Inmate self-control leads the inmate to success.  Without control, nothing productive can occur.

At the individual level there can be great frustration among the correctional staff; officers cannot and will not work well where inmates are poorly controlled.  Lack of self-control among inmates is demonstrated in murder, suicide, drugs, etc.  The uncontrolled individual cannot do the constructive things that lead to success.  If the inmate doesn't die, then it is most likely that he or she will return to prison again.  The inmate is doomed to make the same mistakes over and over again.  This costs the inmate, it costs society and it usually costs the officers of our prison system who are charged with controlling the behavior of inmates who can't control their own behavior.

This section of the manual builds on previous sections.  It is about the how's of controlling behavior by using good management skills.  What, then, are the necessary skills?

In this final section of the manual we will take a close look at three different areas of skills. These skills are dealt with here as "applications" because they really represent the specific ways in which you can apply all of the other skills you've developed in order to manage and control inmate behavior in the most effective possible manner.

— — — — — — — — — — — — — — — —

## THREE APPLICATION SKILLS:

Handling Requests
Making Requests
Reinforcing Behavior

Unlike the earlier skills in Sections I and II, these three areas are not all cumulative.  That is, you will normally be involved at any given time in either handling an inmate's request or making a request of you own.  In either situation, however, you will want to reinforce the inmate's subsequent behavior--positively if you want him to keep doing a particular thing

and negatively if you want to keep him from doing something.  Before going any further, let's take a look at a couple of these skills in action.

## Example:

Here is a situation, quite routine, where an officer demonstrates skill in management.  It could be handled much differently with more negative outcomes.  It involves both the officer making a request of the inmate and, in turn, the inmate making a request of the officer.

Officer:     "Larry, I'd like you to switch your recreation period with Jim for the next two weeks because Jim has been having problems with his neck and can't lift those buckets."

Inmate:     Is it okay with you if I try to get someone else to do it?  I'd like to keep my schedule as it is since I can be with most of my friends on the yard at the time I have now."

Officer:     "I'm sorry, Larry, I know that would upset your schedule but I can't use anyone else since you are the only one that can switch in your unit.  I've already checked it out with the other guys.  It will only be until Jim's neck gets better or we transfer him to another dorm."

Inmate:     "Why do you always pick on me?  I'm always the one who gets screwed on these deals."

Officer:     "I know this irritates the hell out of you because it will interrupt your routine but it's the best I can do right now.  Please report to the work detail at 10:00 a.m. tomorrow instead of 2:00 p.m., Okay?"

## Control Through Skill, Not Force:

The officer in this case used his skills to control his situation.  He didn't demean or put down, he didn't use sarcasm.  You will observe, however, that included in his skills were firmness and reasons for his actions.  There was no weakness.  The inmate now knows what he is expected to do and why.  The officer was even able to continue to be responsive to the inmate when the inmate became irritated.  This use of skill gets that job done and increases the probability that the inmate will feel he has been treated fairly even if he has to have his routine interrupted.  Quite a contrast when you think about how the other officer might have handled it.

OHIO PEACE OFFICER TRAINING COMMISSION
CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

Why is control important for inmate management?

_____

_____

_____

_____

What does an inmate gain when he learns to control his own behavior?

_____

_____

_____

_____

# HANDLING REQUESTS

## SESSION 15

### STUDENT PERFORMANCE OBJECTIVES FOR SESSION 15:
{REFER TO OVERHEAD 22 & 23}

22. Given a multiple choice question, the student will choose the option which identifies the 2 steps in handling requests as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

23. Given a multiple choice question, the student will choose the option which identifies 2 of the 3 reasons for giving an inmate an explanation for an officer's response, as they are given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

### VIDEO TAPE:

"Introduction to Handling Requests"

Time: 1:56

### INDIVIDUAL EXERCISE:

1. Tell students to read pp. 89-93 in the Student Manual.

2. Have students complete exercises on pp. 91 & 93.

### CLASS DISCUSSION:

1. Have class discuss the exercise on p. 91.

   Inmate Request: "Officer Smith, I feel sick. My stomach is real upset and I've been sweating more than usual. Can I go over to the infirmary?

2. What skills would be important to use in this situation?

3. What rules or regulations must be considered?

OHIO PEACE OFFICER TRAINING COMMISSION        TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

4.      Another inmate makes this request five minutes before count:

        Inmate Request:  "Officer Smith, may I run over to "C" Compound?  I left my radio in the recreation area and it will be ripped off if I don't get it."

5.      What skills would be important to use in this situation?

6.      What rules or regulations must be considered?

        By knowing which of the sizing up and communicating skills to use, you can ensure that you really know what's happening with a particular inmate who has a request.  By reviewing the appropriate rules and regulations, you'll have a good idea of whether the inmate's request is or is not legitimate.  Now you're ready to respond to the request itself.

7.      Have class discuss the exercise on p. 93.

        List four legitimate requests inmates could make.

        What are four non-legitimate requests?


*VIDEO TAPE:*

"Second Helpings"

Time:  :41

Inmate Jones is headed through the chow line when he's stopped by Officer Donelli.  The inmate asks for another helping of pizza and Donelli denies the request.

*QUESTIONS AFTER VIEWING* (From p. 94)

What skill did Officer Donelli use in denying this request?

What is the effect on the inmate of using this skill?

OHIO PEACE OFFICER TRAINING COMMISSION — TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *VIDEO TAPE:*

"The Library Pass"

Time:  :17

An inmate asks Officer Andrews for a library pass five minutes before count.

## *QUESTIONS AFTER VIEWING* (From p. 94)

What circumstances of this situation would affect Officer Andrews' response?

Respond to this inmate's request, giving a reason for your response.

## *VIDEO TAPE:*

"The Legal Paper"

Time:  :27

An inmate asks Officer Davis to drop off something for him on her way out of the institution.

## *QUESTIONS AFTER VIEWING* (From p. 95)

What special circumstances could affect Officer Davis' response?

Respond to this inmate's request, giving a reason for your response.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)
CORRECTIONS BASIC TRAINING CURRICULUM

## *ROLE PLAY:*

------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|

------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|
| 1.Gives set to group | 1.Positions, observes & listens | 1.Positions, observes & listens |
| 2.Make requests | 2.Checks things out | 2.Checks things     out |
| 3.Give feedback after group has finished their assignment | 3.Pauses 30 seconds to assess request (legitimate or not) | 3.Rates Officer a)action plus reason "Yes/No" b)action & reason, if no, Why?____ c.Sizing up |
| | 4.Gives action plus reason | 4.Give action plus response for feedback |

# HANDLING REQUESTS

## {15}

Handling requests is the ability to manage inmate requests in a fair and effective manner. The skillful handling of requests helps build trust and reduce tension in the institution.  It is also a good inmate management technique.

The two steps in handling requests are:

THE APPLICATIONS:
Controlling Behavior



Reinforcing
Behavior

Making Requests

Handling Requests

1. Check things out
2. Give response & reason

_____

*Rules, Regulations and Inmate Rights:*

Before we turn to the skills involved in handling an inmate's requests, we should spend a minute reviewing the way in which institutional rules and regulations often relate to the specific things to which an inmate does--and does not--have a right.

Although times are changing rapidly, each officer and each institution is bound by certain legal and institutional requirements to provide certain things to the inmates.  Most of these things are seen to be basic rights and/or needs to which an inmate is entitled.  Your institution probably has some written regulations (not always up-to-date ones,!!) to guide you in these areas.  Abiding by these rights and needs usually enables an officer to establish a working relationship with most of the inmates.  There is always that 10% to 20% who react negatively no matter what you do.  But by following the regulations, you can fairly expect the inmate to do what is expected.

OHIO PEACE OFFICER TRAINING COMMISSION            TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

You have taken away any excuse the inmate might have for negative behavior, even in the eyes of the other inmates who want to see you as the aggressor and inmates as the victim. When you attend effectively to the inmates, you have fulfilled your basic obligations to make the institution and the inmates more fair.

You can either attend as the result of an inmate request or by initiating on the basis of some need you see.  The latter really opens up an inmate.  (As used here, "attending" really refers to both of the skills we'll consider--checking the inmate out and responding to the inmate's request with a reason for your decision).  Attending skills are basic but very powerful.  They reduce 90% of the tension in a prison and help to establish a relationship where communication is possible if a problem arises.

_____

## *THE FIRST STEP IN HANDLING REQUESTS:*

*Use Basic Skills;    Know Rules & Regulations*

<u>Checking Out the Inmate and Situation:</u>  It goes without saying that you are and will be bombarded by requests from inmates.  Some will be legitimate, some not.  Each request must be, and is, responded to.  Even if you ignore the request, you have responded to it and some consequence will occur which can affect your management and control of inmates.  If you find this hard to believe, put yourself in a situation where you want your shift supervisor to consider one of your own requests and he ignores you.  How do you feel?  What message would it communicate if it happened often?  What might be the consequence of it on your behavior?

## CHECKING OUT REQUESTS involves deciding if they are legitimate or not.

Before you respond to any inmate request, you need to use your basic skills to check the inmate out.  Is the inmate leveling with you or is he trying to run some kind of game on you?  You also need to check out the situation in terms of any rules or regulations that might apply.  Using your positioning, observing, listening and responding skills will be invaluable to you here.  As you practice, this will become very clear to you.

## *STUDENT EXERCISE:*

Read the following situations.  Then describe how you would check them out.

*Inmate*
*Request:*    *Officer Smith, I feel sick.  My stomach is real upset and I've*
    *been sweating more than usual.  Can I go over to the infirmary?*

What skills would be important to use in this situation?

_____

_____

What rules or regulations must be considered?

_____

_____

Another inmate makes this request five minutes before count:

*Inmate*
*Request:*    *Officer Smith, may I run over to "C" compound?  I left my radio*
    *in the recreation area and it will be ripped off if I don't get it."*

What skills would be important to use in this situation?

_____

_____

What rules or regulations must be considered?

_____

_____

By knowing which of the sizing-up and communicating skills to use, you can ensure that you really know what's happening with a particular inmate who has a request.  By reviewing the appropriate rules and regulations, you'll have a good idea of whether the inmate's request is or is not legitimate.  Now, you're ready to respond to the request itself.

## *THE SECOND STEP IN HANDLING REQUESTS:*

<u>Responding With a Reason For Your Decision.</u>  The new skill here involves indicating the action you're going to take--your decision--and giving the inmate your reason.  Giving the inmate a good reason is not a sign of weakness.  On the contrary, it is the best way in which to minimize future gripes.  If you turn the inmate down, he won't be able to complain that you didn't even tell him why.  If you grant his request, he'll know that it was just for this one situation for a good and clear reason.

RESPONDING with a reason eliminates possible hassles.

Basically, an officer has three possible avenues of action in relation to an inmate's request.  In each case he should give some reason for his action.  Here are the simplest forms these responses can take:

*"Yes, I'll do (it)_____because_____*

*"No, I won't do (it)_____because_____*

*"I'll look into (it)_____because_____*

## *How You Decide:*

In each instance, the officer bases his intent on the laws and the regulations of the institution.  In cases where inmates need or request something beyond what they are entitled to by law and regulation, each inmate's behavior (past and present), what is asked for, the way it is asked for, and the information you have gained by checking things out should determine your response.  For example, an inmate might ask you, "Hey man, how about a phone call?"  "No, I can't allow you to have a call because you are entitled to only one per month and extra calls are only possible through the counselor (case manager, chaplain, etc.)."

## *Take Care of Basic Needs:*

While an officer may have an option in a case like the one on the previous page, some things--like an inmate's food--cannot be withheld. You may have other options for an abusive inmate who demands his meals (e.g. write him up) but you can't deny him his food. Knowing the law and the regulations of your institution will definitely make your job easier--especially with all the grievances that are written these days. By taking care of the basic needs of the inmate, these headaches and other security problems (tensions) will be greatly reduced.

Taking care of basic needs is a "must" in any relationship. It would be very hard for an inmate to believe you wanted to communicate and be of assistance if you did not attend to basic needs--that is, if you did not give the inmate the minimum required by the law. Dealing with such needs in a creative way builds up trust which will make it more likely that the inmate will talk to you and act upon what you say.

— — — — — — — — — — — — — — — — —

## *STUDENT EXERCISE:*

List four legitimate requests which might be made at your institution and four frequent requests that would not be legitimate at your institution. For the latter, indicate why. For example, in some institutions inmates in a certain unit are entitled to decorate their cells in special ways while those in other units are not. Thus an officer might say to an inmate who is below the level at which cell decoration is allowed: "No, I can't let you do that because you have not earned that privilege yet."

List four legitimate requests inmates could make:

1. _____

2. _____

3. _____

4. _____

List four non-legitimate requests inmates could make:

                  Request                          Why

1. _____       _____

2. _____       _____

3. _____       _____

4. _____       _____

## *Summary of Video Scene: "Second Helpings"*

Inmate Jones is headed through the chow line when he's stopped by Officer Donelli. The inmate asks for another helping of pizza and Donelli denies the request.

### *Questions After Viewing:*

What skill did Officer Donelli use in denying this request?

_____

What is the effect on the inmate of using this skill?

_____

## *Summary of Video Scene: "Library Pass"*

An inmate asks Officer Andrews for a library pass five minutes before court.

What circumstances of this situation would affect Officer Andrews' response?

_____

Respond to this inmate's request, giving a reason for your responses:

_____

_____

## *Summary of Video Scene:  "The Legal Paper"*

An inmate asks Officer Davis to drop off something for him on her way out of the institution.

## *Questions After Viewing:*

What special circumstances could affect Officer Davis' response?

_____

Respond to this inmate's request, giving a reason for your response:

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

-------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|

-------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|
| 1. Gives set to group | 1. Positions, observes & listens | 1. Positions, observes & listens |
| 2. Make requests | 2. Checks things out | 2. Checks things out |
| 3. Give feedback after group has finished their assignment | 3. Pauses 30 seconds to assess request (legitimate or not) | 3. Rates Officer<br>a) action plus reason "Yes/No"<br>b) action & reason, if no, Why?____<br>c. Sizing up |
| | 4. Gives action plus reason | 4. Give action plus response for feedback |

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# MAKING REQUESTS

## SESSION 16

### STUDENT PERFORMANCE OBJECTIVES FOR SESSION 16:
{REFER TO OVERHEADS 24 & 25}

24.    Given a multiple choice question, the student will choose the option which defines the term "A mild format", as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

25.    Given a multiple choice question, the student will choose the option which defines the term "A Direct Format" as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

### *VIDEO TAPE:*

"Introduction to Making Requests"

Time: 1:56

### *INDIVIDUAL EXERCISE:*

1.    Tell students to read pp. 97-99.

2.    Have students complete the exercise on p. 99.

### *CLASS DISCUSSION:*

Have class discuss the exercise.

There may be times when you want to start right out with a direct order or take immediate action without using a polite format. List two examples of when you would give a direct order or take immediate action without making a request. Give the reason why you would do this.

Direct order first:

Immediate action first:

## VIDEO TAPE:

"The Clean Up"

Time: :40

Officer Davis asks inmate Jones to mop up some water. When Jones grumbles, the officer handles it well.

## QUESTIONS AFTER VIEWING (From p. 101)

What format of request does Officer Davis use?

Where did she use responding in making her requests?

What is the effect of her technique on Jones?

## VIDEO TAPE:

"The Mess"

Time: :46

Officer Andrews tells Billy to clean up his cell or suffer the consequences.

## QUESTIONS AFTER VIEWING (From p. 102)

What format of request does Officer Andrews Use?

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Why do you think the officer warned Billy of the consequences of failure to do as he requested?

*ROLE PLAY:*

_____

| Inmate | Officer | Group |
|--------|---------|-------|
| 1. Gives set to group | 1. Leaves room | 1. Positions, observes & listens |
| 2. Role-plays inappropriate behavior | 2. Enters & uses Basic skills during 30 second pause, then makes request | 2. Records own version of request & way it should be made |
| | | 3. Rates Officer "Yes/No" on content & style of request, then gives own version of request |
| | | 4. Rates Basics |

# MAKING REQUESTS

## {16}

Making requests is the ability to manage inmates by making specific requests of them. Making requests skillfully improves the chances that inmates will cooperate and more readily carry out your requests.

The two steps involved in making requests are:

THE APPLICATIONS:
Communicating With Inmates



Reinforcing
Behavior

Making Requests

1. Check things out
2. Take appropriate
   action

Handling Requests

*Two Parts of Making Requests:*

The two procedures involved in making requests in an effective way are checking things out (using the same procedures as when you are handling inmate requests) and taking appropriate action.  As before, you need to check things out to ensure that you don't make the wrong move--a move that might increase tension rather than calm things down.  Once you've done that, you can decide whether the best action will involve a simple request, an order or even direct physical action.

## *The First Part of Making Requests:*

> \*     *Use Basic Skills*
> \*     *Know the Situation*

<u>Checking Things Out:</u>  Since the procedures here will be the same as those involved in handling inmate requests, there's no need to go back over them at length.  Here, however, your aim should be to understand the whole situation involving the inmate whom you plan to have do something.  Is the inmate with the usual group of friends?  If so, what is the inmate's probable relationship with them?  Will the inmate feel face is being lost if you give an order and therefore react antagonistically?  By using your basic sizing up skills and your responding skills if there's any tension in the air, you can make sure that whatever action you take in making your request will be effective.

CHECKING THINGS OUT involves use of your basic and responding skills.

> \*     *Use Responding Skills*

## *The Second Part of Making Requests:*

<u>Taking Action:</u>  Making requests of inmates is routine in corrections, of course.  Many requests are made each shift and often little thought is given to the impact of requests on the control of inmates.  Yet as many of you know, it's how the request is made that often makes the difference, not the nature of the request.

TAKING ACTION means selecting the best way to make your request.

OHIO PEACE OFFICER TRAINING COMMISSION       TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *How You Ask, May Mean More Than What You Ask!*

In taking action to get an inmate to do something, you will remember that you have to be specific.  You should identify what you want done and when you want it done.  Telling an inmate in this manner keeps you clean.  You've put right out there for the inmate and anybody else to see.  Many officers have found a polite request is most effective in getting an inmate to do what is required.  Of course, there are officers who feel that the inmates don't deserve politeness or that it makes an officer look weak.  You, however, were brought up with good manners, at least most of you were.  The question is, are you going to let an inmate bring you down to his or her level?  In addition, when an inmate doesn't do something reasonable when asked politely, then it is the inmate who looks weak and not you.  Moreover, by being initially polite, you've given the inmate the opportunity to go the easy way.  Now it's the responsibility of the inmate if you have to go the hard way.

### *Mild Format:*

Some of you are going to find it difficult to use a polite format; but many officers have found that it is more effective to be polite.  It gets the results you want.  A mild (polite) request can take the form "Would you (please)_____"
or it can take the form "I would appreciate it if you would _____."

### *Direct Format:*

When you make an inmate request, the most direct method is simply to identify what you desire and then use the format, "I want you to _____".  But, because inmates will frequently resent authority if you are simply telling them to do something, you may have fewer hassles if you use a mild request format.  Examples might be, "I'd like you to do _____" or "Would you stop_____".

### *Softening A Request:*

You can soften the statement even more by using polite words .  For example, "I'd like you to please stop_____."

## *Get Stronger When Necessary:*

What format you use for making a request will depend on the situation and the particular inmate.  Of course, if an inmate abuses the mild method, you are always free to move to a stronger position including a direct order.  As indicated above, the point is to get the job done--to have the inmate do what you want.  Most experienced officers agree that it is generally easier if direct confrontation is avoided.

You may also want to use your responding skills in taking action.  For example, you come across an inmate who is in a place where he should not be.  You position yourself so that you can see him but he cannot see you.  You watch for a little while because he appears to be doing nothing else wrong.  Then you move into position so he can also see you.  You approach cautiously--if he is contemplating a break, he may be armed.  As you approach, you recognize the inmate as being new.  The inmate makes no sudden moves and, in fact, gives you a greeting:  "Hello, Officer."  You give the inmate the benefit of the doubt in the sense that you are open to what the inmate will say.  The inmate is new and you haven't seen or heard anything to cause you to intensify your security efforts.

You Respond to Content:  "Hi, _____.  You seem to have drifted off from everybody else."

"I guess so, I just wanted to get off by myself for awhile."

You Respond to Feeling and Content:  "I see.  I guess you can get a feeling of being closed in sometimes being in here, but you can't drift off to this area because it's unauthorized."

Inmate:         "I didn't realize that."

You Make a Request: "Yeah, I'd like you to move back away from the gate and near that group now."

## STUDENT EXERCISE:

There may be times when you want to start right out with a direct order or take immediate action. List two examples of when you would give a direct order or take immediate action without making a request. Give the reason why you would do this.

Direct Order First:

*Situation # 1:*_____

_____

*Situation # 2:*_____

_____

— — — — — — — — — — — — — — — — —

## STUDENT EXERCISE:

*Situation # 1:*_____

_____

*Situation # 2:*_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *Summary of Video Scene: "The Clean Up"*

Officer Davis asks inmate Jones to mop up some water. When Jones grumbles, the officer handles it well.

## *Questions After Viewing:*

What format of request does Officer Davis use?

_____

Where did she use responding in making her request?

_____

## *Summary of Video Scene: "The Mess"*

Officer Andrews tells Billy to clean up his cell or suffer the consequences?

## *Questions After Viewing:*

What format of request does Officer Andrews use?

_____

Why do you think the officer warned Billy of the consequences of failure to do as he requested?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION    TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

| Inmate | Officer | Group |
|--------|---------|-------|
| 1. Gives set to group | 1. Leaves room | 1. Positions, observes & listens |
| 2. Role-plays inappropriate behavior | 2. Enters & uses Basic skills during 30 second pause, then makes request | 2. Records own version of request & way it should be made |
| | | 3. Rate Officer "Yes/No" on content & style of request, then gives own version of request |
| | | 4. Rates Basics |

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# REINFORCING BEHAVIOR

# SESSION 17

## STUDENT PERFORMANCE OBJECTIVES FOR SESSION 17:
{REFER TO OVERHEADS 26 AND 27}

26. Given a multiple choice question, the student will choose the option which defines the term "Reinforcing Behavior" as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

27. Given a multiple choice question, the student will choose the option which identifies the 2 parts of reinforcing behavior as it is given in the Local Corrections Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## *EXPLANATION:*

1. Rewards which reinforce your behavior positively are money, appreciation, etc.

2. Punishments which negatively reinforce your behavior are loss of pay, no appreciation, etc.

## *VIDEO TAPE:*

"Introduction to Reinforcing Behavior"

Time: 2:06

## *INDIVIDUAL EXERCISE:*

1. Tell students to read pp. 103-107 in Student Manual.

2. Have students complete the exercise on pp. 105-106.

## CLASS DISCUSSION:

Have class discuss the exercise.

List some punishments or negative reinforcers you can administer and/or take part in personally and the behavior for which you might give them.

Punishments:


Behaviors you might punish:


List some positive reinforcements you can personally give and/or take part in and the behavior for which you would give them.

Rewards you might give:

Behaviors you might reward:


## VIDEO TAPE:

"The Clean Up"

Time: :19

Officer Davis talks to Jones after he has mopped up.

## QUESTIONS AFTER VIEWING: (From p. 107)

How does Officer Davis use positive reinforcement?


## VIDEO TAPE:

"The Mess"

Time: :50

Officer Andrews talks to Billy after discovering that his cell has not been cleaned up.

## *QUESTIONS AFTER VIEWING:* (From p. 108)

How does Officer Andrews use negative reinforcement?

What other technique does he use to defuse Billy's possible anger?

## *VIDEO TAPE:*

"A Visit to the Chaplain"

Time:  1:06

Inmate Carson approaches Officer Wilson's duty station somewhat agitated, asking to see the chaplain.  The Officer uses skills in handling the situation.

## *QUESTIONS AFTER VIEWING:* (From p. 108)

What interpersonal communication skills can you identify in this scene?

What effect does Officer Wilson's use of these skills have on the inmate?

## EXERCISE # 1:

---------------------------------------------------------------

| Inmate | Officer | Group |
|---|---|---|

---------------------------------------------------------------

| Inmate | Officer | Group |
|---|---|---|
| 1.Gives setting & trust level in existence | 1.Responds,observes & listens | 1.Responds, observes & listens |
| 2.Role-plays; appropriate or inappropriate behavior | 2.Responds | 2.Write own reinforcement & why |
| 3.Reacts to officer responses | 3.Reinforces:<br>a)"If you do not then_____"<br>b)"If you do then_____"<br>c)"Since you are _____then_____"<br>d)"Since you are not_____then____"<br>e)Some personal verbal reinforcement (positive or negative) | 3.Rates officer "Yes/No" on correctness of reinforcement If no, why? |
| 4.Gives Feedback | | 4.Gives responses for feedback |
| | | 5.Rates use of Basics |

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

*STUDENT EXERCISE # 2:*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| *Inmate* | *Officer* | *Group* |
|---|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| *Inmate* | *Officer* | *Group* |
|---|---|---|
| 1. Gives role & setting | 1. Uses all appropriate skills | 1. Positions, observes & listens |
| 2. Role-plays | | 2. Assesses the use & accuracy of management skills |
| 3. Reacts to officer's response | | 3. Writes own responses if appropriate |
| 4. Gives feedback | | 4. Gives feedback |
| | | 5. Rates Basics |

# REINFORCING BEHAVIOR

## {17}

Reinforcing behavior is the ability to administer punishments and rewards effectively. Showing inmates the consequences--either positive or negative--of their actions will help you control their behavior.

The two parts of reinforcing behavior are:

## THE APPLICATIONS: CONTROLLING BEHAVIOR



Reinforcing Behavior

1. Reinforcing positively and negatively

2. Using verbal and non-verbal techniques

Making Requests

Handling Requests

– – – – – – – – – – – – – – – – – –

The only reason people finally do anything is because of the consequences (positive or negative) of doing it or not doing it. Behaviors only change when there are consequences. For the most part, an inmate has been rewarded during life for bad behavior. For instance, most inmates commit several crimes before they get caught. The inmate doesn't realize that not getting caught or being let off easy is not really in his or her best interest.

OHIO PEACE OFFICER TRAINING COMMISSION      TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

In addition to the rewards for negative behavior, most inmates live in a world where being straight and decent is seen as negative and weak. To turn this crazy picture around, institutions and officers must be sure to reward (or to punish) the appropriate behaviors. Also, the punishments and rewards themselves have to be appropriate. That is, the inmate has to experience an action as a reward or a punishment. The reward must also be seen as worth the price and the punishment as equal to the deed to be effective in changing behavior. If you send an inmate to isolation as punishment and the inmate ends up with a private cell and no loss of privileges, you may not really be punishing that inmate. You may actually be rewarding a negative behavior. In a prison setting, the inmate is always testing to find out what the limits are and who is really in control. Many inmates want to know "How much do I have to screw up before somebody tells me to stop?" Once an inmate knows who is really in control, the inmate will reduce this testing behavior. The result is that the inmate is in your control instead of you being in the inmate's control!

_____

## *Two Kinds of Reinforcement:*

There are, essentially, two kinds of reinforcement: verbal and non-verbal. Rather than dealing with these in separate sections, we will consider them together.

### *Verbal and Non-Verbal Reinforcement:*

<u>Handling Punishment:</u> You have several options for giving verbal reinforcements. If a warning is appropriate, you can use a format such as "If you do not do_____then_____ will happen." The first blank would be the behavior you want to have the inmate start or stop and the second blank would be the consequences. If a warning is not appropriate, the format would be "Since you have (Behavior) then (Consequences)." Another kind of reinforcement is just personally expressing your approval of the inmate's behavior. The format here would be "That's a really helpful thing" or "Spike, this place is looking good."

REINFORCING means using verbal and non-verbal rewards and punishments.

## *Force is Risky!*

Non-verbal reinforcement (physical force) should only be used where there is a threat of physical harm to you, to other staff, to the inmate or to other inmates. The risk of such reinforcement is too high and it should be used as a last alternative.

## *EXAMPLE:*

There was one officer who was told by a snitch than an inmate had a knife in his cell.  The officer went to the cell and called the inmate out so that he could shake the cell down.  The inmate appeared reluctant, so the officer grabbed him and pulled him out.  The inmate had the knife hidden in his shirt and stabbed the officer in the back.  The officer should have thought through the situation before attempting to get the inmate out of his cell.  Instead, he got caught up in his need to negatively reinforce the inmate with physical force.

Reinforcements are not threats.  As you know, you never threaten what you won't and/or can't do; and you never give consequences which you don't intend to follow through on.  When you reinforce negatively, you are not setting up a challenge.  You are only  making clear where it's at and what will happen (what the inmate is going to force you to do or what you are required to do).  You can't reinforce if you are out of control.  When you are out of control, you can only threaten.  This puts the inmate in control.  Your manner and tone of voice should be firm but calm, e.g., you might say "I'm giving you a direct order to stop.  If you don't, then I'm going to have to write you up."

## *STUDENT EXERCISE:*

List some punishments you can administer and/or take part in personally and the behavior for which you might give them.

*Punishments:*

1._____

2._____

3._____

4._____

*Behaviors you might punish:*

1._____

2._____

3._____

4._____

— — — — — — — — — — — — — — — —

## *Positive Reinforcement:*

It's just as important to positively reinforce or reward good behavior as it is to negatively reinforce or punish poor behavior.  In fact, trouble can sometimes get started simply because an officer doesn't know how to keep things going as well as they have been going! The effective officer knows which inmates are handling things well and does everything possible to keep them on track.  In addition, the officer positively reinforces occasional good work by inmates who may mess up at other times.  This officer may tell the inmate who always works well, "glad to see you're doing your usual fine job, Ben--I know I can always count on you."  This sort of verbal reinforcement helps the inmate keep going in a constructive direction.  The officer may also call "Way to go, Bill" to an inmate who has just done the first positive thing of the day.  The officer knows it's important for this inmate to recognize when he's on track--just as he has to realize when he's off the track as well.

## *STUDENT EXERCISE:*

List some positive reinforcements you can personally give and/or take part in and the behavior for which you would give them.

*Rewards you might give:*

1._____

2._____

3._____

4._____

*Behaviors you might reward:*

1._____

2._____

3._____

4._____

## Summary of Video Scene:  "The Clean-Up"

Officer Davis talks to Jones after he has mopped up.

## Questions After Viewing:

How does Officer Davis use positive reinforcement?

_____

OHIO PEACE OFFICER TRAINING COMMISSION    TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *Summary of Video Scene:  "The Mess"*

Officer Andrews talks to Billy after discovering that his cell has not been cleaned up.

## *Questions After Viewing:*

How does Officer Andrews use negative reinforcement?

_____

What other technique does he use to defuse Billy's possible anger?

_____

_____

## *Summary of Video Scene:  "A Visit to the Chaplain"*

Inmate Carson approaches Officer Wilson's duty station somewhat agitated, asking to see the Chaplain.  The officer uses skills in handling the situation.

## *Questions After Viewing:*

What interpersonal communication skills can you identify in the scene?

_____

_____

What effect does Officer Wilson's use of these skills have on the inmate?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## STUDENT EXERCISE # 1:

----------------------------------------------------------------

| Inmate | Officer | Group |
|---|---|---|

----------------------------------------------------------------

| Inmate | Officer | Group |
|---|---|---|
| 1.Gives setting & trust level in existence | 1.Responds,observes & listens | 1.Responds, observes & listens |
| 2.Role-plays; appropriate or inappropriate behavior | 2.Responds | 2.Write own reinforcement & why |
| 3.Reacts to officer responses | 3.Reinforces: a)"If you do not then_____" b)"If you do then_____" c)"Since you are ____then____ d)"Since you are not___then___" e)Some personal verbal rein- forcement (positive or negative) | 3.Rates officer "Yes/No" on correctness of rein- forcement. |
| 4.Gives Feedback | | 4.Gives responses for feedback 5.Rates use of Basics |

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## *STUDENT EXERCISE # 2:*

_____

| *Inmate* | *Officer* | *Group* |
|---|---|---|
| 1.Gives role & setting | 1.Uses all appropriate skills | 1.Positions, observes & listens |
| 2.Role-plays | | 2.Assesses the use & accuracy of management skills |
| 3.Reacts to officer's response | | 3.Writes own responses if appropriate |
| 4.Gives feedback | | 4.Gives feedback |
| | | 5.Rates Basics |

# SUMMARY OF THE APPLICATIONS CLOSE-OUT

# SESSION 18

*INDIVIDUAL EXERCISE:*

Have students read pp. 111-112 in Student Manual.

*VIDEO TAPE:*

"Postscript and Credits"

Time:  1:55

*POST-TEST:*

Administer Post-Test.  N.B.: This test is to be used as a class-room exercise ONLY, and does not determine the student's grade for the I.P.C. section of Local Corrections Basic Training.

*CLASS DISCUSSION:*

Discuss the course with the class

Answer any final questions

# SUMMARY OF THE APPLICATIONS

## {18}

We've talked a lot about security and management in this manual.  These are obviously the most important aspects of your work.  Yet some of you may have wondered why we haven't brought up the familiar matter of inmate rehabilitation.  We chose to pass over this matter for a very simple reason:

*THERE'S NO POINT IN MAKING PROMISES YOU CAN'T KEEP!!*

At this point it would be foolish to promise any officer that he or she could learn all that is needed to completely rehabilitate even one inmate, never mind an entire population of them.

However, we can make one promise:  the skills you have learned in this manual are the first step toward meaningful rehabilitation of inmates.  This means that you have done more than master specific methods of managing inmate populations.  This also means that you have more than you have suspected of which to be proud.

You've developed professional skills to do a professional's job.  You've helped to lay to rest that familiar stereotype that "civilians" have of the correctional officer as a brutal, brainless machine that delights in keeping people locked up.  You've gone beyond that.  You've begun to act upon one of the most basic equations in all of human history:

*HUMAN ACTIONS DETERMINE HUMAN REACTIONS.*

The cornerstone of the interpersonal management skills you've learned is decency!
Simply, human decency!  You've got a lot to do.  But, in doing it, you've learned how you can handle inmates like the human beings they are.  In return, you'll able to promote more decent and constructive behavior on their part.  This process involves what has been called the "Principle of Reciprocal Behavior."  That's a fancy term for saying that we all get back what we give.  In your case, you've learned how to invest your work with professional effectiveness--with real skills--and still give inmates the decent treatment they need to develop more constructive patterns of behavior.

OHIO PEACE OFFICER TRAINING COMMISSION TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

Yes, you've got a great deal in which to take pride. Let the committees in Washington draw up endless reports making endless recommendations about rehabilitation programs. Let the bleeding hearts write innumerable letters about brutality to their favorite newspaper editors. Let the rest of the world view the prime-time television image of correctional institutions as the garbage can of society. Let all that go.

As long as you've got the skills to size things up, you'll know what's really happening in your own setting.

As long as you've got the skills to communicate with inmates, you'll be able to reduce tension and get inmates to open up with you.

As long as you've got the skills to control inmates, you can manage their behavior in increasingly constructive ways.

Finally, as long as you can put all of these skills together in such a way that inmates realize they're being treated decently, you're doing more than all the committees and letter-writers and TV viewers in the world to rehabilitate the people who are your charges.

You have the right to take pride in your chosen profession, for you are bringing both professional skills and simple decency to one of the toughest jobs in the world.

OHIO PEACE OFFICER TRAINING COMMISSION     TOPIC 1: INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

# I.P.C. COMPENTENCY TEST

## N.B.: THIS TEST IS A LEARNING TOOL. IT IS <u>NOT</u> THE FINAL EXAM FOR INTERPERSONAL COMMUNICATIONS TRAINING. IT DOES NOT, NECESSARILY, COVER ALL THE SPO'S FOR THIS SECTION OF TRAINING.

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

1.      Which of the following is <u>not</u> a basic skill of sizing up the situation?

   A.      Listening
   B.      Positioning
   C.      Responding
   D.      Posturing


2.      An inmate's request is best <u>evaluated</u> when the officer:

   A.      Knows the rules
   B.      Is a skilled responder
   C.      Defers to his superior
   D.      Sets up a helpful climate


3.      Inferences can be made most accurately when you have:

   A.      Good positioning, posturing and listening
   B.      A valid psychological test
   C.      Observations about environment, behavior and appearance
   D.      Several years of experience


4.      Suspending personal judgement temporarily means:

   A.      Agreeing with inmates
   B.      Not allowing your personal attitudes and values to shut inmates off
   C.      Giving inmates second chances on rules violations
   D.      You are going to be easily conned


5.      Content means:

   A.      What the inmate said or did
   B.      Feelings and emotions
   C.      Attitudes and values
   D.      Basics

6.    One important reason to respond to an inmate's feelings is that:

    A.    It encourages inmates to talk
    B.    It is the inmate's civil right
    C.    It stops the inmate from complaining
    D.    It shows that you're not playing favorites

7.    Establishing whether or not an inmate's request is legitimate is mostly a result of:

    A.    Good listening
    B.    Good observation
    C.    Knowing the inmate
    D.    Knowing the rules and regulations

8.    Drawing inferences, determining implications (trouble, not trouble), deciding normal or abnormal and looking at behavior, appearance and environment are all procedures for:

    A.    Attending
    B.    Listening
    C.    Motivating
    D.    Observing

9.    Communications in corrections is most clearly related to:

    A.    Security
    B.    Officer-inmate relations
    C.    The mandate of society
    D.    Inmate reform

10.   Two steps in handling requests skillfully are:

    A.    Ask relevant questions and reflect
    B.    Respond to feeling and ask 5WH
    C.    Respond to content and respond to feeling
    D.    Check out inmate and situation and respond with a reason

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 1:  INTERPERSONAL COMMUNICATIONS (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

11.  Which of the following is <u>not</u> an important principle of positioning?

    A.  Dress functionally
    B.  Look directly
    C.  Face squarely
    D.  Establish appropriate distances

12.  Reinforcing inmate behaviors means:

    A.  Setting up a token economy
    B.  Agreeing with most behavior
    C.  Reward and punishing appropriately
    D.  Giving up control

13.  Responding accurately to an inmate demonstrates that you are:

    A.  Soft on security
    B.  Skilled in communication
    C.  Vulnerable to manipulation
    D.  Demonstrating approval

14.  Asking yourself questions like "How does the inmate look?"; "What is the inmate doing"; "What did the inmate say?"; are good examples of:

    A.  Relevancy
    B.  5WH
    C.  Reflecting
    D.  Assessing intensity

15.  In developing good listening skills, observing and posturing are important.  Another prerequisite for good listening is:

    A.  Learning to use "street" language
    B.  Positioning
    C.  Asking relevant questions
    D.  Developing a "command" voice

16.     Officers should demonstrate confidence to inmates and fellow officers.  Posturing is one important way to accomplish this.  Posturing involves all of the following, <u>except:</u>

    A.     Inclining forward
    B.     Standing erect
    C.     Eliminating distracting behaviors
    D.      Drawing inferences


17.     Responding to inmates' intense feelings leads to:

    A.     Intensifying them
    B.     Inmate embarrassment
    C.     Coddling
    D.     Defusing them


18.     Appropriate distance in corrections <u>first</u> means:

    A.     Being close
    B.     Being safe
    C.     Being properly postured
    D.     Being able to hear


19.     For an officer to listen effectively, it is important to:

    A.     Get answers
    B.     Reflect on the "gut" feeling
    C.     Help the inmate adjust properly
    D.     Suspend judgement


20.     Which does <u>not</u> give information about energy level?

    A.     Body build
    B.     Grooming
    C.     Posture
    D.     Non-verbal expressions

21.      Adding meaning to feeling results in:

      A.      Interpreting
      B.      Understanding content
      C.      Understanding the reasons for feeling
      D.      Keeping inmates under control

22.      An inmate stoops and picks up an empty ice cream carton while passing near an officer in the yard. He is unaware of the officer's presence.  The officer gives him a genuine smile as they make eye contact immediately after the incident.  This would be an example of:

      A.      Verbal reinforcement
      B.      Good attending skill
      C.      Non-verbal reinforcement
      D.      A good inmate-officer relationship

23.      Your text has three major sections.  Which heading is <u>not</u> one of them?

      A.      Controlling behavior
      B.      Inmate management
      C.      Sizing up the situation
      D.      Communicating with inmates

24.      In seeking information from a reluctant or hostile inmate, an important <u>first step</u> is to:

      A.      Use 5WH questions
      B.      Respond to the inmate's feelings and meaning
      C.      Threaten with consequences
      D.      Question the inmate in front of witnesses

25.      Which is an example of a request in a mild or polite format?

      A.      "Look, Jones, get that floor swept now!"
      B.      "Jones, the floor sure is dirty.  It would be good if somebody swept it."
      C.      "Jones, would you please sweep the floor?"
      D.      "Jones, I want you to sweep the floor?"

# COMPETENCY TEST FOR IPC ANSWER KEY:

| | | | |
|---|---|---|---|
| 1. | C | 13. | B |
| 2. | A | 14. | C |
| 3. | C | 15. | B |
| 4. | B | 16. | D |
| 5. | A | 17. | D |
| 6. | A | 18. | B |
| 7. | D | 19. | D |
| 8. | D | 20. | A |
| 9. | B | 21. | C |
| 10. | D | 22. | C |
| 11. | A | 23. | B |
| 12. | C | 24. | B |
| | | 25. | C |

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**OVERHEAD 1**

SPO 1

## THE 3 BASIC COMPONENTS OF THE IPC MODEL ARE:

---

♦ BASICS

♦ ADD-ONS

♦ APPLICATIONS

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 2 |

SPO 2

THE 3 PURPOSES OF THE IPC TRAINING MODULE ARE:

---

♦ TO GIVE TRAINEES PRACTICAL SKILLS

♦ TO EQUIP TRAINEES TO APPLY THOSE SKILLS TO THE MANAGEMENT OF PEOPLE

♦ TO DEVELOP EACH TRAINEE SO THAT HE/SHE CAN MAKE EFFECTIVE USE OF HIS/HER STRENGTH AS A COMMUNICATOR

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 3 |

SPO #3

## THE 4 "SIZING UP" SKILLS ARE:

---

♦ POSITION


♦ OBSERVE


♦ POSTURE


♦ LISTEN

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### OVERHEAD 4

SPO 4

## THE 2 MAJOR ELEMENTS OF POSITIONING ARE:

---

♦ KEEPING A SAFE DISTANCE

♦ BEING ABLE TO SEE AND HEAR GROUPS AND INDIVIDUALS

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 5 |

SPO 5

## THE 3 MAJOR PARTS OF POSITIONING ARE:

♦ DISTANCING

♦ FACING SQUARELY

♦ LOOKING DIRECTLY

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## OVERHEAD 6

SPO 6

## THE DEFINITION OF "POSTURING" IS:

HOLDING YOUR BODY IN SUCH A WAY THAT SHOWS STRENGTH, CONFIDENCE, INTEREST AND CONTROL

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 7 |

SPO 7

### THE 3 COMPONENTS OF GOOD POSTURING ARE:

_____

STANDING ERECT

ELIMINATING DISTRACTING BEHAVIORS

INCLINING SLIGHTLY FORWARD

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

OVERHEAD 8

SPO 8

## THE 4 ELEMENTS OF OBSERVING ARE:

---

♦ LOOKING CAREFULLY

♦ DECIDING IF A SITUATION IS NORMAL OR ABNORMAL

♦ DECIDING IF A SITUATION INDICATES POTENTIAL FOR TROUBLE, OR IF IT SUGGESTS THERE WILL BE NO TROUBLE

♦ MAKING INFERENCES ABOUT FEELINGS, RELATIONSHIPS AND ENERGY LEVEL

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

OVERHEAD 9

SPO 9

## THE 3 ASPECTS TO BE CONSIDERED DURING THE FIRST PART OF OBERVING ARE:

---

♦ BEHAVIOR

♦ APPEARANCE

♦ ENVIRONMENT

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**OVERHEAD 10**

**SPO 10**

## THE 4 "CLUES" THAT CAN BE USED TO DEVELOP INFERENCES ARE:

---

♦ INMATE FEELING CLUES

♦ INMATE RELATIONSHIPS

♦ INMATE ENERGY LEVELS

♦ INMATE VALUES

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 11 |

SPO 11

## THE 4 STEPS IN LISTENING ARE:

♦ SUSPEND JUDGEMENT

♦ PICK OUT KEY WORDS

♦ IDENTITY THE INTENSITY OF WHAT'S SAID

♦ REFLECT ON MOOD

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

### OVERHEAD 12

### SPO 12

## THE THREE ITEMS THAT MAY BE USED TO DETERMINE INTENSITY ARE:

♦ VOLUME

♦ EMOTION

♦ VOICE PITCH

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

### OVERHEAD 13

SPO 13

## THE 2 ADD-ON SKILLS USED IN INTERPERSONAL COMMUNICATION ARE:

---

♦ RESPONDING


♦ ASKING QUESTIONS

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

## OVERHEAD 14

SPO 14

## THE DEFINITION OF "RESPONDING TO CONTENT" IS:

RESPONDING TO CONTENT IS THE SKILL OF SEEING AND HEARING WHAT IS REALLY HAPPENING AND THE ABILTY TO MIRROR THAT UNDERSTANDING BACK TO THE INMATE

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 15 |

SPO 15

## THE 2 STEPS IN RESPONDING TO CONTENT ARE:

REFLECTING ON WHAT WAS SEEN AND HEARD

USING A RESPONDING FORMAT

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

## OVERHEAD 16

SPO 16

## THE 2 STEPS IN RESPONDING TO FEELING ARE:

♦ REFLECT ON FEELING AND INTENSITY

♦ USING A RESPONDING FORMAT

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 17 |

SPO 17

## THE DEFINITION OF "RESPONDING TO FEELING" IS:

RESPONDING TO FEELING IS THE ABILITY TO CAPTURE IN WORDS THE SPECIFIC FEELING EXPERIENCE BEING PRESENTED BY AN INMATE

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## OVERHEAD 18

### SPO 18

## THE DEFINITION OF "RESPONDING TO FEELING & MEANING" IS:

---

## RESPONDING TO FEELING AND MEANING REQUIRES YOU TO PARAPHRASE THE CONTENT OF AN INMATE'S STATEMENT IN SUCH A WAY AS TO RPOVIDE A MEANINGFUL REASON FOR THE INMATE'S FEELING

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 19 |

SPO 19

## THE APPROPRIATE TIME TO REFER THE INMATE TO A MENTAL HEALTH WORKER OR OTHER SPECIALIST IS:

_____

## WHEN A COMMUNICATION INTERCHANGE GOES DEEPER THAN YOU FEEL YOU CAN MANAGE

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

OVERHEAD 20

SPO 20

## THE 3 TECHNIQUES USED IN ASKING QUESTIONS ARE:

♦ USE THE 5 WH METHOD

♦ THINKING ABOUT WHAT WAS SAID OR NOT SAID

♦ RESPONDING TO THE ANSWER

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

OVERHEAD 21

SPO 21

## THE 3 APPLICATION SKILLS USED IN A CONTROLLING BEHAVIOR ARE:

♦ HANDLING REQUESTS

♦ MAKING REQUESTS

♦ REINFORCING BEHAVIOR

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 22 |

SPO 22

## THE STEPS IN HANDLING REQUEST ARE:

---

♦ CHECK THINGS OUT


♦ GIVE A RESPONSE AND A REASON

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**OVERHEAD 23**

**SPO 23**

## THE 3 REASONS FOR GIVING AN INMATE AN EXPLANATION FOR AN OFFICER'S RESPONSE ARE:

---

♦ HE WON'T BE ABLE TO COMPLAIN THAT HE WASN'T TOLD WHY HE WAS TURNED DOWN

♦ IT MINIMIZES FUTURE GRIPES

♦ IF THE REQUEST IS GRANTED, HE WILL KNOW THAT IT WAS FOR A GOOD AND CLEAR REASON THIS TIME--IT MAY NOT BE GRANTED AGAIN IN THE FUTURE

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 24 |

SPO 24

## THE DEFINITION OF THE TERM "A MILD FORMAT" IS:

A MILD FORMAT IS SIMPLY A POLITE REQUEST

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 25 |

SPO 25

## THE DEFINITION OF THE TERM "A DIRECT FORMAT" IS:

A DIRECT FORMAT MEANS TO IDENTIFY WHAT YOU WANT DONE

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | OVERHEAD 26 |

SPO #26

## THE DEFINITION OF THE TERM "REINFORCING BEHAVIOR" IS:

---

REINFORCING BEHAVIOR IS THE SKILL OF ADMINISTERING PUNISHMENTS AND REWARDS EFFECTIVELY AND OF SHOWING INMATES THE POSITIVE AND NEGATIVE CONSEQUENCES OF THEIR ACTIONS

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

### OVERHEAD 27

SPO 27

## THE 2 PARTS OF REINFORCING BEHAVIOR ARE:

♦ REINFORCE POSITIVELY AND NEGATIVELY

♦ USE VERBAL AND NON-BERBAL TECHNIQUES

# STUDENT HANDOUT

Interpersonal Communications
in the
Correctional Setting
for Full Service Facilities

### STUDENT MANUAL

(Edited June, 1993)
(December, 1995)
(Summer, 2000)

This project was provided under
Grant #EP-4 To
Capitol Communication systems, Inc.
from

## U.S. DEPARTMENT OF JUSTICE

# NIC   National Institute
of Corrections

Points of view expressed herein are those of the authors and
do not necessarily reflect the policies of the
Department of Justice
May, 1983

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

# ACKNOWLEDGEMENT:

*The basic communication skills model used in this training was, originally, developed by Dr. Robert R. Carkhuff, Chairman of the Board of Directors, Carkhuff Institute of Human Technology and his associates.*

| OHIO PEACE OFFICER TRAINING COMMISSION | **TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)** |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | **HANDOUT 1** |

# TABLE OF CONTENTS

---------------------------------------------------------------

1      Introduction to the IPC Model.....................(224)

2.     The Basics: Sizing Up the Situation...............(226)

3.     Positioning.......................................(232)

4.     Posturing.........................................(238)

5.     Observing.........................................(244)

6.     Listening.........................................(256)

7.     Summary of the Basics.............................(262)

8.     The Add-Ons: Communicating With Inmates...........(264)

9.     Responding to Content.............................(269)

10.    Responding to Feeling.............................(274)

11.    Responding to Feeling and Meaning.................(280)

12.    Asking Questions..................................(291)

13.    Summary of the Add-Ons............................(299)

14.    The Applications: Controlling Behavior............(302)

15.    Handling Requests.................................(307)

16.    Making Requests...................................(316)

17.    Reinforcing Behavior..............................(323)

18.    Summary of the Applications.......................(331)

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# PREFACE TO THE STUDENT

The course which you are about to take is probably unlike any other course you have ever taken.  It is different because it is skills oriented.  Unlike so much other training which is theoretical and is filled with "shoulds" and "oughts," this training is practical, immediately applicable and teaches real skills.

You will find that the materials you will be using in the course are extensive and interesting.  This manual will provide you with background material on the skills you are studying.  It will also be your step-by-step guide during the training sessions themselves.  There are also videotape materials which have been produced specifically for the course.  Some segments present information about the skills; others are dramatic scenes that show the skills in action.

Most require your participation either by writing a response, by suggesting an alternate course of action or by reenacting the scene with a different ending.  Another resource is your instructor, who will tell you about, demonstrate and lead you through dozens of exercises that will help you acquire the skills under study.

The final and most important resource which you bring to the course is your own motivation and attitude.  This is a course in Interpersonal Communications.  You will learn these skills only if you communicate--with your instructor and with your fellow students.  This is a very active course - it will require your constant input and participation.  If you enthusiastically contribute that participation, you can be sure that, like hundreds of other correctional employees, your job performance will improve and your job satisfaction will increase.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# INTRODUCTION TO THE IPC MODEL

In the first video segment, TV instructor Roger Frazier introduces himself and the IPC course. He points out that during the training program, you will learn many skills that will help you manage the inmates in your charge more effectively. The skills to be taught come out of the experiences of correctional officers such as yourself who have gone through similar training programs all over the country. He then presents the Interpersonal Communications model around which this course is designed. The model looks like this:

THE APPLICATIONS:
Controlling
Behavior

THE ADD-ONS:
Communicating
With
Inmates

1. Handle Requests
2. Make Requests
3. Reinforce

THE BASICS:
Sizing up the
Situation

1. Respond
2. Ask Questions

1. Position
2. Posture
3. Observe
4. Listen

Traditionally, the training given to correctional officers has been aimed at their heads--it was filled with theories and ideas. Sure, there was some skills training, but that was usually in firearms or self-defense. Another thing about the training was that it was almost exclusively concerned with security-contraband, key control, cell searches and the like. While these are obviously legitimate concerns, this orientation doesn't take into account the fact that correctional officers spend much (if not most) of their time interacting with inmates -- and with each other. Officers traditionally have been trained to keep the institution secure, but not to get along with inmates effectively. More importantly, they haven't been trained in how to get the inmates to do what the officer wants them to do, which is what the job is really all about.

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

This training program is an effort to change that orientation.  It's based on work done by trainers and researchers in the field of corrections over the past 15 years.  It's known as Human Resource Development.  It's based on a careful study of the skills that truly effective correctional officers demonstrate.  Techniques for identifying those skills have been developed, and now there are techniques for teaching others, like you, how to acquire and use those skills.

This training program is designed around the Human Resource Development model.  A model is like a road map: it shows you where you're going.  As you can see from the diagram on the previous page, the IPC model has three major sections.

THE BASICS are pre-management skills that give you information that helps you decide what action to take in any given situation.  Another name for the Basics is Sizing Up Skills.

THE ADD-ONS are communicating skills that will help you get an inmate to explore and share information with you.  These skills are the key to finding out what's really going on in a situation.

THE APPLICATIONS are skills that will help you control inmate behavior in a respecting way -- so that you get what you want done with minimal hassles.

During this training program, you'll get a chance to learn about and practice all of these skills.

Think back on your own experience in being supervised.  You've probably had bosses that you thought did a good job in managing you, and others that you felt did a bad job.  Think about the good bosses.  What qualities or skills did they demonstrate that made them effective in managing you -- that made them successful in motivating you to do a good job? List those qualities and skills below:

_____

_____

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

# THE BASICS:

# SIZING UP THE SITUATION

# (2)

The Basics are sizing up skills that help you know what's happening in any situation. Sizing up helps you avoid costly mistakes and maximizes the chances that your decisions and actions will be effective and accurate. Sizing up works because it gets you ready to take and use information to manage and often prevent problems. Using the Basics is always appropriate because you always need to size up whatever situation you're in.

## THE BASICS:
## Sizing up the Situation



An inmate comes into the correctional supervisor's area -- he is restless, breathing quickly, repeatedly clenching and unclenching his hands. His eyes are wide open and his lips are twitching slightly. But the officer doesn't notice these signs. He's busy going over the morning call-out sheet. His work table is situated so that the inmate is not in full view. The officer would have to make a $90^0$ turn to see the inmate fully.

The inmate asks if he can speak with the officer. Deep in his work, the officer indicates that he is busy and asks the inmate to come back later. Suddenly and without warning, the inmate jumps the officer and proceeds to beat him unmercifully. It takes two other officers to restrain the inmate. The officer who received the beating suffers broken ribs, a fractured skull and numerous abrasions. He is off work for two weeks. The inmate is cuffed and taken to segregation. Eventually found guilty of assault, he is given an additional year to run concurrently with his sentence. There is considerable uneasiness and unrest in the population as a result of the incident.

This attack came as a real shock to everyone. The inmate had a good record with no history of violence. The officer in question was not known to have had problems with inmates. What happened?

## WHAT HAPPENED?

First, we all know that every officer in a correctional setting is vulnerable to the impulsive acts of inmates. Being locked up, removed from the freedom of their homes and the familiar streets, subjected to rigorous controls, forced to interact with many uneasy and even desperate human beings--all of these things put enormous pressure upon individual inmates. When they lash out uncontrollably, the person who is most vulnerable and available often becomes the object of their frustration.

Second, we know that situations like the preceding one are not really predictable. Inmates who set out to "get" an officer may find many more subtle ways to carry out their grudge. Yet their feelings toward an officer are often visible. The officer who *sizes up the situation* and recognizes these feelings will be more cautious in the presence of such inmates.

Third, we must recognize that officers always have the option to handle a given situation in a way that is for better - or for worse. The officer in this situation, for example, might well have handle things in such a way as to avoid the beating he received.

## ANOTHER EXAMPLE:

Consider a second set of circumstances. An officer on the unit has a long list of names on his call-out sheet. Inmates are heading in every direction - to see their case manager, to see the chaplain or a counselor, or to meet work details and so on. The officer has all the information on a clip-board: names, assignments, time out and time in. He has positioned himself beside the gate so that the inmates pass by him in profile, giving him only a side-view.

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

After a few minutes the officer's sheet is relatively clear and he has a lull before the next group of inmates must leave.  Then an inmate who had just left for a work detail appears and informs the officer the lieutenant sent him back to his cell to change his shirt.  The following sequence of events takes place.

## *HASSLES!*

The inmate is written up by the correctional supervisor for wearing "free world" clothes.

The unit officer is reprimanded by the shift lieutenant for the slip-up.

The officer chews out the inmate for getting him into hot water with the lieutenant.

No big deal - nothing like the earlier account of a violent attack.  But look at all the hassle; the wasted energy!!

## *SIZING THINGS UP:*

In general, of course, both of the officers in the previous accounts could have handled things better rather than worse if they had sized up the situation more accurately.  The ability to do just this - to assess what's really going on and decide what, if any, action should be taken - is perhaps the most critical part of an officer's job.  Only the officer who really knows what's going on can choose and take the best possible course of action in managing inmates.

However, the "sizing-up ability" is not an ability with which an officer is born.  Nor is it always an ability that an officer develops through experience alone.  After all, both of the officers in the previous situations were quite experienced.  Therefore, sizing things up requires some very definite skills.

## *FOUR BASIC SKILLS:*

Sizing up any situation involves four, very basic skills:

1. Positioning
2. Posturing
3. Observing
4. Listening

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

## *WHY BASIC?*

The word "basic" is important here.  The four skill areas are basic and fundamental to everything you will learn in Sections II and III of this manual - and to everything you actually do on the job.  You cannot hope to communicate safely and effectively with an inmate or inmates until you have used these skills to *size up the situation.*  Nor can you hope to control inmates unless you have first sized up the situation.  On the other hand, by learning to make continual use of these four basic skills, you can maximize your chances of making the right response in situations where a wrong response could be very costly indeed!

## *USE ALL THE BASICS:*

The four basic skills are cumulative in that each new skill builds on each previous one.  For example, posturing yourself effectively means that you should already be in an effective position, observing accurately means that you should have already gotten into an effective position and posture and so on.  In other words, you don't simply use one skill at a time.  Instead, you size up a situation by making maximum possible use of all four basic skills.

## *GETTING READY TO GO ON DUTY:*

In general, of course, the skilled officer always systematically sizes things up on his shift, whether he is responsible for work-detail supervision or walking the tiers or units.  Here are some ways an officer sizes things up before actually going on duty:

  a.   Checks with the supervisor and reviews the log book to see what has happened during the last shift;

  b.   Reads the log book of the officer he is replacing and asks for a briefing about the conditions in his area of responsibility;

  c.   Determines if there are items that need priority attention (like shaking down a recently vacated living area) and makes a note about taking care of them; and

  d.   Walks the area of responsibility to take a reading of what is going on, who is where, who is doing what and to test the general atmosphere of the area.

It is in this final phase of pre-duty activity, and in the actual duty which follows, that the officer puts his four basic skills to maximum use.

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

### HANDOUT 1

*STUDENT EXERCISE:*

Why do you think that sizing up the situation is important?

_____

_____

_____

_____

_____

_____

_____

_____

If you were to walk the area of your responsibility prior to going on duty, for what would you be looking?

_____

_____

_____

_____

_____

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

Which of the basic skills do you think would be most help for you to get that information?

_____

_____

_____

_____

_____

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

# POSITIONING

# (3)

Positioning means putting yourself in the best possible place to see and hear individuals or groups.  This helps you get information you need to manage inmates and to prevent minor incidents from becoming major problems.

The three parts of Positioning are:

## THE BASICS:
Sizing Up the Situation



Listening

Observing

Posturing

Positioning

1. Distancing
2. Facing Squarely
3. Looking Directly

## *THE FIRST BASIC SKILL:*

Physically positioning yourself in relationship to an individual or group is very important in the effective management of inmates.

## *THREE PARTS OF POSITIONING:*

There are several different principles or activities that you may feel are important to effective positioning.  The three basic parts of positioning which we will focus on in this section are <u>establishing an appropriate distance, facing squarely and looking directly.</u>

As an effective officer, you need to position yourself where you can see and hear problems. Being in a good position helps you to know just what's going down and, therefore, to nip problems in the bud.  Then, too, inmates who think they are not being observed are always more of a problem because they tend to live by the rule "We'll get away with as much as we can -- or with as much as you let us."  As you know, it's impossible for you to be everywhere at once.  It is also very difficult to catch inmates in certain acts because of "look-outs."  Yet, the more you use positioning skills to see and hear (when making rounds, for example) the less likely it is that the inmates will get involved in things that are against the rules.

Now, let's take a look a the three specific skills or procedures just outlined.

_____

## *THE FIRST PART OF POSITIONING:*

<u>Distancing:</u> The first principle of distancing is to keep it safe.  Yet, while safety is foremost it is not enough.  You could be safely in your office while inmates are doing some pretty negative things.

### *Safety Sight:*

This distance must be safe but you must also be able to see what is going on, and you must be able to hear what is being said whenever possible.  *Positioning* <u>means distancing yourself far enough to be safe, but close enough to see and hear.</u>

_____

## *THE SECOND PART OF POSITIONING:*

<u>Facing Squarely:</u>  Facing squarely or fully ensures that your position gives you the most effective line of vision.  Your left shoulder should be lined up with the left boundary line of the area you are watching and your right shoulder should be lined up with the right boundary line of the area you are watching.

*See Everything:*  When you move your head to either side so that your chin is right above either shoulder, you should be able to see the entire field for which you are responsible.  *Positioning* means facing the inmate or inmates squarely.

*Be Unpredictable:*  Sometimes the sheer size of the area for which you are responsible (for example, the yard) makes it impossible to remain squared in one position.  In this sort of situation, you must rotate yourself so that by successive movements you will have squarely faced all the area or persons for whom you are responsible.  In rotating, as in all behaviors, it is always important for you to change the order of doing things so that your behavior cannot be predicted easily.  At the same time, of course, you must be thorough regardless of the pattern you employ.  Facing fully helps you to size up a situation.  You can see best when you are directly facing inmates.  When your goal is communication with inmates (Section II) this also lets them know you are open to hearing them.

*STUDENT EXERCISE:*

You probably have duty stations other than units.  Think of some of these other stations.  Describe where you would position yourself to size up the situation.

Station:  _____

Position:_____

_____

Station:  _____

Position:_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

List two situations in which you think it would be a good idea to look an inmate directly in the eye:

_____

_____

_____

_____

List two situations in which you think it would <u>not</u> be a good idea to look an inmate directly in the eye:

_____

_____

_____

_____

*THE THIRD PART OF POSITIONING:*

<u>Looking Directly:</u>  When positioning yourself, you should look directly at the area or person(s) you are managing.  Unless you look directly, you will not be on top of the situation even if you are in the right position and are facing squarely.  Looking directly at a group often involves looking at their eyes.  When questioning inmates, for example, you will be able to get important clues by observing their eyes and their facial expressions closely.  In addition to the information you can get, your direct look tells inmates that you mean business and are not threatened.  This doesn't mean you get involved in a staring contest.  But many inmates believe that a man who won't look you in the eyes is afraid of you.

Positioning <u>means looking directly at the area and person or people you're managing.</u>

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

**HANDOUT 1**

## *Eye Contact to Communicate:*

Eye contact may also be the best way of communicating interest. Inmates become aware of our efforts to make contact with them when they see us looking directly at their faces. Of course, looking directly at inmates will also provide you with valuable information about them. Inmates who keep shifting their eyes while talking to you signal that, at the very least, they are either uncomfortable with you or with what is being said. This kind of information is important in managing inmates.

## *Summary of Video Scene--"Hall Duty"*

Officer Lopez is on duty in the hallway. Inmates file past him in profile. Officer Lopez is concentrating on his clipboard, and from time to time looks up to observe inmates filing past. We see that one inmate has a questionable item in his hand which is away from the officer.

## *Questions After Viewing:*

How could Officer Lopez's position be improved?

_____

_____

_____

What were the consequences of bad positioning in this case?

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*Summary of Video Scene--"The Dayroom"*

Officer Donnell enters the dayroom during his rounds. There are three inmates in the room: one reading and two playing cards. Officer Donnell walks through the room and checks things out, then takes up a position near the door. Inmate Chico Juarez enters the room, approaches Donnell stealthily, gets very close to him and whispers, "Officer Donnell, I gotta' talk to you...", Donnell turns and looks at Chico.

*Questions After Viewing:*

Describe Officer Donnell's position in relation to the card players.

_____

_____

_____

Did Donnell position himself properly to talk to Chico?

_____

_____

*Role-Play Responsibilities:*

| INMATE | OFFICER | GROUP |
|---|---|---|
| Role-play inmate for 20 seconds. Give Feedback to officer | Position for 20 seconds | Judge each officer on Distance: yes/no Looking Directly: yes/no If no, why? |

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# POSTURING

## {4}

Posturing <u>means holding your body in a way that shows strength, confidence, interest and control.</u>  When you <u>appear</u> strong and confident, inmates will <u>believe</u> you are strong and confident.

The three steps of Posturing are:

## THE BASICS:
Sizing Up the Situation



Your Posture - how you carry yourself - tells an inmate a lot.  It can make an inmate think that you're confident of yourself or that you're really pretty worried about what might happen.  Your aim, of course, is to show your real confidence.

### *Three Parts of Posturing:*

As with positioning, there are several ways in which you can use posturing when you are sizing up the situation.  Here, we'll focus on three specific procedures:  1) Standing erect; 2) Eliminating distracting behaviors; 3) Inclining slightly forward.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*Standing Erect & Eliminating Distracting Behaviors:*

The way in which the first two procedures show confidence should be obvious.  When you stand erect and get rid of distracting behaviors, you let inmates know that you're in full physical control--control not only of your own body but of the whole situation.  That's essential!!  Many inmates will try to intimidate any officer who doesn't look as if he is confident about what he's doing.  If an inmate thinks he can scare you, you're in real trouble.  Any officer without the respect of the inmates is open to embarrassment and abuse.

*Example:*

There was one officer who was known to run at the first sign of trouble.  Other officers felt really uncomfortable with him guarding the rear.  He always stayed by the door of the dining room.  But while the officers disliked this man, the inmates were all over him!  They always managed to get what they wanted and still embarrassed him.  Finally, he quit.  Maybe you'll say, "Fine, he shouldn't have been an officer in the first place!"  His case, however, is just an extreme example of what happens when any officer allows him or herself to be intimidated, or simply looks as though he or she could be intimidated.

*Inclining Forward:*

By standing erect and eliminating distracting habits, you can do a lot to show your strength and confidence.  The third part of the posturing skills outlined here, inclining yourself forward, can also show confidence by reinforcing the idea that all your attention and potential energy is riveted on the inmate or inmates.  Inclining yourself forward, as you will see in Section II, can also help you to communicate your interest.

Used in this way, such a posture says to an inmate, "I am inclined to listen, to pay attention, to be interested."

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

<u>A closer look at the three parts of Posturing:</u>

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

*The First Part of Posturing:*

<u>Standing Erect:</u>  Each of you knows how important standing erect is.  You probably heard it as a child; if you were ever in the service, you heard it there:  "Stand up to your full height," "Be proud, stand up straight," "Stick out that chest,"  "Pull in that gut."  Standing erect takes muscle tone and practice.  Look in the mirror and check yourself out.  Are your shoulders straight?  Is you chest caved in?  How do you feel?  Ask someone else for his or her reaction.  Which way does that individual experience you as stronger, more confident?

Posturing <u>means standing erect to show strength and confidence.</u>

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

*The Second Part of Posturing:*

<u>Eliminating Distracting Behaviors:</u>  An officer who can't stand steady is seen as nervous.  Biting nails, foot-tapping and other distracting behaviors do not communicate confidence and control.  But standing stiff like a board doesn't either.  You should feel tension in your body after you have eliminated distracting behaviors.

Posturing <u>means eliminating all distracting behaviors.</u>

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

*The Third Part of Posturing:*

<u>Inclining Forward:</u>  Your intention here must be to communicate interest and concern by shifting your weight forward so that the inmates become more aware of your "inclination" to communicate and supervise them with respect.  You can do this by placing one foot slightly forward of the other with your weight on the forward foot.  This does communicate "moving close" without actually moving you much closer or making any physical contact.

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)
## HANDOUT 1

Since this position shows you to be more alert, it also gives you more control over the situation.  Lean your weight away from another person.  What do you experience?  Probably a "laid back" sort of remoteness.  You're simply not as involved.

Posturing <u>means inclining yourself forward to show that your attention is really focused.</u>

## *STUDENT EXERCISE:*

List some distracting behaviors that other officers sometimes show.

_____

_____

_____

_____


What are some distracting behaviors that you sometimes show?

_____

_____

_____

_____


## *Summary of Video Scene: "The Keys".*

Officer Wilson is on duty at a station in the hallway.  He leans against the podium and tosses his keys as inmates walk by.

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

HANDOUT 1

*Questions After Viewing:*

Describe Officer Wilson's posture.

_____

_____

_____

How could the officer improve his posture?

_____

_____

_____

What distracting behaviors did the officer exhibit?

_____

_____

_____

What kind of impression would this officer make on inmates?

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*Summary of Video Scene: "On Duty"*

Officer Andrews is on duty at the same station in the hallway. He sees inmate Joe carson go by and calls him back, saying, "Hey, Joe, come here for a sec....I want to talk to you."

*Questions After Viewing:*

Describe Officer Andrews' posture on duty:

_____

_____

_____

Describe Officer Andrews' posture as he gets ready to talk to Joe:

_____

_____

_____

What distracting behavior did he eliminate?

_____

_____

_____

What impression do you think the officer's posture would make on Joe?

_____

_____

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

# OBSERVING

## {5}

Observing is the ability to notice and understand inmate appearances, behavior and environment.  Careful observation of inmate actions will tell you most of what you need to know about them, their feelings and their problems.

The four steps in observing are:

## THE BASICS:

Sizing Up the Situation



Listening

Observing

1. Looking carefully
2. Making inferences about feelings, relationships and energy level
3. Deciding normal/abnormal
4. Deciding trouble/no trouble

Posturing

Positioning

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

## THE FIRST PART OF OBSERVING

Looking at Behavior, Appearance and Environment.  A "behavior" is a nonverbal cue provided by something that the inmate does while conscious and active.  For example, an officer might observe any or all of the following behaviors:  two inmates holding hands; one inmate bumping another inmate; one inmate reading.  An "appearance" is a nonverbal cue that an inmate might display even if he were unconscious or dead.

For example, an officer might observe the following appearances: one inmate is black, another inmate didn't wear clean clothes today; a third inmate is an older person.

## Environment:

Environment, of course, means the particular people and things which an inmate has around the inmate in a particular place.  When observing an inmate, you should try to answer mental questions like:

*Behavior:*             "What's he doing right now?"

*Appearance:* "What are the important things about how she looks?"

*Environment:*"What's important about where he is and who he's with?"

Once you're able to answer these questions, you're ready to draw some inferences about the inmate.

OBSERVING means looking at inmate behavior, appearances, and environment.
‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

## THE SECOND PART OF OBSERVING:

Draw Inferences:  Inferences are the initial conclusions you come to as the result of observing inmates.  You take in visual cues related to inmate appearances, behavior and environment.  these cues are really "clues" which show you something about inmate feelings, inmate relationships, inmate energy levels and inmate values.  The more observations you make, the more inferences you can draw - and the more accurate these inferences will be.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

OBSERVING means drawing inferences about inmate feelings, relationships, energy levels and values.

Drawing Inferences About Feelings:  The officer can use observing skills to draw inferences about how an individual inmate or an entire unit of inmates if feeling.  Knowing how a person is feeling is critical in determining where a person really is.  For example, you might use the feeling word "happy" to describe an inmate who is exercising and smiling.  For an inmate who is pacing while wringing his hand, you might apply the feeling word "tense."  You might use the term "uptight" to describe a group of inmates who are tightly clustered and are speaking with each in a well-guarded hesitant manner.

*STUDENT EXERCISE:*

What feeling word would you apply to the following examples?

a.     An inmate is sitting on her the bed, head hanging down, slowly rocking back and forth.

        *Feeling word:*_____

b.     In shop, an inmate is holding up a chair just completed.  The inmate is pointing to it while standing erect.  Now the inmate puts it down and points to the other inmates to sit down in the chair.

        *Feeling word:*_____

*Drawing Inferences About Relationships:*  Besides being aware of the nonverbal cues that indicate the feelings of the inmate, the officer can further increase his effectiveness in correctional management by looking for cues that indicate the nature of the relationship between himself and the inmates and between the inmates themselves.  The relationship between the officer and the inmates and among the inmates themselves who serves as a good indicator of future action.  An inmate who has a good relationship with an officer may provide him with valuable information about potential breaks in security.  An inmate who has a bad relationship with either an officer or another inmate may be a source of violence.

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

In general, you can categorize relationships and feelings as <u>Positive,</u> <u>Negative</u> or <u>Neutral</u>. Inmates who do things to make your job easier (e.g., arrive on time) probably have or want to have a positive relationship with you. An inmate who always tries to hassle you (e.g., uses abusive language, refuses to obey orders) doesn't have or doesn't want to have a positive relationship with you.

## *EXAMPLES:*

Among inmates, relationships of power are critical. Usually inmates form their own group with a leader. Knowing the relationship within and between groups is crucial. For example, a bumping between members of different groups can mean real trouble. In addition, homosexual relationships, drug relationships, extortion relationships and gambling relationships are sources of great problems. You might observe that two inmates who have had a close relationship are no longer "hanging" together. You might further observe that one of the inmates is with some new inmates. This could mean a problem is brewing.

## *STUDENT EXERCISE:*

List two behaviors and/or appearances that would tell you that two inmates have a <u>negative relationship:</u>

1. _____

2. _____

What might result from these behaviors and/or appearances?

1. _____

2. _____

List two behaviors and/or appearances that would tell you that two inmates have a <u>positive relationship:</u>

1. _____

2. _____

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

HANDOUT 1

## *ENERGY: HIGH? LOW? MEDIUM?*

<u>Inferences About Energy Level.</u> Energy level tells us a great deal about how much and what type of trouble an inmate can and/or will cause. For example, inmates with a low energy level are reluctant to initiate anything. Many inmates have a low energy level. They look and act defeated. Their movements are slow, their heads hang down and every move seems like an effort. These inmates spend a good part of their time sleeping. Inmates with moderate energy levels actively engage in most activities (playing cards, talking, eating) while high energy inmates not only participate in all that is required but also make use of physical fitness equipment and other optional activities. The danger of high energy, of course, is that this energy needs to be used constructively so that it does not become a source of danger. In general, it is important to keep all inmates occupied and involved in activities; but with high energy types, it is absolutely essential.

While it is important to observe basic levels of energy, changes in energy level are even more critical. Energy levels are usually constant for inmates except at special times (e.g., visiting hours, holidays). Changes from high to low or low to high may indicate trouble such as drugs or imminent violence (to self or others).

## *STUDENT EXERCISE:*

List two behaviors that show a high energy level.

1. _____

2. _____

List two behaviors that show a low energy level.

1. _____

2. _____

List two special items that might cause inmate energy levels to change:

1. _____

2. _____

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

<u>Inferences About Inmate Values:</u> It is also important to understand what a given inmate values. Here is where observing the inmate's environment comes in. Every inmate has three basic environments: <u>The place where the inmate lives</u> (unit), <u>the place where the inmate works</u> (shop), <u>the place where the inmate learns</u> (school). In each of these settings, the actual "environment" will include not only physical materials but people -- the people that the inmate "runs with." You can learn a great deal about an inmate by carefully observing his environment. A general rule is: What a person gives his energy to, is of value to that person; the more energy, the higher the value.

Your observations should help you find out how the inmate relates to his environment. Does the inmate have friends? Who are They? Remember, birds of a feather definitely do flock together!! An inmate who hangs out with a drug crowd is telling you something. What are the things that are important for the inmate? You should look for things in the environment that reflect this inmate's interests and values (e.g., neatness, reading material). Knowing what an inmate values has real implications for effective management. When you know what an individual wants or doesn't want, you've got an edge in managing that individual when necessary.

*STUDENT EXERCISE:*

List three things (in relation to environment) that might reflect inmate values:

1. _____

2. _____

3. _____

The reasons for your inferences should be visual cues, related to behaviors, appearances and environment. Inference stand the best chance of being accurate if they are based on detailed and concrete observations rather than on vague and general ones. Inferences are based on your previous observations of behaviors and appearances. The more concrete you can be in describing the appearances and behaviors to yourself and to others with whom you might share them, the more likely it is that your inferences will be correct.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*STUDENT EXERCISE:*

Read the following incident carefully. Be ready to give reasons (descriptions of appearances and behaviors) for some inferences you will be asked to draw.

*Incident:*

November 10, 4:30 p.m., The Yard. Shortly after visiting hours, a group of large inmates approached a new, young inmate who was about 5'6", 125 lbs. They went up to him and surrounded him. One of the larger men put his arm around the young inmate's neck and shoulder and pulled him abruptly to him while looking directly into his face. The young inmate grimaced and tried to pull away. The group laughed. After a few minutes the young inmate gave them something. He then pulled away, head down, barely moving.

*Directions:*

Write down the feelings of the young inmate, his relationship to the group and his energy level. Cite reasons for your inferences. (The reasons should be descriptions of the appearances and behaviors demonstrated).

*Feeling:*_____
                        (angry, scared, happy, sad)

*Reason:*_____

_____

*Relationship:*_____
                        (positive, negative, neutral)

*Reason:*_____

_____

*Energy Level:*_____
                        (high, moderate, low)

*Reason:*_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

## *THE THIRD PART OF OBSERVING:*

Deciding Whether Things Are Normal or Abnormal:  Once you've been on the job for awhile, of course, you get to know how individual inmates tend to function.  One guy is easy-going and hardly ever hassles others.  A second guy always looks like he's mad at the world.  A third always seems to be feeling sorry for himself.  Your observations and the inferences you've drawn can help you determine whether a particular inmate is in a "normal" or an "abnormal" condition at any point in time.

## OBSERVING means determining if things are normal or abnormal.

In determining whether things are normal or abnormal for a given inmate at a given time, compare your present observations of the inmate with any past ones and/or with any comments which other officers may have made about the inmate.  For example, you may observe an inmate arguing loudly with another inmate.  The inmate may even be making threats of one kind or another.  If this is normal behavior for this inmate, you probably need to exercise only the usual amount of caution.  But, if the appearance and behavior of the angry inmate are highly unusual or abnormal,  you'll know it's a potentially violent situation.
---------------------------------------------------------------

## *THE FOURTH PART OF OBSERVING:*

Deciding Whether There is Trouble/No Trouble:  This decision should be based on your observations and your knowledge of prison life.  With your knowledge of prison life in general, you should be able to generate certain principles that will be useful in making this decision (e.g. "birds of a feather flock together"; "a very depressed person usually withdraws from activities and other people"; "when 10% to 15% of a group of inmates are down, tense or hostile, it can affect the entire group;" "abrupt and/or major changes in behavior and/or appearances means trouble"; "a guy who has used a shank before in prison has a greater likelihood of stabbing someone else").

## OBSERVING means deciding whether it's a "trouble" or a "no trouble" situation.

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

## EXAMPLE:

Take the situation where you observe a homosexual with a different inmate from the one with whom he'd been keeping company. This homosexual's first partner has been shouting at you and others lately, staying up at night and following the "new couple." Given these observations, you can infer that the first partner is angry (shouting), has a negative relationship with his former partner (there is a new partner) and has a higher energy level (not sleeping, following the new couple around). You combine these inferences with your knowledge that inmates will harm other inmates when a homosexual relationship breaks down. You suspect that the first partner is going to try to get even with the new partner for stealing his lover and ruining his image. You decide this is a trouble situation.

## Conclusion:

Observing inmate appearance and behavior is usually the quickest and most accurate way to detect whether or not a given individual is really having a problem. Inmates are usually reluctant to talk about problems. Your observations will allow you to anticipate problems so that you can prepare for their possible impact upon the inmate, on other inmates, even on you and other officers.

## Summary of Video Scene: "THE PICK"

Officer Davis is on duty in the dayroom, observing inmate activities. There are four inmates in the room -- two watching TV and two playing cards. A fifth inmate (Billy) enters, carrying on about his lost pick. He approaches the TV watchers, who tell him to get lost and he approaches the card players, one of whom becomes angry while the other calms things down. Billy wanders over and slumps down into a chair muttering to himself.

## STUDENT EXERCISE:

What inferences would you make about the TV watchers? Include reasons based on visible clues about behavior, appearance and environment.

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

*Inferences about relationships:*_____

_____

_____

*Reasons:*_____

*Inferences about energy levels:*_____

_____

_____

*Reasons:*_____

What inferences would you make about the card players?  Again, include reasons based on observed clues.

*Inferences about relationships:*_____

_____

_____

*Reasons:*_____

*Inferences about energy levels:*_____

_____

_____

*Reasons:*_____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

What inferences would you make about Billy?

*Feelings:*_____

*Reasons:*_____

*Relationship to Chico:*_____

*Reasons:*_____

*Chico's relationship to him:*_____

*Reasons:*_____

*Energy Level:*_____

*Reasons:*_____

What clues do you have that this situation is either normal or abnormal?

_____

_____

What clues do you have that this situation is either trouble or no trouble?

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | **TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)** |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | **HANDOUT 1** |

*STUDENT EXERCISE:*

Your instructor will guide the group through role playing activities that will give you more practice in using the skill of Observing.

A.    *Feeling_____Reason_____*

B.    *Relationship_____Reason_____*

C.    *Energy Level_____Reason_____*

D.    What knowledge or principles do you have that would apply to the situation?

_____

_____

_____

_____

E.    *Normal or abnormal?_____*

F.    *Trouble or no trouble?_____*

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

# LISTENING

## {6}

Listening <u>is the ability to hear and understand what inmates are saying.</u> Listening helps you hear the danger signals from inmates while things are still at the verbal stage so you can take appropriate action to manage situations before they get out of hand.

The four steps in Listening are:

## THE BASICS
Sizing Up the Situation



Listening
1. Suspend judgement
2. Pick out key words
3. Identify intensity
4. Reflect on mood

Observing

Posturing

Positioning

*Verbal Cues and Signals:*

Inmates often go through a verbal stage before the action begins. If you can hear the danger signals, you can cut off the trouble before it really breaks out. Listening involves the officer's ability to hear and accurately recall all the important verbal cues used by the inmates.

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

"Important" here means stated or implied signals of trouble or problems. The danger may be an inmate's intention to inflict personal harm or to harm another inmate, the intention to inflict harm on an officer or even the intention to attempt a possible prison break. You can listen for cues that mean violence is occurring or that violence is possible if preventive action is not taken soon. For example, an officer on one shop heard some furniture moving around rapidly. When he investigated, he found an inmate chasing another inmate with a razor blade. The victim was using the furniture to block the attacking inmate.

Complaints from inmates are common, of course--but they're also important. An effective officer listens to complaints and recognizes when a complaint arises from a usually uncomplaining inmate. An officer especially listens for changes; silence when there is usually noise (dining area); or noise when there is usually silence (3 a.m. in the unit). Once again, the officer asks the question: "Is there trouble here?"

Position, Posture, Observe:

As indicated before, you should get ready for listening by using the basic positioning, posturing and observing skills whenever possible. A good position will obviously help you hear better. Posturing, while perhaps less important in terms of listening for management, is essential when you're listening to an inmate who really wants to talk to you; your posture can signal the inmate that you're focusing all your attention on that inmate. Finally, your observing skills cannot always be used to promote better listening--i.e., you may overhead something that inmates are talking about around a corner. But, when possible, visual observations help you to understand the implications of what you're hearing. An inmate who sounds angry but turns out to be leaning back in his chair and grinning may have only been telling a story to others; an inmate whose angry voice fits with his or her tense, uptight appearance presents quite a different situation.

Concentration:

One more preliminary thing: you can't listen effectively to an inmate or to inmates if you've got other things on your mind. If you're thinking about home or other job responsibilities, you may miss a lot of what is said and what it really means. You've got to focus on the inmate to whom you're listening--and this takes a good deal of concentration.

You can work to develop this kind of concentration by reviewing what you're going to do and whom you're going to see before you assume your post. Then you'll really be ready to start using the four specific procedures which skilled listening involves: Suspend Judgement; Pick out Key Words; Identify intensity; Reflect on Mood

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

_____

*THE FIRST PART OF LISTENING:*

<u>Suspend Judgement:</u>  This is very difficult to do in relation to any inmate since society itself has passed judgement on him or her.  Yet most officers agree that it's important to judge a person on what they do now in prison rather than on what was done on the outside.  It is still hard at times to listen without immediate judgement because most of the inmates either complain about other inmates, the prison or you or demand to be given something.  Despite this, it will severely hurt your management efforts if you do not suspend judgement because you will never hear the real verbal cues you need to hear to prevent the danger or assist someone.

LISTENING <u>means suspending your own judgement temporarily so you can really hear what's being said.</u>

All complaints sound the same after awhile -- but they are not all the same!!  Some are just the normal negatives of inmates while others are real warning signals of danger.  Just let the inmate's message sink in before making any decisions about it.  Of course, certain situations within the prison call for quick action; but if you develop your nonjudgemental listening ability now, you will hear better and be able to take appropriate action more quickly when necessary.

_____

*THE SECOND PART OF LISTENING:*

<u>Pick Out Key Words:</u>  There are key words and phrases to listen for.  Here are a few; add some of your own:  "kill", "depressed," "snitch", "honky", "waste", "hawk", "crow", "nigger", "blackman". Other words to listen for:  "You'll pay", "Get out of here", "hostage".  Of course, everything you hear and see must be considered in terms of who the inmate is that did or said it.  Some inmates are always threatening or sounding off.  In addition to the key words, you'll need to pick out the person who is involved.

LISTENING means picking out key words and phrases like "get" or "shank" or "that S.O.B."

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*STUDENT EXERCISE:*

List some words or phrases that signal danger or trouble in your own particular environment.

_____

_____

_____

_____

— — — — — — — — — — — — — —

*THE FOURTH PART OF LISTENING:*

Reflect On What The Mood Is

"Mood" here means, at a very simple level, what the inmates are feeling. One question you may ask to determine mood is "What kinds of feelings are being expressed or implied (positive, negative, neutral)?" Another question you want to answer is "Is this mood normal or abnormal for this time and place?" Sure, there are always exceptions. For example, a man can say "I'm going to kill you" quietly and without emotion yet still mean it. This is why it is so important to know your prisoners and to continue to observe and listen for other cues.

LISTENING means determining whether an inmate's mood is positive, negative or neutral and whether this mood is normal or abnormal.

## Reasons:

When you answer the question, "Is this normal or abnormal?", you should try to formulate the reason why this is the case. "Normal" means "as it usually is." This can apply to one inmate as well as to a large group of inmates.

Inmates are usually quite consistent in their behaviors in the various settings of the institution, e.g., it's not normal for inmates to be really up when they are not occupied; therefore, if your inmates are flying when there are no visiting hours due, no work, no shop, etc., then things are not normal and the possibility of danger exists.

## *Summary of Video Scene: "Old Bag"*

An inmate says, "If that old bag tries to touch me one more time, she'll be sorry. It'll be a long time before she tries that with anybody else again. Keep her away from me or I'll get her."

## *Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

## *Summary of Video Scene: "Gone for Good"*

An inmate says, "Oh, what's the use? My life's a mess. She's gone for good this time, and I'm stuck here and can't do a damn thing about it. What's the use of going on?"

## *Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*Summary of Video Scene:  "Tough Number"*

An inmate says, "Your pal, Officer Adams, really thinks he's a tough number.  If he keeps riding our asses the way he's been doing - well, he'll see.  He'll find out just how tough he really is."

*Questions After Viewing:*

From the inmate's statement, identify:

Key Words:_____

Moods:_____

Intensity:_____

<u>Responsibilities:</u>

---------------------------------------------------------------

| *INMATE* | *OFFICER* | *GROUP* |
|----------|-----------|---------|
| 1.Describe setting | 1.Position, Posture Observe, Suspend judgement, Say NOTHING | 1.Position for paying attention |
| 2.Role-play inmate for 20-30 seconds | 2.Pull out key words | 1.Write own answers |
| 3.Provide verbal cues for conveying information | 3.Identify intensity (high, medium, low) | 3.Rate officer on sizing up Skills (# 1) |
| | 4.Define Mood (positive, negative, neutral) | 4.Rate officer on # 2-6 (yes/no) |
| | 5.Mood normal, abnormal | |
| | 6.Why | |

APPROVED 9/6/00; REVISED 5/30/01

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

HANDOUT 1

# SUMMARY OF THE BASICS

## {7}

Now--What have you got?

It wasn't that long since Harry had finished his training and gone on the job. His lack of experience, however, really didn't bother him too much. He had a lot going for him. For one thing, he had some good basic skills.

He walked the unit halfway through his shift. In one cubicle two older inmates played checkers, their usual game. He'd watched them before. They'd play for an hour--no more, no less. All part of their own little routine. So long as they stuck to it, Harry knew things were probably all right.

In another room, a young guy lay on his bed reading. His roommate, an older man named Dan, paced back and forth. Tension. Dan was usually a quiet, relaxed guy.

"Hi, Dan." Harry stopped three or four feet from the other man and faced squarely. To one side he could see Dan's roommate watching him over the top of his book. "How's it going?"

"All right--no problems. I'm just upset not getting any mail from my wife. It's been a couple of weeks."

"I'm sorry to hear that. Maybe, tomorrow, huh?"

The older man nodded and went back to pacing. Harry turned to face the younger inmate. "How're things, Jay?"

Jay looked away. "Shove off, huh?" But there was no anger in his voice. He sounded nervous if anything. There was no way he was going to meet Harry's gaze.

Something happening there, all right. Harry made a mental note to ask the other officers on duty about Jay. He'd also swing past again in a few minutes, break his normal routine and maybe learn a little more about what was going on.

Yes, Harry had a lot going for him with his basic skills. Now you've got the same skills working for you. Being able to size things up means being able to know when things are going smoothly--and when they're not. This in turn means being able to minimize risk and maximize your effectiveness on the job. Being a correctional officer is never easy.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

It is, however, nearly impossible if all you have to go on is impulse and habit!  Now you can move beyond these limited capabilities and start to put some real professionalism into your work!

All right...You've had a chance to learn the four basic skills you need to size up a situation--to manage your job and the inmates more effectively.  You've practiced positioning, posturing, observing and listening.  But as you know, there's far more to being an effective officer than being able to size things up.  There will be times when you will choose to manage by communicating with inmates.  You'll want to defuse a troublesome situation or get important information.  You may want to get involved with inmates' concerns.

In the second major section of this manual, we'll consider the skills you'll need to communicate with inmates.  The skills in this second section, while optional when it comes to helping inmates with personal problems, are absolutely essential when dealing with tense situations--situations where strong feelings may get out of control unless you're able to communicate with inmates.  Sizing things up just lets you know what's happening and what may happen.  To change things for the better--and that's what effective management requires--you need to add-on communication skills!!

THE ADD-ONS

1. Responding
2. Asking Questions

THE BASICS

1. Position
2. Posture
3. Observe
4. Listen

# THE ADD-ONS:
# COMMUNICATING WITH INMATES

## {8}

Add-on skills help you open up communication with inmates. They provide you with the ability to get another person to tell you more about what he knows or thinks. You'll find the add-on communicating skills invaluable whenever you need to get more information about a situation, or when you choose to become involved with an inmate.

The two Add-on communicating skills are:

THE ADD-ONS:
Communicating with inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
3. Responding to feeling
   and meaning

It's been said that the only thing worse than a young guy who thinks he knows it all is an old guy who's sure he knows it--but doesn't!

*EXAMPLE:*

Some of you may be new to corrections. Others of you may have some correctional experience.

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

Whatever your situation, you've probably run across one or two officers who have gotten themselves stuck in the traditional hard-line approach. To these officers, an inmate is an inmate--period. They're right, of course--but only up to a point. Two older officers at a large institution found this out to their considerable embarrassment. It seems a young officer started work. He was cheerful enough but he didn't say much. Even so, the two experienced men figured him for a staff training center whiz kid who thought he had all the answers. He didn't, of course. But as it turned out, neither did they.

One day the three happened to be on duty together. An inmate named Larry got one of the two older men aside and tipped him off about some contraband that Jess, another inmate, had stashed in his room. Minutes later, the two experienced officers had Jess out and were conducting a thorough search. Sure enough, they found a small vial of "coke" hidden in his bedding.

"That's kind of hard to believe," the young officer said to the older guys once Jess had been written up.

"Yeah? How's that?"

"Well, I've seen Jess around--and I've watched who he hangs out with. He doesn't seem like the kind of guy who's into drugs."

One of the older officers shrugged. "Who knows? All that counts is that we found this in his bed. He can try to deny that it's his, but there's no getting around the facts."

Jess did deny it. He swore that he knew nothing about the "coke." In the end the officers just figured he was lying. They restricted his privileges and shifted him to a different unit.

The next day another inmate requested to be moved in with Ray, Jess's former roommate. The officers agreed and the move was made. Less than a week later, Ray "fell down" and got a deep gash in his head. Although he, himself, said it was an accident, the officers knew he was clamming up. They tried to get the inmate to talk. They tried to get the new roommate to talk. No one, however, would say anything but "accident." Eventually, the two officers just dropped the whole thing.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

## *Skill Makes the Difference!*

"It could have been an accident," one of them said.  "Sure," the other agreed.  "But it could also have been a set-up right from the start.  They could have framed Jess to get him out of Ray's room and get their own man in."

"Yeah, I guess.  But they may have just seen a chance when we busted Jess and moved in."

It was a mystery the two older officers never solved.  What bothered them most was the knowledge that something might have been put over on them.  But it didn't have to turn out this way.  The officers probably could have gotten Jess, Ray and the other inmate to really open up if they had possessed some effective communication skills.

Just what is communication all about?  We know that some officers can really talk with inmates and others can't.

## *Why It's Important to Communicate:*

Although you see and hear inmates every working day, chances are you're never really sure what's going on inside them. At the most fundamental level, officers and inmates are all human beings.  Many times it seems that the similarities stop right there.  This is understandable, of course, since in the end it's obvious that inmates are not the same as officers.

## *Understanding Means Effectiveness:*

The gulf between you and any one inmate may often be frustrating.  In one way you feel that you know this inmate but in another way you're sure you don't.  Knowing the inmate is important.  The better your understanding of any inmate, the more effective you can be in terms of inmate management.

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

### *Communication Promotes Understanding:*

This is where communication skills become important add-ons. When you choose to use these skills, you can find out a great deal more about where individual inmates are. You can add to your understanding and action in ways that will help you defuse tension, decrease the chances of trouble and increase your ability to handle any and all situations more effectively.

The basic skills covered in Section I let you size up the situation. The add-on communication skills presented in Section II let you understand the full implications of that situation and act constructively.

### *What Are the Skills?*

Once you choose to communicate with an inmate or a group of inmates, you begin by putting all of the four basic skills to use: positioning, posturing, observing and listening. As the communicative process develops, you use the new skills in two important areas.

------------------------------------------------------------------

*THE TWO SKILLS:     RESPONDING TO INMATES*
                    *ASKING RELEVANT QUESTIONS*
------------------------------------------------------------------

As the materials which follow make clear, responding to inmates means a good deal more than just answering a greeting--although this, too, can be important. You need to take the initiative in developing effective responses. By the same token, asking relevant questions means more than a simply "Hey, what's going on?' Here in Section II you'll have a chance to learn the specific procedures involved in responding and asking questions effectively.

### *Getting Ready By Using the Basics: Position*

As noted earlier, communicating with inmates must begin with your use of all the basic skills. You position yourself at the best possible distance from the inmate--three to four feet when you are working with a single person (although this could certainly increase if danger was imminent). This puts you close enough to see and hear everything yet not so close that you seem overly threatening. You face the inmate squarely, your left shoulder squared with the inmate's right and your right with the inmate's left. You look directly at the inmate, making frequent eye contact to let the inmate know you're really "right there."

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*Posture---Observe---Listen:*

You posture yourself so as to communicate both confidence and real attention. You observe the inmate's appearance and behavior, using visual cues to draw inferences about the inmate's feelings, relationship with you and general energy level.

You listen carefully, making sure you take in all the key words and verbal indications of intensity so that you can determine just what the inmate's mood really is. Only after you have really mastered and put to use the basic skills will you be able to use the add-on communication skills effectively.

Like the basic skills, communication skills involve a step-by-step approach. First, you respond to the inmate. Then you ask any relevant questions you need to ask. Then you respond again, this time to the inmate's answers. You would usually not, in other words, just jump in and start asking questions--at least not if you're trying to get the inmate to open up and communicate with you voluntarily.

*STUDENT EXERCISE:*

We have all met some officers who are skilled at communicating with inmates. What qualities or skills did these good communicators have that made them effective? List two:

1._____

2._____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# RESPONDING TO CONTENT

## {9}

Responding to content <u>is the skill of seeing and hearing what is really happening and the ability to reflect that understanding back to the inmate.</u>  You're letting the inmate know you heard accurately and are on top of the situation.

There are two steps to responding to content:

THE ADD-ONS:
Communicating With Inmates

Asking Questions

Responding

1. Responding to content:
   *  Reflecting on what was seen and heard
   *  Use responding format

------------------------------------------------------------------

*THREE LEVELS OF RESPONDING:*

*To Content*
*To Feeling + Meaning*
------------------------------------------------------------------

Responding means just that--showing a clear reaction to something which you have seen or heard.  A response <u>gives evidence</u> that you have listened.  In this Section we'll take a look at several levels of responding.  At the simplest level, you can respond to content by summarizing and expressing what an inmate or group of inmates has said or done.  At the next level, you can respond to the feelings shown in an inmate's words or reflected in actions.  Finally, you can respond to both the particular feelings and reasons for these feelings.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

Each new level of responding does more to show an inmate that you are really on top of things, really seeing, hearing and understanding the inmate in terms of where the inmate is.

Probably more than anything else in this training, responding is going to seem strange to you. It's new, and you may be doubtful about its worth. There are two things to remember here.

*First*, this is a skill to be added to what you already do rather than a skill to replace what you do. The more responses you have to choose from the more effective you can be. *Second*, by practicing the skill, you will learn the best places and ways to use it.

— — — — — — — — — — — — — — — — —

*THE FIRST LEVEL OF RESPONDING:*

While your use of the basic skills establishes a relationship in which inmates are more likely to cooperate with and talk to you, responding is a tool you can use at the moment to communicate with inmates. Responding to content is the first part of responding to the total problem or situation involving inmates. It shows an inmate that you have heard or seen what he said or did. When any person, including an inmate, knows that you are seeing and/or hearing him accurately, the inmate will tend to talk more freely. This is critical because talking gives you more of the information you need while allowing the inmate to get things out in the open and ventilate them.

RESPONDING at the simplest level reflects content:

"You're saying_____."

*Respond to Content:*

When responding to content, you are focusing on what the inmates are either saying or doing. Using what you have learned, you focus by positioning yourself for observing and/or listening to the inmates. Next, you reflect on what you have seen and heard: "What are the inmates doing?" and "What is the inmate saying?" In answering both questions, stick close to what is actually going on and/or what is being said. Finally, after taking it all in and reflecting on it, you summarize what the inmates are saying or doing in your own words. You respond to the content by saying to an inmate either: "You look (it looks) _____" or "You're saying_____."

(For example:  "You look pretty busy" or "You're saying, you're pretty busy.")

You respond to content when you want more information to aid you in management.  This may occur when you are interrogating an inmate or when you notice unusual behavior in an inmate or a group of inmates and would like to get some information from them about what they are doing.  For example, you might notice a group of usually talkative inmates being very quiet.  You could say to them:  "You people seem pretty quiet today."  This gives them the opportunity to respond to you while also letting them know that you are observing them and observing them accurately.  Unlike other approaches to getting information, responding to content doesn't automatically put an inmate on the defensive.

## STUDENT EXERCISE:

List two examples of situations in which you might respond to content in order to get more information.

1._____

2._____

— — — — — — — — — — — — — — —

## Get Inmates to Talk Instead of Act!

The typical inmate attitude is "the inmate vs. the officer."  Although there is a lot of truth in this, responding can alter the "me against them" belief enough to open communication with inmates.  An inmate who is committed to some destructive action and who has done destructive things in the past will probably not be affected by responding to content.  But such responses will give many other inmates an opportunity to talk it out, to share it rather than keep it inside.

## Example:

One inmate might say "I really can't stand him.  He pushes me and pushes me.  Every time I see him, I want to get even."  Put aside your desire to question such an inmate ("Why do you want to do something foolish?") and your desire to push him into something positive by stating a negative ("You really want to do some more time!")  Instead, give him a response to content:  "You're saying you really want to get back at him."

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

This response will encourage talk and help you get the information you need to really understand the situation before you push for or take any action.  Instead of switching to a hostile or defensive way to counter what he might see as an officer's usual hassling, the inmate relaxes.  You're not pushing.  You're not hassling.  Instead, you're playing along and giving him a chance to tell about something and thereby lessen the probability that he will do that thing.  In addition, the more an inmate talks, the more you learn about his values. The more you know about his values, the easier it is to manage him.

### *Summary of Video Scene:  "The New Job"*

An inmate complains about a job request he's made:  Officer Lopez responds to the content of the inmate's statement.

### *Questions After Viewing:*

What other response could be made to the content of the inmate's statement?

_____

_____

### *Summary of Video Scene:  "The Transfer"*

Officer Juan Lopez asks Officer Jim Wilson about how long it took him to get a transfer. Juan says he's been waiting quite awhile.

### *Questions After Viewing:*

How would you respond to Juan (responding to content?)

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

---------------------------------------------------------------

| *INMATE* | *OFFICER* | *GROUP* |
|---|---|---|

---------------------------------------------------------------

| *INMATE* | *OFFICER* | *GROUP* |
|---|---|---|
| 1. Gives the setting | 1. Attends | 1. Position, observe, listen |
| 2. Role-plays 20-30 seconds | 2. Waits 30 seconds | 2. Write own responses |
| | 3. Gives responses: "You're saying_____" "You look (it looks)_____" | 3. Rate officer's response. "Yes" if accurate, "No" if not accurate |
| | | 4. Rate officer's attending |

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# RESPONDING TO FEELING

## {10}

**Responding to feeling** is the ability to capture in words the specific feeling experience being presented by an inmate.  By responding to, or reflecting back, the inmate's feeling, you show that you understand that feeling.  This encourages the inmate to talk, to release his feelings.

The two steps in responding to feeling are:

## THE ADD-ONS
Communicating With Inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
   * Reflect on feeling and intensity
   * Respond to feeling

------------------------------------------------------------------

*THE SECOND LEVEL OF RESPONDING:*
------------------------------------------------------------------

Every person has feelings that affect what they say and do.  The nature and strength of these feelings usually determine what a person is going to do.  When you respond to an inmate's feeling, you are reaching inside the inmate and encouraging the individual to share personal feelings with you.  The skill of responding to feelings has important implications for the management of inmates.

RESPONDING at the next level reflects feelings:

"You feel_____"

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*Understanding Can Defuse Bad Feelings:*

Showing you understand how an inmate feels can be even more powerful than showing you understand the content of the inmate's actions and/or words. Showing an inmate that you understand negative feelings can usually defuse those negative feelings. By responding to feelings at the verbal or "symbolic" behavior level, you keep the inmate's words from turning to action. Also, responding to feelings at a verbal level can give you the necessary clues to determine the inmate's intention. If the inmate clams up after you have responded to the inmate's feelings, the inmate is probably telling you that he or she is going to act on them; on the other hand, if the inmate goes with it verbally, the inmate is telling you that he or she wants to talk it out instead of acting on it. You all know the difference between a talking fight where the parties are looking for a way out ("Yeah!" vs. "Oh, yeah!") and a real fight where the fists will be flying any second.

*Greater Understanding:*

Besides being able to defuse negative feelings so that words don't become actions, responding to feelings leads to greater understanding of--and by--the inmate. The inmate can't always link up feelings with the situation and is often at a loss to understand where he or she is. In addition, when you respond to positive feelings, these feelings get reinforced (unlike negative feelings). There's nothing mysterious about this. We don't enjoy our negative feelings so we get rid of them by sharing them -- "talking it out". But we do enjoy our positive feelings. They only become stronger when they're shared with another person. You can begin to strengthen the positive feelings that will help an inmate to act more positively simply by recognizing and responding to these feelings. As a general rule, a person who feels positive personally will try to do positive things while a person who feels negative personally will try to do negative things. If you push this out into a general principle, you get something like "people tend to act in ways consistent with the way other people see them."

If you put together an inmate's low self-image and the fact that others have a low image of him as well, you can predict that the inmate will act accordingly, i.e. negatively. Now you can't pretend that an inmate is positive when obviously, the inmate is not. However, if the inmate feels positive or does something that is positive, then recognizing that will help.

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*STUDENT EXERCISE:*

List two situations where it would be important and useful to defuse negative feelings.

1._____

2._____

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

## *Respond to Feelings:*

For responding to feeling, you position and posture yourself, then observe and listen. Then you reflect for the feeling (happy, angry, sad, scared, etc.) and its intensity (high, medium, low). Finally, you respond by saying, "You feel_____." For example, "You feel angry."

## *Basic Types of Feelings: Happy? Sad? Angry? Scared? Confused?*

Here the new skill involves reflecting for feeling and intensity. Adding a new skill doesn't mean discarding the old skills, of course. When reflecting for feeling, you are really asking yourself "Given what I see and hear, how does the inmate basically feel?" Is the inmate happy, angry, sad, scared or confused? The inmate's behavior and words will let you make a good guess at the feeling. For example, an inmate who yells at another inmate, "You stupid idiot, look what you did to my bed!", while the inmate waves his or her arms and turns red in the face, is obviously feeling some level of anger.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*Intensity of Feelings: High? Medium? Low?*

After you have picked out the feeling word, you must reflect on the intensity of the feeling. For example, anger can be high in intensity (boiling mad), medium in intensity (frustrated) or low in intensity (uptight). The more accurately your feeling word reflects the intensity, the more effective your response will be. That is, your response will be more accurate and will do the job better, e.g., defuse the negative feelings. You wouldn't choose "concerned" for the example given on the previous page because the term is too weak to describe an inmate yelling, turning red in the face and waving his or her arms around. Such an understatement would probably only make the inmate more angry. But "You feel furious", would fit fine.

*STUDENT EXERCISE:*

Take each of the five basic feeling words (happy, angry, confused, sad and scared) and write a high, medium and low intensity word for each.

### FEELING WORDS

| | HIGH | MEDIUM | LOW |
|---|---|---|---|
| Happy | _____ | _____ | _____ |
| Angry | _____ | _____ | _____ |
| Confused | _____ | _____ | _____ |
| Sad | _____ | _____ | _____ |
| Scared | _____ | _____ | _____ |

## Summary of Video Scene:  "The Appeal"

Inmate Carson is talking about the work he's done on his appeal; Officer Davis responds to Carson's feelings.

## Questions After Viewing:

Did Officer Davis respond to the feeling correctly?

_____

What other feeling word(s) would be appropriate?

_____

## Summary of Video Scene:  "Going Home":

An inmate is talking about getting out soon.

## Questions After Viewing:

Identify the feeling and intensity in the inmate's statement:

_____

_____

How would you respond (responding to feeling)?

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*Communicator*                     *Responder*                     *Group*

_____

1.Shares real problem

2.Rates responses
  after group rating

1.Positions,
  observes
  listens

2.Pauses 10-20
  seconds

3."You feel_____"

1.Positions,
  observes
  listens

2.Writes own
  "You feel_____"

3.Rate "Yes/No" on
  officer's response
  and why

4.Give individual
  response to group

5.Rate Yes/No on
  sizing up

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# RESPONDING TO FEELING AND MEANING

## {11}

Responding to feeling and meaning combines the two previous skills.  Responding to feeling and meaning <u>requires you to paraphrase the content of an inmate's statement in such a way as to provide a meaningful reason for the inmate's feeling.</u>

The two steps in responding to feeling and meaning are:

THE ADD-ONS:
Communicating With Inmates

Asking Questions

Responding

1. Responding to content
2. Responding to feeling
3. Responding to feeling and meaning
   * Reflect on feeling & reason
   * Respond to feeling & meaning

*THE THIRD LEVEL OF RESPONDING:*

*Meaning is the Reason for the Feeling:*

Learning how to respond to content and how to respond to feeling has prepared you to respond to feeling and meaning.  Now your responses at this new level can put everything together.  Here you will capture effectively where the inmate is at the moment.

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)
## HANDOUT 1

By adding the meaning to the feeling, you will help yourself and the inmate understand the reason for his feelings about the situation.  The reason is simply the personal meaning for the inmate about what is happening.  For example, an inmate in danger of being pulled into a fight when his record is clean and his parole is due, might feel "scared" because "the fight could blow my chances to get out."  The personal meaning of the potential fight for this inmate is that it might blow his chances for parole.  That is one reason why he is scared.

RESPONDING at the highest level reflects both feeling and meaning.
          "You feel_____because_____."

By putting together the feeling and meaning and responding to both, you show the inmate you understand the present experience for the inmate.  This increases the chances of the inmate talking to you about the thing in which you are interested.  In addition, for interrogation purposes, you will be able to learn more about what the inmate values and fears so that you can get a handle on the inmate and, if necessary, use the values and fears to apply pressure in order to manage the inmate.  For example, one officer might be confronted with a hostile inmate who is refusing to let the officer shake down the inmate's cell.

Inmate:     "No way.  You're not going to shake this cell down because some snitch told you some crap.  There's nothing in here."

Officer:     "You feel angry because we're going to mess up your cell when there's nothing there."

Inmate:     "That's right.  I knew some damn snitch was going to run to you to get me, but I told all the guys that I'm not going to let nobody in here for no good reason."

Officer:     "You feel tense because your reputation is on the line and you're gonna' make us take you out even if it costs you."

Inmate:     "That's right, man."  (Then yells to other inmates), "You ain't taking me."

By now the officer has the picture.  This inmate has backed himself into a corner with his peers and now he can't give up.  The officer wisely clears the cells immediately around the inmate's cell and then tells the inmate that they are going to take him out physically so everybody can see but that there's going to be no rough stuff.  The responding gave the officer enough extra information to avoid a confrontation.

In another situation, an inmate asks the officer a question about his work detail.

Inmate: "Why do I have to be in the kitchen?  The steam and the odors suffocate me."

Officer: "You feel concerned because the conditions over there are hard for you to work in."

Inmate: "Yeah. I get this heavy feeling in my chest and I begin to wheeze after about thirty minutes.  I know the kitchen supervisor thinks I'm running a game, but man, I need to get out of there!"

Officer: "You feel worried about your situation because you think something is wrong in your chest that the smells in the kitchen make worse and you can't convince the detail supervisor that you're leveling with him."

Inmate: "Right, it's getting worse, all the time and I don't know what to do."

Officer: How about going to the infirmary in the morning to get it checked?  The doctor can authorize a work detail change if there is evidence that your condition needs it."

The officer understands clearly where the inmate is in the situation, where he wants (or needs) to be and is able to suggest a possible solution.  This became possible because he was able to attach an understanding of meaning to the feelings of the inmate.


*Respond to Feeling Plus Meaning:*

What we need to focus on here, of course, is an inmate's reason (personal meaning) for his or her feeling.  Supplying the reason means you must understand why what happened is important.

You do this by rephrasing the content in your own words to capture that importance.  You are actually giving the reason for the feeling.  In this way, you make the inmate's feeling clearer and more understandable.  It is also important to capture whether the inmate feels personally responsible or sees someone else as responsible.  Your response should reflect where the inmate sees the responsibility in the beginning, even though you may not agree.  By doing this you will have a better chance of opening the inmate up.  You can always disagree when it becomes necessary and effective to do so.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*STUDENT EXERCISE:*

An inmate had been a "snitch" for a particular officer until the day the inmate suspected that word had leaked out about this activity. The inmate confronted the officer with narrowed eyes and hands trembling.

"You rotten fink!! You promised you wouldn't rat! Now they know about me. You really screwed me over!"

Identify the intensity and category of this feeling and pick an accurate "feeling" word to describe the inmate's emotion:

_____

Now supply the reason for the inmate's feeling. What does this situation really mean to the inmate? Who is the inmate blaming? Why is all of this so important to the inmate? To understand what's going on, you have to forget that you may not have leaked anything; forget that you had your reasons if you did tell someone; forget the inmate's words and tone and language. What does this mean to the inmate? Recognizing the meaning, formulate a response.

RESPONSE TO FEELING AND MEANING: "You feel_____ because_____."

_____

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

## EXPLANATION:

The officer who was actually involved knew how to initiate communication with an inmate in a tense situation like this -- and he recognized that failure to do so could mean real trouble. He knew that the inmate's basic feeling was anger.  He knew that the intensity of this feeling was high and that the inmate was really furious.  He knew that the inmate was blaming him for risking his life -- the real meaning of the situation for the inmate.  Knowing all of this, the officer was able to respond effectively to the inmate's feeling and to what his feeling meant.

*"You feel furious because I put your life in danger."*

This response caught the inmate flat-footed.  He had expected the officer to either deny everything, to tell him to shut his mouth, or to ignore the whole thing.  He certainly hadn't expected the officer to respond to his situation at the same level that he, the inmate, was experiencing it!!

Because the officer knew how to respond at this level, he was able to keep the inmate talking openly.  In a tense situation, this can mean the difference between effective management and genuine danger!

## Referral:

When responding to feeling and meaning, a communication interchange may sometimes go deeper than you feel you can handle.  If this happens, you must consider the option of a referral.  With your added understanding, your referral will be that much more specific and beneficial.  Many times your added understanding will provide you with the information you need to really manage the inmate.  The payoff for you and the inmate will be rewarding. Many officers put in their time with the inmates but don't get the payoff because they lack some of the skills needed to finish off the good start that they make by being decent and fair.  Responding is one way to ensure the payoff.

Practice your responding skills with inmates with whom you have been communicating. When you practice the skill, don't just give one response and say to yourself, "Well, I did it." Keep using your responding skills over and over again when you are trying to understand the inmate.  When you feel he has said all he is going to say, or when you know all you need to know, then you can take action.  Be careful about giving advice too soon.  A lot of times an inmate will hold back part of the problem until it becomes apparent how you will react.  If you tell the inmate what to do too early, it may not be good advice.

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*Summary of Video Scene:  "The Writ"*

An inmate is talking about the writ he's been working on for some time.

*Questions After Viewing:*

Identify

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

*Summary of Video Scene:  "The New Job"*

An inmate is talking about a job request he made awhile ago.

*Questions After Viewing:*

Identify

Feeling:_____

Intensity:_____

Reason for feeling:_____

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

**HANDOUT 1**

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

*Summary of Video Scene:  "The Transfer"*

*Questions After Viewing:*

Officer Juan Lopez asks Officer Jim Wilson how long it took him to get a transfer.  Juan says he's been waiting quite awhile.

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the officer's feeling?

_____

How would you respond to this officer (responding to feeling and meaning)?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)
## HANDOUT 1

*Summary of Video Scene: "The Appeal"*

An inmate is talking about the work he's done on his appeal.

*Questions After Viewing:*

<u>Identify</u>

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate's (responding to feeling and meaning)?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

### HANDOUT 1

*Summary of Video Scene:  "Going Home"*

An inmate is talking about getting out soon.

*Questions After Viewing:*

Identify

Feeling:_____

Intensity:_____

Reason for feeling:_____

Who is responsible for the inmate's feeling?

_____

How would you respond to this inmate (responding to feeling and meaning)?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

## *EXERCISE # 1*

-------------------------------------------------------------

| *Communicator* | *Responder* | *Group* |
|---|---|---|
| 1. Gives real stimulus | 1. Positions, observes, listens | 1. Position observe listen |
| 2. Gives spontaneous reply following each each response | 2. Pause 10-20 seconds | 2. Write down own response |
| 3. Rates responder after group rating | 3. Gives response: | 3. Rate:"Yes/No" last response If no, Why? |
| | 4. Pause 10-20 seconds | 4. Give individual response to group |
| | 5. Gives response: "You feel_____ because_____." | 5. Feedback on sizing up |

-------------------------------------------------------------

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

## *EXERCISE # 2*

------------------------------------------------------------------

| Communicator | Responder | Group |
|---|---|---|

------------------------------------------------------------------

<u>Trainer:  Stop interchange if two in a row are off and restructure.</u>

| Communicator | Responder | Group |
|---|---|---|
| 1. Gives stimulus | 1. Positions, observes, listens | 1. Position, observe, listen |
| 2. Give feedback | 2. Pauses 10-20 seconds | 2. Writes own response |
| | 3. Responds: "You feel _____" | 3. Rates helper "Yes/No" in each response |
| | 4. Pauses 10-20 seconds | 4. Give individual response |
| | 5. Responds: "You feel_____ because_____" | 5. Feedback on sizing up |

------------------------------------------------------------------

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

# ASKING QUESTIONS

## {12}

You ask questions in order to get useful answers.  Some questions get better answers than others:  the skill of asking questions will help you increase your information and enhance your ability to manage inmates well.

The three techniques in asking questions are:

## THE ADD-ONS:
Communicating with Inmates

Asking Questions
_____

1. Using the 5WH method
2. Thinking about what was said or not said
3. Responding to the answer

Responding
_____

As the following materials make clear, there are really three basic steps involved in asking relevant questions in an effective way.  First, you must develop one or more questions of the "5WH" type: Who, What, Where, When, Why and How.  Second, you must think about the answer or answers given by the inmate to make sure you fully understand all the implications.  Third, respond to the inmate by reflecting back his/her answer.

Asking questions will help you manage an inmate.  If an inmate answered our questions, we would be all set. After all, we have all the right questions.  The reality, however, is that for a variety of reasons (e.g., lack of trust, the inmate's own guilt) the inmate does not answer many questions.  In fact, questions will sometimes have the opposite effect.  That is, they will shut off communication with inmates rather than open it up.  This is because questions are often seen as the bullets of the enemy ("Cover up, here they come").  The only way questions can be really effective in opening up an inmate is when they are used in addition to the basic skills plus responding.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*Use the Basics, Plus Responding:*

Use of the basics plus responding can get an inmate to the point where there can be open communication. It is then that questions can make their contribution by getting some of the necessary specifics (who, what, when, where, why and how -- the 5WH system)

----------------------------------------------------------------

*THE FIRST STEP IN ASKING QUESTIONS:*

<u>Asking 5WH Questions:</u> Answers to questions will give you the detail you need to manage inmates effectively. The more details you know, the better you can understand what is going on. You always want to know who is involved, what they are doing or going to do, when and where something happened or will happen, how it's going to be done or how it was done, and why it did or will take place.

*5WH:*

"Where were you?"
"Who were you with?"
"Why were you there?"
"What did you actually do?"
"When did all this happen?"
"How was it handled?"

----------------------------------------------------------------

*THE SECOND STEP IN ASKING QUESTIONS:*

<u>Thinking About What Was Said or Not Said:</u> It's not enough just to ask good questions. You also have to be able to make sense out of the answers you get (and recognize as well, perhaps, the answers you're still not getting). An inmate may be leveling with you and giving you the information you need to manage things or even to provide assistance. The inmate may be leveling with you as best that is possible but perhaps not giving you all the information you need. The inmate may be covering something up, which means he/she is still not fully open, still not really communicating with you.

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

_____

*How Does the Inmate Look?   What's The Inmate Doing?*
*What Did the Inmate Say?   What Didn't the Inmate Say?*

In thinking about the inmate's answer to you question, you can consider four specific things: How the inmate looks upon answering (relaxed, uncomfortable); What is the inmate doing when answering (facing you and making eye contact; looking away; looking down at the ground); What the inmate actually said (the informational content of the answer); What the inmate may have failed to say (any "gaps" in the way the answers fit with your questions). By reflecting on these four areas of concern, you can make sure that you fully understand all the implications of the inmate's answer.  Once you've responded to this answer, you can ask additional questions to get the rest of the information you need.

_____

*THE THIRD STEP IN ASKING QUESTIONS:*

<u>Responding to Answers:</u>  Responding to answers means reflecting back to the inmate what he or she has said in terms of content, feeling and/or meaning -- all the skills you learned previously.  Responding opens up the inmate and gives you a chance to make sure you understand what is being said.  It also builds up trust with the inmate.  For these reasons, you should always try to respond to an inmate's actions or words at the highest possible level before and after you actually start asking questions.  Questions then fill in the details of the picture.  Often details (reasons) come from responding skills alone.  If they do not, questions are appropriate.  It's as simple as that.
_____

*STUDENT EXERCISE:*

For each of the following situations, first make a response, then ask an appropriate question.

a.   *You have found an inmate with lots of extra "goodies" in his cell.  You know he couldn't have enough tickets of his own to purchase all that stuff.  When you inquire about the "goodies" the inmate says the following:*

   *"Jesus, man, can't a fellow buy some things without being persecuted?  I used my tickets to buy these things.  I've been saving these tickets and goodies for awhile.  You just haven't looked before.  A guy can't even take care of himself here.  Why don't you find something else to do?"*

APPROVED 9/6/00; REVISED 5/30/01

**TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)**

**HANDOUT 1**

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

b.      *"I know I'm stuck on the stuff.  I know it's killing me."*

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

c.      *"School is really moving.  I read my first novel the other day.  Really good stuff.  I never knew reading could be exciting."*

Respond: "You feel_____because

_____."

Question (5WH):_____

_____

*EXAMPLE:*

Let's imagine that you're talking with a young inmate who hasn't been inside too long. You've recognized that he's really scared stiff because of the way other inmates have been pushing him around.

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

You've been able to respond to him at the level of feeling and meaning: "So you really feel terrified because these guys just want to take you right over." Now you're set to ask a question. "Who are the guys that have been hassling you the most?"

The inmate looks around quickly, then looks down at his feet. When his answer comes, it is given in a low, unclear voice. "Oh, just some of the guys in the yard."

You look at his appearance and see he's really uptight. He won't look you in the eye--he won't even speak up in a clear voice. On top of this, he's answered your question with only the vaguest kind of information. In the end, his answer leaves out far more details than it includes. Upon reflection, you realize that the guy is not only scared in general but is really frightened right now in case some of the inmates who have been after him should catch him talking to you. In other words, your reflecting lets you know that this isn't a guy who's trying to play it smart with you. He's not clamming up on purpose. Instead, he's just living in fear right there in front of you. Realizing all of this, you're able to respond even more fully and immediately to him.

"You're scared stiff right now because whoever's hassling you might get wind of us talking together."

The inmate looks up, surprised. He didn't know any officer could really see and hear him as he actually is. You've just grown about six inches in his eyes--maybe to the point where you suddenly seem stronger than the threat of those inmates who have been hassling him! Instead of clamming up, the young inmate keeps on talking, answering your next questions more fully, which is just what you want him to do. Because in the end, you know you can gain his confidence and learn the information you need to get.

_____

*Summary of Video Scene: "The Fight"*

Officer Donelli is questioning Inmate Joe Carson about a fight that took place earlier in the yard.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*Questions After Viewing:*

What does Officer Donelli learn from the exchange?

_____

_____

How could the officer improve his questioning technique?

_____

_____

*Summary of Video Scene: "Another Fight"*

Officer Donnelli is questioning Inmate Lincoln about the same fight which took place earlier.

*Questions After Viewing:*

What does Officer Donelli learn from the exchange?

_____

_____

Where in his questioning does he use responding skills?

_____

_____

Where in his questioning does he use the 5WH technique?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

*Summary of Video Scene: "The Stolen Letter"*

An inmate is upset about a letter stolen from his cell. Officer Wilson questions him, trying to find out exactly what happened and how much the inmate knows.

What does Officer Wilson learn from this exchange?

_____

_____

Where does he respond to the content of the inmate's statements?

_____

_____

Where does he respond to the feeling and meaning of the inmate's statement?

_____

_____

What has the officer accomplished through his communication?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

---

| Inmate/Staff | Communicator | Group |
|---|---|---|
| 1. Role-plays or real stimulus | 1. Positions, observes, listens | 1. Position observe, listen |
| 2. Reacts to responses & answers questions | 2. Pause & respond | 2. Reflects own re-sponse & questions |
| 3. Give feedback | 3. Ask question after reflecting (5WH) | 3. Rates officer reflecting |
| | 4. Pause, reflects & responds again on answer to question | 4. Question attached to reflection "Yes/No" |
| | | 5. Present each response & question |
| | | 6. Feedback on sizing up |

| | |
|---|---|
| **OHIO PEACE OFFICER TRAINING COMMISSION** | **TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)** |
| CORRECTIONS BASIC TRAINING CURRICULUM | **HANDOUT 1** |

# SUMMARY OF THE ADD-ONS

## {13}

Jimmy was an inmate whom everyone -- officers and other inmates alike -- invariably referred to as "a bad mother." There was a lot of respect in this phrase. You learned respect around Jimmy. How could you help it? He was 6'5", 275 pounds and a former sergeant in the Green Berets. To top it off, he had a temper like a bear just coming out of hibernation and found the ground still frozen solid!

Jimmy didn't like officers. In his time he'd sent more than a few to the hospital. By now the officers had figured out a drill. When they wanted Jimmy out of his cell, six of them went in and brought him out. Even then it wasn't easy. He just naturally loved to crack heads: a "bad mother".

One day a new officer came on duty. The old hands were happy to show him around. "Listen," they said, "you gotta' meet Jimmy."

"Jimmy?" The new guy didn't have a whole lot of experience on the job but he knew a set-up when he saw one. "Who's he? What's his story?"

Half a dozen seasoned officers accompanied the new man to Jimmy's cell, grinning and nudging each other. Oh, they wouldn't let the new guy get hurt or anything. But it sure would be something to see his face when Jimmy tried to crush his head like a grapefruit!

"Hey, Jimmy--you got someone to see you," one of the officers told the huge inmate, unlocking the cell and moving back quickly.

Jimmy's only answer was a grunt. He had been sleeping. Now he emerged slowly from his cell, scowling and rubbing his eyes.

"What do you miserable creeps want now? Man, I'm gonna' tear you into small pieces if you come close enough!" His eyes focused on the new guy for the first time. "What this, some kinda' bait or somethin'?"

The older officers expected the new guy to back off when he saw Jimmy tower over him. Instead, the new officer stuck out his hand.

"I'm Ben," he said.  "I guess you're really ripped at us because we just barged in on you."

The other officers saw Jimmy's brow furrow.  He'd been about to swing and they'd been all tensed up to jump in.  But now Jimmy seemed unsure.  He didn't shake, but neither did he swing.

Then his face cleared.  In another moment he flung his head back and laughed out loud.

"Whoooeee!"  He calmed down at last and looked at the new guy.  "I knew it!  I knew if I just hung around this place long enough they'd have to send a real man to handle me!"

That was all.  In choosing to initiate communication instead of using force, the new officer had taken Jimmy off guard.  This was a new approach.  More than that, it was an indication to an inmate full of anger and hostility that maybe there still were people out there who could talk to him--even listen to him.  That knowledge made all the difference in the world to Jimmy!

What enabled the new officer to make this kind of difference, of course, was his communication skills--in particular, responding.  These are the same skills you yourself have begun to master.

In the first section of this manual, you learned the skills you need to size up the situation. Now, working through this second section, you've learned the skills you need in order to initiate meaningful communication to improve your management responsibilities--the skills involved in responding and asking questions.  These skills are designed to help you manage inmates by communication.  Now it's time to move on--to go beyond sizing up and communicating and consider what's involved in really controlling the situation.  We'll concentrate on this topic and the skills it requires in the final section of the manual.

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

CORRECTIONS BASIC TRAINING CURRICULUM

The Applications:

Controlling
Behavior

The Add-ons:

Communicating with
Inmates

The Basics

Sizing Up the
Situation

APPROVED 9/6/00; REVISED 5/30/01

# THE APPLICATIONS: CONTROLLING BEHAVIOR

## {14}

The application skills combine the basic and the add-on skills, and are aimed at controlling inmate behavior. These skills are important in helping you maintain control and manage inmates well.

The Applications include three specific skills:

THE APPLICATIONS:
Controlling Behavior



Reinforcing Behavior

Making Requests

Handling Requests

An officer whose responsibility was to control 100 inmates in a unit had many assignments to delegate, many requests to answer and many orders to give inmates on almost each shift. He consistently interrupted "bull" sessions and "rap" groups to give orders to inmates. His usual approach to inmates was to be very direct in his behavior--no social amenities. A typical request was made by simply interrupting a group or an inmate's sleep by saying, "Watson, we need to get this area policed up, go grab a mop and get with it." If something unusual was needed, there was never an explanation or reason, just the order. Inmates grew to resent this of the officer and complained. The officer successfully defended his behavior on the grounds that this was no "country club' and that to be courteous would be to demean his authority. He would lose respect by being so "candy" in the way he appeared to the inmates. Respect grows of toughness was his philosophy. If inmates approached him with concerns, they were normally handled in an abrasive manner. No reasons were given if requests were denied. The officer wanted a reputation as a no-nonsense officer who does not coddle persons who couldn't make it on the street without

breaking the law.  The officer was a victim of the depression era and had managed to get where he was without acting in immoral ways.

If inmates completed tasks willingly or initiated helpful ideas, his attitude was either that was what is expected of them or that they were just setting up a "con."  The atmosphere in his unit was tense although the "lid" was always on.  He was a severe disciplinarian.  His reputation as tough was widely known.  He even made things tough on new officers who sometimes tried to communicate with inmates or brought up new ideas that they learned at the Staff Training Center.

One evening after chow, four inmates unbolted the motor which was used to drive the ventilation fan or top of the unit and let it drop on the roof of the office outside the unit while this officer was filling out his log book.  The motor crashed through the roof and completely severed the officer's desk.  Weighing 600 lbs., it was meant to crush the officer as he worked.  Fortunately for him, he had turned from his work at his desk momentarily when the motor struck.  The message that was communicated was clear to the institutional administration.  Although the perpetrators were never found, the officer's supervisors had the good sense to transfer the officer to other correctional duty.  It is uncertain whether he ever got the message.

## *What Went Wrong?*

This is just one of hundreds of stories which make a similar point; not all the ways in which officers try to control inmates are good; some are actually dangerous and more than a few have proven disastrous.  Many ineffective methods of control have been based on the myths and folktales passed down through different generations of correctional workers.  The problem with the majority of these is that they treat anything other than a show of pure force as a sign of official weakness.  Yet the fear of looking fearful in the eyes of inmates has actually caused many officers to take greater risks -- like the officer in the story quoted above.  One thing is certain; as soon as an officer begins to develop effective interpersonal management skills, he begins to experience the real reward of being able to control situations with less tension, less force--and a lot less risk to himself!

But, let's go back to the story for a moment.  There are a number of things the officer could have done to avoid creating the situation into which he forced himself.

For one thing, he could have consistently used the basic sizing- up-the-situation skills we covered in Section I.  By using these skills - and especially those involving observation and listening - he would have had a far more complete understanding of the situation among his hundred inmates.  Even more importantly, of course, he could have responded to his inmates.  This, more than anything else, would have let them know - in constructive rather than antagonistic terms - that he was really aware of each and every one of them.  Yet, even effective use of basic skills plus use of communicating skills would probably not have been enough.  This officer, like every officer, needed specific, yet constructive, ways of controlling inmate behavior.  This section of the manual will outline a number of such ways - the "applications" which any officer should have open to him.

## *Control is the Key:*

Controlling behavior simply means taking charge.  This is what it's all about in an institution.  Without the ability to control behavior, all the other efforts are wasted.  An officer has to do everything possible to ensure appropriate behavior, first in the officer's own interests as well as those of the institution and in the interest of the inmate.  The same holds true for the inmate.  Learning to control personal behavior leads to a secure institution.  Inmate self-control leads the inmate to success.  Without control, nothing productive can occur.

At the individual level there can be great frustration among the correctional staff; officers cannot and will not work well where inmates are poorly controlled.  Lack of self-control among inmates is demonstrated in murder, suicide, drugs, etc.  The uncontrolled individual cannot do the constructive things that lead to success.  If the inmate doesn't die, then it is most likely that he or she will return to prison again.  The inmate is doomed to make the same mistakes over and over again.  This costs the inmate, it costs society and it usually costs the officers of our prison system who are charged with controlling the behavior of inmates who can't control their own behavior.

This section of the manual builds on previous sections.  It is about the how's of controlling behavior by using good management skills.  What, then, are the necessary skills?

In this final section of the manual we will take a close look at three different areas of skills. These skills are dealt with here as "applications" because they really represent the specific ways in which you can apply all of the other skills you've developed in order to manage and control inmate behavior in the most effective possible manner.

– – – – – – – – – – – – – – – – – –

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

*THREE APPLICATION SKILLS:*

Handling Requests
Making Requests
Reinforcing Behavior

Unlike the earlier skills in Sections I and II, these three areas are not all cumulative.  That is, you will normally be involved at any given time in either handling an inmate's request or making a request of you own.  In either situation, however, you will want to reinforce the inmate's subsequent behavior--positively if you want him to keep doing a particular thing and negatively if you want to keep him from doing something.  Before going any further, let's take a look at a couple of these skills in action.

*Example:*

Here is a situation, quite routine, where an officer demonstrates skill in management.  It could be handled much differently with more negative outcomes.  It involves both the officer making a request of the inmate and, in turn, the inmate making a request of the officer.

Officer:      "Larry, I'd like you to switch your recreation period with Jim for the next two weeks because Jim has been having problems with his neck and can't lift those buckets."

Inmate:      Is it okay with you if I try to get someone else to do it?  I'd like to keep my schedule as it is since I can be with most of my friends on the yard at the time I have now."

Officer:      "I'm sorry, Larry, I know that would upset your schedule but I can't use anyone else since you are the only one that can switch in your unit.  I've already checked it out with the other guys.  It will only be until Jim's neck gets better or we transfer him to another dorm."

Inmate:      "Why do you always pick on me?  I'm always the one who gets screwed on these deals."

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

Officer:     "I know this irritates the hell out of you because it will interrupt your routine but it's the best I can do right now.  Please report to the work detail at 10:00 a.m. tomorrow instead of 2:00 p.m., Okay?"

*Control Through Skill, Not Force:*

The officer in this case used his skills to control his situation.  He didn't demean or put down, he didn't use sarcasm.  You will observe, however, that included in his skills were firmness and reasons for his actions.  There was no weakness.  The inmate now knows what he is expected to do and why.  The officer was even able to continue to be responsive to the inmate when the inmate became irritated.  This use of skill gets that job done and increases the probability that the inmate will feel he has been treated fairly even if he has to have his routine interrupted.  Quite a contrast when you think about how the other officer might have handled it.

Why is control important for inmate management?

_____

_____

_____

_____

What does an inmate gain when he learns to control his own behavior?

_____

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

HANDOUT 1

# HANDLING REQUESTS

## {15}

Handling requests is the ability to manage inmate requests in a fair and effective manner. The skillful handling of requests helps build trust and reduce tension in the institution. It is also a good inmate management technique.

The two steps in handling requests are:

THE APPLICATIONS:
Controlling Behavior



Reinforcing Behavior

Making Requests

Handling Requests

1. Check things out
2. Give response & reason

_____

*Rules, Regulations and Inmate Rights:*

Before we turn to the skills involved in handling an inmate's requests, we should spend a minute reviewing the way in which institutional rules and regulations often relate to the specific things to which an inmate does--and does not--have a right.

Although times are changing rapidly, each officer and each institution is bound by certain legal and institutional requirements to provide certain things to the inmates. Most of these things are seen to be basic rights and/or needs to which an inmate is entitled. Your institution probably has some written regulations (not always up-to-date ones,!!) to guide you in these areas. Abiding by these rights and needs usually enables an officer to establish a working relationship with most of the inmates. There is always that 10% to 20% who react negatively no matter what you do. But by following the regulations, you can fairly expect the inmate to do what is expected.

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

You have taken away any excuse the inmate might have for negative behavior, even in the eyes of the other inmates who want to see you as the aggressor and inmates as the victim. When you attend effectively to the inmates, you have fulfilled your basic obligations to make the institution and the inmates more fair.

You can either attend as the result of an inmate request or by initiating on the basis of some need you see. The latter really opens up an inmate. (As used here, "attending" really refers to both of the skills we'll consider--checking the inmate out and responding to the inmate's request with a reason for your decision). Attending skills are basic but very powerful. They reduce 90% of the tension in a prison and help to establish a relationship where communication is possible if a problem arises.

_____

*THE FIRST STEP IN HANDLING REQUESTS:*

*Use Basic Skills;    Know Rules & Regulations*

<u>Checking Out the Inmate and Situation:</u>  It goes without saying that you are and will be bombarded by requests from inmates. Some will be legitimate, some not. Each request must be, and is, responded to. Even if you ignore the request, you have responded to it and some consequence will occur which can affect your management and control of inmates. If you find this hard to believe, put yourself in a situation where you want your shift supervisor to consider one of your own requests and he ignores you. How do you feel? What message would it communicate if it happened often? What might be the consequence of it on your behavior?

CHECKING OUT REQUESTS involves deciding if they are legitimate or not.

Before you respond to any inmate request, you need to use your basic skills to check the inmate out. Is the inmate leveling with you or is he trying to run some kind of game on you? You also need to check out the situation in terms of any rules or regulations that might apply. Using your positioning, observing, listening and responding skills will be invaluable to you here. As you practice, this will become very clear to you.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*STUDENT EXERCISE:*

Read the following situations.  Then describe how you would check them out.

*Inmate*
*Request:*  *Officer Smith, I feel sick.  My stomach is real upset and I've*
*been sweating more than usual.  Can I go over to the infirmary?*

What skills would be important to use in this situation?

_____

_____

What rules or regulations must be considered?

_____

_____

Another inmate makes this request five minutes before count:

*Inmate*
*Request:*  *Officer Smith, may I run over to "C" compound?  I left my radio*
*in the recreation area and it will be ripped off if I don't get it."*

What skills would be important to use in this situation?

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

What rules or regulations must be considered?

_____

_____

By knowing which of the sizing-up and communicating skills to use, you can ensure that you really know what's happening with a particular inmate who has a request. By reviewing the appropriate rules and regulations, you'll have a good idea of whether the inmate's request is or is not legitimate. Now, you're ready to respond to the request itself.

## *THE SECOND STEP IN HANDLING REQUESTS:*

Responding With a Reason For Your Decision. The new skill here involves indicating the action you're going to take--your decision--and giving the inmate your reason. Giving the inmate a good reason is not a sign of weakness. On the contrary, it is the best way in which to minimize future gripes. If you turn the inmate down, he won't be able to complain that you didn't even tell him why. If you grant his request, he'll know that it was just for this one situation for a good and clear reason.

RESPONDING with a reason eliminates possible hassles.

Basically, an officer has three possible avenues of action in relation to an inmate's request. In each case he should give some reason for his action. Here are the simplest forms these responses can take:

*"Yes, I'll do (it)_____because_____*

*"No, I won't do (it)_____because_____*

*"I'll look into (it)_____because_____*

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*How You Decide:*

In each instance, the officer bases his intent on the laws and the regulations of the institution. In cases where inmates need or request something beyond what they are entitled to by law and regulation, each inmate's behavior (past and present), what is asked for, the way it is asked for, and the information you have gained by checking things out should determine your response. For example, an inmate might ask you, "Hey man, how about a phone call?" "No, I can't allow you to have a call because you are entitled to only one per month and extra calls are only possible through the counselor (case manager, chaplain, etc.)."

*Take Care of Basic Needs:*

While an officer may have an option in a case like the one on the previous page, some things--like an inmate's food--cannot be withheld. You may have other options for an abusive inmate who demands his meals (e.g. write him up) but you can't deny him his food. Knowing the law and the regulations of your institution will definitely make your job easier--especially with all the grievances that are written these days. By taking care of the basic needs of the inmate, these headaches and other security problems (tensions) will be greatly reduced.

Taking care of basic needs is a "must" in any relationship. It would be very hard for an inmate to believe you wanted to communicate and be of assistance if you did not attend to basic needs--that is, if you did not give the inmate the minimum required by the law. Dealing with such needs in a creative way builds up trust which will make it more likely that the inmate will talk to you and act upon what you say.

— — — — — — — — — — — — — — — — —

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

*STUDENT EXERCISE:*

List four legitimate requests which might be made at your institution and four frequent requests that would not be legitimate at your institution. For the latter, indicate why. For example, in some institutions inmates in a certain unit are entitled to decorate their cells in special ways while those in other units are not. Thus an officer might say to an inmate who is below the level at which cell decoration is allowed: "No, I can't let you do that because you have not earned that privilege yet."

List four legitimate requests inmates could make:

1. _____

2. _____

3. _____

4. _____


List four non-legitimate requests inmates could make:

|  | Request |  | Why |
|---|---|---|---|
| 1. | _____ | | _____ |
| 2. | _____ | | _____ |
| 3. | _____ | | _____ |
| 4. | _____ | | _____ |


*Summary of Video Scene: "Second Helpings"*

Inmate Jones is headed through the chow line when he's stopped by Officer Donelli. The inmate asks for another helping of pizza and Donelli denies the request.

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

*Questions After Viewing:*

What skill did Officer Donelli use in denying this request?

_____

What is the effect on the inmate of using this skill?

_____

*Summary of Video Scene: "Library Pass"*

An inmate asks Officer Andrews for a library pass five minutes before court.

What circumstances of this situation would affect Officer Andrews' response?

_____

Respond to this inmate's request, giving a reason for your responses:

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

*Summary of Video Scene:  "The Legal Paper"*

An inmate asks Officer Davis to drop off something for him on her way out of the institution.

*Questions After Viewing:*

What special circumstances could affect Officer Davis' response?

_____

Respond to this inmate's request, giving a reason for your response:

_____

_____

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

### HANDOUT 1

------------------------------------------------------------

| Inmate | Officer | Group |

------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|
| 1. Gives set to group | 1. Positions, observes & listens | 1. Positions, observes & listens |
| 2. Make requests | 2. Checks things out | 2. Checks things out |
| 3. Give feedback after group has finished their assignment | 3. pauses 30 seconds to assess request (legitimate or not) | 3. Rates Officer<br>a) action plus reason "Yes/No"<br>b) action & reason, if no, Why?___<br>c. Sizing up |
| | 4. Gives action plus reason | 4. Give action plus response for feedback |

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# MAKING REQUESTS
----------------------------------------------------------------
## {16}

Making requests is the ability to manage inmates by making specific requests of them. Making requests skillfully improves the chances that inmates will cooperate and more readily carry out your requests.

The two steps involved in making requests are:

## THE APPLICATIONS:
Communicating With Inmates



*Two Parts of Making Requests:*

The two procedures involved in making requests in an effective way are checking things out (using the same procedures as when you are handling inmate requests) and taking appropriate action. As before, you need to check things out to ensure that you don't make the wrong move--a move that might increase tension rather than calm things down. Once you've done that, you can decide whether the best action will involve a simple request, an order or even direct physical action.

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

*The First Part of Making Requests:*

* *Use Basic Skills*
* *Know the Situation*

<u>Checking Things Out:</u>  Since the procedures here will be the same as those involved in handling inmate requests, there's no need to go back over them at length.  Here, however, your aim should be to understand the whole situation involving the inmate whom you plan to have do something.  Is the inmate with the usual group of friends?  If so, what is the inmate's probable relationship with them?  Will the inmate feel face is being lost if you give an order and therefore react antagonistically?  By using your basic sizing up skills and your responding skills if there's any tension in the air, you can make sure that whatever action you take in making your request will be effective.

CHECKING THINGS OUT involves use of your basic and responding skills.

* *Use Responding Skills*

*The Second Part of Making Requests:*

<u>Taking Action:</u>  Making requests of inmates is routine in corrections, of course.  Many requests are made each shift and often little thought is given to the impact of requests on the control of inmates.  Yet as many of you know, it's how the request is made that often makes the difference, not the nature of the request.

TAKING ACTION means selecting the best way to make your request.

OHIO PEACE OFFICER TRAINING COMMISSION

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

### HANDOUT 1

## *How You Ask, May Mean More Than What You Ask!*

In taking action to get an inmate to do something, you will remember that you have to be specific.  You should identify what you want done and when you want it done.  Telling an inmate in this  manner keeps you clean.  You've put right out there for the inmate and anybody else to see.  Many officers have found a polite request is most effective in getting an inmate to do what is required.  Of course, there are officers who feel that the inmates don't deserve politeness or that it makes an officer look weak.  You, however,  were brought up with good manners, at least most of you were.  The question is, are you going to let an inmate bring you down to his or her level?  In addition, when an inmate doesn't do something reasonable when asked politely, then it is the inmate who looks weak and not you.  Moreover, by being initially polite, you've given the inmate the opportunity to go the easy way.  Now it's the responsibility of the inmate if you have to go the hard way.

### *Mild Format:*

Some of you are going to find it difficult to use a polite format; but many officers have found that it is more effective to be polite.  It gets the results you want.  A mild (polite) request can take the form "Would you (please)_____"
or it can take the form "I would appreciate it if you would
_____."

### *Direct Format:*

When you make an inmate request, the most direct method is simply to identify what you desire and then use the format, "I want you to _____".  But, because inmates will frequently resent authority if you are simply telling them to do something, you may have fewer hassles if you use a mild request format.  Examples might be, "I'd like you to do _____" or "Would you stop_____".

### *Softening A Request:*

You can soften the statement even more by using polite words .  For example, "I'd like you to please stop_____."

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*Get Stronger When Necessary:*

What format you use for making a request will depend on the situation and the particular inmate. Of course, if an inmate abuses the mild method, you are always free to move to a stronger position including a direct order. As indicated above, the point is to get the job done--to have the inmate do what you want. Most experienced officers agree that it is generally easier if direct confrontation is avoided.

You may also want to use your responding skills in taking action. For example, you come across an inmate who is in a place where he should not be. You position yourself so that you can see him but he cannot see you. You watch for a little while because he appears to be doing nothing else wrong. Then you move into position so he can also see you. You approach cautiously--if he is contemplating a break, he may be armed. As you approach, you recognize the inmate as being new. The inmate makes no sudden moves and, in fact, gives you a greeting: "Hello, Officer." You give the inmate the benefit of the doubt in the sense that you are open to what the inmate will say. The inmate is new and you haven't seen or heard anything to cause you to intensify your security efforts.

You Respond to Content: "Hi, _____. You seem to have drifted off from everybody else."

"I guess so, I just wanted to get off by myself for awhile."

You Respond to Feeling and Content: "I see. I guess you can get a feeling of being closed in sometimes being in here, but you can't drift off to this area because it's unauthorized."

Inmate: "I didn't realize that."

You Make a Request: "Yeah, I'd like you to move back away from the gate and near that group now."

## TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

### HANDOUT 1

*STUDENT EXERCISE:*

There may be times when you want to start right out with a direct order or take immediate action.  List two examples of when you would give a direct order or take immediate action without making a request.  Give the reason why you would do this.

Direct Order First:

*Situation # 1:*_____

_____

*Situation # 2:*_____

_____

– – – – – – – – – – – – – – – – –

*STUDENT EXERCISE:*

*Situation # 1:*_____

_____

*Situation # 2:*_____

_____

## Summary of Video Scene:  "The Clean Up"

Officer Davis asks inmate Jones to mop up some water.  When Jones grumbles, the officer handles it well.

## Questions After Viewing:

What format of request does Officer Davis use?

_____

Where did she use responding in making her request?

_____

## Summary of Video Scene:  "The Mess"

Officer Andrews tells Billy to clean up his cell or suffer the consequences?

## Questions After Viewing:

What format of request does Officer Andrews use?

_____

Why do you think the officer warned Billy of the consequences of failure to do as he requested?

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

----------------------------------------------------------------

| *Inmate* | *Officer* | *Group* |
|---|---|---|

----------------------------------------------------------------

| *Inmate* | *Officer* | *Group* |
|---|---|---|
| 1. Gives set to group | 1. Leaves room | 1. Positions, observes & listens |
| 2. Role-plays inappropriate behavior | 2. Enters & uses Basic skills during 30 second pause, then makes request | 2. Records own version of request & way it should be made |
| | | 3. Rate Officer "Yes/No" on content & style of request, then gives own version of request |
| | | 4. Rates Basics |

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

# REINFORCING BEHAVIOR

## {17}

Reinforcing behavior is the ability to administer punishments and rewards effectively. Showing inmates the consequences--either positive or negative--of their actions will help you control their behavior.

The two parts of reinforcing behavior are:

## THE APPLICATIONS: CONTROLLING BEHAVIOR



Reinforcing Behavior

1. Reinforcing positively and negatively

2. Using verbal and non-verbal techniques

Making Requests

Handling Requests

– – – – – – – – – – – – – – – – – – – –

The only reason people finally do anything is because of the consequences (positive or negative) of doing it or not doing it. Behaviors only change when there are consequences. For the most part, an inmate has been rewarded during life for bad behavior. For instance, most inmates commit several crimes before they get caught. The inmate doesn't realize that not getting caught or being let off easy is not really in his or her best interest.

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

In addition to the rewards for negative behavior, most inmates live in a world where being straight and decent is seen as negative and weak. To turn this crazy picture around, institutions and officers must be sure to reward (or to punish) the appropriate behaviors. Also, the punishments and rewards themselves have to be appropriate. That is, the inmate has to experience an action as a reward or a punishment. The reward must also be seen as worth the price and the punishment as equal to the deed to be effective in changing behavior. If you send an inmate to isolation as punishment and the inmate ends up with a private cell and no loss of privileges, you may not really be punishing that inmate. You may actually be rewarding a negative behavior. In a prison setting, the inmate is always testing to find out what the limits are and who is really in control. Many inmates want to know "How much do I have to screw up before somebody tells me to stop?" Once an inmate knows who is really in control, the inmate will reduce this testing behavior. The result is that the inmate is in your control instead of you being in the inmate's control!

–––––––––––––––––––––––––––––––––––––––––––––––––––––––––––––––

## *Two Kinds of Reinforcement:*

There are, essentially, two kinds of reinforcement: verbal and non-verbal. Rather than dealing with these in separate sections, we will consider them together.

### *Verbal and Non-Verbal Reinforcement:*

Handling Punishment: You have several options for giving verbal reinforcements. If a warning is appropriate, you can use a format such as "If you do not do_____then_____ will happen." The first blank would be the behavior you want to have the inmate start or stop and the second blank would be the consequences. If a warning is not appropriate, the format would be "Since you have (Behavior) then (Consequences)." Another kind of reinforcement is just personally expressing your approval of the inmate's behavior. The format here would be "That's a really helpful thing" or "Spike, this place is looking good."

REINFORCING means using verbal and non-verbal rewards and punishments.

## *Force is Risky!*

Non-verbal reinforcement (physical force) should only be used where there is a threat of physical harm to you, to other staff, to the inmate or to other inmates. The risk of such reinforcement is too high and it should be used as a last alternative.

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)

### HANDOUT 1

*EXAMPLE:*

There was one officer who was told by a snitch than an inmate had a knife in his cell. The officer went to the cell and called the inmate out so that he could shake the cell down. The inmate appeared reluctant, so the officer grabbed him and pulled him out. The inmate had the knife hidden in his shirt and stabbed the officer in the back. The officer should have thought through the situation before attempting to get the inmate out of his cell. Instead, he got caught up in his need to negatively reinforce the inmate with physical force.

Reinforcements are not threats. As you know, you never threaten what you won't and/or can't do; and you never give consequences which you don't intend to follow through on. When you reinforce negatively, you are not setting up a challenge. You are only making clear where it's at and what will happen (what the inmate is going to force you to do or what you are required to do). You can't reinforce if you are out of control. When you are out of control, you can only threaten. This puts the inmate in control. Your manner and tone of voice should be firm but calm, e.g., you might say "I'm giving you a direct order to stop. If you don't, then I'm going to have to write you up."

*STUDENT EXERCISE:*

List some punishments you can administer and/or take part in personally and the behavior for which you might give them.

*Punishments:*

1._____

2._____

3._____

4._____

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

## HANDOUT 1

*Behaviors you might punish:*

1._____

2._____

3._____

4._____


— — — — — — — — — — — — — — — — —


## *Positive Reinforcement:*

It's just as important to positively reinforce or reward good behavior as it is to negatively reinforce or punish poor behavior.  In fact, trouble can sometimes get started simply because an officer doesn't know how to keep things going as well as they have been going! The effective officer knows which inmates are handling things well and does everything possible to keep them on track.  In addition, the officer positively reinforces occasional good work by inmates who may mess up at other times.  This officer may tell the inmate who always works well, "glad to see you're doing your usual fine job, Ben--I know I can always count on you."  This sort of verbal reinforcement helps the inmate keep going in a constructive direction.  The officer may also call "Way to go, Bill" to an inmate who has just done the first positive thing of the day.  The officer knows it's important for this inmate to recognize when he's on track--just as he has to realize when he's off the track as well.

| | |
|---|---|
| OHIO PEACE OFFICER TRAINING COMMISSION | **TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)** |
| CORRECTIONS BASIC TRAINING CURRICULUM | **HANDOUT 1** |

## *STUDENT EXERCISE:*

List some positive reinforcements you can personally give and/or take part in and the behavior for which you would give them.

*Rewards you might give:*

1._____

2._____

3._____

4._____

*Behaviors you might reward:*

1._____

2._____

3._____

4._____

## *Summary of Video Scene:  "The Clean-Up"*

Officer Davis talks to Jones after he has mopped up.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | HANDOUT 1 |

*Questions After Viewing:*

How does Officer Davis use positive reinforcement?

_____

*Summary of Video Scene:  "The Mess"*

Officer Andrews talks to Billy after discovering that his cell has not been cleaned up.

*Questions After Viewing:*

How does Officer Andrews use negative reinforcement?

_____

What other technique does he use to defuse Billy's possible anger?

_____

_____

*Summary of Video Scene:  "A Visit to the Chaplain"*

Inmate Carson approaches Officer Wilson's duty station somewhat agitated, asking to see the Chaplain.  The officer uses skills in handling the situation.

*Questions After Viewing:*

What interpersonal communication skills can you identify in the scene?

_____

_____

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**HANDOUT 1**

What effect does Officer Wilson's use of these skills have on the inmate?

_____

_____

## STUDENT EXERCISE # 1:

------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|

------------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|
| 1.Gives setting & trust level in existence | 1.Responds,observes & listens | 1.Responds, observes & listens |
| 2.Role-plays; appropriate or inappropriate behavior | 2.Responds | 2.Write own reinforcement & why |
| 3.Reacts to officer responses | 3.Reinforces: a)"If you do not then_____" b)"If you do then_____" c)"Since you are _____then_____ d)"Since you are not___then___" e)Some personal verbal rein-forcement (positive or negative) | 3.Rates officer "Yes/No" on correctness of reinforcement |
| 4.Gives Feedback | | 4.Gives responses for feedback |
| | | 5.Rates use of Basics |

OHIO PEACE OFFICER TRAINING COMMISSION

# TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

## HANDOUT 1

*STUDENT EXERCISE # 2:*

------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|

------------------------------------------------------------

| Inmate | Officer | Group |
|--------|---------|-------|
| 1.Gives role & setting | 1.Uses all appropriate skills | 1.Positions, observes & listens |
| 2.Role-plays | | 2.Assesses the use & accuracy of management skills |
| 3.Reacts to officer's response | | 3.Writes own responses if appropriate |
| 4.Gives feedback | | 4.Gives feedback |
| | | 5.Rates Basics |

# SUMMARY OF THE APPLICATIONS

## {18}

We've talked a lot about security and management in this manual.  These are obviously the most important aspects of your work.  Yet some of you may have wondered why we haven't brought up the familiar matter of inmate rehabilitation.  We chose to pass over this matter for a very simple reason:

*THERE'S NO POINT IN MAKING PROMISES YOU CAN'T KEEP!!*

At this point it would be foolish to promise any officer that he or she could learn all that is needed to completely rehabilitate even one inmate, never mind an entire population of them.

However, we can make one promise:  the skills you have learned in this manual are the <u>first step</u> toward meaningful rehabilitation of inmates.  This means that you have done more than master specific methods of managing inmate populations.  This also means that you have more than you have suspected of which to be proud.

You've developed professional skills to do a professional's job.  You've helped to lay to rest that familiar stereotype that "civilians" have of the correctional officer as a brutal, brainless machine that delights in keeping people locked up.  You've gone beyond that.

You've begun to act upon one of the most basic equations in all of human history:

*HUMAN ACTIONS DETERMINE HUMAN REACTIONS.*

The cornerstone of the interpersonal management skills you've learned is <u>decency!</u>  Simply, human decency!  You've got a lot to do.  But, in doing it, you've learned how you can handle inmates like the human beings they are.  In return, you'll able to promote more decent and constructive behavior on their part.  This process involves what has been called the "Principle of Reciprocal Behavior."  That's a fancy term for saying that we all get back what we give.  In your case, you've learned how to invest your work with professional effectiveness--with real skills--and still give inmates the decent treatment they need to develop more constructive patterns of behavior.

APPROVED 9/6/00; REVISED 5/30/01

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.)

CORRECTIONS BASIC TRAINING CURRICULUM

HANDOUT 1

Yes, you've got a great deal in which to take pride.  Let the committees in Washington draw up endless reports making endless recommendations about rehabilitation programs.  Let the bleeding hearts write innumerable letters about brutality to their favorite newspaper editors.  Let the rest of the world view the prime-time television image of correctional institutions as the garbage can of society.  Let all that go.

As long as you've got the skills to size things up, you'll know what's really happening in your own setting.

As long as you've got the skills to communicate with inmates, you'll be able to reduce tension and get inmates to open up with you.

As long as you've got the skills to control inmates, you can manage their behavior in increasingly constructive ways.

Finally, as long as you can put all of these skills together in such a way that inmates realize they're being treated decently, you're doing more than all the committees and letter-writers and TV viewers in the world to rehabilitate the people who are your charges.

You have the right to take pride in your chosen profession, for you are bringing both professional skills and simple decency to one of the toughest jobs in the world.

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #1:

1.      WHAT ARE THE 3 BASIC COMPONENTS OF THE IPC MODEL?

_____

_____

_____

2.      WHAT ARE THE 3 PURPOSES OF THE IPC TRAINING MODULE?

_____

_____

_____

## SESSION #2:

3.      LIST THE 4 "SIZING UP" SKILLS.

_____

_____

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #3:

4.     LIST THE 2 MAJOR ELEMENTS OF POSITIONING.

_____

_____

5.     LIST THE 3 MAJOR PARTS OF POSITIONING.

_____

_____

_____

## SESSION #4:

6.     DEFINE THE TERM "POSTURING".

_____

_____

_____

_____

7.     LIST THE 3 COMPONENTS OF GOOD POSTURING.

_____

_____

_____

OHIO PEACE OFFICER TRAINING COMMISSION

CORRECTIONS BASIC TRAINING CURRICULUM

## TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)
## STUDENT WORKSHEET

## SESSION #5:

8. WHAT ARE THE 4 ELEMENTS OF OBSERVING?

_____

_____

_____

_____

9. WHAT ARE THE 3 ASPECTS TO BE CONSIDERED DURING THE FIRST PART OF OBSERVING?

_____

_____

_____

10. WHAT ARE THE 4 "CLUES" THAT CAN BE USED TO DEVELOP INFERENCES?

_____

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #6:

11.   WHAT ARE THE 4 STEPS IN LISTENING?

_____

_____

_____

_____

12.   WHAT ARE THE 3 ITEMS THAT MAY BE USED TO DETERMINE INTENSITY?

_____

_____

_____

## THERE ARE NO SPO'S ON SESSION #7

## SESSION #8:

13.   LIST THE 2 ADD-ON SKILLS USED IN INTERPERSONAL COMMUNICATION?

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #9

14.    DEFINE THE TERM "RESPONDING TO CONTENT."

_____

_____

_____

15.    WHAT ARE THE 2 STEPS IN RESPONDING TO CONTENT?

_____

_____

## SESSION #10

16.    WHAT ARE THE 2 STEPS IN RESPONDING TO FEELING?

_____

_____

17.    DEFINE THE TERM "RESPONDING TO FEELING."

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #11:

18.     DEFINE THE TERM "RESPONDING TO FEELING AND MEANING/"

_____

_____

_____

19.     WHAT IS THE APPROPRIATE TIME TO REFER THE INMATE TO A MENTAL HEALTH WORKER OR OTHER SPECIALIST.

_____

_____

_____

## SESSION #12:

20.     WHAT ARE THE 3 TECHNIQUES USED IN ASKING QUESTIONS?

_____

_____

_____

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1:  INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## THERE ARE NO SPO'S ON SESSION #13

## SESSION #14:

21.     LIST THE 3 APPLICATIONS SKILLS USED IN CONTROLLING BEHAVIOR.

_____

_____

_____

## SESSION #15:

22.     WHAT ARE THE 2 STEPS IN HANDLING REQUESTS?

_____

_____

_____

_____

23.     LIST THE 3 REASONS FOR GIVING AN INMATE AN EXPLANATION FOR AN OFFICER'S RESPONSE.

_____

_____

_____

_____

| OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.) |
|---|---|
| CORRECTIONS BASIC TRAINING CURRICULUM | STUDENT WORKSHEET |

## SESSION #16:

24.    DEFINE THE TERM "A MILD FORMAT."

_____

_____

_____

25.    DEFINE THE TERM "A DIRECT FORMAT."

_____

_____

_____

_____

## SESSION #17:

26.    DEFINE THE TERM "REINFORCING BEHAVIOR."

_____

_____

_____

27.    LIST THE 2 PARTS OF REINFORCING BEHAVIOR.

_____

_____

_____

| | |
|---|---|
| OHIO PEACE OFFICER TRAINING COMMISSION | **TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)** |
| CORRECTIONS BASIC TRAINING CURRICULUM | **PRACTICE EXERCISE** |

## INTERPERSONAL COMMUNICATION
## (I.P.C.)

1.      What are the three basic components of the IPC Model?

2.      What are the 3 purposes of the IPC training module?

3.      List the 4 "sizing up" skills.

4.      What are the 2 major elements of positioning?

5.      List the 3 major parts of positioning.

6.      Define the term "Posturing".

7.      List the 3 components of good posturing.

8.      What are the 4 elements of observing?

9.      List the 3 aspects to be considered during the first part of observing.

10.     What are the 4 "clues" that can be used to develop inferences?

11.     What are the 4 steps in listening?

12.     List the 3 items that may be used to determine intensity.

13.     What are the 2 add-on skills used in interpersonal communication?

14.     Define the term "Responding to Content".

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 1: INTERPERSONAL COMMUNICATION (I.P.C.)**

CORRECTIONS BASIC TRAINING CURRICULUM

**PRACTICE EXERCISE**

15.     What are the two steps in responding to content?

16.     What are the 2 steps in responding to feeling?

17.     Define the term "Responding to Feeling".

18.     Define the term "Responding to Feeling and Meaning".

19.     What is the appropriate time to refer the inmate to a mental health worker or other specialist.

20.     What are the 2 methods used in asking questions?

21.     What are the 3 application skills used in controlling behavior?

22.     List the 2 steps in handling requests.

23.     What are the 3 reasons for giving an inmate an explanation for an officer's response?

24.     Define the term "A Mild Format".

25.     Define the term "A Direct Format".

26.     Define the term "Reinforcing Behavior".

27.     What are the 2 parts of reinforcing behavior?

# Ohio Peace Officer Training Curriculum

## Basic Training Curriculum – 558 Hours Total

| Unit 1 | Administration | 21 |
|---|---|---|
| Unit 2 | Legal | 77 |
| Unit 3 | Human Relations | 76 |
| Unit 4 | Firearms | 60 |
| Unit 5 | Driving | 24 |
| Unit 6 | Subject Control | 60 |
| Unit 7 | First Aid | 12 |
| Unit 8 | Patrol | 48 |
| Unit 9 | Civil Disorders | 24 |
| Unit 10 | Traffic | 72 |
| Unit 11 | Investigation | 54 |
| Unit 12 | Physical Conditioning | 30 |

## Unit 1 Administration.............................................. 21 Hours Total

1. Introduction to Basic Training
2. Role of the American Peace Officer
3. Philosophy and Principles of the American Justice System
4. The Criminal Justice System & Structure of the American Courts
5. Ethics & Professionalism
6. Community Policing
7. Introduction to Report Writing*

## Unit 2 Legal.......................................................... 77 Hours Total

1. General Provisions
2. Ohio Revised Code
   a. Homicide, Assault, Menacing
   b. Kidnapping, Extortion
   c. Sexual Assault
   d. Prostitution, Obscenity
   e. Arson & Related Offenses
   f. Robbery, Burglary, Trespass & Related Offenses
   g. Theft, Fraud & Related Offenses
   h. Gambling & Related Offenses
   i. Liquor Control
   j. Drug Offenses
   k. Offenses Against Public Peace
   l. Selected Offenses Against the Family
   m. Offenses Against Justice & Public Administration



Δ π EXHIBIT ____
Deponent Huddleston
Date 6-4-15  Rptr WH
WWW.DEPOBOOK.COM

        n.  Conspiracy, Attempt, Complicity
        o.  Weapons
3.  Laws of Arrest*
4.  Search and Seizure*
5.  Legal Aspects of Interview & Interrogation*
6.  Civil Liability & Use of Force*
7.  Testifying in Courts & Rules of Evidence

## Unit 3 Human Relations................................................ 76 Hours Total

1. Communicating with the Public & the Media
2. Handling the Special Needs Population
3. Domestic Violence*
4. Crisis Intervention*
5. Child Abuse & Neglect*
6. Missing Children Investigation*
7. Juvenile Justice System
8. Victim's Rights
9. Crime Prevention
10. Understanding Cultural Differences

## Unit 4 Firearms.................................................…........ 60 Hours Total

1. Safety Procedures*
2. Handgun & Related Equipment*
3. Basic Fundamentals of Pistol Craft*
4. One Hand Technique*
5. Multiple Targets*
6. Low Level Light Conditions*
7. Use of Protective Cover*
8. Move & Shoot*
9. Shotgun Training*

## Unit 5 Driving….....…....................................…........ 24 Hours Total

1. Defensive Driving*
2. Pursuit Driving*
3. Practical Exercises

## Unit 6 Subject Control.............................................. 60 Hours Total

1. Subject Control Techniques*

**Unit 7 First Aid\***………..………………………………….. **12 Hours Total**

**Unit 8 Patrol**…………………………………………………..**48 Hours Total**
1. Vehicle Patrol Techniques
2. Foot Patrol
3. Responding to Crimes in Progress
4. Building Searches
5. Stops & Approaches\*
6. Auto Theft & V.I.N. Reconstruction
7. Gang Awareness
8. Communications
    a. Radio Procedures
    b. LEADS
9. Prisoner Booking & Handling
10. Report Writing\*

**Unit 9 Civil Disorders**…………………………………….…...**24 Hours Total**
1. Control of Nonviolent Crowds, Confronting Hostile Crowds
2. Riot Formations
3. Chemical Agents
4. Bombs & Explosives
5. Terrorism – Domestic & International
6. Hazardous Materials\* /ICS

**Unit 10 Traffic**………..………………………………….…….. **72 Hours Total**
1. Introduction to Traffic
2. Motor Vehicle Offenses
3. Commercial Vehicle Offenses
4. Traffic Crash Investigation
    a. Traffic Crash Planning, Factors & Events
    b. Traffic Crash Reporting Procedures
    c. Interviewing & Fact Gathering
    d. Diagramming & Template
    e. Collection & Evidence
    f. Vehicle Damage
5. Uniform Traffic Ticket
6. Speed Enforcement
7. Traffic Direction & Control
8. Alcohol Detection, Apprehension & Prosecution
9. Exercise for Traffic Crash Investigation

**Unit 11 Investigation**…………………………………………. **54 Hours Total**
1. Crime Scene Search

2. Evidence Collection Techniques
3. Crime Scene Sketching & Detailed Drawing
4. Police Photography
5. Tracing Stolen Property
6. Arson Scene Investigation
7. Controlled Substance & Drug Awareness
8. Ohio Drug Laws
9. Confidential Informants
10. Observation, Perception & Description
11. Line-ups
12. Gambling & Prostitution
13. Liquor Control & Enforcement
14. Surveillance
15. Interview & Interrogation Techniques*
16. Search Warrants*
17. Investigative Report Writing*

## Unit 12 Physical Conditioning.....................................30 Hours Total

Candidates must participate in training that covers running in a timed atmosphere, broad jumps, push-ups and sit-ups.

*Denotes a topic requiring mandatory attendance.

**UNIT 3:**      **HUMAN RELATIONS**

**TOPIC 2:**      **INTERACTING WITH THE SPECIAL NEEDS POPULATION**

**GOAL:**      THE STUDENT WILL KNOW ASPECTS OF INTERACTING WITH THE SPECIAL NEEDS POPULATION.

**SUB-GOALS:**

The student will know the symptoms displayed by a person with "major depression."

The student will be able to define the term "mental illness."

The student will know the symptoms of "bipolar disorder in the manic phase."

The student will know the signs of "schizophrenia."

The student will know the symptoms of "schizophrenia."

The student will know the signs of a person with an "anxiety disorder."

The student will know the types of "de-escalation techniques."

The student will know the behaviors to be avoided in "de-escalation techniques."

The student will know the "phrases of communication."

The student will know the indicators of "suicidal thought."

The student will know methods of responding to chemical abusers.

The student will know the indicators of a person with "autism."

The student will know intellectual abilities affected by dementia.

The student will know the signs of a person with "alzheimer's disease."

The student will know the categories of life changes regarding the elderly - mentally/physically challenged.

The student will know the interaction skills needed for dealing with elderly persons.

The student will know the interaction skills for the vision impaired.

The student will know the interaction skills for the hearing impaired.

The student will know the options for emergency admission due to mental illness.



Δ π EXHIBIT   C

Deponent Huddleston

Date 6-4-15 Rptr WH

WWW.DEPOBOOK.COM

OHIO PEACE OFFICER TRAINING COMMISSION               TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS
                                                                                      POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**REQUIRED HOURS:** SIXTEEN (16) HOURS

**STUDENT PERFORMANCE OBJECTIVES:**

1. Given a multiple choice question, **the student will choose the option which states 4 of the common symptoms displayed by a person with "Major Depression,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

2. Given a multiple choice question, **the student will choose the option which defines the term "Mental Illness"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

3. Given a multiple choice question, **the student will choose the option which states 6 of the symptoms of "Bipolar Disorder in the Manic Phase"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

4. Given a multiple choice question, **the student will choose the option which states 4 of the common signs of "Schizophrenia,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

5. Given a multiple choice question, **the student will choose the option which states 2 of the symptoms of "Schizophrenia,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

6. Given a multiple choice question, **the student will choose the option which states 3 signs of "Anxiety Disorder",** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

7. Given a multiple choice question, **the student will choose the option which states 5 of the De-escalation Techniques,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

8. Given a multiple choice question, **the student will choose the option which states 5 behaviors that should be avoided when engaged in De-escalation,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

9. Given a multiple choice question, **the student will choose the option which states 4 of the phrases to aid in communication,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

10. Given a multiple choice question, **the student will choose the option which states 2 of the Indicators of Suicidal Thought,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

11. Given a multiple choice question, **the student will choose the option which states 3 Methods of Responding to Chemical Abusers,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

12. Given a multiple choice question, **the student will choose the option which states 2 of the indicators of "Autism,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

13. Given a multiple choice question, **the student will choose the option which states the 3 intellectual abilities affected by Dementia,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

14. Given a multiple choice question, **the student will choose the option which states 5 signs of "Alzheimer's Disease,"** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

15. Given a multiple choice question, **the student will choose the option which states 5 categories of life changes regarding the elderly-mentally/physically challenged,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

16. Given a multiple choice question, **the student will choose the option states 4 interaction skills needed in dealing with elderly persons,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

17. Given a multiple choice question, **the student will choose the option which states 2 of the Interaction Skills for the Vision Impaired,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

18. Given a multiple choice question, **the student will choose the option which states 2 of the Interaction Skills for the Hearing Impaired,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

19. Given a multiple choice question, **the student will choose the option which states the 4 criterion for Emergency Admission,** as given in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

20. Given a multiple choice question containing a narrative situation, **the student will choose the option that identifies the underlying concept or the best course of action to be taken by a peace officer,** based on the application of the SPOs in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

## INSTRUCTOR REFERENCES:

National Institutes of Health: "Cerebral Palsy: Hope Through Research," NINDS. Publication date July 2001. NIH Publication No. 93-159.

Butler MG. Prader-Willi Syndrome: current understanding of cause and diagnosis. AM J Med Genet. 1990 Mar; 35(3): 319-32.

Yeargin-Allsopp M, Rice C, Karapurkar T, Doernberg N, Boyle C, Murphy C. Prevalence of Autism in a U.S. Metropolitan Area. *Journal of the American Medical Association,* 2003.

The Harvard Mental Health Letter. Sept. 2002.

National Institutes of Health Publication No. 3879 -- Anxiety Disorders.

National Institute of Mental Health, "Facts about Anxiety Disorder," Fact Sheet Publication No. OM-99 4152. Printed January, 1999.

U.S. Department of Health and Human Services. *Mental health: a report of the Surgeon General.* Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services, National Institutes of Health, National Institute of Mental Health, 1999.

The Ohio Police Chief, "A Police Officer's Guide: When in Contact With People Who Have Mental Retardation"

The Ohio Police Chief, "Dealing With Special Populations: Some Guiding Principles"

The Ohio Police Chief, "Protecting and Serving Those with Alzheimer's Disease" by Chief Philip K. Potter, CLEE

Closing The Gap: The Help-Seeking Behavior of Minorities; Julia Mayo, PhD, Chief, Clinical Studies; Department of Psychiatry, Saint Vincent's Hospital and Medical Center; New York, NY http://www.omhrc.gov/ctg/full-mhm.htm

Gilliand B. & James, R. (1996). Listening and responding in CIT - crisis intervention, In Memphis C.I.T. Manual, Memphis Police Department: Memphis, Tenn. 158 -- 165

Kausch, O., Resnick, P.J., "Psychiatric Assessment of the Violent Offender," Handbook of Psychological Approaches with Violent Offenders: Contemporary Strategies and Issues, V.B. Van Hasselt & M. Herson (Eds.), Klewer Academic/Plenum Publishers, New York, p. 439-457, 1999

Scott, C.L.: "Juvenile Violence," The Psychiatric Clinics of North America, 22:71-83, 1999

PEACE OFFICER BASIC TRAINING CURRICULUM

## Websites of Interest:

www.nami.org

www.psychiatrymatters.md

www.ncjrs.org

www.mentalhealth.org

www.psych.org

www.mh.state.oh.us

www.surgeongeneral.gov

www.psychlaws.org

www.suicidology.org

## TEACHING AIDS:

Handouts
Chalk/Chalkboard
Lectern
Overhead Projector
Prepared Overheads
Multimedia Projector

## STUDENT REFERENCES:

| | |
|---|---|
| Handout #1 | Ohio Revised Code §5122.01 |
| Handout #2 | Ohio Revised Code §5122.10 |
| Handout #3 | Types of Personality Disorders |
| Handout #4 | Anxiety Disorders: The Most Commonly Diagnosed Psychiatric Conditions |
| Handout #5 | Dementia **(SPO #13)** |
| Handout #6 | Guidelines when Communicating with a Person who has (or seems to have) Alzheimer's Disease or Some Other Form of Dementia |
| Handout #7 | State and Federal Victims Services |
| Handout #8 | Commonly Prescribed Psychotropic Medications |
| Handout #9 | Application for Emergency Admission (Form DMH-0025) |
| Handout #10 | Fisher v. Harden: 398 F. 3D 837 |
| Handout #11 | Five Indicators of Suicidal Thought **(SPO #10)** |
| Handout #12 | Steps for Responding to a Person in a Suicidal Crisis |
| Handout #13 | Stages of Alcohol Withdrawal |
| Handout #14 | Ohio Revised Code §2901.21 |
| Handout #15 | Ohio Revised Code §5126.30 – 5126.34 |
| Handout #16 | Methods for Responding to Chemical Abusers **(SPO #11)** |
| Handout #17 | Other Indicators that a Person may have Autism |
| Handout #18 | Other Developmental Disabilities |
| Handout #19 | Ohio Revised Code §2305.51 |

# SPECIAL NOTE TO COMMANDERS AND INSTRUCTORS

INSTRUCTORS ARE OBLIGED TO REVIEW EACH LESSON PLAN THEY TEACH FOR ACCURACY, CURRENT INFORMATION AND APPLICABILITY TO THE COMMUNITY DEMANDS. IF IT IS FOUND THAT INFORMATION IN A PARTICULAR LESSON PLAN IS OUT OF DATE OR FOR ANY REASON REQUIRES CHANGES OR UPDATES, PLEASE NOTIFY THE OHIO PEACE OFFICER TRAINING COMMISSION – CURRICULUM SUPERVISOR - AT 1-800-346-7682 OR FAX TO (740) 845-2675. COMMENTS MAY BE MAILED TO OPOTC, P.O. BOX 309, LONDON, OH 43140.

INSTRUCTORS ARE ALSO EXPECTED TO:

*   BEAR IN MIND THE LEGAL, MORAL, PROFESSIONAL AND ETHICAL IMPLICATIONS OF INSTRUCTING IN A COMMISSION-APPROVED PROGRAM.

*   USE ANY AND ALL OPPORTUNITIES WHICH MAY ARISE DURING INSTRUCTION OF THE REQUIRED MATERIAL TO POINT OUT TO THE STUDENTS THE LEGAL, MORAL, PROFESSIONAL AND ETHICAL RESPONSIBILITIES THEY WILL BEAR TO THEIR EMPLOYERS AND COMMUNITIES WHILE SERVING IN AN OFFICIAL CAPACITY.

*   USE SCENARIOS AND EXAMPLES SPECIFIC TO EACH LESSON PLAN TO GENERATE ACTIVE DISCUSSIONS CONCERNING THE ETHICAL IMPLICATIONS OF THE TOPIC/SKILL BEING TAUGHT. EMPHASIS SHOULD BE PLACED ON THE BENEFITS OF ETHICAL BEHAVIOR AND THE CONSEQUENCES OF UNETHICAL BEHAVIOR.

I. **PREPARATION**

   A. Introduction

      1. Instructor

      2. Course

   B. Purpose of this section of your training:

      1. To explain interaction skills for mentally disturbed, developmentally disabled and mentally ill people

      2. To explain some of the problem areas faced by elderly and mentally/physically challenged persons

      3. To explain some of the disorders that afflict all levels of society

   C. SPOs

II. **PRESENTATION**

   A. Officers are imbued with a take charge attitude and use command presence to help deal with criminals, victims, and to handle problems with which they have been called upon to deal

      1. This attitude can actually inflame the situation and cause the mentally ill individual to escalate his/her behavior

      2. You can have more control and authority over the person in a mental health crisis by using verbal and non-verbal communication that signifies a desire to help the person, while still maintaining officer safety.

      3. The effective officer is one, who, at times, is able to camouflage his/her combat readiness

   B. **MENTAL ILLNESS CAN BE DEFINED AS: A SUBSTANTIAL DISORDER OF THOUGHT, MOOD, PERCEPTION, ORIENTATION, OR MEMORY THAT GROSSLY IMPAIRS JUDGMENT, BEHAVIOR, CAPACITY TO RECOGNIZE REALITY, OR ABILITY TO MEET THE ORDINARY DEMANDS OF LIFE.**

      SPO #2
      OVERHEAD #1

1. The first observations of mental illness were made by Dorothea Dix prior to the Civil War

2. Mental illness was noted in homeless people on the streets, or in jails or prisons

3. Reform movements to create institutions were established

4. Institutionalization was supposed to allow for more humane methods to be employed

5. In the 1950's, societal perception turned away from institutionalization

   a. Institutional scandals

   b. Advent of medications

   c. Outcry from civil liberty organizations

6. De-institutionalization became a "battle cry" or "call to arms"

   a. Mentally ill persons were placed into communities with the expectation of continuing treatment and support

   b. It was found, however, that resources and treatments were more challenging to provide in a decentralized environment compared to a centralized institution

7. In 2005 modern society                              OVERHEAD #2

   a. Mentally ill people represent a large segment of the population in most communities

   b. Mentally ill people represent approximately 1/3rd of the homeless population

   c. 16% of jail and prison populations suffer from mental illness

   d. 7% - 10% of all calls involve mental illness

   e. 22% of the U.S. population suffer from mental illness (1 in 5 adults)

8. Society has come full circle on what actions should be taken with mental illness

9. Law enforcement has become the defacto mental health first responder in society

10. Training in this area has traditionally been limited

11. The results have been problematic for law enforcement and mentally ill people

12. People with mental illness are 4 times more likely to die in encounters with the police than are members of the general population

> **O.R.C. 2305.51 HANDOUT #19**

13. The first call of your career may be this type of situation

14. Each call will be unpredictable

15. Proper preparation with training will increase your readiness and safety awareness

16. Injuries and death decrease due to training

17. Law Enforcement is increasing the training component

18. Mental health resources have been generally unknown to law enforcement

19. Incarceration had been a frequent recourse for the mentally ill

20. Collaborations have been formed to change this pattern and provide the necessary help for those who are mentally ill

21. Public safety resources must, by necessity, exceed resources for other social services

C. Mental illness can be manifested in many forms

1. They may be grouped into four (4) major categories:

> **OVERHEAD #3**

a. Mood

| | |
|---|---|
| b. Thought | |
| c. Personality | |
| d. Other | |
| 2. Mental illness can occur in one or more categories | |
| D. Depression can be defined as: a feeling of sadness, the "blues," feeling down, or not enjoying activities that once provided enjoyment | **OVERHEAD #4** |
| 1. Usually these feelings are related to some life event | |
| a. Problem or loss | |
| b. Refers to an illness | |
| c. A disorder of the brain in which a change in the chemical balance of the brain causes serious symptoms | |
| 2. **COMMON SYMPTOMS DISPLAYED BY A PERSON WITH MAJOR DEPRESSION INCLUDE, BUT ARE NOT LIMITED TO:** | **SPO #1** **OVERHEAD #5** |
| a. Profound feelings of sadness, "blues": | |
| 1. Lasting more than a few days | |
| 2. Maybe even weeks | |
| b. Deep feelings of helplessness and hopelessness; profound pessimism | |
| c. Thoughts and feelings of guilt and self-blaming | |
| d. Diminished feelings of self-worth | |
| e. Lack of energy or ability to do normal activities, sometimes even including simple and routine activities | |
| f. Loss of interest in normal activities, such as family, friends, hobbies, etc., and tendency toward isolation | |
| g. Feelings of irritability | |

3. Physical symptoms may include some or all of the following:

    a. Changes in eating patterns (either more or less than normal)

    b. Changes in sleeping patterns (difficulty sleeping, sleeping a lot)

    c. Increased feeling of being tired

    d. Loss of sex drive

    e. Constipation

4. A person may experience a "psychotic depression"

    a. The depression is accompanied by:

       1. Hallucinations (seeing or hearing things that are not real) and/or,

       2. Delusions (fixed, rigid beliefs that have no basis in reality)

    b. Some people suffer from acute episodes of depression, meaning that they only have occasional serious episodes

    c. Others suffer from chronic depression, meaning that they have continuing problems over the course of their lives

E. Bipolar disorder can be defined as: a brain disorder that causes unusual shifts in a person's mood, energy, and ability to function     **OVERHEAD #6**

1. Bipolar disorder is formerly known as manic-depressive illness

2. The symptoms of bipolar disorder are severe

    a. They can result in:

       1. Damaged relationships

       2. Poor job performance

OHIO PEACE OFFICER TRAINING COMMISSION　　TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

|  |  |
|---|---|
| 3.　School performance | |
| 4.　Possible suicide | |
| b.　Bipolar disorder can be treated | |
| 3.　Bipolar disorder also varies among people | |
| a.　More than 2 million American adults, or about 1 percent of the population age 18 and older in any given year, have bipolar disorder | |
| b.　Bipolar disorder typically develops in late adolescence or early adulthood | |
| c.　Some people have their first symptoms during childhood | |
| d.　Some develop them late in life | |
| e.　Usually, not immediately evident as an illness | |
| f.　People may suffer for years before it is properly diagnosed and treated | |
| g.　Bipolar disorder is a long-term illness | |
| h.　It must be carefully managed throughout a person's life | |
| 4.　**SYMPTOMS OF A PERSON IN THE MANIC PHASE OF BIPOLAR DISORDER:** | SPO #3<br>OVERHEAD #7A, 7B |
| a.　Feelings of great happiness and euphoria | |
| b.　Sometimes, sudden outbursts or irritability, rage, and/or paranoia | |
| c.　Grandiose ideas and feelings of inflated self-importance (great plans or ideas for activities, and feeling of being capable of doing great things to realize those plans or ambitions) | |
| d.　Rapid flights of ideas or thoughts (called lability or referred to as being labile) | |

e. At the extremes, a person's thoughts may race so that his or her words come out in a non-stop rush and may not make sense because they seem so disconnected and forced

f. Sometimes, risky or reckless behavior (driving very fast, buying sprees, indiscreet sexual advances, high-risk recreational activities, (e.g. hang-gliding)

g. Great energy, and enhanced physical activity for long periods of time – sometimes, a person can go for days with little or no sleep

h. Often, feelings of great creativity, insight, and understanding of the world and of connections between things

i. Sometimes these feelings are associated with religious or spiritual ideas or concepts

j. Behavior that is often obnoxious to others (saying or doing things that are often offensive to others, and are outside of normally-accepted social boundaries)

k. Great increases in sexual energy and desire

l. In extreme cases, ideas or thoughts that are clearly out of touch with reality

    1. Some of these behaviors may also be associated with other illnesses or conditions besides bipolar disorder

    2. The effects of some drugs can cause similar behaviors

F. Schizophrenia is a chronic, severe, and disabling brain disease         **OVERHEAD #8**

  1. It is commonly held that schizophrenia is the same as "split personality"

  2. This is incorrect

  3. Approximately 1 percent of the population develops schizophrenia during their lifetime

|  |  |
|---|---|
| a. More than 2 million Americans suffer from the illness in a given year | |
| b. Schizophrenia affects men and women with equal frequency | |
| c. It appears earlier in men most often during their | |
|     1. Late teens or | |
|     2. Early twenties | |
| d. It usually appears in women during their | |
|     1. Twenties | |
|     2. Early thirties | |
| e. Schizophrenia is a Thought Disorder | |
| 4. A person with chronic schizophrenia does not typically recover normal functioning on his/her own and must receive continuing treatment that includes medications | |
| 5. Symptoms of thought disorders vary from person to person | |
| 6. **COMMON SIGNS OF SCHIZOPHRENIA** and other thought disorders: | SPO #4<br>OVERHEAD #9 |
| a. Disordered thinking and speech | |
| b. Delusions | |
| c. Hallucinations | |
| d. Unusual realities | |
| f. Poor hygiene or grooming | |
| g. Inappropriate or muted feelings or emotions | |
| h. Inappropriate behaviors or actions including: | |
|     1. Social behaviors | |

2. Dressing inappropriately for the weather

7. **SYMPTOMS OF SCHIZOPHRENIA ARE:**                    SPO #5
                                                         OVERHEAD #10

   a. Key Symptoms

      1. Extreme suspiciousness

      2. Delusions that others are persecuting or plotting against a person

      3. Possibly grandiose thinking

   b. Individuals can frequently be:

      1. Very angry

      2. Aloof

      3. Argumentative

      4. Difficult

      5. Violent

      6. Suicidal

   c. People with this particular disorder can be one of the greatest potential threats to law enforcement and others

G. Psychosis can be defined as: a loss of contact with    OVERHEAD #11
   reality, typically including delusions (false ideas about
   what is taking place or who one is) and hallucinations
   (seeing or hearing things which aren't there)

   1. Potential Causes include:

      a. Alcohol

      b. Certain Drugs

      c. Brain Tumors

      d. Epilepsy

      e. Psychotic Depression

| | |
|---|---|
| f. Stroke | |
| g. Alzheimer's | |
| h. Other Brain Disorders | |
| 2. Key Symptoms: | **OVERHEAD #12** |
| a. Loss of touch with reality | |
| b. Seeing, hearing, feeling, or otherwise perceiving things that are not there (hallucinogenic) | |
| c. Disorganized thought and/or speech | |
| d. Emotion is exhibited in an abnormal manner | |
| e. Unfounded fear/ suspicion | |
| f. Mistaken perceptions (illusions) | |
| g. False beliefs (delusions) | |
| 3. Psychosis can prevent a person from functioning normally | |
| 4. During psychotic states, there can be an inability to care for oneself | |
| 5. Without treatment, the possibility of self-harm or harm to others is increased | |
| 6. Delusion can be defined as: a false belief based on incorrect inference about external reality that is firmly sustained despite what almost everybody else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary | |
| 7. The belief is not one ordinarily accepted by other members of the person's culture or sub-culture. | |
| 8. Delusion is not necessarily tied directly to psychosis | |
| 9. Some delusions include: | |
| a. Delusions of paranoia (others are plotting against them) | |

    b. Grandiose Delusions (exaggerated ideas of one's importance or identity)

    c. Somatic Delusions (a healthy person believing that he/she has a terminal illness)

10. Hallucination can be defined as: a sensory perception (seeing, hearing, feeling, tasting, and smelling) in the absence of an outside stimulus.

11. Hallucinations are not tied directly to psychosis

H. Personality Disorders Are Defined as:

1. A mental disorder characterized by inflexible, deeply ingrained, maladaptive patterns of adjustment to life that cause either subjective distress or significant impairment of adaptive functioning

    a. Is pervasive and inflexible

    b. Has an onset in adolescence or early adulthood

    c. Is stable over time

    d. Leads to distress or impairment

2. Exact causes are not certain

3. It is generally thought that many personality disorders result from difficult, negative, or traumatic childhood experiences

4. Two of the more commonly-known personality disorders are:

    **OVERHEAD #13**
    **HANDOUT #3**

    a. Antisocial personality disorder (three or more of the following symptoms

        1. Failure to conform to social norms

        2. Deceitfulness

        3. Impulsivity; failure to plan ahead

        4. Reckless disregard for the safety of self or others

     5.  Consistent irresponsibility

     6.  Lack of remorse after having hurt, mistreated, or stolen from another

  b.  Borderline personality disorder is identified by a pervasive pattern of experience and behavior that is abnormal with respect to any two of the following

     1.  Control of impulses

     2.  Thinking

     3.  Mood

     4.  Personal relations

     5.  Suicidal

I.  Anxiety Disorders are a very common category of mental disorders

  1.  They can be very troubling and uncomfortable for people, and can certainly cause a person to experience a crisis situation

  2.  Some people experience feelings of anxiety at abnormal levels requiring intervention

    a.  Feelings start as a "normal" response to a realistic situation or concern

    b.  **SIGNS OF ANXIETY DISORDER INCLUDE:**

**SPO #6**
**OVERHEAD #14**

     1.  A person may feel extremely upset and unable to control feelings and situations

     2.  He or she may feel very worried and upset

     3.  May exaggerate the significance of an actual or imagined event or situation

     4.  The person may "catastrophize"

     5.  The person may worry all the time – typically way out of proportion to realistic causes

6. A person who is excessively anxious may also have physical symptoms

    a. Headaches

    b. Stomach aches

    c. Sleeping problems

    d. Difficulty breathing

3. People who experience episodes of extreme anxiety have continuing episodes

    a. An anxiety episode is rarely just a one-time event

    b. It is instead a pattern of responding to life situations

    c. It is a very uncomfortable way to be, and some seek treatment for it

4. Neither normal anxiety nor excessive anxiety is necessarily a diagnosable mental disorder

    a. A person's feelings of excessive anxiety can evolve into a diagnosable anxiety disorder

    b. Feelings of normal anxiety and normal depression go hand-in-hand

5. Such emotional responses can escalate into more significant emotional crisis situations

6. Specific Anxiety Disorders

    a. A key difference between these disorders and "normal" or "excessive" anxiety is:

        1. They usually occur without any connection to a specific life event or circumstance

        2. Anxiety disorders are often chronic

        3. A person may have many episodes over the course of his or her life

|  |  |
|---|---|
| 4.  They can cause great discomfort and can have a significant impact on the ability to function in everyday life | |
| b.  Anxiety disorders:  these are the most commonly diagnosed psychiatric conditions | **OVERHEAD #15**<br>**HANDOUT #4** |
| 1.  Generalized Anxiety Disorder | |
| 2.  Panic Disorder | |
| 3.  Phobias | |
| 4.  Obsessive-Compulsive Disorder | |
| 5.  Post-Traumatic Stress Disorder | |
| J.  Dementia | |
| 1.  **INTELLECTUAL ABILITIES AFFECTED BY DEMENTIA** | **SPO #13**<br>**OVERHEAD #16**<br>**HANDOUT #5** |
| a.  Thinking | |
| b.  Memory | |
| c.  Reasoning | |
| 2.  It is severe enough to interfere with a person's abilities to: | |
| a.  Care for himself or herself | |
| b.  Socialize | |
| c.  Plan for the future | |
| 3.  Dementia is not a disease | |
| a.  Dementia is a description of a group of symptoms that can accompany other diseases or physical conditions | |
| b.  These symptoms most commonly include: | **OVERHEAD #17** |
| 1.  Confusion as to time, place or person | |
| 2.  Shortened attention span | |

3.  Changes in short term memory

4.  Changes in language capability or trouble finding words

5.  Changes in ability to calculate, plan or reason

6.  Changes in personal care habits

7.  Changes in personality

c.  Research

1.  10% of people over the age of 65 have Alzheimer's Disease or a related dementia

2.  Doubles every five years beyond 65

3.  Persons as young as 35 have been diagnosed with Alzheimer's disease – very rare

4.  In younger people, it is typically much more aggressive

K.  Alzheimer's disease:  the most common form of dementia

1.  Alzheimer's is a progressive disease that attacks brain cells

2.  It causes a person to lose control over various abilities:

**OVERHEAD #18**

a.  Language

b.  Social awareness

c.  Mood

d.  Self-care ability

e.  Planning

f.  Reasoning

g.  Judgment

| | |
|---|---|
| 3. People in the terminal stages of Alzheimer's disease eventually lose: | |
|     a. Control of all physical functions | |
|     b. May no longer feel pain | |
|     c. May no longer feel hunger | |
|     d. May no longer feel thirst | |
|     e. May be unable to fight off even the most basic of infections | |
| 4. **COMMON SIGNS OF ALZHEIMER'S DISEASE INCLUDE:** | **SPO #14**<br>**OVERHEAD #19** |
|     a. Seems to be lost | |
|     b. Seems to be agitated or angry | |
|     c. Doesn't seem to grasp the nature or seriousness of the situation | |
|     d. Can't seem to relate to time | |
|     e. Repeats questions or statements | |
|     f. Gives inappropriate responses to questions | |
|     g. Is dressed inappropriately | |
|     h. Has a blank facial expression | |
|     i. Is out of touch with reality | |
| 5. Problems of younger people with Alzheimer's disease: | |
|     a. Keeping a job | |
|     b. Driving safely | |
|     c. Participating in familiar hobbies | |
|     d. Activities become impossible | |
| 6. Recognizing a Person with Alzheimer's Disease or another form of Dementia | **OVERHEAD #20** |

a. Memory loss and impaired thinking

b. Difficulty performing familiar tasks

c. Problems with language and communication

d. Disorientation as to time and place

e. Poor or diminished judgment

f. Problems following directions

g. Misplacing things

h. Changes in mood, personality, or behavior

i. Impaired visual or spatial skills

j. Loss of motivation

k. Changes in normal sleep patterns

7. Guidelines for communicating with a person who has (or seems to have) Alzheimer's disease or some other form of dementia:

**HANDOUT #6**

a. First, identify yourself as a law enforcement officer and state the purpose of your being there no matter how obvious it may seem

b. Speak slowly and maintain a low-pitched voice

c. Use short familiar words

d. Ask "yes" or "no" questions

e. Ask one question at a time, allowing plenty of response time

f. If necessary, repeat the question, using the exact previous wording. Victims with Alzheimer's Disease may grasp only parts of the initial question

g. Maintain good eye contact while communicating

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

---

| | |
|---|---|
|     h.  Substitute non-verbal for verbal communication (prompting is a good technique) | |
|     i.  If available, solicit help of a care giver to assist you with communicating | |
|   3.  The mentally ill person may be experiencing some paranoia about interacting with a law enforcement officer | |
|     a.  Use persuasion rather than force whenever possible | **OVERHEAD #21** |
|     b.  Make the scene safe | |
|     c.  Identify signs or symptoms of mental illness | |
|     d.  Determine whether a serious crime has been committed | |
|     e.  Evaluate the need for immediate transport to: | |
|         1.  Mental Health Facility | |
|         2.  Jail | |
|     f.  Arriving at the scene | **Fisher v. Harden, 398 F. 3d 837, 2005 Fed. App. HANDOUT #10** |
|         1.  Assess the situation | |
|         2.  Gather information | |
|             a.  Individuals | |
|             b.  Bystanders | |
|             c.  Family members | |
|     g.  Locate the person in crisis and begin interaction | |
|   4.  De-escalation Techniques require a balance of: | |
|     a.  Respect | |
|     b.  Firmness | |
|   5.  Be empathetic, not sympathetic | |

EFFECTIVE 8/1/06

| | |
|---|---|
| a. Empathy defined as: the ability to imagine oneself in another's place and understand the other's feelings, desires, ideas, and actions. | OVERHEAD #22 |
| b. Sympathy defined as: a feeling or an expression of pity or sorrow for the distress of another; compassion or commiseration. | |
| 6.  PHRASES TO AID IN COMMUNICATION | SPO #9 OVERHEAD #23 |
| a.  "We (I) want to help." | |
| b.  "How can we (I) help?" | |
| c.  "This can be worked out." | |
| d.  "This can be worked out if you will help" | |
| e.  "We (I) need your help." | |
| f.  "That's good." | |
| g.  "We (I) don't want anyone to get hurt." | |
| h.  "We (I) know you don't want to hurt anyone." | |
| 7.  DMH – 0025  APPLICATION FOR EMERGENCY ADMISSION | SPO #19 |
| a.  Emergency Admission Options | |
| 1.  Represents a substantial risk of physical harm to himself as manifested by evidence of threats of, or attempts at, suicide or self-inflicted bodily harm; | |
| 2.  Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness; | |

OHIO PEACE OFFICER TRAINING COMMISSION — TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

|  |  |
|---|---|
| 3. Represents a substantial or immediate risk of serious physical impairment or injury to himself as manifested by evidence that he is unable to provide for and is not providing for his basic physical needs because of his mental illness and that appropriate provision for such needs cannot be made immediately available in the community; or... | |
| 4. Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself | |
|   b. AKA "Pink Slip" | |
| 8. Ohio Revised Code Statute | |
|   a. 5122.01 | HANDOUT #1 |
|   b. 5122.10 | HANDOUT #2 |
| **L. DE-ESCALATION TECHNIQUES** | SPO #7<br>OVERHEAD #24A, 24B |
| 1. Officers should: | |
|   a. Remain calm and avoid overreacting and under-reacting | |
|   b. Provide or obtain on-scene emergency aid when treatment of an injury is urgent | |
|   c. Follow procedures indicated on medical alert bracelets or necklaces | |
|   d. Indicate a willingness to understand and help | |
|   e. Speak simply and briefly, and move slowly | |
|   f. Remove distractions, upsetting influences, and disruptive people from the scene | |
|   g. Understand that a rational discussion may not take place | |

    h.  Recognize that the person may be overwhelmed by sensations, thoughts, frightening beliefs, sounds ("voices"), or the environment

    i.  Be friendly, patient, accepting, and encouraging, but remain firm and professional

    j.  Be aware that a uniform, gun, and handcuffs may frighten the person with mental illness, and reassure the person that no harm is intended

    k.  Recognize and acknowledge that a person's delusional or hallucinatory experience is real to him or her

    l.  Announce actions before initiating them

    m.  Gather information from family or bystanders

    n.  If the person is experiencing a psychiatric crisis, ask that a representative of a local mental health organization respond to the scene

2.  **BEHAVIORS TO AVOID WHILE ENGAGED IN DE-ESCALATION:**

    a.  Moving suddenly, giving rapid orders or shouting

    b.  Forcing a discussion

    c.  Maintaining direct, continuous eye contact

    d.  Touching the person (unless essential to safety)

    e.  Crowding the person or move into his or her zone of comfort

    f.  Expressing anger, impatience or irritation

    g.  Assuming that a person who does not respond cannot hear

    h.  Using inflammatory language, such as "crazy," "psycho," "mental," or "mental subject"

    i.  Challenging delusional or hallucinatory statements

SPO #8
OVERHEAD #25

      j.  Misleading the person to believe that officers on the scene think or feel the way the person does

M. The Crisis Intervention Team:

  1.  Also known as "CIT"

     a.  Recognized as a National Best Practice for Law Enforcement

     b.  Composed of professional law enforcement officers who usually volunteer for the assignment

     c.  Designed for the "First Responder"

     d.  Established by the Memphis Police Department in 1988

  2.  Training provided to:

     a.  Law Enforcement Officers

     b.  Probation Officers

     c.  Parole Officers

     d.  Emergency Medical Technicians (EMT's)

  3.  Specially trained in Crisis Interaction Skills

  4.  State and Federal Victim Services are identified     **HANDOUT #7**

  5.  Focus is placed on two factors:

     a.  Communication

     b.  Intervention

  6.  Emphasis is placed upon three areas:

     a.  Recognition of mental health signs and symptoms

     b.  Substance abuse

     c.  Effects of medications     **HANDOUT #8**

  9.  Medications are available for a variety of mental illnesses     **HANDOUT #9**

a.  Side effects

   1.  Dry Mouth

   2.  Constipation

   3.  Blurred Vision

   4.  Drowsiness

   5.  Decreased Sexual Desire

   6.  Menstrual Changes

   7.  Stiff Muscles on one side

      a.  Neck

      b.  Jaw

   8.  Restlessness

   9.  Slurred Speech

   10. Muscle Stiffness

   11. Tremors

      a.  Hands

      b.  Feet

b.  Agranulocytosis: A decrease in the production of white blood cells, which occurs only when taking clozapine, requires monitoring of the blood every two weeks

c.  Tardive Dyskinesia:

   1.  Most serious side effect

   2.  Involuntary facial movements

   3.  Jerking movements of the body

   4.  Twisting movements of the body

**OVERHEAD #26A, 26B**

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

5.  Usually involves older citizens

6.  Affects 15% to 20% of those who have taken older antipsychotic drugs for years

7.  Decreases slowly from the body when medication ceases

d.  Failure to take the medications can, in many cases, cause a relapse of symptoms

e.  A primary reason is because of undesirable side effects from the medication

f.  Many tend to self-medicate with alcohol and/or illicit drugs

g.  SAMI (Substance Abuse and Mental Illness)  AKA "Dual Diagnosis

N.  Suicidal People

1.  Law enforcement officers often have to deal with suicidal people

2.  You may encounter a suicidal person in a variety of contexts, including:

a.  A disturbance call at a residence or a public place, in which you subsequently learn that a subject is feeling suicidal

b.  A call about a person threatening suicide – in some cases, a person who is armed

c.  EMS call regarding a person who has harmed him or herself – perhaps by taking an overdose of pills or cutting his or her wrists

d.  A call from a mental health or crisis intervention agency involving a report of a person with suicidal ideas

3.  Why People Consider Suicide

a.  **FIVE INDICATORS OF SUICIDAL THOUGHT**

1.  Emotional pain

**SPO #10**
**OVERHEAD #27**
**HANDOUT #11**

2. Mental illness

3. Alcohol and drug use

4. Rational decision

5. Manipulation of others

b. Suicidal thoughts may occur in one or more areas

4. Guidelines for Responding to Suicidal People

   a. When responding to a person in a suicidal crisis, your key goals are to:

      1. Keep the subject and others safe

      2. Control the situation

      3. Do what you reasonably can to help arrange follow-up care or intervention

   b. Steps for responding to a person in a suicidal crisis **HANDOUT #12**

      1. Conduct a continuing threat assessment

      2. Try to get the person to talk

      3. Show empathy

      4. Negotiate solutions

      5. Determine what action to take

5. Responding to an Armed Subject Threatening Suicide

   a. These situations are all extreme

   b. Specifics may vary

      1. The subject may be armed with a firearm
      2. An edged weapon

      3. Some other form of weapon

      4. Subject may be alone

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

|  |  |
|---|---|
| 5.  Have others with him or her | |
| c.  The primary issue of safety: | |
|     1.  Of the subject… | |
|     2.  Of other citizens involved… | |
|     3.  Of responding law enforcement personnel | |
| d.  Gaining control of the situation is critical | |
|     1.  How you respond depends on… | |
|     2.  Your threat assessment… | |
|     3.  Whether anyone is in imminent danger | |
| e.  Try to gain control of a situation through Professional Communication verbalization skills | |
|     1.  That may take time | |
|     2.  Always try to use it | |
|     3.  Do not hurry | |
| f.  A particular concern is a subject trying to commit "suicide by cop" | **OVERHEAD #28** |
|     1.  A person acting in such a way as to force the police to kill him or her, rather than committing suicide himself or herself | |
|         a.  If the person is simply armed and refusing to drop the weapon… | |
|         b.  But has not actually threatened anyone with it… | |
|         c.  The proper response depends on the circumstances | |
| g.  Law enforcement agencies are using "less-than-lethal" weapons | |
| h.  Familiarize yourself (before a crisis situation) with the policies and procedures of your agency for use of less-than-lethal force options | |

i.    Deadly force may be a first and last resort to stop a threat

j.    It is only to be employed when use of lesser force options has been precluded

k.   Your threat assessment in the particular circumstances is the basis for your actions

O.   People Under the Influence of Alcohol or Other Drugs

   1.   As a law enforcement officer, you will encounter many people under the influence of alcohol or other drugs

     a.   Some will be under the influence when you deal with them, which can cause them to act:

       1.   Strangely

       2.   Foolishly

       3.   In a bizarre manner

       4.   Dangerously

     b.   Others will be experiencing withdrawal from a substance, which can also cause concerning behaviors

     c.   Intoxication and withdrawal also present potentially serious medical problems and concerns

   2.   Chemical abusers constitute one of the three main categories

     a.   This group includes people who:

       1.   Abuse alcohol or

       2.   Drugs

       3.   Both

     b.   It includes chronic abusers

     c.   Some people whom you encounter will be addicts

1.  They are physically and/or psychologically dependent on a habit-forming substance

2.  Alcoholics are people who are addicted to alcohol

3.  People who abuse substances may also have a mental disorder or a developmental disability

4.  This aspect can complicate your response

3.  Abuse of alcohol is one of the most significant social problems in the United States

a.  It causes health problems

b.  It is the source of a huge amount of personal and family heartache

c.  It results in millions of dollars in lost work time

d.  Alcohol abuse also creates problems for law enforcement officers

4.  General Indicators of Intoxication

a.  The level and degree of alcohol intoxication depends on:

1.  What the person has had to drink

2.  The amount of alcohol consumed

3.  The time frame during which it was consumed

4.  Whether or not the person has eaten while drinking

5.  The person's body weight

b.  A subject may be:
1.  Mildly intoxicated

2.  Extremely intoxicated

5.  The effects of use and abuse of drugs vary greatly

a.  Many subjects will have used a combination of alcohol and drugs

b.  Some subjects will have taken more than one type of drug

c.  You are not likely to know for sure what substances a person has used

6.  Such general indicators include:

    **OVERHEAD #29**

a.  Slurred speech

b.  Odor of an alcoholic beverage on the breath

c.  Inability to stand or walk normally

d.  Confusion or disorientation

e.  Lethargy (slow, sleepy, uninspired behavior)

f.  Unusual or severe aggressiveness or agitation, or unusually obnoxious behavior

g.  Abnormal breathing, such as breathing which is very rapid and/or shallow

h.  Tremors ("shakes")

i.  Excessive irritability, being quick to anger

j.  Unusual restlessness, inability to stand or sit still or stay on task for long

k.  Feeling of being very hot or very cold

l.  Strange, unusual, or bizarre behavior

7.  Indicators that are specific to possible drug use include:

a.  Track or needle marks on a person's arms or legs

b.  Presence of drugs or drug paraphernalia

c.  Pupils of the eyes either very dilated (large) or pinpoint

| | |
|---|---|
| d. The subject may appear to be experiencing: | **OVERHEAD #30** |
|     1. Delusions (ideas or thoughts that are not based in reality) | |
|     2. Hallucinations (seeing things that are not there, or hearing voices, or sometimes smelling things that are not there) | |
| e. These symptoms may indicate: | |
|     1. Drug intoxication | |
|     2. Alcohol withdrawal | |
|     3. Mental illness | |
|     4. Some combination | |
| 8. Indicators of Possible Alcohol or Drug Withdrawal | |
| a. Withdrawal defined: A phenomenon that occurs when a person who has used significant amounts of alcohol of drugs, usually over a long time, stops taking them | |
|     1. The person's body has become used to the substance(s) | |
|     2. Reacts in specific ways to the change that occurs | |
|     3. When they are no longer provided | |
| b. Withdrawal from alcohol is potentially the most serious type of withdrawal | |
|     1. Withdrawal can be a medical emergency | |
|     2. People can die from this | |
| c. Alcohol withdrawal typically occurs in stages | **HANDOUT #13** |
| 9. Legal Requirements: People Who are Intoxicated or Incapacitated | |
| a. Ohio law distinguishes between people who are intoxicated and people who are incapacitated | |

| | |
|---|---|
| b. Ohio Revised Code §2901.21 defined (intoxicated) | **HANDOUT #14** |
| c. Ohio Revised Code §5126.30 thru 5126.34 defined (incapacitated) | **HANDOUT #15** |
| 10. **METHODS OF RESPONDING TO CHEMICAL ABUSERS** | **SPO #11** <br> **HANDOUT #16** |
| a. Always consider a person under the influence of alcohol or drugs a potential threat | |
| b. Try to assess the person's physical condition | |
| c. Remember that a crisis situation is a matter of perception | |
| d. Avoid arguing with a person under the influence of alcohol or drugs | |
| e. Remember that the person may have additional problems | |
| f. Recognize that apparent intoxication may be caused by other conditions | |
| g. Know your options for resolving the situation | |
| 11. People with Developmental Disabilities | |
| a. Law enforcement officers will respond to calls involving people who have some form of developmental disability | |
| b. Developmental disability is defined as: | **OVERHEAD #31** |
| 1. A severe, chronic (continuing) disability which originated during birth or childhood, is expected to continue indefinitely, and which substantially restricts the person's functioning in several major life activities <br> a. It is caused by a mental or physical impairment or some combination <br><br> b. It begins before the person reaches the age of 18 | |

| | |
|---|---|
| 2. The disability results in substantial functional limitations in, at least, three areas:<br><br>   a. Self-care<br><br>   b. Receptive language<br><br>   c. Expressive language<br><br>   d. Learning<br><br>   e. Mobility<br><br>   f. Self-direction<br><br>   g. Capacity for independent living<br><br>   h. Economic self-sufficiency<br><br>3. People with such disabilities require life-long services and supports or other forms of assistance<br><br>12. Mental Retardation<br><br>   a. This is the most common form of developmental disability<br><br>   b. The key characteristic of mental retardation is reduced intellectual functioning<br><br>   c. A person with retardation also has diminished ability to adapt to the daily demands of the normal social environment, including:<br><br>      1. Communication<br><br>      2. Academic or vocational skills<br><br>      3. Independent living skills<br><br>   d. To be diagnosed with retardation, this disability has to originate before the age of 18<br><br>   e. Mental retardation may result from any of several causes:<br><br>      1. Prenatal (before birth) problems | **OVERHEAD #32** |

    a. Illnesses

    b. Viruses

    c. Infections

  2. Maternal use of:

    a. Alcohol

    b. Drugs

    c. Tobacco

    d. Exposure to pollutants or chemicals

f. Difficulties during childbirth that cause the child's brain to be deprived of oxygen or events that occur after a child is born:

  1. Brain injury

  2. Malnutrition

  3. Infection

  4. Exposure to toxic chemicals

g. Retardation may also result from genetic or hereditary causes

  1. It is not a form of mental illness

  2. It is not a disease

  3. It cannot be cured

h. People with mental retardation can also experience different symptoms

  1. Hallucinations

  2. Delusions

  3. Severe depression

13. Indicators that a person may have mental retardation include:

   a. Apparent inability to understand things as well as other people

   b. Concrete thinking

      1. Apparent difficulty in understanding or processing abstract ideas or concepts

      2. Immature behavior in certain social situations or acting below age level

   c. Most mentally retarded people encountered will be either mildly or moderately mentally retarded

   d. Many are quite capable of holding a job and living independently with limitations

   e. People with severe retardation or profound retardation are less likely to function independently and are often victims of crimes

   f. A person with mental retardation may experience a crisis situation for any of several reasons:

      1. He or she may be traumatized as a victim of crime

      2. May have a disturbing argument or confrontation with someone

         a. Family member

         b. Employer

         c. Other person

      3. Sometimes people who are retarded are "scapegoated"

         a. Set up by others…

         b. To do things that they would not otherwise do

**OVERHEAD #33**

**AMERICAN ASSOCIATION ON MENTAL RETARDATION**

| | |
|---|---|
| P. Autism is defined as:  a neurologically-based developmental disability that seriously affects a person's communication, decision-making and socialization skills | **OVERHEAD #34** |
|   1. Affects more than 12 million people in the world | |
|   2. Affects four times as many males as females | |
|   3. Autism is a complex disorder that includes multiple levels of functioning | |
|     a. Mild | |
|     b. Severe | |
|   4. Some people with autism have: | |
|     a. Severe mental retardation | |
|     b. Others have superior abilities | |
|   5. Almost all with autism have significant problems responding appropriately in social situations | |
|   6. There is no cure for autism | |
|   7. Recognizing People with Autism | |
|     a. It may be difficult to recognize that a person has autism | |
|       1. He or she may have and present an autism information card | |
|       2. May wear a medical-alert bracelet | |
|       3. May have information sewn or imprinted on clothing | |
|       4. A non-permanent tattoo | |
|     b. **INDICATORS OF AUTISM MAY INCLUDE:** | **SPO #12**<br>**OVERHEAD #35**<br>**HANDOUT #17** |
|       1. Verbal difficulties | |
|       2. Unusual physical behaviors | |
|       3. Inappropriate social responses | |

| | |
|---|---|
| Q.  Other Developmental Disabilities | **OVERHEAD #36** <br> **HANDOUT #18** |
|    1.  Cerebral Palsy can defined as:  a group of chronic conditions affecting body movements and muscle coordination | |
|    2.  Epilepsy (seizure disorder) can be defined as:  a physical condition that occurs when there is a sudden, brief change in the way that the brain works | |
|    3.  Traumatic Brain Injury (aka TBI) can be defined as:  a sudden physical assault on the head causing damage to the brain | |
|    4.  Prader-Willi Syndrome can be defined as:  a complex genetic disorder that includes short stature, mental retardation or learning disabilities, incomplete sexual development, characteristic problems, low muscle tone, and an involuntary urge to eat constantly | |
|    5.  Fetal Alcohol Syndrome (aka FAS) can be defined as:  a pattern of physical and mental defects which develops in some unborn babies when the mother drinks too much alcohol during pregnancy | |
| R.  Problems that could be expected when communicating with the elderly and mentally/physically challenged: | |
|    1.  Reduced or impaired physical mobility | |
|    2.  Loss of hearing, identified as slight to total deafness | |
|    3.  Diminished vision, ranging from impaired to blindness | |
|    4.  Mental capacity extending from normal, but a little slower, to incapacitated | |
| R.  Issues and life changes concerning the aged | |
|    1.  Physical appearance | |
|    2.  Emotional changes | |
|    3.  Death of a spouse | |
|    4.  Problems in marriage | |

|  |  |
|---|---|
| 5. Retirement |  |
| 6. Sensory loss |  |
| S. **CATEGORIES OF LIFE CHANGES AND ISSUES REGARDING THE ELDERLY AND THE MENTALLY/PHYSICALLY CHALLENGED** | SPO #15<br>OVERHEAD #37 |
| 1. Physical issues |  |
|    a. Mobility |  |
|    b. Appearance |  |
|    c. Disease |  |
|    d. Long term care |  |
| 2. Death and dying |  |
|    a. Spouse |  |
|    b. Family |  |
|    c. Peers |  |
|    d. Friends |  |
| 3. Marriage problems |  |
|    a. Empty nest |  |
|    b. Life style change |  |
|    c. Stress |  |
|    d. Anxiety |  |
| 4. Abuse |  |
|    a. Spouse |  |
|    b. Family |  |
|    c. Others |  |
|    d. Self |  |

5. Sensory impairment

   a. Loss of sight

   b. Loss of hearing

   c. Loss of speech, etc.

6. Medication problems

   a. Too much

   b. Too little

   c. Lack of medication

   d. Depression

7. Alcohol

   a. Abuse

   b. Mixing with medication

8. Retirement or lack of employment

   a. Decline in money which affects:

      1. Food

      2. Shelter

      3. Clothing

   b. Loss of employment

   c. Loneliness

   d. Feeling of failure to accomplish life goals

   e. Being unprotected

   f. Loss of control

9. Emotional problems: All of the above with the addition of fear in everyday life

| | |
|---|---|
| T. **INTERACTION SKILLS NEEDED IN DEALING WITH ELDERLY PERSONS** | **SPO #16**<br>**OVERHEAD #38** |
|    1. Obtain all possible information | |
|    2. Show respect | |
|    3. Body language can be interpreted | |
|    4. Position yourself to best be seen | |
|    5. Touch is OK, only if necessary | |
|    6. Provide reassurance and security | |
|    7. Control your voice by tone, volume, pace | |
|    8. Keep communication simple | |
|    9. Explain what you are doing | |
|    10. Try not to restrain them | |
|    11. Having family and/or friends present is beneficial | |
| U. Crisis intervention skills for the mentally/physically challenged | |
|    1. **INTERACTION SKILLS FOR THE VISION IMPAIRED** | **SPO #17**<br>**OVERHEAD #39** |
|      a. Introduce yourself | |
|      b. Speak and act normally | |
|      c. Ask first before giving assistance | |
|      d. Always warn the person of any hazards, steps, curbs, walkways, etc. | |
|    2. **INTERACTION SKILLS FOR THE HEARING IMPAIRED** | **SPO #18**<br>**OVERHEAD #40** |
|      a. Position yourself to best be seen | |
|      b. Make sure you are understood | |
|      c. A nod doesn't mean someone understands | |

    d. Find a mutual communication means:

       1. Normal speech

       2. Being told to "speak-up"

       3. Reading lips

       4. Signing

       5. Notes and messages

V. Community referral handbook

    1. Each officer should be equipped with a community referral handbook which lists all the community agencies in that jurisdiction

    2. To use a community referral handbook choose the problem which has the highest priority for the individual

    3. While talking to the individual, do a mental scan for an agency which provides service for the identified problem

    4. Make every attempt to "Personalize" the agency to which you refer the individual

    5. Clarify any questions the individual may have concerning the agency in question

    6. Complete a referral slip with a copy to the individual and one for your files

    7. Be sure that you keep advised on new agencies that open in your jurisdiction and add them into your referral handbooks

## III. PRACTICE

A. Distribute the practice exercise

B. Have students complete

C. Review exercise with students

D. Be available for questions

## IV. TEST/SPOS

OHIO PEACE OFFICER TRAINING COMMISSION

**TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION**

PEACE OFFICER BASIC TRAINING CURRICULUM

**OVERHEAD 1**

**SPO #2**

## MENTAL ILLNESS

A SUBSTANTIAL DISORDER OF THOUGHT, MOOD, PERCEPTION, ORIENTATION, OR MEMORY THAT GROSSLY IMPAIRS JUDGMENT, BEHAVIOR, CAPACITY TO RECOGNIZE REALITY, OR ABILITY TO MEET TO ORDINARY DEMANDS OF LIFE.

# MODERN SOCIETY

1. MENTALLY ILL PEOPLE REPRESENT A LARGE SEGMENT OF THE POPULATION IN MOST COMMUNITIES

2. MENTALLY ILL PEOPLE REPRESENT APPROXIMATELY 1/3RD OF THE HOMELESS POPULATION

3. 16% OF JAIL AND PRISON POPULATIONS SUFFER FROM MENTAL ILLNESS

4. 7% - 10% OF ALL CALLS INVOLVE MENTAL ILLNESS

5. 22% OF THE U.S. POPULATION SUFFERS FROM MENTAL ILLNESS (1 IN 5 ADULTS)

# MENTAL ILLNESS MAJOR CATEGORIES

- MOOD

- THOUGHT

- PERSONALITY

- OTHER

# DEPRESSION

## A FEELING OF SADNESS, THE "BLUES," FEELING DOWN, OR NOT ENJOYING ACTIVITIES THAT ONCE PROVIDED ENJOYMENT

OVERHEAD 5

SPO #1

## SYMPTOMS OF MAJOR DEPRESSION

- PROFOUND FEELINGS OF SADNESS, "BLUES"

- DEEP FEELINGS OF HELPLESSNESS; PROFOUND PESSIMISM

- THOUGHTS AND FEELINGS OF GUILT AND SELF-BLAMING

- DIMINISHED FEELINGS OF SELF-WORTH

- LACK OF ENERGY OR ABILITY TO DO NORMAL ACTIVITIES, SOMETIMES EVEN INCLUDING SIMPLE AND ROUTINE ACTIVITIES

- LOSS OF INTEREST IN NORMAL ACTIVITIES, SUCH AS FAMILY, FRIENDS, HOBBIES, ETC., AND TENDENCY TOWARD ISOLATION

- FEELINGS OF IRRITABILITY

# BIPOLAR DISORDER

## A BRAIN DISORDER THAT CAUSES UNUSUAL SHIFTS IN A PERSON'S MOOD, ENERGY, AND ABILITY TO FUNCTION

OVERHEAD 7-A

SPO #3

## SYMPTOMS OF A PERSON IN THE MANIC PHASE OF BIPOLAR DISORDER

- FEELINGS OF GREAT HAPPINES AND EUPHORIA

- SOMETIMES, SUDDEN OUTBURSTS OR IRRITABILITY, RAGE, AND/OR PARANOIA

- GRANDIOSE IDEAS AND FEELINGS OF INFLATED SELF-IMPORTANCE

- RAPID FLIGHTS OF IDEAS OR THOUGHTS (CALLED LABILITY REFERRED TO AS BEING LABILE)

- AT THE EXTREMES, A PERSON'S THOUGHTS MAY RACE SO THAT HIS OR HER WORDS COME OUT IN A NON-STOP RUSH AND MAY NOT MAKE SENSE BECAUSE THEY SEEM SO DISCONNECTED AND FORCED

- SOMETIMES, RISKY AND RECKLESS BEHAVIOR

- GREAT ENERGY, AND ENHANCED PHYSICAL ACTIVITY FOR LONG PERIODS OF TIME

- OFTEN, FEELINGS OF GREAT CREATIVITY, INSIGHT, AND UNDERSTANDING OF THE WORLD AND OF CONNNECTIONS BETWEEN THINGS

- SOMETIMES THESE FEELINGS ARE ASSOCIATED WITH RELIGIOS OR SPIRITUAL IDEAS OR CONCEPTS

- BEHAVIOR THAT IS OFTEN OBNOXIOUS TO OTHERS

- GREAT INCREASES IN SEXUAL ENERGY AND DESIRE

- IN EXTREME CASES, IDEAS OR THOUGHTS THAT ARE CLEARLY OUT OF TOUCH WITH REALITY

# SCHIZOPHRENIA

## A CHRONIC, SEVERE, AND DISABLING BRAIN DISEASE

OVERHEAD 9

SPO #4

## COMMON SIGNS OF SCHIZOPHRENIA

- DISORDERED THINKING AND SPEECH

- DELUSIONS

- HALLUCINATIONS

- UNUSUAL REALITIES

- POOR HYGIENE OR GROOMING

- INAPPROPRIATE OR MUTED FEELINGS OR EMOTIONS

- INAPPROPRIATE BEHAVIORS OR ACTIONS

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

OVERHEAD 10

SPO #5

## SYMPTOMS OF SCHIZOPHRENIA

KEY SYMPTOMS:

- EXTREME SUSPICIOUSNESS

- DELUSIONS THAT OTHERS ARE PERSECUTING OR PLOTTING AGAINST A PERSON

- POSSIBLY GRANDIOSE THINKING

INDIVIDUALS CAN FREQUENTLY BE:

- VERY ANGRY

- ALOOF

- ARGUMENTATIVE

- DIFFICULT

- VIOLENT

- SUICIDAL

PEOPLE WITH THIS PARTICULAR DISORDER ARE PROBABLY THE GREATEST POTENTIAL THREATS TO LAW ENFORCEMENT OFFICERS AND OTHERS

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**OVERHEAD 11**

## PSYCHOSIS

A LOSS OF CONTACT WITH REALITY, TYPICALLY INCLUDING DELUSIONS (FALSE IDEAS ABOUT WHAT IS TAKING PLACE OR WHO ONE IS) AND HALLUCIANTIONS (SEEING OR HEARING THINGS WHICH AREN'T THERE)

## KEY SYMPTOMS OF PSYCHOSIS

- LOSS OF TOUCH WITH REALITY

- SEEING, HEARING, FEELING, OR OTHERWISE PERCEIVING THINGS THAT ARE NOT THERE (HALLUCINOGENIC)

- DISORGANIZED THOUGHT AND/OR SPEECH

- EMOTION IS EXHIBITED IN AN ABNORMAL MANNER

- UNFOUNDED FEAR/ SUSPICION

- MISTAKEN PERCEPTIONS (ILLUSIONS)

- FALSE BELIEFS (DELUSIONS)

# COMMONLY KNOWN PERSONALITY DISORDERS

- ANTISOCIAL PERSONALITY DISORDER

- BORDERLINE PERSONALITY DISORDER

# SIGNS OF ANXIETY DISORDERS

- A PERSON MAY FEEL EXTREMELY UPSET AND UNABLE TO CONTROL FEELINGS AND SITUATIONS

- HE OR SHE MAY FEEL VERY WORRIED AND UPSET

- MAY EXAGGERATE THE SIGNIFICANCE OF AN ACTUAL OR IMAGINED EVENT OR SITUATION

- THE PERSON MAY "CATASTROPHIZE"

- THE PERSON MAY WORRY ALL THE TIME – TYPICALLY WAY OUT OF PROPORTION TO REALISTIC CAUSES

- A PERSON WHO IS EXCESSIVELY ANXIOUS MAY ALSO HAVE PHYSICAL SYMPTOMS

# MOST COMMONLY DIAGNOSED ANXIETY DISORDERS

- GENERALIZED ANXIETY DISORDER

- PANIC DISORDER

- PHOBIAS

- OBSESSIVE-COMPULSIVE DISORDER

- POST-TRAUMATIC STRESS DISORDER

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

OVERHEAD 16

SPO #13

# DEMENTIA

DEMENTIA IS A DESCRIPTION OF A GROUP OF SYMPTOMS THAT CAN ACCOMPANY OTHER DISEASES OR PHYSICAL CONDITIONS

- THINKING

- MEMORY

- REASONING

NOTE: DEMENTIA **IS NOT** A DISEASE

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**OVERHEAD 17**

## COMMON SYMPTOMS OF DEMENTIA

- CONFUSION AS TO TIME, PLACE OR PERSON

- SHORTENED ATTENTION SPAN

- CHANGES IN SHORT TERM MEMORY

- CHANGES IN LANGUAGE CAPABILITY OR TROUBLE FINDING WORDS

- CHANGES IN ABILITY TO CALCULATE, PLAN OR REASON

- CHANGES IN PERSONAL CARE HABITS

- CHANGES IN PERSONALITY

# ABILITIES LOST DUE TO ALZHEIMER'S DISEASE

- LANGUAGE

- SOCIAL AWARENESS

- MOOD

- SELF-CARE ABILITY

- PLANNING

- REASONING

- JUDGMENT

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**OVERHEAD 19**

**SPO #14**

## COMMON SIGNS FOR PEOPLE WITH ALZHEIMER'S DISEASE

- SEEMS TO BE LOST

- SEEMS TO BE AGITATED OR ANGRY

- DOESN'T SEEM TO GRASP THE NATURE OR SERIOUSNESS OF THE SITUATION

- CAN'T SEEM TO RELATE TO TIME

- REPEATS QUESTIONS OR STATEMENTS

- GIVES INAPPROPRIATE RESPONSES TO QUESTIONS

- IS DRESSED INAPPROPRIATELY

- HAS A BLANK FACIAL EXPRESSION

- IS OUT OF TOUCH WITH REALITY

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

OVERHEAD 20

## OTHER FORMS OF DEMENTIA

- MEMORY LOSS AND IMPAIRED THINKING

- DIFFICULTY PERFORMING FAMILIAR TASKS

- PROBLEMS WITH LANGUAGE AND COMMUNICATION

- DISORIENTATION AS TO TIME AND PLACE

- POOR OR DIMINISHED JUDGMENT

- PROBLEMS FOLLOWING DIRECTIONS

- MISPLACING THINGS

- CHANGES IN MOOD, PERSONALITY, OR BEHAVIOR

- IMPAIRED VISUAL OR SPATIAL SKILLS

- LOSS OF MOTIVATION

- CHANGES IN NORMAL SLEEP PATTERNS

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 416 of 630 PAGEID #: 1204

## INTERACTING WITH THE MENTALLY ILL

- MAKE THE SCENE SAFE

- IDENTIFY SIGNS OR SYMPTOMS OF MENTAL ILLNESS

- DETERMINE WHETHER A SERIOUS CRIME HAS BEEN COMMITTED

- EVALUATE THE NEED FOR IMMEDIATE TRANSPORT TO:

  o MENTAL HEALTH FACILITY

  o JAIL

- USE PERSUASION RATHER THAN FORCE WHENEVER POSSIBLE

- ARRIVING AT THE SCENE

  o ASSESS THE SITUATION

  o GATHER INFORMATION

    ♦ INDIVIDUALS

    ♦ BYSTANDERS

    ♦ FAMILY MEMBERS

- LOCATE THE PERSON IN CRISIS AND BEGIN INTERACTION

# EMPATHY VS. SYMPATHY

<u>EMPATHY</u> DEFINED AS: THE ABILITY TO IMAGINE ONESELF IN ANOTHER'S PLACE AND UNDERSTAND THE OTHER'S FEELINGS, DESIRES, IDEAS, AND ACTIONS.

<u>SYMPATHY</u> DEFINED AS: A FEELING OR AN EXPRESSION OF PITY OR SORROW FOR THE DISTRESS OF ANOTHER; COMPASSION OR COMMISERATION.

# PHRASES TO AID IN COMMUNICATION

- "WE (I) WANT TO HELP."

- "HOW CAN WE (I) HELP?"

- "THIS CAN BE WORKED OUT."

- "THIS CAN BE WORKED OUT IF YOU WILL HELP."

- "WE (I) NEED YOUR HELP."

- "THAT'S GOOD."

- "WE (I) DON'T WANT ANYONE TO GET HURT."

- "WE (I) KNOW YOU DON'T WANT TO HURT ANYONE."

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

OVERHEAD 24A

SPO #7

## DE-ESCALATION TECHNIQUES

## OFFICER'S SHOULD:

- REMAIN CALM AND AVOID OVERREACTING AND UNDERREACTING

- PROVIDE OR OBTAIN ON-SCENE EMERGENCY AID WHEN TREATMENT OF AN INJURY IS URGENT

- FOLLOW PROCEDURES INDICATED ON MEDICAL ALERT BRACELETS OR NECKLACES

- INDICATE A WILLINGNESS TO UNDERSTAND AND HELP

- SPEAK SIMPLY AND BRIEFLY, AND MOVE SLOWLY

- REMOVE DISTRACTIONS, UPSETTING INFLUENCES, AND DISRUPTIVE PEOPLE FROM THE SCENE

- UNDERSTAND THAT A RATIONAL DISCUSSION MAY NOT TAKE PLACE

- RECOGNIZE THAT THE PERSON MAY BE OVERWHELMED BY SENSATIONS, THOUGHTS, FRIGHTENING BELIEFS, SOUNDS ("VOICES"), OR THE ENVIRONMENT

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM                        OVERHEAD 24B

- BE FRIENDLY, PATIENT, ACCEPTING, AND ENCOURAGING, BUT REMAIN FIRM AND PROFESSIONAL

- BE AWARE THAT A UNIFORM, GUN, AND HANDCUFFS MAY FRIGHTEN THE PERSON WITH MENTAL ILLNESS, AND REASSURE THE PERSON THAT NO HARM IS INTENDED

- RECOGNIZE AND ACKNOWLEDGE THAT A PERSON'S DELUSIONAL OR HALLUCINATORY EXPERIENCE IS REAL TO HIM OR HER

- ANNOUNCE ACTIONS BEFORE INITIATING THEM

- GATHER INFORMATION FROM FAMILY OR BYSTANDERS

- IF THE PERSON IS EXPERIENCING A PSYCHIATRIC CRISIS, ASK THAT A REPRESENTATIVE OF A LOCAL MENTAL HEALTH ORGANIZATION RESPOND TO THE SCENE

OVERHEAD 25

SPO #8

## BEHAVIORS TO AVOID WHILE ENGAGED IN DE-ESCALATION

- MOVING SUDDENLY, GIVING RAPID ORDERS OR SHOUTING

- FORCING DISCUSSION

- MAINTAINING DIRECT, CONTINUOUS EYE CONTACT

- TOUCHING THE PERSON (UNLESS ESSENTIAL TO SAFETY)

- CROWDING THE PERSON OR MOVE INTO HIS OR HER ZONE OF COMFORT

- EXPRESSING ANGER, IMPATIENCE OR IRRITATION

- ASSUMING THAT A PERSON WHO DOES NOT RESPOND CANNOT HEAR

- USING INFLAMMATORY LANGUAGE, SUCH AS "CRAZY," "PSYCHO", "MENTAL", OR "MENTAL SUBJECT"

- CHALLENGING DELUSIONAL OR HALLUCINATORY STATEMENTS

- MISLEADING THE PERSON TO BELIEVE THAT OFFICERS ON THE SCENE THINK OR FEEL THE WAY THE PERSON DOES

# SIDE EFFECT

- DRY MOUTH

- CONSTIPATION

- BLURRED VISION

- DROWSINESS

- DECREASED SEXUAL DESIRE

- MENSTRUAL CHANGES

- STIFF MUSCLES ON ONE SIDE

    o  NECK

    o  JAW

- RESTLESSNESS

- SLURRED SPEECH

- MUSCLE STIFFNESS

- TREMORS

    o  HANDS

    o  FEET

AGRANULOCYTOSIS:  A DECREASE IN THE PRODUCTION OF WHITE BLOOD CELLS, WHICH OCCURS ONLY WHEN TAKING CLOZAPINE, REQUIRES MONITORING OF THE BLOOD EVERY TWO WEEKS

TARDIVE DYSKINESIA:

- MOST SERIOUS SIDE EFFECT

- INVOLUNTARY FACIAL MOVEMENTS

- JERKING MOVEMENTS OF THE BODY

- TWISTING MOVEMENTS OF THE BODY

- USUALLY INVOLVES OLDER CITIZENS

- AFFECTS 15% TO 20% OF WHO HAVE TAKEN OLDER ANTIPSYCHOTIC DRUGS FOR YEARS

- DECREASES SLOWLY FROM THE BODY WHEN MEDIATION CEASES

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

**OVERHEAD 27**

**SPO #10**

## INDICATORS OF SUICIDAL THOUGHT

- EMOTIONAL PAIN

- MENTAL ILLNESS

- ALCOHOL AND DRUG USE

- RATIONAL DECISION

- MANIPULATION OF OTHERS

## SUICIDE BY COP

A PERSON ACTING IN SUCH A WAY AS TO FORCE THE POLICE TO KILL HIM OR HER, RATHER THAN COMMITTING SUICIDE HIMSELF OR HERSELF

- IF THE PERSON IS SIMPLY ARMED AND REFUSING TO DROP THE WEAPON…

- BUT HAS NOT ACTUALLY THREATENED ANYONE WITH IT…

- THE PROPER RESPONSE DEPENDS ON THE CIRCUMSTANCES

## GENERAL INDICATORS OF PEOPLE UNDER THE INFLUENCE OF ALCOHOL OR OTHER DRUGS

- SLURRED SPEECH

- ODOR OF AN ALCOHOLIC BEVERAGE ON THE BREATH

- INABILITY TO STAND OR WALK NORMALLY

- CONFUSION OR DISORIENTATION

- LETHARGY (SLOW, SLEEPY, UNINSPIRED BEHAVIOR)

- UNUSUAL OR SEVERE AGGRESSIVENESS OR AGITATION, OR UNUSUALLY OBNOXIOUS BEHAVIOR

- ABNORMAL BREATHING, SUCH AS BREATHING WHICH IS VERY RAPID AN/OR SHALLOW

- TREMORS ("SHAKES")

- EXCESSIVE IRRITABILITY, BEING QUICK TO ANGER

- UNUSUAL RESTLESSNESS, INABILITY TO STAND OR SIT STILL OR STAY ON TASK FOR LONG

- FEELING OF BEING VERY HOT OR VERY COLD

- STRANGE, UNUSUAL, OR BIZARRE BEHAVIOR

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 427 of 630  PAGEID #: 1215

## DELUSION VS. HALLUCINATION

**DELUSIONS (IDEAS OR THOUGHTS THAT ARE NTO BASED IN REALITY)**

**HALLUCINATIONS (SEEING THINGS THAT ARE NOT THERE, OR HEARING VOICES, OR SOMETIMES SMELLING THINGS THAT ARE NTO THERE)**

# DEVELOPMENTAL DISABILITY

A SEVERE, CHRONIC (CONTINUING) DISABILITY WHICH ORIGINATED DURING BIRTH OR CHILDHOOD, IS EXPECTED TO CONTINUE INDEFINITELY, AND WHICH SUBSTANTIALLY RESTRICTS THE PERSON'S FUNCTIONING IN SEVERAL MAJOR LIFE ACTIVITIES

# DEVELOPMENTAL DISABILITY FUNCTIONAL LIMITATIONS

- SELF-CARE

- RECEPTIVE LANGUAGE

- EXPRESSIVE LANGUAGE

- LEARNING

- MOBILITY

- SELF-DIRECTION

- CAPACITY FOR INDEPENDENT LIVING

- ECONOMIC SELF-SUFFICIENCY

## INDICATORS THAT A PERSON MAY HAVE MENTAL RETARDATION, INCLUDE:

- APPARENT INABILITY TO UNDERSTAND THINGS AS WELL AS OTHER PEOPLE

- CONCRETE THINKING

  - APPARENT DIFFICULTY IN UNDERSTANDING OR PROCESSING ABSTRACT IDEAS OR CONCEPTS

  - IMMATURE BEHAVIOR IN CERTAIN SOCIAL SITUATIONS OR ACTING BELOW AGE LEVEL

- MOST MENTALLY RETARDED PEOPLE ENCOUNTERED WILL BE EITHER MILDLY OR MODERATELY MENTALLY RETARDED

- MANY ARE QUITE CAPABLE OR HOLDING A JOB AND LIVING INDEPENDENTLY WITH LIMITATIONS

- PEOPLE WITH SEVERE RETARDATION OR PROFOUND RETARDATION ARE LESS LIKELY TO FUNCTION INDEPENDENTLY AND ARE OFTEN VICTIMS OF CRIMES

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 431 of 630 PAGEID #: 1219

## AUTISM

A NEUROLOGICALLY-BASED DEVELOPMENTAL DISABILITY THAT SERIOUSLY AFFECTS A PERSON'S COMMUNICATION, DECISION-MAKING AND SOCIALIZATION SKILLS

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 432 of 630  PAGEID #: 1220

**OVERHEAD 35**

**SPO #12**

## INDICATORS OF AUTISM MAY INCLUDE

- VERBAL DIFFICULTIES

- UNUSUAL PHYSICAL BEHAVIORS

- INAPPROPRIATE SOCIAL RESPONSES

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 433 of 630 PAGEID #: 1221

## OTHER DEVELOPMENTAL DISABILITES

CEREBRAL PALSY CAN BE DEFINED AS: A GROUP OF CHRONIC CONDITIONS AFFECTING BODY MOVEMENTS AND MUSCLE COORDINATION

EPILEPSY (SEIZURE DISORDER) CAN BE DEFINED AS: A PHYSICAL CONDITION THAT OCCURS WHEN THERE IS A SUDDEN, BRIEF CHANGE IN THE WAY THAT THE BRAIN WORKS

TRAUMATIC BRAIN INJURY (AKA TBI) CAN BE DEFINED AS: A SUDDEN PHYSICAL ASSAULT ON THE HEAD CAUSING DAMAGE TO THE BRAIN

PRADER-WILLI SYNDROME CAN BE DEFINED AS: A COMPLEX GENETIC DISORDER THAT INCLUDES SHORT STATURE, MENTAL RETARDATION OR LEARNING DISABILITIES, INCOMPLETE SEXUAL DEVELOPMENT, CHARACTERISTIC PROBLEMS, LOW MUSCLE TONE, AND AN INVOLUNTARY URGE TO EAT CONSTANTLY

FETAL ALCOHOL SYNDROME (AKA FAS) CAN BE DEFINED AS: A PATTERN OF PHYSICAL AND MENTAL DEFECTS WHICH DEVELOPS IN SOME UNBORN BABIES WHEN THE MOTHER DRINKS TOO MUCH ALCOHOL DURING PREGNANCY

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

**OVERHEAD 37**

**SPO #15**

## CATEGORIES OF LIFE CHANGES REGARDING THE ELDERLY AND THE MENTALLY/PHYSICALLY CHALLENGED

- PHYSICAL ISSUES

- DEATH AND DYING

- MARRIAGE PROBLEMS

- ABUSE

- SENSORY IMPAIRMENT

- MEDICATION PROBLEMS

- ALCOHOL

- RETIREMENT OR LACK OF EMPLOYMENT

- EMOTIONAL PROBLEMS:  ALL OF THE ABOVE WITH THE ADDITION OF FEAR IN EVERYDAY LIFE

## INTERACTION SKILLS NEEDED IN DEALING WITH THE ELDERLY

- OBTAIN ALL POSSIBLE INFORMATION

- SHOW RESPECT

- BODY LANGUAGE CAN BE INTERPRETED

- POSITION YOURSELF TO BEST BE SEEN

- TOUCH IS OK, ONLY IF NECESSARY

- PROVIDE REASSURANCE AND SECURITY

- CONTROL YOUR VOICE BY TONE, VOLUME, PACE

- KEEP COMMUNICATION SIMPLE

- EXPLAIN WHAT YOU ARE DOING

- TRY NOT TO RESTRAIN THEM

- HAVING FAMILY AND/OR FRIENDS PRESENT IS BENEFICIAL

OHIO PEACE OFFICER TRAINING COMMISSION          TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

OVERHEAD 39

SPO #17

## CRISIS INTERVENTION SKILLS FOR THE VISION IMPAIRED:

- INTRODUCE YOURSELF

- SPEAK AND ACT NORMALLY

- ASK FIRST BEFORE GIVING ASSISTANCE

- ALWAYS WARN THE PERSON OF ANY HAZARDS, STEPS, CURBS, WALKWAYS, ETC.

OVERHEAD 40

SPO #18

## CRISIS INTERVENTION SKILLS FOR THE HEARING IMPAIRED:

- POSITION YOURSELF TO BEST BE SEEN

- MAKE SURE YOU ARE UNDERSTOOD

- A NOD DOESN'T MEAN SOMEONE UNDERSTANDS

- FIND A MUTUAL COMMUNICATION MEANS

§ 5122.01. Definitions

As used in this chapter and Chapter 5119. of the Revised Code:

(A) "Mental illness" means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life.

**(B) "Mentally ill person subject to hospitalization by court order" means a mentally ill person who, because of the person's illness:**

**(1) Represents a substantial risk of physical harm to *self* as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;**

**(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;**

**(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or**

**(4) Would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.**

(C)(1) "Patient" means, subject to division (C)(2) of this section, a person who is admitted either voluntarily or involuntarily to a hospital or other place under section 2945.39, 2945.40, 2945.401 [2945.40.1], or 2945.402 [2945.40.2] of the Revised Code subsequent to a finding of not guilty by reason of insanity or incompetence to stand trial or under this chapter, who is under observation or receiving treatment to such place.

(2) "Patient" does not include a person admitted to a hospital or other place under section 2945.39, 2945.40, 2945.401 [2945.40.1], or 2945.402 [2945.40.2] of the Revised Code to the extent that the reference in this chapter to patient, or the context in which the reference occurs, is in conflict with any provision of sections 2945.37 to 2945.402 [2945.40.2] of the Revised Code.

(D) "Licensed physician" means a person licensed under the laws of this state to practice medicine or a medical officer of the government of the United States while in this state in the performance of the person's official duties.

(E) "Psychiatrist" means a licensed physician who has satisfactorily completed a residency training program in psychiatry, as approved by the residency review committee of the American medical association, the committee on post-graduate education of the American osteopathic association, or the American osteopathic board of neurology and psychiatry, or who on July 1, 1989, has been recognized as a psychiatrist by the Ohio state medical association or the Ohio osteopathic association on the basis of formal training and five or more years of medical practice limited to psychiatry.

(F) "Hospital" means a hospital or inpatient unit licensed by the department of mental health under section 5119.20 of the Revised Code, and any institution, hospital, or other place established, controlled, or supervised by the department under Chapter 5119. of the Revised Code.

(G) "Public hospital" means a facility that is tax-supported and under the jurisdiction of the department of mental health.

(H) "Community mental health agency" means any agency, program, or facility with which a board of alcohol, drug addiction, and mental health services contracts to provide the mental health services listed in section 340.09 of the Revised Code.

(I) "Licensed clinical psychologist" means a person who holds a current valid psychologist license issued under section 4732.12 or 4732.15 of the Revised Code, and in addition, meets either of the following criteria:

(1) Meets the educational requirements set forth in division (B) of <u>section 4732.10</u> of the Revised Code and has a minimum of two years' full-time professional experience, or the equivalent as determined by rule of the state board of psychology, at least one year of which shall be post-doctoral, in clinical psychological work in a public or private hospital or clinic or in private practice, diagnosing and treating problems of mental illness or mental retardation under the supervision of a psychologist who is licensed or who holds a diploma issued by the American board of professional psychology, or whose qualifications are substantially similar to those required for licensure by the state board of psychology when the supervision has occurred prior to enactment of laws governing the practice of psychology;

(2) Meets the educational requirements set forth in division (B) of <u>section 4732.15</u> of the Revised Code and has a minimum of four years' full-time professional experience, or the equivalent as determined by rule of the state board of psychology, in clinical psychological work in a public or private hospital or clinic or in private practice, diagnosing and treating problems of mental illness or mental retardation under supervision, as set forth in division (1)(1) of this section.

(1) "Health officer" means any public health physician; public health nurse; or other person authorized by or designated by a city health district; a general health district; or a board of alcohol, drug addiction, and mental health services to perform the duties of a health officer under this chapter.

(K) "Chief clinical officer" means the medical director of a hospital, or a community mental health agency, or a board of alcohol, drug addiction, and mental health services, or, if there is no medical director, the licensed physician responsible for the treatment a hospital or community mental health agency provides.  The chief clinical officer may delegate to the attending physician responsible for a patient's care the duties imposed on the chief clinical officer by this chapter.  Within a community mental health agency and shall be a licensed physician or licensed clinical psychologist who supervises diagnostic and treatment services.  A licensed physician or licensed clinical psychologist designated by the chief clinical officer may perform the duties and accept the responsibilities of the chief clinical officer in the chief clinical officer's absence.

(L) "Working day" or "court day" means Monday, Tuesday, Wednesday, Thursday, and Friday, except when such day is a holiday.

(M) "Indigent" means unable without deprivation of satisfaction of basic needs to provide for the payment of an attorney and other necessary expenses of legal representation, including expert testimony.

(N) "Respondent" means the person whose detention, commitment, hospitalization, continued hospitalization or commitment, or discharge is being sought in any proceeding under this chapter.

(O) "Legal rights service" means the service established under section 5123.60 of the Revised Code.

(P) "Independent expert evaluation" means an evaluation conducted by a licensed clinical psychologist, psychiatrist, or licensed physician who has been selected by the respondent or the respondent's counsel and who consents to conducting the evaluation.

(Q) "Court" means the probate division of the court of common pleas.

(R) "Expunge" mean:

(1) The removal and destruction of court files and records, originals and copies, and the deletion of all index references;

(2) The reporting to the person of the nature and extent of any information about the person transmitted to any other person by the court;

(3) Otherwise insuring that any examination of court files and records in question shall show no record whatever with respect to the person;

(4) That all rights and privileges are restored, and that the person, the court, and any other person may properly reply that no such record exists, as to any matter expunged.

(S) "Residence" means a person's physical presence in a county with intent to remain there, except that:

(1) If a person is receiving a mental health service at a facility that includes nighttime sleeping accommodations, residence means that county in which the person maintained the person's primary place of residence at the time the person entered the facility;

(2) If a person is committed pursuant to section 2945.38, 2945.39, 2945.40, 2945.401 [2945.40.1], or 2945.402 [2945.40.2] of the Revised Code, residence means the county where the criminal charges were filed.

When the residence of a person is disputed, the matter of residence shall be referred to the department of mental health for investigation and determination.  Residence shall not be a basis for a board's denying services to any person present in the board's service district, and the board shall provide services for a person whose residence is in dispute while residence is being determined and for a person in an emergency situation.

(T) "Admission" to a hospital or other place means that a patient is accepted for and stays at least one night at the hospital or other place.

(U) "Prosecutor" means the prosecuting attorney, village solicitor, city director of law, or similar chief legal officer who prosecuted a criminal case in which a person was found not guilty by reason of insanity, who would have had the authority to prosecute a criminal case against a person if the person had not been found incompetent to stand trial, or who prosecuted a case in which a person was found guilty.

(V) "Treatment plan" means a written statement of reasonable objectives and goals for an individual established by the treatment team, with specific criteria to evaluate progress towards achieving those objectives.  The active participation of the patient in establishing the objectives and goals shall be documented.  The treatment plan shall be based on patient needs and include services to be provided to the patient while the patient is hospitalized and after the patient is discharged.  The treatment plan shall address services to be provided upon discharge, including but not limited to housing, financial, and vocational services.

(W) "Community control sanction" has the same meaning as in underline section 2929.01 of the Revised Code.

(X) "Post-release control sanction" has the same meaning as in section 2967.01 of the Revised Code.

§ 5122.10. Emergency hospitalization; temporary detention; limitations.

Any psychiatrist, licensed clinical psychologist, licensed physician, health officer, **parole officer, police officer, or sheriff may take a person into custody**, or the chief of the adult parole authority or a parole or probation officer with the approval of the chief of the authority may take a parolee, an offender under a community control sanction or a post-release control sanction, or an offender under transitional control into custody and may immediately transport the parolee, offender on community control or post-release control, or offender under transitional control to a hospital or, notwithstanding section 5119.20 of the Revised Code, to a general hospital not licensed by the department of mental health where the parolee, offender on community control or post-release control, or offender under transitional control may be held for the period prescribed in this section, if the psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, **police officer, or sheriff has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (B) of section 5122.01 of the Revised Code, and represents a substantial risk of physical harm to self or others if allowed to remain at liberty pending examination.**

A written statement shall be given to such hospital by the transporting psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer, chief of the adult parole authority, parole or probation officer, or sheriff stating the circumstances under which such person was taken into custody and the reasons for the psychiatrist's, licensed clinical psychologist's, licensed physician's, health officer's, parole officer's, police officer's, chief of the adult parole authority's, parole or probation officer's, or sheriffs belief. This statement shall be made available to the respondent or the respondent's attorney upon request of either.

**Every reasonable and appropriate effort shall be made to take persons into custody in the least conspicuous manner possible. A person taking the respondent into custody pursuant to this section shall explain to the respondent: the name, professional designation, and agency affiliation of the person taking the respondent into custody; that the custody-taking is not a criminal arrest; and that the person is being taken for examination by mental health professionals at a specified mental health facility identified by name.**

If a person taken into custody under this section is transported to a general hospital, the general hospital may admit the person, or provide care and treatment for the person, or both, notwithstanding section 5119.20 of the Revised Code, but by the end of twenty-four hours after arrival at the general hospital, the person shall be transferred to a hospital as defined in section 5122.01 of the Revised Code.

**TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION**

**HANDOUT 2**

A person transported or transferred to a hospital or community mental health agency under this section shall be examined by the staff of the hospital or agency within twenty-four hours after arrival at the hospital or agency.  If to conduct the examination requires that the person remain overnight, the hospital or agency shall admit the person in an unclassified status until making a disposition under this section.  After the examination, if the chief clinical officer of the hospital or agency believes that the person is not a mentally ill person subject to hospitalization by court order, the chief clinical officer shall release or discharge the person immediately unless a court has issued a temporary order of detention applicable to the person under section 5122.11 of the Revised Code.  After the examination, if the chief clinical officer believes that the person is a mentally ill person subject to hospitalization by court order, the chief clinical officer may detain the person for not more than three court days following the day of the examination and during such period admit the person as a voluntary patient under section 5122.02 of the Revised Code or file an affidavit under section 5122.11 of the Revised Code, the chief clinical officer shall discharge the person at the end of the three-day period unless the person has been sentenced to the department of rehabilitation and correction and has not been released from the person's sentence, in which case the person shall be returned to that department.

# TYPES OF PERSONALITY DISORDER

## Antisocial Personality Disorder

Most people with this disorder are males.  Key features include:  a continuing pattern of behavior that shows disregard for or abuse of the rights of other people; disregard of the wishes or feelings of others; manipulative and/or deceitful behavior; a pattern of impulsive behavior (acting on the spur of the moment, without thinking ahead to the consequences); irritability or aggressiveness; a pattern of irresponsibility in regard to work, family obligations, and so on; and lack of remorse or guilt for their actions – partly because they tend to always blame other people for their actions rather than take blame or responsibility themselves.  Such individuals are often charming and verbally persuasive.

People with antisocial personality disorder are sometimes referred to as "sociopaths," although this is not a specific mental health term.

These can be difficult people to deal with because they act out a lot, do not take responsibility for their actions, and are often argumentative – particularly when challenged.  Some can be dangerous people.  Many use and abuse alcohol and drugs consistently, and can be even more unpredictable and potentially dangerous when under such influence.  People with this disorder often get involved with law enforcement.  They often commit crimes such as stealing, destroying property, and drug dealing.

## Borderline Personality Disorder

The essential feature of this disorder, as set forth in DSM-IV, is "a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins in early adulthood and is present in a variety of contexts."  This is a disorder that affects approximately 2% of the population.  Most people diagnosed with it are women.  Many people with this disorder are victims of trauma – often during childhood or adolescence – including physical, sexual, and/or extreme emotional abuse.

Key symptoms of borderline personality disorder include: emotional instability, with frequent shifts of feelings from depression to irritability to anxiety, etc.; displays of inappropriate and intense anger, with temper tantrums or deep brooding; and intense but stormy relationships with other people. People with this disorder tend to view other people, at any given time, as either all-good or all-bad, depending on whether they think the person is meeting their needs at that particular moment. Their assessments of others shift frequently. Also, they tend to be quite impulsive in all aspects of their lives – behaving on the spur of the moment based on their emotions, rather than rationally thinking ahead to the consequences of their actions.

Such individuals frequently use alcohol and drugs to self-medicate, and are often long-term substance abusers. Many are also prone to episodes of depression, sometimes including suicidal behavior. Their substance abuse and depression are often patterns of response to a personal history of neglect and abuse suffered during the person's formative years.

Many people with this disorder make suicide attempts. Some also engage in self-injurious behavior, including cutting themselves or sometimes burning themselves with cigarettes or matches, but their doing so is not necessarily a suicide attempt. The motivations for such self-injurious behavior can be complicated, and sometimes have to do with experiencing pain in order to feel "real". People who do this often say that hurting themselves gives them a feeling of relief.

They often experience intense emotional crises, usually in response to a received problem or disappointment with another person or persons in their life. A person may get extremely upset and volatile in such a circumstance. You may respond to a person during such a crisis, perhaps in the context of a domestic disturbance call, a disturbance in a public place, a suicidal person contact, or other situation. The subject may be intoxicated during such a contact.

As noted, many people with borderline personality disorder are victims of trauma, often including physical and/or sexual abuse. Many such victims of trauma may have difficulties with being placed in restraints, such as handcuffs, or with being required to remove clothing. Being placed in restraints, for example, may cause them to re-live their trauma and thus cause feelings of extreme distress. This does not necessarily mean that you should not place them in restraints, but at least be aware of the possible implications of restraints for them. It if is possible to use an alternative to handcuffs, consider doing so.

Treatment for personality disorders primarily consists of talk therapy to help people better understand their behavior patterns and to develop more constructive behaviors. There are no medications that specifically treat or cure a personality disorder, although people with such disorders frequently take psychiatric medications for conditions associated with their disorder, such as depression and anxiety.

Many people with personality disorders have not, in fact, specifically been diagnosed as having such a disorder. Most will not have sought the help of a medical or mental health professional for a personality disorder, and they do not even usually know about such disorders or recognize that they have a problem based on the disorder.

Thus, during a contact with a subject, you are unlikely to be in a position to be able to identify him or her as a person with a personality disorder, either in general or in regard to a specific disorder. Again, your job is to be aware of behaviors and to respond to people exhibiting such behaviors. Nevertheless, it is useful to know that such disorders are often the basis for the behavior that you will see.

# ANXIETY DISORDERS: THE MOST COMMONLY DIAGNOSED PSYCHIATRIC CONDITIONS

## Generalized Anxiety Disorder

Sometimes referred to as GAD, this disorder may be diagnosed by a clinician if a person displays symptoms for at least six months.  The symptoms include fairly constant and excessive anxiety, and feelings of tension and worry.  Some people describe their feelings as being "shaky" or "keyed-up" or "on edge".  These feelings are accompanied by other symptoms, which may include restlessness, being easily fatigued, difficulty concentrating, muscle tension, disturbed sleep, and irritability.  A person may experience pain and discomfort from headaches, stomachaches, backaches, and so on.  The feelings of worry and anxiety are pervasive and control a person's life, even when there are no identifiable real-life situations or concerns that would cause the feelings of anxiety or worry.  For example, people with this disorder often worry excessively about financial concerns, their jobs, family issues, relationship issues, possible misfortunes to themselves or others, or even minor matters like routine car repairs, and cannot will themselves not to worry about these things.

Many people with this disorder are so troubled by the feelings of anxiety that they self-medicate with alcohol and/or drugs.  That is how they may try to calm themselves down and fall asleep.  Unfortunately, some then get addicted to the alcohol or drugs, causing further problems for them.  Also, some people who suffer from this disorder for a long time develop major depression as well, which then requires treatment.  Or, a person may experience chronic low-grade depression, referred to as "dysthmia".  Thus, chronic anxiety and depression often are seen in the same person.

## Panic Disorders

Panic disorders are another common category of anxiety disorders.  The key feature of this is panic attacks, which are very uncomfortable feelings of extreme anxiety that come out of the blue and are not usually associated with any specific event or "trigger".  A person experiencing a panic attack may feel flushed, perspire greatly, have a rapid heartbeat, have the "shakes", feel dizzy and light-headed, and feel very out of control.

Someone may feel that he or she can't breathe, and may feel that he or she is about to have a heart attack or even die.  Such an attack typically lasts for a short time, such as 15-30 minutes, although individual episodes could be longer or shorter.  But even those 15-30 minutes can seem like an eternity to a person undergoing a panic attack.  The frequency of a person's panic attacks can vary widely.  Some people have frequent attacks, such as each week, continuing for months.  Other people may have a number of attacks within days, but then not experience any more attacks for many weeks or months.  Once a person has experienced panic attacks, they are usually very concerned about having further episodes of such attacks.

Research has shown that 25% to 30% of people with panic disorder have suicidal thoughts at some point.  Depression is a common co-occurring disorder.

Research has indicated that the cause of panic attacks is probably partly psychological and partly biological.  However, stressful life events are thought to be a factor in the severity of the disorder.  Medications have proven effective for many people in blocking the frequency and severity of panic attacks.

<u>Phobias</u>

DSM-IV, the diagnostic manual of the American Psychiatric Association, defines a phobia as "a persistent, irrational fear of a specific object, activity, or situation (the phobic stimulus) that results in a compelling desire to avoid it.  This often leads either to avoidance of the phobia, the avoidance of the object, activity or situation by a person must seriously interfere with the person's ability to function normally.  A person may have a great fear about a certain activity, such as bungee jumping, but if he or she simply avoids engaging in that activity in routine life, it is not a phobia.

A specific phobia is a marked and persistent fear of a specific, identifiable situation or object.  Examples are fear of heights, fear of flying, fear of snakes, or fear of being in closed-up spaces (claustrophobia).  The person may recognize that his or her fear is unreasonable or excessive, but cannot help responding to the "phobic stimulus" either by avoiding it entirely or by experiencing it with extreme anxiety that is similar to the symptoms of a panic attack.

Social phobia

Which is also sometimes known as "social anxiety disorder" – is fear of social situations, including social performance situations such as speaking in public or participating in certain types of events in which other people are present. Some people, for example, have a phobia about eating or drinking in front of other people. A person with this disorder may be petrified of being embarrassed and/or having to do something with other people watching and maybe judging them, and that fear causes panic-like feelings. Again, a person may realize that his or her fear is unreasonable, but can't help it. Both specific and social phobias are treatable in most people.

Obsessive-Compulsive Disorder

This disorder, commonly referred to as "OCD", is primarily characterized by recurrent obsessions or compulsions that are severe and that cause significant distress and/or impairment for a person with the disorder. Obsessions are defined in DSM-IV as "persistent ideas, thoughts, impulses or images that are experienced as intrusive and inappropriate and that cause marked anxiety or distress." Some examples of obsessions include: the need to have things or objects in a particular order, such as on a dresser or desktop; repeated thoughts about contamination, such as fear of being contaminated by germs through shaking hands or touching another person; and repeatedly doubting whether one has locked a door or turned off a stove.

Compulsions are defined as "repetitive behaviors or mental acts the goal of which is to prevent or reduce anxiety or distress, not to provide pleasure or gratification." Examples include: repeated hand-washing, cleaning things over and over, counting things, repeatedly checking on things (such as whether a door is in fact locked), or demanding assurances about something from other people. An obsession, which is an idea or thought, often leads to a compulsion, which is a behavior based on that idea or thought. For example, a person who has an obsession with contamination by germs may then have the compulsion to wash his hands fifty times a day. The person feels intense anxiety about contamination until he washes his hands, which temporarily brings relief from the anxiety caused by that obsession. But that relief is usually short-lived, and the person feels compelled to repeat the hand-washing again and again. People with OCD typically experience a lot of distress and discomfort due to the disorder. Such people may or may not recognize the unreasonableness or excessiveness of their obsessions and compulsions. Or, they may recognize that only to some extent.

## Post-Traumatic Stress Disorder

This disorder, often referred to as PTSD, always develops in response to some real-life event that a person experiences.  In that sense, it is unlike the other anxiety disorders, which may or may not be related to real-life experiences.  People may develop the symptoms of post-traumatic stress disorder following direct experience of a highly traumatic event that usually involves serious injury, threatened death, actual death, or a serious threat to physical wellbeing.  Or, a person may simply witness these stress factors rather than directly experience them.  The person experiencing or witnessing the terrible event(s) feels intense fear, helplessness, or a sense of horror.

The symptoms of PTSD then develop as a response to the highly traumatic event.  Those symptoms involve re-experiencing the traumatic event in some way, including through nightmares or night terrors or flashbacks.  For example, a person who has been through a frightening or traumatic war incident may experience feelings of horror upon hearing a car backfire, because the sound reminds him of guns or bombs.  Or a woman who was the victim of sexual abuse may relive the horror of that experience when touched by any other man, even when that touch is not meant to be threatening or abusive.  The person may have recurrent and distressing memories and/or dreams about the traumatic event, and may experience intense psychological distress when exposed to stimuli – sounds, sights, smells, experiences – that symbolize or resemble something about that event.

Some people with PTSD experience a sense of emotional "blunting", meaning that their emotional responses to people and events are numb or distant.  They maybe unable to remember important aspects of the traumatic event, may feel detached or estranged from other people, and/or they may be unable to have loving feelings toward other people.

When medical or mental health professionals diagnose anxiety disorders, they do so on the basis of specific diagnostic criteria.  Some of these criteria were noted above.  An important consideration in making such diagnoses is that the clinician must rule out the possibility that the symptoms of anxiety are caused by a medical or substance abuse problem.  There are, for example, a number of medical conditions that can cause a person to experience feelings of great anxiety.  Some include: cardiac (heart) conditions; thyroid problems, such as hyperthyroidism; seizure disorders; diabetes; respiratory conditions such as pneumonia, pulmonary disease, or hyperventilation; or vitamin deficiencies.  Anxiety can also be the result of reactions to prescribed or over-the-counter medications.

Substance abuse can also cause significant anxiety symptoms.  Anxiety can result from alcohol intoxication or withdrawal, as well as from abuse of a number of illegal or illicit drugs, including cocaine, methamphetamines, hallucinogens, cannabis (marijuana), and inhalants.  Use of the drug Ecstasy can cause feelings of intense anxiety.

## DEMENTIA

Though not part of the "normal" aging process, some people show signs of changes in their memory and intellectual functions as they age. Most commonly, such changes are associated with Alzheimer's disease and other forms of dementia.

You will respond to situations involving people who have Alzheimer's disease or another form of dementia. Thus, you should know basic facts about dementia, how to recognize it, and how best to respond to a person with dementia.

### WHAT IS DEMENTIA?

The term dementia refers to the loss of intellectual abilities, such as thinking and memory and reasoning, that is severe enough to interfere with a person's ability to care for himself or herself, socialize, and plan for the future.

Dementia is not a disease in itself, but rather a description of a group of symptoms that can accompany other diseases or physical conditions. These symptoms most commonly include the following:

> ➢ Confusion as to time, place or person

> ➢ Shortened attention span

> ➢ Changes in short term memory

> ➢ Changes in language capability or trouble finding words

> ➢ Changes in ability to calculate, plan or reason

> ➢ Changes in personal care habits

> ➢ Changes in personality

Dementia is usually separated into two categories: reversible and irreversible. Gone untreated, all dementia can lead to progressive decline. However, reversible dementia means that the dementia is caused by a condition that, if treated properly, will cure it or at least slow the rate of decline. Reversible dementia that goes untreated for long periods of time can lead to irreversible changes. Conditions causing reversible and irreversible dementia can include the following:

## REVERSIBLE DEMENTIA (TYPES)

- ➢ Depression
- ➢ Malnutrition
- ➢ Dehydration
- ➢ Infection
- ➢ Medication/drug interactions
- ➢ Vitamin B-12 deficiency
- ➢ Hydrocephalus
- ➢ Hypoglycemia/hyperglycemia

## IRREVERSIBLE DEMENTIA (TYPES)

- ➢ Alzheimer's disease
- ➢ Vascular disease (small strokes)
- ➢ Frontotemporal Dementias
- ➢ Lewy Body Disease
- ➢ Parkinson's Disease
- ➢ Huntington's Disease
- ➢ Creutzfeld-Jakob Disease
- ➢ Alcohol-related dementia

Because some dementia causes can be treated and even cured, it is very important for family members and others to seek and obtain a thorough medical and psychiatric diagnosis of a person so as to identify treatable conditions.  Early assessment and intervention in all cases is essential for effective treatment either to reverse the condition, if possible, or to slow the rate of progression in the case of irreversible dementia.

In the case of Alzheimer's disease and most other irreversible dementias, the changes are often subtle and come on over time, not always showing a clear indication of a problem.

Most irreversible dementias such as Alzheimer's disease are most commonly associated with older adults.  In fact, research has indicated that almost 10% of people over the age of 65 have Alzheimer's or a related dementia, and that figure doubles every five years beyond 65.  The Alzheimer's Association estimates that as many as 50% of persons over the age of 85 have Alzheimer's disease or a related form of irreversible dementia.  In more rare instances, persons as young as 35 have been diagnosed with Alzheimer's disease.  The progression of the disease in younger people is typically much more aggressive than that seen in older adults.

**OHIO PEACE OFFICER TRAINING COMMISSION**     TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

# HANDOUT 6

## GUIDELINES FOR COMMUNICATING WITH A PERSON WHO HAS (OR SEEMS TO HAVE) ALZHEIMER'S DISEASE OR SOME OTHER FORM OF DEMENTIA

➢ FIRST, IDENTIFY YOURSELF AS A LAW ENFORCEMENT OFFICER AND STATE THE PURPOSE OF YOUR BEING THERE NO MATTER HOW OBVIOUS IT MAY SEEM

➢ SPEAK SLOWLY AND MAINTAIN A LOW-PITCHED VOICE

➢ USE SHORT FAMILIAR WORDS

➢ ASK "YES" OR "NO" QUESTIONS

➢ ASK ONE QUESTION AT A TIME, ALLOWING PLENTY OF RESPONSE TIME

➢ IF NECESSARY, REPEAT THE QUESTION WITH THE EXACT PREVIOUS WORDING – VICTIMS WITH ALZHEIMER'S DISEASE MAY GRASP ONLY PARTS OF THE INITIAL QUESTION

➢ MAINTAIN GOOD EYE CONTACT WHILE COMMUNICATING

➢ SUBSTITUTE NON-VERBAL FOR VERBAL COMMUNICATION (PROMPTING IS A GOOD TECHNIQUE)

➢ IF AVAILABLE, SOLICIT HELP OF A CARE GIVER TO ASSIST YOU WITH COMMUNICATING

## STATE AND FEDERAL VICTIMS SERVICES

ACTION Ohio Coalition for Battered Women
36 W. Gay St., Suite 311
Columbus, OH 43215-2840
614-221-1255
1-888-622-9315

Buckeye State Sheriffs' Association
6230 Busch Blvd., Ste. 260
Columbus, OH 43229
614-431-5500

Court of Claims of Ohio
150 E. Gay St., 23 rd Floor
Columbus, OH 43215
614-466-7447

FBI Victim Specialist
500 S. Front St., Ste. 1050
Columbus, OH 43215
614-744-2123

Mothers Against Drunk Driving (MADD)
5900 Roche Dr., Ste. 250
Columbus, OH 43229
614-885-6233
1-800-552-8641

Office of the Attorney General
Consumer Protection Division
30 E. Broad St., 14th Fl.
Columbus, OH 43215-3400
1-800-282-0515
614-466-8831

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## HANDOUT 7

Office of the Attorney General
Crime Victims Services Section
Ohio Victims of Crime Compensation Program
150 E. Gay St., 25TH Fl.
Columbus, OH 43215
1-800-582-2877
614-466-5610

Office of the Attorney General
Ohio Missing Children's Clearinghouse
150 E. Gay St., 25TH Fl.
Columbus, OH 43215
1-800-325-5604

Office of Criminal Justice Services
140 E. Town St.
Columbus, OH 43215
614-466-7782

Ohio Coalition on Sexual Assault
933 N. High St., Ste. 120B
Columbus, OH 43085
614-781-1902

Ohio Court Appointed Special Guardian
Guardian Ad Litem
CASA/GAL Association
261-B East Livingston Ave.
Columbus, OH 43215
1-800-891-6446
614-224-2272

Ohio Dept. Of Health
Rape Prevention Project
246 N. High St.
Columbus, OH 43215
614-466-5332

Ohio Dept. of Mental Retardation and Developmental Disability (MRDD)
Major Unusual Incident (MUI) Investigation
1601 W. Broad St.
Columbus, OH 43222-1055
614-995-3817
614-995-3810

Ohio Dept. Of Rehab. and Correction
Office of Victim Services
1050 Freeway Dr.
Columbus, OH 43229
1-888-824-8464
614-728-9947

Ohio Dept. of Youth Services
Office of Victim Services
51 N. High St., 3rd Floor
Columbus, OH 43215
1-800-872-3132

Ohio Domestic Violence Network
4807 Evanswood Dr., Ste. 201
Columbus, OH 43229
1-800-934-9840
614-781-9651

Ohio Office of Criminal Justice Services
Family Violence Prevention Center
140 E. Town St., 14TH  Floor
Columbus, OH 43215
614-466-7782

Ohio Prosecuting Attorneys Assn.
196 E. State St., Ste. 200
Columbus, OH 43215
614-221-1266

Ohio Victim Witness Association
Greene Co. Prosecutor's Office
61 Greene St.
Xenia, OH 45285
937-376-5087

Parents of Murdered Children National Chapter
100 E. Eighth St.
Cincinnati, OH 45202
888-818-7662

Southwest Ohio Critical Incident Stress Management Team
P.O. Box 62445
Cincinnati, OH 45262-0445
1-800-212-1322 (on-call pager)
513-563-2172

U.S. Attorney Office (Northern Region)
801 W. Superior Ave., Ste. 400
Cleveland, OH 44113
216-622-3600

U.S. Attorney Office (Southern Region)
303 Marconi Blvd., Ste. 200
Columbus, OH 43215
614-469-5715

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

HANDOUT 8

## Commonly Prescribed Psychotropic Medications

| Antipsychotics (used in the treatment of schizophrenia and mania) | Anti-depressants | Anti-obsessive Agents |
|---|---|---|
| TYPICAL ANTIPSYCHOTICS | TRICYCLICS | Anafranil (clomipramine) |
| Haldol (haloperidol) | *Anafranil (clomipramine) | Luvox (clomipramine) |
| Loxitane (loxapine) | Asendin (amoxapine) | Paxil (paroxetine) |
| Mellaril (thioridazine) | Elavil (amitriptyline) | Prozac (fluoxetine) |
| Moban (molindone) | Norpramin (desipramine) | Zoloft (sertraline) |
| Navane (thiothixene) | Pamelor (nortriptyline) | |
| Prolixin (fluphenazine) | Sinequan (doxepin) | **Antianxiety Agents** |
| Serentil (mesoridazine) | Surmontil (trimipramine) | Ativan (lorazepam) |
| Stelazine (trifluoperazine) | Tofranil (imipramine) | BuSpar (buspirone) |
| Thorazine (perphenazine) | Vivactil (protriptyline) | Centrax (prazepam) |
| Trifalon (perphenazine) | | *Inderal (propranolol) |
| | SSRIs | *Klonopin (clonazepam) |
| ATYPICAL ANTIPSYCHOTICS | Celexa (citalopram) | Lexapro (escitalopram) |
| Abilify (aripiprazole) | Lexapro (escitalopram) | Librium (chlordiazepoxide) |
| Clozaril (clozapine) | *Luvox (fluvoxamine) | Serax (oxazepam) |
| Risperdal (risperidone) | Paxil (paroxetine) | *Tenormin (atenolol) |
| Seroquel (quetiapine) | Prozac (fluoxetine) | Tranxene (clorazepate) |
| Zyprexa (olanzapine) | Zoloft (sertraline) | Valium (diazepam) |
| | | Xanax (alprazolam) |
| **Mood Stabilizers (used in the treatment of bipolar disorder)** | MAOIs | *Antidepressants, especially SSRIs, are also used in the treatment of anxiety. |
| Depakene (valproic acid) | Nardil (phenelzine) | |
| Depakote | Parnate (tranylcypromine) | |
| Eskalith | | **Stimulants (used in the treatment of ADHD)** |
| Lithobid (lithium) | OTHERS | Adderall (amphetamine |
| Lithonate | Desyrel (trazodone) | And dextroamphetamine) |
| Lithotabs | Effexor (venlafaxine) | Cylert (pemoline) |
| *Lamictal (lamotrigine) | Remeron (mirtazapine) | Dexedrine |
| *Neurontin (gabapentin) | Serzone (nefazodone) | (dextroamphetamine) |
| *Tegretol (carbamazepine) | Wellbutrin (bupropion) | Ritalin (methylphenidate) |
| *Topamax (topiramate) | | *Antidepressants with stimulant properties, such as Norpramin and Wellburtrin, are also used in the treatment of ADH |
| | **Anti-Panic Agents** | |
| | Klonopin (clonazepam) | |
| | Paxil (paroxetine) | |
| | Xanax (alprazolam) | |
| | Zoloft (sertraline) | |
| | *Antidepressants are also used in treatment of panic disorder. | |

Listed above are the brand names, followed by the generic in parenthesis. A second chart below provides cross-referencing by generic name.

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

# HANDOUT 8

| Generic Name | Brand Name | Current Uses |
|---|---|---|
| alprazolam | Xanax | anxiety, panic |
| amitriptyline | Elavil, Endep | depression (tricyclic) |
| amoxapine | Asendin | Psychotic depression |
| amphetamine | Adderall | ADD |
| aripiprazole | Abilify | schizophrenia (atypical) |
| buproprion | Wellbutrin | depression, ADD |
| buspirone | BuSpar | Anxiety |
| carbamazepine | Tegretol | bipolar disorder |
| chloriazepoxide | Librium | Anxiety |
| chlorpromazine | Thorazine | schizophrenia (typical) |
| citalopram hydrobromide | Celexa | depression (SSRI) |
| clomipramine | Anafranil | OCD, depression (tricyclic) |
| clonazepam | Klonopin | Anxiety |
| clorazepate | Tranxene | Anxiety |
| clozapine | Clorazil | schizophrenia (atypical) |
| desipramine | Norpramin | depression (tricyclic), ADD |
| dextroamphetamine | Adderall, Dexedrine | ADD |
| diazepam | Valium | Anxiety |
| divalproex sodium | Depakote | bipolar disorder |
| doxepin | Adapin, Sinequan | depression (tricyclic) |
| escitalopram | Lexapro | depression (SSRI), anxiety |
| fluoxetine | Prozac | depression (SSRI), OCD, panic |
| fluphenazine | Prolixin, Prolixin Decanoate | schizophrenia (typical) |
| fluvoxamine | Luvox | OCD, depression (SSRI) |
| haloperidol | Haldol, Haldol Decanoate | schizophrenia (typical) |
| imipramine | Tofranil | depression (tricyclic), panic |
| lithium carbonate | Eskalith, Lithobid | bipolar disorder |
| lithium citrate | Cibalith S | bipolar disorder |
| lorazepam | Ativan | Anxiety |
| loxapine | Loxitane | schizophrenia (typical) |
| maprotiline | Ludiomil | depression (tricyclic) |
| mesoridazine | Serentil | schiophrenia (typical) |
| methylphenidate | Ritalin | ADD |
| mirtazapine | Remeron | Depression |
| molindone | Moban | schiophrenia (typical) |
| nefazodone | Serzone | Depression |
| nortriptyline | Pamelor | depression (tricyclic) |
| olanzapine | Zyprexa | schizophrenia (atypical) |
| oxazepam | Serax | Anxiety |
| paroxetine | Paxil | depression (SSRI), OCD, panic |
| pemoline | Cylert | ADD |

EFFECTIVE 8/1/06

# HANDOUT 8

| Generic Name | Brand Name | Current Uses |
|---|---|---|
| perphenazine | Trilafon | schizophrenia (typical) |
| phenelzine | Nardil | depression (MAOI) |
| prazepam | Centrax | Anxiety |
| prochlorperazine | Compazine | schizophrenia (typical) |
| protriptyline | Vivactil | depression (tricyclic) |
| quetiapine | Seroquel | schizophrenia (atypical) |
| risperidone | Risperdal | schizophrenia (atypical) |
| sertraline | Zoloft | depression (SSRI), ODC, panic |
| thioridazine | Mellaril | schizophrenia (typical) |
| thiothixene | Navane | schizophrenia (typical) |
| tranylcypromine sulfate | Pramate | depression (MAOI) |
| trazodone | Desyrel | depression (tricyclic) |
| trifluoperazine | Stelazine, Vesprin | schizophrenia (typical) |
| trimipramine | Surmontil | depression (tricyclic) |
| valproic acid | Depakene | bipolar disorder |
| venlafaxine | Effexor | Depression |

*Although this medication has been approved by the FDA for the treatment of other disorders, it has not been approved for this particular use. Some evidence of this medication's efficacy for such use does exist however. This type of medication use is referred to as "off label."

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

# HANDOUT 9

## APPLICATION FOR EMERGENCY ADMISSION
In Accordance with Sections 5122.01 and 5122.10 ORC

TO: The Chief Clinical Officer of _____
(Behavioral Healthcare Organization - BHO/Facility Name)     (Date)

The undersigned has reason to believe that:

_____
(Name of Person to be Admitted)

1. Is a mentally ill person subject to hospitalization by court order under division B of Section 5122.01 of the Revised Code, i.e., this person

☐ (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

☐ (2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

☐ (3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or

☐ (4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself.

2. Represents a substantial risk of physical harm to self or others if allowed to remain at liberty pending examination.

Therefore, it is requested that said person be admitted to the above named facility.

### STATEMENT OF BELIEF

Must be filled out by one of the following: a psychiatrist, licensed clinical psychologist, licensed physician, health or police officer, sheriff or deputy sheriff.

(Statement shall include the circumstances under which the individual was taken into custody and the reason for the person's belief that hospitalization is necessary. The statement shall also include a reference to efforts made to secure the individual's property at his residence if he was taken into custody there. Every reasonable and appropriate effort should be made to take this person into custody in the least conspicuous manner possible.)

Original - Medical Record, Copy - Suspense File          Page 1 of 2          APPLICATION FOR EMERGENCY ADMISSION
DMH-0026 (Rev. 8/02)                                                                              DMH-MedR-1030

OHIO PEACE OFFICER TRAINING COMMISSION

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

# HANDOUT 9

## APPLICATION FOR EMERGENCY ADMISSION
In Accordance with Section 5122.10 ORC

Name of Person to be Admitted

### STATEMENT OF BELIEF (continued)

Signature

| Title/Position/Badge or License No. | Place of Employment |
|---|---|
|  |  |

### STATEMENT OF OBSERVATION BY PSYCHIATRIST, LICENSED PHYSICIAN, OR LICENSED CLINICAL PSYCHOLOGIST, IF APPLICABLE

Place of Observation (e.g., community mental health center, general hospital, office, emergency facility)

| Signature | Title |
|---|---|
|  |  |

| Approved  ☐ Yes  ☐ No | Signature of Chief Clinical Officer | Date |
|---|---|---|

Original - Medical Record, Copy - Suspense File
DMH-0025 (Rev. 8/02)

Page 2 of 2

APPLICATION FOR EMERGENCY ADMISSION
DMH-MedR-1030

WILLIAM E. "BUSTER" FISHER, et al., Plaintiffs-Appellants,
v. TOM E. HARDEN, in his official capacity as Sheriff of
Morrow County, Ohio, et al., Defendants-Appellees.

No. 02-3996

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

05a0096p.06;
398 F.3d 837; 2005 U.S. App. LEXIS 3276; 2005 FED App. 0096P
(6th Cir.)

June 11, 2004, Argued
February 25, 2005, Decided
February 25, 2005, Filed

COUNSEL: ARGUED: James D. McNamara, Columbus, Ohio, for Appellants.

Douglas J. Suter, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees.

ON BRIEF: James D. McNamara, Columbus, Ohio, for Appellants.

Douglas J. Suter, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees.

JUDGES: Before: KEITH, CLAY, and GIBBONS, Circuit Judges. KEITH, J., delivered the opinion of the court, in which CLAY, J., joined. GIBBONS, J., delivered a separate dissenting opinion.

OPINION BY: DAMON J. KEITH

OPINION: [*839] [***1]

DAMON J. KEITH, Circuit Judge. The Plaintiff-Appellant, William E. "Buster" Fisher, filed a complaint on December 4, 2000, in which, pursuant to 42 U.S.C. § 1983, he charged the Defendants-Appellees, Sheriff Tom E. Harden, Deputy Stephen Alexander, Deputy Molly Alexander, and Deputy Mark Leary (collectively "the Defendants"), with having violated his right against an unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. On May 9, 2002, the Defendants filed a joint [**2] motion for summary judgment. The district court subsequently issued an opinion and order on August 6, 2002, in which it granted the Defendants' request for a summary judgment on the grounds that (1) they had a reasonable suspicion that Fisher was suicidal, and, as a consequence, their actions in affecting a seizure of Fisher were protected by the doctrine of qualified immunity, and (2) there was no genuine [***2] issue of material fact on Fisher's claim that the County failed to adequately train and supervise the deputies. In this appeal, Fisher asserts that the officers who seized him did not have probable cause to justify a mental health seizure, and that Harden failed to adequately train and supervise his deputies. n1 For the reasons set forth below, we REVERSE, in part, and AFFIRM, in part, the judgment of the district court. [**3]

## FACTUAL BACKGROUND

The facts relevant to this cause occurred on the afternoon of July 10, 2000, in a rural farming area of Morrow County, Ohio. The area consists of wide open farming land, with heightened visibility in all directions. On that day, Fisher, a seventy-seven-year-old retired farmer, had gone out to shoot groundhogs, an activity in which he routinely engaged in an effort to help protect his neighbors' crops. Dressed in bib overalls, Fisher had taken with him a folding chair, his rifle, and a tripod that he used to help him aim his rifle and hold it steady. He positioned himself, sitting in the folding chair, upon an elevated railroad grade on one of his neighbor's property.

Fisher sat at a distance of approximately 250 yards from County Road 59, a rural road that runs through this area of Morrow County. A passerby noticed Fisher off in the distance sitting on railroad tracks and found his presence there quite unusual. Upon gathering that this was possibly a suicidal person, the passerby telephoned the Morrow County Sheriff's Department and reported, incorrectly, that [*840] a man had his feet tied to the railroad tracks. The Sheriff's Department subsequently dispatched [**4] a "Code 58," which indicates a possible suicide.

Two of the Defendants, deputies Stephen Alexander and Molly Alexander, who are husband and wife, responded to the dispatch. Upon their arrival on the scene, the officers located Fisher, who was still seated in his folding chair approximately 250 yards away. Mr. Alexander used the cruiser's microphone and speaker system to arouse Fisher's attention and instruct him to come toward the officers. Fisher stood up, gathered his belongings, and began walking along the railroad tracks toward the officers. As Fisher proceeded toward them, the officers noticed he was carrying a rifle slung over his shoulder. They drew their firearms, crouched behind their open cruiser door, and ordered Fisher to lay down the rifle before coming any closer. The officers acknowledged that initially Fisher appeared unable to hear their first command, and they responded with additional instructions for him to lay down his rifle. Upon hearing their command at a distance of nearly 200 yards away, Fisher readily complied with their request. The officers instructed Fisher further to lay down his folding chair and tripod. Again, once Fisher could hear their request, [**5] he readily complied. n2 [**6] [***3]

For the next couple of minutes, the officers observed Fisher walk toward the road, with nothing in his hands. As he walked deliberately toward them, it became apparent to Mr. Alexander that Fisher was an older gentleman. The officers conceded that he approached them in a normal fashion, and did not act out or say or do anything out of the ordinary. Nonetheless, they kept their weapons drawn and trained upon him. As Fisher arrived at the road, Mr. Alexander directed him to walk backwards toward Mrs. Alexander. After he finally reached them, the officers commanded Fisher, still at gunpoint, to lay face down on the roadway, and handcuffed him behind his back.

Fisher immediately went into cardiac arrest. After unsuccessfully attempting to stand Fisher on his feet, the officers left him handcuffed and lying on the ground. [*841] Presumably unaware of the seriousness of Fisher's condition, Mr. Alexander immediately went to retrieve the objects that Fisher had placed on the ground. Shortly thereafter, a woman who lived nearby and another Defendant, Deputy Mark Leary, separately arrived at the scene. The woman, who had been unable to attain sufficient attention from the Alexanders, informed [**7] Leary that Fisher suffered from a heart condition. Leary, observing Fisher's distressed state, uncuffed him, turned him on his back and called for medical assistance. Fisher was life-flighted to Riverside Hospital in Columbus, Ohio, for emergency care. Although Fisher survived, he is permanently disabled as a result of the incident.

Approximately five months later, to wit, December 4, 2000, Fisher filed a complaint against the Defendants in the United States District Court for the Southern District of Ohio. In the complaint, Fisher charges, among other things, that the officers violated his right, as guaranteed by the <u>Fourth</u> and <u>Fourteenth Amendments to the United States Constitution</u>, to be free from unreasonable seizure without probable cause, and that Sheriff Tom Harden failed to adequately train and supervise his deputies. On August 6, 2002, the district court granted the Defendants' motion for a summary judgment. In doing so, the district court determined that the officers were entitled to qualified immunity because Fisher had failed to establish a constitutional violation, and that there was no genuine issue of a material fact to support his claim against Harden for a failure [**8] to train and supervise his deputies. This appeal followed.

## FIVE INDICATORS OF SUICIDAL THOUGHT

Emotional Pain

A person may be undergoing a severe emotional crisis due to a life situation that is causing a lot of stress, leading to feelings of depression and anxiety. The person's coping abilities are temporarily severely reduced. These very uncomfortable feelings may cause a person to have thoughts of suicide. The person does not usually want to be dead, but instead wants a way out of the psychological and emotional pain they are experiencing, and perceives suicide as the way out of that pain. This is probably the most common situation that you will encounter.

Sometimes a person undergoing such a crisis will think about suicide for a while, but in other cases he or she will make a sudden, impulsive decision to take his or her life. Such an impulsive decision often follows a particularly perturbing event, such as a serious argument with another person, losing a job, hearing very bad news, or being arrested.

Mental Illness

Other suicidal people are mentally ill, and having thoughts of suicide as a result of an aspect of the illness. Serious depression is probably the form of mental illness most commonly associated with suicidal feelings. There is a very high correlation between major depression and suicidal thoughts and behavior. As noted, one reason for this is that deep feelings of helplessness and hopelessness are commonly associated with depression. That is, a seriously depressed person feels that things are terrible, that they will not get better, and that they are powerless to make things better. They are not thinking in a rational or balanced way, of course, and cannot be convinced rationally to see things differently.

In other cases, a person may be having delusional thoughts in which self-harm is predominant. Remember that delusions are ideas or thoughts that are not based in reality, but of which the person is convinced. Or, a person may be experiencing hallucinations, such as voices telling him or her to kill him or herself. Sometimes a person's illness may cause so much discomfort that the person considers suicide as a way to end that discomfort. For example, a person with severe continuing anxiety may feel that he or she simply can't go on having those feelings, and that ending his or her life is the option to end the discomfort. Or, a person who hears voices that are accusatory or mocking or belittling may see suicide as a way to end the tortured feelings caused by the voices.

**HANDOUT 11**

**SPO #10**

Alcohol and Drug Use

Alcohol and drug use can be factors in a person's suicidal thoughts and feelings, in a number of ways. For one thing, alcohol and drugs negatively affect judgment and reasoning, and may cause a person to act in ways that he or she might not act when not affected by the chemical substances.  A person may, for example, act much more impulsively when drinking or using drugs.

In some cases, the effects of alcohol or drugs may be so uncomfortable or distressing that a person may want to be dead.  Alcohol withdrawal, for example, can be extremely unpleasant, both physically and psychologically, as can withdrawal from some drugs. Some illegal or illicit drugs can cause intoxication effects that may be associated with thoughts or behavior that can result in danger to one's self or to other people.

In rarer cases, a person who is an alcoholic or drug addict may simply be so discouraged by the inability to stop drinking or using drugs as to have thoughts of suicide. Such persons may feel like failures, may feel that they have hurt or let down their loved ones or others, and may feel that others would be better off without them.

Remember that many people have co-occurring disorders, most commonly meaning that they have both a substance abuse disorder and a mental disorder. This "double whammy" is problematic in many ways, because the two disorders can worsen the effects of each other. For example, if a person is having suicidal thoughts or feelings due to a mental disorder, those thoughts and feelings may be compounded when the person is drinking or using drugs.

Rational Decision

Some people will make a rational decision that they want to be dead.  Most people who think about suicide do not really want to die, but instead just want their feelings of pain to end and perceive suicide as the way to accomplish that. But some people actually want to end their lives.  For example, a person may have a terminal illness and does not wish to suffer longer or be a burden to others.

Manipulation of Others

Some people use suicide threats or suicidal behavior as a way to manipulate others. They do not wish to be dead and are not feeling that suicide is a way to end emotional pain, but instead are using suicide as a way to get something they want. Example: "If you leave me, I'll kill myself."

Some people go further than just threatening suicide—they actually make suicide attempts as a way to manipulate others.  For example, such persons might attempt suicide to get people to feel sorry for them or to get attention that they think they could not have gotten otherwise. Some such people kill themselves accidentally.

As the officer responding to a person in crisis, you cannot determine whether a suicidal person is being manipulative or really intends to commit suicide.  Even if you suspect the person is being manipulative, always treat suicide threats and suicidal behavior as being real.

## STEPS FOR RESPONDING TO A PERSON IN SUICIDAL CRISIS

1.  Conduct a Continuing Threat Assessment

Remember that people in crisis are unpredictable.  Your first priority is to ensure safety.  Conduct a threat assessment before you walk into a situation, and continue to assess throughout your contact. If the situation is clearly dangerous—for example, if the subject is armed with a weapon and threatening suicide, good tactics are critical. When dealing with a suicidal person, safety is always an issue.  Even when a person seems to be calmer and more in control, he or she can be a threat to his or her own safety and the safety of others.

Always ask about weapons, including edged weapons, and check for weapons. Be aware of the possibility of weapons being brought out, even when you have checked. If you are in a residence, do not allow the subject to go into the kitchen, where there are knives. Even when a person is sitting on a couch or chair, he or she may have a knife or other weapon hidden under a cushion.  Suspect that possibility and remain alert, and check for such items as soon as you can.

If the person needs immediate medical care—for example, if the person has cut him or herself or taken poison or an overdose of medication, call EMS and provide whatever immediate care you are trained to do.

If you respond to a suicidal person in a residence and you smell gas, the situation is extremely hazardous. Do not operate anything electric—do not turn on a light switch or activate any electrical appliances.  Do not use your flashlight or radio. Any spark—even from static electricity—could cause a gas explosion.  Leave the house immediately (with the suicidal person, if possible) and request fire to respond.

2.  Try to Get the Person to Talk

Try to get the person to talk and then listen carefully, so you can assess the situation and find out what is going on. Sometimes you will have information in advance that a person is suicidal, and sometimes you will not know that until you arrive at a scene. You may become aware that a person is in a suicidal crisis because of what that person says. Note, however, that often a person will make subtle hints about suicidal feelings rather than talk directly about thoughts of suicide. For example, the person may say, "She'd be better off without me" or, "He'll soon be sorry he treated me this way."

As always, getting a person to talk and listening carefully is your best way to find out what is going on. First, try to get the subject to calm down and be as physically comfortable as possible. Then, ask questions and get the person to talk, if possible. Suicidal thoughts and feelings can be difficult to talk about, but it is always best to talk about them directly rather than to avoid the subject. As you learned during the section in this text on serious depression, some questions that are appropriate for you to ask include these:

> "Can you tell me what's going on?"

> "Are you thinking of killing (or hurting) yourself?"

> If the person answers yes: "Have you thought about how you would do it?

> Have you thought about when you would do it?"

> "Have you made previous suicide attempts?"

Other very good questions to ask are

> "Is there anything that would help you now?

> "Is there anything we can do to help you get through this?"

Ask these questions in a neutral, straightforward manner so that you do not give the subject the message that you consider the person "crazy" or strange for having suicidal feelings.

Listen to what the person says, using your best active listening skills. Ask follow-up questions as necessary. Doing so will not only help you better understand and assess the situation so as to decide on appropriate action, but it may also help the subject. Remember that talking things out is always better than acting things out. So if you can provide an opportunity for the subject to talk about his or her difficult feelings and thoughts, that may help prevent him or her from acting out those feelings by attempting or committing suicide.

By getting the subject to talk and by listening, you also stall for time. Time is your ally in a suicidal crisis situation. There is rarely a need to resolve such a situation quickly. Whenever you can take the time to try to defuse a subject's difficult feelings and calm a situation, that is a good approach. Another reason for asking these questions and documenting the answers is that it will help you decide whether to initiate an Emergency Detention of the subject. Dangerousness to self is one of the criteria for Emergency Detention, and the answers to your questions may help to establish dangerousness. You may observe other things that suggest dangerousness, such as supplies of pills, or cuts or burns on a person's arm. As noted, some people who hurt themselves are not actually suicidal, but do so for other psychological reasons. In such a case, a good question to ask is "Did you feel the need to be dead or just hurt yourself?" The answer may help you determine an appropriate disposition.

3. Show Empathy

Show empathy for the person and his or her situation. Remember that your attitude and demeanor during an encounter with a person in crisis makes a big difference in the outcome of that encounter. A person experiencing a suicidal crisis is someone in a lot of pain. If you can show some human empathy for the person, it will probably help them get through the crisis a bit better. One way of showing empathy is to let the person know that you can identify with their feelings. For example, if the person is depressed because of a failed marriage, you might say (if it's true), ""Yeah, I've been through a divorce myself. It made me feel terrible." Remember, do not say "I know how you feel." You don't.
You can also say things like,

"I sense you're really down on yourself right now."

"I know talking about this is really rough, but we can take it slow."

4. Negotiate Solutions

Once you have talked to a person who is in a suicidal crisis and tried to assess what is going on with him or her, try to find out what specifically can be done to help the person. As noted, it may be a good idea to ask that directly. What the answer will be depends on the circumstances. In some cases, a person may indicate that he or she needs to go to a hospital or other care facility. In other cases, the person may want to talk to a particular person or entity. If you don't ask, you may not know.

You may have to negotiate with the person. For example, he or she may want something that is not feasible, such as to be left alone or to be allowed to go to a particular location, and you cannot allow those requests. You may then have to keep talking and try to get the person to agree to another option that will ensure safety of the person and control of the situation. <u>Never promise anything that you cannot deliver or do not have the authority to follow up on</u>. That is never a good idea. Remember that your credibility is critical at all times, and especially so when you are responding to a troubled person.

Use whatever tools or techniques you can, in the time available, to try to get the person through the crisis situation. You are not a therapist, but you are a first responder, and your goal is to do what is possible and feasible to get the person through the suicidal crisis situation (which may last for only a short while) to a point that he or she is better able to make good decisions. Time is your ally. Do what you can in the time that you have, rather than rushing to resolve the situation—and perhaps ending up with a worse situation. Here are some tools or techniques that you can try: <u>Non-suicide agreement</u>. A useful tool to consider is a non-suicide agreement, or pact. It can be a verbal agreement. It simply means that you specifically ask the subject if he or she will agree not to attempt suicide for a short, specific period of time—such as three hours or six hours. For the agreement to be reasonable the time frame must be short and definite. It is best to indicate what will happen during or by the end of that time—perhaps getting someone to see the person, getting him or her into a hospital, etc.

Example:

"Mary, we're going to try to get some help for you, but it may take a little while. Can I have your agreement that you won't try to kill yourself between now and 8:00 a.m., when we can get you in to the clinic?"

The value of this is that it provides structure for the person, and buys time for the person to get through the crisis. It gives the subject the message that you trust him or her to follow through with an agreement, which is empowering to the person. It may or may not work, but it is often worth trying. It is a tool that many therapists use, and so can you. However, it is a technique that depends on a sense of trust between you and the subject. For that reason, you should generally use it only with people you know and with whom you have a decent relationship.

A non-suicide agreement is not a binding contract, and should not be thought of as such. It is just a potential tool.

Appeal to reality/consequences of behavior.  In some cases, you may be able to make a rational appeal to a suicidal person.  People in suicidal crises are not usually thinking clearly and rationally, and they do not necessarily think about the possible consequences of their behavior, particularly the long-term consequences.  So if you can identify a person's "hooks"—people or things that are important to them, you may be able to use this information.  As with the non-suicide agreement, it is generally best to use this technique if you know the person and have a relationship with him or her, but that is not an absolute requirement.

For example, you might say something like, "Joe, have you thought about how your death will affect others?"  In fact, Joe may not have thought about how his children or wife or others would be affected by his suicide, and your reminding him of that may affect his thinking and actions.

Or, you may say things like:

"How do you think your mother and/or father will deal with you killing yourself?"
"You know, if you kill yourself, you'll never see Susie grow up, graduate, and get married. I can tell you care about her a lot."

"You've told me you've made some pretty important breakthroughs on your job. If you killed yourself, you'll never have that satisfaction again."

This approach may or may not work in a given situation, but it is at least a tool to consider using.  In fact, it will simply not work with some people in a suicidal crisis. Some people are so desperate that they believe their loved ones actually would be better off without them, and are not subject to logical or reasonable arguments to the contrary. This does not mean that it is not worthwhile to try to appeal to a person about possible consequences of suicide, just realize that it will not work with some people.

5.  Determine What Action to Take

Once you have ensured safety and achieved control of a situation, then you should try to determine the next appropriate steps to help a person in a suicidal crisis.  What these steps are depends on the circumstances. Some options include:

   A.    Releasing the subject to his or her family and providing the subject and family members with a referral (names and telephone numbers) to local sources of assistance such as local or county crisis intervention or substance abuse agencies, suicide-prevention hotlines, etc.

B.    Contacting family members or friends of a person.  In some cases, you may decide to initiate a contact with a subject's family or friends, to inform them of the situation and to enlist their assistance.

C.    Contacting local crisis intervention specialists to see the person either immediately or very soon. This may include a law enforcement crisis intervention team if available or local or county mental health/crisis intervention personnel.

D.    Get the person to agree to a voluntary psychiatric evaluation.  You may need the assistance of local crisis intervention specialists or local mental health resources to arrange this.

E.    Initiating an emergency detention. As a law enforcement officer, you have the legal authority to take a person into custody, without their consent, for an emergency detention if he or she meets the legal criteria of being dangerous (to self or others) and is mentally ill, drug dependent or developmentally disabled. The purpose of an emergency detention is to make it possible for the person to be evaluated to see if he or she meets the criteria for involuntary civil commitment.  If you feel you cannot safely leave the person alone or with friends or family, an emergency detention may be the appropriate choice. This option is discussed in detail in a later section of this text.

These are just some of the options available to you.  How to determine the most appropriate choice in such a situation is a matter of local policy and procedure.  In some cases, you may be required or advised to check with a supervisor or other person in your agency.  Or policy may indicate that you are to contact a designated mental health or crisis intervention agency for advice on the best thing to do.  As always, know and follow your agency's policies.

## STAGES OF ALCOHOL WITHDRAWAL

1.  Stage 1 occurs in the first day or so after the person has stopped drinking. Initial signs and symptoms may include tremors, profuse sweating, disorientation, and possibly delusions and/or hallucinations.

2.  Stage 2 begins within 7 to 48 hours after the person has stopped drinking, and may include seizures.

3.  Stage 3 takes place between 12 and 48 hours after the person's last drink. The person may experience auditory hallucinations—that is, hear voices. These voices may be taunting or persecuting.

4.  Stage 4 is the final stage, and may occur within 72 to 96 hours after the person's last drink. In this stage, the person may experience delirium tremens, often known as "DTs." These are characterized by some or all of the following:

    Profound confusion and disorientation

    Delusions and vivid hallucinations in which the person sees various creatures—usually animals or snakes or bugs—in various postures around him or her, or feels things crawling on his or her skin ShakingFeeling of severe agitation and frightRapid pulse and breathing Pale skin SweatingHigh fever, along with possible seizures or convulsions VomitingCurling into a fetal position.

    If you observe a person displaying these last signs and symptoms—that is, indicators of possible delirium tremens—consider it a medical emergency and arrange for immediate emergency medical care. Remember: a person can die from this serious stage of alcohol withdrawal.

    Withdrawal from drugs is not the same as alcohol withdrawal. There is no withdrawal at all from some drugs (such as hallucinogens), and the nature of withdrawal varies depending on the particular drug for those drugs that do cause withdrawal symptoms. With some drugs (such as stimulants), withdrawal may mostly result in apathy and long periods of sleep. With others, withdrawal can be more of a medical and psychological problem for the person. Withdrawal from depressants such as barbiturates, for example, can result in convulsions, delirium, and—in rare cases—death.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## HANDOUT 14

## OHIO REVISED CODE §2901.21

(A)  Except as provided in division (B) of this section, a person is not guilty of an offense unless both of the following apply:

> (1) The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing;

> (2) The person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense.

(B)  When the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense.

(C)  Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense. Voluntary intoxication does not relieve a person of a duty to act if failure to act constitutes a criminal offense. Evidence that a person was voluntarily intoxicated may be admissible to show whether or not the person was physically capable of performing the act with which the person is charged.

(D)  As used in this section:

> (1) Possession is a voluntary act if the possessor knowingly procured or received the thing possessed, or was aware of the possessor's control of the thing possessed for a sufficient time to have ended possession.

> (2) Reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts.

> (3) "Culpability" means purpose, knowledge, recklessness, or negligence, as defined in section 2901.22 of the Revised Code.

> (4) "Intoxication" includes, but is not limited to, intoxication resulting from the ingestion of alcohol, a drug, or alcohol and a drug.

## OHIO REVISED CODE § 5126.30 THRU 5126.34

(A) "Adult" means a person eighteen years of age or older with mental retardation or a developmental disability.

(B) "Caretaker" means a person who is responsible for the care of an adult by order of a court, including an order of guardianship, or who assumes the responsibility for the care of an adult as a volunteer, as a family member, by contract, or by the acceptance of payment for care.

(C) "Abuse" has the same meaning as in section 5123.50 of the Revised Code, except that it includes a misappropriation, as defined in that section.

(D) "Neglect" has the same meaning as in section 5123.50 of the Revised Code.

(E) "Exploitation" means the unlawful or improper act of a caretaker using an adult or an adult's resources for monetary or personal benefit, profit, or gain, including misappropriation, as defined in section 5123.50 of the Revised Code, of an adult's resources.

(F) "Working day" means Monday, Tuesday, Wednesday, Thursday, or Friday, except when that day is a holiday as defined in section 1.14 of the Revised Code.

(G) "Incapacitated" means lacking understanding or capacity, with or without the assistance of a caretaker, to make and carry out decisions regarding food, clothing, shelter, health care, or other necessities, but does not include mere refusal to consent to the provision of services.

(H) "Emergency protective services" means protective services furnished to a person with mental retardation or a developmental disability to prevent immediate physical harm.

(I) "Protective services" means services provided by the county board of mental retardation and developmental disabilities to an adult with mental retardation or a developmental disability for the prevention, correction, or discontinuance of an act of as well as conditions resulting from abuse, neglect, or exploitation.

(J) "Protective service plan" means an individualized plan developed by the county board of mental retardation and developmental disabilities to prevent the further abuse, neglect, or exploitation of an adult with mental retardation or a developmental disability.

(K) "Substantial risk" has the same meaning as in section 2901.01 of the Revised Code

(L) "Party" means all of the following:

(1) An adult who is the subject of a probate proceeding under sections 5126.30 to 5126.33 of the Revised Code;

    (2) A caretaker, unless otherwise ordered by the probate court;

(3) Any other person designated as a party by the probate court including but not limited to, the adult's spouse, custodian, guardian, or parent.

(M) "Board" means a county board of mental retardation and developmental disabilities.

TOPIC 2:  INTERACTING WITH THE SPECIAL NEEDS POPULATION

HANDOUT 16

SPO #11

## METHODS OF RESPONDING TO CHEMICAL ABUSERS

Always Consider a Person Under the Influence a Potential Threat

Those who have used alcohol and/or drugs are unpredictable and they may be volatile and even dangerous. Such an individual may be quite cooperative one moment, and uncooperative or resistive the next moment.  Never be complacent when dealing with such individuals, and always take precautions and actions that best ensure your safety and that of others.

One of the common effects of use of alcohol or other drugs is loss of normal inhibitions or other social controls that a person has when not affected by the chemicals. Thus, a person may behave in a very obnoxious or threatening or even dangerous way when intoxicated, and that behavior should affect your threat assessment. A person who is under the influence of alcohol or drugs should always be considered a greater potential threat to officers and citizens in any situation.

People who are under the influence of certain drugs can be particularly dangerous. For example, PCP ("angel dust") may cause people to behave in a very bizarre way, experiencing vivid hallucinations and delusions—often paranoid delusions that others are out to hurt or kill them.  Such a person may be very strong and violent, believing that you or others want to harm them.  Such people can also be suicidal.
Similarly, a person who has taken LSD, a hallucinogenic drug, may experience a "bad trip," in which he or she may experience extreme anxiety and confusion and a feeling of loss of control.

Cocaine users may behave in a "manic" way, or appear quite anxious and restless. They may experience severe mood swings.  Cocaine is a stimulant.  A person who has overdosed on cocaine may be quite agitated and may experience hallucinations and/or convulsions.

Ecstasy causes users to behave in bizarre ways. People under the influence of this drug can be dangerous.

The key point is that people who have taken drugs are unpredictable and potentially dangerous to you and others. You generally do not know what drugs they have taken, nor do you know what the drugs have been mixed with, nor do you know whether the person is also mentally ill. There are a lot of variables. Always consider people under the influence to be unpredictable. Therefore, never presume that you know how a subject will react to your presence and to your verbal directions in a given situation—even when you have dealt with that subject previously.  Always maintain proper distancing and continue to assess threat and take proper tactical actions accordingly.

## HANDOUT 16

## SPO #11

The other side of this coin is that people who behave badly when under the influence of a substance are often very different when they are not under that influence. Thus, a subject whom you encounter may be quite obnoxious and difficult—swearing at you, being uncooperative, maybe even fighting—and then the next day, when sober, may be normal and perhaps even embarrassed and apologetic about their behavior.

<u>Try to Assess the Person's Physical Condition</u>

You have a responsibility to assess an individual's condition.  Under the law, if a person is incapacitated due to alcohol, you have a duty to place that person in protective custody.

If you suspect alcohol or drug use, ask such questions as:

"What have you had to drink?"

"How much have you had to drink?"

"When did you take your last drink?"

"Have you used any other substances / drugs? If so, what? How much?

When?"

Try to get the person to voluntarily agree to a preliminary breath test (PBT).  Also try to assess the person's physical condition, in terms of their ability to walk and talk, and so on.

Observe the person for indications of deteriorating condition, as the level of alcohol or drugs increases in his or her system.  Watch for such signs as:

➢  Decreasing level of consciousness

➢  Speech becoming more slurred

➢  Face getting more slack

➢  Decreasing ability to understand or respond

➢  Decreasing ability to walk or stand up straight

Also, be aware of possible serious injuries that may need medical attention. A person who has used alcohol or drugs may have fallen down and hurt himself. He may or may not show that he is in pain, because alcohol and drugs may dull the pain. A person may even have a broken limb and not show much pain, and may not even know that he is seriously injured. So be aware of such possible injuries, and if appropriate provide medical attention for the person.

Remember that a Crisis Situation is a Matter of Perception

Remember that a crisis situation is a matter of perception to a person experiencing the crisis. What may seem like a routine, non-crisis incident to you may be perceived very differently by a subject. For example, you may stop a man for drunk driving and may issue him a citation. To you, that is a routine procedure. But the subject may perceive this as a very significant event: he will now have this on his driving record, may lose his license, his insurance will increase, his wife may be very upset with him, and so on. To him, it is very much a crisis situation, and he may react accordingly—perhaps by becoming very upset and even confrontational. He becomes a short-term EDP. At the very least, try to understand the significance of such an event to the subject, and do not minimize the significance of the event to him.

Never Argue with a Person Under the Influence of Alcohol or Drugs

It is not to your advantage to argue with a person who is under the influence of alcohol and/or drugs. Such a person is usually not rational, and may even enjoy or provoke arguments. Arguing can escalate emotions in a situation, and that is not what you want to happen. It is usually better to state your expectations for the subject's compliance clearly and directly and then take appropriate actions, following the DONE concept that you have learned about in Professional Communication and DAAT training.

According to this concept, you should stop talking and take action under the following conditions:

➢ Danger

➢ Overriding concern

➢ No progress

➢ Escape

# HANDOUT 16

## SPO #11

Be prepared for a subject to be challenging and argumentative.  You may hear such remarks as, "Why are you guys hassling me?" in a belligerent tone. You may need to be more authoritative. You may also need to repeat yourself. Persons under the influence of alcohol have a diminished capacity to process words and information.  For that reason, you should speak slowly and give only one command at a time.

Remember That the Person May Have Additional Problems

Many people who abuse alcohol and/or drugs also have other issues: they may also have a mental illness, be developmentally disabled, and so on.  People who are substance abusers and are mentally ill are said to have a "dual diagnosis."  Dual diagnosis is fairly common. In particular, people who have depressive disorders and/or anxiety disorders often use alcohol or drugs, partly as a way to self-medicate their persistently uncomfortable feelings.  Also, people with certain personality disorders—including antisocial personality disorder and borderline personality disorder—are often substance abusers.

The dual diagnosis of mental illness and substance abuse is problematic because the two disorders together make each one worse.  A confused person becomes more confused, a hostile person more threatening and assaultive, and a suicidal person more likely to engage in self-harmful behavior, and so on.  Thus, the potential threat to you and others from such a person is more than if the person were just a substance abuser or just mentally ill.  Also, with some people their mental disorder and their alcohol or drug use increases the likelihood that they will engage in antisocial and criminal behavior.

Again, you may or may not know that a person has both a mental disorder and a substance abuse problem. You may only be aware of his or her behavior, not the cause of that behavior.  However, if you are aware that a subject has a history of mental illness and is also a substance abuser, that information should make you aware that this particular person is potentially more unpredictable and dangerous.

Recognize That Apparent Intoxication May Be Caused by Other Conditions

Some medical conditions mimic the indicators of substance abuse, as well as of mental illness. For example, a person with diabetes may experience a diabetic coma or insulin shock, and those signs and symptoms may be interpreted as mental illness or substance abuse. They are similar in some ways.  Or, a person may have a seizure, which could be due to alcohol withdrawal or could be due to epilepsy.  A person may experience visual or auditory hallucinations and/or indicators of paranoia (extreme suspiciousness) as a result of mental illness, or use of certain drugs, or as a result of alcohol withdrawal.

## HANDOUT 16

## SPO #11

If you smell the odor of an intoxicant (such as beer or whiskey) on a person's breath or clothing, that may tell you that he or she has used alcohol. But it does not mean that alcohol is the only issue; the person may have used other drugs as well, may be mentally ill, and may have another medical condition or problem in addition to the alcohol use. Remember, it is not your job to diagnose a person's condition—that is, to determine the reason for the signs and symptoms you observe. Your job is to assess whether or not a situation seems to be serious enough to require medical attention, including emergency care.

### Know Your Options for Resolving the Situation

If a person is intoxicated, but not incapacitated, you have various options for resolving the situation. Depending on the circumstances, these may include:

➤ Doing nothing, if the person appears to be safe and is not causing a disturbance

➤ Taking the person home, if he or she consents

➤ Leaving the person in the care of a sober friend or family member

➤ Taking the person to a detoxification facility for voluntary admission if the person and the facility staff agree

➤ Your agency may have specific policies for dealing with intoxicated persons. You should know and follow these.

➤ If the person is incapacitated by alcohol, you have no choice: you must place him or her in protective custody and take him or her to a treatment facility.

➤ Of course, if the person needs medical attention for injuries or other conditions, you must provide for that as well.

## INDICATORS OF AUTISM MAY INCLUDE

Verbal difficulties

Approximately 50% of people with autism are entirely nonverbal. Others may only repeat what was said to them, or may communicate with sign language, picture cards, or use gestures and pointing. Those who do speak may do so in a passive, monotone voice, possibly with unusual pronunciations or words. He or she may sound computer-like, and/or may not use an appropriate volume for a given situation.

Persons with autism may not understand verbal directions or commands such as, "Stop," "Come here," or "Stand here." He or she may seem not to listen, or may not seem to care about what is being said. Or he or she may not make normal eye contact, which can give the impression that he or she is not listening or has something to hide. The person may not be able to give important information or answer questions. He or she may not respond to a request for clarification, or may not understand or accept statements or answers from officers.

The person may appear argumentative, stubborn or belligerent. He or she may say "No!" in response to many questions, or may ask "Why?" incessantly. When uncomfortable for any reason, a person with autism may engage in repeated questions ("What if...? What's your name?..."); or may continually argue; or may ramble on about such things as a favorite sports team, train or bus schedules, names of cities, etc. People with autism are usually very honest—sometimes too honest. They are often very blunt and not tactful, and do not or cannot tell lies.

Unusual physical behaviors

Often people with autism have physical behaviors that can seem very odd or bizarre. They may walk in an unusual way—such as walking on their toes, or using a pigeon-toed gait or a running style. They may appear drunk, or as though high on drugs, or having a psychotic episode. The person may stare at you or direct a fixed gaze somewhere else.

In the case of a sudden change in routine or unusual sensory input (e.g., lights, sirens, presence of dogs) a person with autism may respond with an escalation of behaviors often associated with autism. These can include repetitive behaviors such as pacing, hand flapping, or twirling hands; hitting oneself; or screaming. Temper tantrums are often a response to fear, confusion or frustration, and represent an effort to stop the disturbing stimulus.

Persons with autism may also have a seizure disorder, although this will not ordinarily be obvious to someone who does not know them.

<u>Inappropriate social responses</u>

People with autism may have difficulty with appropriate personal space, and may stand too close or too far away.  He or she may have difficulty interpreting facial expressions (e.g., smiles, frowns, raised eyebrows, etc.) or body language (e.g., command presence or a defensive posture). Similarly, the person may have difficulty recognizing jokes or teasing remarks.

A person with autism may not recognize potentially dangerous situations, and/or may not be able to distinguish between serious problems and minor ones.  He or she may not know how or where to get help for problems.  Persons with autism may not recognize a police vehicle, badge or uniform, or, even if they do recognize these symbols of authority, they may not understand what is expected of them.

## RESPONDING TO PEOPLE WITH AUTISM

Keep sensory stimuli to a minimum

If possible, turn off sirens and flashing lights and remove or limit other sensory stimuli. If feasible, keep dogs from the scene. Even ordinary lights, sounds, touch, and/or verbal directions may not be well tolerated, and the person may react with repetitive behaviors often associated with autism. If the person's behavior escalates, maintain a safe distance until his or her inappropriate behaviors lessen—but remain alert to the possibility of further outbursts or impulsive acts.

Check for injury and medical information

Check for the presence of medical alert jewelry or tags, or other information indicating that a person has autism. Remember that a person may also have a seizure disorder, and there may be information about that specifically. Evaluate the person for injury. He or she may not ask for help or show any indications of pain, even though injury seems apparent.

If possible, avoid touching the person—especially near the face and shoulders.  If touching seems necessary, alert the person first.  Try to avoid standing close to or directly behind a person with autism.

If you take an individual you know or suspect has autism into custody and convey him or her to jail, be sure to let jail staff know about the possibility of autism.  This is information that is important for the individual's safety.  You may suggest to staff that they place the person by himself, rather than in general population, pending an evaluation by a mental health professional.  That will help avoid risk of abuse and/or injury to the person with autism.

Use effective communication techniques

When you are dealing with a person with autism, you should talk in a calm voice and repeat things as necessary.  Be patient and use a normal tone of voice—talking more loudly will not help the person understand better. Expect delayed responses to questions or commands.  Wait for the person to respond and wait for him or her to make eye contact.  If the person seems comfortable, you can ask him or her to "Look at me." However, do not interpret limited or no eye contact as meaning that the person is being deceitful or disrespectful. Do not force or expect eye contact.

Use short, direct phrases, such as: "Stand up now." and "Go to the car." Avoid idioms or figurative expressions such as "What's up your sleeve?" or "Are you pulling my leg?" because the person will probably not understand these phrases.  You may want to consider using alternate ways of communicating with the person, through visual techniques such as writing, drawing stick figures, or sign language (if you or someone knows that), or—if available—picture or phrase books.

# OTHER DEVELOPMENTAL DISABILITIES

## Cerebral Palsy

Cerebral palsy is a term used to describe a group of chronic conditions affecting body movements and muscle coordination. It is characterized by an inability to fully control motor function, particularly muscle control and coordination. Some people with this condition experience muscle spasms or other involuntary movements. Some cannot talk or walk; others can. Cerebral palsy is caused by brain damage, usually during fetal development or infancy.

A person with cerebral palsy may experience a crisis situation like anyone else. He or she may, for example, become easily frustrated if something unusual happens, or if unable to communicate with someone or to get around easily.

It is important to be patient with people with this disability. They may have great difficulty communicating verbally, and it can be too easy to become impatient. Take time, and, if necessary, seek the assistance of a person who has experience in communicating with the person. Remember that a person with cerebral palsy may or may not have associated mental impairment.

## Epilepsy (Seizure Disorder)

Epilepsy is a physical condition that occurs when there is a sudden, brief change in the way that the brain works. When brain cells are not working properly, for any of a variety of reasons, a person's consciousness, movements or actions may be altered for a short time. These altered states are known as epileptic seizures. In some cases, a person can have a convulsion with complete loss of consciousness. In other cases, a person will just have a brief period of fixed staring. Or, a person may engage in brief periods of unconscious "automatic behavior," such as buttoning or unbuttoning a shirt, and may not remember doing so later.

If you observe behaviors such as these, be aware that it could be a seizure. Do not assume that a person is acting "weird" on purpose.

## Traumatic Brain Injury

Traumatic brain injury (TBI) occurs when a sudden physical assault on the head causes damage to the brain. This may result from an accident, a fight, or other head trauma. Shaken baby syndrome is a severe form of head injury that occurs when a baby has been shaken forcibly enough to cause extreme brain injury. TBI does not refer to brain injuries that happen during birth.

The signs of brain injury vary, depending on the part of the brain that was injured and the severity of the injury. Signs of injury may include difficulties with:

➢ Abstract thinking and reasoning or understanding words

➢ Memory, attention, or problem-solving

➢ Speech

➢ Walking or other physical activities

➢ Seeing and/or hearing

Learning Brain injury can also sometimes cause strange behaviors or behavior patterns. If you see a person exhibiting these behaviors, at least keep in mind that brain injury may be the cause. It could be a medical emergency, or at least a situation that calls for medical evaluation to determine the cause of the behavior.

<u>Prader-Willi Syndrome</u>

PWS is a complex genetic disorder that includes short stature, mental retardation or learning disabilities, incomplete sexual development, characteristic behavior problems, low muscle tone, and an involuntary urge to eat constantly, which, coupled with a reduced need for calories, leads to obesity.

Although PWS is associated with an abnormality of chromosome 15, it is generally considered not to be an inherited condition, but rather a spontaneous genetic birth defect that occurs at or near the time of conception. PWS is found in people of both sexes and all races.

About 1 in 14,000 people in the U.S. are estimated to have PWS, and the birth rate may be even higher. Prader-Willi syndrome is one of the 10 most common conditions seen in genetics clinics and is the most common genetic cause of obesity that has been identified.

People with PWS have a flaw in the part of their brain (the hypothalamus) that determines hunger and satiety (fullness). These people never feel full enough, so they have a continuous urge to eat. To compound this problem, people with PWS need considerably fewer calories than normal to maintain an appropriate weight. The obesity that results is the major cause of illness and death in this disorder. As in the general population, obesity in PWS can cause high blood pressure, respiratory difficulties, diabetes and other problems.

There's more to PWS than the obesity. People with PWS have a characteristic appearance and speech quality, significant learning disabilities or mental retardation, and various other problems. A number of these features must be present for a clinical diagnosis of PWS, and specific genetic tests are available to confirm the diagnosis.

In addition to sometimes extreme attempts to obtain food, people with PWS are prone to temper outbursts, stubbornness, rigidity, argumentativeness, and repetitive thoughts and behaviors. Strategies to deal with these problems usually include structuring the person's environment, implementing behavioral management techniques, and occasionally drug therapy.

People with PWS can accomplish many of the things their "normal" peers do -- attend school, enjoy community activities, get jobs, and even move away from home. However, they need a lot of help. School children with PWS are likely to need special education and related services, such as speech and occupational therapy. In community, work and residential settings, adolescents and adults often need special assistance to learn and carry out responsibilities and to get along with others. In all settings, people with PWS need around-the-clock food supervision. As adults, most affected individuals do best in a special group home for people with PWS, where food access can be restricted without interfering with those who do not need such restriction. Although in the past many died in adolescence or young adulthood, it is thought that prevention of obesity will allow a person with PWS to live a normal lifespan.

## FETAL ALCOHOL SYNDROME

Fetal alcohol syndrome (FAS) is not specifically a developmental disability, according to the Wisconsin statutory definition. However, it is a condition that is not uncommon and shares certain characteristics with developmental disabilities.

Fetal alcohol syndrome is a pattern of physical and mental defects which develops in some unborn babies when the mother drinks too much alcohol during pregnancy. Symptoms include growth deficiencies, such as small body size and weight, deformed facial features, poor coordination, and mental retardation or problems with learning. Many people with FAS are also hyperactive as children, and may have poor impulse control and poor judgment. Many experience behavior problems throughout their lives, which can lead to involvement with the criminal justice system.

You are unlikely to know that a person has been affected by FAS. The person may not be aware of it. However, such a person is potentially an EDP because of his or her poor judgment, poor impulse control, and other behavior problems, and therefore may be more of a threat risk.

## §2305.51

**Immunity of mental health professional or organization as to violent behavior by client or patient**

(A)    (1) As used in this section:

(a) "Civil rights" has the same meaning as in section 5122.301 [5122.30.1] of the Revised Code.

(b) "Mental health client or patient" means an individual who is receiving mental health services from a mental health professional or organization.

(c) "Mental health organization" means an organization that engages on or more mental health professionals to provide mental health services to one or more mental health clients or patients.

(d) "Mental health professional" means an individual who is licensed, certified, or registered under the Revised Code, or otherwise authorized in this state, to provide mental health services for compensation, remuneration, or other personal gain.

(e) "Mental health service" means a service provided to an individual or group of individuals involving the application of medical, psychiatric, psychological, counseling, social work, or nursing principles or procedures to either of the following:

(i) The assessment, diagnosis, prevention, treatment, or amelioration of mental, emotional, psychiatric, psychological, or psychosocial disorders or diseases, as described in the most recent edition of the diagnostic and statistical manual of mental disorders published by the American psychiatric association;

(ii) The assessment or improvement of mental, emotional, psychiatric, psychological, or psychosocial adjustment or functioning, regardless of whether there is a diagnosable, pre-existing disorder or disease.

(f) "Knowledgeable person" means an individual who has reason to believe that a mental health client or patient has the intent and ability to carry out an explicit threat of inflicting imminent and serious physical harm to or causing the death of a clearly identifiable potential victim or victims and who is either an immediate family member of the client or patient or an individual who otherwise personally knows the client or patient.

(2) For the purpose of this section, in the case of a threat to a readily identifiable structure, "clearly identifiable potential victim" includes any potential occupant of the structure.

(B) A mental health professional or mental health organization may be held liable in damages in a civil action, or may be made subject to disciplinary action by an entity with licensing or other regulatory authority over the professional or organization, for serious physical harm or death resulting from failing to predict, warn of, or take precautions to provide protection from the violent behavior of a mental health client or patient, only if the client or patient or a knowledgeable person has communicated to the professional or organization an explicit threat of inflicting imminent and serious physical harm to or causing the death of one or more clearly identifiable potential victims, the professional or organization has reason to believe that the client or patient has the intent and ability to carry out the threat, and the professional or organization fails to take one or more of the following actions in a timely manner:

(1) Exercise any authority the professional or organization possesses to hospitalize the client or patient on an emergency basis pursuant to section 5122.10 of the Revised Code;

(2) Exercise any authority the professional or organization possesses to have the client or patient involuntarily or voluntarily hospitalized under Chapter 5122. of the Revised Code;

(3) Establish and undertake a documented treatment plan that is reasonably calculated, according to appropriate standards of professional practice, to eliminate the possibility that the client or patient will carry out the threat, and, concurrent with establishing and undertaking the treatment plan, initiate arrangements for a second opinion risk assessment through a management consultation about the treatment plan with, in the case of a mental health organization, the clinical director of the organization, or, in the case of a mental health professional who is not acting as part of a mental health organization, any mental health professional who is licensed to engage in independent practice;

(4) The mental health professional or organization is not liable in damages in a civil action, and shall not be made subject to disciplinary action by any entity with licensing or other regulatory authority over the professional or organization, for disclosing any confidential information about a mental health client or patient that is disclosed for the purpose of taking any of the actions.

(D) The immunities from civil liability and disciplinary action conferred by this section are in addition to and not in limitation of any immunity conferred on a mental health professional or organization by any other section of the Revised Code or by judicial precedent.

(E) This section does not affect the civil rights of mental health client or patient under Ohio or federal law.

1. List the Common Symptoms displayed by a person with Major Depression:

2. Define the term "Mental Illness:"

3. List the Symptoms displayed by a person with Bipolar Disorder in the Manic Phase:

4. List the Signs of Schizophrenia:

5. List the Symptoms of Schizophrenia:

6. List the signs of a person with an Anxiety Disorder:

7. List the De-escalation Techniques:

OHIO PEACE OFFICER TRAINING COMMISSION — TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## STUDENT WORKSHEET

8. List the Behaviors that should be avoided when engaged in De-escalation:

9. List the Phrases to Aid in Communication:

10. List the Indicators of Suicidal Thought:

11. List the Methods for Responding to Chemical Abusers:

12. List the indicators of a person with Autism:

13. List the intellectual abilities affected by Dementia:

14. List the signs of a person with Alzheimer's Disease:

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## STUDENT WORKSHEET

15. List the categories of life changes regarding the elderly-mentally/physically challenged:

16. List the interaction skills needed in dealing with elderly persons:

17. List the interaction skills for the Vision Impaired:

18. List the interaction skills for the Hearing Impaired:

19. List the options for taking a person into custody due to that person's mental illness:

# PRACTICE EXERCISE

1.  List the Common Symptoms displayed by a person with Major Depression:

2.  Define the term "Mental Illness:"

3.  List the Symptoms displayed by a person with Bipolar Disorder in the Manic Phase:

4.  List the Signs of Schizophrenia:

5.  List the Symptoms of Schizophrenia:

6.  List the signs of a person with an Anxiety Disorder:

7.  List the De-escalation Techniques:

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 2: INTERACTING WITH THE SPECIAL NEEDS POPULATION

PEACE OFFICER BASIC TRAINING CURRICULUM

## PRACTICE EXERCISE

8. List the Behaviors that should be avoided when engaged in De-escalation:

9. List the Phrases to Aid in Communication:

10. List the Indicators of Suicidal Thought:

11. List the Methods for Responding to Chemical Abusers:

12. List the indicators of a person with Autism:

13. List the intellectual abilities affected by Dementia:

14. List the signs of a person with Alzheimer's Disease:

15. List the categories of life changes regarding the elderly-mentally/physically challenged:

16. List the interaction skills needed in dealing with elderly persons:

17. List the interaction skills for the Vision Impaired:

18. List the interaction skills for the Hearing Impaired:

19. List the options for taking a person into custody due to that person's mental illness:

**UNIT 3:**     **HUMAN RELATIONS**

**TOPIC 4:**     **CRISIS INTERVENTION**

**GOAL:**     THE STUDENT WILL KNOW ASPECTS OF CRISIS INTERVENTION.

**SUB-GOALS:**

The student will be able to define terms related to crisis situations

The student will know the steps of the grieving process.

The student will know the stages of the crisis response pattern.

The student will understand the stages of value formation.

The student will know problems associated with forming perceptions.

The student will be able to identify the parts of a communication message.

The student will know types of crimes for which victims can seek relief under the Ohio victims' rights law.

The student will know types of information law enforcement personnel must provide a victim under the Ohio victims' rights law.

**REQUIRED HOURS:** SIX (6) HOURS

**STUDENT PERFORMANCE OBJECTIVES:**

1. Given a multiple choice question, **the student will choose the option which defines the term "Crisis,"** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

2. Given a multiple choice question, **the student will choose the option which defines the term "Intervention,"** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

3. Given a multiple choice question, **the student will choose the option which defines the term "Crisis Intervention,"** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

4. Given a multiple choice question, **the student will choose the option which states 3 of the 5 steps of the grieving process,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.



Δ π EXHIBIT D
Deponent Huddleston
Date 6-4-15 Rptr WH
WWW.DEPOBOOK.COM

5. Given a multiple choice question, **the student will choose the option which states the 3 stages in the crisis response pattern,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission

6. Given a multiple choice question, **the student will choose the option which states the 3 stages of value formation,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

7. Given a multiple choice question, **the student will choose the option which states the approximate age-span of each stage of value formation,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

8. Given a multiple choice question, **the student will choose the option which states the 4 problems associated with forming perceptions,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

9. Given a multiple choice question, **the student will choose the option which states the 3 parts of a communicated message,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

10. Given a multiple choice question, **the student will choose the option which lists 5 of the 9 misdemeanor crimes for which victims can seek relief under the Victims' Rights Law of Ohio,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

11. Given a multiple choice question, **the student will choose the option which states 4 of the 6 items of information law enforcement personnel must provide to the victim under the Ohio Victims' Rights Law,** as stated in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.

*Given a multiple choice question containing a narrative situation, the student will choose the option that identifies the underlying concept or the best course of action to be taken by a peace officer based on the application of the SPOs in the Basic Training Curriculum of the Ohio Peace Officer Training Commission.*

## INSTRUCTOR REFERENCES:

Bounds, Mary. "Crisis Intervention," Cleveland Police Department Resources Unit. Cleveland, Ohio. March 1987,

Brill, Naomi I. "Working with People: The Helping Process." New York; J.B. Lippencott Company, 1978.

Radelet, Louis A. and Carter, David L. "The Police and the Community," Macmillan College Publishing Company, New York 1994.

Spahr-Nelson, Terri. "Post Traumatic Stress and the Psychological Impact of Trauma." S.T.O.P. Violence Against Women Seminar - Summer 1997.

The Commission on Peace Officer Standards and Training. State of California. "Guidelines for Sexual Assault Investigation." 1986.

Whisenand, Paul M. and Ferguson, R. Fred. "The Managing of Police Organizations," Prentice Hall, New Jersey. 1996.

## TEACHING AIDS:

Chalk
Chalkboard
Lectern
Overhead Projector
Prepared Overheads
Instructor Guide for Alligator River Story

## STUDENT REFERENCES:

Student worksheet
Handout # 1:  Elements of Crime of Rape
Handout # 2:  The Alligator River" Story

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 504 of 630 PAGEID #: 1292

# *SPECIAL NOTE TO COMMANDERS AND INSTRUCTORS*

INSTRUCTORS ARE OBLIGED TO REVIEW EACH LESSON PLAN THEY TEACH FOR ACCURACY, CURRENT INFORMATION AND APPLICABILITY TO THE COMMUNITY DEMANDS. IF IT IS FOUND THAT INFORMATION IN A PARTICULAR LESSON PLAN IS OUT OF DATE OR FOR ANY REASON REQUIRES CHANGES OR UPDATES, PLEASE NOTIFY THE OHIO PEACE OFFICER TRAINING COMMISSION – CURRICULUM SUPERVISOR- AT 1-800-346-7682 OR FAX TO (740) 845-2675. COMMENTS MAY BE MAILED TO OPOTC, P.O. BOX 309, LONDON, OH 43140.

INSTRUCTORS ARE ALSO EXPECTED TO:

* BEAR IN MIND THE LEGAL, MORAL, PROFESSIONAL AND ETHICAL IMPLICATIONS OF INSTRUCTING IN A COMMISSION-APPROVED PROGRAM.

* USE ANY AND ALL OPPORTUNITIES WHICH MAY ARISE DURING INSTRUCTION OF THE REQUIRED MATERIAL TO POINT OUT TO THE STUDENTS THE LEGAL, MORAL, PROFESSIONAL AND ETHICAL RESPONSIBILITIES THEY WILL BEAR TO THEIR EMPLOYERS AND COMMUNITIES WHILE SERVING IN AN OFFICIAL CAPACITY.

* USE SCENARIOS AND EXAMPLES SPECIFIC TO EACH LESSON PLAN TO GENERATE ACTIVE DISCUSSIONS CONCERNING THE ETHICAL IMPLICATIONS OF THE TOPIC/SKILL BEING TAUGHT. EMPHASIS SHOULD BE PLACED ON THE BENEFITS OF ETHICAL BEHAVIOR AND THE CONSEQUENCES OF UNETHICAL BEHAVIOR.

I. **PREPARATION**

    A. Introduction

       1. Instructor

       2. Course

    B. The purpose of the segment of your training is to give you information about how people in a crisis situation will react to the situation and to you

    C. Dealing with people in crisis is one of the most difficult situations an officer can encounter and to one degree or another, encompasses most of the contacts the officer will have with the public

    D. The information presented here will include, but not be limited to:

       1. Definition of terms related to crisis situations

       2. Steps of the grieving process

       3. Stages of the crisis response pattern

       4. The stages of value formation

       5. Problems associated with forming perceptions

       6. The parts of a communicated message

       7. The types of crimes for which victims may seek relief under the Ohio Victim's Rights Law

       8. The types of information that law enforcement personnel are required to give victims under the Ohio Victim's Rights Law

    E. SPOs

**STUDENT NOTEBOOK**

II. **PRESENTATION:**

   A. Legislation

      1. The basis of this course is Substitute House Bill 435, effective April 4, 1985, which required 6 hours of Rape Crisis Training

      2. Rape: 2907.02

         a. Elements of Crime         **HANDOUT #1**

            1. Engage in sexual conduct

            2. With another person who is not the spouse of the offender or who is the spouse but is living separate and apart from the offender when offender for the purpose of preventing resistance:

               a. Substantially impairs the other person's judgement or control

               b. By administering a drug or intoxicant to the other person, surreptitiously by force, by threat of force or deception OR

            3. Engage in sexual conduct with another person when the offender purposely compels the other person to submit by force or threat of force

         b. Penalty

            1. Felony, 1st degree

            2. Life imprisonment if victim is 13 years or younger

            3. Penetration is not required for cunnilingus or fellatio

      3. Felonious Sexual Penetration

         a. 2907.12 Repealed 10/7/96

         b. The elements of this crime are, presently, included in the rape statute

B.  Rationale for crisis intervention in all offenses regardless if violent or property crimes

1.  Psychological "first aid"

a.  Realizing all victims are in a state of crisis

b.  Identify principles which lead to effective responses from the victim

c.  Keep your own emotions under control

2.  As a result of improved communications in crisis situations:

**OVERHEAD #1**

a.  Victims will provide more assistance in the investigation

b.  Victims will be better witnesses for the prosecution

c.  The officer will be more effective in gathering information

d.  The officer will be more effective in transmitting information

C.  **DEFINITION OF THE TERM "CRISIS":**

**SPO #1**
**OVERHEAD #2**

1.  A period of emotional upset in which a person's usual coping mechanism has failed, problem solving skills decrease and feelings of panic increase

a.  Sudden, arbitrary, unpredictable

b.  Normal perception is distorted

c.  Suggestibility is heightened

2.  Several interrelated factors may produce crisis

**OVERHEAD #3**

a.  Hazardous, stressful event

b.  Perceived threats to basic needs or loss of those needs

c.  Inability of the person to respond with adequate coping

**SPO #2**

| | |
|---|---|
| D. **DEFINITION OF THE TERM "INTERVENTION": STEPPING IN TO SUPPORT THE HEALTHY, COPING PART OF THE INDIVIDUAL TO RESTORE EQUILIBRIUM** | **OVERHEAD #4** |
|    1. Importance of early intervention | |
|       a. Police are usually the first called to the scene | |
|       b. Police officer becomes the key figure | |
|    2. Victim relies on police officer | |
|       a. Authority | |
|       b. Professionalism | |
| E. **DEFINITION OF THE TERM "CRISIS INTERVENTION": STEPPING IN TO HELP RESTORE EQUILIBRIUM DURING A PERIOD OF EMOTIONAL UPSET** | **SPO #3**<br>**OVERHEAD #5** |
| F. The importance of the officer's role in treating the victim | |
|    1. My response has a significant impact on the victim's recovery | |
|    2. Treat the victim how I would want my loved ones treated | |
|    3. Treat victim with dignity and respect | |
|    4. Give the victim written material to take with them | |
|    5. Encourage the victim to regain control of his/her life | |
|    6. Refer them to counseling | |
| G. Post Traumatic Stress Disorder | **OVERHEAD #6** |
|    1. Commonly known as "P.T.S.D." | |
|    2. P.T.S.D. represents the impact after the crisis | |
|    3. The essential feature of P.T.S.D. is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving: | |
|       a. Direct personal experience of the event | |

|  |  |
|---|---|
| b. Witnessing the event | |
| c. Learning about such an event involving a close family member or associate | |
| 4. Symptoms of P.T.S.D. | **OVERHEAD #7** |
| a. Flashbacks in the form of dreams | |
| b. Avoidance of the stimuli that caused the event | |
| c. Increased physical response in the aftermath (nausea) | |
| 5. Examples of traumatic events: | |
| a. Assaults | |
| b. Physical and/or emotional abuse | |
| c. Murder | |
| d. Kidnapping | |
| e. Being taken hostage | |
| f. Stalking | |
| g. Military combat | |
| h. Prisoner of war | |
| i. Natural or man-made disasters | |
| 6. Additional factors in P.T.S.D. | |
| a. Trauma is a crisis that happens suddenly, without warning and causes a temporary imbalance in the person's life | |
| b. There is no right or wrong way to cope with crisis. Everyone does it differently | |
| c. Trauma victims experience a loss of control in their lives | |
| 1. They could not control it | |
| 2. Most want to regain control | |

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 4: CRISIS INTERVENTION

PEACE OFFICER BASIC TRAINING CURRICULUM

|  |  |
|---|---|
| 3. People "move on" differently | |
| 7. **THERE ARE 5 STEPS IN THE GRIEVING PROCESS** | SPO #4 OVERHEAD #8 |
| a. Denial | |
| b. Bargaining | |
| c. Anger | |
| d. Sadness | |
| e. Acceptance | |
| 8. Severity and length of the victim's response to trauma will vary because of several factors. | |
| a. Severity of trauma | |
| b. Duration of trauma (repeated) | |
| c. Relationship to perpetrator | |
| d. Social and family support | |
| e. Family history | |
| f. Childhood experiences | |
| 9. Recovery is hampered if, at the time of disclosure, the police or family react in a negative, non-supportive fashion. | |
| H. **THE CRISIS RESPONSE PATTERN HAS 3 STAGES:** | SPO #5 OVERHEAD #9 |
| 1. Disorganization | |
| a. Confused, unsure of facts | |
| b. Internal coping | |
| 1. Shock | |
| 2. Denial | |
| 3. Disbelief | |

    c.  External expressions: From very calm to very hysterical

  2.  Stabilization

    a.  Efforts to move on

    b.  Internal coping

      1.  Need for equilibrium

      2.  Stability

    c.  External expressions

      1.  Returning to work and pre-crisis time

      2.  Use of alcohol/drugs

      3.  Move, change locks

  3.  Reorganization

    a.  Resolving the trauma

    b.  Internal coping:  Need to resolve the conflict

    c.  External expressions

      1.  Trigger words/actions

      2.  Experiencing set backs

      3.  Start/return to counseling

      4.  Divorce

I.  Class Exercise

  1.  Divide the class into groups of 3-5 members

  2.  Have students read the Alligator River Story

  3.  Have students rank the characters of the story individually

  4.  Then, have students rank the characters as a group

**HANDOUT #2
INSTRUCTOR GUIDE AND
STUDENT VERSION**

| | |
|---|---|
| 5. Have the entire class discuss the story and the characters | |
|    a. Who was the least desirable and why | |
|    b. What is the rationale for that conclusion | |
|    c. Discuss students' individual philosophy | |
| J. Values, Attitudes and Perceptions | |
| 1. Definition of Value:  An enduring belief that a specific mode of conduct is personally or socially preferable over an opposite mode of conduct | **OVERHEAD #10** |
| 2. Value System | |
|    a. A collection of our values in many different areas | |
|    b. Usually, in hierarchical ranking | |
| 3. **THERE ARE 3 STAGES OF VALUE FORMATION** | **SPO #6**<br>**OVERHEAD #11** |
|    a. Imprinting | |
|    b. Modeling | |
|    c. Socialization | |
| 4. **APPROXIMATE AGE-SPAN OF EACH STAGE OF VALUE FORMATION:** | **SPO #7**<br>**OVERHEAD #12** |
|    a. Imprinting (Birth - 7 Years) | |
|       1. Basic framework | |
|       2. Learned from family | |
|       3. Determines future strengths | |
|    b. Modeling (Ages 7 - 14 Years) | |
|       1. Friends | |
|       2. Identify "heroes" | |
|       3. School is major factor | |

    c.  Socialization (Ages 14 - 20 Years)

        1.  Influence of peer groups

        2.  Testing of earlier values

        3.  Common interests

5.  Values may be changed in either one of two ways:      **OVERHEAD #13**

    a.  Significant Emotional Events:

        1.  Death

        2.  Divorce

        3.  Loss of job

        4.  Serious injury

        5.  Winning the lottery

    b.  Profound Dissatisfaction

        1.  Three factors all need to be present to make the change

        2.  We must have a very deep dissatisfaction with the present

        3.  We must possess a lot of psychological and physical energy

        4.  We must acquire an insight for redirecting the driving dissatisfaction

            a.  Smoking

            b.  Changing jobs

            c.  Getting divorces

            d.  Having children

6.  Benefits Provided by Values

    a.  Filters: Operate in degrees

        1.  Good/bad

  2. Right/wrong

  3. Normal/abnormal

  4. Acceptance/rejection

 b. Create generation gaps

  1. Parents different than children

  2. Storytelling

 c. Produce individual differences

  1. Makes each of us different in how we handle life

  2. Makes a parent different from a child

 d. Serve as standards of conduct

  1. Causes us to take or reject a position

  2. Allows us to justify our actions

 e. Cause or resolve conflicts

  1. Value conflicts

  2. Helps us to make decisions

 f. Trigger our emotions

  1. Can cause anger when values come into conflict

  2. Guilt can occur

 g. Thought provokers

  1. Easier to speculate when based on a sound value system

  2. Values generate thoughts as well as guide them

 h. Motivate us

    1. Helps us to choose one path over another

    2. We will pursue what we value

7. Attitudes are shaped by our Value System

  a. Work attitude

    1. How we view co-workers

    2. How we view our job

    3. How we view ourselves in the job

    4. An awareness helps us do our jobs better

  b. Family attitude

    1. How we view our family

    2. Priorities

8. Perceptions

  a. Perceptions are formed as a result of:

    1. Experiencing our physical surroundings

    2. Use of all senses

    3. Filtering through values

  b. Perceptions are usually the result of Personal Opinions:

    1. They are individualized, with no two experiences being the same

    2. They are formed with incomplete data

  c. Our view of the world

    1. Controlled by our perceptions of reality

    2. Also controlled by our social roles

    3. Distorted

  d. **FOUR PROBLEMS ASSOCIATED WITH**

**SPO #8**
**OVERHEAD #14**

| | |
|---|---|
| **FORMING PERCEPTIONS** | |
| 1. Personal Rigidity: Unable to adjust to change | **OVERHEAD #15** |
| 2. Emotional Loading: | |
|     a. Emotions change our perception of a person or group | |
|     b. "Police are good, until they arrest me!" | |
| 3. Experiential Limitations | |
|     a. Limited experience makes it hard to accept reality | |
|     b. Death of a loved one the first time it happens | |
| 4. Cultural Myopia | |
|     a. Commonly known as Tunnel Vision | |
|     b. Perceptions are weighted by: | |
|        1. Attitudes | |
|        2. Beliefs | |
|        3. Values we accept as part of our ethnic, racial or social class | |
| K. Communication | |
| 1. Our value system, attitudes and perceptions are the basis for the way in which we communicate | |
| 2. **THERE ARE 3 PARTS OF A COMMUNICATED MESSAGE** | **SPO #9**<br>**OVERHEAD #16** |
|     a. Fact: A report of reality as the communicator sees it | |
|     b. Inference: Body language that sends additional information to the receiver | |
|     c. Judgment: The meaning the sender places upon the information | |

L. There are both verbal and non-verbal techniques which should be used when interviewing the victim

1. Verbal Communication

   a. 33% of the message is verbal

   b. Words are only 10% of the message

   c. Pitch, rate of speed, voice inflection account for 25% of the message

   d. Active listening

      1. Focusing on the person's whole message

      2. Make an attempt not to make it personal

         a. Clarification

         b. Summarization

         c. Allowing silence

   e. Making specific requests or suggestions, such as sitting down

   f. Open-ended questions

      1. Intended to get additional facts

      2. Expanded information

      3. Examples:

         a. What led you to...?

         b. How do you know...?

   g. Use non-questions for answers, such as:

      1. "Tell me more about..."

      2. "Please describe..."

   h. Asking sex questions

    1. If the officer is comfortable, the victim will feel more comfortable

    2. Negotiate with the victim what terminology will be used

    3. Base that decision on several factors

        a. Age of victim

        b. Education level of victim

        c. "Street smarts"

        d. Proximity of other people

i. Stating the obvious

    1. "You're safe now"

    2. Comment on observable facts

j. Personalize statements

    1. Convey empathy

    2. Empathy: Putting yourself into another person's shoes

        a. "I'd like to help you"

        b. "You're not to blame"

k. Mind reading

    1. Requires an understanding of victimology

    2. "You're probably thinking..."

l. Sharing feelings

    1. "I'm sorry this happened to you"

    2. "I feel..."

m. Closed-ended questions

    1. Can be specifically answered

2. Limit information

3. Efficient for getting quick answers: "Are you hurt?"

2. Non-verbal techniques

   a. Eye contact

      1. Look at victim's face

      2. Do not stare

   b. Body posture

      1. Eye level with victim

         a. Best if both people are seated

         b. Leaning slightly toward victim

      2. Avoid "towering" over the victim

   c. Distance/Body posture

      1. Close enough to speak quietly

      2. Do not "corner" the victim

      3. Do not block their view of the rest of the room

   d. Touching

      1. "Open" gestures

      2. Avoid self touching

   e. Vocalization

      1. Use low tones: Promotes attention

      2. Speak slowly: Increases comprehension

   f. Facial expression: Demonstrates interest in what the victim is saying

   g. Clothing

      1. A uniform may be threatening

    2.  Remove hat

M.  Victim concerns during interviews

   1.  The style of the officer

      a.  Concerned or caring?

      b.  Kind and compassionate

   2.  Receiving information:  Did officer explain why he needed that information

   3.  Repetition of question

      a.  Confusing to victims

      b.  Skeptical of officer's ability

   4.  Privacy issues

      a.  If necessary the interview should be done privately depending upon the situation

      b.  The victim may blame:

         1.  The officer

         2.  Police department

         3.  Society in general

      c.  Avoid lecturing the victim

         1.  Show compassion

         2.  Empathy

      d.  Follow-up investigation

         1.  Do not make promises you cannot keep

         2.  Explain procedures of what will happen with this case

         3.  Offer insight into how the crime could be prevented in the future

| | |
|---|---|
| N. The Victim's Rights Law of Ohio | **N.B. : 2930 FIRST BECAME LAW UNDER SB 186 ON 10-12-94. PARTS OF 2930 BECAME EFFECTIVE 7/1/96** |
| 1. All felony crime victims are eligible for relief under the law | |
| 2. **THERE ARE 9 MISDEMEANOR CRIMES FOR WHICH VICTIMS CAN SEEK RELIEF UNDER THE VICTIMS' RIGHTS LAW OF OHIO:** | **SPO #10 OVERHEAD #17** |
|     a. Domestic violence | |
|     b. Assault | |
|     c. Vehicular homicide | |
|     d. Negligent homicide | |
|     e. Sexual imposition | |
|     f. Menacing by stalking | |
|     g. Menacing | |
|     h. Aggravated menacing | |
|     i. Intimidation of a crime victim or witness | |
| O. Notice to Victims | |
| 1. Notice may be either oral or written | |
| 2. Required notice to victims | |
|     a. Law Enforcement and Prosecutors <u>must</u> give information to victims | |
|     b. Bill of Rights pamphlet | |
|     c. Available assistance | |
|     d. Victim's compensation | |
|     e. Protective orders | |
| 3. **SIX ITEMS OF INFORMATION LAW ENFORCEMENT PERSONNEL MUST PROVIDE TO** | **SPO #11 OVERHEAD #18** |

**THE VICTIM UNDER THE OHIO VICTIMS' RIGHTS LAW:**

    a.  Name of investigator

    b.  Name of prosecutor

    c.  Defendant's name

    d.  Eligibility for pre-trial release

    e.  Notice when suspect arrested

    f.  Notice when suspect released

4.  Prosecutors "to the extent possible" must confer with the victim before...

    a.  A plea bargain

    b.  Diversion

    c.  Amendment to charges

    d.  Dismissal

    e.  Trial

5.  Other notices the prosecutor must also make:

    a.  Name of the offense

    b.  Defendant's name

    c.  Case number

    d.  Right to attend hearings

    e.  Summary of rights

    f.  Intimidation procedures

    g.  Person/phone contact

    h.  To have a representative

P.  Required Notices if the Victim Requests

1. All court proceedings and schedule changes including date, time and location

2. Acquittal or conviction

    a. If convicted, what crime convicted of

    b. Name, address and phone number of the probation officer and officer preparing pre-sentence investigation

    c. Notice that the victim may make a statement as part of the pre-sentence investigation (PSI)

    d. Judge may show victim's statement to the defendant

    e. The date, time and place of sentencing and the right to speak at the sentencing

    f. The sentence and change to the sentence

3. Filing of an appeal

    a. The appeal process

    b. The release of the defendant

    c. The time and place of the appeal

    d. Results of the appeal

    e. Victims who have requested any other notification may also be notified of:

        1. Incarceration of defendant

        2. The likely release date

        3. Contact information of the custodial agency

4. Any hearing for judicial release

    a. Victims right to make a statement at this hearing

    b. Court must notify the victim after any release hearings

P. Other Victim Rights

1.  Confidentiality

    a.  Prosecutor may motion to suppress information on victims or witnesses if there is fear from threats or violence

    b.  The "court shall hold" the recorded hearing in chambers

    c.  The court may suppress victim information from files except when determining the crime location and seal the transcript of the hearing

2.  Speedy prosecutions

3.  Presence

    a.  The victim may attend any hearing at which the defendant is present unless the judge rules exclusion of the victim is necessary to guarantee a fair trial

    b.  This supersedes evidence rule 615

4.  Support person: At the victim's request the judge must permit a support person to accompany the victim unless the judge rules this will cause an unfair trial for the defendant

5.  Separate waiting: The court must attempt to minimize contacts and provide a separate victim waiting area from the defendant

6.  Bond re-hearing: If the defendant is released on bond and the victim or victim's family has been harmed or threatened by the defendant or at the defendant's direction, then the victim may request the prosecutor to motion the court to reconsider bond conditions

7.  Property return: Law enforcement must promptly return property to the victim unless:

    a.  It is contraband

    b.  Prosecutor certifies it must be kept instead of photographed

    c. Judge rules the evidentiary value is greater than victim's need

8. Impact statement

    a. Victim may make an oral or written statement at any pre-sentence investigation ordered by the judge

    b. The statement may include the following:

        1. Physical harm

        2. Emotional harm

        3. Economic losses

        4. Restitution needs

        5. Opinion on sentencing

    c. The judge must permit and consider a victim's statement before a sentencing or early release hearing

9. Employee protections

    a. Employers cannot punish employees for preparing or attending hearings at the prosecutor's request or by subpoena

    b. Violation is contempt of court

10. Early release/transitional control

    a. If the victim requests, the agency having custody must notify the victim 3 weeks prior to:

        1. Adult Parole Authority recommends or holds an early release hearing

        2. Furlough is granted and furlough pendency, for work, training, education or to arrange employment

        3. Notice "as soon as practical" to visit a dying relative or to attend a funeral

    4. Release on electronic monitoring

    5. When any of the above occur the victim must be notified they have the right to submit an impact statement

  b. The victim must be notified PROMPTLY if the following occur:

    1. Escape of the defendant

    2. Absence of the defendant

    3. Recapture of the defendant

    4. Death of the defendant

    5. Any other release or condition of release

11. Responsibility for compliance

  a. Prosecutors must seek compliance with all victims rights

  b. Failure of any right does not change results or allow for damage claims by victims

12. Forms

  a. Provided by the State of Ohio

  b. Toll Free number to file claims

G. Vicarious Trauma

**OVERHEAD #19**

  1. Vicarious Trauma means the psychological consequences to a care giver after being exposed to a victim's traumatic material

  2. Other terms used which have the same meaning:

    a. Empathic strain

    b. Compassion fatigue

    c. Secondary trauma

  3. Vicarious Trauma affects any care giver who repeatedly has exposure to the accounts of trauma

suffered by others

   a. Police officers

   b. Medical professionals

   c. Judges, Attorneys, Juries

   d. Social workers, Therapists

   e. Disaster workers

4. Vicarious Trauma affects people who suffer from it in a number of ways:

   a. Causes significant psychological or physical distress

   b. Not the same as "burnout"

   c. Physical effects

      1. Tired, low energy

      2. Nightmares

      3. Changes in sex drive

      4. Muscle tension

      5. Headaches

      6. Ulcers

   d. Emotional effects

      1. Detached or lonely

      2. Overwhelmed

      3. Anxious, depressed

      4. Hopelessness, unfulfilled

   e. Social effects:

      1. Withdrawn

      2. Prefers to be alone

        3.  Fixation with work

        4.  Lacks balance in work/home

    f.  Psychological effects

        1.  Decreased motivation...drive

        2.  Cynical

        3.  Mentally detached from work

        4.  Distorted view of the world

R.  Coping Strategies for Police Officers

    1.  Self assessment

        a.  Recognize it happens to me

        b.  Understanding what it is

    2.  Avoid over-reacting to crisis

        a.  OK to have intense feelings

        b.  Do not become obsessive about it

    3.  Seek support group

        a.  Peers

        b.  Co-workers

    4.  Go beyond daily crisis management

        a.  Take a long vacation

        b.  Two weeks at minimum

    5.  Balance work and play

        a.  Routine exercise every day

        b.  Friends outside of work

    6.  Seek help for yourself

|  |  |
|---|---|
|     a.  If you feel out of control<br><br>    b.  Prolonged depression<br><br>  7.  Set boundaries for yourself<br><br>    a.  How many hours to work<br><br>    b.  How much alone time<br><br>    c.  How much family time<br><br>  8.  Reward yourself for successes<br><br>    a.  Seeing the glass as half full<br><br>    b.  Create to do lists<br><br>    c.  Scratch off tasks when done<br><br>    d.  Show accomplishments<br><br>**III. PRACTICE**<br><br>  A.  Distribute exercises to students<br><br>  B.  Have students complete<br><br>  C.  Review exercises with students<br><br>  D.  Be available for questions, if necessary<br><br>**IV. TEST/SPOS** |  <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**TO BE TAKEN AT END OF COURSE** |

## AS A RESULT OF IMPROVED COMMUNICATIONS IN CRISIS SITUATIONS:

---

- ◆ VICTIMS WILL PROVIDE MORE ASSISTANCE IN THE INVESTIGATION

- ◆ VICTIMS WILL BE BETTER WITNESSES FOR THE PROSECUTION

- ◆ THE OFFICER WILL BE MORE EFFECTIVE IN GATHERING INFORMATION

- ◆ THE OFFICER WILL BE MORE EFFECTIVE IN TRANSMITTING INFORMATION

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 531 of 630  PAGEID #: 1319

## DEFINITION OF THE TERM "CRISIS":

## A PERIOD OF EMOTIONAL UPSET IN WHICH A PERSON'S USUAL COPING MECHANISM HAS FAILED, PROBLEM SOLVING SKILLS DECREASE AND FEELINGS OF PANIC INCREASE

## SEVERAL INTERRELATED FACTORS MAY PRODUCE CRISIS:

♦ HAZARDOUS, STRESSFUL EVENT

♦ PERCEIVED THREATS TO BASIC NEEDS OR LOSS OF THOSE NEEDS

♦ INABILITY OF THE PERSON TO RESPOND WITH ADEQUATE COPING

## DEFINITION OF THE TERM "INTERVENTION":

## STEPPING IN TO SUPPORT THE HEALTHY, COPING PART OF THE INDIVIDUAL TO RESTORE EQUILIBRIUM

## DEFINITION OF THE TERM "CRISIS INTERVENTION":

---

# STEPPING IN TO HELP RESTORE EQUILIBRIUM DURING A PERIOD OF EMOTIONAL UPSET

## POST TRAUMATIC STRESS DISORDER:

---

♦ COMMONLY KNOWN AS 'P.T.S.D."

♦ P.T.S.D. REPRESENTS THE IMPACT AFTER THE CRISIS

SYMPTOMS OF P.T.S.D.:

♦ FLASHBACKS IN THE FORM OF DREAMS

♦ AVOIDANCE OF THE STIMULI THAT CAUSED THE EVENT

♦ INCREASED PHYSICAL RESPONSE IN THE AFTERMATH (NAUSEA)

OVERHEAD 8

SPO #4

## THERE ARE 5 STEPS IN THE GRIEVING PROCESS:

♦ DENIAL

♦ BARGAINING

♦ ANGER

♦ SADNESS

♦ ACCEPTANCE

# THE CRISIS RESPONSE PATTERN HAS 3 STAGES:

---

♦ DISORGANIZATION

♦ STABILIZATION

♦ REORGANIZATION

## DEFINITION OF VALUE:

# AN ENDURING BELIEF THAT A SPECIFIC MODE OF CONDUCT IS PERSONALLY OR SOCIALLY PREFERABLE OVER AN OPPOSITE MODE OF CONDUCT

## THERE ARE 3 STAGES OF VALUE FORMATION:

♦ IMPRINTING

♦ MODELING

♦ SOCIALIZATION

## APPROXIMATE AGE-SPAN OF EACH STAGE OF VALUE FORMATION:

♦ **IMPRINTING (BIRTH - 7 YEARS)**

♦ **MODELING (AGES 7-14 YEARS)**

♦ **SOCIALIZATION (AGES 14-20 YEARS)**

## VALUES MAY BE CHANGED IN EITHER ONE OF TWO WAYS:

♦ SIGNIFICANT EMOTIONAL EVENTS

♦ PROFOUND DISSATISFACTION

OHIO PEACE OFFICER TRAINING COMMISSION                    TOPIC 4:  CRISIS INTERVENTION
PEACE OFFICER BASIC TRAINING CURRICULUM

# OVERHEAD 14

## SPO #8

### 4 PROBLEMS ASSOCIATED WITH FORMING PERCEPTIONS:

◆ PERSONAL RIGIDITY

◆ EMOTIONAL LOADING

◆ EXPERIENTIAL LIMITATIONS

◆ CULTURAL MYOPIA

EMOTIONAL LOADING:

◆ EMOTIONS CHANGE OUR PERCEPTION OF A PERSON OR GROUP

◆ "POLICE ARE GOOD, UNTIL THEY ARREST ME!"

## THERE ARE 3 PARTS OF A COMMUNICATED MESSAGE:

♦ FACT

♦ INFERENCE

♦ JUDGMENT

THERE ARE 9 MISDEMEANOR CRIMES FOR WHICH VICTIMS CAN SEEK RELIEF UNDER THE VICTIMS' RIGHTS LAW OF OHIO:

♦ DOMESTIC VIOLENCE

♦ ASSAULT

♦ VEHICULAR HOMICIDE

♦ NEGLIGENT HOMICIDE

♦ SEXUAL IMPOSITION

♦ MENACING BY STALKING

♦ MENACING

♦ AGGRAVATED MENACING

♦ INTIMIDATION OF A CRIME VICTIM OR WITNESS

OHIO PEACE OFFICER TRAINING COMMISSION

PEACE OFFICER BASIC TRAINING CURRICULUM

TOPIC 4: CRISIS INTERVENTION

## OVERHEAD 18

### SPO #11

## SIX ITEMS OF INFORMATION LAW ENFORCEMENT PERSONNEL MUST PROVIDE TO THE VICTIM UNDER THE OHIO VICTIMS' RIGHTS LAW:

♦ NAME OF INVESTIGATOR

♦ NAME OF PROSECUTOR

♦ DEFENDANT'S NAME

♦ ELIGIBILITY FOR PRE-TRIAL RELEASE

♦ NOTICE WHEN SUSPECT ARRESTED

♦ NOTICE WHEN SUSPECT RELEASED

Case: 1:14-cv-00637-SSB-KLL Doc #: 77-2 Filed: 02/23/16 Page: 548 of 630  PAGEID #: 1336

## VICARIOUS TRAUMA:

## VICARIOUS TRAUMA MEANS THE PSYCHOLOGICAL CONSEQUENCES TO A CARE GIVER AFTER BEING EXPOSED TO A VICTIM'S TRAUMATIC MATERIAL

## ELEMENTS OF THE CRIME OF RAPE
## 2907.02

(A)(1)   No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

(a)   For the purpose of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception.

(b)   The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

(c)   The other person's ability to resist or consent is substantially impaired because of mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of mental or physical condition or because of advanced age.

(2)   No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

(B)   Whoever violates this section is guilty of rape, a felony of the first degree.

***FOR FULL TREATMENT SEE 2907.02***

# THE ALLIGATOR RIVER STORY
## STUDENT VERSION

Once upon a time there was a woman named Abigail who was in love with a man named Gregory. Gregory lived on the shore of a river. Abigail lived on the opposite shore of the river. The river which separated the two lovers was streaming with the man-eating alligators. Abigail wanted to cross the river to be with Gregory. Unfortunately, the bridge had been washed out. So she went to ask Sinbad, the only river-boat captain in the area, to take her across. He said he would be glad to if she would consent to go to bed with him preceding the voyage.

She promptly refused and went to a good friend named Ivan to explain her plight and to ask for his help in developing an alternate plan. Ivan said he did not want to get involved in the situation. Abigail felt her only alternative was to accept Sinbad's terms. Sinbad fulfilled his promise to Abigail and delivered her into the arms of Gregory.

When Abigail told Gregory about her amorous escapade in order to cross the river, Gregory cast her aside with disdain. Heartsick and rejected, Abigail turned to another friend, Slug, with her tale of woe. Slug, feeling compassion for Abigail, sought out Gregory and beat him brutally. Abigail was overjoyed at the sight of Gregory getting his due.

As the sun sets on the horizon, we hear Abigail laughing at Gregory.

---

Privately, rank the five characters from the most offensive character to the least objectionable. The Character you find most reprehensible will be first on your list, with the fifth being the least objectionable.

1. _____ (most objectionable)

2. _____

3. _____

4. _____

5. _____ (least objectionable)

# INSTRUCTOR'S GUIDE FOR
# "ALLIGATOR RIVER"

The Alligator River Story is a values clarification exercise that stimulates the values awareness of each participant, and gives the instructor an opportunity to gain insight into the participants as individuals, and to help them identify the relation of values to attitude and behaviors.

Provide a copy of the story to each participant, requesting that they read the story, then rank the characters according to the degree of objectionable behavior demonstrated by each.  The character ranked number one will be designated as the most objectionable character; number five, the least objectionable.  Allow everyone time to rank the character, then sub-group by different areas of the room.  Each group will take five or ten minutes to compile a list of the reasons they consider their choice the most reprehensible.  When back in the large group, a spokesperson from each of the five sub-groups can highlight the major points of their discussion.  Allow an additional five minutes for inter-group discussion and debate.

The instructor should remember that it is not the choice of the particular character that would define the value-set of the individual.  Rather it is the rationale used for supporting a choice that is indicative of the individual's philosophy.  How each person interacts in the group provides insight for the instructor, the group, and the individual.  Is the person argumentative or conciliatory, persuasive or easily led, chauvinistic, or able to espouse personal values while maintaining respect for divergent positions.  Important observation of the attitudes held by the students can be made during the sub-group and the inter-group discussions.

In order to clarify or highlight the assumptions and judgments inherent in the choice of each character, the following commentary may be useful:

Abigail - Would you be more sympathetic to Abigail knowing the following:

Many people have different reactions to bad news/grief.  In a grief period, such as the death of a loved one or loss of job, people exhibit a variety of emotions:  some cry, others appear outwardly calm, others may even laugh due to the inability to cope with the news on any other level of emotion, publicly and/or privately.  All of these reactions are NORMAL.  Some are more typical than others, but all fall in the "normal" range.

If you respond negatively to Abigail originally, due to her laughing when Slug was brutally beating Gregory, does the above make you feel any differently?

# HANDOUT 2

Next, many people felt that Abigail was bad because she did not "save herself" for Gregory, but slept with Sinbad to cross the river. Would you still feel as strongly if the situation were reversed and it was Gregory who had to give "sexual favor" to a female boat captain? Would Gregory's moral choice be just as "wrong" or would it be more acceptable? Why or why not? Discuss the "double standard" idea.

<u>Gregory</u> - As a "true love", Gregory did not support Abigail for "better or worse". Why didn't Gregory try to get across the river instead of leaving that effort to Abigail? Then he shuns his love when she makes that dire sacrifice.

On the other hand, Gregory's reaction of "shunning" his girlfriend (Abigail) after learning of her action may, in fact, be a "normal" reaction to grief. (See note on Abigail). This type of reaction is one that, unfortunately, often appears after a woman has been raped. Occasionally, a woman's husband/boyfriend is unable to cope with the fact that his loved one has been assaulted. Rape is not a sex crime, but a crime of a violence. Many people confuse rape with lovemaking. They think it is the woman's fault. It is not. Still, at times, relatives and friends have been critical of a victim, made her feel cheap, guilty, etc., about something she had no control over.

Instead of supporting her when she needs them they turn her away - like Gregory. "Alligator River Story" is a bit different; a rape, by legal definition, did not occur.

<u>Ivan</u> - Ivan is considered to be objectionable by many people due to his "apparent" apathy. Ivan did not lend an ear to Abigail - a friend of his. He did not get <u>involved</u>. We do like to stress the importance of involvement in our society. It is usually a good trait.

However, Ivan did have a decision to make. As long as he did not directly and intentionally hurt another individual, he had a right to his decision. He <u>chose</u> not to become involved. That was okay. Involvement would have been any, had this been his choice, if he followed the above criteria. He could have listened, perhaps, but maybe there was some reason why he could not/would not do so (i.e., a previous appointment, he could love Abigail himself and not want to prejudice her choice, he could be depressed, he could feel helpless, etc.) <u>Responsible</u> involvement is positive and often worthwhile. Each person must choose the extent of his involvement. You can only be responsible for your own behavior. Do not blame another for your emotion and do not feel guilty about the actions of another.

<u>Slug</u> - Briefly, Slug's discussion is one in which the group can explore whether the end justifies the means. Slug may have had the good intention of trying to make Abigail feel better. Even if he did have her interest at heart, does that justify his brutal beating of Gregory? Had Gregory assaulted Slug, it would have been legal for Slug to defend himself. Slug's actions were violent, illegal, and did not help anyone. What alternatives did Slug have? What could he have done to help the situation?

<u>Sinbad</u> - What can we say about Sinbad? Legally, he did not <u>force</u> her into anything; therefore he was not guilty of rape under the law. Morally, there was a charge of coercion. What Sinbad did was technically legal. Abigail did have a choice, whether or not to take the boat, to see Gregory or not to see him, to sleep with Sinbad or not to do so. Morally, it would be perceived as a crime of opportunity in which Sinbad extorted sexual favors in return for his services.

# HANDOUT 2

Was Sinbad a "good businessman" who understandably took advantage of the opportunity at hand, or was he a scoundrel and a lecherous man?

During the entire discussion, the participants should be led to recognize that empathy and understanding do not have to be products of their personal dichotomy of right and wrong. One can decide that one would not accept a sexual proposition in order to get something needed and still empathize with the difficulties of Abigail's dilemma. One can disagree with Slug's use of violence and still understand the emotions beyond his actions. The ability to make a decision based on facts rather than prejudicial bias and the ability to empathize without condemning or condoning are important traits as they relate to the aspects of interviewing a rape victim.

The concept of a non-judgmental approach does not mean that individuals do not have values and opinions. Indeed, "Alligator River" highlighted the group's differences admirably. What is required is an acknowledgment of a personal outlook and the recognition that the officer will not allow it to interfere with the quality service offered to victims. The officers must not only deal with the effects of their own value systems, but they will also have to withstand the subtle pressures to offer their "off the record" judgment which is often requested by family, medical and legal professionals, as well as the public-at-large, before the investigation has been completed or when it has been discontinued.

OHIO PEACE OFFICER TRAINING COMMISSION | TOPIC 4:  CRISIS INTERVENTION

PEACE OFFICER BASIC TRAINING CURRICULUM

# STUDENT WORKSHEET

1. Define the term "Crisis."

2. Define the term "Intervention."

3. Define the term "Crisis Intervention."

4. State the 5 steps of the grieving process.

5. State the 3 stages in the crisis response pattern.

6. State the 3 stages of value formation.

7. State the approximate age-span of each stage of value formation.

8. State the 4 problems associated with forming perceptions.

9. State the 3 parts of the communicated message.

10. List the 9 misdemeanor crimes for which victims can seek relief under the Victims' Rights Law of Ohio.

11. State the 6 items of information law enforcement personnel must provide to the victim under the Ohio Victims' Rights Law.

OHIO PEACE OFFICER TRAINING COMMISSION                    TOPIC 4:  CRISIS INTERVENTION
PEACE OFFICER BASIC TRAINING CURRICULUM
# PRACTICE EXERCISE

1. Define the term "Crisis."

2. Define the term "Intervention."

3. Define the term "Crisis Intervention."

4. State the 5 steps of the grieving process.

5. State the 3 stages in the crisis response pattern.

6. State the 3 stages of value formation.

7. State the approximate age-span of each stage of value formation.

8. State the 4 problems associated with forming perceptions.

9. State the 3 parts of the communicated message.

10. List the 9 misdemeanor crimes for which victims can seek relief under the Victims' Rights Law of Ohio.

11. State the 6 items of information law enforcement personnel must provide to the victim under the Ohio Victims' Rights Law.

# OHIO PEACE OFFICER TRAINING COMMISSION
## STUDENT SIGN-IN SHEET

SCHOOL NAME: Butler Tech Peace Officer Training Academy   SCHOOL NUMBER: BAS-10-024   DATE: 02-18-10

| TITLE & TOPIC #: | Interacting with the Special Needs Population 3.2 | TIME: FROM: 0800 TO: 1200 HOURS: 4 |
| TITLE & TOPIC #: | Interacting with the Special Needs Population 3.2 | TIME: FROM: 1300 TO: 1700 HOURS: 4 |
| TITLE & TOPIC #: | | TIME: FROM: TO: HOURS |
| TITLE & TOPIC #: | | TIME: FROM: TO: HOURS: |
| TITLE & TOPIC #: | | TIME: FROM: TO: HOURS: |

TOTAL HOURS FOR THE DAY: 8

| | NAME (Typed Alphabetically) | SIGNATURE | TIME IN | TIME OUT | TIME IN | TIME OUT | HOUR ABSENT | HOURS PRESENT |
|---|---|---|---|---|---|---|---|---|
| 1. | Audretch, Casey A. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 2. | Bess, Timothy D. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 3. | Carter, William C. | William C. Carter | 0800 | 1200 | 1300 | 1700 | | 8 |
| 4. | Compton, Krista M. | Krista M Compton | 0800 | 1200 | 1300 | 1700 | | 8 |
| 5. | Crouch, Cory D. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 6. | Duffy, Andrew J. | Andrew Duffy | 0800 | 1200 | 1300 | 1700 | | 8 |
| 7. | Duke, Thomas J. | Thomas J. Duke | 0800 | 1200 | 1300 | 1700 | | 8 |
| 8. | Fultz, Dakota W. | Dakota Fultz | 0800 | 1200 | 1300 | 1700 | | 8 |
| 9. | Haller, Jeffrey M. | Jeff M Haller | 0800 | 1200 | 1300 | 1700 | | 8 |
| 10. | Huddleston, Joseph T. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 11. | Hutten, Daniel B., Jr. | Daniel Hutten Jr | 0800 | 1200 | 1300 | 1700 | | 8 |
| 12. | Johnson, Mollie M. | Mollie Johnson | 0800 | 1200 | 1300 | 1700 | | 8 |
| 13. | Jordan, Donald H., Jr. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 14. | Karle, Christopher M. | CK TO | 0800 | 1200 | 1300 | 1700 | | 8 |

COMMENTS: _____

_____

_____

BTC-0277

COMMANDER SIGNATURE

Please enter your CURRENT OPOTC Certificate Number after your signature.

Thomas J. _____ BAS-

INSTRUCTOR SIGNATURE                    INSTRUCTOR SIGNATURE

INSTRUCTOR SIGNATURE                    INSTRUCTOR SIGNATURE

SF121unv



Δ π EXHIBIT E
Deponent Huddlesta
Date 6.4.15 Rptr WH
WWW.DEPOBOOK.COM

# OHIO PEACE OFFICER TRAINING COMMISSION
## STUDENT SIGN-IN SHEET

SCHOOL NAME: Butler Tech Peace Officer Training Academy   SCHOOL NUMBER: BAS-10-024   DATE: 02-19-10

| TITLE & TOPIC #: | | TIME: FROM: | TO: | HOURS: |
|---|---|---|---|---|
| Interacting with the Special Needs Population 3.2 | | 0800 | 1200 | 4 |
| Interacting with the Special Needs Population 3.2 | | 1300 | 1700 | 4 |
| | | | | |
| | | | | |
| | | | | |

TOTAL HOURS FOR THE DAY: 8

| | NAME (Typed Alphabetically) | SIGNATURE | TIME IN | TIME OUT | TIME IN | TIME OUT | HOUR ABSENT | HOURS PRESENT |
|---|---|---|---|---|---|---|---|---|
| 1. | Audretch, Casey A. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 2. | Bess, Timothy D. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 3. | Carter, William C. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 4. | Compton, Krista M. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 5. | Crouch, Cory D. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 6. | Duffy, Andrew J. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 7. | Duke, Thomas J. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 8. | Fultz, Dakota W. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 9. | Haller, Jeffrey M. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 10. | Huddleston, Joseph T. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 11. | Hutten, Daniel B., Jr. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 12. | Johnson, Mollie M. | | 0800 | 1200 | 1200 | 1700 | | 8 |
| 13. | Jordan, Donald H., Jr. | | 0800 | 1200 | 1300 | 1700 | | 8 |
| 14. | Karle, Christopher M. | | 0700 | 1200 | 1300 | 1700 | | 8 |

COMMENTS: _____

COMMANDER SIGNATURE   BTC-0277

INSTRUCTOR SIGNATURE

Please enter your CURRENT OPOTC Certificate Number after your signature.

INSTRUCTOR SIGNATURE

INSTRUCTOR SIGNATURE

INSTRUCTOR SIGNATURE

SF121unv

Δ π EXHIBIT
Deponent Huddleston
Date 6-4-15 Rptr WH
WWW.DEPOBOOK.COM

## OHIO PEACE OFFICER TRAINING COMMISSION
## STUDENT SIGN-IN SHEET

SCHOOL NAME: Butler Tech Peace Officer Training Academy  SCHOOL NUMBER: BAS-10-024  DATE: 02-22-10

| TITLE & TOPIC #: | | TIME: FROM: | TO: | HOURS: |
|---|---|---|---|---|
| Crisis Intervention 3.4 | | 0800 | 1200 | 4 |
| Crisis Intervention 3.4 | | 1300 | 1500 | 2 |
| Victim's Rights 3.8 | | 1500 | 1700 | 2 |
| | | | | |
| | | | | |

TOTAL HOURS FOR THE DAY: 8

| | NAME (Typed Alphabetically) | SIGNATURE | TIME IN | TIME OUT | TIME IN | TIME OUT | HOUR ABSENT | HOURS PRESENT |
|---|---|---|---|---|---|---|---|---|
| 1. | Audretch, Casey A. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 2. | Bess, Timothy D. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 3. | Carter, William C. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 4. | Compton, Krista M. | *signature* | 0900 | 1200 | 1300 | 1700 | 1 | 7 |
| 5. | Crouch, Cory D. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 6. | Duffy, Andrew J. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 7. | Duke, Thomas J. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 8. | Fultz, Dakota W. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 9. | Haller, Jeffrey M. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 10. | Huddleston, Joseph T. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 11. | Hutten, Daniel B., Jr. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 12. | Johnson, Mollie M. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 13. | Jordan, Donald H., Jr. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |
| 14. | Karle, Christopher M. | *signature* | 0800 | 1200 | 1300 | 1700 | | 8 |

COMMENTS: _____

*signature* BTC-0277
COMMANDER SIGNATURE

*signature* BAS-20632
INSTRUCTOR SIGNATURE

INSTRUCTOR SIGNATURE

Please enter your CURRENT OPOTC Certificate Number after your signature.

*signature* BAS-20912
INSTRUCTOR SIGNATURE

INSTRUCTOR SIGNATURE

SF121unv

Δ π EXHIBIT 6
Deponent Huddleston
Date 6.4.15    Rptr WH
WWW.DEPOBOOK.COM





**TASER® X26 CERTIFICATION**

Joseph Huddleston

*This Certifies that*

Joseph Huddleston

Certified User

is trained in the proper and safe use of the TASER® X26 Conducted Energy Weapon and has passed the requirements of the **Hamilton County Sheriff's Office** TASER X26 law enforcement and corrections training program under the supervision of a Certified Instructor.

Certification will expire one year from date of signature.

*In Witness Whereof, Certified Instructor*

**Carl Edwards**

*has certified the successful completion of the training requirements this day:*

**12/16/2010**

Certified Instructor:

Certified Instructor ID:

0103051148014128713346C

© 2004 TASER International, Inc. TASER®, Shaped Pulse™ and the Globe & Lightning Bolt Logo are trademarks of TASER International, Inc.

Δ π EXHIBIT 1-1
Deponent Huddleston
Date 4-15 Rptr. MH
www.zoprosoft.com



Δπ EXHIBIT __I__
Deponent Huddleston
Date 4-15 Rptr. AWH
WWW.DEPOBOOK.COM



# TASER TRAINING ACADEMY

## TASER Electronic Control Device

### USER CERTIFICATE

**Joseph Huddleston**

*This certifies that the above named individual has completed the training required and has passed a written examination in the use of the TASER X2 Electronic Control Device. By accepting this User Certificate, the Student accepts the terms of the Training Materials License Agreement, incorporated herein by reference, and agrees to be bound by its terms as a Licensee of TASER International, Inc. This certification is good for one year.*

*Instructor:* <u>SGT Augusto Orue</u>  *Date:* <u>November 13, 2012</u>



# TASER
Protect Life

## Hamilton County Sheriff's Office

## 2012 Taser X26 Update Training

Version 18 Released July 2011



Δ π EXHIBIT ___J___
Deponent Huddleston
Date 6-4-15  Rpt WH
WWW.DEPOBOOK.COM

# Cardiac

- Risk of an ECD application having a negative effect on a person's heart rate and/or rhythm is not zero

- The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications

The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is not zero, but is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications.

Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191

This paper describes the first methodology and results for estimating the order of probability for a TASER ECD directly causing human ventricular fibrillation (VF). The probability of an X26 Taser causing human VF was estimated using: (1) current density near the human heart estimated by using 3D finite-element (FE) models; (2) prior data of the maximum dart-to-heart distances that caused VF in pigs; (3) minimum skin-to-heart distances measured in erect humans by echocardiography; and (4) dart landing distribution estimated from police reports. The estimated mean probability of human VF was 0.000006 for data from a pig with no resection when inserting a blunt probe.

One risk of applying electricity to a human is the direct induction of ventricular fibrillation (VF). In addition to electrically induced direct VF induction, other risks include, but are no limited to: cardiac capture/pacing for sufficiently long duration to deteriorate to VF and through sufficiently significant physiological or metabolic effects to negatively impact the heart.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

This document, and the entirety of its contents, is for discussion and demonstration purposes only. All numbers, references, and values in this document are nominal. Actual measurements on particular products, references, and/or analogies may vary as a result of many factors including, but not limited to, factors outside TASER International, Inc.'s (TASER's) control. Please refer to TASER published product specifications, manuals and product literature for additional information including specified limits, test conditions, and allowed tolerances. For more information please see current TASER Web site (www.taser.com). TASER reserves the right to change or modify this document without notice. TASER is a registered trademark of TASER International, Inc.

2 Stedman's Medical Dictionary, 26th Edition.
3 Ho JD, Dawes DM, Reardon RF, et al. Echocardiographic Evaluation of a TASER-X26 Application in the Ideal Human Cardiac Axis. Acad Emerg Med. Aug 10, 2008. Heart Rhythm 2008, 29th Annual Scientific Sessions, May 14-17, 2008, San Francisco, CA USA. Jeffrey D. Ho, MD, Donald M. Dawes, MD, Robert F. Reardon, MD, Anne L. Lapine, MD, Jeremy D. Olsen, MD, Benjamin J. Dolan, BA and James R. Miner, MD. Hennepin County Medical Center, Minneapolis, MN, Lompoc District Hospital, Lompoc, CA.
4 Sloane CM, Chan TC, Dunford JV, Neuman T, Vilke GM. Serum troponin I measurement of subjects exposed to the TASER X-26. J Emerg Med. 2008 Jul;35(1):29-32. Epub 2008 Mar 4.
5 Ho, JD, Dawes, DM, et al. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults. Acad Emerg Med, 2007 (Supplement 1); 14: S128-S129.
6 Vilke G., Sloane, C., et al. Does the TASER Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects? Acad Emerg Med, 2007 (Supplement 1); 14:S104.
7 Levine, S., Sloane, C., Chan, T., et al. Cardiac of human subjects exposed to the TASER. J Emerg Med, 2007.
8 Ho, J., Dawes, D., et al. Ultrasound measurement of cardiac activity during conducted electrical weapon application in exercising adults. Ann Emerg Med, 2007; 50 (3): S108.
9 Ho JD, Miner JR, Lakkireddy DR, et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med, 2006;13:589-595.
10 Barnes Jr., D., Winslow, J., et al. Cardiac Effects of the TASER X26 Conducted Energy Weapon. Ann Emerg Med, 2006; 48 (Supplement):102monitoring

# Cardiac

- Experts have identified  heart to dart distance as being a key determining factor in whether an ECD can affect the heart.
- The further an ECD dart is away from the heart, the lower the risk of affecting the heart.

Experts have identified  heart to dart distance as being a key determining factor in whether an ECD can affect the heart.  The VF probability for a given dart location decreased with the dart-to-heart horizontal distance (radius) on the skin surface. The further an ECD dart is away from the heart, the lower the risk of affecting the heart.

*Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191*

# Physiologic or Metabolic Effects

- The ECD can produce physiologic or metabolic effects (see notes)
- Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects



See Trademark Notice file on DVD. © 2011 TASER International Inc.

The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium), heart rate and rhythm; lactic acid; myoglobin; pH; respiration; stress hormones or other biochemical neuromodulators (e.g., catecholamines). Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects

This section is not a complete outline of ECD related medical research and information.

Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

# Physiologic or Metabolic Effects

Studies show ECD effects are comparable or less than from:
- Struggling
- Resisting
- Fighting
- Fleeing
- Some other force tools or techniques



In human studies of electrical discharge from a single ECD of up to 15 seconds, these effects on acidosis, CK, electrolytes, stress hormones, and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Adverse physiologic or metabolic effects may increase risk of death or serious injury.

This section is not a complete outline of ECD related medical research and information.

Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

# Higher Risk Populations

- ECD use has not been scientifically tested on:
  - Pregnant women
  - The infirm
  - The elderly
  - Small children
  - Low body-mass index (BMI) persons
- ECD use on these individuals could increase the risk of death or serious injury.

ECD use has not been scientifically tested on:

> Pregnant women
>
> The infirm
>
> The elderly
>
> Small children
>
> low body-mass index (BMI) persons

ECD use on these individuals could increase the risk of death or serious injury

Although ECDs have been used in the field on members of each of these high risk populations, often without injury, it is unknown if these individuals are at a higher risk of injury or death due to a lack of scientific research.

Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

Version 18 07/11

6

# Physiologically or Metabolically Compromised Persons

- Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD")
- The subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors
- Any physiologic or metabolic change may cause or contribute to death or serious injury
- Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

---

Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD"). The factors that may increase susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal, sensitization to arrhythmias, etc), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD Use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

This section is not a complete outline of ECD related medical research and information. Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

Version 18 07/11

7



# Risk Benefit Standard

4th Amendment Risk/Benefit Standard:

"[I]n judging whether [officer's] actions were reasonable, we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the threat to the public that [officer] was trying to eliminate."

(*Scott v. Harris*, 550 U.S. 372, 383 (2007))



In Scott v Harris the court stated:

- In determining reasonableness of the manner in which a seizure is effected, we must balance the nature and quality of the intrusion on the individual's 4th Amendment interests against the importance of the governmental interests alleged to justify the intrusion.*

- "we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the threat to the public that [officer] was trying to eliminate." Id.

- *************************************************************************

- *Scott v. Harris*, 550 U.S. 372, 383 (2007).

9

# "Quantum of Force"

"Quantum of force" means:
 - the reasonably foreseeable (to the officer) effects and injuries of a chosen force option under the totality of the circumstances of the force option use

Quantum of force" means:
 - the reasonably foreseeable effects and injuries of a chosen force option under the totality of the circumstances of the force option use

## "Quantum of Force"

To use ECD in probe mode:

Officer must reasonably perceive subject to be:

- An immediate threat of harm/injury or
- Fleeing or flight risk from serious offense
- Officer consider necessity of warning

Be aware of foreseeable risks of secondary injury, especially falls from heights or on hard surfaces

---

To use ECD in probe mode:
Officer must reasonably perceive subject to be:
•An immediate threat of harm/injury or
•Fleeing or flight risk from serious offense
•Officer consider necessity of warning
Be aware of foreseeable risks of secondary injury, especially falls from heights or on hard surfaces

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

*Bryan v. MacPherson*, 630 F.3d 805 (C.A.9 (Cal.), November 30, 2010).

# Id., quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (C.A.10 (Utah) 2010).) (Graham factors clearly cautioned against a significant use of force, such as the deployment of a[n ECD]);

See also, numerous court decisions have found that use of ECD in probe mode is at least an intermediate, if nonlethal, level of force. See, e.g.,

-*Cockrell v. City of Cincinnati*, Slip Copy, 2010 WL 4918725 (S.D.Ohio, November 24, 2010)

-*Oliver v. Fiorino*, 586 F.3d 898, 903 (C.A.11 2009) (ECD "designed to cause significant, uncontrollable muscle contractions");

-*Orem v. Rephann*, 523 F.3d 442, 447-48 (C.A.4 2008) (rejecting that ECD constitutes minor or *de minimus* level of force);

-*Hickey v. Reeder*, 12 F.3d 754, 757 (C.A.8 1993) (stun gun inflicts painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless);

-*Crowell v. Kirkpatrick*, 667 F.Supp.2d 391, 408 (D.Vt. 2009) (ECDs have "been described by other courts as 'moderate, non-lethal force" and cause "acute-even severe-physical pain");

-*Orsak v. Metro. Airports Comm'n*, 675 F.Supp.2d 944, 957-59 (D.Minn. 2009);

-*Cyrus v. Town of Mukwonago*, 2009 WL 1110413, at *21 (E.D. Wis. April 24, 2009) ("use of a[n ECD] as an intermediate or medium, though not insignificant, quantum of force...."); See also *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (C.A.7 (Wis.) 2010);

-*Kaady v. City of Sandy*, 2008 WL 5111101, at *16 (D.Or. Nov. 26, 2008) (use of a[n ECD] constitutes an intermediate level of force and a significant intrusion on a victim's 4th Amendment rights.);

-*McDonald v. Pon*, 2007 WL 4420936, at *2 (W.D.Wash. Dec. 14, 2007) ("[ECD] use is considered an intermediate control tactic.");

-*Beaver v. City of Federal Woy*, 507 F.Supp.2d 1137, 1144 (W.D.Wash.2007) ("use of a[n ECD] constituted significant force.") (see *Beaver v. City of Federal Way*, 301 Fed.Appx. 704 (C.A.9 (Wash), November 25, 2008);

-*Parker v. City of South Portland*, 2007 WL 1468658, at *22 (D.Me. 2007) ("In the circumstances, the [ECD] fairly can be characterized-as it has been by one court-as a significantly violent level of force."), see also *Parker v. Gerrish*, 547 F.3d 1 (C.A.1 (Me.) 2008);

-*DeSalvo v. City of Collinsville*, 2005 WL 2487829, at *4 (S.D.Ill. 2005);

-*Brown v. City of Golden Valley*, 574 F.3d 491 (C.A.8 (Minn.) 2009).

-*Casey v. City of Federal Heights*, 509 F.3d 1278 (C.A.10 (Colo.) 2007);

-*Mann v. TASER International, Inc.*, 588 F.3d 1291 (C.A.11 (Ga.) 2009).

11

# Additional Force Factors

- Court may consider "the availability of [less injurious] alternative methods of capturing or subduing a suspect." (*Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005))

- Court may consider what officers knew about the suspect's health, mental condition, or other relevant frailties.* (*Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994))

- Officer should give a warning before force when appropriate.

Other factors the court may consider in determining the reasonableness of force include:

•The availability of [less injurious] alternative methods of capturing or subduing a suspect

•What officers knew about the suspect's health, mental condition, or other relevant frailties

•And whether the officers warned the suspect that a certain type of force was about to be used

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Also, see: *Bryan v. McPherson*, 590 F.3d 767 (C.A.9 2009) - seat belt violation, failed to comply, clenched fists, profanities, acting out.

\*See Force consideration in the Training manual or DVD

Version 18  07/11

12

# Considerations to Avoid ECD Excessive Force Liability

- Justify and document every use or application of force, including:
  - each ECD trigger pull or 5 second discharge
  - fully document subject's threats, behaviors, and actions

- Avoid using ECD on elevated risk population member, unless necessary and legally justifiable

---

Considerations to Avoid ECD Excessive Force Liability:

• Justify and document every use or application of force, including:

    • each ECD trigger pull or 5 second discharge

    • fully document subject's threats or behaviors

• Avoid using an ECD on elevated risk population member, unless necessary and justifiable

**************************************************************************

Numerous use-of-force related litigations, criminal prosecutions and disciplinary actions of officers, and community/media criticism related to allegations of misuse regarding ECD deployment/use emanate from allegations including:

1. ECD deployment(s) where it is alleged that the ECD should not have been deployed/used – allegation that ECD use was not justified.
2. ECD deployment(s) on a person in a suspect (special) population.
3. Multiple ECD deployments in drive (touch) stun mode – where the ECD can only foreseeably be utilized for discomfort compliance.
4. Repeated, prolonged, or continuous ECD deployments where it is alleged that the officer(s) had opportunity(ies) to control and failed to do so.

Thus, it is important for officers to fully understand and appreciate:

1. Whether they can legally deploy an ECD?
2. How many ECD deployments are legally acceptable?
3. Whether the officers have taken reasonable and appropriate steps/actions to

appropriately minimize the number of ECD exposures/discharges.

# Considerations to Avoid ECD Excessive Force Liability

- Know your objectives for using force
- Do not use pain compliance if circumstances dictate that pain is ineffective
- Increase the likelihood of NMI & minimize skin damage by using probes

See Trademark Notice Me on DVD. © 2011 TASER International Inc.

To help avoid ECD excessive force liability:

- Know what it is you want to achieve through this use of force and include it in your report
- Do not attempt pain compliance tools or tactics if pain is not effective
- Increase the likelihood of NMI & minimize skin damage by using probes as opposed to drive stun

# Considerations to Avoid ECD Excessive Force Liability

Avoid multiple, repeated, prolonged, or continuous ECD exposures unless necessary to counter reasonably perceived threat(s) and is legally justifiable—<u>document your justification</u>



Considerations to Avoid ECD Excessive Force Liability:

• Justify and document every use or application of force, including:

    • each ECD trigger pull or 5 second discharge

    • fully document subject's threats or behaviors

• Avoid using an ECD on elevated risk population member, unless necessary and justifiable

• Avoid multiple, repeated, prolonged, or continuous ECD exposures unless necessary to counter reasonably perceived threat(s) and justifiable—document your justification

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Numerous use-of-force related litigations, criminal prosecutions and disciplinary actions of officers, and community/media criticism related to allegations of misuse regarding ECD deployment/use emanate from allegations including:

1. ECD deployment(s) where it is alleged that the ECD should not have been deployed/used – allegation that ECD use was not justified.
2. ECD deployment(s) on a person in a suspect (special) population.
3. Multiple ECD deployments in drive (touch) stun mode – where the ECD can only foreseeably be utilized for discomfort compliance.
4. Repeated, prolonged, or continuous ECD deployments where it is alleged that the officer(s) had opportunity(ies) to control and failed to do so.

Thus, it is important for officers to fully understand and appreciate:

1. Whether they can legally deploy an ECD?
2. How many ECD deployments are legally acceptable?
3. Whether the officers have taken reasonable and appropriate steps/actions to appropriately minimize the number of ECD exposures/discharges.

Version 18  07/11

15



Electronic Control Devices, or ECDs, are designed to use propelled wires or direct contact to conduct energy to affect the sensory and/or motor functions of the nervous system. The TASER X26 is a software upgradable, ECD manufactured by TASER International, Inc. (TASER).

Version 18 07/11

# Trigger Operation

- Single trigger pull and release discharges an electrical charge for a 5-second cycle
- Shift the Safety Switch down (SAFE) to stop a discharge (e.g., if accidentally discharged)
- Holding the trigger continuously beyond the 5-second cycle will continue the electrical discharge until the trigger is released. (The discharge will cease once the trigger is released after the initial 5-second cycle.)

Pulling the trigger initiates a 5-second discharge cycle. The cycle may be extended beyond 5 seconds by keeping the trigger depressed. To stop a discharge cycle, for example an accidental discharge, shift the Safety Switch down to the SAFE position. Holding the trigger continuously beyond the 5-second cycle will continue the electrical discharge until the trigger is released. In this instance, the discharge will cease once the trigger is released.

Version 18 07/11

17

# DPM Replacement / Upgrading

- Replace DPM when % remaining is < 20%
- Use for training until 1% remaining
- Dispose at 1%
  - Caution: Continued use at 1% or lower could cause damage to the X26 ECD



Use the DPM/XDPM from 99%-20% in the field. When it reaches 20% remove the DPM/XDPM and use in Training. When it gets to 1% dispose of according to local disposal laws.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Instructor Notes:** When the DPM gets below 1%, the Lithium Energy Cells are going dead. At this point, the power level will drop below the minimum level at which the microprocessor will run. This is called a brownout. It is similar to unplugging your desk-top computer from the wall without shutting it down properly.

# Spark Test

- A daily spark test should be conducted once every 24 hours or prior to the start of your shift for individually issued X26 ECDs.
- One spark (1/19th of a second) is adequate. However, this is not a practical duration. As long as the officer sees a visible spark between the electrodes, it is not necessary to extend the duration. In most cases, less than one second.
- The reason for the spark test is:
  - To check that the ECD is sparking.
  - To check the battery's performance.
  - There are components in the high voltage section of some older X26 ECDs that are more reliable when energized ("conditioned") on a regular basis.

TASER recommends a spark test of the X26 ECD once every 24 hrs or before you the start of your shift. This is to ensure that the ECD is functioning properly, to make sure the batteries are performing adequately and also there are components in the high voltage section that are more reliable when energized or ("Conditioned") on a regular basis. When performing a spark test make sure you look and listen for the arc, meaning you see the arcing and you hear the pulse rate. You will know how the 19 pulses per second spark rate should sound after you fire the ECD a few times. You will know if the pulse rate drops below the 19 pulses per second. Technically one spark or 1/19th of a second should be adequate to ensure the ECD is functioning but this is not practical. A 1-2 second spark test is adequate.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Our primary concern is officer safety. While it is not possible to guaranty that any ECD will function properly, we continually strive for the highest level of quality and reliability. However, nothing can replace an operational check of the ECD for functionality and possibility of an ECD failure during field deployment. We are also sensitive to the cost associated with the use of the DPM (Digital Power Magazine) and have tried to minimize the test requirements without compromising officer safety.

The only way to determine the proper functioning of all components is to conduct a daily spark test. There is no display or other method to verify proper ECD operation other than seeing the actual spark between the electrodes.

The X26 ECD is a highly sophisticated electronic device. We build the ECDs to be robust. However, there are many times that they are subject to extreme conditions in the field including dropping, exposure to significant moisture, etc. Any of these factors could damage an internal component without any external indication. Conducting a daily spark test helps to check the proper operation of components.

While the CID readout of battery life is accurate, there is a possibility that the battery could be discharged outside the ECD (e.g., if the DPM is improperly stored the metal contacts may be shorted out) and this would not affect the displayed percentage, even though the DPM is unintentionally depleted. The daily spark test is to assist in adequately confirming DPM strength.

TASER requires a spark test prior to each shift or a minimum of once per work day. It is not necessary to spark test the ECD on days off, as long as a spark test is conducted prior to the start of the next shift

There are several possibilities that can result from the failure of an internal component of the ECD, including but not limited to: (1) complete failure of the ECD including no spark and no LASER or LED; (2) the LASER and/or LED function properly, but the ECD fails to spark; (3) when the trigger is pulled, the countdown on the CID is normal, but the ECD delays a second or more before beginning to spark; or (4) partial power or low pulse rate.

The life expectancy of the DPM is based primarily on the number of pulses. If the spark test is conducted for one second or less per day, the DPM would not have to be replaced for approximately 3 years; however, upgrade the software as available.

If the ECD does not pass the spark test, contact TASER for return authorization. The customer support number is 800.978.2737. Also, we have a troubleshooting guide on our website at www.taser.com. Click on the technical support icon for a link to the troubleshooting guide. This may help correct some problems without the need to return the ECD to the factory.

Departments should review ECD data downloads to review officers turning off their ECD after one second during the spark test and transferring this practice to the field. Some departments have officers do their spark test while holding the ECD in their non-dominant hand facing downward but still maintaining a visual on the spark. This method helps minimize bad muscle memory. Others require the supervisor to conduct all spark tests.

Version 18 07/11

19



# TASER Cartridge

# Cartridge Inspection

- Blast doors attached
- No cracks
- Locking tabs are not compressed
- Expiration date

Operators should inspect their cartridges. Make sure the blast doors are in place, there are no cracks, the locking tabs are not compressed and check to make sure the cartridge is not expired.

The expiration date of the cartridge can be found on the back next to the serial number.

Version 18 07/11



The 15, 21, LS and XP 25 ft TASER Cartridges utilize an 8-degree angle between the probes to achieve its probe spread. The top probe is propelled horizontal relative to the ECD when inserted into an M26/X26 ECD. The bottom probe is propelled downward at an 8-degree angle. With these particular TASER Cartridges, there is no affirmative top or bottom. Each probe is positioned inside the cartridge at 4-degrees off the centerline. The firing bays of the M26/X26 ECDs are set at a 4-degree down angle. When the TASER Cartridge is loaded, the top probe becomes horizontal relative to the ECD and the 8-degree angle is achieved.

Version 18 07/11



For the 15, 21, LS and XP 25 foot TASER Cartridges, the rule of thumb to estimate probe spread is that for every 7 feet the probes travel from the TASER ECD to the target, there will be approximately 1 foot of distance between the probes upon impact.  Remember the LASER of the M26/X26 ECD's indicates the relative point of aim of the top probe.
*************************************************************************
*******************
Review 8-degree downward spread of bottom probe.
When fired, the top probe impacts at point of aim.  The LASER indicates the point of impact within 3 inches at a distance of 13 feet.  The bottom dart travels at an 8-degree angle downward. The spread between probes increases the further you get from your target with the probes separating one foot (.3m) for every 7 feet (2.1m) they travel.
The wire is thin insulated wire (copper-clad steel) and can break easily.  (Show how thin the wire is).



When preparing to load the TASER cartridges into the X26 ECD, carefully hold the TASER Cartridge on both sides of the cartridge while keeping your fingers and all parts of your body away from the front of the TASER cartridge at all times.

# Loading TASER Cartridges

- Ensure the Safety Switch is in the down (SAFE) position
- Point the X26 ECD in a safe direction
- Insert the TASER cartridge into the deployment bay until it is seated



Ensure the safety is in the down (SAFE) position and point the ECD in a safe direction. Carefully insert the TASER cartridge into the deployment bay of the X26 ECD until it is seated. You may hear an audible click when this occurs. Gently tug the cartridge to ensure its seated.

# Cartridge Safety

- Deployed by electrical discharge
- Can be discharged by static electricity (TASER Cartridge only)
- Keep hands away from the front of cartridges
- Do not inadvertently point cartridges at yourself or at anyone else



TASER Cartridges are deployed by electrical discharge. Unexpected deployments can be caused by static electricity so its imperative that you keep hands away from the front of the cartridge and do not inadvertently point cartridges at yourself or anyone else. Always keep your hands away from the front of the cartridge. The following pictures are some examples of keeping your hand in front of cartridges during inadvertent or accidental discharges.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Warning: Use caution not to arc the ECD closer than 2 inches from a live (unfired) cartridge. If this is done, the cartridge could discharge. Since the cartridge is not attached to the ECD there would be no electricity flowing to the probes but the probes could strike an unintended person or object.

This is a primary concern when the cartridge is removed to apply a drive stun and the cartridge is held in the hand near the location of the drive stun. See the section on drive stun for further information.

Although highly unlikely, it is possible for TASER cartridges to deploy outside of the TASER ECD, or in an ECD that has not been activated. Care should be taken to keep electrostatic discharge away from TASER cartridges, and to not point the cartridge at anybody you do not intend to deploy it on.

TASER cartridges should be kept away from conditions known to create an electrostatic discharge, such as rubbing cloth (i.e. jacket liner or pocket) across a cartridge in an environment known to create static shocks.

Attempting to deploy a cartridge with no blast doors may deliver a small charge to the wires and probes. If the cartridge does not fire, any conductive material that comes

into contact with the front of the cartridge shortly thereafter could draw a spark across the front and deploy the probes.



These photos illustrate what can happen if hands are placed in front of the cartridge during discharge. This incident occurred during officer training exercises as the officer placed hands in front of the cartridge during discharge. Although the intent was most likely not to deploy the probes into his own hand, the results can be seen in these photos when proper safety guidelines are not adhered to and accidents occur.



In this module, we will be discussing Tactical Considerations.

# Flammability

TASER ECD can ignite explosive materials, liquids, fumes, gases, vapors, or other flammable substances and materials

Gasoline, sewer gases, meth labs, flammable personal defense sprays, hair gels, butane lighters, etc.

A TASER ECD can ignite explosive materials, liquids, fumes, gases, vapors, or other flammable substances and materials such as gasoline, sewer gases, meth labs, flammable personal defense sprays, hair gels, butane lighters, etc.   Some personal defense sprays use flammable carriers such as alcohol and could be dangerous to use in immediate conjunction with TASER ECDs.

# Flammability

- Personal Defense Sprays
  - Some propulsion agents (carriers) are flammable
  - Some carriers are alcohol and oil based



When we talk about testing your OC's or other chemical agent's flammability with your TASER ECD, you should understand that some include flammable agents for propulsion carriers or to lower its freezing point. Some carriers are alcohol or oil based. Some are water based. Some agents use a mixture formula that is proprietary to the manufacturer or unknown to the public. Some of these formulas can ignite and cause flames when applied proximal to a TASER ECD.



# Line Up The ECD With The Target

- Keep ECD in line with target
- Get both probes on target
- May need to angle so bottom probe hits leg
- May need to turn ECD sideways if subject is laying down

Both probes need to contact the subject to achieve NMI.  If one probe strikes the subject and the other probe misses but lands on a conductive surface, the circuit might be completed, but NMI is unlikely due to the resistance.

Remember, the bottom probe deploys at an 8 degree downward angle in line with the grip of the ECD. If the subject is standing, you may need to keep the ECD vertical to get both probes on target. If you anticipate, based on probe spread and the point of aim of the top probe, that the bottom probe will hit the subject's leg, you may need to angle the ECD to line it up with the targeted leg. If the subject is laying down, you will need to angle the ECD sideways to get both probes on target.

Since a dog's body is longer horizontally than vertically, you might need to turn the ECD sideways to get both probes on an aggressive dog.

# Warning

- Avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, chest/breast, or known pre-existing injury areas without legal justification.
- The preferred target areas are the lower center mass (below chest) for front shots and below the neck area for back shots.

Avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, chest/breast, or known pre-existing injury areas without legal justification.

The preferred target areas are the lower center mass (below chest) for front shots and below the neck area for back shots.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Refer to "Sensitive Body Part Hazard" warnings.



This is a photo of an unintentional probe impact to the eye of a 50 year old male in Australia.  Surgeons from Adelaide's Queen Hospital removed the probe and the man's eyesight was later fully restored.   Despite the success of this case, impact to the eye can result in serious injury.  In another case, the eye was lost.

*******************************************************************
***************.

Refer to "Eye Injury Hazard" and "LASER Light could result in serious eye injury" in warnings.



Although in the past we have recommended targeting the center of mass for both the front and rear of the body, we have seen some ineffective hits to the front of the body, particularly with hits to the upper torso with narrow probe spreads. By lowering the point of aim to the lower torso on the front of the body, we increase the potential for NMI by splitting the hemispheres and targeting larger muscle groups. This also reduces the risk of hitting sensitive body areas.

Non preferred Target zones are NOT prohibited, rather they should be avoided when practical.



Because of the larger muscle groups, the preferred target zone on the back begins just below the neck and extends all the way down the legs.

# Probe Placement

- Deploy per department SOP
- Greater probe spread generally increases effectiveness
  - Narrow probe spreads typically are more effective if one probe is above the belt and the other probe is below the belt



Deploy probes in compliance with your department's policy.

Remember, the bottom probe is traveling at a downward angle relative to the position of the ECD. Line up the TASER ECD with the subject's body to get both probes on target.

# Probe Placement

- If practicable, deploy probes at suspect's back:
  - Clothing fits tighter
  - Surprise factor
  - Stronger muscles – usually even more overwhelming
- Aim at preferred target zones
- Avoid sensitive areas of the body



Although probe hits to the front of the body are usually very effective, the back is usually the preferred target for several reasons:

Clothing typically fits tighter across the shoulders, upper back and upper legs,

The subject is surprised,

And the back side of the body has more large muscle groups such as the Trapezius (upper back), Latissmus dorsi (mid & lower back), Gluteus maximus (butt), Biceps femoris (hamstring) and Gastrocnemius (calf).

Targeting the backside decreases the chances of having a probe strike the eye, throat, chest/breasts or genitals.

The entire back side below the neck is a preferred target zone.

# Probe Placement

Electrical arc can penetrate SOME soft body
armor and may jump up through clothing up
to approximately 2 inches total or
approximately 1 inch per probe

The electrical arc can "jump" through clothing and some soft body armor, but not all.
Maximum clothing penetration is approximately two inches total or approximately one
inch per probe. In any of these situations, common sense is key.

Skin penetration of the probes is required for XREP ECD only.

## Causes of Limited Effectiveness

- Miss or single dart hit
- Loose or thick clothing
- Low nerve or muscle mass
- Limited probe spread
- Wires break
- Operator error



These are some of the causes of limited effectiveness: a miss by both probes or a single probe hit, loose or thick clothing, low nerve or muscle mass deployments, limited probe spread, wires that break, and operator error.

Version 18 07/11

40

# "Silence is Golden"

- No change in subject behavior + loud arc = bad connection or TASER ECD use is ineffective
- Reload and target different area or 3-point drive stun follow up with cartridge still attached

If the subject is not reacting and the electrical arc is loud during a field deployment, the electric charge is likely not being delivered and may not be effective.  The operator may reload a fresh cartridge and deploy it at an alternate area, or keep the cartridge on the TASER ECD and perform a  3-point drive stun follow up to complete circuit or consider other force options.

# Tactical Considerations

- If practical, attempt to gain compliance using verbal commands
- Verbal commands, display of TASER ECD, turning on the LASER, or arc display may gain compliance



TASER ECDs are not a substitute for common sense and good communication. If practical, attempt to gain compliance using verbal commands. At times, verbal commands and display of the TASER ECD may gain compliance. One of the greatest advantages of TASER ECDs is their ability to sometimes stop aggressive behavior simply by pointing the ECD and placing the LASER on the subject. Displaying the arc on the end of the TASER ECD has often been shown to be a deterrent.

# Injuries From Falls

- NMI frequently causes people to fall
- Falls, even from ground level, can cause serious injuries
- Consider the environment and the likelihood of a fall related injury



Like many other force options, NMI frequently causes people to fall to the ground. They may or may not be able to catch or brace themselves and cushion the fall. Several people have suffered injuries from falling on a hard surface following an ECD exposure. Consider the environment the subject is standing on and the likelihood that a fall will result in injury.

# Increased Deployment Risk Examples

- Subject running or in an elevated position
- Operating vehicle or machinery
- Flammable or explosive environment



The risks of TASER ECD exposure should be balanced between several factors, including, but not limited to: threat to the officer, threat to the subject and the public as well as the availability of other force options and the likely outcome of their use.  Some increased deployment risk examples include a subject running, a subject in an elevated position above the ground where the impact of the fall is increased,  someone operating a vehicle or machinery that could lose control of it during a TASER ECD deployment,  and a subject in a flammable or explosive environment.

# Increased Deployment Risk Examples

- Obviously pregnant
- In water (drowning risk)
- Sensitive target areas
- Obviously frail or infirm



Additional increased risks include: an obviously pregnant female; subject in water, mud, marsh environment, or other areas where breathing ability may be impaired if exposed to the NMI of a TASER ECD; or a subject that is obviously frail or infirm and a fall to the ground could cause injury. Sensitive target areas may also be considered as increased risks. While a TASER ECD deployment may be an appropriate option to use on subjects in these and other situations, the important thing to remember is to look at the totality of the circumstances, including applicable laws and agency policy, and balance the risk of injury versus the risk of the threat.

# Tactical Considerations

- Avoid "TASER ECD over-dependence"
- Consider having lethal cover or other reasonable and appropriate force options available when practical
- Consider cover and distance tactics
- When practical, have at least one back-up officer present to control/cuff under power



Officers should avoid over dependence on the TASER ECD. In other words, understand that although the advantages of using the TASER ECD have been proven in the field time and time again, it may not be the best answer to every problem you deal with. Consider having lethal cover or other reasonable and appropriate force options available when practical. Consider your cover and distance tactics when dealing with subjects who are reasonably perceived as an immediate threat.

Version 18 07/11

# Contingencies

- No weapon system will operate or be effective all of the time
- An ECD or cartridge may not fire or be effective
- Be prepared to transition to other options

TASER ECDs are sophisticated electronic devices that are subjected to the challenging law enforcement environment. An ECD or cartridge may not fire or be effective. Have contingency plans for dealing with ineffective deployments or other applications.

# Contingencies

- Deploy with 2nd TASER cartridge if available, or have a 2nd TASER ECD nearby (M/X26)
- If TASER cartridge is a "dud," keep ECD aimed at target while placing the ECD on SAFE
- Reload with a new cartridge and re-engage target
- Do not attempt to reuse a dud

Attempt to deploy the TASER ECD with a second TASER cartridge available. Or have a second TASER ECD nearby in case of a miss or ineffective deployment or application. If a TASER cartridge is a dud, keep the ECD aimed at the target while shifting the safety switch to the down position as it may fire after a delay. Even if it did not fire with the first electrical pulse, any pulses that follow could discharge the cartridge. If the ECD is aimed off target when the cartridge discharges, the probes could hit an unintended target.

# Probe Placement
## (Does not apply to 35 ft cartridges)

- Deployment range from point blank to 15, 21, or 25 feet depending on cartridge

- Preferred range = 7 to 15 feet from target for probe spread, officer safety, and accuracy



Deployment range depends on numerous factors including the type of cartridge loaded in the TASER ECD. The range can be anywhere from point blank to fifteen, 21 or 25 feet depending on the cartridge. Of course, the TASER ECD operator should be within the maximum range to allow for slack in the wires when probes impact/attachment is achieved. Not allowing for slack in this situation may break the wires. If a deployment is at the maximum range of the TASER/Smart cartridge, the officer may need to close the distance slightly to avoid breaking the wires when the probes impact/attach. Very close deployments could result in increase accuracy, but have less reactionary distance and smaller probe spread, which could be less effective. Long range deployments provide increased officer safety and increased probe spread, but also increase the likelihood of a missed probe. An officer could also misjudge maximum range and be too far from the subject for the probes to reach them. Preferred range of the 21 and 25 foot cartridges is 7 to 15 feet. This provides a balance between several factors. Those factors include officer safety, probe spread and accuracy. Analysis of actual field use data submitted to TASER indicates this range of 7 to 15 feet appears to be the best overall compromise between these factors as it allows the officer to remain outside the reactionary gap, provides the distance needed to achieve adequate probe spread that typically allows for NMI to occur and keeps the officer close enough to allow for the probes to be accurate during deployment.

# Deployment Distance Considerations



Deployments from 0-7 feet (0-2 meters):

- Higher hit probability
- Limited probe spread = low amount of muscle mass affected
- Short reactionary distance
- Consider targeting the waist area to "split the hemispheres"

See preferred target zones [previous slides and warnings]. Be aware of the maximum range of your cartridges.

We have seen impressive results with aiming near the waistline and placing one probe above the beltline and the other probe below the beltline. We call this technique "splitting the hemispheres". Think of the beltline as an equator and the upper and lower body as hemispheres. Particularly when firing at close range, consider targeting the waist area to put one probe above the waist and one probe below the waist possibly into the thigh, leg or buttocks area for enhanced effectiveness. This technique, commonly referred to as splitting the hemispheres, can affect two or more large muscle groups and increase the chances of achieving NMI even with a limited probe spread.

While the pelvic triangle has been shown to be an effective target area, care must be taken to avoid the genitals when practical, or when legally justified.

Version 18 07/11

# Deployment Distance Considerations

Deployments from 7-15 feet(2-4.5 meters):

- Higher hit probability
- Good probe spread = good amount of muscle affected
- Slack in wires (with 21 or 25 foot cartridges
- Good reactionary distance

See preferred target zones [previous slides and warnings]. Be aware of the maximum range of your cartridges.

Deployments from 7 to 15 feet are considered to be within the preferred range of the TASER ECD.  There is a higher probability the probes will impact the subject.  A good probe spread is generally achieved and there is typically enough muscle affected to achieve NMI.

# Deployment Distance Considerations

Deployments from 15-25 feet(4.5 – 7.6m):

- May be out of range of 15/21' cartridges
- Fair hit probability with both probes
- Large probe spread = large amount of muscle affected
- Less slack in wires
- Larger reactionary distance



See preferred target zones [previous slides and warnings]. Be aware of the maximum range of your cartridges.

Deployments from 15 to 25 feet offer a fair probability that both probes will impact the target. If the probes do impact the target, there should be a fairly large probe spread with a larger amount of muscle affected by the TASER ECD.

# Controlling/Cuffing Under Power

- You can go hands on with the subject during the 5-second cycle without feeling the effects of the NMI
  - Electricity follows the path of least resistance
  - Do not place hands on or between probes



There is a natural reluctance to touch a person who is being shocked by electricity. But remember, you can grab onto a person during the five second cycle without feeling the effects of the NMI discharge. You will not feel the electrical current unless you touch directly between or directly onto one of the probes. If this does happen, you will not be incapacitated. You will feel a shock and instinctively pull your hand away. Just reassess the subject and grab him somewhere else.

# Controlling/Cuffing Under Power

- When feasible move in and control the subject while the TASER ECD is cycling and the subject is incapacitated
- EDPs, focused, intoxicated, excited delirium individuals, etc may not comply with verbal commands



There have been incidents where subjects have been exposed to multiple TASER ECD cycles because the subject would not comply with verbal surrender commands following a TASER ECD deployment. Contact officers were available but did not move in during the cycle while the subject was incapacitated. While there are circumstances under which multiple cycles are appropriate and reasonable, officers should consider an attempt to move in and control the subject while the TASER ECD is cycling and it is practical and reasonably safe to do so. Emotionally disturbed persons, focused, intoxicated, excited delirium, etc. individuals may not comply with verbal commands following the TASER ECD cycle.

Remember, as with any application of force, each ECD cycle or deployment must be legally justified.

Version 18 07/11

54

# Tactical Considerations

- Keep sufficient slack in the wires
- Move with the subject if they start to roll
- If only one probe hits or low probe spread, consider drive stun follow-up with cartridge still in place



During ECD deployment, the operator must remember to keep sufficient slack in the wires and may need to move with the subject if they start to roll. Failure to do either of these may result in wire breakage or probe disconnect causing a loss of ECD contact (continuous completed circuit with delivery of electrical charge) with the subject. If a single probe impact occurs, the ECD operator may consider a drive stun follow-up to complete the circuit. A small or limited probe spread may not achieve NMI and a drive stun follow-up away from the impact sites of the probes should increase the effectiveness of the deployment.

# Look for a Change in Behavior

- Look AND listen when evaluating the effectiveness of an ECD deployment
- Watch the subject's reaction and look for a change in their behavior
- Listen to the sound of the ECD
- Quiet pulsing typically indicates a good connection

Officers should look AND listen when evaluating the effectiveness of an ECD deployment. Watch the subject's reaction and look for a change in their behavior. They could fall to the ground or go rigid during incapacitation. No reaction, no change in their behavior, or a loud arcing sound could indicate poor connection or no connection at all, limited probe spread, or a low muscle mass contact. Listen to the sound of the ECD. A quiet pulsing sound typically indicates a good connection. Clothing disconnects can result in intermittent contact which may be less effective and the sound level of the discharge may noticeably fluctuate during the cycle.

# Look for a Change in Behavior

- Loud arcing sound typically indicates NO connection
- Intermittent arcing typically indicates a poor connection such as a clothing disconnect



Loud arcing across the electrodes on the front of the ECD or an expended cartridge indicates the energy is not traveling down the wires to complete the circuit with the subject. Intermittent arcing at the front of the ECD may indicate a poor connection such as a clothing disconnect.

# If No Change in Behavior

- Reload new cartridge and re-engage
- Keep expended cartridge in place and apply a drive-stun follow up
- Employ other force options, other alternatives, or disengage



Following ECD deployment, if no change in behavior consider: reloading a new cartridge and re-engaging the subject, keep the expended cartridge in place and apply a drive stun follow up, or employ other force option, other alternatives, or disengage.

Remember, as with any application of force, each ECD cycle or deployment must be legally justified.



Review warnings regarding drive stun application and effects. Remember, as with any application of force, each ECD cycle or deployment must be legally justified.

# Drive-Stun Backup

- Probe deployments are usually more desirable/effective than drive stuns (that are not three-point deployments)
- NMI vs. pain compliance
- Can be applied from a safer distance
- Usually require fewer cycles

There are two separate modes of drive-stun backup: (1) drive stun utilizing front ECD electrodes, and (2) three-point deployment.

Probe deployments are usually more desirable and effective than drive stuns without a cartridge for several reasons: (1) there is an increased probability of NMI versus the pain compliance of the drive stun;

(2) probe deployments can be applied from a safer distance than a drive stun applied with direct contact;

(3) Probe deployments usually require fewer cycles and fewer injuries are typically observed; and

(4) probe deployments usually result in lesser skin and tissue damage than drive stun. (Typically a probe deployment results in two small puncture wounds. Even a single drive-stun cycle can result in numerous skin injuries due to the often continually moving ECD contact points on the body)

Instructors MUST be clear that the drive stun generally does not cause incapacitation. Because of this, officers may find themselves in prolonged struggles with violent suspects whom they end up drive stunning several times in several different locations. This often results in multiple discharges and numerous signature marks and scratches on the subject's body. It is in these types of scenarios that officers may face accusations of excessive force, even though they may be justified in their use of force and the ECD in these cases, many of them could have avoided problems by using probes to incapacitate the subject and allow fellow officers to restrain them without further struggle. Of course, officers will not always have the option of using probes. When this is the case and a drive stun is used, they should try to target appropriate pressure points in an attempt to get the suspect restrained as quickly as possible.

# Drive Stun with Live Cartridge

- Can be effective, but the probes may deploy into the subject
- Close probe spread may not achieve NMI
- Leave deployed cartridge in place and apply (three-point) drive stun away from probe impact sites
- This tactic could result in significant injury if applied to a subject's head or neck area

See Trademark Notice file on DVD. © 2011 TASER International Inc.

It is possible to apply a drive stun with a live cartridge, and this may be an effective technique. There is a low risk of over penetration. The close probe spread will likely not have an NMI effect.

The officer may leave the deployed cartridge on the ECD and apply contact away from the impact site of the probes. This technique could have an effect similar to a probe deployment from distance with a substantial probe spread. If only one probe impacts the subject, the drive stun follow up can act as the second probe completing the circuit.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

When the X26 ECD is in direct contact with the subject the cartridge MAY deploy the probes into the subject, but this might not always happen. Typically, the electrical arc from the ECD needs to touch the ignition pin at the very front of the cartridge under the blast doors to start the sequence inside the cartridge that results in probe deployment. If a drive stun with a live cartridge is attempted, the circuit may be completed through the subject instead of arcing over the front of the cartridge. This may result in a drive-stun effect, but may not always cause the probes to deploy. Pulling the ECD away from the contact made with subject may cause the arc to travel over the front of the cartridge and the probes should deploy.

The X3 ECD cartridge should deploy even in direct contact with the subject.

# Drive-Stun Backup

- To use the drive stun without firing the probes, remove the live cartridge
- The drive stun will typically not cause NMI, only pain compliance
- If not effective, evaluate the location of the drive stun, consider an additional cycle to a different pressure point or consider an alternative force option

It may be an acceptable technique to deploy the cartridge from close range and follow up with a drive stun away from that area to achieve NMI, but a drive stun without the cartridge can be used as a backup option as well. To use the drive stun without deploying the probes, simply remove the live cartridge. Remember, the drive stun alone will likely not cause NMI because the contact points are too close together. It generally acts as a pain compliance tool. If it is not effective, evaluate the location of the drive stun, consider an additional ECD application to a different pressure point, or consider alternative force options. Again, remember...the drive stun alone usually does not cause NMI.

# Drive-Stun Backup

- Do not hold on to a live cartridge while applying a drive stun
- If cartridge gets within 2 inches of the ECD, it may deploy

When using the drive stun as a backup option, do not hold on to a live cartridge.  If the cartridge gets within two inches of the ECD or the subject, it may deploy.



For maximum effectiveness of the drive stun, drive the ECD into certain pressure points of the subject's body. Suggested pressure points are highlighted in the training material. Use care when applying the drive stun to the neck or groin (officers should only target these areas when they are defending themselves against a violent attacker). Stay away from the trachea and back of the neck. The tracheas is soft tissue and could easily be crushed. The cervical portion of the spine is very sensitive to pressure. Also, care should be taken when applying a drive stun to the pelvic triangle to avoid the possibility of crushing the testicles. Because of the risk of injury, these areas should not be used on subjects who do not pose an immediate threat.

Version 18 07/11

