# Deputy Matthew Alexander

June 05, 2015

NANCY ROELL

v.

HAMILTON COUNTY, OHIO/BOARD OF COMMISSIONERS, et al.

1:14-CV-637



513.233.3000
877.233.4403
Fax: 513.233.2310
depo@elitereportingagency.com

1             UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4

5  _____
                          )
6  NANCY ROELL             )
  as executrix of the estate of  )
7  GARY L. ROELL, SR.,       )
                          )
8      Plaintiff,     )
                          ) CASE NO.
9          vs.       ) 1:14-CV-637
                          )
10  HAMILTON COUNTY, OHIO/BOARD OF )
  COMMISSIONERS, et al.       )
11                       )
        Defendants.    )
12  _____)

13

14

15      Deposition of:  DEPUTY MATTHEW ALEXANDER

16      Pursuant to:   Notice

17      Date and Time:  Friday, June 5, 2015
                     10:03 a.m.
18      Place:        Hamilton County
                     Prosecutor's Office
19                230 East Ninth Street
                Suite 4000
20                Cincinnati, Ohio  45202

21      Reporter:     Wendy Haehnle
                     Notary Public - State
22                      of Ohio

23      Videographer:  John Bonavita

24

25

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3          For the plaintiff:

 4                  Alphonse A. Gerhardstein, Esq.
                        and
 5                  Jacklyn Gonzales-Martin, Esq.
                        of
 6                  Gerhardstein & Branch Co., LPA
                    432 Walnut Street
 7                  Suite 400
                    Cincinnati, Ohio  45202
 8                  513.621.9100, Ext. 13
                    agerhardstein@gbfirm.com
 9                  jgmartin@gbfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1    APPEARANCES OF COUNSEL:

 2

 3         For the defendants:

 4                 Jerome A. Kunkel, Esq.
                         and
 5                 Pamela J. Sears, Esq.
                         of
 6                 Office of Hamilton County
                     Prosecuting Attorney
 7                 230 East Ninth Street
                   Suite 4000
 8                 Cincinnati, Ohio  45202
                   513.946.3082
 9                 pam.sears@hcpros.org
                   jerry.kunkel@hcpros.org
10                         and
11                 Linda L. Woeber, Esq.
12                         of
                   Montgomery Rennie & Jonson, LPA
13                 36 East Seventh Street
                   Suite 2100
14                 Cincinnati, Ohio  45202
                   513.768.5239
15                 lwoeber@mrjlaw.com

16

17         Also Present:

18                 Katie Cornelius
                   Nancy Roell
19                 Deputy Joe Huddleston
                   Deputy Willy Dalid
20

21                         - - -

22

23

24

25
```

4

```
 1                    I N D E X

 2

 3   DEPUTY MATTHEW ALEXANDER                    PAGE

 4       EXAMINATION BY MR. GERHARDSTEIN           5
         EXAMINATION BY MS. SEARS               107
 5
         FURTHER EXAMINATION
 6         BY MR. GERHARDSTEIN                  178
         FURTHER EXAMINATION
 7         BY MS. SEARS                         184

 8

 9

10   EXHIBITS                      MARKED    REFERENCED

11       DEPOSITION EXHIBIT    2      -          74
         DEPOSITION EXHIBIT    5      -          60
12       DEPOSITION EXHIBIT   16     39          39
         DEPOSITION EXHIBIT   17     61          61
13
         DEPOSITION EXHIBIT    A      -          82
14       DEPOSITION EXHIBIT    B      -         114
         DEPOSITION EXHIBIT    C      -          86
15       DEPOSITION EXHIBIT    D      -         115
         DEPOSITION EXHIBIT    J      -          79
16       DEPOSITION EXHIBIT    M    116         116
         DEPOSITION EXHIBIT    N    119         119
17

18
                           - - -
19

20

21

22

23

24

25
```

5

```
 1              THE VIDEOGRAPHER:  We are on the
 2       record.  The time is 10:03 a.m.
 3   BY MR. GERHARDSTEIN:
 4       Q.   Good morning.
 5       A.   Good morning.
 6       Q.   State your name, please.
 7       A.   Matthew Alexander.
 8            MR. GERHARDSTEIN:  Oh, you want to
 9       swear him in?
10            THE REPORTER:  Yeah.
11                DEPUTY MATTHEW ALEXANDER
12   a defendant herein, having been duly sworn, was
13   examined and deposed as follows:
14                      EXAMINATION
15   BY MR. GERHARDSTEIN:
16       Q.   What's your highest level of education?
17       A.   High school.
18       Q.   Where did you graduate from?
19       A.   Oak Hills.
20       Q.   What year?
21       A.   2003.
22       Q.   And what's your present job?
23       A.   Deputy sheriff patrol officer.
24       Q.   When did you start as a patrol
25   officer?
```

1      A.   January 2nd, 2013.

2      Q.   And did you have a field training

3  period?

4      A.   I did.

5      Q.   When was that over with?

6      A.   That was over in March -- beginning of

7  April, beginning of April.

8      Q.   Who were your field training officers?

9      A.   It is now Sergeant Sovereign

10  (phonetic), my primary coach, Adam McMillan, and

11  Corporal Crider (phonetic).

12      Q.   How do you spell that?

13      A.   C-r-i-d-e-r.

14      Q.   Did you start with the county in

15  corrections?

16      A.   Yes.

17      Q.   What year was that?

18      A.   April 7th, 2005.

19      Q.   So prior to August -- or prior to

20  August 13th, 2013, you had the corrections

21  training that your lawyer reviewed with

22  Deputy Huddleston yesterday, right?

23      A.   Correct.

24      Q.   And prior to August 13th, 2013, like

25  Huddleston, your training included interpersonal

7

1   communication, right?

2       A.   Correct.

3       Q.   And prior to August 13th, 2013, like

4   Huddleston, your training included interacting

5   with people in crisis situations and mental

6   health training, right?

7       A.   Correct.

8       Q.   And also like Huddleston, prior to

9   August 13th, 2013, you had Taser training, right?

10      A.   Correct.

11      Q.   And, like Huddleston, your Taser

12  training and your other training covered excited

13  delirium, right?

14      A.   Yes.

15      Q.   Okay.  So on August 13th, 2013, you

16  encountered Mr. Gary Roell, right?

17      A.   Correct.

18      Q.   And Roell -- Mr. Roell appeared to be

19  having a mental health crisis when you

20  encountered him, right?

21      A.   I did not know that at the time.

22      Q.   During the course of your interaction

23  with him, you figured that out, right?

24      A.   I still didn't know that.

25      Q.   Well, during the course of your

8

1    interaction with Mr. Roell, you drew the

2    inference that he was having a mental health

3    problem?

4        A.   It could have been a possibility.

5        Q.   So -- and you thought that, right, that

6    it could have been a possibility?

7        A.   Could have been a possibility.

8        Q.   And you and Huddleston and Dalid used

9    force on Mr. Roell, right?

10       A.   Correct.

11       Q.   And he died following that use of

12   force, right?

13       A.   Correct.

14       Q.   And the coroner ruled that the cause of

15   death was excited delirium, right?

16       A.   Correct.

17       Q.   And you don't disagree with that

18   coroner determination for the cause of death, do

19   you?

20       A.   I'm not an expert in that field; no

21   reason not to.

22       Q.   Okay.  Were you criminally prosecuted

23   for your acts involving Mr. Roell?

24       A.   I was not.

25       Q.   Were you disciplined --

9

1          A.    I was not.

2          Q.    -- by the Hamilton County Sheriff's

3    Office for the way you handled the incident

4    involving Mr. Roell?

5          A.    I was not.

6          Q.    Were you provided any retraining based

7    on the way you handled the incident involving

8    Mr. Roell?

9          A.    I was not.

10         Q.    Are you aware of any policy changes at

11   the Hamilton County Sheriff's Office as a result

12   of the events involving Mr. Roell?

13         A.    I'm not sure.

14         Q.    Did you follow the Hamilton County

15   Sheriff's Office use-of-force policy with respect

16   to your interaction with Mr. Roell?

17         A.    Yes.

18         Q.    Now, during your interaction with

19   Mr. Roell, you never tried to stop

20   Deputy Huddleston from using the Taser, right?

21         A.    No.

22         Q.    And on August 13th, 2013, is it your

23   view that Deputy Huddleston followed the Hamilton

24   County Sheriff's Office Taser policy and

25   procedure with respect to his interaction with

1    Mr. Roell?

2         A.   Yes.

3              MS. SEARS:  Objection as to the policy

4         and procedure.

5              There's policy, procedure, and

6         training.  So I'm going to object to the

7         policy in question for purposes of the

8         excessive force claim.

9    BY MR. GERHARDSTEIN:

10        Q.   You can answer.

11        A.   Can you repeat the question?  I'm

12   sorry.

13             MR. GERHARDSTEIN:  (Indicating.)

14             (The record was read.)

15        A.   Yes.

16   BY MR. GERHARDSTEIN:

17        Q.   And on August 13th, 2013, did you and

18   Deputy Huddleston follow the Hamilton County

19   Sheriff's Office Taser training with respect to

20   your use of force on Mr. Roell?

21             MS. SEARS:  Objection.

22             You can answer.

23        A.   I never used a Taser.

24   BY MR. GERHARDSTEIN:

25        Q.   Right.  But you were assisting --

1     A.    Right.

2     Q.    -- Mr. Huddleston, right --

3     A.    Correct.

4     Q.    -- or Deputy Huddleston, right?

5          So was it your view that those actions

6  followed the Taser training?

7     A.    Correct.

8     Q.    On August 13th, 2013, did you follow

9  the Hamilton County Sheriff's Office policy and

10  custom regarding your encounter with -- with

11  Mr. Roell with respect to encountering people

12  with mental illness?

13     A.    Yes.

14     Q.    On August 13th, 2013, with respect to

15  your encounter with Mr. Roell, did you follow the

16  Hamilton County Sheriff's Office training with

17  respect to excited delirium?

18          MS. SEARS:  Can I just -- because I

19     don't want to keep interrupting you.

20          Can I just impose a continuing

21     objection to --

22          MR. GERHARDSTEIN:  Sure.

23          MS. SEARS:  -- all questions regarding

24     policy -- custom, policy, and procedure for

25     the purposes of the excessive force claim,

12

```
 1          and then I won't have to interrupt you each

 2          time?

 3                  MR. GERHARDSTEIN:  All right.  Well,

 4          that was training.

 5                  Could you read the question back,

 6          please?

 7                  (The record was read.)

 8          A.   I believe so.

 9   BY MR. GERHARDSTEIN:

10          Q.   On August 13th, 2013, did you follow

11   the Hamilton County Sheriff's Office training

12   with respect to your restraint and cuffing of

13   Mr. Roell?

14          A.   Yes.

15          Q.   And did you follow the Hamilton County

16   Sheriff's Office policies with respect to your

17   restraint and cuffing of Mr. Roell?

18          A.   Yes.

19          Q.   So in your view, did you do anything

20   wrong with respect to your use of force on

21   Mr. Roell?

22          A.   No.

23                  MS. SEARS:  Objection as to the

24          characterization of wrong.

25                  You can answer the question.
```

```
 1       A.   No.

 2  BY MR. GERHARDSTEIN:

 3       Q.   August 13th, 2013, what time did your

 4  shift start?

 5            It would have been the day before,

 6  right?

 7       A.   It was 1900 the day before, on the

 8  12th.

 9       Q.   Okay.  And what time is that in --

10       A.   7:00 p.m.

11       Q.   And that was your normal shift?

12       A.   Correct.

13       Q.   What -- did you have an assignment?

14       A.   I ran the north Sycamore beat.

15       Q.   And what's that mean, you ran that

16  beat?  What's that mean?

17       A.   That was my assignment area every day.

18  Every day when I came into work -- it was my

19  assigned area every day.

20       Q.   Okay.  And what was the initial

21  information you got with respect to the problem

22  at Barrington Court?

23       A.   From what I can recall, it was a

24  neighbor trouble and somebody was breaking out

25  the windows.
```

1    Q.   Did you learn anything else?

2    A.   I don't believe so.

3    Q.   Some neighbor trouble, did that mean a

4    neighbor was breaking out the windows?

5    A.   I didn't know.

6    Q.   Okay.

7    A.   It just came out as a neighbor trouble.

8    Q.   All right.  And how did you learn

9    that?

10   A.   From the dispatch.

11   Q.   Did you talk to dispatch or did you

12   just hear it over the radio?

13   A.   I heard it on the radio and I

14   acknowledged that I was en route.

15   Q.   Okay.  And then what happened?

16   A.   Myself and Deputy Huddleston were on

17   the side of the highway helping Montgomery with a

18   DUI crash, rollover crash, helping with traffic

19   assistance until their unit showed up.

20   And then we -- as soon as we cleared that,

21   we got the dispatch.  And then we went -- went --

22   went to the scene, showed up.

23   Q.   And then as you got to the scene, where

24   did you park your cruiser?

25   A.   I pulled right up to the front.  My

1    driver's side door would be directly in front of

2    complainant's front door.

3        Q.   Okay.  And what did you see as you

4    approached the complainant's front door?

5            Did you see anything around the carport

6    or --

7        A.   I did notice there was some landscaping

8    tore up.  I didn't really pay much attention to

9    that, because I was looking for the address.

10       Q.   Okay.

11       A.   But I did notice there was some

12   landscaping -- just disarray.

13       Q.   All right.  Did you see any debris in

14   the carport, board game parts, anything like

15   that?

16       A.   No, not that I remember.

17       Q.   And when you pulled up in front of the

18   condos, what did you observe?

19       A.   I observed -- I was looking for the

20   address.  And I observed the -- the complainant

21   on her front porch waving us down, just panicked.

22           And she directed myself and

23   Deputy Huddleston to the back of the residence.

24       Q.   And you also saw the next door wide

25   open and dark, right?

16

```
 1        A.   I did not.

 2        Q.   Did you see at the front of the house

 3   debris with the door wide open and debris lying

 4   on the sidewalk?

 5        A.   I don't recall that, no.

 6        Q.   Did you give an interview of your -- of

 7   the events of this day before you left duty the

 8   follow morning --

 9        A.   Yes, I did.

10        Q.   -- or that morning?

11        A.   Yes.

12        Q.   And if you made statements during that

13   interview, would you trust those statements or

14   recollections that you have today?

15             MS. SEARS:  Objection to the

16        characterize -- characterization of trust.

17             You can answer the question if you

18        understand it.

19        A.   What do you mean trust?

20   BY MR. GERHARDSTEIN:

21        Q.   Which would be more reliable, the ones

22   you made at the time or the ones you're making

23   today?

24        A.   I'm not sure of that.  I don't know;

25   probably the ones I made at the time.
```

1      Q.   When you saw the complainant, you said

2   she was panicked.

3           What did she say to you and what did

4   you say to her?

5      A.   I said -- I think I said -- from my

6   remembrance, I said, where is he?

7           And she -- she pointed us into the back

8   door, the back patio area, directed us back

9   there.

10     Q.   Did you ask her any other questions?

11     A.   I don't recall.

12     Q.   Did she provide you with any additional

13  information about the suspect?

14     A.   I don't recall.

15     Q.   Did you learn prior to approaching the

16  back patio area whether there had been any prior

17  runs to these condos?

18     A.   No, I did not.

19     Q.   Before you moved in the direction that

20  she pointed you, what happened next?

21     A.   We ran to the back of the patio area to

22  where Mr. Roell was.

23     Q.   Did you have your Taser or gun out?

24     A.   I did not, from my --

25     Q.   And when you ran to the back of the

18

1    patio area -- describe the patio area.

2         A.   It is a privacy fence.  I think it's a

3    six-foot high privacy fence, enclosed by a gate

4    that encloses the back patio of the complainant's

5    back -- backyard.

6         Q.   And as you entered -- as you came upon

7    the patio, the gate was open?

8         A.   I don't recall.

9         Q.   What happened next?

10        A.   We made contact with Mr. Roell.  And he

11   was, I remember, screaming no; all about water.

12             Myself and Deputy Huddleston both asked

13   to show hands, show us your hands.

14             He then immediately, within seconds,

15   you know, charged at us.

16        Q.   Where was he when you first saw him?

17        A.   He was up by the -- the broken

18   windows.

19        Q.   Which way was he facing?

20        A.   I believe he was facing the windows.

21        Q.   What was he doing?

22        A.   He was holding a hose and a flower pot,

23   and just screaming.

24        Q.   Was he touching the unit at all?

25        A.   I don't recall.

19

```
 1          Q.    How far from the windows was he?

 2          A.    Probably six inches.  I don't know, a

 3    foot.

 4          Q.    And the flower pot was a peat pot with

 5    some plastic ribbing around it?

 6          A.    I just saw the flower pot.  I don't

 7    know if there was a ribbing around it.

 8          Q.    And at that time, what was he

 9    wearing?

10          A.    He was wearing a shirt and that's it;

11    naked from the waist down.

12          Q.    And he was screaming no and screaming

13    about water?

14          A.    Correct.

15          Q.    And was that pretty much true

16    throughout your whole encounter with him, that he

17    was screaming about water and screaming no?

18          A.    He was screaming no when we had given

19    him orders.  He was -- he was not complying

20    whatsoever.

21          Q.    And was he also continuing to scream

22    about water?

23          A.    He screamed -- he said some things

24    about water throughout the incident.

25          Q.    And those were not responsive to
```

20

1    anything you were talking about, right?

2         A.    The water statement?

3         Q.    Yeah.

4         A.    Correct.

5         Q.    And as far as you could tell, it didn't

6    make a lot of sense, did it?

7         A.    I didn't understand why he was yelling

8    for water.

9         Q.    Okay.  Did you see that the window was

10   broken?

11        A.    Yes.

12        Q.    How many windows were broken?

13        A.    I think there was just two on the side

14   of the patio door.

15        Q.    And this was about 3:00 in the

16   morning?

17        A.    Whatever time the dispatch was.  I'm

18   not sure.

19        Q.    It was very early in the morning,

20   right?

21        A.    Right.

22        Q.    Did you both start speaking to him

23   while he was still facing the window?

24        A.    I remember telling him to give his

25   hands.  I'm not too sure if Huddleston was.

```
 1        Q.   And -- and you made that statement to

 2   give you -- to give us your hands while he was

 3   still facing the window?

 4        A.   I don't recall exactly his positioning

 5   when he was -- when I was talking to him or

 6   yelling at him.

 7             But when I showed up, he was facing the

 8   window.

 9        Q.   Okay.  But you spoke to him before he

10   ever acknowledged you, right?

11        A.   Correct.

12        Q.   Okay.

13        A.   Correct.

14        Q.   And how far away from you was he at

15   that point?

16        A.   Probably 15 feet, 20 feet.

17        Q.   What was the tone of voice that you

18   used as you drew his attention to you?

19        A.   I was -- I was loud.

20        Q.   So you were using your command

21   presence?

22        A.   Correct.

23        Q.   And you were giving him an order,

24   right?

25        A.   Correct.
```

```
1          Q.   And you wanted him to know that that
2     was a firm and a -- a strong order --
3          A.   Correct.
4          Q.   -- is that right?
5               So give me an example.  Just try to say
6     it the way you said it to him right now.
7          A.   Show us your hands, something along
8     those lines.
9          Q.   Where were you located at the time you
10    made that command to him?
11         A.   I was located -- I think it was
12    directly outside the patio door.
13         Q.   How long did you make any observation
14    of him before you said, show us your hands?
15         A.   I believe Deputy Huddleston asked him
16    what he was doing.  And it was -- it was about
17    maybe five seconds.
18         Q.   And what was his tone of voice?
19         A.   He was -- he was pretty loud.
20         Q.   At the time you observed this
21    individual -- how old was he, by the way?
22         A.   I'm not sure.
23         Q.   Was he a young man or an older --
24         A.   He was an older man.
25         Q.   At the time you observed this older man
```

1    with just a T-shirt on and naked from the waist

2    down, screaming statements about water and

3    holding this plant and hose, at that point, did

4    you draw any inference that he was having a

5    mental health problem?

6         A.   I did not.

7         Q.   Would you agree that those facts are

8    consistent with a person having a mental health

9    problem?

10         A.   It could be that or consistent with

11    other things, as well.

12         Q.   Would you agree that those facts are

13    consistent with a person who's got some sort

14    of -- of interference with his mental

15    functioning?

16         A.   I would agree with that.

17         Q.   So it could have been drugs, it could

18    have been --

19         A.   Alcohol.

20         Q.   -- alcohol, it could have been mental

21    illness, right?

22         A.   Correct.

23         Q.   So you -- and you drew an inference

24    that there was something off or bizarre about

25    him, right?

1          A.    I drew an inference that something was

2     not right with him.

3          Q.    Okay.  Did you talk to Huddleston at

4     all about your plan for interacting with

5     Mr. Roell?

6          A.    I did not.

7          Q.    Now, you said he came at you; is that

8     right?

9          A.    Correct.

10          Q.    And as he came at you, he was walking

11     fast?

12          A.    It was a pretty brisk walk.

13          Q.    And he was still holding the hose and

14     the basket, right?

15          A.    Correct.

16          Q.    You didn't see any other weapons on

17     him, right?

18          A.    I did not see anything, no.

19          Q.    And as he was coming at you, what did

20     he say?

21          A.    He just kept yelling no and -- and

22     walked right towards us in a very aggressive

23     manner.

24          Q.    And when you say an aggressive manner,

25     what do you mean?

25

```
 1        A.    I mean, he -- he looked angry, very,
 2   very agitated, the way he was talking, yelling.
 3        Q.    And while he was coming at you, were
 4   both of you continuing to give him orders?
 5        A.    I don't recall.
 6        Q.    He -- at that point, he didn't throw
 7   any punches at you, right?
 8        A.    No.
 9        Q.    And he was moving toward you, and he
10   was screaming no and something about water,
11   right?
12        A.    When he was moving towards us, he was
13   just yelling no.
14        Q.    Did you remain outside the gate?
15        A.    Yes.
16        Q.    And was Huddleston outside the gate?
17        A.    I believe he was right next to me or
18   either a step or two in front or behind me.
19        Q.    And at that point, was Dalid there?
20        A.    I don't think Dalid showed up until we
21   actually put hands onto him.
22        Q.    At any point, did Huddleston say, show
23   me your hands and come out?
24        A.    I don't recall if he did or not.
25        Q.    Did Huddleston tell him to drop the
```

26

```
 1    items and get on the ground or you're going to be

 2    tased?

 3         A.   I don't remember that part.

 4         Q.   Was there any warning as Mr. Roell was

 5    approaching you that he was going to be tased?

 6         A.   I remember the -- the arcing.  I

 7    remember hearing that, when Deputy Huddleston did

 8    the arc.

 9         Q.   And where was Mr. Roell when

10    Deputy Huddleston did the arc?

11         A.   He was approaching us.

12         Q.   So he was still on the patio and you

13    were outside the gate?

14         A.   Yes.

15         Q.   Do you agree that one of your goals was

16    to get Mr. Roell away from the patio?

17         A.   I agree that my goal was to get him

18    under control.

19         Q.   Were you trying to do that away from

20    the patio?

21         A.   I just wanted to get him under

22    control.

23         Q.   Right.  But you didn't enter the patio,

24    right?

25         A.   Correct.
```

1     Q.   And so, as he approached, was the

2  statement made to Mr. Roell that, you don't want

3  to get tased, you should come out?

4     A.   I don't recall that.

5     Q.   So if there was a witness who said that

6  you were trying to get the guy out of the back

7  porch, and that the officer said, you don't want

8  to get tased, you know, come on out, would that

9  witness be incorrect?

10     A.   I don't recall that, so I don't know.

11     Q.   Both you and Alexander were giving

12  commands, right?

13     A.   I am Alexander.

14     Q.   I'm sorry.

15          Both you and Huddleston were giving --

16     A.   I don't recall if Huddleston was or

17  not.

18     Q.   And you continued to use your command

19  voice, right?

20     A.   Correct.

21     Q.   And your consistent command was that he

22  give you his hands, right?

23     A.   Show us your hands, or something along

24  those lines, correct.

25     Q.   So what did you want him to do when you

1  said, show us your hands?

2      A.   I wanted him to comply.

3      Q.   Well, you could see his hands, right?

4      A.   Correct.

5      Q.   You saw that he had a basket and a

6  hose.  So what beyond that did you want him to do

7  to comply with the show-us-your-hands order?

8      A.   Drop everything in his hands.

9      Q.   Did you tell him to drop everything in

10  his hands?

11      A.   I just -- I don't recall what I said.

12  It was something along the lines of, show your

13  hands.

14           But he was not complying with -- with

15  anything.  He was coming at us.

16      Q.   Did you tell him to stop?

17      A.   Yes.

18      Q.   And as he came closer to you, you would

19  agree that he never threw any punches or attacked

20  you, right?  He was just moving toward you?

21      A.   He was coming towards us.  I don't know

22  what he was trying to do.

23      Q.   Okay.  And then --

24      A.   Typically, when someone isn't listening

25  and they're approaching an officer when they're

1   telling them to stop or put your -- show us your

2   hands, they're -- they're coming to do something

3   to me, to harm me, maybe.

4        Q.   So you grabbed him?

5        A.   I did.

6        Q.   And when -- and you grabbed him after

7   the arcing, right?

8        A.   Correct.

9        Q.   And when the Taser was arced, what was

10  his reaction?

11       A.   I don't recall.  I think -- I think he

12  hesitated or stopped or kind of flinched.

13       Q.   And when the Taser was arced, was there

14  also a laser light shining on him?

15       A.   Yes.

16       Q.   And where on his body did that light --

17       A.   I don't recall.  It was on his front

18  side somewhere.

19       Q.   And did he react to the light at all?

20       A.   No.  He kept coming at us; didn't

21  stop.

22       Q.   Then what happened?

23       A.   We then had to put our hands on him to

24  attempt to gain control of him outside the patio

25  area at this time.

1          And then he continued to struggle.  And

2     during the struggle, I believe I remember

3     Huddleston yelling Taser.

4          And at that time, Deputy Dalid was on

5     scene, as well.  And we got off him for a second

6     while the Taser got deployed, so then we could

7     gain control of him while the Taser was supposed

8     to be taking effect, which it never did.

9          Q.   When you grabbed at him, you also

10    grabbed the plant, right?

11         A.   I don't think so.  I don't recall.  I

12    don't recall.

13         I -- I think the plant went flying at

14    some point in time.

15         Q.   And ended up in the ground?

16         A.   Correct.

17         Q.   So the -- the plant didn't strike you

18    at all, right?

19         A.   It didn't strike me.  I don't believe

20    so.

21         Q.   And it didn't strike Huddleston, right?

22         A.   I don't know.

23         Q.   And when you grabbed at him, did he

24    fall down?

25         A.   I believe he went to the ground, from

1    what I remember.

2         Q.   And did he fall down because he was

3    also getting tangled up in the hose?

4         A.   I think the hose stayed inside.  I

5    don't think the hose ever came out of the patio

6    area.

7         Q.   So did he, at some point, fall because

8    he was interfered with -- with -- by the hose?

9         A.   I'm not sure.  I think he fell because

10   he was interfered with by us attempting to gain

11   control of him.

12        Q.   And when he fell -- was he tased before

13   he fell or after he fell?

14        A.   I'm not sure when he fell.  I don't

15   know.  I believe -- he was on the ground prior to

16   the tasing, I believe.  I'm not sure.

17        Q.   And was he on the ground at the time he

18   was tased?

19        A.   I'm not sure.  I don't remember.

20             I remember seeing the -- whenever he

21   went back into the patio, the barbs were in the

22   back.  I remember seeing the barbs coming out of

23   the back of his shirt.

24             But I don't remember where he was at

25   the exact time he was tased.

1          I remember getting off of him when

2     Deputy Huddleston yelled Taser --

3          Q.   And when --

4          A.   -- so I didn't get tased, too.

5          Q.   And when you got off of him, after

6     hearing Deputy Huddleston say Taser, was he on

7     the ground?

8          A.   I don't recall.

9          Q.   When you were encountering him during

10    this period that he was tased and you got off of

11    him, this was outside the gate, right?

12         A.   Correct.

13         Q.   Had the gate closed?

14         A.   I'm not sure.

15         Q.   And there was a time, though, when he

16    got away from you and was inside the patio with

17    the gate closed and the three of you were outside

18    the patio on the other side of the gate?

19         A.    When he went back inside, I believe the

20    gate did close back.  I believe he closed it.

21         Q.   And is that something he had to

22    physically pull, or did it just automatically

23    close?

24         A.   I don't know.  I'm not sure.

25         Q.   And when he went back inside, did he

1    walk on his two feet, or did he crawl?

2         A.   From what I remember, I think he

3    crawled.

4         Q.   As you sit here today, do you recall

5    that he was tased while he was crawling?

6         A.   I don't think he was.  Because I

7    remember him crawling back in the patio after --

8    I remember seeing the barbs in his back --

9         Q.   Okay.

10        A.   -- on his shirt.

11        Q.   And so how did the barbs get in his

12   back?

13        A.   I don't know.  I -- I jumped off of

14   him.  And I don't know where the Taser was -- I

15   remember seeing them in the backside of him, the

16   barbs.  They weren't connected.  They were just

17   kind of hanging there.

18        Q.   And when you say you jumped off of him,

19   did you jump off of him when he was standing or

20   when he was on the ground?

21        A.   I don't remember.  I just remember

22   getting off of him.

23        Q.   So at that point, you had had the

24   encounter you just described, and he is on the

25   inside, having crawled back into the patio, and

1    the three officers are on the outside, on the

2    other side of the gate, right?

3        A.    Correct.

4        Q.    So at that point, he had been saying

5    things about water and no, right?

6        A.    I don't remember if he was still

7    yelling then.  I think he was yelling throughout

8    the entire incident.

9        Q.    Okay.  You think he was yelling?

10       A.    I think he was, yes.

11       Q.    And he was nude throughout the entire

12   incident from the waist down, right?

13       A.    Right.

14       Q.    And -- and you had had this encounter

15   with him.  Did he seem to have a lot of strength?

16       A.    He did.

17       Q.    And he was combative?

18       A.    He was combative.

19       Q.    And when you touched him, was he wet?

20       A.    He -- he was slippery.

21       Q.    And was that consistent with being

22   sweaty?

23       A.    Or from the water.  I'm not sure.

24       Q.    Was his skin warm?

25       A.    I don't recall.

35

1    Q.   Well, these symptoms that you've just

2   confirmed are all consistent with the symptoms of

3   excited delirium, right?

4    A.   I guess so.  They were symptoms, yeah.

5    Q.   And as of August 13th, 2013, you were

6   familiar with excited delirium, right?

7    A.   Correct.

8    Q.   And you had been trained to know that

9   excited delirium was an -- was a medical

10   emergency, right?

11    A.   Correct.

12    MS. SEARS:  Objection.

13    Oh, well, go ahead and answer.

14   BY MR. GERHARDSTEIN:

15    Q.   So as you stood on one side of the --

16   the gate and he was on the other side of the

17   gate, as far as you knew, he wasn't encountering

18   any other members of the public, right?

19    A.   Well, the windows were broken out.  So

20   he --

21    Q.   Okay.

22    A.   -- had access to the inside of the

23   house.

24    Q.   He would have to go through the windows

25   to get there?

36

 1      A.   Or breaking in the window.

 2      Q.   And, at least, as of the time he was on

 3  the other side of the gate, he wasn't destroying

 4  any property at that moment, right?

 5      A.   Not to my knowledge.

 6      Q.   And you hadn't observed any weapons on

 7  him, other than the hose that he had held at one

 8  point --

 9      A.   Right.

10      Q.   -- right?

11           And he hadn't actually used the hose as

12  a weapon, right?

13      A.   Not at that time, no.

14      Q.   Or at any time?

15      A.   Not at any time, no.

16      Q.   And -- so while you were on the other

17  side of the gate, did you say anything to the

18  other officers and did they say anything to you

19  before proceeding?

20      A.   No.

21      Q.   At that point, when you were on the

22  other side of the gate, did you call for EMS

23  services?

24      A.   No.

25      Q.   Would you agree that the Hamilton

1    County Sheriff's Office excited delirium training

2    states that when someone has the symptoms of

3    excited delirium, if practical, you should call

4    for EMS so that they're available promptly after

5    use of force, right?

6            MS. SEARS:  Objection.

7            You can answer.

8        A.    If practical, yes.

9    BY MR. GERHARDSTEIN:

10       Q.    Before you opened that gate and then

11   proceeded to continue the engagement with him,

12   did you discuss any plan of action with the other

13   officers?

14       A.    No.

15       Q.    Now, when you did open the gate --

16   which one of you opened the gate by the way?

17       A.    I'm not -- I'm not sure.

18       Q.    Okay.  When you did open the gate, what

19   happened?

20       A.    We went back in.  And I believe the

21   Taser cycle was still cycling the five seconds.

22            So we were attempting to go back in and

23   gain control of him again.  And then there was

24   another struggle.

25            By that time, we were by the tree, the

1    mulch area in the backyard, directly in front of

2    the open patio -- or open gate door.

3              We struggled again.  And at some point

4    in time, he actually punched me in the left side

5    of my face with a closed fist.

6              At some point in time, there was a

7    handcuff on him.  I believe we had one handcuff

8    on him during the struggle before he punched me,

9    because the handcuff actually came around and

10   struck the side of my head.

11        Q.   When he was over by the mulch and -- as

12   you enter the patio, you're talking about the

13   area just to the left as you go in, right?

14        A.   Correct.

15        Q.   Was he standing or on the ground?

16        A.   I don't recall.

17        Q.   And you say you struggled.  What do you

18   mean by that?

19        A.   We attempted to get his hands again and

20   gain control of him and get him in handcuffs.

21   And it was -- he was still combative and flailing

22   around and not complying.

23        Q.   And it was your view at the time that

24   he didn't purposely punch you, but he was just

25   trying to swing at anything in particular, just

1      actively trying to get out, right?

2             MS. SEARS:  Objection as to what his

3         view was.

4             You're --

5    BY MR. GERHARDSTEIN:

6         Q.   You can answer.

7             MS. SEARS:  -- telling him what his

8         view is?

9    BY MR. GERHARDSTEIN:

10        Q.   You can answer.

11            MS. SEARS:  If you understand the

12        question, you can answer.

13        A.   It seemed there was intent to punch me,

14   because that was a closed fist.

15            MS. SEARS:  Did you say 16, Wendy?

16            THE REPORTER:  (Indicating.)

17            MS. SEARS:  Thank you.

18            (Deposition Exhibit 16 was marked for

19            identification.)

20   BY MR. GERHARDSTEIN:

21        Q.   I'm going to show you what's been

22   marked as Exhibit 16.

23            You were interviewed by video on the

24   morning of this altercation right?

25        A.   Correct.

 1        Q.    And I'm going to direct your attention

 2   to page 43 of the transcript of that interview.

 3   And at line 8, the detective interviewing you --

 4   who was the detective -- do you remember who the

 5   people were interviewing you?

 6        A.    I remember Detective Todd (phonetic).

 7        Q.    Was there another one?

 8        A.    There was, but I don't remember who it

 9   was.

10        Q.    Okay.  At line 8 he says, When you were

11   struggling with him, he was throwing -- besides

12   the one punch he hit you in the face, did he

13   throw any other punches?

14             And the answer is, He was flailing

15   everywhere around.  I don't think he was trying

16   to swing at anything in particular.  He was just

17   actively trying to get out.

18             Did I read that correctly?

19        A.    You did.

20        Q.    Did -- this punch that hit you in the

21   face, did that occur before the second tasing or

22   after?

23        A.    I believe it was before.

24        Q.    So was he in the grass and just kind of

25   launched up and hit you?

41

1        A.   I believe we were over there by the

2    tree.  I'm not sure if he was -- I don't remember

3    his exact location.

4        Q.   And was he standing or on the ground?

5        A.   I don't remember his exact

6    positioning.

7        Q.   Okay.  So you don't know if he was

8    standing or --

9        A.   No.

10       Q.   -- not?

11       A.   I don't recall.

12       Q.   Do you know if you were by the tree or

13   were you -- were you out in the patio area?

14       A.   I believe I was in the mulch area --

15       Q.   Okay.  So --

16       A.   -- by the tree area.

17       Q.   So was he facing you?

18       A.   He would have been, yes.  He would have

19   been facing me.

20            I don't know if he was -- I don't know

21   if we were on the ground or not.  I'm not sure.

22       Q.   So you just don't recall if he was on

23   the ground at the time he punched you?

24       A.   I don't.

25       Q.   So you wouldn't know then if you were

1    on the ground at the time he punched you, right?

2         A.   I don't think I was.  I'm not sure.

3         Q.   At any point when he was out on the

4    other side of the gate or while he was inside the

5    patio, was he on his stomach?

6         A.   At any point during the struggle?

7         Q.   Yeah.

8         A.   I'm not sure.

9         Q.   When you got the cuff on him, did

10   you -- at that point, did you cuff him up, or was

11   he just having a cuff on each hand?

12              What was the situation?

13        A.   From what I recall, we only had one

14   cuff on at the time he hit me.  We were trying to

15   get both -- we were trying to get two sets of

16   handcuffs on him.

17              He was a bigger guy and he was

18   combative.  We were just trying the best

19   possible -- best way possible to cuff him in the

20   front or wherever -- whichever way we could.

21              And then -- what was the rest of your

22   question?

23        Q.   So at the -- did you get both cuffs on

24   him?

25        A.   Eventually, I think we did, after, I

1    think, the second tasing --

2         Q.    Okay.

3         A.    -- the second barb tasing.

4         Q.    And to go back to what you knew before

5    you ever started the encounter, take a look at

6    page 7 of Exhibit 16.

7              At the bottom of the page, the

8    detective interviewing you, at line 24, says, And

9    when you got the dispatch, it was a male breaking

10   windows and it was a known suspect of the

11   neighbor.  So you and Paul 32 -- 9 Paul 32 were

12   the first two to arrive on the scene?

13             And your answer was yes.

14             Do you see that?

15        A.    Yes.

16        Q.    Does that refresh your recollection as

17   to --

18        A.    I don't remember --

19        Q.    -- whether the suspect was known to the

20   complainant?

21        A.    I don't recall that part.

22        Q.    And then also on page 5, at line 18 --

23   or line 14 -- it -- you're saying, I don't

24   remember the exact time I was dispatched to a

25   male breaking the windows, backyard, damaging

44

```
1    property.
2            He was currently on scene, and I think
3    it was the -- a name came out.  I think it was
4    neighbor -- said it was the neighbor.  His name
5    came out over the -- and then you're interrupted.
6            Does that refresh your recollection as
7    to whether you knew that the alleged perpetrator
8    was that neighbor of the complainant?
9        A.   I don't remember that part.  But I
10   guess I did.
11       Q.   And then at page 9, at line 20, you're
12   describing your entry into the back.  And you
13   say, I came around and saw the fence open.
14           Do you see that?
15       A.   I do.
16       Q.   Does that refresh your recollection as
17   to whether the fence was open when you first got
18   there?
19       A.   I don't recall if the fence was open or
20   not.
21       Q.   And at page 16, at line 11, you're
22   describing your initial encounter with Mr. Roell.
23           And you say, I think he did have that
24   plant in his hand until I grabbed it.  I remember
25   seeing it on the ground after -- during the
```

45

1    struggle.

2            MS. SEARS:  Can I object --

3    BY MR. GERHARDSTEIN:

4        Q.   Does that refresh your recollection as

5    to whether you grabbed the plant?

6            MS. SEARS:  Could I just offer an

7        objection?

8            And -- and I would like the -- the

9        deputy to read that entire page 16 before he

10       answers your question so he has the entire

11       context.

12       A.   What line were you referring to?  I'm

13   sorry.

14   BY MR. GERHARDSTEIN:

15       Q.   Eleven through 13.

16           MS. SEARS:  Would you read the entire

17       page, please --

18           THE WITNESS:  Uh-huh.

19           MS. SEARS:  -- before you answer the

20       question?

21       A.   What's your question?  I'm sorry.

22   BY MR. GERHARDSTEIN:

23       Q.   Does that refresh your recollection as

24   to whether you grabbed the plant?

25       A.   I don't remember grabbing the plant.

46

1       Q.   I'm going to -- the other thing I want
2  to just review with you is page 24.
3            We were talking about that first
4  tasing.  And at the bottom of 24, the detective
5  says, Let's go back one second.  When you said
6  that, when he shot him the first time, where
7  did -- you say you saw the barbs.  Where was he
8  struck at?
9            And the answer was, It was on the back
10 because he was crawling --
11      A.   Okay.
12      Q.   -- and I remember seeing the barbs, the
13 wire.
14           Does that refresh your recollection as
15 to whether he was tased while he was crawling?
16      A.   I don't remember when he was tased.
17 But I do remember him crawling back in, like I
18 stated before.
19      Q.   Oh, yeah.  Take a look at page 45.  And
20 I had asked you about whether you noticed the
21 condo next door to the complainant and the door
22 being open and debris inside the door.
23           And at page 45, you say, I remember
24 when I came up -- this is line 7 -- when I
25 initially pulled onto the scene, the neighbor's

1    front door was wide open.  It was dark.  There

2    was trash.

3              Does that refresh your recollection as

4    to whether you saw debris inside the neighbor's

5    door?

6         A.   I don't recall that.

7         Q.   So let's go back to the time when you

8    are all -- you've all reentered the -- all three

9    officers have reentered the patio, you've come

10   back through the gate, Mr. Roell is inside,

11   toward the mulch on the left; is that right?

12        A.   Correct.

13             MS. SEARS:  Objection as to reenter.

14             I don't think the testimony is that he

15             had been in the patio area.

16   BY MR. GERHARDSTEIN:

17        Q.   And at that point, you tried to get him

18   cuffed, right?

19        A.   Correct.

20        Q.   How long did you struggle with him

21   before he was tased a second time?

22        A.   I'm not sure.

23        Q.   Up to that point, how much time had

24   elapsed?

25        A.   I'm not sure.

48

```
 1        Q.   You'd agree that if the Taser barbs are

 2   inserted into the subject and he's being

 3   energized, you can cuff him without getting

 4   shocked, right?

 5        A.   If both barbs are in him?

 6        Q.   Yeah.

 7        A.   Yes.

 8        Q.   So when you say you let Mr. Roell go

 9   because you didn't want to get shocked, do you

10   mean you just didn't want to get hit by a barb?

11        A.   Correct.

12        Q.   Okay.  Did any tasing continue after

13   Mr. Roell was cuffed?

14        A.   No.

15        Q.   Was all the tasing concluded by the

16   time he was cuffed in front?

17        A.   Correct.  Part of that question -- you

18   said when he was cuffed.  You said altogether

19   cuffed.  Both cuffs were connected and

20   everything.

21        Q.   Well, that's good.  Thank you.

22             Did any tasing continue after one of

23   the cuffs was on?

24        A.   I don't remember if the one cuff was

25   on.  I think it was, because it hit me.  And I
```

1    think the tasing -- the second tasing was after

2    he hit me.

3        Q.   All right.  So -- but after he was

4    cuffed in front, then was there any tasing?

5        A.   No.

6        Q.   Where was he when he was cuffed in

7    front?

8        A.   He was laying down in the patio area,

9    in the middle of the patio area.

10       Q.   Now, when you were interviewed, you

11   never reported that you had told Mr. Roell to

12   stop as he was first approaching you and you were

13   outside the gate and he was coming from the

14   windows.

15            When did you recollect that you had

16   told him to stop?

17       A.   I remember giving him verbal commands,

18   show us your hands, whatever the verbal

19   commands -- I'm not sure exactly what my verbal

20   commands were.

21       Q.   Okay.

22       A.   But it was to surrender.

23       Q.   So you're not sure whether you told him

24   to stop or not?

25       A.   I don't remember exactly -- what my

50

 1    exact words were.

 2         Q.   Okay.  And while you were attempting to

 3    cuff him, were there periods when he was on his

 4    stomach?

 5         A.   I believe he was on his side when he

 6    was cuffed.

 7         Q.   Was he ever on his stomach?

 8         A.   I don't recall him being on his

 9    stomach.

10         Q.   At any point before he was cuffed and

11    shackled, did you call, or did any of the

12    officers call for EMS?

13         A.   Yes.

14         Q.   When was that?

15         A.   It was after he was -- he was

16    controlled, he was cuffed.

17         Q.   But before he was shackled?

18         A.   I don't recall if it was before or

19    after the shackles.  It was after we kind of got

20    somewhat control of him.

21         Q.   Who went and got the shackles?

22         A.   I did.

23         Q.   Where did you get those?

24         A.   Out of my vehicle.

25         Q.   And at the time you went to your

1    vehicle to get the shackles, had EMS been called?

2         A.   I don't recall.

3         Q.   And then when you came back and applied

4    the shackles, did you witness anybody calling

5    EMS?

6         A.   I witnessed -- I heard somebody call

7    for EMS.  I'm not sure if it was before I came

8    back or -- you know, before I went to get my

9    shackles.

10             I think it was Deputy Dalid.

11        Q.   While Mr. Roell was being restrained,

12   did anybody advise him of his rights?

13        A.   I don't recall.

14        Q.   And when Mr. Roell was cuffed in front

15   and shackled, what was the plan at that point, if

16   there was one?

17        A.   Our plan was to get the squad there and

18   check him out.

19        Q.   And then what did you anticipate

20   happening after the squad would come?

21             MS. SEARS:  Objection as to whether he

22        anticipated --

23   BY MR. GERHARDSTEIN:

24        Q.   I mean, what were the options?

25        A.   I don't know what the squad would have

52

 1    done.  I'm not sure.

 2         Q.   So the squad would determine whether

 3    you would arrest him or take him to the

 4    hospital?

 5         A.   The squad would determine if there was

 6    medical need to take him to the -- to the

 7    emergency room.

 8         Q.   Even after he was in cuffs and

 9    shackled, he was still making statements about

10    water, right?

11         A.   From what I remember, he was yelling

12    water throughout the entire incident.

13         Q.   And was there a time when he actually

14    fell asleep?

15         A.   I don't remember that part.

16         Q.   And if there are witnesses who saw him

17    on his stomach during the period before EMS came,

18    would you disagree with those?  Or do you just

19    not recall?

20         A.   From what I recall, he was on his side

21    the entire time.

22         Q.   Did there come a time when

23    Corporal Steers arrived?

24         A.   There did.

25         Q.   And did he say when he arrived that

53

1    this situation looked like it could be an excited

2    delirium situation?

3         A.   I didn't hear him say that.  I don't

4    recall that.

5         Q.   Deputy Huddleston said that the whole

6    department got training after this incident.

7              Did you hear him say that yesterday in

8    his deposition?

9         A.   Yes.

10        Q.   Do you know what he was talking

11   about?

12        A.   I'm not sure.

13        Q.   Was there any specific training

14   referencing the Roell incident after Mr. Roell

15   died?

16        A.   I think we may have had like an excited

17   delirium -- just took a PowerPointer of protocol

18   or --

19        Q.   And was that a -- like a refresher

20   course?

21        A.   I believe it was.  I'm not too -- I'm

22   not too sure.

23        Q.   Did you take it?

24        A.   I believe I did.  I remember something

25   like that.

54

```
 1        Q.   And in any -- when you took that
 2   course, after the Roell incident, did anyone say
 3   that the Roell incident was an example of excited
 4   delirium?
 5        A.   I don't recall that.
 6        Q.   Did anyone identify in that training
 7   whether there were any errors in the treatment of
 8   Mr. Roell?
 9        A.   Not to my knowledge.
10        Q.   Were you present when Mr. Roell lost
11   his vital signs?
12        A.   I was.
13        Q.   Tell me about that.
14        A.   I was -- I believe I was standing off
15   to the side when Corporal Steers showed up.  I
16   believe they were checking for a pulse right when
17   he walked in.  I think Deputy Dalid was.
18             And they realize he didn't have a
19   pulse.  And then they started CPR.
20   Corporal Steers started CPR.
21        Q.   Did you, yourself, observe any
22   difference in Mr. Roell prior to the discovery
23   that he had lost his vital signs?
24        A.   He was -- when he was cuffed, he was
25   constantly up and down, fighting, combative, and
```

55

1     then he'd slow down; fighting, combative, then

2     he'd slow down.

3              So, I guess, during one of the times he

4     slowed down, he -- he lost his pulse.

5              So he was consistent to what he was

6     doing prior, when he didn't have his vital signs,

7     him going up and down.

8              He was down at that point.

9     Q.    So as -- so he would have a period of

10    calmness and then getting agitated again --

11    A.    Right.

12    Q.    -- is that what you're saying?

13    A.    Right.

14    Q.    And this was during a period of

15    calmness that it was discovered --

16    A.    Correct.

17    Q.    -- that he had lost his vital signs?

18    A.    Correct, yes.

19    Q.    Were you off work at all after this

20    incident?

21    A.    They gave me next day off.  Then I had

22    my off days after that.

23    Q.    Were you certified in the X2?

24    A.    Yes.

25    Q.    So when the X2 discharges cartridges,

1    did aphids sprinkle around?

2         A.    Yes.

3         Q.    Did you observe anyone collecting those

4    aphids?

5         A.    I didn't.

6         Q.    And did you see where they landed?

7         A.    I did not.

8         Q.    There is a policy requiring officers to

9    create a supplemental written report when there

10   is force used, right?

11        A.    I'm not sure.

12        Q.    Have you ever used force before

13   Mr. Roell?

14        A.    When I was -- since I've been on

15   patrol?

16        Q.    Yeah.

17        A.    No.

18        Q.    Would you agree that you did not

19   prepare any written summary of your activities

20   with respect to Mr. Roell?

21        A.    I did not give a written statement,

22   no.

23        Q.    Okay.  And so the only statement you

24   ever provided was in the interview format with

25   the detectives, right?

 1      A.   Correct.

 2      Q.   Did you observe Deputy Huddleston ever

 3  do any drive stuns?

 4      A.   I -- I do recall something along the

 5  lines of doing a drive stun to his leg.  But I

 6  think it was once he crawled back in the patio,

 7  after he initially got tased the first time.

 8      Q.   And did that have any effect?

 9      A.   None of the tasings had any effect

10  throughout the entire incident.

11      Q.   The fact that a Taser -- I mean,

12  normally Tasers work, right?

13      A.   Normally.

14           MS. SEARS:  Objection as to --

15  BY MR. GERHARDSTEIN:

16      Q.   And the fact --

17           MS. SEARS:  -- characterization of

18      work.

19           I'm sorry.  I thought you were

20      finished, Al.  I apologize for interrupting.

21  BY MR. GERHARDSTEIN:

22      Q.   The fact that a Taser has no effect on

23  the subject is unusual, right?

24      A.   It's not normal.

25      Q.   Okay.  That also is consistent with

58

 1    excited delirium symptoms, right?

 2             MS. SEARS:  Objection.

 3        A.   It could be anything.  It could be

 4    barbs didn't get connected.  It could be drugs,

 5    alcohol.  It could be anything.

 6    BY MR. GERHARDSTEIN:

 7        Q.   Okay.  But it's also consistent with

 8    excited delirium symptoms?

 9        A.   It could be one of the factors.

10        Q.   Okay; one of the factors related to

11    excited delirium?

12        A.   It could be one of the factors of why

13    the Taser didn't work.

14        Q.   Okay; that he was experiencing

15    super-human strength --

16        A.   It's something -- could have been the

17    barb didn't connect or some kind of drugs or some

18    kind of mental breakdown.

19        Q.   Okay.  And -- but my question was, one

20    of those factors could be that he was

21    experiencing excited delirium --

22        A.   One of them could be --

23        Q.   -- do you agree?

24        A.   One of them could be.

25        Q.   Okay.  When Mr. Roell was the

59

 1    subject -- whether his death was the subject of

 2    the -- of an investigation, did you ever go back

 3    and recreate the scene with anybody?

 4          A.   I did not.

 5          Q.   Did you ever go and take any pictures

 6    or go back to the scene at all?

 7          A.   Never, no.

 8          Q.   You'd agree that, as a deputy, contact

 9    with mentally ill citizens is foreseeable,

10    right?

11          A.   Yes.

12          Q.   And you'd agree that you must take the

13    symptoms of mental illness that you observe into

14    account when you develop a strategy for taking

15    mentally ill people into custody, right?

16          A.   If the --

17               MS. SEARS:  Objection.

18               You can answer, if you understand what

19          symptoms mean.

20    BY MR. GERHARDSTEIN:

21          Q.   Is that correct?

22          A.   If time allows it.

23          Q.   Pardon?

24          A.   If time allows it.

25          Q.   You'd agree that on August 13th, 2013

1     Mr. Roell was demonstrating symptoms consistent

2     with mental illness, right?

3            MS. SEARS:  Objection.

4        A.   He was demonstrating symptoms that

5     something wasn't right.  He was either on drugs,

6     alcohol, or mentally ill.

7     BY MR. GERHARDSTEIN:

8        Q.   Take a look at Exhibit 5.  Are you

9     familiar with this policy of the Hamilton County

10    Sheriff's Office on handling of handicapped

11    persons?

12       A.   Yes.

13       Q.   And would you agree that, from what you

14    observed on August 13th, 2013, Mr. Roell met the

15    definition of a person who was physically or

16    mentally impaired?

17       A.   He showed the symptoms of it, yes.

18       Q.   On that early morning when you

19    encountered him, did any of you contact the

20    mental illness hotline?

21       A.   We did not.

22       Q.   And on that early morning when you

23    encountered Mr. Roell, did you alert or seek the

24    assistance of any mobile crisis team?

25       A.   We did not.

61

1              (Deposition Exhibit 17 was marked for

2              identification.)

3    BY MR. GERHARDSTEIN:

4         Q.   I'm going to show you what's been

5    marked as Exhibit 17.  This is -- this is a

6    recall, a summary of the dispatch records related

7    to the response to Barrington Court.  Okay?

8         A.   Okay.

9         Q.   Have you ever seen that incident recall

10   before?

11        A.   Yes.

12        Q.   So maybe you could help me interpret

13   this.

14              On -- this records that on

15   August 13th, 2013 at 2:49 in the morning, we see,

16   Neighbor is Gary Roell, male white, wearing a

17   blue T-shirt, broke out window, tore down the

18   complainant's curtains and is damaging the

19   outside flower pots.

20              Did I read that correctly?

21        A.   You did.

22        Q.   And is that what you heard over

23   dispatch?

24        A.   I don't recall hearing that.  I think I

25   was going on scene shortly after, looking for the

1    address.

2         Q.   So in your experience, is the summary

3    that's typed on here consistent with what's aired

4    over the radio?

5         A.   Usually.

6         Q.   And you did monitor this radio call,

7    right?

8         A.   Correct.

9         Q.   And at 2:48, above what I just read, I

10   see that it says -- what's C/C mean?

11        A.   See complainant.

12        Q.   Pardon?

13        A.   See complaint.

14        Q.   See complainant, reference trouble with

15   neighbor who broke out the complainant's window,

16   currently standing in the backyard.

17             Did I read that correctly?

18        A.   Correct.

19        Q.   So that would direct the officer to --

20   to check in with the complainant?  Is that

21   what -- is that what that means?

22        A.   Correct.  That means the complainant

23   would like to see you at some point in time.

24        Q.   Okay.  All right.  And at 2:48 there's

25   9S32, ER.  Is that you, 9S32?

1     A.   Correct.

2     Q.   And ER means en route?

3     A.   en route, correct.

4     Q.   Okay.  And then we get to the broadcast

5     that I read earlier, Neighbor is Gary Roell,

6     right?

7     A.   Right.

8     Q.   Or Royal is what they say there.

9          And, at least, the -- normally, that's

10     something you would have heard, as well as the

11     first broadcast about this incident, right?

12     A.   They don't always broadcast everything

13     they put on the -- the MBC.  But I don't remember

14     if that was broadcast or not.  It may very well

15     have been.

16     Q.   And then at 2:50 it says, Stat HL/9S32,

17     27.

18     A.   27 means I'm on scene.

19     Q.   Okay.  And what's Stat HL?

20     A.   I'm not sure what that means.

21     Q.   All right.  But that's you, 9S32 --

22     A.   Correct.

23     Q.   -- right?

24          Then they seem to print your name under

25     it anyway, right?

64

 1      A.   Right.

 2      Q.   And then at 2:50, also, it says that

 3  9P32 is 27.

 4           Does that mean that Huddleston's also

 5  at scene?

 6      A.   Correct.  27 means on scene.

 7      Q.   Okay.

 8      A.   He gave Corporal Steers a disregard.

 9  That's why it says AV, which is available.

10      Q.   Where is that?

11      A.   Just above where it says, 9 Paul 32.

12      Q.   Okay.

13      A.   Where it says, M Steers available right

14  above it, AV.

15      Q.   Oh, okay.  And how do you see that as a

16  disregard?

17      A.   Because that's when --

18      Q.   Steers says he's available.

19      A.   That's when Deputy Huddleston got on

20  the radio and said to give him a disregard, keep

21  him south.

22      Q.   Okay.  But we don't -- so you know that

23  just because you remember.

24           But you can't read that from the --

25      A.   Well, he goes available, which means he

1    was -- he's not going anymore.

2        Q.   Oh, I see.

3        A.   The dispatch made him available.

4        Q.   But then at 2:54 -- 9S33 is Steers,

5    right?

6        A.   Correct.

7        Q.   And it says ER.

8        A.   That's when we called for officer

9    assistance.

10       Q.   Okay.  So at that point, he starts

11   making his way toward you, right?

12       A.   Correct.

13       Q.   And --

14       A.   I'm assuming.

15       Q.   Sewall also is ER at 2:54, right?

16       A.   Correct.

17       Q.   And Alderman is 4N32?

18       A.   4 north 32 in Montgomery and --

19       Q.   Okay.  And he's also coming?

20       A.   Correct.

21       Q.   So then we have at 2:55 one in custody,

22   request units continue --

23       A.   Correct.

24       Q.   Is that what that says?

25       A.   Correct.

```
 1        Q.   And that means -- can you tell who made
 2   that broadcast?
 3        A.   I believe I did.
 4        Q.   And at what point did you make that
 5   broadcast?
 6        A.   Well, we have one in custody, means we
 7   have one, at least, cuffed.
 8        Q.   Right.  But when was that?
 9        A.   That was after he was cuffed back in
10   the patio.
11        Q.   And after the shackles were on him?
12        A.   I don't remember if shackles were on
13   him or not.
14        Q.   So that means that you arrived at 2:50.
15   And you said he was in custody at 2:55, right?
16        A.   That's when I broadcasted over the air,
17   correct.
18        Q.   And from the moment you arrived to the
19   moment you started to engage with him by making
20   the commands, how much time had passed?
21        A.   From the moment I arrived?
22        Q.   (Nodding head.)
23        A.   Maybe 30 -- 25, 30 seconds maybe.
24        Q.   Okay.  So the vast majority of this
25   time, almost four-and-a-half minutes, was spent
```

1    in the struggle with Mr. Roell, right?

2              MS. SEARS:  Objection as to

3        four-and-a-half minutes.

4        A.   I'm not sure what --

5    BY MR. GERHARDSTEIN:

6        Q.   Well, you arrived at 2:50.  You said

7    25 seconds to get back there and start your

8    encounter with Mr. Roell.  And then that leaves

9    four-and-a-half minutes to --

10       A.   That would be a rough estimate.  I

11   mean, I don't know if these -- how close these

12   are to the next minute.

13       Q.   Right.  And, also, it's -- you don't

14   know where -- how long he had been in custody

15   when you said, one in custody, right?

16       A.   Usually, I call it out when -- yeah.

17       Q.   Usually, you call it out right away?

18       A.   Typically.

19       Q.   Okay.

20              MS. SEARS:  Might need to speak a

21        little more clearly.

22              THE WITNESS:  Sorry.

23              MS. SEARS:  That's okay.  Maybe speak

24        up a little bit.  You have a low voice --

25              THE WITNESS:  I know I do.  I'm sorry.

```
 1              MS. SEARS:  -- and you're dropping at
 2          the end.  So maybe keep your chin and -- and
 3          just kind of keep your voice a little -- a
 4          little stronger.  Okay?
 5              THE WITNESS:  Gotcha.
 6     BY MR. GERHARDSTEIN:
 7          Q.   So in the police -- in your experience
 8     as a -- as a law enforcement officer,
 9     four-and-a-half minutes is a long time to be
10     struggling with somebody, isn't it?
11              MS. SEARS:  Objection.
12     BY MR. GERHARDSTEIN:
13          Q.   You can answer.
14              MS. SEARS:  You can answer if you
15          understand the question -- a long time --
16          A.   A struggle's a struggle, two minutes or
17     five minutes or whatever.  It's still going to be
18     a long time.
19     BY MR. GERHARDSTEIN:
20          Q.   I'm sorry.  What --
21          A.   It's -- no matter what a struggle is,
22     it's going to be a long time.
23          Q.   And then EMS was requested two minutes
24     after that -- after you broadcasted that he was
25     in custody, right?
```

69

1          MS. SEARS:  Well, it's the timeline on

2     here.

3          MR. GERHARDSTEIN:  Hold on.  Let me ask

4     the question --

5          MS. SEARS:  I'm -- fine.  But --

6          MR. GERHARDSTEIN:  -- all right?

7          You don't need to argue --

8          MS. SEARS:  No.

9          MR. GERHARDSTEIN:  -- or give him

10    clues.

11         MS. SEARS:  No.  What I need to do

12    is --

13         MR. GERHARDSTEIN:  That is what you're

14    doing.  You're not making a record, you're

15    educating the witness.

16         MS. SEARS:  You said --

17         MR. GERHARDSTEIN:  And that is not

18    professional.

19         MS. SEARS:  You said two minutes.  And

20    then this -- this says --

21         MR. GERHARDSTEIN:  Just stop.

22         MS. SEARS:  -- a particular time.

23         No.  I need to understand your

24    question, so I can --

25         MR. GERHARDSTEIN:  No.  Just stop.

70

```
 1              MS. SEARS:  -- appropriately make an
 2       objection.
 3              No.  Please don't --
 4              MR. GERHARDSTEIN:  Let me repeat the
 5       question again.
 6              MS. SEARS:  Please don't hold your hand
 7       up at me and tell me to stop.
 8              If I want to make a record --
 9              MR. GERHARDSTEIN:  Let me read the
10       question again.
11              MS. SEARS:  No.  Excuse me.
12  BY MR. GERHARDSTEIN:
13       Q.   At 2:55, it says, One in custody.  And
14  that was your broadcast; is that correct?
15              MS. SEARS:  I'll make an --
16  BY MR. GERHARDSTEIN:
17       Q.   Is that correct?
18              MS. SEARS:  I'll make a record.  I'll
19       make an objection.  Okay?
20              This is not your --
21              MR. GERHARDSTEIN:  Okay.
22              MS. SEARS:  -- record.  It's our
23       record.
24              And I'm entitled --
25  BY MR. GERHARDSTEIN:
```

71

```
1          Q.   At 2:55, it says, One in custody; is

2     that correct, sir?

3               MS. SEARS:  Let me just finish.

4               I will make a record when I need to

5          make a record, Mr. Gerhardstein.

6               And if you have a problem with my

7          comment, then you interpose an objection.

8               But don't hold your hand up at me

9          and -- and give me a stop sign, like I work

10         for you or like I -- like you're the boss of

11         me, frankly.

12              Now, if you understand that question,

13         please feel free to answer it.

14    BY MR. GERHARDSTEIN:

15         Q.   At 2:55, it says, One in custody.

16              Do you see that, sir?

17         A.   That's what it says on here, correct.

18         Q.   All right.  And that was your

19    broadcast, right?

20         A.   I don't know -- like I said, I don't

21    know where in the 2:55 minute -- it's not showing

22    that.

23         Q.   And at 2:57, there was a request EMS.

24              Do you see that?

25         A.   I do see that.
```

72

```
1        Q.    Okay.  So the request for EMS came out

2    after he was in custody, somewhere in the

3    vicinity of two minutes later, right?

4        A.    In the vicinity, correct.

5        Q.    Okay.  And then it says 9S32 advised to

6    slow units.

7              What's that mean?

8              That's you talking, right?

9        A.    Right.  That's me advising everybody

10   not to haul -- haul a man up there and get hurt;

11   slow down.

12             When I called for officer needs

13   assistance, we were still fighting him.

14       Q.    Okay.  And --

15       A.    He was not restrained when I called for

16   more -- when I called for the additional units.

17       Q.    And 9P31, requesting EMS, that's Dalid,

18   right?

19       A.    Correct.

20       Q.    What's ACB, to slow units?

21       A.    All-county broadcast.  It goes out to

22   every unit in the county.

23       Q.    Because the officer needed assistance,

24   it goes out to every unit.

25       A.    Correct.
```

73

 1     Q.    Okay.  And then who broadcasts that CPR

 2  was in progress at 3:04?

 3     A.    It says it was me, 9 Sam 32.

 4     Q.    And how long after CPR started did you

 5  broadcast that it was in progress?

 6     A.    I believe I did it right away.  It may

 7  have been shortly after.

 8     Q.    Did you determine yourself whether the

 9  CPR was making -- was having any positive

10  impact?

11     A.    I do recall them saying they got a

12  pulse back a few times.

13     Q.    So at least with respect to Mr. Roell,

14  you had had several minutes of struggle with him,

15  and then he lost his vital signs, right?

16        MS. SEARS:  Object as to the word

17     several.

18     A.    From what it says here, there was

19  approximately a coup -- a few minutes.

20  BY MR. GERHARDSTEIN:

21     Q.    Okay.

22     A.    Four or five minutes; three, four, five

23  minutes, could be anywhere in there.

24        MS. SEARS:  Remember to keep your voice

25     up.

74

1     BY MR. GERHARDSTEIN:

2          Q.   And then --

3               THE WITNESS:   Sorry.

4               MS. SEARS:   Do you need him to repeat

5          what he just said, Wendy?

6               THE REPORTER:   (Indicating.)

7               MS. SEARS:   Okay.

8     BY MR. GERHARDSTEIN:

9          Q.   Take a look at Exhibit 2, page 4488.

10    And this is the 2012 excited delirium roll call

11    training for Hamilton County.

12         A.   Okay.

13         Q.   At page 4488, it states that, Usually,

14    within minutes of being restrained, the victim

15    loses all vital signs.

16              Did I read that correctly?

17         A.   You did.

18         Q.   And that's what happened here, right?

19         A.   Correct.

20         Q.   Your radios were on your person,

21    right?

22         A.   Right.

23         Q.   So in order to call for EMS while you

24    were back behind the condo, you needed to press a

25    button on the microphone on your uniform and

1    broadcast?

2        A.    Right.

3        Q.    And that didn't happen until after

4    Mr. Roell was cuffed and shackled, right?

5        A.    I don't know if he was shackled.

6        Q.    All right.  But until you felt that he

7    was in custody?

8        A.    That he was cuffed.

9        Q.    So take a look at page 4491 of the

10   excited delirium roll call materials.  And this

11   is titled, How to Respond to an Excited Delirium

12   Emergency, right?

13       A.    Uh-huh.

14       Q.    And the first bullet point is, If the

15   detail you're responding to sounds like it may

16   involve an excited delirium patient, ask dispatch

17   for EMS and have them staged nearby.

18            That did not happen here, correct?

19       A.    It did not, because we weren't

20   dispatched to an excited delirium emergency.

21       Q.    And the second bullet point says, If

22   the situation permits, have EMS on scene before

23   engaging the subject.

24            That did not happen here, right?

25       A.    The situation did not permit.

1     Q.   So are you saying you -- well, you say

2  the situation did not permit.

3          Let's go to the moment when he -- when

4  Mr. Roell has crawled back through the gate, is

5  inside the patio, and the three officers are

6  about to enter the gate and continue trying to

7  restrain him.  Okay?

8     A.   Okay.

9     Q.   At that point, would you agree that you

10  had the opportunity to, at least, push the button

11  and call for EMS?

12     A.   No.

13     Q.   And at that point, did you call for

14  additional officers, or had you not done that

15  yet?

16     A.   Not yet.

17     Q.   At the moment you were on the other

18  side of the gate and Mr. Roell was on the patio,

19  you'd agree that you had had enough experience

20  with Mr. Roell to confirm his symptoms as

21  consistent with excited delirium, right?

22          MS. SEARS:  Objection as form.

23  BY MR. GERHARDSTEIN:

24     Q.   You can answer.

25     A.   What was the question again?  I'm

1    sorry.

2              MR. GERHARDSTEIN:  (Indicating.)

3              (The record was read.)

4        A.   Or drugs, alcohol.  It's consistent

5    with -- could be anything.

6    BY MR. GERHARDSTEIN:

7        Q.   Well, take a look at 4489.

8        A.   Okay.

9        Q.   And you had enough experience with

10   Mr. Roell to confirm most of these symptoms as

11   symptoms that you witnessed Mr. Roell exhibiting,

12   right?

13       A.   He had some of the symptoms, correct.

14       Q.   Okay.  Did you say to either of your

15   brother officers that we have an excited delirium

16   situation here?

17       A.   No.

18       Q.   You -- you knew excited delirium is a

19   medical problem, right?

20       A.   Correct.

21       Q.   And, in fact, you knew that one of the

22   risks of excited delirium is that people lose

23   their vital signs after they are engaged in

24   this -- in any struggle so vigorously, right?

25              MS. SEARS:  Objection.

78

```
 1              Is this knew at the time of the
 2      incident?
 3              MR. GERHARDSTEIN:  Yes.
 4              MS. SEARS:  Oh, knew at the time of the
 5      incident.
 6   BY MR. GERHARDSTEIN:
 7      Q.   Right?
 8              MS. SEARS:  Can -- do you understand
 9      the question?
10   BY MR. GERHARDSTEIN:
11      Q.   You can answer.
12      A.   I don't understand.  I'm sorry.
13      Q.   Okay.
14              MR. GERHARDSTEIN:  Just read it back.
15              (The record was read.)
16      A.   We agree that he can lose his vital
17   signs.
18   BY MR. GERHARDSTEIN:
19      Q.   Okay.  So what steps did you take to
20   make sure that EMS would be available should he
21   lose his vital signs?
22      A.   We called EMS when we had the
23   opportunity to.  We were never given the
24   opportunity to.
25      Q.   And that, again, is because you didn't
```

```
 1    press the button and make that call before you

 2    rushed back into the patio, right?

 3                MS. SEARS:  Objection.

 4                Asked and answered --

 5    BY MR. GERHARDSTEIN:

 6        Q.   Is that correct?

 7                MS. SEARS:  -- three times, now.

 8        A.   I've already answered that question.

 9    BY MR. GERHARDSTEIN:

10        Q.   Is that right?

11        A.   I've already answered the question.

12        Q.   Is that correct?

13                MS. SEARS:  You can answer it again if

14        you understand the question.

15        A.   What was the question again?

16                MR. GERHARDSTEIN:  Read it back.

17                (The record was read.)

18        A.   There was no time to.

19    BY MR. GERHARDSTEIN:

20        Q.   I'm going to ask you to take a look at

21    a defense exhibit, J, which is the Taser

22    training.

23                No.  I think it's in this pile.

24                MS. SEARS:  Yeah.  It might be in here.

25                MR. GERHARDSTEIN:  J is the --
```

1          MS. SEARS:  Yeah.  Here it is.

2          It's just the top there.

3     BY MR. GERHARDSTEIN:

4          Q.   And look at page 58.

5          You've seen these Taser materials

6     before, right?

7          A.   Yes.

8          Q.   And this particular slide suggests that

9     if you've used the Taser and the behavior of the

10    subject hasn't changed, you can reload a new

11    cartridge and reengage.  That's the first bullet

12    point, right?

13         A.   Okay.

14         Q.   And when you're doing an X2, you don't

15    even have to do that, because you can just shoot

16    the second cartridge, right?

17         A.   Correct.

18         Q.   And Deputy Huddleston actually did

19    shoot the second cartridge, right?

20         A.   Correct.

21         Q.   And then this also says you can keep an

22    expended cartridge in place and apply a drive

23    stun follow-up.

24         And Deputy Huddleston actually tried

25    that one, too?

1          A.    I believe.

2          Q.    Because there's a prong inserted into

3    Mr. Roell, and he did a drive stun to the back of

4    the leg in order to attempt to complete the

5    circuit, right?

6          A.    We thought there was a prong.  I guess

7    he thought there was.

8          Q.    Okay.  But you witnessed him try to do

9    that, right?

10         A.    Correct.

11         Q.    And then the third bullet point is that

12   you can apply the force options or other

13   alternatives or disengage, right?

14         A.    Correct.

15         Q.    And at -- at no point in this encounter

16   with Mr. Roell did you disengage, right?

17         A.    We did not.

18         Q.    And the --

19         A.    We disengaged once he was in -- in

20   control.

21         Q.    Once you had him in custody?

22         A.    Right.

23         Q.    But you chose not to disengage and

24   formulate a different plan, that would use less

25   force on him, right?

82

```
 1            MS. SEARS:  Objection to less force.
 2  BY MR. GERHARDSTEIN:
 3       Q.   Is that right?
 4       A.   We did not disengage.
 5       Q.   So take a look at Exhibit A within the
 6  defense materials.
 7            MS. SEARS:  I think it's right here.
 8            MR. GERHARDSTEIN:  Yeah.
 9            THE WITNESS:  Is that my water?
10            MS. SEARS:  Oh, yes.  That is your
11       water.  I'm sorry.  Pardon me.  I'm sorry.
12  BY MR. GERHARDSTEIN:
13       Q.   And look at page 4, dash, 1, dash, 62.
14            Now, these materials are the
15  interpersonal communication training materials
16  that you received in connection with your
17  corrections training, right?
18       A.   Correct.
19       Q.   And these are the types of materials
20  that would refer to and utilize throughout your
21  work in corrections and on the road, right?
22       A.   Correct.
23       Q.   And one of the things it suggests that
24  you should do when you observe somebody who is
25  acting unusually is that you look at his
```

1  behavior, his appearance, and the environment,

2  right?

3      A.   Where are you reading that again?  I'm

4  sorry.

5      Q.   4, dash, 1, dash, 62.  It's the

6  italicized words under Environment.

7          You look at his behavior --

8      A.   Correct.  Okay.  I see what you're

9  saying.  I gotcha.

10     Q.   -- and his appearance, his environment,

11  right?

12     A.   Right.

13     Q.   And, of course, in this situation his

14  behavior was bizarre, right?

15     A.   He was yelling and screaming, correct.

16     Q.   And his appearance was --

17     A.   Nude.

18     Q.   -- nude from the waist down, which is

19  unusual, right?

20     A.   It's not normal.

21     Q.   And the environment was a closed patio

22  with a privacy fence around it and a wall with

23  the windows as the fourth wall, right?

24     A.   And the windows were broken out, yes.

25     Q.   So when you made these observations and

84

 1   you set out to draw the inferences that are

 2   called for at the next -- as the next step in

 3   developing a plan of interpersonal communication,

 4   the inference you drew was that he was confused

 5   or disoriented, right?

 6        A.   I didn't --

 7             MS. SEARS:  Are you telling him that's

 8        the inference, or are you asking him if

 9        that's the inference?

10   BY MR. GERHARDSTEIN:

11        Q.   Is that right?

12        A.   Are you asking me?

13             MR. GERHARDSTEIN:  Read the question

14        back.

15             (The record was read.)

16        A.   The inference I drew was he was out of

17   control.

18   BY MR. GERHARDSTEIN:

19        Q.   And out of control is consistent with

20   being disoriented and confused, right?

21        A.   That's one of them.

22        Q.   Okay.  At any point, did you respond to

23   his statements about water?

24        A.   No.  There was no -- there was no

25   opportunity to.  There was no opportunity to.

```
 1            I'm sorry.

 2       Q.   Well --

 3            MS. SEARS:  I'll tell you what, why

 4       don't --

 5  BY MR. GERHARDSTEIN:

 6       Q.   When you heard his statements --

 7            MS. SEARS:  I'm sorry -- switch your

 8       chair, so you're facing Mr. Gerhardstein and

 9       you're facing Wendy, the court reporter, and

10       then when you drop your chin down, I think

11       Wendy might still be able to pick up what

12       you're saying.  Okay?  Because that might

13       help.

14            I'm sorry, Al.

15  BY MR. GERHARDSTEIN:

16       Q.   You -- you heard statements about water

17  on and off through the whole encounter with him,

18  right?

19            MS. SEARS:  Objection.

20            Asked and answered.

21       A.   Yes.

22  BY MR. GERHARDSTEIN:

23       Q.   So when you say there was no

24  opportunity to respond, you certainly had time

25  to, right?
```

1          A.   We did not.

2          Q.   Well, you chose not to use -- you chose

3    not to make any statements responsive to his

4    statements about water while you were struggling

5    with him --

6               MS. SEARS:  Objection.

7    BY MR. GERHARDSTEIN:

8          Q.   -- is that fair?

9               MS. SEARS:  Objection.

10              Argumentative.

11         A.   My concern when struggling with him was

12   getting him under control.

13   BY MR. GERHARDSTEIN:

14         Q.   And you didn't choose to use any of the

15   techniques that you learned in terms of

16   interpersonal communication and crisis management

17   while you were trying to get him under control;

18   is that fair?

19              MS. SEARS:  Objection.

20              Argumentative.

21         A.   Again, there was no time.  He -- he --

22   he came right at us, not listening to anything we

23   were saying while he was coming at us.

24   BY MR. GERHARDSTEIN:

25         Q.   Take a look Exhibit C.

```
 1              MS. SEARS:  Let's put this one back in

 2         here -- A back in here so it doesn't get all

 3         messed up for Wendy.  Okay.  I'll take it.

 4         You go ahead.

 5              Was it C; is that right, C?

 6              MR. GERHARDSTEIN:  Yeah.

 7    BY MR. GERHARDSTEIN:

 8         Q.   3, dash, 2, dash 70, the bullet point

 9    in the middle of the slide titled, Interacting

10    with the Mentally Ill says, Use persuasion rather

11    than force whenever possible.

12              Did I read that correctly?

13         A.   3, dash, 2, dash, 7?

14         Q.   7.

15         A.   7.

16         Q.   Sorry.

17              Did I read that correctly?

18         A.   Which one are you reading?  I'm sorry.

19         Q.   Use persuasion rather than force

20    whenever possible.

21         A.   You did read that correctly.

22         Q.   Did you use persuasion with

23    Gary Roell?

24         A.   It also says here, Make the scene safe.

25    And the scene was not safe.
```

88

1        Q.    And that's -- why do you say the scene
2    was not safe?

3        A.    Because he was out of control.

4        Q.    But one way to help a mentally ill
5    person get in control is using persuasion rather
6    than force, right?

7        A.    Didn't know if he was mentally ill at
8    the time.

9        Q.    Well, you had lots of symptoms that
10   suggested that, right?

11       A.    Suggested other things, too.

12       Q.    Well, but even if his mental incapacity
13   was due to drugs or alcohol, there might be other
14   techniques, rather than force, that would be
15   effective, right?

16       A.    Our --

17             MS. SEARS:  Objection.

18             You can answer.

19       A.    Make the scene safe and get him under
20   control.

21   BY MR. GERHARDSTEIN:

22       Q.    Would you agree that while you were
23   interacting with Mr. Roell, you and Huddleston
24   were giving him commands?

25       A.    I gave a command.  I don't remember if

89

1    Huddleston was or not.

2         Q.   So there was no coordination as to

3    whether -- designating one of you to be the

4    speaker to him, right?

5         A.   Not to my knowledge, no.

6         Q.   Would you agree that Gary Roell seemed

7    overwhelmed?

8         A.   I -- I'm not sure.

9         Q.   Would you agree that you were not

10   having a rational discussion with him?

11        A.   With Mr. Roell?

12        Q.   Right.

13        A.   I would agree he was not complying with

14   anything we were asking him to do.

15        Q.   And his response -- and his statements

16   were not related to anything you were asking him?

17        A.   Well, he was stating no, which --

18        Q.   And he was stating --

19        A.   The water was kind of odd.

20        Q.   Okay.

21        A.   But the no was in relation to what we

22   were asking him to do.

23        Q.   Well, he said no throughout, right?

24        A.   Right.  Well, so --

25        Q.   So you didn't know if no related to not

1    having any water or not doing what you asked,

2    right?

3         A.    Or not complying --

4         Q.    Right.

5         A.    -- or surrendering.

6         Q.    So you don't know what he -- what he

7    was talking about, right?

8         A.    Right.

9         Q.    And you'd agree that you weren't using

10   a calm voice or trying to slow the pace down,

11   right?

12        A.    I was yelling because he was yelling --

13        Q.    Okay.

14        A.    -- so he could hear me.

15        Q.    Would it have been helpful to you if

16   you had information about prior runs to

17   Mr. Roell's residence involving his need for

18   mental health services --

19             MS. SEARS:  Objection as to --

20   BY MR. GERHARDSTEIN:

21        Q.    Would that have been helpful?

22        A.    I mean, regardless, we had to get him

23   in control.

24        Q.    Yeah.  My question was, would it have

25   been helpful to know what the experience of prior

1    runs had shown.

2         A.   No.

3         Q.   So if other officers had been able to

4    come and talk with him in a way that calmed him

5    down, you wouldn't want to know that?

6              MS. SEARS:  Objection.

7              Argumentative.

8         A.   Would I want to know if other officers

9    could talk him down?

10   BY MR. GERHARDSTEIN:

11        Q.   Yeah.

12        A.   When we showed up to the scene, he was

13   out of control.  There was no calming him down.

14   He immediately came after us.

15        Q.   Well, he came at you, right?

16             MS. SEARS:  Objection.

17             He answered the question.

18   BY MR. GERHARDSTEIN:

19        Q.   Right?

20        A.   He came after --

21             MS. SEARS:  Objection.

22             Argumentative.

23   BY MR. GERHARDSTEIN:

24        Q.   After your interaction with Mr. Roell,

25   have you used any force on any suspects?

1        A.    No.

2        Q.    And while you were in corrections, did

3    you use any force that was reported as a use of

4    force on inmates?

5        A.    I used -- I was down there

6    seven-and-a-half years.  There's been times.

7        Q.    What was the most serious use of force

8    incident while you were in corrections?

9        A.    Most of them were from just the CERT

10   team call-outs.

11            I remember just one where the inmate

12   wouldn't go into a cell, and I would escort him

13   into a cell and he ended up fighting me.  But

14   that was very minor.  Nothing happened.

15            He just got pushed into the cell; and

16   closed the door.

17            My use of force downtown, very

18   minimal.

19       Q.    You said earlier that encounters with

20   mentally ill citizens are foreseeable for you as

21   a law enforcement officer, right?

22       A.    Correct.

23       Q.    And you'd also agree then that,

24   pursuant to your Taser training and your county

25   training, that encounters with persons

1    experiencing excited delirium are also

2    foreseeable, right?

3          MS. SEARS:  Objection.

4       A.   Not necessarily, not foreseeable.  It's

5    a possibility.

6    BY MR. GERHARDSTEIN:

7       Q.   So it -- so -- and that's why you're

8    trained for it, because it's -- because it is a

9    possibility that could happen, right?

10      A.   Correct.

11          THE WITNESS:  I need to use the

12       restroom.

13          MS. SEARS:  Are you asking -- did you

14       want to break to go to the restroom?

15          THE WITNESS:  Well, he just said we had

16       ten minutes left in the tape.

17          MS. SEARS:  Yeah.  So do you want to

18       wait to go to the restroom for ten minutes?

19          THE WITNESS:  That's fine.

20          MS. SEARS:  Is that okay?

21          THE WITNESS:  Yeah.

22          MS. SEARS:  You sure?

23          THE WITNESS:  Uh-huh.

24          MS. SEARS:  All right.

25          MR. GERHARDSTEIN:  Let's take a break.

```
 1            MS. SEARS:  Oh, okay.

 2            MR. GERHARDSTEIN:  And we'll see where

 3       we're at.

 4            MS. SEARS:  All right.

 5            THE VIDEOGRAPHER:  We are off the

 6       record.  The time is 11:44 a.m.

 7            (Off the record.)

 8            THE VIDEOGRAPHER:  We are on the

 9       record.  The time is 12:02 p.m.

10  BY MR. GERHARDSTEIN:

11       Q.   What's your age?

12       A.   Twenty-nine.

13       Q.   Are you married?

14       A.   Yes.

15       Q.   Any kids?

16       A.   Four.

17       Q.   Have you sued anyone or been sued?

18       A.   I was involved in a yellow --

19  Cincinnati yellow cab lawsuit.

20       Q.   What's the -- just give me the --

21       A.   It was an automobile accident.  I was

22  injured; and medical bills.  So I --

23       Q.   So you sued a cab company --

24       A.   Correct.

25       Q.   -- for your injuries?
```

95

```
 1              Is that over with?

 2      A.    Yes.

 3      Q.    Have you ever filed for bankruptcy?

 4      A.    No.

 5      Q.    Have you taken any medications today?

 6      A.    No.

 7      Q.    How tall are you?

 8      A.    Five, ten.

 9      Q.    And how much do you weigh?

10      A.    About 195.

11      Q.    And what did you do to prepare for the

12  deposition?

13      A.    Just met with my attorneys.

14      Q.    And I don't want to know what you said

15  to them and what they said to you.

16              But what did you look at?

17      A.    I reviewed my statement and the -- and

18  the video statement, the Taser policy, and the

19  use-of-force policy.

20      Q.    Anything else?

21      A.    (Shaking head.)

22      Q.    And you attended yesterday's

23  deposition, I guess?

24      A.    Yeah.

25      Q.    Prior to August 13th, 2013, had you
```

96

1    ever discharged a firearm at a suspect?

2         A.    No.

3         Q.    And had you ever discharged a Taser at

4    a suspect?

5         A.    No.

6         Q.    And since 20 -- August 13th, 2013, have

7    you discharged a Taser at a suspect?

8         A.    No.

9         Q.    Since you've been on the road, have

10   you -- what's the worst injury a suspect has

11   received in connection --

12        A.    In my --

13        Q.    -- with any use of force you've engaged

14   in?

15        A.    I've never been involved in use of

16   force, other than this.

17        Q.    Have you been disciplined at all since

18   you've worked for the Hamilton County Sheriff's

19   Office?

20        A.    Even in corrections?

21        Q.    Yeah.

22        A.    Yes.

23        Q.    What discipline?

24              MS. SEARS:  Objection.

25              You can answer.

1    A.    I got a cell phone write-up, a DVD

2    player write-up -- in the jail, this is in the

3    jail -- missed briefing, missed my agility run.

4    BY MR. GERHARDSTEIN:

5        Q.    Anything else?

6        A.    I think that's it.

7        Q.    And did any of these result in

8    suspensions?

9        A.    I received a three-day suspension for

10   the briefing.  I believe it was three days.

11       Q.    Have you ever received any discipline

12   since you've been on the road patrol?

13       A.    I got a 2 GIG cards, G-I-G -- they're

14   general infraction -- one for misplacing a cell

15   phone on the hood of my car, and I didn't know it

16   was there when I was handling a suspect, and it

17   got damaged; and then wrecking a cruiser.

18       Q.    What happened on the cruiser?

19       A.    I was doing patrol in a business area,

20   and then I hit a light pole.

21       Q.    So do you know, is your discipline

22   captured in some file other than your personnel

23   file?

24       A.    I don't believe so.

25       Q.    Because that discipline on the road

```
 1    patrol doesn't show up in your personnel file.

 2         A.    I believe it goes in there.

 3         Q.    Okay.

 4         A.    My evaluation I just received, it was

 5    on there.

 6         Q.    Yeah.  The evaluations are in there.

 7         A.    My GIG cards are on that one.

 8         Q.    When were you certified with the X2?

 9         A.    2012 -- 2013.  I'm sorry -- when I came

10    onto the road patrol, January 2013.

11         Q.    And who was your instructor?

12         A.    I think it was Lee Edwards.

13         Q.    When were you certified in the X26?

14         A.    2000 -- I want to say 2010, 2011.

15         Q.    And who was your instructor?

16         A.    I believe it was Lee Edwards again.

17         Q.    Okay.  Since you have worked for the

18    sheriff's office, did you ever work in -- in the

19    capacity of somebody who executed warrants for

20    the probate court?

21         A.    No.

22         Q.    Did you ever do any pink-slipping of

23    suspects?

24         A.    I've pink-slipped people before.

25         Q.    Tell me about that.
```

99

1      A.   If they're suicidal or they're -- you

2  know, can't control -- can't take care of

3  themselves, overdosed, tried taking pills or

4  something.

5      Q.   How many times has that happened?

6      A.   I don't know, less than ten.

7      Q.   Give me a -- you don't have to use

8  names.  Just give me an example of -- like one of

9  the more recent cases that you've had where you

10 you've pink-slipped somebody.

11     A.   Got a call for -- I think it was

12 brother and -- husband and wife.  The husband was

13 feeling very suicidal and was unable to care for

14 himself.  His wife was concerned.

15     Q.   What did you do?

16     A.   Talked to him.  And he did confirm that

17 he was suicidal, and he needed to talk to

18 somebody.

19          So we took him down to Deaconess.

20     Q.   And he cooperated?

21     A.   Uh-huh.

22     Q.   And when you went to Deaconess -- is

23 that where University Hospital has their

24 psychiatric emergency service?

25     A.   It's right next to -- I think, it's

100

1    Taft Middle School.  It's a branch off of them.

2        Q.    But that's part of the University

3    Hospital system, right?

4        A.    I -- I believe so.

5        Q.    And then once -- so in that situation,

6    he didn't resist at all, right?

7        A.    No.

8        Q.    Did you have any situations where you

9    pinked-slipped somebody who was not cooperating?

10       A.    Not to my recollection, no.

11       Q.    And in those situations where you've

12   pink-slipped people -- and by pink-slip we mean

13   you're using your authority as a law enforcement

14   officer under Ohio law to have an involuntary

15   review by a health care professional of a

16   person's mental status, right?

17       A.    Correct.

18       Q.    And when you have approached people

19   with that in mind, you have used your

20   interpersonal communication skills to gain their

21   cooperation, right?

22       A.    Most of them have been pretty

23   cooperative off the get-go.

24       Q.    Well, they were cooperative, but you

25   also maintained a calm, reassuring manner, right?

```
 1       A.   Correct, because they were

 2  cooperative.

 3       Q.   When you worked in corrections, did you

 4  have encounters with people who were delusional

 5  or out of control because of a mental disturbance

 6  while you were responsible for supervising them

 7  in the -- in the pods?

 8       A.   I have.

 9       Q.   And with those individuals, have you

10  sought the assistance of the medical staff in the

11  course of your work with such inmates?

12       A.   I have in the past, correct.

13       Q.   Give me an example of a situation where

14  you worked in tandem with the medical staff to

15  help secure the safety of an inmate who was

16  delusional or acting out.

17       A.   Typically, when that happens, they put

18  them in a restraint chair.  And then the medical

19  staff and the psych staff talks to them in the

20  restraint chair.

21       Q.   And when they are placed in the

22  restraint chair, the medical staff interacts with

23  them promptly afterwards, right?

24       A.   Typically, yes.

25       Q.   And when they're placed in the
```

1    restraint chair, medical staff is on notice that

2    that inmate's going to be placed in the restraint

3    chair, right?

4         A.   It's usually -- comes from them or the

5    psychiatrist.

6         Q.   Did you have a cell phone on

7    August 13th, 2013?

8         A.   I did.

9         Q.   And did you use it at all in connection

10   with any calls about your involvement with

11   Mr. Roell?

12        A.   I called my wife.

13        Q.   Anybody else?

14        A.   That's it.

15        Q.   Let's go off the record, and you can

16   just give me the cell phone number and the

17   service provider off the record.

18             THE VIDEOGRAPHER:  We are off the

19        record at 12:12 p.m.

20             (Off the record.)

21             THE VIDEOGRAPHER:  We are back on the

22        record at 12:13 p.m.

23   BY MR. GERHARDSTEIN:

24        Q.   Did you have your uniform on on

25   August 13th, 2013?

1       A.   Yes.

2       Q.   And what was on your duty belt?

3       A.   CD21, which is the baton, gun, the

4    magazines, handcuffs, and Taser, and radio.

5       Q.   And was yours an X2 or an X26?

6       A.   X2.

7       Q.   Did you have a flashlight?

8       A.   I did not on me at the time.  Those

9    aren't on -- those aren't on our belt.

10      Q.   At any point in your encounter with

11   Mr. Roell on August 13th, 2013, did Mr. Roell

12   say, I'm not armed?

13      A.   No.

14      Q.   On the incident recall, you pointed out

15   that the first broadcast, C, slash, C, means, see

16   the complainant?

17      A.   Correct.

18      Q.   Did you ask any other questions of the

19   complainant after you had been back to the patio?

20           Did you ever have any other encounter

21   with her at all?

22      A.   I never -- I never spoke to her, other

23   than when she directed us, you know, from the

24   front.

25      Q.   So did you have an opportunity to learn

1    that she had also talked to Mr. Roell that

2    evening?

3        A.   I did not.

4        Q.   Would that have been helpful to you, to

5    learn what she had learned about Mr. Roell?

6        A.   Probably not.

7        Q.   You mentioned that you didn't witness

8    Mr. Roell start snoring, right?

9        A.   I don't recall that.

10       Q.   Would you agree, though, that snoring

11   after vigorous exercise and then like getting out

12   of consciousness to the point where you're

13   snoring, that that is an indication of a medical

14   problem?

15           MS. SEARS:  Objection.

16       A.   It's odd.

17   BY MR. GERHARDSTEIN:

18       Q.   Had you ever -- have you ever heard of

19   that being --

20       A.   No.

21       Q.   -- a symptom of a medical problem?

22       A.   I don't recall, no.

23       Q.   Are you friends with either Huddleston

24   or Dalid?

25       A.   Am I friends with them?

1     Q.    Yeah.

2     A.    Yes.

3     Q.    Outside of work?

4     A.    Yes.

5     Q.    Do you socialize with them?

6     A.    I do.

7     Q.    Did either one of them help you get

8  your job with the sheriff's office?

9     A.    No.

10    Q.    Did you work with them in

11 corrections?

12    A.    I did.

13    Q.    Both of them?

14    A.    Yes.

15          MR. GERHARDSTEIN:  What else you got?

16 BY MR. GERHARDSTEIN:

17    Q.    Immediately after the EMS squad removed

18 Mr. Roell, did you have an opportunity to talk to

19 Dalid or Huddleston about what just happened?

20    A.    No.

21    Q.    Tell me what happened immediately after

22 Mr. Roell was removed from the scene.

23    A.    Corporal Steers then directed us all to

24 separate and go into individual cruisers.

25          I went into Corporal Steer's cruiser's

1    front seat.

2            Other people were also directed to take

3    Deputy Huddleston and Dalid to their respective

4    spots, where they went.

5        Q.   Have you ever talked to them about what

6    happened that night?

7        A.   After the incident we kind of discussed

8    it, after we got interviewed and everything.

9        Q.   Did you talk to them at all between the

10   time you were put in these separate cruisers and

11   the time you were interviewed?

12       A.   No.

13       Q.   So any conversations you had about what

14   happened all occurred after you were each

15   interviewed?

16       A.   Correct.

17       Q.   Have you reviewed the interviews of the

18   other officers?

19       A.   I have not.

20       Q.   Have you seen their videos?

21       A.   I have not.

22            MR. GERHARDSTEIN:   What else?

23            Okay.   I don't have any other

24       questions.   Thank you.

25            MS. SEARS:   Okay.   Thank you.

```
1                       EXAMINATION

2   BY MS. SEARS:

3        Q.   Deputy, you were present yesterday when

4   Deputy Huddleston was -- gave his deposition; is

5   that correct?

6        A.   Correct.

7        Q.   And in that deposition, do you recall

8   my discussing the corrections academy training

9   and interpersonal communications training?

10       A.   Yes.

11       Q.   And did you hear Deputy Huddleston's

12  responses to my questions about that training?

13       A.   Yes.

14       Q.   Is there anything you would add in

15  addition to what Deputy -- Deputy Huddleston said

16  to explain that training?  Or was his answer

17  fairly complete?

18       A.   It was pretty complete.  Just,

19  basically -- it's just the way you talk to people

20  and how to deescalate the situation.

21            Because your mouth is your best tool.

22       Q.   And I asked Deputy Huddleston if he had

23  occasion day in and day out in corrections to

24  utilize the skills that he had been introduced to

25  in that training in his job and the scope of his
```

1    employment.

2         Did you have that opportunity, sir?

3    A.   I did.

4    Q.   And then we had a conversation,

5    Deputy Huddleston and I, about CERT, C-E-R-T.

6         Are you familiar with that?

7    A.   I am.

8    Q.   And I believe -- if I remember

9    correctly, Deputy Huddleston stated that you also

10   were on the CERT team.

11        Did I remember that correctly?

12   A.   You did.

13   Q.   And Deputy Huddleston described the

14   CERT team in terms of its -- how it looked and

15   what its function is.

16        Is there anything you would add to what

17   Deputy Huddleston had to say?

18   A.   No.

19   Q.   How long were you a member of the CERT

20   team?

21   A.   It was probably three, four years.

22   Q.   And how did you come to be on the CERT

23   team?

24   A.   We were all individually selected and

25   went through the process of testing and the

1     physical fitness.

2                 And we were all selected personally by

3     the man in charge of the CERT team.

4          Q.   Who was that person in charge?

5          A.   Now it's Captain Scheffler.

6          Q.   Oh, Captain Scheffler.

7                 And, at the time, was it

8     Captain Scheffler?

9          A.   Yes --

10         Q.   Okay.

11         A.   -- it was.

12               He was a lieutenant at the time.

13         Q.   He was a lieutenant?  Okay.

14         A.   I'm sorry.

15         Q.   No, no.  That's okay.

16               So it wasn't a different person, he

17    just had a different rank?

18         A.   Correct.

19         Q.   Okay.  And was your job performance up

20    until the time Captain -- then Lieutenant, now

21    Captain Scheffler, asked you to participate on

22    the CERT, was your job performance a

23    consideration?

24         A.   Yes.

25         Q.   Was your ability to handle inmates in

1    particular situations, whether they be tense

2    situations or other situations -- was that a

3    variable that Captain Scheffler considered in

4    choosing you to join CERT?

5         A.   Yes.

6         Q.   Was your decision-making and judgment,

7    as you exhibited it during the time you were a

8    corrections officer -- was that a variable or a

9    characteristic that the captain -- then

10   lieutenant -- was considered, if you know?

11        A.   Yes.

12        Q.   Was your decision-making and your

13   ability to make decisions, to assess the

14   situation and make a determination as to the

15   proper reaction from a tactical law enforcement

16   perspective -- was that a characteristic, if you

17   know, that the then lieutenant took into account

18   when asking you particularly to join the CERT

19   team?

20        A.   Yes.

21        Q.   And then can you tell me what your

22   reason was for taking the patrol academy and

23   leaving -- attempting -- I guess designing to

24   leave corrections and go on road patrol?

25        A.   My objective was to -- always wanted to

1    come out to the streets and not stay in the jail.

2            And the first opportunity I was given

3    to take the patrol academy, I jumped on it and

4    took it and enrolled.

5        Q.   Now that you've been on patrol for --

6    what, since '12?  Am I --

7        A.   January 2013.

8        Q.   '13.

9            Now that you've been on patrol since

10   '13, did you -- do you find that your work in

11   corrections has been an asset to you in terms of

12   your working the patrol division?

13       A.   Absolutely.

14       Q.   And what assets would you say that you

15   gathered while you were a corrections officer

16   that are useful to you now, while you're on

17   patrol?

18       A.   The way you handle the constantly

19   evolving scenarios that happen in the jail pod,

20   the agitated people, the high-profile people.

21            You know, you -- the way you talk to

22   them, you know, gets you through the day.

23       Q.   And when you say high-profile, what do

24   you mean?

25       A.   High-profile cases, murderers, you

1    know, stuff like that, that -- high-felony

2    crimes.

3        Q.    And, let's see, you said rapidly

4    evolving situations --

5        A.    Correct.

6        Q.    -- that occur in the jail.

7              And when you compare the jail

8    environment and the patrol environment, would you

9    agree with me that the patrol environment can be

10   more challenging because there are less variables

11   that you can control?

12       A.    Correct; a lot more environmental

13   weapons out on the road.  And there --

14       MS. SEARS:  Speak up a little bit.  Wendy --

15       A.    A lot more environmental weapons on the

16   street than there is in the jail.

17   BY MS. SEARS:

18       Q.    And when you mean -- when you say

19   environmental weapons, is that a -- kind of a

20   term of art in the law enforcement profession?

21       A.    Correct.

22       Q.    Okay.  Can you explain for the record

23   what an environmental weapon is?

24       A.    It could be anything out on the streets

25   that could be used as a weapon against us.

1      Q.   Can you give me some examples that --
2  of an environmental weapon?

3      A.   In reference to a specific incident?

4      Q.   This incident or any other.

5      A.   There's glass -- a hose, glass,
6  anything they can pick up and throw at us.

7           I mean --

8      Q.   And are you familiar with the term
9  deadly weapon?

10     A.   I am.

11     Q.   Okay.  And how would you define a
12 deadly weapon?

13     A.   It's a weapon that can result in deadly
14 force if you use it.

15     Q.   And could an unloaded gun be a deadly
16 weapon?

17     A.   It could be.

18     Q.   Could a ceramic pot be a deadly
19 weapon?

20     A.   Yes.

21     Q.   What?

22     A.   Yes.

23     Q.   And when you are on scene in -- in the
24 real world, not in the jail environment, are you
25 trained to assess the potential threat that --

1    that might arise?

2         A.    Correct.

3         Q.    And are you trained to, basically, plan

4    for the worst and hope for the best?

5         A.    Yes.

6         Q.    Did you recall or do you recall my

7    conversation with Deputy Huddleston about the

8    patrol academy yesterday --

9         A.    Yes.

10        Q.    -- took the patrol academy?

11        A.    Yes.

12        Q.    And was that at Butler Tech, as well?

13        A.    It was.

14        Q.    And did -- do you recall that I went

15   over the curriculum from the patrol academy with

16   Deputy Huddleston yesterday?

17        A.    I do.

18        Q.    I'm not going to go over it all with

19   you.  But if you don't mind, just looking at

20   Exhibit B for me.

21             MS. SEARS:  It was probably in this

22        pile.  Let me see if I can -- oh, here it

23        is, right on top.

24   BY MS. SEARS:

25        Q.    Just -- I just ask you to glance at

1    that and see if those topics sound familiar to

2    you, and if the hours seem about right.

3            I mean, I understand that you're not --

4    you didn't calculate them.  You don't have a

5    calculation of them.  So --

6        A.   It does look accurate.

7        Q.   And then, if you don't mind -- just

8    taking a glance at what has been marked as, I

9    believe, Exhibit C, which I think

10   Mr. Gerhardstein has already showed you.

11           MS. SEARS:  We're going to try real

12       hard not to take your exhibits.

13   BY MS. SEARS:

14       Q.   Exhibit C and Exhibit D; and I'm just

15   going to ask you to glance at those, which you

16   already did with -- with regard to one of them.

17           I think it was the special needs

18   population that you went over with

19   Mr. Gerhardstein.

20       A.   Correct.  Yes.

21       Q.   Do these appear to be OPOTA curriculum?

22       A.   Yes.

23       Q.   And do you see --

24           MS. SEARS:  We're on M, Wendy, right?

25           THE REPORTER:  (Indicating.)

1           MS. SEARS:  Why don't I have a picture

2      of these?  I'm such a gumba.

3           (Deposition Exhibit M was marked for

4           identification.)

5  BY MS. SEARS:

6      Q.   I'm showing you what's been marked as

7  Exhibit M for purposes of your -- of your

8  deposition.

9           Is this a sign-up -- sign-in sheet from

10  the Butler Tech patrol academy?

11      A.   It is.

12      Q.   And I think -- if you just page through

13  them after I'm done paging through them, I think

14  there's a date at the top; is that right?

15      A.   There is.

16      Q.   Are these a series of sign-in sheets

17  that you signed when you took the classes at

18  Butler Tech on crisis intervention and dealing

19  with the special needs population?

20      A.   It is.

21      Q.   And did you pass that academy?

22      A.   Yes.

23      Q.   And did you pass the OPOTA test?

24      A.   Yes.

25      Q.   And since you did -- oh, I forgot to

1    ask you this.

2           Deputy Huddleston said that while on

3    CERT, that there were regularly scheduled

4    training sessions four hours a month?

5       A.   Correct.

6       Q.   Is that your recollection, as well?

7       A.   Yes.

8       Q.   Did you participate in those?

9       A.   I did.

10      Q.   And how would you describe the types of

11   training that you -- you participated in?

12      A.   A lot of it was scenario-based.

13           We -- they put us in high-stress

14   scenarios or scenarios that have happened in the

15   past.

16           And we go through it, and they critique

17   us and make sure we did it proficiently and

18   safely and tactically correct.

19      Q.   And would you -- I think I asked you

20   this.

21           Would you agree, about four hours a

22   month -- every month you had --

23      A.   Correct.

24           I think we had like a weekend during

25   the summer, too, or a three-day-weekend training.

118

1      Q.   Okay; the CERT -- CERT team?

2      A.   Correct.

3      Q.   And with regard to the patrol academy,

4   did you have firearms training in the patrol

5   academy?

6      A.   I did.

7      Q.   And did you have the opportunity to go

8   through FAS training in the patrol academy?

9      A.   I did.

10      Q.   Simulated firearms training --

11      A.   Yes.

12      Q.   -- is that correct?

13      A.   Yes.

14      Q.   Now, since you've been out in the

15   sheriff's department on patrol, have you been --

16   has there been training available to you, or have

17   you participated in training?

18      A.   Yes.

19      Q.   And you're not looking at a list of

20   your training now, are you?

21      A.   No.

22      Q.   Just off the -- just from your

23   recollection, what would you say would be the

24   training that you participated in?

25      A.   I went into some traffic-stop training,

1    high-risk traffic stops and some drug

2    identification training.

3            It was mostly drug and traffic-stop

4    training, additional.

5        Q.   And do you get recertified on your

6    Taser every year?

7        A.   We do.

8        Q.   And do you get recertified on your

9    firearm every year?

10       A.   We do.

11       Q.   And in that recertification of your

12   firearm, do you review your use-of-force

13   policy?

14       A.   We -- think so; believe so.

15            MS. SEARS:  This will be N.

16            (Deposition Exhibit N was marked for

17            identification.)

18   BY MS. SEARS:

19       Q.   I'm showing you what's been marked as

20   Exhibit N for purposes of your deposition today.

21            Do you recognize this?

22       A.   It's an evaluation.

23       Q.   And at the top, is this a -- is this

24   one of your evaluations?

25       A.   Yes.

```
 1        Q.    And it's dated 4/7/12; is that right?

 2        A.    Yes.

 3        Q.    Were you still in corrections at that

 4   time?

 5        A.    I was.

 6        Q.    And this says annual evaluation; is

 7   that right?

 8        A.    Yes.

 9        Q.    And who was reviewing you?  Who was --

10   who was giving you this evaluation?

11        A.    Looks like Sergeant Sparks (phonetic)

12   and Sergeant Keaton (phonetic).

13        Q.    And then Lieutenant -- now Captain --

14   Scheffler, looks like he signed off on it.

15        A.    Correct.

16        Q.    Okay.  Could I call your attention to

17   the comments on the next page?

18              He -- do you see that -- does a

19   particularly good job when he is assigned to work

20   in the psych unit.

21              Do you see that?

22        A.    I do.

23        Q.    Deputy Alexander gets along well with

24   others, assists without complaint.

25              Do you see that?
```

1      A.    I do.

2      Q.    And then if you drop down to the next

3   paragraph, I have supervised Deputy Alexander for

4   the last three months.  He has primarily been

5   assigned to the psych unit.

6            Is that your memory?

7      A.    Yes.

8      Q.    In this position he's required to

9   interact with our mental and disturbed inmates.

10           Do you see that?

11     A.    I do.

12     Q.    I feel he is successful in this area

13   due to his low-key approach.

14           Do you see that?

15     A.    I do.

16     Q.    Do you have a low-key approach?

17     A.    I do.

18     Q.    How do you define a low-key approach?

19     A.    I always come in just trying to -- I'm

20   not trying to go hands-on -- or use of force

21   unless necessary.

22           And I just try to just talk to them

23   and, I guess, just have a -- the best tool on my

24   belt's my mouth, and I use it.

25     Q.    He seems to only raise his voice when

122

1    it is absolutely necessary.

2           Do you see that?

3    A.    Yes.

4    Q.    Do you agree with that?

5    A.    I do.

6    Q.    He tries to bring an inmate to his

7    level for a successful conclusion in a possible

8    critical situation.

9           Do you agree that that's what you tried

10   to do in -- while in corrections?

11   A.    Yes.

12   Q.    Do you continue to use these sorts of

13   personality attributes in your work on the patrol

14   unit?

15   A.    I do.

16   Q.    Do you find that this particular

17   approach to people that you come into contact

18   with is effective?

19   A.    Very.

20   Q.    And do you find it more effective than,

21   perhaps, just going to warp 8 right in the

22   initial contact?

23   A.    I agree, yes.

24   Q.    And why do you find it more

25   effective?

1      A.   Because you're not coming in at such a

2  high level.  You're not -- you know, you want to

3  keep the -- keep the stress level down, keep

4  everything low, low-key.

5           And just -- that usually results in a

6  successful encounter with whoever I'm

7  encountering with.

8      Q.   And if, for some reason, that doesn't

9  work, where -- where do you go from there?

10     A.   You -- I mean, you have to raise your

11  voice and, you know, you can follow a continuum.

12     Q.   And in your view as a law enforcement

13  professional, does the subject control the degree

14  of force that's necessary in any particular

15  interaction with a subject?

16     A.   Yes.

17     Q.   And in your interaction with a subject,

18  if you -- if you would go immediately to a sort

19  of an aggressive -- you know, I call it Mach 8 or

20  warp 8 kind of approach, just as immediate

21  interaction with a subject, would that incline --

22  in your experience, to have the subject meet you

23  at that level?

24     A.   Typically.

25     Q.   So from an officer safety perspective,

124

1    and from a tactical consideration perspective, is

2    it a better approach to come in low-key and --

3    and move up from there, depending on what's

4    necessary?

5        A.   Yes.

6        Q.   When you are in a tactical encounter

7    with a subject, can you tell me about the

8    variable of officer safety?

9            Is that a variable that you consider?

10       A.   Is what a variable?

11       Q.   Officer safety.

12       A.   Yes.

13       Q.   Is -- in terms of the variables that

14   you consider, where would you place officer

15   safety?

16       A.   It's at the top.

17       Q.   At the top?

18       A.   Yeah.

19       Q.   Do you have a firearm when you

20   encounter a subject --

21       A.   I do.

22       Q.   -- on your person?

23       A.   I do.

24       Q.   Is it loaded?

25       A.   Yes.

125

1        Q.   Do you recall you discussed with

2   Mr. Gerhardstein some excited delirium training

3   that you did?  And you actually looked at what, I

4   believe, is Exhibit 2, the roll call training.

5        A.   I do.

6        Q.   Do you recall whether you had that roll

7   call training before or after your encounter with

8   Mr. Roell?

9        A.   I don't recall.  I think it was

10  before.

11       Q.   But you don't -- but you're not

12  certain?

13       A.   I'm not certain.

14       Q.   Okay.  Can you tell me -- we've had a

15  lot of conversations about plans and whether you

16  had a plan and what your plan was.

17            Tell us about what you're trained to

18  do.

19            For example, in this particular

20  situation involving Mr. Roell, you get a run for

21  a -- neighborhood trouble run.  Okay?  This is

22  your run.

23            You hear it and you -- you respond to

24  it?

25       A.   Correct.

1       Q.    What -- what are you trained to do?

2       A.    Investigate the complaint.

3       Q.    Okay.

4       A.    And then make contact with who the --

5    the complaint is against.

6       Q.    The subject, let's call the person.

7       A.    Okay, the subject -- and evaluate the

8    situation and go from there.

9       Q.    Okay.  So when you get to the scene,

10   other than what you understand the run to be, you

11   don't have necessarily -- or do you have

12   necessarily a preconceived notion of what you're

13   going to find there?

14      A.    No.

15      Q.    Other than what you might glean from a

16   dispatch or maybe some other personal contact you

17   may have had with the subject or complainant, do

18   you assume any particular scenario that -- that

19   you're going to encounter?

20      A.    No.

21      Q.    When you first encounter a subject --

22   let's say he is the subject of a complaint --

23   what are you trained to do with regard to that

24   subject?

25      A.    Make contact and investigate the

127

1    situation.

2        Q.   And when you see the subject and he is

3    standing in your physical presence, what kinds of

4    things are you observing about the subject to

5    assess the situation?

6        A.   It's the surroundings, what's in his

7    hands, his demeanor.

8        Q.   And do the things that you observe

9    about the subject and assess about the subject

10   then inform how you're going to interact with the

11   subject?

12       A.   Yes.

13       Q.   And do they also then dictate the --

14   the next steps of your encounter with the

15   subject?

16       A.   Yes.

17       Q.   When you encounter a subject when

18   you're in uniform and they're 15 feet away from

19   you and you are asking them what's going on and

20   they start coming to you briskly, do you assess

21   something at that point?

22       A.   Yes.

23       Q.   What is the assessment?

24       A.   He's coming towards me to possibly hurt

25   me.

1      Q.    So do you assess a threat at that

2   point?

3      A.    Absolutely.

4      Q.    And let's say, for example, this

5   incident, as you've testified, one of the

6   officers shows their Taser, arcs their Taser, and

7   orders him to stop, stop, show your hands, stop,

8   and they don't stop.  They continue to come.

9         What is your assessment of that threat?

10     A.    He's possibly trying to hurt us.  He's

11  not going to comply.

12     Q.    At that point, in that scenario, do you

13  make a determination to take that subject under

14  control?

15     A.    Yes.

16     Q.    In your opinion as a professional law

17  enforcement officer, do you have any other option

18  at that point?

19     A.    No.

20     Q.    Once you've made the assessment to take

21  the subject under control -- in this particular

22  scenario -- let's assume that, as in this

23  incident, as you've described it, a matter of

24  minutes, and you're struggling and fighting with

25  that person, is there any time during that

1    struggling and fighting that you decide not to

2    take the subject under control?

3        A.   No.

4        Q.   Now, let's say the subject is mentally

5    ill.

6             Does that mean you don't take him under

7    control?

8        A.   No.

9        Q.   Let's say the subject is high on PCP.

10            Does that mean you don't take him under

11   control --

12       A.   No.

13       Q.   -- in this scenario?

14            Let's say the subject is drunk as a

15   monkey and combative and aggressive.

16            Does that matter to you in terms of

17   your assessment of a threat and whether to take

18   him under control?

19       A.   No.

20       Q.   Now, once the subject's under control,

21   whether the subject is mentally ill or in need of

22   medical care --

23       A.   Yeah.

24       Q.   -- is that a variable that you need to

25   consider?

1          A.    Yes.

2          Q.    Once the subject's under control, if

3     the person is so, perhaps, high on drugs or has

4     some other kind of hallucinatory or is in an

5     intoxicated state, is that a variable that you

6     need to consider once he's under control?

7          A.    Yes.

8          Q.    Now, at some point in the questioning,

9     Mr. Gerhardstein -- Gerhardstein described you as

10    saying, give me your hands, give me your hands.

11    And I think other times it was, show me your

12    hands.

13         A.    Okay.

14         Q.    What do you recall saying to

15    Mr. Roell?

16         A.    I don't recall the exact -- it was

17    something along those lines, to comply, show us

18    your hands, give us your hands.

19         Q.    Okay.  And by that, were you -- what

20    were you ordering him to do from your pers --

21    perspective?

22         A.    Put his hands up.

23         Q.    To put his what?

24         A.    Put his hands up.

25         Q.    Put his hands up?

1       A.   Right.

2       Q.   And --

3       A.   Or drop what he had, you know, just

4   comply.

5       Q.   Now, is that a command that you have

6   been taught to be given -- taught to give?

7       A.   Yes.

8       Q.   And that is a command that you've given

9   on other occasions?

10      A.   Correct.

11      Q.   Now, in your testimony or your

12  conversation with Mr. Gerhardstein, you said that

13  he said, no, no, no.

14           And from your perspective -- I thought

15  your testimony was you thought he was saying no

16  in terms of your commands; no, I'm not going to

17  show my hands, no, I'm not going to drop

18  anything.

19      A.   Correct.

20      Q.   Was that your perception at the time?

21      A.   Yes.

22      Q.   Now, later on in your conversation with

23  Mr. Gerhardstein, he asked you, you don't really

24  know what he meant.

25           And you said, well, no, really don't

1    know what he meant.

2           Do you remember having that

3    conversation --

4           A.   Yes.

5           Q.   -- with Mr. Gerhardstein?

6           So you don't really know what he

7    actually meant.

8           But when you tell us what your

9    perception was, your perception was he was

10   refusing to comply with your commands?

11          A.   Correct.

12          Q.   Now, when you're assessing someone as

13   to whether or not they're a potential threat, the

14   fact that you're ordering them to do something

15   and you're showing your command presence -- I

16   think is how Mr. Gerhardstein described it -- and

17   they refuse to comply with your authority, what

18   does that speak to you in terms of your

19   assessment of the threat and the seriousness of

20   the situation?

21          A.   It's serious.  He's coming to maybe

22   hurt me.

23          Q.   And the fact that he is -- you

24   perceived him saying, no, no, no, to your

25   commands, did that enter into your assessment

133

1    that Mr. Roell was a threat?

2         A.    Absolutely.

3         Q.    Now, is that part of your training, in

4    terms of subject control and subject observation

5    to make those observations about a subject and

6    then draw inferences about the subject in order

7    to keep yourself safe?

8         A.    Yes.

9         Q.    Let's say you responded and -- I think

10   you said -- I don't want to put words in your

11   mouth.

12              I think you said you responded and you

13   knew it was a neighbor trouble run.  And you

14   remember hearing that dispatch; is that right?

15        A.    Correct.

16        Q.    And when you got there, you said you

17   saw the neighbor at her -- what you believe to be

18   her doorway --

19        A.    Correct.

20        Q.    -- is that right?

21              Now, in your statement, you also said

22   you remembered seeing a kid, or what you

23   perceived to be a kid, also --

24        A.    Right.

25        Q.    -- is that right?

1       A.    That's what I said in my statement,

2    correct.

3       Q.    Now, the fact that there is a woman and

4    maybe children in this house where the

5    complainant was, is that a variable that you

6    consider in assessing the seriousness of the

7    encounter that you're going to have --

8       A.    Yes.

9       Q.    -- or the -- the -- I guess, the

10   tactical considerations that you're going to

11   make?

12      A.    Yes.

13      Q.    And why -- what is the tactical

14   consideration or the consideration of that

15   variable in terms of how you're going to deal

16   with a situation?

17      A.    Well, the call came out.  He was

18   breaking the windows.  And I know there's a

19   family inside he could potentially be going in to

20   hurt.  I don't know his objective.

21           I guess that's a variable of -- make

22   sure the family is safe.

23      Q.    So at the time you're running around

24   the house, is it your testimony that you don't

25   know if he's breaking in, you don't know if he's

135

1    breaking in to hurt someone?

2         You have no idea what he's doing?

3    A.   Right.

4    Q.   And at this point, again, are you

5    planning for the worst --

6    A.   Yes.

7    Q.   -- and hoping for the best?

8    A.   Yes.

9    Q.   Now, Mr. Gerhardstein has asked you

10   several times about a plan.

11        As you and Deputy Huddleston respond to

12   that address, bail out of your cars, see the

13   victim and run around to the back of the house to

14   encounter what you believe to be the subject of

15   the complaint, are you responding according to

16   your training?

17   A.   Yes.

18   Q.   So do you need to discuss with

19   Deputy Huddleston what you're going to do and how

20   you're going to do it?

21   A.   No.

22   Q.   What?

23   A.   No.

24   Q.   Are you trained in terms of how -- what

25   you're going to do and how you're going to do it

1    in terms of getting to the house, assessing

2    immediately the situation, and then running

3    around to the back to encounter the subject?

4         A.    Yes.

5         Q.    Now, if the -- if the complainant in

6    this case had -- had not waved you around back,

7    would you have gone around back?

8         A.    I think that --

9         Q.    -- or do you know?

10        A.    I -- I don't know.

11        Q.    Do you want to look at Exhibit 17?

12        A.    All right.

13        Q.    Okay.  Take a minute to do that.

14        A.    I probably would have, because the

15   detail came in that he was standing in the

16   backyard.

17        Q.    Okay.  So if the detail had come

18   back -- had not come back that he was standing in

19   the backyard, let's say, would you have known to

20   go in the backyard?

21        A.    No.

22        Q.    And would you have stopped and talked

23   to the complainant?

24        A.    Correct.

25        Q.    But, in this particular case, you

137

1    didn't need to do that.

2         A.    Correct.

3         Q.    You don't need to stop and talk to

4    her --

5         A.    Correct.

6         Q.    -- right?  Okay.

7              So when you and Deputy Huddleston get

8    around back, you contact Mr. Roell; is that

9    right?

10        A.    Yes.

11        Q.    And I think you testified that

12   Deputy Huddleston said something to him.

13             I can't remember what you said that --

14        A.    I remember that I was yelling.  I don't

15   remember if he was yelling.

16        Q.    Okay.  And I could be wrong, but I

17   thought you said Deputy Huddleston said something

18   like, what are you doing, or something like that.

19        A.    Yeah.

20        Q.    Do you -- was that your testimony?

21        A.    Something along those lines.

22        Q.    And you said Deputy -- you were

23   standing outside the gate, not in the patio

24   enclosure when you said that, right?

25        A.    Right.

```
 1        Q.   Now, is there a tactical reason why you

 2   would remain outside the gate instead of going

 3   right into the patio area when you first

 4   encountered Mr. Roell?

 5        A.   We were going to be closer to him, and

 6   you've got your distance, and you've also got the

 7   gate as your cover, if needed.

 8        Q.   So there were tactical considerations

 9   that you were considering in terms of whether to

10   go into the gate?

11        A.   Correct.

12        Q.   Did you -- did you talk to

13   Deputy -- Deputy Huddleston about a plan for

14   those tactical considerations before you went

15   there?

16        A.   No.

17        Q.   Are you trained to consider those

18   tactical considerations?

19        A.   Yes.

20        Q.   Do you have to talk to each other about

21   them?

22        A.   No.

23        Q.   So as I understand it, there was that

24   initial encounter with Mr. Roell, and he started

25   coming at you in what you described as a brisk
```

1    pace -- or I don't want to put words in your

2    mouth.

3            But you variously described it, you and

4    Deputy Huddleston, as a -- as a fast pace,

5    correct?

6        A.   Correct.

7        Q.   And you've described it as an

8    aggressive and combative manner that he came at

9    you?

10       A.   Correct.

11       Q.   And so those observations that you were

12   making about him, did those enter into your

13   assessment of what the appropriate action --

14   reaction to his force would be?

15       A.   Yes.

16       Q.   Is that when you started yelling at him

17   commands in a loud voice that you exhibited for

18   us earlier?

19       A.   Yes.

20       Q.   Now, did you and Deputy Huddleston make

21   a plan about how you were going to talk to

22   Mr. Roell if he came at you in a combative and

23   aggressive way?

24       A.   No.

25       Q.   Are you trained as to how to interact

1    with a subject who comes at you in a loud,

2    aggressive manner?

3         A.   Yes.

4         Q.   And, in fact, you're trained in terms

5    of subject control.  And that's one of the

6    dynamics that you're -- well, let me ask you -- I

7    shouldn't say that.

8              Let's -- I'll rephrase it, because that

9    was --

10             Are you trained in a -- in a -- in the

11   academy and beyond in terms of subject control?

12        A.   Yes.

13        Q.   And is part of that training becoming

14   aware of and reactive to those inferences that

15   you make about what a subject may be trying to do

16   from how he acts?

17        A.   Yes.

18        Q.   You indicated that, just now, it was --

19   the distance between you and Mr. Roell was

20   something you considered, right?

21        A.   Yes.

22        Q.   And why is that important?

23        A.   There's the reactionary gap of the time

24   where they can respond to you, get to you quickly

25   enough where you can respond and pull out a

1    weapon.

2          There's a gap there you want to keep to

3    keep yourself safe.

4          Q.    And where did you learn about that?

5          A.    In the academy.

6          Q.    And did you and Deputy Huddleston and

7    then Dalid talk about the reactionary gap as you

8    were encountering Mr. Roell?

9          A.    No.

10         Q.    Did you talk about the importance of

11   maintaining a distance in your planning of how

12   you were going to interact with Mr. Roell?

13         A.    No.

14         Q.    Mr. Gerhardstein asked you whether

15   Mr. Roell struck you.

16         Do you recall that conversation with

17   Mr. Gerhardstein?

18         A.    I -- I do.

19         Q.    And did you give Mr. Roell an

20   opportunity to strike you?

21         A.    No.

22         Q.    Did you give Mr. Roell an opportunity

23   to take that basket and smack you upside the head

24   with it as you were maybe two feet away from

25   him?

1      A.    No.

2      Q.    Did you give Mr. Roell the opportunity

3   to grab your firearm?

4      A.    No.

5      Q.    Now, are you trained to control a

6   subject before they have an opportunity to hurt

7   you?

8      A.    Yes.

9      Q.    Are you trained to control a subject

10  before they have the opportunity to get anywhere

11  near you, to punch you, if you can?

12     A.    Yes.

13     Q.    Now, Mr. Gerhardstein also asked you

14  when Mr. Roell went back into the gated area, to

15  your knowledge, was he destroying any property

16  there.

17           Do you recall that?

18     A.    I do recall that.

19     Q.    As I understood your testimony,

20  Deputy Huddleston deployed the Taser the first

21  time -- the first deployment of the actual

22  cartridge --

23     A.    Correct.

24     Q.    -- correct?

25           And as it was cycling in that five

143

1    seconds, is when Mr. Roell went into the gate and

2    you followed him?

3        A.    Correct.

4        Q.    So assuming that Taser actually cycles

5    for five seconds, the time from when the Taser

6    was deployed and -- and he was outside the gate,

7    to whether -- when he was inside the gate with

8    the three of you, was somewhere within five

9    seconds?

10       A.    Yes.

11       Q.    So when you indicated to

12   Mr. Gerhardstein that you didn't have time in

13   those five seconds to stop and make a plan, did

14   you have time in those five seconds to stop and,

15   perhaps, have a debate amongst yourselves about

16   what you should do?

17       A.    No.

18       Q.    What did your training and your

19   experience tell you at that point that you needed

20   to do?

21       A.    We needed to contain and gain control

22   of him.

23       Q.    And would your training and your

24   experience support the three of you allowing

25   Mr. Roell to simply go back into that gate and

1    shut that gate and remain there for, I don't

2    know, whenever -- whatever time it might take for

3    EMS to -- to respond?

4        A.    No.

5        Q.    Now, let's think about -- let's talk

6    about EMS responding.

7             Did you hear the conversation yesterday

8    between Mr. Gerhardstein and Deputy Huddleston

9    about staging?

10       A.    Correct.

11       Q.    And is staging necessarily the same

12   thing as being on scene?

13       A.    No, it's not.

14       Q.    And what's the difference between

15   staging and being on scene?

16       A.    On scene means you're actually

17   physically on the scene of the incident.

18            Staging means they're somewhere around

19   the area.  It could be around the corner.  It

20   could be around the block.  It could be a couple

21   blocks away --

22       Q.    And --

23       A.    -- waiting for the scene to be secure

24   to respond onto the scene.

25       Q.    So what entity makes the determination

1    of where the staging of EMS occurs?

2            Does the sheriff's department decide

3    that?

4        A.   Do we decide where they stage?

5        Q.   Yes.

6        A.   No.

7        Q.   And what entity decides when they'll

8    respond to scene?

9            Do you guys tell them when to respond

10   to scene?

11       A.   We -- that day, we requested them to

12   respond.

13       Q.   Okay.  And once -- once they get to the

14   scene, if the subject's out of control, will they

15   approach the subject?

16       A.   Absolutely not.

17       Q.   So let's say from Mr. Gerhardstein's

18   example, that you shut Mr. Roell in the gate, and

19   you wait for EMS to get there.

20            And let's just assume for the sake of

21   Mr. Gerhardstein's theory that Mr. Roell sits

22   down in one of those chairs and just hangs out

23   until EMS gets there.  Okay?

24       A.   Okay.

25       Q.   Let's just assume that there's no

1    damage and he doesn't try to get into the house.

2    None of those things that might happen happen.

3        A.    Okay.

4        Q.    Okay?

5              And then EMS gets there.  And now the

6    gate's shut.

7              Then what happens?

8        A.    They're still going to want us to

9    secure him before they talk to him.

10       Q.    And so you would have to open the gate

11   and go in -- into the patio area?

12       A.    Correct.

13       Q.    Okay.  Now that Mr. Roell's been alone

14   in that patio area while you all have been

15   waiting for EMS, does that suggest to you any

16   tactical considerations or officer safety

17   concerns?

18       A.    Now we're at square one where we

19   were.

20       Q.    Are you?

21       A.    Yeah.

22       Q.    What's in that patio?

23       A.    Glass, hose, plants, flower pots.

24       Q.    And while Mr. Roell was in that patio

25   area, what was he doing?

```
 1        A.   The -- when we came in the encounter

 2   with him?

 3        Q.   No.  Let's say that you're standing

 4   outside that -- that gate waiting for EMS to

 5   come.

 6             What's he doing while he's in there

 7   where you can't see him?

 8        A.   We don't know.

 9        Q.   And so this -- when EMS comes, you

10   would go secure Mr. Roell; is that correct?

11        A.   Correct.

12        Q.   And when you went to secure Mr. Roell,

13   let's say when EMS comes, would you -- would you

14   use the same tactics that you used in the

15   incident that you used -- would you still employ

16   the hands-on approach --

17        A.   Yes.

18        Q.   -- assuming that he was not

19   cooperative?

20        A.   Yes.

21        Q.   How long would that take?

22        A.   Who knows?

23        Q.   Now, was Mr. Roell in that patio

24   area -- when he went back into that patio area,

25   during that cycle of tasing, was he in there long
```

1    enough to pick up a flower pot and throw it

2    through any windows or destroy any property?

3         A.   We got in there pretty quick, so I

4    don't believe he had enough time.

5         Q.   Was that a tactical consideration of

6    yours?

7         A.   Yes.

8         Q.   Now, when Mr. Roell turned around and

9    went into the gated patio area, did you respond

10   according to your training?

11        A.   Yes.

12        Q.   In your opinion as a professional law

13   enforcement officer, was it necessary for you to

14   have a conversation with Deputy Huddleston and

15   Dalid about how you were going to physically take

16   control of Mr. Roell?

17        A.   No.

18        Q.   In fact, as a tactical consideration --

19   would it be detrimental, tactically, to stop and

20   have that conversation?

21        A.   It potentially could.

22        Q.   And what would be detrimental or

23   adverse about having that conversation at that

24   point?

25        A.   He's in that patio area with the

149

1   weapons and the family is also the victims and

2   inside the residence.

3          He can go destroy stuff again. And

4   there's all kinds of variables.

5      Q. And when you say weapons, are you -- do

6   you mean the term environmental --

7      A. Environmental weapons.

8      Q. Can I ask you to look at Exhibit 16, at

9   page 43?

10      A. 16?

11      Q. Yes. It would be the transcript of

12   your statement that Mr. Gerhardstein prepared for

13   you -- or that he gave to you, I should say;

14   page 43.

15          Detective -- the detect -- this is a

16   conversation you had with Mr. -- when you were

17   struggling with him, was he throwing -- besides

18   the one punch he hit you in the face, did he

19   throw any other punches?

20          And you said, He was flailing

21   everywhere around. I don't think he was trying

22   to swing at anything in particular.

23          In your testimony, or before, when you

24   were talking to Mr. Gerhardstein, you indicated

25   it was your perception that Mr. Roell meant to

1    punch you in the face.

2          Is -- was that your perception at the

3    time?

4    A.    Yes.

5    Q.    And then with the subsequent flailing

6    around that Mr. Roell was doing, was it your

7    perception that he was trying to continue to hit

8    people?  Or did you have a different perception

9    about those other actions he was taking

10   physically?

11   A.    I just think he was trying to actively

12   get away or resist some more; continued to

13   resist.

14   Q.    And so from your testimony here -- or

15   from your interview here, the particular words

16   you used -- you use the word punch with regard to

17   the contact that was with your face with a fist.

18         And you use flailing everywhere around

19   as describing these other actions.

20         Are those two -- well, tell me what you

21   mean when someone's flailing around.  What did

22   you observe, if you can recall, about what

23   Mr. Roell was doing?

24   A.    He was just swinging his arms around,

25   trying to get away, trying to actively resist and

1    just moving his whole body around.

2        Q.   He wasn't balling up his fists and

3    punching people?

4        A.   No.

5        Q.   So that flailing around, was that a

6    different action from the fist he made, where he

7    punched you in the face?

8        A.   Yes.

9        Q.   Had you ever been called to the

10   Barrington -- to this location?  I think it's --

11   what is it, Barrington Court?

12            Had you personally ever been there?

13       A.   Before this incident?

14       Q.   Yes.

15       A.   I don't think so.

16       Q.   And had you personally had any contact

17   with Mr. Roell before?

18       A.   I had not.

19       Q.   Okay.  So Mr. Gerhardstein and you

20   discussed excited delirium.  And I got a little

21   confused.

22            So at one point, Mr. Gerhardstein asked

23   you whether you felt the Taser took effect.

24            And you said no, correct?

25       A.   Correct.

 1      Q.   And when you say take effect, what

 2  do -- what do you mean?

 3          What would -- if it took effect, what

 4  would you expect to see from the subject?

 5      A.   I expect to see him stop and the

 6  neuromuscular -- NMI to take effect.

 7      Q.   NMI; a neuromuscular effect, right?

 8      A.   Yes.

 9      Q.   And what does that look like?

10      A.   It's usually straight -- you straighten

11  up and you're locked up and can't move.

12      Q.   And do you sometimes fall down?

13      A.   Yes.

14      Q.   Did you ever observe Mr. Roell

15  straighten up, lock up, or fall down, as a --

16  what you considered to be a direct result of a

17  Taser deployment?

18      A.   No.

19      Q.   So this is where I get a little

20  confused.

21          I thought -- and I could be mistaken --

22  that Mr. Gerhardstein asked you, isn't this a

23  factor that would lead you to believe that

24  Mr. Roell was experiencing excited delirium.

25          Do you recall that conversation that

1    you had with Mr. Gerhardstein?

2         A.    Tasers not taking effect --

3         Q.    Yes.

4         A.    -- not being a factor?

5         Q.    Yes.

6         A.    I don't recall that.

7         Q.    You don't recall having that

8    conversation.

9              What I want -- what I want to explore

10   is, is it -- is it your testimony that a Taser

11   could have complete conductivity on a subject

12   who's experiencing excited delirium and, because

13   of excited delirium, the Taser would have no

14   effect?

15        A.    I don't --

16        Q.    Is that your testimony?

17        A.    I don't think so.

18        Q.    Do you have any idea about that?

19        A.    No.

20        Q.    When have you been trained that a Taser

21   would not take effect on a subject?

22        A.    When the barbs aren't connected.

23        Q.    Do you have any reason or any

24   understanding or any ability to know whether the

25   barbs affected and you have complete

154

1    connectivity -- connectivity, that a person

2    experiencing excited delirium would be impervious

3    to that connectivity?

4         A.   No.

5         Q.   So if that was -- if that was, perhaps,

6    how your testimony sounded, that -- that would

7    not be an accurate statement of what you

8    personally know?

9         A.   Correct.

10        Q.   Okay.  In this particular situation, do

11   you -- well, strike that.

12             Let's look at Exhibit 5.

13             Do you recall looking at this with

14   Mr. Gerhardstein?

15        A.   I do.

16        Q.   And he asked you to look at -- he asked

17   you whether or not Mr. Roell fit the definition

18   of physical or mental impairment.

19             Do you see that?

20        A.   I do.

21        Q.   And you said yes.

22        A.   Yes.

23        Q.   Okay.  Can you tell me what medically

24   recognized disorder that you observed that

25   Mr. Roell had at the time you encountered him?

155

```
 1              Did you observe a medical-recognized
 2    disorder that you were aware of when you -- when
 3    he was coming at you in that patio area?
 4         A.   No.
 5         Q.   Did you see any anatomical loss or
 6    disfigurement?
 7         A.   No.
 8         Q.   What about neurological impairment?
 9    Did you have a way to see if there was any
10    neurological impairment?
11         A.   No.
12         Q.   Musculoskeletal -- I don't even know if
13    I can say that very well.
14              Did you see any of that impairment?
15         A.   No.
16         Q.   He moved pretty good, didn't he?
17         A.   Yes.
18         Q.   Pretty well, I should say.
19              What about respiratory impairment?  Did
20    you see any of that?
21         A.   No.
22         Q.   Did you -- were you aware of any blood
23    or heart disorders?
24         A.   No.
25         Q.   Any mental retardation?
```

1      A.   No.

2      Q.   Were you aware that he was mentally

3  ill?

4      A.   No.

5      Q.   Did he seem to have visual impairment?

6      A.   No.

7      Q.   Hearing impairment?

8      A.   No.

9      Q.   Speech impediments?

10     A.   No.

11     Q.   Okay.  So why did you say yes?

12     A.   I don't know.

13     Q.   All right.  So with regard to these --

14  this description and this definition of physical

15  and mental impairment, you see it now, right?

16     A.   Yes.

17     Q.   Could someone who's drunk as a monkey

18  present physical impairment to you?

19     A.   Yes.

20     Q.   Mental impairment to you?

21     A.   Yes.

22     Q.   And when you say mental impairment or

23  physical impairment, do you mean observations

24  about their physicality that cause you to think

25  that they may be impaired?

1        A.    Yes.

2        Q.    Have you ever arrested anybody for DUI?

3        A.    Yes.

4        Q.    Is the touchstone of a DUI impairment?

5        A.    Yes.

6        Q.    Is the touchstone of a DUI physical

7   impairment?

8        A.    Yes.

9        Q.    Mental impairment?

10       A.    Yes.

11       Q.    What about somebody high on drugs, PCP,

12   heroin, cocaine, would they exhibit for you any

13   physicality or mental affect that might cause you

14   to think they may be impaired in some way?

15       A.    Yes.

16       Q.    Can you tell the difference between

17   someone who's impaired, let's say, from a

18   diabetic coma or a diabetic medical situation?

19   Can you look at that person and tell that person

20   is impaired by a diabetic situation as opposed to

21   a alcohol-related situation?

22       A.    No.

23       Q.    In terms of getting that person off the

24   road and getting control over them, does it

25   matter whether their impairment is a result of a

1    diabetic situation or an alcohol situation?

2        A.    No.

3        Q.    Does it matter if their impairment is a

4    result of a mental situation or a medical or

5    metabolic situation?

6        A.    No.

7        Q.    What's your job?

8        A.    Making sure everybody's safe.

9        Q.    With regard to Exhibit 17 -- let's look

10    at that real quick.  This is the incident recall

11    sheet.

12        And I thought you told Mr. Gerhardstein

13    that not necessarily everything that's on the MDC

14    would appear on this recall sheet; is that what

15    you said?

16        A.    Correct.

17        Q.    When you say MDC, you mean your in-car

18    computer?

19        A.    Yes.

20        Q.    And then Mr. Gerhardstein and I had a

21    little disagreement.

22        But -- but let me ask you this.

23        It says here that you went on scene

24    at -- or at least it records on scene -- that you

25    commented to dispatch that you went on -- that

1    you went on scene at 2:50.

2        A.    Yes.

3        Q.    Is that -- would that reflect when you

4    told dispatch you were on scene?

5        A.    What, when I -- it could.

6        Q.    Okay.  So when you key dispatch and

7    say, I'm on scene, would -- would that reflect

8    the 2:50?  Is that the time that they would

9    record, or do you know?

10        A.    I don't know if that's exactly the

11    time.  It's whenever they enter it in the

12    computer.

13        Q.    Okay.  When do you typically say on

14    scene, in terms of if you're getting to wherever

15    you're dispatched to go to?

16        A.    Typically, I say it before I actually

17    arrive on scene.

18        Q.    And why is that?

19        A.    Just in case there is a scenario where

20    I need to jump out or get out of a car, there's

21    a -- you know, a bad situation I roll up to.

22            Dispatch already knows I'm there,

23    instead of me screaming for help and they don't

24    know where I am because they don't -- I'm not on

25    scene yet.

1      Q.   Okay.  So is that an officer safety

2  consideration for you?

3      A.   It is.

4      Q.   So you want communications to know

5  you're at that location in case some -- in case

6  you need help and you just start screaming,

7  something bad happens?

8      A.   Correct.

9      Q.   Now, do you remember when you radioed

10  dispatch to tell them you were on scene with --

11  with regard to the Roell incident?

12         Do you have an independent recollection

13  of that?

14      A.   I do not.

15      Q.   Okay.  And with regard to this 2:50, it

16  looks like, on scene -- and then at 2:55 there's

17  an entry here on Exhibit 17, one in custody,

18  request units continue; is that correct?

19      A.   Yes.

20      Q.   Now, from 2:50 to 2:55 is five minutes;

21  you'd agree with me?

22      A.   Yes.

23      Q.   But I think you responded to

24  Mr. Gerhardstein, you don't know, do you, in

25  terms of this 2:50, whether that was seconds

```
1    right before 2:50 or if that 2:50 was closer to

2    2:51 in terms of seconds, do you?

3         A.   No, I don't.

4         Q.   So am I correct that this could be as

5    much as five minutes or as little as three

6    minutes --

7         A.   Yes.

8         Q.   -- between what looks like you were on

9    scene and you had Mr. Roell in custody?

10        A.   Yes.

11        Q.   Now, when you had Mr. Roell in custody,

12   was he under control?

13        A.   No.  He was still actively being

14   combative while in custody.

15        Q.   Okay.  Now, you had a conversation with

16   Mr. Gerhardstein about calling EMS and a

17   conversation about this entry, 2:57, request EMS.

18             I can't remember, did you request EMS?

19   I guess you did.  This is your call letter,

20   right?

21        A.   9 Paul 31, that would be Willy Dalid.

22        Q.   Oh, that's Willy.  Okay.  I'm sorry.  I

23   forgot that.

24             And I think you told Mr. Gerhardstein

25   that you were -- you don't recall when that
```

162

```
 1   happened.  You weren't -- you don't know if you

 2   were present or if -- you heard it on the radio,

 3   but you don't know it --

 4        A.   I don't remember if I was actually

 5   there or if I heard it on the radio.

 6        Q.   Okay.

 7        A.   I remember hearing it.

 8        Q.   And it looks like at 2:58 a fire unit

 9   was dispatched; is that right?

10        A.   Medic 93, yes.

11        Q.   And then it looks like at -- at least

12   2:59 here, Officer Gilliland arrived?

13        A.   Correct.

14        Q.   You don't know if that's closer to 3:00

15   or closer to 2:59 in terms of seconds, right?

16        A.   I do not.

17        Q.   And then Officer Sewall and Steers seem

18   to arrive -- at least put themselves on scene, I

19   should say -- at -- at 3:00?

20        A.   Correct.

21        Q.   Now, what does 35 mean?

22        A.   35 means you're on scene, but you're

23   still available --

24        Q.   Oh, okay.

25        A.   -- for dispatch.
```

 1      Q.   Oh, okay.

 2           You don't know, do you, where -- when

 3   these three officers put themselves on scene,

 4   where they physically were located?

 5      A.   I do not.

 6      Q.   Do you have any sense of how much time

 7   elapsed from the time Mr. Roell stopped the last

 8   combative behavior and went into that lull or

 9   rest where you believe he lost cardiac function?

10           Do you recall how long of a time frame

11   that was before Steers arrived and began CPR?

12           Do you have a sense of that?

13      A.   It was the very fast.  I'm not -- a

14   minute, maybe.  It seemed like it was pretty

15   quick.

16      Q.   Okay.  You weren't timing it?

17      A.   No.

18      Q.   Did you call for officers need

19   assistance?

20      A.   I did.

21      Q.   And what's that call mean?

22      A.   It means send more cars fast.

23      Q.   And why do you do that?

24      A.   Because there is a situation where

25   it's -- you're out of control or fighting, and an

1    officer is in a bad situation, and that officer

2    needs more units to help control the situation.

3         Q.   And is that an officer safety

4    situation?

5         A.   Yes.

6         Q.   Did -- were you three able, though, to

7    get control of Mr. Roell?

8         A.   We did eventually get him cuffed.

9         Q.   And, again, it looks from this detail

10   incident recall that that could have been as much

11   as five minutes or as little as three minutes you

12   were able to do that in your encounter with

13   him --

14        A.   Correct.

15        Q.   -- is that right?

16        A.   Correct.

17        Q.   Let's look at Exhibit 2.  This is the

18   excited delirium training.  Let's look at

19   Bates 4489.  That's that number down there in the

20   corner.

21             So you and Mr. Gerhardstein discussed

22   these symptoms that would have been identified in

23   this roll call training as symptoms of excited

24   delirium, right?

25        A.   Yes.

1      Q.    Okay.  So is -- aggressiveness, is that

2  a symptom exclusively of excited delirium?

3      A.    Exclusively?  No.

4      Q.    Combativeness, is that a symptom

5  exclusively of excited delirium?

6      A.    No.

7      Q.    Hyperactivity, is that a symptom

8  exclusively of excited delirium?

9      A.    No.

10      Q.    The combination of aggressiveness,

11  combativeness, and hyperactivity, is that a

12  symptom exclusive of excited delirium?

13      A.    No.

14      Q.    Extreme paranoia.

15            Were you able to determine whether or

16  not Mr. Roell was extremely paranoid?

17      A.    No.

18      Q.    Unexpected strength.

19            Is unexpected strength a symptom

20  exclusively of excited delirium in your

21  experience?

22      A.    No.

23      Q.    Is the combination of aggressiveness,

24  combativeness, hyperactivity, and unexpected

25  strength -- is that combination exclusively a

1    symptom of excited delirium in your law

2    enforcement experience?

3         A.   No.

4         Q.   Incoherent shouting, is that a symptom

5    exclusive of excited delirium?

6         A.   No.

7         Q.   Is the combination of aggressiveness,

8    combativeness, hyperactivity, unexpected

9    strength, and incoherent shouting -- is that

10   combination a symptom exclusively of excited

11   delirium in your experience?

12        A.   No.

13        Q.   Shedding of clothes is a weird one,

14   right?

15        A.   It is.

16        Q.   Have you ever been in an encounter

17   where someone approached you with less than all

18   of their clothes on?

19        A.   In the jail, yeah --

20        Q.   And --

21        A.   -- or, I've been -- and from the

22   public, as well.

23        Q.   Yeah?

24        A.   Yeah.

25        Q.   Have those people been experiencing

167

```
1   excited delirium, to your knowledge?

2       A.   No.

3       Q.   Were they drunk?

4       A.   Possibly.

5       Q.   But what -- do you know what was wrong

6   with them?

7       A.   No.

8       Q.   They just didn't have all their clothes

9   on?

10      A.   Right.

11      Q.   Okay.  So how many --

12      A.   I had to investigate it first to find

13  out.

14      Q.   Okay.  When you investigated why they

15  didn't have their clothes on, were you able to

16  determine why they didn't have their clothes on?

17           Maybe their wife threw them out in the

18  middle of the night.  I don't know.

19      A.   Not right away.

20      Q.   No, what were some of the reason they

21  didn't have all their clothes on?

22      A.   Intoxicated, high, I mean -- the one I

23  came in chronic encounter with was very

24  intoxicated.

25      Q.   Okay.  So the shedding of clothes, in
```

1    your experience, is that a symptom exclusively of

2    excited delirium?

3        A.    No.

4        Q.    Would the combination of

5    aggressiveness, combativeness, hyperactivity,

6    unexpected strength, incoherent shouting, and a

7    lack of clothes -- would those be -- would that

8    combination of be a symptom of excited delirium,

9    exclusively, in your law enforcement experience?

10       A.    No.

11       Q.    What would those things also indicate

12   to you, either individually or collectively or in

13   some combination of them?

14            What types of things would they

15   indicate to you?

16       A.    Intoxicated, high on drugs.  Those are

17   my first -- main two that I would be worried

18   about.

19       Q.    And if that subject presents a threat

20   to you, is the tactical -- is the tactical

21   response to get the subject under control?

22       A.    Yes.

23       Q.    And then what do you determine?

24       A.    Determine what's wrong with them after

25   that.

1      Q.   Is that what you did with regard to

2  the Mr. Roell Situation --

3      A.   Yeah.

4      Q.   -- or attempted to do, I should say.

5      A.   Yes.

6      Q.   Was it your belief that disengaging

7  with Mr. Roell at the time Mr. Gerhardstein has

8  suggested, that it would be an option, when you

9  went back into that gated patio -- is it your

10  opinion as a law enforcement professional, that

11  that was an option for you?

12      A.   No.

13      Q.   Why not?

14      A.   Because there was a potential for him

15  to get ahold of more weapons inside the patio

16  area where he can harm himself or others.

17      Q.   Mr. Gerhardstein pointed out to you a

18  couple different areas in your training where

19  it's suggested that persuasion is the more, I

20  guess, appropriate technique, if it's practical

21  or it's available to you.

22        Do you agree with that concept?

23      A.   If it's practical, yes.

24      Q.   And do you ascribe to that?  Do you

25  attempt to do that?

```
 1        A.    Absolutely.

 2        Q.    Were you able to do that, in your

 3   opinion, with regard to Mr. Roell?

 4        A.    No.

 5        Q.    Have you ever been in a SWAT

 6   call-out?

 7        A.    No.

 8        Q.    Have you ever been in a hostage

 9   situation?

10        A.    No.

11        Q.    Are you familiar with -- is there

12   sheriff's protocol for a SWAT situation or a

13   hostage situation?

14        A.    Is there a what?  I'm sorry.

15        Q.    A protocol.

16        A.    I believe so.

17        Q.    And in certain SWAT situations, is

18   there an ability to -- to use some techniques

19   that you don't have in a rapidly-evolving

20   encounter with a subject?

21        A.    Yes.

22        Q.    What would they be?

23        A.    I mean, you have more options to sit

24   there and plan and get a plan together while

25   you're evaluating the threat and engage in the
```

171

1    necessary plan that you had planned.

2         Q.   Did you have that the opportunity with

3    regard to your interaction with Mr. Roell?

4         A.   No.

5         Q.   Mr. Gerhardstein asked you several

6    different times with regard to a few different

7    variables, if certain things would be, quote,

8    helpful, closed quote, for you.

9              I'm not certain what he was intimating

10   about those questions.  But it occurred to me

11   that there might be a suggestion that, had you

12   had other information that night, that you would

13   have done something different with regard to

14   taking subject control of Mr. Roell.

15             Would --

16        A.   I would have not have done anything

17   different.

18        Q.   So let's say that, for example, you had

19   even been to the Roell home on a prior occasion.

20             Let's say that Mrs. Role had called you

21   on a prior occasion to take her husband to the

22   hospital.  Okay?

23        A.   Okay.

24        Q.   And let's say that you responded.  And

25   you were able to speak with Mr. Roell, and you

172

 1  were able to pink-slip him, and you took him to

 2  the hospital.  Okay?

 3        A.    Okay.

 4        Q.    So let's say -- can you -- can you --

 5        A.    I'm following you.

 6        Q.    -- roll with me on that?  Are you with

 7  me on that?

 8              All right.  So let's say you get to the

 9  house that night and you know it's Mr. Roell.

10              Now you know what?

11        A.    I've --

12        Q.    You've pink-slipped before, right?

13        A.    Yeah, right.

14        Q.    So what do you know?

15        A.    That I've pink slipped him before, that

16  he possibly has some kind of medically -- medical

17  disorder.

18        Q.    Okay.  And so you run around the corner

19  with Deputy Huddleston, and you say, hey, Gary,

20  what's going on?

21              And he turns around and comes at you.

22  Would absolutely anything be different?

23        A.    No.

24        Q.    I'm assuming from my hypothetical that

25  Mr. Roell does exactly the same thing that he did

173

 1    that night, despite the fact that you called him

 2    Gary and, you know, you recognized him.

 3            Okay.  So you would not do anything --

 4    nothing would be different from your

 5    perspective?

 6        A.    No.

 7        Q.    How did you feel?

 8        A.    I felt threatened.

 9        Q.    How did you feel when Mr. Roell passed

10    away?

11        A.    It was sad.  I mean, I -- we don't want

12    anybody to die.  That's -- that's not our

13    objective here.  That's not what we're out here

14    doing.

15        Q.    Did it -- did it cause you -- I've read

16    you were described as shaken up.  Were you shaken

17    up by that?

18        A.    I was.

19        Q.    Was that the first time that you'd been

20    involved in -- in someone dying in a situation in

21    which you've been involved?

22        A.    On duty?  Yes.

23        Q.    Yes.

24        A.    Yes.

25        Q.    And did it bother you?

1      A.   It did.

2      Q.   And have you had occasion, since the

3   incident, to play it back in your head and maybe

4   second-guess yourself?

5      A.   I wouldn't say second-guess myself.  I

6   mean, like I said, I wish it would have ended

7   differently.  But, unfortunately, it didn't.

8           MS. SEARS:  Can I have just a minute?

9           THE VIDEOGRAPHER:  We are off the

10          record at 1:17 p.m.

11          (Off the record.)

12          THE VIDEOGRAPHER:  We are back on the

13          record at 1:24 p.m.

14   BY MS. SEARS:

15     Q.   Thank you.  Could I ask you to look at

16   Exhibit 16?  That is, again, the transcript of

17   your interview after the incident that

18   Mr. Gerhardstein showed you.  And can I draw your

19   attention to page 34, please?

20          Are you at 34?

21     A.   I am.

22     Q.   Would you read the page just silently

23   to yourself, please?  Please let me know when

24   you're done.

25     A.   Okay.

175

1          Q.   On page 34, in response to the

2    detective's question -- he asks you, At any

3    point, did he stop fighting.

4               And you -- you said, It took a while.

5               What do you mean, it took a while?

6    What were you referencing there, if you recall?

7          A.   Just from the time that he initially

8    came at us to -- the struggle began.

9          Q.   And when you said, it took a while,

10   what did you mean, the fighting?

11         A.   Correct, the -- the fighting.

12         Q.   We kept making comments and told him to

13   relax, we've got help on the way, just relax,

14   we've got help on the way.  I just kept telling

15   him to relax.

16              And what kind of -- tone of voice were

17   you using when you were telling him to relax?

18         A.   I was calm, very low-key.

19         Q.   Okay.  You weren't saying, relax,

20   relax, everybody's good, relax, the help's on the

21   way?

22         A.   No.

23         Q.   Were you telling at him?

24         A.   No.

25         Q.   Did you have your hand on him?

1          A.   I did.

2          Q.   Where was your hand?

3          A.   I think on his shoulders, shoulder

4    area, upper body.

5          Q.   And were you controlling him with your

6    hand, or were you just resting your hand?

7               How was your hand?

8          A.   Well, when he was -- when he would be

9    combative, when he was -- you know, I would

10   control.  And then we wouldn't, I would ease up

11   and kind of rest my hand on him.

12         Q.   Okay.  As he would become combative,

13   you would increase the pressure of your hand on

14   him?

15         A.   Pretty much, just -- yeah.

16         Q.   Did you ever hit him?

17         A.   No.

18         Q.   Did you ever hit him with any -- did

19   you ever use -- was there ever any intermediate

20   force, other than the Taser, used in this

21   incident, to your knowledge?

22         A.   No.

23         Q.   And then when he would relax, you would

24   relax your hand, right?

25         A.   Correct.

177

```
 1         Q.    Now, when he became combative, did you

 2    yell and scream at him at that point?

 3         A.    I don't -- I don't recall that.  I

 4    don't believe so.

 5         Q.    Would there --

 6               MR. GERHARDSTEIN:  You're talking about

 7    after the cuffing?

 8               MS. SEARS:  Yes.  I'm sorry.  That was

 9         a terrible question.  I apologize.

10    BY MS. SEARS:

11         Q.    I'm talking about after -- after the

12    cuffing, when he was going through those spurts

13    of combativeness and calmness that you described

14    for Mr. Gerhardstein.

15               That's -- that's the time I'm talking

16         about.

17         A.    Okay.

18         Q.    Were you yelling at him during those

19    times of combativeness --

20         A.    I don't believe so.

21         Q.    -- combativeness?

22               And then -- and then he made more of

23    these comments about water, that you've talked

24    about with Mr. Gerhardstein, kept talking about

25    their house being dry.
```

```
 1               He was still screaming.  He was
 2     screaming at all of us.  He was screaming.
 3               Were you screaming back at him?
 4          A.   No.
 5          Q.   It says, so we were just waiting for
 6     the squad, just kept telling him to relax, relax.
 7               Is that that -- so how -- what was your
 8     tone of voice with him then?
 9          A.   Low-key.
10          Q.   And what were you trying to accomplish
11     there?
12          A.   Just trying to get him to understand to
13     relax, help's on the way.
14          Q.   Did you make a plan with
15     Deputy Huddleston and Deputy Dalid that you would
16     talk in that tone of voice to Mr. Roell?
17          A.   No.
18          Q.   Were you trying to reassure him or just
19     trying to calm him down or --
20          A.   Mr. Roell?
21          Q.   Yeah.
22          A.   Yes.
23               MS. SEARS:  Nothing further, Al.
24                    FURTHER EXAMINATION
25     BY MR. GERHARDSTEIN:
```

1      Q.   Deputy, take a look at Exhibit 17.

2      A.   Okay.

3      Q.   Can you identify for me where you made

4  the call for officer needs assistance?

5      A.   I don't see it on here.

6      Q.   Given what you do see on here, can you

7  tell me where it would fit?

8      A.   It would probably fit before 2:54, when

9  9 Sam 33 was en route.

10     Q.   Before 2:54, when 9 Sam 33, and after

11  it says, Huddleston on scene; so somewhere

12  between 2:50 and 2:54?

13     A.   9 Paul 32, 27, yes.

14     Q.   Yes.

15     A.   Yes.

16     Q.   And were you broadcasting on this

17  frequency?

18     A.   On the east?  Yes.

19     Q.   So if you made the call for officer

20  needs assistance, it should be on here, right?

21     A.   I would think so.

22     Q.   But you recall making that?

23     A.   I do recall requesting more units.

24     Q.   And why do you place it where you do,

25  between 2:50 and 2:54?

1        A.    Because, initially, 9 Sam 32 got

2     disregarded by Deputy Huddleston.

3              And then, when he goes en route, is

4     whenever he was en route once I called for more

5     units.

6        Q.    You mean by Corporal Steers?

7        A.    Correct, and all these other three

8     officers all were responding -- four officers

9     that were responding all at the same time.

10       Q.    So before you had Mr. Roell in custody

11    and in cuffs, you made the call for officer needs

12    assistance?

13       A.    Correct.

14       Q.    And in order to do that, you had to

15    press a button on the radio and say, what,

16    officer needs assistance?

17       A.    I think I yelled, send cars.

18       Q.    Send cars?  All right.

19              And that was in order to enhance

20    officer safety, correct?

21       A.    Correct.

22       Q.    Okay.  Now, an identical amount of

23    energy would have to be used in order to call for

24    EMS to come to the scene, right?

25       A.    Correct.

```
 1        Q.   And when you looked at Exhibit 2 -- and

 2   you may want to pull that out again, it's in the

 3   book -- at page 4489, you went through all these

 4   symptoms and said, they could be something else,

 5   right?

 6        A.   Correct.

 7        Q.   But all these symptoms -- you've been

 8   trained to recognize that all these symptoms

 9   support an inference of excited delirium, as

10   well, right?

11        A.   An inference, correct.

12        Q.   Okay.  And so, based on that inference,

13   it's totally appropriate to take a safeguard and

14   bring EMS close to the scene, right?

15        A.   When -- if the time allowed, correct.

16        Q.   Right.  Well, you had as much time to

17   call for officers as you had to call for EMS?

18        A.   Officer safety, yes.

19        Q.   Okay.  So the whole point of training

20   on excited delirium is that it's so dangerous,

21   right?  Because the -- because the suspect can

22   die within minutes of the -- of the altercation

23   being over with, right?

24             MS. SEARS:  Objection.

25   BY MR. GERHARDSTEIN:
```

1      Q.   Isn't that correct?

2      A.   That it is the potential ending, it

3  could result in death.

4      Q.   Right.  So that's why you have special

5  training on it, right?

6      A.   Correct.

7      Q.   And that's why it's important to have

8  EMS available, because the critical time is right

9  when he's been restrained, right?

10      A.   When it's applicable, yes.

11      Q.   And in this instance, Mr. Roell's

12  symptoms may have been consistent with some other

13  things, but were also consistent with excited

14  delirium, right?

15      A.   It was one of them, yes.

16      Q.   Okay.  And there was no call for EMS

17  until after Mr. Roell was already in custody --

18           MS. SEARS:  Objection.

19  BY MR. GERHARDSTEIN:

20      Q.   -- is that right?

21           THE WITNESS:  Asked and answered.

22      A.   When he was -- when the scene was safe

23  and he was in custody, the squad was called.

24  BY MR. GERHARDSTEIN:

25      Q.   And all you had to do in order to

1   advance their presence on the scene was make a

2   call similar to the one you did for officer needs

3   assistant --

4          MS. SEARS:  Objection.

5   BY MR. GERHARDSTEIN:

6      Q.   -- right?

7          MS. SEARS:  Objection as to all.

8   BY MR. GERHARDSTEIN:

9      Q.   Is that right?

10         MS. SEARS:  You can answer the

11     question.

12  BY MR. GERHARDSTEIN:

13     Q.   Is that right?

14     A.   By pushing the button, and -- yes.

15     Q.   Okay.  You were asked about what might

16  have happened if you had used his name.

17         Do you recall those questions?

18     A.   At the ending, yes.

19     Q.   Well, and also when you first

20  encountered him, if you had said something like,

21  hey, Gary, what's going on?

22     A.   I thought you meant the timing of the

23  question.  I'm sorry.

24     Q.   And you do know that sometimes when a

25  person is addressed by their actual name, it

184

1   helps establish rapport, right?

2        A.   It could.

3        Q.   So you have no idea what would have

4   happened if you had started this encounter by

5   using his name?

6        A.   I don't.

7             MR. GERHARDSTEIN:  Okay.  Got anything

8        else or any other questions?

9             MS. SEARS:  I just have a couple

10  things.

11                  FURTHER EXAMINATION

12  BY MS. SEARS:

13       Q.   How many cases of excited delirium have

14  you had?

15       A.   Zero -- one.

16       Q.   One?

17       A.   This one.

18       Q.   How many cases of somebody being drunk

19  or high exhibiting these symptoms have you had?

20       A.   Several.

21       Q.   Did you have any of those things in the

22  jail, I mean, just people being out of control,

23  hyperactive, that sort of thing?

24       A.   I worked in intake, so we got some of

25  the drunks come in and --

1      Q.   Okay.  Several, my mom always taught

2   me, means seven.  I don't know what other people

3   think several means.  But when somebody says

4   several, my mom's voice says seven.

5      A.   So how many intoxicated people, on

6   drugs have I encountered in my career?

7      Q.   That exhibited those symptoms there,

8   yeah.  How -- seven?

9      A.   More than that.  More than that.

10     Q.   How many more?  Can you even tell me?

11     A.   I couldn't tell you.

12     Q.   When you arrive --

13     A.   It's a lot.

14     Q.   When you arrive on a scene and someone

15  with those symptoms that are in Exhibit 2 --

16  what's the Bates number at the bottom?

17     A.   4489.

18     Q.   With the exception of the paranoia,

19  okay, those symptoms or some combination of those

20  symptoms, in your experience as a law enforcement

21  officer, would you perceive that to be someone

22  that's drunk or high, would you -- or even

23  mentally ill, or someone having an excited

24  delirium episode?

25     A.   It would be one of the three:  drunk,

1    high, or mentally ill.

2        Q.   What about excited delirium?  Is that

3    the first thing that comes to your mind?

4        A.   No.  But it could be.

5        Q.   And now that you've experienced a

6    situation of excited delirium, it's sort of in

7    your -- in your mind that that's an option for --

8        A.   It still could be an option still at

9    that point; so could the other ones.

10       Q.   And in your training regarding excited

11   delirium, were you ever taught -- taught that

12   people experiencing excited delirium absolutely

13   do not respond to deescalation?

14       A.   No.

15       Q.   Were you ever taught that?

16       A.   No.

17            MS. SEARS:  Okay.  No further

18       questions.

19            MR. GERHARDSTEIN:  I don't have

20       anything else.

21            MS. SEARS:  Me either.  Thank you.

22            MR. GERHARDSTEIN:  Thank you.

23            MS. SEARS:  So we're back when --

24            MR. GERHARDSTEIN:  Instruction.

25            MS. SEARS:  Oh, yes, the instructions.

187

```
 1        I always want to leave in a hurry.

 2        THE VIDEOGRAPHER: Mr. Alexander, you

 3   have the option to read and sign your

 4   transcript.  Would you like to read and

 5   sign, or would you like to waive that right?

 6        MS. SEARS:  He'll read and sign it.

 7        THE VIDEOGRAPHER:  Okay.  You also have

 8   the right to view the video before the court

 9   or jury views it.

10        Would you like to view that, or would

11   you like to waive that right?

12        MS. SEARS:  We'll view it.

13        THE VIDEOGRAPHER: We are off the record

14   at 1:36.

15

16                    _____
                      DEPUTY MATTHEW ALEXANDER
17

18                        - - -

19        DEPOSITION ADJOURNED AT 1:36 P.M.

20                        - - -

21

22

23

24

25
```

188

1                    C E R T I F I C A T E

2

3    STATE OF OHIO        :
                          :  SS
4    COUNTY OF HAMILTON   :

5              I, Wendy Haehnle, the undersigned, a

6    duly qualified and commissioned notary public

7    within and for the State of Ohio, do certify that

8    before the giving of his deposition, DEPUTY

9    MATTHEW ALEXANDER was by me first duly sworn to

10   depose the truth, the whole truth and nothing but

11   the truth; that the foregoing is the deposition

12   given at said time and place by DEPUTY MATTHEW

13   ALEXANDER; that I am neither a relative of nor

14   employee of any of the parties or their counsel,

15   and have no interest whatever in the result of

16   the action.

17        IN WITNESS WHEREOF, I hereunto set my hand

18   and official seal of office at Cincinnati, Ohio,

19   this 16th day of June 2015.

20

21

22   Wendy Haehnle
     Notary Public - State of Ohio
23   My commission expires September 3, 2017

24

25

189

```
 1                    E R R A T A   S H E E T

 2          DEPOSITION OF:  DEPUTY MATTHEW ALEXANDER
                 TAKEN:  JUNE 5, 2015
 3
            Please make the following corrections to my
 4          deposition transcript:

 5

 6          Page   Line Number             Correction Made

 7          _____

 8          _____

 9          _____

10          _____

11          _____

12          _____

13          _____

14          _____

15          _____

16          _____

17          _____

18          _____

19          _____

20          _____

21          _____

22          _____

23          _____

24          _____        _____
                                               7/6/2015
25          Witness Signature                Date
```