# Willy J. Dalid

June 10, 2015

NANCY ROELL

v.

HAMILTON COUNTY, OHIO BOARD OF COMMISSIONERS, et al.

1:14-CV-637



513.233.3000
877.233.4403
Fax: 513.233.2310
depo@elitereportingagency.com

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4

5    _____
                                      )
     NANCY ROELL, as executrix of the )
6    Estate of Gary L. Roell, Sr.,    )
                                      )
7           Plaintiff,                )
                                      ) CASE NO.
8                    vs.              ) 1:14-CV-637
                                      )
9    HAMILTON COUNTY, OHIO            )
     BOARD OF COMMISSIONERS,          )
10   et al.,                          )
                                      )
11          Defendants.               )
     _____)
12

13

14        Deposition of:  WILLY J. DALID

15        Pursuant to:    Notice

16        Date and Time:  Wednesday, June 10, 2015
                          10:06 a.m.
17        Place:          Hamilton County
                              Prosecutor's Office
18                        230 East Ninth Street
                          Suite 4000
19                        Cincinnati, Ohio  45202

20        Reporter:       Kelly A. Graff
                          Notary Public - State
21                                    of Ohio

22

23

24

25

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3           For the plaintiff:

 4                   Alphonse A. Gerhardstein, Esq.
                          and
 5                   Jacklyn Gonzales-Martin, Esq.
                          of
 6                   Gerhardstein & Branch Co., LPA
                     432 Walnut Street
 7                   Suite 400
                     Cincinnati, Ohio  45202
 8                   513.621.9100, Ext. 13
                     agerhardstein@gbfirm.com
 9                   jgmartin@gbfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1    APPEARANCES OF COUNSEL:

 2

 3         For the defendants:

 4                 Jerome A. Kunkel, Esq.
                          and
 5                 Pamela J. Sears, Esq.
                          of
 6                 Office of Hamilton County
                     Prosecuting Attorney
 7                 230 East Ninth Street
                   Suite 4000
 8                 Cincinnati, Ohio  45202
                   513.946.3082
 9                 pam.sears@hcpros.org
                   jerry.kunkel@hcpros.org
10
                          and
11
                   Linda L. Woeber, Esq.
12                        of
                   Montgomery Rennie & Jonson, LPA
13                 36 East Seventh Street
                   Suite 2100
14                 Cincinnati, Ohio  45202
                   513.768.5239
15                 lwoeber@mrjlaw.com

16

17         Also Present:

18                 Nancy Roell
                   Anthony McNamara
19                 Katie Cornelius, videographer

20

21                          - - -

22

23

24

25
```

4

```
 1                      I N D E X

 2

 3   WILLY J. DALID                              PAGE

 4      EXAMINATION BY MS. GONZALES-MARTIN        5
        EXAMINATION BY MS. SEARS                 104
 5      FURTHER EXAMINATION
           BY MS. GONZALES-MARTIN               193
 6      FURTHER EXAMINATION BY MS. SEARS         199
        FURTHER EXAMINATION
 7         BY MS. GONZALES-MARTIN               201
        FURTHER EXAMINATION BY MS. SEARS         202
 8      FURTHER EXAMINATION
           BY MS. GONZALES-MARTIN               202
 9

10
        EXHIBITS                    MARKED    REFERENCED
11
        PLAINTIFF'S EXHIBIT  2        -          193
12      PLAINTIFF'S EXHIBIT  7        -          193
        PLAINTIFF'S EXHIBIT 11        -           36
13      PLAINTIFF'S EXHIBIT 12        -           37
        PLAINTIFF'S EXHIBIT 15        -          196
14      PLAINTIFF'S EXHIBIT 18       30           30
        PLAINTIFF'S EXHIBIT 19       34           34
15      PLAINTIFF'S EXHIBIT 20       67           67
        PLAINTIFF'S EXHIBIT 21       83           83
16      PLAINTIFF'S EXHIBIT 22       88           88

17      DEFENDANTS' EXHIBIT  K        -          113

18

19                         - - -

20

21

22

23

24

25
```

```
 1                    WILLY J. DALID

 2   a witness herein, having been duly sworn, was

 3   examined and deposed as follows:

 4                    EXAMINATION

 5   BY MS. GONZALES-MARTIN:

 6         Q.    Would you please state your name?

 7         A.    Willy Dalid.

 8         Q.    Middle name?

 9         A.    John.

10         Q.    What's your highest level of

11   education?

12         A.    High school.

13         Q.    Where did you go?

14         A.    Winton Woods High School.

15         Q.    Winton Woods?

16         A.    Yes.

17         Q.    When did you graduate?

18         A.    '94.

19         Q.    Do you have prior law enforcement

20   experience?

21         A.    Yes, ma'am.

22         Q.    Explain that.

23         A.    State highway patrol.

24         Q.    What year did you work for them?

25         A.    1999.
```

```
1        Q.   Until when?

2        A.   The end of 1999 or 2000, I guess.

3        Q.   Did you go through their academy?

4        A.   Yes, ma'am.

5        Q.   When?

6        A.   '99.

7        Q.   Where?

8        A.   Ohio State Highway Patrol in Columbus,

9   Ohio.

10        Q.   How long was that academy?

11        A.   Seven months.

12        Q.   Is that OPOTA training?

13        A.   No, ma'am.  State patrol, state

14   training.

15        Q.   Why did you leave the highway patrol?

16        A.   I was in Lima, Ohio and lived too far

17   away from home.

18        Q.   Were you disciplined?

19        A.   No, ma'am.

20        Q.   Do you have any other law enforcement

21   experience before the Hamilton County Sheriff's

22   Office?

23        A.   I worked at Lincoln Heights Police

24   Department.

25        Q.   When was that?
```

1          A.    That was in 2001.

2          Q.    How long did you work there?

3          A.    I believe the end of 2001, beginning of

4     2002.

5          Q.    So less than a year?

6          A.    Yes, ma'am.

7          Q.    Why did you leave?

8          A.    I wasn't OPOTA certified.  I was only

9     state certified.

10         Q.    Were you disciplined?

11         A.    No, ma'am.

12              MS. SEARS:  Can I just object,

13         continuing objection, Jackie?

14              That way I won't have to interrupt you

15         anymore about any questions regarding

16         discipline with regard to relevance to the

17         excessive force claim and then I won't have

18         to interrupt you.

19    BY MS. GONZALES-MARTIN:

20         Q.    So were you disciplined at Lincoln

21    Heights?

22         A.    No, ma'am.

23         Q.    And were you fired from

24    Lincoln Heights?

25         A.    No, ma'am.

```
 1          Q.    Any other law enforcement experience

 2    before Hamilton County?

 3          A.    Corrections, which is Hamilton County,

 4    yes, ma'am.  That was 2004.

 5          Q.    What was 2004?

 6          A.    Hamilton County.

 7          Q.    You were hired in Hamilton County in

 8    2004?

 9          A.    Yes, ma'am.

10          Q.    Into the corrections department?

11          A.    Yes, ma'am.

12          Q.    What is your present job?

13          A.    I work for patrol division for Hamilton

14    County.

15          Q.    When were you promoted to patrol?

16          A.    June 5, 2012.

17          Q.    What did you have to do to be promoted

18    to patrol?

19          A.    Took a test, a test, physical, yes,

20    ma'am.

21          Q.    Did you pass the test the first time?

22          A.    Yes, ma'am.

23          Q.    Did you pass the physical the first

24    time?

25          A.    Yes, ma'am.
```

9

 1          Q.    Prior to August 13, 2013, you had

 2    corrections training that your lawyer reviewed

 3    with Deputies Huddleston and Alexander last week

 4    right?

 5          A.    Yes, ma'am.

 6          Q.    And like Huddleston and Alexander, your

 7    training included interpersonal communications

 8    training?

 9          A.    Yes, ma'am.

10          Q.    And from that training, you knew how to

11    make observations of the subject's emotions and

12    to make inferences about them?

13          A.    Yes, ma'am.

14          Q.    And it included crisis situations?

15          A.    Yes, ma'am.

16          Q.    Like Huddleston and Alexander, your

17    training included mental health response?

18          A.    I did not get any mental health

19    responses.  What do you mean responses?

20          Q.    You were trained to respond to people

21    having a mental health crisis?

22          A.    Oh.  Yes, ma'am.

23          Q.    And from that training, you knew that

24    mental illness is a medical condition, right?

25          A.    Yes, ma'am.

1      Q.   And actions of a subject in a mental

2   health crisis are often not intentional, but

3   symptoms of a medical problem --

4           MS. SEARS:  Objection.

5   BY MS. GONZALES-MARTIN:

6      Q.   -- right?

7      A.   Can you repeat that?

8      Q.   The actions of a subject in a mental

9   health crisis are often not intentional, but

10  symptoms of a medical problem?

11     A.   Not all, no.

12     Q.   You've learned in your training that

13  someone in a mental health crisis might not be

14  acting intentionally --

15     A.   Right.

16     Q.   -- bizarrely?

17     A.   Correct.

18     Q.   In a certain way it's often that

19  they're having a medical crisis, right?

20     A.   No, they're not having a medical

21  crisis.  They're having -- they're not speaking

22  right or talking, that's not medical, that's just

23  maybe something is wrong with them.

24     Q.   They're exhibiting symptoms of a

25  medical --

1       A.    Correct.

2             MS. SEARS:  Deputy, can I just tell

3       you, Ms. Gonzales-Martin speaks very quickly

4       and you speak very quickly, maybe even

5       quicker than me.  I'm not sure.  We'll let

6       the court reporter be the judge of that.

7       But you're not letting her finish her

8       questions.

9             Take a breath, let Ms. Gonzales-Martin

10      finish her questions, and then answer.

11      Okay?

12            THE WITNESS:  Yes, ma'am, okay.

13      Sorry.

14      BY MS. GONZALES-MARTIN:

15      Q.    So you'd agree that a person in a

16      mental health crisis is exhibiting symptoms of

17      their medical condition?

18      A.    Yes.

19            MS. SEARS:  Objection.

20      BY MS. GONZALES-MARTIN:

21      Q.    And from that training, you knew that a

22      lot more mentally ill people are living in the

23      community nowadays since we, as a society, have

24      stopped institutionalizing people with mental

25      illness?

12

```
 1              MS. SEARS:  Objection.

 2         A.   In society?  Yeah, there is.  Most of

 3    them are.  Not all of them, but --

 4    BY MS. GONZALES-MARTIN:

 5         Q.   And like Huddleston and Alexander, you

 6    had taser training?

 7         A.   Yes, ma'am.

 8         Q.   And your training on tasers included

 9    excited delirium?

10         A.   Yes, ma'am.

11         Q.   And you had general training on excited

12    delirium, correct?

13         A.   Yes, ma'am.

14         Q.   You knew, prior to August 13, 2013,

15    that excited delirium is a medical condition that

16    presents itself as a law enforcement problem?

17              MS. SEARS:  Objection as to the

18         characterization of law enforcement

19         problem.

20         A.   Yeah, we've had training on it, yes.

21    BY MS. GONZALES-MARTIN:

22         Q.   You knew that excited delirium is a

23    life-threatening emergency?

24              MS. SEARS:  Objection as to -- I mean,

25         if you know that it is, you can answer or
```

13

1       not.

2           A.   I don't know that, but it's in the

3    training curriculum.

4    BY MS. GONZALES-MARTIN:

5           Q.   You knew that early advanced

6    coordination with EMS is key in an excited

7    delirium situation, correct?

8               MS. SEARS:  Objection.

9           A.   Can you repeat that?

10   BY MS. GONZALES-MARTIN:

11          Q.   You knew that early advanced

12   coordination with EMS is key in an excited

13   delirium situation?

14              MS. SEARS:  Objection as to key.

15          A.   It's not key.  I mean, you have to have

16   staff on there.  You have to have medical staff.

17   But --

18   BY MS. GONZALES-MARTIN:

19          Q.   You took training on excited

20   delirium?

21          A.   Correct.

22              And that's what it says in our

23   training, correct.

24          Q.   You knew that a lot of backup is needed

25   in an excited delirium situation?

14

1           MS. SEARS:  Objection.

2      A.   Not at that moment, no.

3           If it's in front of us, then

4 we can't -- we have to control the subject, the

5 suspect.  It's not right off -- you know, we

6 don't know that if he's experiencing excited

7 delirium or not.  He can be experiencing

8 anything.

9 BY MS. GONZALES-MARTIN:

10     Q.   The Hamilton County Sheriff's Office

11 training on excited delirium recommends six

12 officers on scene before approaching the subject,

13 correct?

14          MS. SEARS:  Objection.

15     A.   Yes.

16 BY MS. GONZALES-MARTIN:

17     Q.   And that's all true whether the excited

18 delirium is caused by a mental illness or drugs,

19 correct?

20          MS. SEARS:  Objection as to what's all

21      true.

22     A.   On what?

23 BY MS. GONZALES-MARTIN:

24     Q.   What we just talked about, the EMS,

25 having extra officers on hand, that's true

1   whether the excited delirium is caused by a

2   mental health crisis or by drugs, correct?

3       A.   Yes.

4       Q.   And like Huddleston and Alexander,

5   before August 13, 2013, you had use-of-force

6   training?

7       A.   Yes, ma'am.

8       Q.   And you knew how to assess factors for

9   use of force, including the severity of the

10  crime?

11      A.   Yes, ma'am.

12      Q.   Whether the subject was fleeing or

13  resisting?

14      A.   Yes, ma'am.

15      Q.   The subject's mental condition?

16      A.   How we control them or -- what are your

17  questions about?  Do we have training on those?

18      Q.   You were trained when assessing the

19  factors for applying use of force?

20      A.   Right.

21      Q.   To consider the mental condition of the

22  subject?

23      A.   Correct.

24      Q.   And you have to constantly reassess and

25  adjust according to the totality of the

1    circumstances?

2         A.   Correct.

3         Q.   And the more you know about a subject

4    before you engage, the better, right?

5         A.   Yes.

6         Q.   But when you don't know much about a

7    subject, you have to rely on your training to

8    react appropriately, correct?

9         A.   Correct.  We have to know what the

10   subject is doing.

11        Q.   So you have to make observations and

12   adjust quickly?

13        A.   Right.

14        Q.   And lay people aren't trained in

15   excited delirium and use-of-force continuum,

16   correct?

17        A.   Who is it?

18             MS. SEARS:  Objection.

19   BY MS. GONZALES-MARTIN:

20        Q.   Lay people, me, people who aren't

21   police officers.

22             MS. SEARS:  Objection.

23        A.   Repeat that question.

24   BY MS. GONZALES-MARTIN:

25        Q.   Lay people who aren't police officers

1    don't get training -- specialized training that

2    you have in use of force in excited delirium,

3    correct?  That's special training that you've got

4    as a police officer?

5            MS. SEARS:  Objection.

6        A.   They can.  I mean, you can yourself, is

7    that what you're trying to say?  I don't know

8    what the -- so no.

9    BY MS. GONZALES-MARTIN:

10       Q.   Using force in excited delirium

11   response are things that you're uniquely prepared

12   for as a police officer, correct?

13           MS. SEARS:  Objection as to uniquely

14       prepared.

15       A.   Yes.

16   BY MS. GONZALES-MARTIN:

17       Q.   On August 13, 2013, you encountered

18   Gary Roell, correct?

19       A.   Yes.

20       Q.   Mr. Roell appeared to be having a

21   mental health crisis when you encountered him,

22   right?

23       A.   I don't know that.

24       Q.   You used force on Gary Roell?

25       A.   To control him, correct.

18

```
 1        Q.   And he died following the use of force,
 2   correct?
 3             MS. SEARS:  Objection.
 4        A.   He passed after.
 5   BY MS. GONZALES-MARTIN:
 6        Q.   The coroner ruled the cause of death
 7   was excited delirium, correct?
 8             MS. SEARS:  Objection.
 9             If you know.
10        A.   I don't know that.
11             MS. GONZALES-MARTIN:  Pam, if you know
12        is --
13             MS. SEARS:  I said objection, if you
14        know, you can answer, is what I said.
15             MS. GONZALES-MARTIN:  And if you know
16        is coaching your witness.
17             MS. SEARS:  I'm sorry.  Maybe I didn't
18        complete the sentence because then you
19        interrupted but -- and maybe I didn't, I was
20        writing and saying.  But objection, if you
21        know, you can answer, is what my instruction
22        would be to the client -- to my client.
23             MS. GONZALES-MARTIN:  But telling the
24        client, if you know, is coaching the client
25        and that's not allowed.
```

1          MS. SEARS:  Okay.

2          But you can answer if you know.  Did

3    you answer the question?

4          THE WITNESS:  I did already.

5          MS. SEARS:  Okay.  I didn't hear it

6    because I was listening to Ms. Gonzales.

7          MS. GONZALES-MARTIN:  If you could stop

8    telling him, if you know.  That is coaching

9    him.

10          MR. GERHARDSTEIN:  Just do a general

11    objection for --

12          MS. SEARS:  I understand, but I

13    disagree.

14          MS. GONZALES-MARTIN:  If you could,

15    give him a general objection that if he

16    doesn't know, he shouldn't answer.

17          MS. SEARS:  You would rather I say,

18    objection, if you don't know, don't answer?

19          MS. GONZALES-MARTIN:  I would prefer if

20    you would follow the rules for objecting in

21    a deposition, which is to just place an

22    objection.

23          MR. KUNKEL:  Does the general public --

24    are they trained in use of force, how would

25    he know?

20

```
 1              MR. GERHARDSTEIN:  She's doing the
 2      deposition.
 3              MR. KUNKEL:  You're talking.
 4              MS. SEARS:  I understand what you're
 5      saying.  I'll create the record I need to
 6      create.
 7              I understand how to object, I
 8      understand the rules of civil procedure, I
 9      understand the the rules of criminal
10      procedure, and I understand the rules of
11      evidence, okay.
12              And so and this is not my first rodeo,
13      okay?  So I understand your objection.
14              MS. GONZALES-MARTIN:  Could you please
15      mark this in the record?
16  BY MS. GONZALES-MARTIN:
17      Q.   Are you aware that the coroner ruled
18  that the cause of death in this case was excited
19  delirium?
20      A.   I was not.
21      Q.   Do you have any reason to disagree with
22  the cause of death being excited delirium?
23              MS. SEARS:  Objection.
24      A.   Do I have what now?
25  BY MS. GONZALES-MARTIN:
```

1      Q.   Any reason to disagree that the cause

2  of death was excited delirium?

3      A.   I'm not a medical field, so --

4      Q.   Were you criminally prosecuted for any

5  of your acts involving Mr. Roell?

6      A.   No.

7      Q.   Were you disciplined by the

8  Hamilton County Sheriff's Office for the way you

9  handled the incident with Mr. Roell?

10     A.   No.

11     Q.   Were you provided any retraining based

12  on the way you handled the incident with

13  Mr. Roell?

14     A.   Retraining as in after the incident?

15     Q.   Yes.

16     A.   We did a couple of things, but just

17  online stuff.

18     Q.   Was it as a result of your actions with

19  Mr. Roell?

20     A.   No.

21     Q.   Were you -- are you aware of any policy

22  changes at Hamilton County Sheriff's Office as a

23  result of the events involving Mr. Roell?

24     A.   No, I don't.

25     Q.   On August 13, 2013, did you follow

```
 1    Hamilton County Sheriff's Office use-of-force

 2    policy --

 3         A.   Yes.

 4         Q.   -- regarding -- on August 13, 2013, did

 5    Deputies Huddleston and Alexander -- well, I'm

 6    sorry -- on August 13, 2013, did

 7    Deputy Huddleston follow Hamilton County

 8    Sheriff's Office taser policy regarding

 9    Mr. Roell?

10              MS. SEARS:  Objection.

11         A.   Yes.

12    BY MS. GONZALES-MARTIN:

13         Q.   You never tried to stop

14    Deputy Huddleston from using the taser --

15              MS. SEARS:  Objection.

16    BY MS. GONZALES-MARTIN:

17         Q.   -- correct?

18         A.   No.

19         Q.   On August 13, 2013, did you and

20    Deputies Huddleston and Alexander follow your

21    Hamilton County taser training regarding your use

22    of force on Mr. Roell?

23         A.   Yes.

24         Q.   On August 13, 2013, did you follow

25    Hamilton County Sheriff's Office policy regarding
```

23

1    encountering people with mental illness?

2              MS. SEARS:  Objection.  So I would just

3         make a continuing objection, so I don't have

4         to interrupt you anymore, to questions

5         regarding policies and the training and the

6         extent to which in this incident they

7         followed those things for purposes of the

8         excessive force claim.  Okay?  And then I

9         won't have to interrupt you anymore.

10   A.   Yes.

11   BY MS. GONZALES-MARTIN:

12   Q.   Did you follow, on August 13, 2013,

13   Hamilton County Sheriff's Office excited delirium

14   training?

15   A.   Yes.

16   Q.   And did you also follow Hamilton County

17   Sheriff's Office restraint and cuff policy?

18   A.   Yes.

19   Q.   Did you follow the custom and practice

20   of the Hamilton County Sheriff's Office with

21   respect to your use of force on Mr. Roell?

22   A.   Custom and practice?

23   Q.   The custom and practice at Hamilton

24   County Sheriff's Office with respect to use of

25   force as you know it, did you follow it?

1       A.   Yes.

2       Q.   And did you do anything wrong with

3  respect to your use of force on Mr. Roell?

4            MS. SEARS:  Objection.

5       A.   No.

6            MS. SEARS:  Give me time to object.

7       Okay?

8            THE WITNESS:  Yes, ma'am.  Sorry.

9  BY MS. GONZALES-MARTIN:

10      Q.   Did you leave the Ohio State Highway

11 Patrol without a new job lined up?

12      A.   Yes.

13      Q.   And when did you leave?

14      A.   2000 -- yeah, 2001, '99, 2001.

15      Q.   What month?

16      A.   I don't remember.

17      Q.   What time of year?  And when did you

18 start your next job?

19      A.   I was actually -- I was actually

20 working with Coffee Break Services.

21      Q.   So are you saying you weren't without a

22 job?

23      A.   No, I was not without a job, no.  Not a

24 police job, just a regular job.

25      Q.   When you left Lincoln Heights, did you

1   have another job lined up?

2       A.   I was still working, correct, yes.

3       Q.   Where were you working at that time?

4       A.   Coffee Break.

5       Q.   What's it called?

6       A.   Coffee Break Services.

7       Q.   What's that?

8       A.   It's a vending place, vending water,

9   coffee distributors.

10          MR. GERHARDSTEIN:  Oh, that was years

11      before.

12  BY MS. GONZALES-MARTIN:

13      Q.   When I asked you about retraining, you

14  said you did a couple of things.  What did you

15  do?

16      A.   Online stuff like retraining on

17  domestic violence, I believe autism.  And the

18  rest I don't remember.  It's been a while.

19      Q.   When was the last time you had

20  training?

21      A.   The last one was domestic about a

22  couple months ago maybe.  That was the last one

23  we had.

24      Q.   On August 13, 2013, what were you doing

25  before your encounter with Mr. Roell?

```
 1        A.   I was helping out with a rollover crash

 2   on 275 and Montgomery.

 3        Q.   Is that the same crash that

 4   Deputies Huddleston and Alexander were --

 5        A.   Yes, ma'am.

 6        Q.   -- responding to?

 7        A.   Yes, ma'am.

 8        Q.   Try and let me finish.

 9        A.   Sorry.

10        Q.   The court reporter will get on us.

11             And how did you first get involved with

12   the incident involving Mr. Roell?

13        A.   I was last at the scene of the

14   rollover.  When I walked up towards Montgomery

15   talking to them, I heard it on the radio.

16        Q.   What did you hear on the radio?

17        A.   The call was a neighbor in trouble.

18        Q.   What else did you hear on the radio?

19        A.   That was it.

20        Q.   What frequency were you on?

21        A.   I was on a different frequency, which

22   is northeast communications.

23        Q.   Is that the same frequency as

24   Deputy Huddleston?

25        A.   Yes, ma'am.
```

1     Q.    How many frequencies are there?

2     A.    Different, different townships has

3  different frequencies.  Symmes Township is

4  northeast.  And Sycamore, Columbia, and all of

5  them are on the east channels.

6     Q.    Are there other channels for the

7  Hamilton County Sheriff's Office?

8     A.    There's Renew and everything for

9  specialized.

10     Q.    What did you say?

11     A.    Renew, any specialized.

12     Q.    Renew?

13     A.    Right.  They have different things.

14     Q.    And did you only have access to the

15  northeast communications frequency?

16     A.    I had access for northeast, and the

17  east inside my car with a different radio.

18     Q.    Okay.  But the radio that you wear on

19  your shoulder, you only have northeast?

20     A.    Yes, ma'am.

21     Q.    And Deputy Alexander was on the east

22  frequency?

23     A.    Yes, ma'am.

24     Q.    But you knew that this was a known

25  suspect, a neighbor, right?

```
 1        A.   No, ma'am.

 2             MS. SEARS:  Objection.

 3             You can answer.  Just let me object.

 4        A.   No, ma'am.

 5   BY MS. GONZALES-MARTIN:

 6        Q.   You knew it was a neighbor?

 7             MS. SEARS:  Objection.

 8   BY MS. GONZALES-MARTIN:

 9        Q.   This was neighbor trouble you just

10   said, correct?

11        A.   Yeah.  I mean --

12        Q.   When you arrived on the scene, what did

13   you observe when you got there?

14        A.   I seen a patrol car which is in front

15   of me.  I saw Deputy Huddleston run to the back

16   on the right-hand side of the complex.

17             As I was getting out, I heard him say,

18   hey, and I ran left side of the complex, thought

19   he would be running.

20        Q.   Did you observe the complainant?

21        A.   No, ma'am.

22        Q.   When you got to the back, Huddleston

23   and Alexander were trying to get Gary Roell out

24   of the enclosed porch, right?

25        A.   I did not see that.
```

1       Q.   You gave an interview the morning of

2   the incident before you finished your shift,

3   right?

4       A.   Yes, ma'am.

5       Q.   And you told the truth in that

6   interview?

7       A.   Yes, ma'am.

8       Q.   And that interview was closer in time

9   to the events than as we sit here today,

10  correct?

11      A.   Yes, ma'am.

12      Q.   That interview would therefore be more

13  reliable as an account of your memory of the

14  events than your memory as we sit here today?

15      A.   Yes, ma'am.

16      Q.   Okay.  I'd like to play you a clip from

17  that interview.  And it starts at 7:15:42.

18          MS. SEARS:  Objection.  Are you going

19      to have this interview marked as an exhibit,

20      then?

21          MS. GONZALES-MARTIN:  I am.  I'll give

22      it to the court reporter after.

23          MS. SEARS:  Okay.  I prefer it be

24      marked now if that's possible, if you don't

25      mind.

1      MS. GONZALES-MARTIN: Sure. Let's do

2  it now. I'd like to mark this exhibit as

3  Plaintiff's Exhibit -- I think I'm on 17 or

4  18.

5      MS. SEARS: I think we had a 17.

6      MS. GONZALES-MARTIN: Yeah. This will

7  be Plaintiff's Exhibit 18.

8      MS. SEARS: Don't ever rely on me.

9  That was a lucky thing for me because I

10  can't keep track.

11      (Video played.)

12      (Plaintiff's Exhibit 18 was marked for

13      identification.)

14      MS. SEARS: So I would just offer --

15  before you ask a question on that, I would

16  offer an objection in case the officer would

17  like to see any preceding part of that

18  interview or even post part of that

19  interview before he answers your questions.

20  Because it's sort of taken out of context

21  of the entire totality of the

22  circumstances.

23      MS. GONZALES-MARTIN: I've stopped the

24  video at, it says on the lower left-hand

25  corner of the screen, 7:16:40.

31

1    BY MS. GONZALES-MARTIN:

2         Q.    Is that you in the video?

3         A.    Yes, ma'am.

4         Q.    And are those your words the day of the

5    incident?

6         A.    Yes, ma'am.

7         Q.    Deputy Huddleston tased Gary Roell,

8    correct?

9         A.    Yes, ma'am.

10        Q.    Where did the barbs hit?

11        A.    I do not know where it hit.

12        Q.    There were some struggle outside of the

13   patio, correct?

14        A.    Yes, ma'am.

15        Q.    And after Gary Roell was struck with

16   the taser and there had been some struggle, he

17   then crawled his way back into the patio; is that

18   correct?

19        A.    I did not see that, no, ma'am.  He

20   walked in.

21        Q.    So he ran toward the patio, correct?

22        A.    Correct.

23        Q.    He was trying to get away from you,

24   correct?

25        A.    I'm sorry?

1      Q.   He was trying to get away from you and

2  the other deputies, correct?

3        MS. SEARS:  Objection.

4      A.   He was trying to go back in.  I don't

5  know what he was trying to go to on the other

6  side because there's people in there.

7  BY MS. GONZALES-MARTIN:

8      Q.   And the gate was then shut, correct?

9      A.   Yes.

10     Q.   Who shut the gate?

11     A.   He did.

12     Q.   How did he shut the gate?

13     A.   He shut it this way, because when it

14  shut he said -- he mentioned that those fucking

15  wires was on him.

16     Q.   So did you hear him say something about

17  the fucking wires on him --

18     A.   Correct.

19     Q.   -- when the door was closed?

20     A.   As he was shutting it, yes, ma'am.

21     Q.   So the wires were freaking him out?

22        MS. SEARS:  Objection.

23     A.   I don't know what the wires were was

24  doing to him.

25        Usually when a taser is deployed and

1   it's hit, someone falls down.  Usually it kind of

2   freezes them.  And when he didn't freeze, I

3   thought, okay, he was either on drugs, PCP

4   or -- it's supposed to work.

5   BY MS. GONZALES-MARTIN:

6        Q.   Or mentally having an excited delirium

7   episode?

8        A.   I did not know that.

9        Q.   But you could tell something was off,

10  something was bizarre with him?

11            MS. SEARS:  Objection, asked and

12       answered.

13            You can answer.

14            THE REPORTER:  I didn't hear an

15       answer.

16            THE WITNESS:  I'm sorry?

17            THE REPORTER:  I didn't hear an

18       answer.

19       A.   That something was wrong?

20  BY MS. GONZALES-MARTIN:

21       Q.   Yes.

22       A.   Yes, there was something wrong with

23  him, yes, either drugs or PCP.

24       Q.   What did you learn about the sheriff's

25  office history with Gary Roell at this point?

34

1             MS. SEARS:  Objection.

2        A.   I've never dealt with him.

3    BY MS. GONZALES-MARTIN:

4        Q.   As you were arriving to the scene and

5    first encounter him, what did you know about him

6    at that point?

7        A.   Nothing.

8             MS. GONZALES-MARTIN:  This will be 19.

9             (Plaintiff's Exhibit 19 was marked for

10            identification.)

11   BY MS. GONZALES-MARTIN:

12       Q.   The court reporter has handed you

13   what's been marked Plaintiff's Exhibit 19, and

14   this is a transcript of your interview the day of

15   the incident.

16       A.   Okay.

17       Q.   You can review it if you'd like.  I

18   want you to turn to Page 10.  Feel free to read

19   more of the page for context if you'd like, but

20   I'm going to ask you about lines 13 through 17.

21       A.   Okay.

22       Q.   Does that refresh your recollection

23   about whether Mr. Roell crawled back towards the

24   fence?

25       A.   He crawled from when we were trying to

35

1    control him the first time and -- when I looked

2    over, I didn't see where he was at.  I looked

3    over.  He was crawling towards that way.  That's

4    when I noticed he had -- his buttocks was

5    exposed.

6          Q.   Had you had any other calls about

7    Gary Roell the day of the incident or the day

8    before?

9               MS. SEARS:  Objection.

10         A.   No, ma'am.

11   BY MS. GONZALES-MARTIN:

12         Q.   Deputy Alexander testified that he

13   observed the front door of the neighbor's house

14   wide open with garbage.

15              Did you observe that?

16         A.   No, ma'am.

17         Q.   But you ran right by it, right?

18              MS. SEARS:  Objection.

19         A.   No.  I ran by just the side of the

20   house.  I didn't see any of the complex.  I just

21   ran back that way to --

22   BY MS. GONZALES-MARTIN:

23         Q.   So you arrived in front of the

24   complainant's address, correct?

25         A.   I didn't know what the address was.  I

1    knew there was a cruiser right in front of me.

2        Q.   And it was the unit that was on the end

3    of a row of condos, right?

4             MS. SEARS:  Objection.

5        A.   Who; the complainant?

6    BY MS. GONZALES-MARTIN:

7        Q.   Yes.

8        A.   I don't know.  All I saw was

9    Deputy Huddleston ran towards the back side, the

10   right-hand side.

11       Q.   The end of a building?

12       A.   Correct.

13       Q.   And so you went -- instead of the way

14   that Huddleston went --

15       A.   Correct.

16       Q.   -- you went to the left as you're

17   facing the building?

18       A.   Right, the opposite side, yes, ma'am.

19       Q.   I'll have you turn to Plaintiff's

20   Exhibit 11, please.

21       A.   Oh, this one.  Sorry.

22       Q.   This is a photo of the open door that I

23   was describing that's to the left of the

24   complainant's unit as you're looking at the

25   building.

```
 1               Does that refresh your recollection

 2    about the scene that night?

 3         A.   I've never seen it.

 4         Q.   What did you observe about

 5    Gary Roell?

 6               MS. SEARS:  Objection, foundation.

 7    BY MS. GONZALES-MARTIN:

 8         Q.   When you first saw Gary Roell, what did

 9    you observe about him?

10         A.   When I first made contact with him was

11    during the control.

12         Q.   He had a plant, a potted -- well, a

13    basket with a plastic wire around it, correct?

14         A.   On his hands, correct.

15         Q.   There's a picture of that.  Plaintiff's

16    Exhibit 12, correct?

17         A.   I did not see that.  No, I did not see

18    that kind.  I mean, it was like that, but I

19    didn't really quite see exactly what it was.

20         Q.   He also had a garden hose, correct?

21         A.   I don't recall.  I think he did.

22         Q.   And he was screaming, correct?

23         A.   I didn't hear that, no.

24         Q.   Well, he was saying some gibberish?

25         A.   I didn't hear that, either.
```

1        Q.   Did you hear him say anything?

2        A.   No, not during the first contact.

3        Q.   The other deputies were deposed last

4    week and you were here, correct?

5        A.   Correct.

6        Q.   And they both testified that Mr. Roell

7    was saying things about water?

8        A.   That was on them, not on me.  I didn't

9    hear any of that.

10       Q.   Mr. Roell was nude from the waist down,

11   correct?

12       A.   Not until after I seen him crawl.  Yes,

13   he was nude.  I seen his buttocks.

14       Q.   He didn't get nude from the waist down

15   at some point after you left -- after you

16   arrived, correct?  He was nude the entire time?

17       A.   When I made contact with him, yes.

18       Q.   And you didn't observe him destroying

19   any property, correct?

20       A.   No, I did not.

21       Q.   So you had interpersonal communications

22   training and crisis training like Huddleston and

23   Alexander?

24            MS. SEARS:  Objection, asked and

25            answered.

1    BY MS. GONZALES-MARTIN:

2        Q.   Correct?

3            MS. SEARS:  You can answer.

4        A.   Yes, ma'am.

5    BY MS. GONZALES-MARTIN:

6        Q.   And from your training and experience,

7    you knew that Gary Roell was having a mental

8    problem, correct?

9            MS. SEARS:  Objection.

10       A.   No, I did not.

11   BY MS. GONZALES-MARTIN:

12       Q.   But you agree that his symptoms were

13   consistent with your excited delirium training,

14   correct?

15           MS. SEARS:  Objection.

16       A.   No.

17   BY MS. GONZALES-MARTIN:

18       Q.   You agree that Mr. Roell was

19   aggressive?

20       A.   Yes.

21       Q.   Combative?

22       A.   Isn't that the same?  Aggressive,

23   combative?

24       Q.   So you agree that he was combative?

25       A.   He was aggressive.

1        Q.     Hyperactive?

2        A.     I did not see that.

3        Q.     He had unexpected strength?

4        A.     He did have that.

5        Q.     And he had shedding of clothes?

6        A.     After -- yes, he was naked from the

7    buttocks.

8        Q.     Did you talk to Deputies Huddleston and

9    Alexander about your observations of

10   Gary Roell?

11       A.     No.  I didn't have time.

12       Q.     Gary Roell didn't have a weapon,

13   correct?

14              MS. SEARS:  Objection.

15       A.     A weapon as in he had a hose, but --

16   not a hose, but the wire thing.

17   BY MS. GONZALES-MARTIN:

18       Q.     That's all he had?

19       A.     That's a weapon.

20              MS. SEARS:  Objection, the weapon.

21   BY MS. GONZALES-MARTIN:

22       Q.     He didn't have any weapons aside from a

23   flower basket and a garden hose?

24       A.     Right.

25       Q.     What did you say to the other deputies

1  on scene and what did they say to you before you

2  started to engage Mr. Roell?

3       A.   I didn't say anything.

4       Q.   Did you and Deputies Huddleston or

5  Alexander designate anyone to talk?

6       A.   No.  It happened so fast.

7       Q.   Both Huddleston and Alexander were

8  giving commands, correct?

9       A.   All I heard was Huddleston.

10      Q.   All you heard was Huddleston?

11      A.   Correct.

12      Q.   Were you giving commands, as well?

13      A.   No.

14           Usually when somebody gives commands we

15  don't want to talk over each other.

16      Q.   So you didn't give any commands?

17      A.   No.

18      Q.   Were Deputies Huddleston and Alexander

19  using a command presence?

20           MS. SEARS:  Objection.

21      A.   Like -- an example?

22  BY MS. GONZALES-MARTIN:

23      Q.   As a police officer, you know what I

24  mean by command presence, don't you?

25           MS. SEARS:  Objection.

```
 1        A.   Well, when you're talking to somebody,

 2   yes.

 3   BY MS. GONZALES-MARTIN:

 4        Q.   Was Deputy Huddleston using a command

 5   presence?

 6        A.   Yes.

 7        Q.   And was Deputy Alexander using a

 8   command presence?

 9        A.   I don't know if Alexander was.  I know

10   Huddleston was.

11        Q.   Were you using a command presence?

12        A.   No.

13        Q.   No?

14        A.   I wasn't talking.

15        Q.   You have to be talking to use a command

16   presence?

17        A.   Well, I mean, when you give somebody

18   commands, yes.  If I tell you put your hands up,

19   you know, put your hands up, that's still giving

20   a command presence.

21        Q.   A neighbor said that Gary said at one

22   point, I'm not armed.

23             Did you hear that?

24        A.   No, I did not.

25        Q.   Where was Gary Roell when you first
```

43

1    touched him?

2         A.    He was outside of the patio.

3         Q.    Was his skin warm?

4         A.    I don't know.

5         Q.    Was he wet?

6         A.    Don't know.

7         Q.    Deputy Huddleston sparked his taser,

8    correct?

9         A.    A drive -- like, what do you mean, did

10   he spark it?

11        Q.    Did Deputy Huddleston spark his

12   taser?

13        A.    I don't recall.  I can't remember.

14        Q.    He put the laser red dots on

15   Gary Roell, though, correct?

16        A.    That I did not see.

17        Q.    At some point Deputy Alexander grabbed

18   the plant that we had talked about Gary Roell

19   having?

20        A.    Correct.

21        Q.    And Gary Roell pulled away?

22        A.    All I saw was the plant go up in the

23   air.

24        Q.    And Gary -- did you hear Gary Roell say

25   anything at that point?

44

```
 1          A.    No.

 2          Q.    Mr. Roell was flailing around,

 3   correct?

 4                MS. SEARS:  Objection as to form.

 5          A.    We were trying to control him and he

 6   was moving around, yes.

 7   BY MS. GONZALES-MARTIN:

 8          Q.    He was distraught?

 9                MS. SEARS:  Objection.

10          A.    Distraught?  I don't know.

11   BY MS. GONZALES-MARTIN:

12          Q.    So at that point, after you put your

13   hands on Gary Roell --

14          A.    Correct.

15          Q.    -- there was a struggle and then at

16   some point a tasing?

17          A.    Correct.

18          Q.    And that's when Gary Roell crawled back

19   towards the patio, entered the patio, correct?

20                MS. SEARS:  Objection, asked and

21          answered.

22                You can answer.

23          A.    No.  It was a struggle, he crawled, got

24   up, went by the fence line, got tased, tried --

25   when he closed the door, he said, get these
```

45

1     fucking wires off me, and the door was closed.

2     BY MS. GONZALES-MARTIN:

3          Q.    So at this point, now that the door to

4     the fenced-in area is closed, you observed that

5     Mr. Roell was nude from the waist down?

6          A.    Yes, ma'am.

7          Q.    Had extreme strength?

8          A.    Yes, ma'am.

9          Q.    Was combative?

10         A.    Yes, ma'am.

11         Q.    And you recognized these as symptoms of

12    excited delirium?

13         A.    No.

14         Q.    As of August 13, 2013, you were

15    familiar with excited delirium?

16              MS. SEARS:  Objection, answered twice.

17              You can answer.

18         A.    Training.

19    BY MS. GONZALES-MARTIN:

20         Q.    I'm sorry?

21         A.    Training.

22         Q.    You were familiar with it from your

23    training, is that what you're saying?

24              MS. SEARS:  Objection, asked and

25              answered four times.

46

```
 1        A.   Yes.  I already answered.

 2   BY MS. GONZALES-MARTIN:

 3        Q.   When you said that after Gary Roell

 4   crawled, he got up, where was he when he got

 5   up?

 6        A.   When I looked up, he was already by the

 7   doorway.

 8        Q.   How far were you from the doorway

 9   before he got up or while you were trying to get

10   him on the ground?  So how far did he crawl?

11        A.   I don't know.  I don't know how far it

12   would be.  It was pretty close.

13        Q.   Pretty close to the doorway?

14        A.   Correct.

15        Q.   A couple feet?

16        A.   I don't know.

17             MS. WOEBER:  Deputy Dalid, could you

18        try to keep your voice up?

19             THE WITNESS:  I'm sorry.

20             MS. WOEBER:  I'm just having trouble

21        hearing.

22   BY MS. GONZALES-MARTIN:

23        Q.   Did he walk through or crawl through

24   the gate?

25             MS. SEARS:  Objection, asked and
```

```
 1        answered.

 2              Answer it again.

 3        A.    He walked.  I'm sorry.

 4   BY MS. GONZALES-MARTIN:

 5        Q.    Was he backing up into the gate or

 6   walking forward into the gate?

 7        A.    After the tasing?  After the tasing, he

 8   was walking in because he had to close the

 9   door.

10        Q.    He was -- okay.

11        A.    Like, he was kind of like -- I mean,

12   what do you mean backing up?

13        Q.    You said he crawled and then he got

14   up?

15        A.    Correct.

16        Q.    At that point was he backing away from

17   you --

18        A.    No.

19        Q.    -- or was he walking forward into the

20   gate?

21        A.    Sideways, I guess.  The door was right

22   there.

23        Q.    You covered excited delirium in your

24   Hamilton County Sheriff's Office training?

25              MS. SEARS:  Objection, asked and
```

1          answered five times.

2                Go ahead and answer it the fifth

3          time.

4          A.   Yes.

5     BY MS. GONZALES-MARTIN:

6          Q.   Also in your OPOTA training?

7          A.   Yes.

8          Q.   And in your field training?

9          A.   An overview?  Yes.

10         Q.   So once the gate was closed, Mr. Roell

11    was inside the fenced area alone, right?

12               MS. SEARS:  Objection.

13         A.   Yes.

14    BY MS. GONZALES-MARTIN:

15         Q.   He wasn't close to other members of the

16    public?

17               MS. SEARS:  Objection, foundation.

18         A.   No.

19    BY MS. GONZALES-MARTIN:

20         Q.   He was not armed, aside from the basket

21    and hose we talked about?

22               MS. SEARS:  Objection, foundation.

23    BY MS. GONZALES-MARTIN:

24         Q.   He wasn't armed aside from the hose and

25    basket, but he -- actually, at this point, the

1    basket has been tossed outside?

2         A.   He can be alone with a lot of things,

3    patio furniture, plants, any other plants,

4    anything.

5         Q.   As far as you know, he's not armed

6    aside from what we talked about, right?

7              MS. SEARS:  Objection, calls for

8         speculation.

9         A.   Except for the patio plants, everything

10   else in the immediate --

11   BY MS. GONZALES-MARTIN:

12        Q.   He's not destroying any property --

13             MS. SEARS:  Objection.

14   BY MS. GONZALES-MARTIN:

15        Q.   -- that you know of, right?

16             MS. SEARS:  Objection.

17        A.   Can't see him.

18   BY MS. GONZALES-MARTIN:

19        Q.   Did you say anything to the other

20   officers and did they say anything to you before

21   proceeding after Mr. Roell was inside the gate?

22        A.   No.

23        Q.   At that point, had you called for

24   EMS?

25        A.   Didn't have time.

50

 1      Q.    Had you asked for anyone else to call

 2  EMS?

 3      A.    We didn't have enough time.

 4            Once he got tased, we pursued.  That's

 5  what our training is, to gain control of him.

 6      Q.    Would you agree that Hamilton County

 7  Sheriff's Office excited delirium training says

 8  to have EMS available when you use force?

 9            MS. SEARS:  Objection.

10      A.    To have them available right at the

11  time?  When we had time, yes.  We didn't have

12  that time.

13  BY MS. GONZALES-MARTIN:

14      Q.    Before you opened the gate and pursued

15  Mr. Roell, did you develop a plan?

16      A.    Our plan was to control him.

17      Q.    Did you have a plan for how you were

18  going to do that?

19      A.    Handcuff techniques, arm bar

20  techniques.

21      Q.    Did you discuss anything at all about

22  the plan with your other officers?

23      A.    No.  It was instinct training.

24            MS. SEARS:  What did you say?

25      A.    It was instinct training.

1          MS. SEARS:  I'm sorry.  I didn't hear.

2    BY MS. GONZALES-MARTIN:

3          Q.    So at some point, someone opened the

4    gate, right?

5          A.    Correct.

6          Q.    Who opened the gate?

7          A.    I don't know.  I was too short.

8          Q.    So you didn't open the gate?

9          A.    No.  I don't know who opened the

10   gate.

11         Q.    But it was Deputy Huddleston or

12   Deputy Alexander?

13         A.    Correct.

14         Q.    What did you do next?

15         A.    Came in and tried to control the right

16   side of his body, right arm.

17         Q.    How did you do that?

18         A.    By arm bar technique.  Grab them by the

19   wrist and shoulders trying to control him.

20         Q.    Did that work?

21         A.    No.

22         Q.    What did you do next?

23         A.    Tried to do a handcuff and we ended up

24   on the left-hand side by the bushes.  And then I

25   put one cuff on him as we was on the ground and

52

1    then put another set -- saw another set of cuffs,

2    put those together.  So he was cuffed with two

3    handcuffs on, about this far apart.

4         Q.   At what point did Gary Roell go to the

5    ground?

6              MS. SEARS:  Objection.

7         A.   To the ground inside the patio?

8    BY MS. GONZALES-MARTIN:

9         Q.   Yes.

10        A.   That would be -- I know we went down

11   somehow, but we went down backwards.  I don't

12   know what time frame, when it would be.

13        Q.   Gary Roell didn't punch you or hit you,

14   right?

15             MS. SEARS:  Objection.

16        A.   Did not.

17   BY MS. GONZALES-MARTIN:

18        Q.   And you didn't see Gary Roell punch

19   Deputy Alexander, did you?

20        A.   I was focused on him.

21        Q.   So that's no?

22        A.   No.

23        Q.   And Gary Roell wasn't trying to swing

24   at anything in particular, right?  He was just

25   actively trying not to be restrained?

53

1          MS. SEARS:  Objection, foundation.

2      A.   Correct.

3  BY MS. GONZALES-MARTIN:

4      Q.   At some point, Gary Roell was tased

5  with taser prongs a second time; is that

6  correct?

7      A.   I don't remember that.

8      Q.   And eventually Gary Roell's on the

9  ground and flopping around and all three officers

10  are trying to restrain him, correct?

11     A.   Trying to control, correct.

12     Q.   While he was being restrained,

13  Deputy Huddleston advised him of his Miranda

14  rights, correct?

15     A.   I believe, yes.

16     Q.   And Gary Roell responded that he didn't

17  understand?

18     A.   He said, I don't give a shit.

19     Q.   He also said, I don't understand,

20  correct?

21     A.   I know I remember, I don't give a

22  shit.

23     Q.   Did you have a chance to review your

24  interview from the night of the incident before

25  today's deposition?

54

1      A.    The one like this?

2      Q.    The written transcript.

3      A.    Correct.

4            MS. GONZALES-MARTIN:  I'm going to play

5      another portion of the video interview

6      starting at 7:20:58.

7            (Video was played.)

8            MS. GONZALES-MARTIN:  I stopped the

9      video at 7:21:25.

10  BY MS. GONZALES-MARTIN:

11      Q.   Is that what you said in your

12  interview?

13      A.    Yes.

14            MS. SEARS:  I'm sorry.  Was the

15      question, is that what you said?

16            MS. GONZALES-MARTIN:  Yes.

17            MS. SEARS:  I'm sorry.  I didn't mean

18      to interrupt.  Go ahead.

19            MS. GONZALES-MARTIN:  I'm going to play

20      the video again starting at 7:21:25.

21            (The video was played.)

22            MS. GONZALES-MARTIN:  I stopped the

23      video at 7:21:38.

24  BY MS. GONZALES-MARTIN:

25      Q.   You said, I waited and waited until the

1    squad got there, correct?

2         A.    Correct.

3         Q.    How long?

4         A.    I don't know how long it would be.

5         Q.    What was the plan for when Gary Roell

6    restrained?

7              MS. SEARS:  Objection, asked and

8         answered.

9              You can answer.

10        A.    Have the squad check on him.

11   BY MS. GONZALES-MARTIN:

12        Q.    What did you do while Gary Roell was

13   being restrained?

14        A.    What did I do?

15        Q.    Uh-huh.

16        A.    I was still trying to control him

17   because he was still being aggressive and still

18   trying to do -- trying to do pushups or pull up

19   this way.  He was still flaring -- flailing

20   around.

21        Q.    Mr. Roell alternated between calm

22   behavior and extreme agitation, right?

23        A.    Correct.

24        Q.    And even -- and as he was restrained,

25   he made some comments about water, right?

1        A.   Correct.

2        Q.   He continued to make such comments even

3    while he was being restrained?

4             MS. SEARS:  Objection --

5        A.   I only heard him once.

6             MS. SEARS:  -- as to form.

7             I'm sorry.  What was your answer?

8             THE WITNESS:  I only heard him once.

9    BY MS. GONZALES-MARTIN:

10       Q.   How did you restrain him?

11       A.   He was cuffed in both hands, cuffed

12   together.  He was on his side like this.  And I

13   was between his shoulder blade, so his right

14   shoulder blade should be right between me.

15            And I had his right arm -- right

16   shoulder, I should say, right here and I was

17   trying to -- I was holding onto him because I

18   couldn't just hold him down like this, I had to

19   grab at least hold of him so I could control

20   him.

21       Q.   And he was struggling, correct?

22       A.   Yes.

23       Q.   And at some point he fell asleep?

24       A.   Yes.  He was snoring the first time.

25       Q.   And you knew that that was a danger

1  sign medically, correct?

2     A.  I didn't know what to think.  I was

3  like he's snoring.

4     Q.  After he came to, he said, I need to

5  get up, I need to get up, I was just trying to

6  get water, correct?

7        MS. SEARS:  Objection as to form.

8     A.  I don't remember.  I know he was trying

9  to get up.  After the snoring, he started getting

10  agitated again, tried to get up on me again,

11  tried to put him back down.

12        MS. GONZALES-MARTIN:  I'm going to

13        start the video again at 7:27:05.

14        (Video was played.)

15        MS. GONZALES-MARTIN:  I stopped the

16        video at 7:27:45.

17        MS. SEARS:  Can I ask a question?

18        Are you transcribing -- the court

19        reporter, are you transcribing the actual --

20        what's being said on the tape or just the

21        fact that the tape is being played?

22        THE REPORTER:  I'm indicating that it's

23        being played.

24        I mean, it's my understanding it's

25        already been transcribed by our firm --

58

```
 1              MS. SEARS:  Correct.  Okay.  I just
 2        wanted to clarify.  Thank you.
 3              THE REPORTER:  You're welcome.
 4              If you would give me an instruction to
 5        do that, I will do it.
 6              MS. SEARS:  I don't know that it's
 7        necessary.  I just wanted to know.
 8   BY MS. GONZALES-MARTIN:
 9        Q.   So I just played a clip of the video.
10              Is that what you said in your
11   interview?
12        A.   Yes.
13              MS. SEARS:  Can you tell me again --
14        I'm sorry, Jackie -- what was the time of
15        that clip?  I want to make sure I wrote that
16        down correctly.
17              MS. GONZALES-MARTIN:  It was 7:27:05
18        through 7:27:44.
19              MS. SEARS:  Thank you so much.  Again,
20        I'm sorry to interrupt.
21   BY MS. GONZALES-MARTIN:
22        Q.   Can you describe Gary Roell
23   physically?
24        A.   He -- stalky, kind of had a big
25   belly.
```

1    Q.    And he's an older man, correct?

2    A.    I didn't see his face.

3    Q.    He wasn't a spry, young teenager?

4    A.    No, no, he was not.  He was --

5  correct.

6    Q.    And he was kind of in an awkward

7  position on the ground as you were trying

8  to restrain him with the other officers,

9  right?

10        MS. SEARS:  Objection as to form.

11   A.    He was on his side.

12 BY MS. GONZALES-MARTIN:

13   Q.    So he -- he was resisting your efforts

14 to keep him on the ground, right?

15   A.    Yes, ma'am.

16   Q.    For how long?

17   A.    Oh, minutes-wise, I don't know.  It

18 felt like it was an eternity, but I'm sure it was

19 shorter.

20   Q.    And he would struggle and then he would

21 go limp, right?

22   A.    He would struggle and then he would be

23 calm, start snoring, and then a minute later he'd

24 start agitated again.  The second time he

25 snored.

60

```
1        Q.   So he snored twice?

2        A.   Correct.

3        Q.   Did he go limp and stop resisting

4   without snoring at any point?

5        A.   He was calm, yes.

6        Q.   And what were Deputies Huddleston and

7   Alexander doing while you were restraining

8   Mr. Roell?

9        A.   I don't know.  I was focused on him.

10       Q.   Were they trying to restrain him,

11   also?

12       A.   I don't know if they were -- I know

13   somebody was next to me, but I don't know.  I was

14   focused on getting him -- because if he gets up.

15   I'm controlling him so nobody else gets hurt and

16   I don't get hurt.

17       Q.   But you don't know if your fellow

18   deputies were trying to help you?

19       A.   I'm sure they were.

20       Q.   Gary Roell was on his belly for part of

21   the time that you and the other deputies were

22   trying to control him, right?

23            MS. SEARS:  Objection.

24       A.   He was on his side.  His belly might

25   have been on the ground.  But he's a bigger guy
```

1    and had a belly on him.

2    BY MS. GONZALES-MARTIN:

3       Q.   He was on his belly when he started

4    snoring, right?

5       A.   He was on his side and the belly might

6    have been touching the ground.

7            MS. GONZALES-MARTIN:  Let me start the

8        video again.  This time it's starting at

9        7:28:23.

10           (The video was played.)

11           MS. GONZALES-MARTIN:  I stopped the

12       video at 7:28:54.

13   BY MS. GONZALES-MARTIN:

14      Q.   Is that what you said in your

15   interview?

16      A.   Yes.

17      Q.   So Corporal Steers arrives, correct?

18      A.   Yes.

19      Q.   And Steers says, this looks like

20   excited delirium, right?

21      A.   I did not hear that.

22      Q.   It became apparent that Mr. Roell had

23   no pulse shortly after that, right?

24           MS. SEARS:  Objection as to form.

25      A.   After someone told me to roll him up,

62

1    lift him up.

2    BY MS. GONZALES-MARTIN:

3        Q.    So who first noticed that there was no

4    pulse?

5        A.    I did, because I was by his

6    shoulders.

7        Q.    Did anyone from Hamilton County

8    Sheriff's Office ever say that there were errors

9    in the handling of this incident?

10           MS. SEARS:  Objection as to form.

11       A.    No.

12   BY MS. GONZALES-MARTIN:

13       Q.    Did anyone from the Hamilton County

14   Sheriff's Office discuss the incident in any

15   training after?

16           MS. SEARS:  Objection as to form.

17       A.    No.

18   BY MS. GONZALES-MARTIN:

19       Q.    Were you ever told by anyone that there

20   were errors in the way the incident was

21   handled?

22       A.    No.

23       Q.    Were you off work after the incident?

24       A.    Yes, ma'am.

25       Q.    For how long?

```
 1        A.    One day.

 2        Q.    When the taser cartridges were shot,

 3   did the aphids from the taser come out?

 4        A.    I don't know.

 5        Q.    Were you asked to collect the

 6   aphids?

 7        A.    No.

 8        Q.    Did deputy -- or, I'm sorry --

 9   Corporal Steers conduct CPR on Mr. Roell?

10        A.    Yes.

11        Q.    For how long?

12        A.    I don't know how long.

13        Q.    What did you do while Corporal Steers

14   was conducting CPR?

15        A.    Stood back.  And then he told me to go

16   and check with the -- try to get the squad down

17   from the back, kind of get them down where we're

18   at so they wouldn't get lost.

19        Q.    So where did you go?

20        A.    The back side, towards the front.

21        Q.    The back side, toward the front.  What

22   do you mean?

23        A.    From the back side, towards the front.

24   From the back where I was at, towards the

25   front.
```

64

```
 1         Q.    So you left the patio, went outside the

 2   patio area, and walked toward the front of the

 3   building?

 4         A.    I walked towards the street to wait on

 5   the squad.

 6         Q.    The way you came?

 7         A.    No.

 8         Q.    Did you take the same route?

 9         A.    No.   The closest one.

10         Q.    And where did you wait for the squad?

11         A.    Right in front of the -- well, as they

12   was coming up, I was trying to tell them to go

13   where we were at.   It was pretty quick when I met

14   the squad.

15         Q.    Did you meet the squad in front of the

16   complainant's house?

17         A.    I don't know.   I know it was on the

18   street.

19         Q.    There's the street into the complex and

20   then there's inside the complex.

21         A.    Right.

22         Q.    So where were you?

23         A.    It's inside where you pull in the

24   parking areas and stuff like that.   It's

25   right --
```

```
 1        Q.   So you're in front of the building?

 2        A.   The side of the building, the left side

 3   of it.

 4        Q.   Did you fill out a use-of-force report

 5   about this incident?

 6        A.   No.

 7        Q.   Did you write any kind of statement

 8   about the incident?

 9        A.   I had an incident report, yes.

10             MR. GERHARDSTEIN:  I didn't hear.

11             MS. GONZALES-MARTIN:  He had an

12        incident report.

13        A.   Or incident statement, I should say.

14   BY MS. GONZALES-MARTIN:

15        Q.   Were you aware of any prior calls to

16   the Roell residence?

17        A.   No.  I'm northeast, a different

18   section.

19        Q.   Would you have appreciated learning

20   about prior calls --

21             MS. SEARS:  Objection.

22   BY MS. GONZALES-MARTIN:

23        Q.   -- at the residence?

24             MS. SEARS:  I'm sorry, Jackie.  I

25        didn't mean to interrupt you.
```

66

```
 1              Objection as to form.
 2       A.    Would I have?  It wouldn't come to
 3  me.
 4  BY MS. GONZALES-MARTIN:
 5       Q.    In a perfect world in which you could
 6  know more, would you have appreciated knowing
 7  more?
 8       A.    Yes, in a perfect world, yes.
 9       Q.    Did you know Gary Roell name before you
10  approached him?
11       A.    No, I did not.
12       Q.    Did you or the other deputies use
13  Mr. Roell's name when talking to him?
14       A.    I did not recall anybody that --
15       Q.    Are you trained on positional
16  asphyxiation?
17       A.    Am I trained?
18       Q.    Yes.
19       A.    Get them on the side so they don't -- I
20  mean, we're trained, yeah.
21       Q.    What is positional asphyxiation?
22       A.    It's when if somebody's suffocating.
23       Q.    Did you ever go back to the scene and
24  do a walk-through?
25       A.    No.
```

1      Q.   Did you ever do any review of the

2   incident other than the interview that you

3   gave?

4      A.   No.

5           MS. GONZALES-MARTIN:  Can we take a

6      short break?

7           MS. SEARS:  Sure.

8           THE VIDEOGRAPHER:  We're off the

9      record.

10          (A recess was taken from 11:16 to

11          11:30.)

12          (Plaintiff's Exhibit 20 was marked for

13           identification.)

14          THE VIDEOGRAPHER:  We're on the

15      record.

16   BY MS. GONZALES-MARTIN:

17      Q.   You stated before we took a break

18   that you gave a written statement after the

19   incident, correct?

20      A.   Yes, ma'am.

21      Q.   I'm handing you what's been marked

22   Plaintiff's Exhibit 20.

23          Is that the written statement?

24      A.   Yes, ma'am.

25      Q.   And this is your handwriting?

68

 1          A.   Yes, ma'am.

 2          Q.   Who asked you to give this statement?

 3          A.   I don't know.  I don't know.

 4          Q.   Where were you when you wrote it?

 5          A.   I was in the patrol car, in the front

 6     of the patrol car, inside it.

 7          Q.   Whose patrol car?

 8          A.   I believe it was mine.  I think it was

 9     mine.

10          Q.   Who did you give it to when you

11     completed the report?

12          A.   I don't remember.

13          Q.   Are you aware that Deputies Huddleston

14     and Alexander did not fill out a written

15     report?

16          A.   Yes, from their deposition.

17          Q.   Do you know why you filled out a report

18     and they didn't?

19          A.   No, I don't.

20          Q.   We talked earlier about when Mr. Roell

21     fell asleep, whether he was -- what his position

22     was, correct?

23          A.   (Nodding head.)

24          Q.   And you talked about that in

25     your interview the day of the incident,

 1   right?

 2       A.   Yes.

 3       Q.   I'd like to play you another clip of

 4   the interview starting at 7:30:37.

 5            (Video was played.)

 6            MS. GONZALES-MARTIN:  I stopped the

 7            video at 7:31:06.

 8   BY MS. GONZALES-MARTIN:

 9       Q.   At this point in the video, you've

10   stood up from your chair and you're leaning over

11   on the desk, correct?

12       A.   Right.

13       Q.   And you've got your body -- your arms

14   are against your chest and your arms are touching

15   the desk, right?

16       A.   Correct.

17            (Video was played.)

18            MS. GONZALES-MARTIN:  I stopped the

19            video at 7:31:29.

20   BY MS. GONZALES-MARTIN:

21       Q.   Would you agree that, as a sheriff's

22   deputy, contact with mentally ill citizens is

23   foreseeable?

24            MS. SEARS:  Objection.

25       A.   Foreseeable as in in the future?

1    BY MS. GONZALES-MARTIN:

2         Q.   Yes.

3         A.   Yeah.

4         Q.   Would you agree that you have to take

5    symptoms of mental illness into account when

6    developing a strategy for taking a mentally ill

7    person into custody?

8              MS. SEARS:  Objection, asked and

9         answered.

10             You can answer.

11        A.   No.

12             You don't think I should?

13             Repeat that question again.

14   BY MS. GONZALES-MARTIN:

15        Q.   Do you agree that a deputy must take

16   symptoms of mental illness into account in

17   developing a strategy for taking a mentally ill

18   person into custody?

19             MS. SEARS:  Objection.

20        A.   You should.  I mean --

21   BY MS. GONZALES-MARTIN:

22        Q.   And would you agree that on

23   August 13, 2013, Gary Roell needed emergency

24   psychiatric treatment?

25             MS. SEARS:  Objection.

```
 1        A.   I didn't know that.

 2   BY MS. GONZALES-MARTIN:

 3        Q.   The encounter with Mr. Roell, who was

 4   having a mental health crisis, you now know, and

 5   was half naked and speaking nonsense about water,

 6   that's the type of conduct you're trained for,

 7   right?

 8             MS. SEARS:  Objection.

 9        A.   Repeat that again.

10   BY MS. GONZALES-MARTIN:

11        Q.   This incident --

12        A.   Okay.

13        Q.   -- With Mr. Roell --

14        A.   Right.

15        Q.   -- who you now know was having a mental

16   health problem --

17        A.   I didn't know that at the time.

18        Q.   Right.  You now know, correct?

19        A.   Yeah.  That's why I'm here.

20             I'm confused.  Go ahead.

21        Q.   A person is having a mental health

22   crisis, half naked, speaking nonsense, the type

23   of situation from your training that you're

24   prepared to -- that you're trained to respond to,

25   right?
```

1          MS. SEARS:  Objection.

2     A.   Yes.

3  BY MS. GONZALES-MARTIN:

4     Q.   Prior to August 13, 2013, how many

5  times had you approached a suspect displaying

6  signs of loss of reality or loss of control?

7     A.   Four, if that, maybe less.

8     Q.   You've pink-slipped people in the

9  past?

10    A.   Yes, I did.

11    Q.   How many times?

12    A.   Five.

13    Q.   Have you carried out probate court

14 temporary orders of detention?

15    A.   No.

16    Q.   Explain the pink-slipping experiences.

17         MS. SEARS:  Objection as to form.

18         But go ahead.

19    A.   We had one Sunday morning was

20 irrational, saying he called our dispatch saying

21 that his computer, all his electronics was being

22 bugged, somebody was trying to kill him, somebody

23 was in the parking lot.

24         He did have a CCW, a gun inside the

25 room.  And we made contact with him.  He was

73

1    sweating profusely.  Got the squad, checked him

2    out, and then pink-slipped him because he was

3    being irrationale what he was talking about and

4    he had a weapon.

5    BY MS. GONZALES-MARTIN:

6        Q.   You said this happened just this last

7    Sunday?

8        A.   Sunday, this Sunday, yesterday -- or

9    when did I work?  Yeah, Sunday, Monday morning.

10       Q.   You also have dealt with mentally ill

11   people in the jail, right?

12       A.   Yes.

13       Q.   At what point in the encounter this

14   past Sunday did you call EMS?

15       A.   At what point?

16       Q.   Uh-huh.

17       A.   When we're talking to him and he was in

18   the room sweating, just figuring out that, hey,

19   what's going on with you, didn't have any health

20   issues or anything.  I don't know what time frame

21   it would be.

22       Q.   So you saw him and made some

23   observations about him?

24       A.   Correct.

25       Q.   And thought this is -- I should call

74

1    EMS, someone should call EMS?

2        A.    Correct.

3        Q.    And was that before or after you made

4    physical contact with him?

5        A.    That was after.  We figured out what

6    was going on with him first, if he was --

7        Q.    By physical contact, I mean touching

8    him.

9        A.    No.  By physically seeing him that he

10   wasn't going to do anything rational --

11   irrational, just making contacts.  I'm sorry.

12       Q.    So you observed him?

13       A.    Correct.

14       Q.    Then called EMS?

15       A.    Correct.

16       Q.    Then you -- did you make physical

17   contact with him after?

18       A.    We talked to him, got him in the

19   squad -- in my cruiser to send it to Deaconess.

20       Q.    Did he have clothes on?

21       A.    Correct.

22       Q.    What did EMS do when they arrived on

23   the scene?

24       A.    They just checked his blood pressure.

25       Q.    And then did EMS give you the go-ahead

1  to take the gentleman in your cruiser?

2      A.   No.   The squad said he was fine, he was

3  good to go, just the way he was acting and saying

4  somebody was going after him.   He had a handgun.

5  I didn't want to give him his handgun back and

6  end up doing anything irrational, so we took him

7  to PS.

8      Q.   You took him to where?

9      A.   PS, Deaconess, to be evaluated.

10     Q.   That's for psychiatric treatment?

11     A.   Correct.

12     Q.   What did you learn from dispatch about

13 that incident?

14     A.   That he had a weapon and he was not --

15 he was saying that everything was bugged on him

16 or somebody was trying to kill him, was the

17 complaint.

18     Q.   And you said you have done five

19 pink-slip calls?

20     A.   The other ones were just suicidal.

21 They were suicidal.

22     Q.   When were those?

23     A.   I don't recall.

24     Q.   So there was this incident and then

25 four suicidal incidents?

76

1          A.    Correct.

2          Q.    Do you remember any details of the

3     suicidal incidents?

4          A.    No, I don't.  It's been a while.

5          Q.    You also dealt with mentally ill people

6     in the jail when you worked in corrections?

7          A.    Yes, ma'am.

8          Q.    Were you on a CERT team in the jail?

9          A.    Yes, ma'am.

10         Q.    When did you join the CERT team?

11         A.    2006, I believe.

12         Q.    Did you take mentally ill people into

13    custody in any other circumstances, not in the

14    pink-slip circumstance?

15         A.    No.

16         Q.    Have you had other situations where use

17    of force was used on people experiencing mental

18    health episodes?

19         A.    At the jail, yes.

20         Q.    Were those the kind of things that you

21    filled out a use-of-force report for?

22         A.    Yes.

23         Q.    How many times?

24         A.    For use of force, one, just one.

25         Q.    Tell me about that.

1        A.    It was I was working cold holding where

2   I take care of everybody for court.  Went to go

3   back in the back, print some pictures.  One of

4   the deputies asked me to escort one of the

5   gentlemen to a holding cell where he has to be by

6   himself.

7             We got past the court holding area

8   closest to the holding cell.  The gentleman

9   started speaking gibberish and spitting on the

10  floor.  He was in and out of the jail.

11            So he spit on the floor and one of our

12  deputies told him, clean it up, gave him a towel.

13  He wiped it off, wiped it down in a swiping

14  motion and threw it towards the deputy.  And then

15  we all made contact, tried to put him back in the

16  cell, control him and put him in a cell.

17       Q.    That was Mr. Linsley?

18       A.    Correct.

19       Q.    In corrections did you learn

20  deescalation protocols?

21       A.    We learned deescalation training,

22  yes.

23       Q.    An officer is never allowed to

24  needlessly endanger a suspect, correct?

25       A.    No.

78

1              MS. SEARS:  Objection as to form.

2         A.   An officer what?

3    BY MS. GONZALES-MARTIN:

4         Q.   Is never allowed to needlessly endanger

5    a suspect, right?

6         A.   To never?  Yes.  Like never endanger

7    them?  Correct.

8         Q.   Officers are required to reevaluate the

9    decision to use force when circumstances change,

10   right?

11        A.   Yes.

12        Q.   Officers are required to accurately

13   report all use of force and any allegation of

14   excessive force, right?

15             MS. SEARS:  Objection as to form.

16        A.   Yes.

17   BY MS. GONZALES-MARTIN:

18        Q.   Did you accurately report the Roell use

19   of force?

20        A.   Did I accurately?  They were there,

21   yes.  Supervisors were there, yes.  But did we

22   write anything?  No.

23        Q.   Did you accurately report the use of

24   force on Mr. Roell?

25        A.   Yes.

1       Q.   Officers who don't follow the rules

2    regarding use of force should be accountable,

3    right?

4            MS. SEARS:  Objection.

5       A.   Officers that don't use should be

6    accountable for what they do?

7    BY MS. GONZALES-MARTIN:

8       Q.   Officers who don't follow the rules

9    with use of force should be accountable, right?

10           MS. SEARS:  Objection.

11      A.   Follow their training, which we did,

12   yes.

13   BY MS. GONZALES-MARTIN:

14      Q.   In general, officers who don't follow

15   the rules regarding use of force should be held

16   accountable, right?

17           MS. SEARS:  Objection.

18      A.   No.

19   BY MS. GONZALES-MARTIN:

20      Q.   So there are rules regarding use of

21   force that you've been trained in, right?

22      A.   Right.

23      Q.   And if an officer doesn't follow those

24   rules --

25      A.   Oh, right, correct, he should be,

80

1    correct.

2         Q.    He should be held accountable,

3    correct?

4         A.    Correct.

5         Q.    Did this use of force end as you

6    planned it would?

7               MS. SEARS:  Objection.

8               You can answer.

9         A.    Did the use of force end the way it's

10   supposed to be?  We don't want anybody to pass,

11   but we controlled the subject, yes.

12   BY MS. GONZALES-MARTIN:

13        Q.    What happened that surprised you about

14   this incident?

15        A.    What happened to surprise?  That he

16   passed.

17        Q.    Did anything --

18        A.    That was very surprising.

19        Q.    Anything else surprise you?

20        A.    No.

21        Q.    How old are you?

22        A.    Forty-one.

23        Q.    Are you married?

24        A.    Yes, ma'am.

25        Q.    Do you have kids?

1         A.    Three boys and a girl.

2         Q.    Have you ever sued anyone?

3         A.    No.

4         Q.    You ever been sued?

5         A.    Yes.

6         Q.    You were sued by Mr. Linsley we talked

7    about earlier, right?

8         A.    Yes, ma'am.

9         Q.    Were you sued by anyone else?

10        A.    No, ma'am.

11        Q.    So Gerald Linsley sued you and that was

12   in 2007 and again in 2009, right?

13        A.    2007.

14        Q.    I think it was dismissed and refiled or

15   something.

16        A.    I don't know anything about it.

17        Q.    But you were sued in 2007 by

18   Mr. Linsley?

19        A.    Correct.

20        Q.    And he was a mentally ill inmate,

21   right?

22        A.    I did not know it at the time, no.

23        Q.    But he was a mentally ill inmate you

24   know now, right?

25        A.    Correct, now I do.

82

1        Q.   And he had been arrested for having a

2   mental health episode and breaking someone's

3   window, right?

4        A.   I didn't know his -- I didn't know what

5   he was arrested for.

6        Q.   But that's true, right?

7        A.   I still don't know what he was arrested

8   for.

9        Q.   Well, you read the lawsuit filed

10  against you, right?

11       A.   Right, my lawsuit.  But what he was

12  arrested for at the time, the jail, I didn't know

13  anything about it.

14       Q.   But you know now?

15       A.   Now I do, yes.

16       Q.   And you and another corrections officer

17  were trying to move him into a cell and at some

18  point Mr. Linsley spit, and you and the other

19  officers used force, right?

20       A.   We used control tactics.

21       Q.   And you said he was muttering some

22  gibberish, right?

23       A.   Correct, on the way to the cell.

24       Q.   That force was found to be excessive by

25  the Hamilton County Sheriff's Office, right?

1        A.    No.

2              MS. SEARS:  Objection.

3              You can answer.

4        A.    No.

5              (Plaintiff's Exhibit 21 was marked for

6               identification.)

7   BY MS. GONZALES-MARTIN:

8        Q.    You've been handed what's been marked

9   as Plaintiff's Exhibit 21.

10             MS. SEARS:  I believe I already did

11        this, but my colleagues want me to reiterate

12        an objection to this entire line of

13        questioning.  I think my other objection

14        covered it, but for the abundance of

15        caution.

16  BY MS. GONZALES-MARTIN:

17       Q.    Take a minute to look through this if

18  you'd like, but I believe it's the counseling and

19  some attachments regarding the use of force on

20  Mr. Linsley.  Let me know when you're ready.

21       A.    Okay.

22       Q.    Take all the time you need, but I'm

23  just going to ask you a question about the front

24  page.  Take your time if you want to review it.

25       A.    Go ahead.

84

1      Q.   There's a narrative in the middle of

2  the page, the first page of this exhibit, and the

3  fifth paragraph down starting, Sergeant Menkhaus.

4           Do you see where I'm at?

5      A.   Uh-huh.

6      Q.   It says, Sergeant Menkhaus advised

7  that, based on his investigation, he feels the

8  force used in this incident was not only

9  excessive, but unnecessary, as well as the

10 officers involved failed to notify a supervisor

11 as to the use of force, as well as the officers

12 failed to file a use-of-force report, which under

13 general order 208 is required.

14          Did I read that correctly?

15     A.   Yes.

16     Q.   Does that refresh your recollection

17 about your supervisor finding that the force used

18 was excessive?

19     A.   Yes.

20     Q.   And your supervisors also found

21 that you violated policy by not reporting the use

22 of force, correct?

23     A.   Not reporting it immediately when I was

24 trying to do court holding, trying to get the

25 courts -- I couldn't stop court and say, hey,

1    judge, can I stop this for a minute and let me

2    take care of this.

3        Q.   I'm sorry.

4        A.   Go ahead.

5        Q.   Were you criminally prosecuted for that

6    use of force?

7        A.   No.

8        Q.   Your only discipline was counseling and

9    letter in your personnel file?

10       A.   Yes.

11       Q.   Have you ever filed bankruptcy?

12       A.   Yes.

13       Q.   When?

14       A.   2000, I believe.

15       Q.   Was that the only time?

16       A.   Yes, ma'am.

17       Q.   Are you taking any medications today?

18       A.   No, ma'am.

19       Q.   What did you do -- and I don't want to

20   hear about any communications with your

21   lawyer -- but what did you do to prepare for

22   today's deposition?

23       A.   I read this statement and then the one

24   that was transcribed for that.

25       Q.   The statement you're referring to is

86

```
 1    Plaintiff's Exhibit 20?

 2         A.    Correct, summary.

 3         Q.    Prior to August 13, 2013, did you ever

 4    discharge a firearm at a suspect?

 5         A.    No, ma'am.

 6         Q.    Prior to August 13, 2013, did you ever

 7    discharge a taser at a suspect?

 8         A.    No, ma'am.

 9         Q.    Since August 13, 2013, have you ever

10    discharged a firearm at a suspect?

11         A.    No, ma'am.

12         Q.    Have you ever discharged a taser at a

13    suspect since August 13, 2013?

14         A.    No, ma'am.

15         Q.    Have you had any previous experiences

16    when you arrested a suspect and the suspect was

17    injured during the arrest?

18         A.    I don't recall if he was injured.  I

19    don't believe he was.  So no.

20         Q.    You're thinking about a specific

21    instance?

22         A.    It was an incident when I first came

23    out on patrol.  But I don't think he was

24    injured.

25         Q.    What happened?
```

1        A.   He was pursued and we got him in his

2   house.  He refused to obey any of our verbal

3   commands.  We made contact with him.  I put

4   an arm bar on him and put him on the

5   ground.

6            But I believe he only had a scrape on

7   his left side, I believe.  I can't remember,

8   though.

9        Q.   Did you fill out a use-of-force

10  report?

11       A.   Correct.

12       Q.   So you received a counseling letter

13  after the Linsley incident, correct?

14       A.   Yes, ma'am.

15       Q.   And you were verbally counseled in 2007

16  about your weight, right?

17       A.   Yes, ma'am.

18       Q.   In 2008, October 11, 2008, you received

19  a written infraction for using a baton against a

20  citizen and not reporting it, right?

21       A.   I called a patrol -- a patrol officer,

22  yes.  I called him to do a report.

23       Q.   You received a written --

24       A.   I don't remember that, then.  I think

25  it was on a detail, I believe.

88

1              (Plaintiff's Exhibit 22 was marked

2               for identification.)

3    BY MS. GONZALES-MARTIN:

4         Q.   You've been handed what's marked as

5    Plaintiff's Exhibit 22.  Take a minute to look at

6    it if you'd like.

7              MS. WOEBER:  Do you have another copy?

8              MS. GONZALES-MARTIN:  I don't.

9         A.   Yeah, I remember that.

10   BY MS. GONZALES-MARTIN:

11        Q.   Does Plaintiff's Exhibit 22 refresh

12   your recollection about a written discipline for

13   using a baton against a citizen and not reporting

14   it?

15        A.   Yes.  It was a fight.

16             MS. SEARS:  Objection as to form.

17             Go ahead.

18        A.   Yes.  He was fighting us.

19   BY MS. GONZALES-MARTIN:

20        Q.   And you received that discipline in

21   your personnel file?

22        A.   Correct.

23        Q.   You got a written counseling in 2009

24   because of your weight, right?

25        A.   Yes.  I guess it was the last -- the

1    other one that you just told me before that,

2    before the incident and you told me about my

3    weight?

4         Q.   Well, you were warned in 2007 verbally

5    about your weight?

6         A.   Yes.

7         Q.   And then in 2009 you got a written

8    counseling letter about your weight, right?

9              MS. SEARS:  Objection.

10             You can answer.

11        A.   Yes.

12   BY MS. GONZALES-MARTIN:

13        Q.   Then on September 11, 2010, you

14   received a suspension -- a one-day suspension

15   based on an incident in which you took an inmate

16   to the ER and he was able to escape from you?

17        A.   Yes.

18        Q.   And you were texting at the time that

19   he escaped, right?

20        A.   I was texting to get overtime, yes.

21        Q.   And the inmate entered a patient's room

22   in the hospital without you knowing and the

23   hospital staff had to order him out?

24        A.   Well, he told us.  We ordered him out,

25   yes.

90

```
 1        Q.    Have you been disciplined since

 2   September 11, 2010?

 3        A.    Not that I know of.

 4        Q.    Do you believe that you've been trained

 5   adequately as a Hamilton County sheriff's

 6   deputy?

 7             MS. SEARS:  Objection as to form.

 8        A.    Yes.

 9   BY MS. GONZALES-MARTIN:

10        Q.    Is  there  any training that you wanted

11   to  have  before August 13, 2013, that you wanted

12   to get?

13             MS. SEARS:  Objection.

14             You can answer.

15        A.    No.

16   BY MS. GONZALES-MARTIN:

17        Q.    Is there any training that you've

18   requested before or since August 13, 2013 that

19   was not provided to you?

20        A.    No.

21        Q.    You went to patrol academy through the

22   Hamilton County Sheriff's Office, right?

23        A.    Yes, ma'am.

24        Q.    At their training facility?

25        A.    Yes, ma'am.
```

```
 1        Q.   And that's OPOTA training?

 2        A.   Yes, ma'am.

 3        Q.   That was October 2005?

 4        A.   Yes, ma'am.

 5        Q.   Are you certified on the taser X26?

 6        A.   Yes, ma'am.

 7        Q.   When were you certified in that?

 8        A.   I believe September 13th, 2011 or 2010,

 9   one of them.

10        Q.   What about the taser X2?

11        A.   No.

12        Q.   Do you carry a taser on your belt?

13        A.   Yes, ma'am.

14        Q.   And what kind of taser is it?

15        A.   X160.

16        Q.   Where are your certificates --

17             MR. GERHARDSTEIN:  I didn't hear you.

18             THE WITNESS:  X26.

19   BY MS. GONZALES-MARTIN:

20        Q.   Where are your certificates of

21   completion for the taser X26 training?

22        A.   Corrections.

23        Q.   Is your personnel file -- do you have a

24   separate personnel file for corrections versus

25   patrol?
```

92

1          A.    I believe they are -- there's the

2    corrections training and then the patrol

3    training.

4          Q.    If you wanted to see your X26

5    certificate, how would you get it?

6          A.    In corrections, I believe, still

7    there.

8          Q.    Have you had any taser training since

9    you were certified on the X26?

10         A.    Requals, requalifications.

11         Q.    How often do you do those?

12         A.    Yearly.

13         Q.    Have you done them every year since you

14    were certified?

15         A.    Last year, just last year.  We had some

16    last year.  But through corrections and CERT,

17    yes, we do when we do our training every month.

18    We do taser training or whatever training we do.

19    So yes.

20         Q.    So you were certified on the X26 in

21    2010 or '11?

22         A.    Correct.

23         Q.    Did you requalify in 2012?

24         A.    Correct, yes.

25         Q.    2013?

93

1      A.    '13, yes.

2      Q.    2014?

3      A.    I don't know if we did last year or

4   not.  I can't remember.

5      Q.    Have you done it yet this year?

6      A.    We haven't had inservice yet.

7      Q.    Tell me what the requalification

8   training consists of.

9      A.    For?

10      Q.    For the taser.

11      A.    The taser?  We do a class and then we

12   do hands-on, drawing.  And then we do training

13   rounds.  We draw, shoot, taser, taser shoot,

14   reholster, reload.  And we do a simulation after

15   that, so we get our new cartridges.

16      Q.    So you actually fire the taser?

17      A.    Yes.

18      Q.    How many times do you fire it in the

19   requalification training?

20      A.    Two.

21      Q.    Do you ever get to do it any more than

22   two times?

23      A.    We only have two cartridges.

24      Q.    What other training other than taser

25   training have you received since being on

94

1  patrol?

2      A.   We do requals on our weapons and

3  batons.  That's it.

4      Q.   You also mentioned the domestic

5  violence training?

6      A.   Correct, right, online stuff.

7      Q.   Who was your field training

8  supervisor?

9      A.   On?

10     Q.   When you joined patrol.

11     A.   Lieutenant Orue.

12     Q.   Orue?

13     A.   Orue, yes, O-r-u-e.

14     Q.   And he kept records of your field

15  training, right?

16     A.   Training.

17          MS. SEARS:  Objection as to form.

18     A.   Training.

19  BY MS. GONZALES-MARTIN:

20     Q.   Prior to August 13, 2013, who at the

21  Hamilton County Sheriff's Office was responsible

22  for training on use of force?

23     A.   It would be, I think, Lee Edwards

24  maybe.

25     Q.   Edwards?

1      A.   I believe.

2           MS. SEARS:  What was the rest of your

3      answer?

4           THE WITNESS:  Lee Edwards.

5           MS. SEARS:  And what did you say?

6           THE WITNESS:  I believe.

7   BY MS. GONZALES-MARTIN:

8      Q.   What about training on tasers?

9      A.   I don't know.  I don't know who does it

10  now.

11     Q.   I'm talking about prior to

12  August 13, 2013.

13     A.   Prior to that, it was Ludwig, was the

14  one that trained me in 2010.  He was in

15  corrections.

16     Q.   What about those requalification

17  trainings?

18     A.   Requals, it was Lee Edwards.

19     Q.   Is there a training department?

20     A.   Yes.

21     Q.   Who's the head of that?

22     A.   Lieutenant Stuckey.  I don't know who

23  it is now, but it was Lieutenant Stuckey.

24     Q.   It was Lieutenant Stuckey prior to

25  August 13, 2013?

1      A.    Prior -- no.  Prior training would

2   be -- in ours, in corrections we do training.

3   Ems was our training for corrections.

4            And then the other one, I don't recall

5   who was in charge of it.

6      Q.    So Stuckey is the --

7      A.    After --

8      Q.    -- person in control?

9      A.    Right now, as of right now, yes.

10     Q.    And you don't know when he started?

11     A.    No, I don't know when she started.

12     Q.    Oh, she?

13     A.    Yes.

14     Q.    And what is her title?

15     A.    Lieutenant.

16     Q.    On August 13, 2013, were there any

17  deputies designated to respond to mentally ill

18  persons?

19     A.    I don't know.

20     Q.    Were there any deputies assigned to

21  take persons into custody pursuant to probate

22  court orders?

23     A.    Court services does all the,

24  like -- I don't know.  What do you call those?

25     Q.    A temporary order of detention?

1     A.   Like protection orders.  What are you

2  talking about?

3     Q.   If the probate court is asking the

4  sheriff's office to bring someone in because

5  they're a danger to themselves or others.

6     A.   Oh.  I don't know.

7     Q.   You don't know if there's an officer

8  designated to do that?

9     A.   I don't know.

10    Q.   What specific training did you have

11  regarding handling mentally ill persons?

12    A.   Specific training?  Just the curriculum

13  that we have.

14    Q.   What do you mean?  What curriculum is

15  that?

16    A.   For the OPOTA training.

17    Q.   But you also had the Hamilton County

18  Sheriff's Office excited delirium training,

19  right?

20    A.   It's done, right, with the OPOTA

21  training.

22    Q.   I want to ask about your equipment that

23  you had on August 13, 2013.

24         So you had a cruiser?

25    A.   Yes.

1      Q.   Were you alone with your cruiser?

2      A.   Yes, ma'am.

3      Q.   Does your cruiser have any video

4  capability?

5      A.   No, ma'am.

6      Q.   Does it have audio recording

7  capability?

8      A.   No, ma'am.

9      Q.   Do you have video or audio on your

10  person?

11     A.   No, ma'am.

12     Q.   I mean, video or audio recording system

13  on your person.

14         So do you have a computer terminal in

15  your cruiser?

16     A.   Our MDC, yes.

17     Q.   MDT?

18     A.   MDC.

19     Q.   MDC.

20         Did any information come across your

21  MDC regarding Mr. Roell?

22         MS. SEARS:  Objection.

23         You can answer.

24     A.   Come regarding Mr. Roell?  It was --

25  no.  Just from where I called out where I was

1    going, like teletype type of thing.  No, because

2    it's different.  Northeast and east doesn't have

3    the same.

4    BY MS. GONZALES-MARTIN:

5         Q.    You described your radio earlier.

6               You had a radio on your shoulder?

7         A.    Correct.

8         Q.    And you had a different radio in your

9    car?

10        A.    In my bag, yes.

11        Q.    Were both radios on?

12        A.    Yes.

13        Q.    When you talked to dispatch -- you did

14   talk to dispatch, right?

15        A.    I talked to them when I called the

16   squad.  That was the only time I talked to

17   them.

18        Q.    Well, you radioed that you were going

19   to respond to the scene, right?

20        A.    Correct, I did.

21        Q.    You did?

22        A.    Northeast, correct, not the east.

23        Q.    What did you use to contact dispatch?

24        A.    The radio.

25        Q.    The radio on your shoulder?

```
 1        A.    Yes, ma'am.

 2        Q.    Did you talk to any -- to any other

 3   Hamilton County Sheriff's employees through your

 4   cruiser about the incident?

 5        A.    No.

 6        Q.    There's a chat capability in your MDC,

 7   right?

 8        A.    Yes.

 9        Q.    Did you use that?

10        A.    No.

11        Q.    Did you use a cell phone the night of

12   the incident?

13        A.    I called -- after the incident?

14        Q.    Yeah.

15              Did you say you called your son?

16        A.    After the incident, yes.

17        Q.    Did you call anyone else?

18        A.    No.

19              MS. GONZALES-MARTIN:  Let's go off the

20         record for a second.

21              VIDEOGRAPHER:  We're off the record.

22              (Off the record.)

23              VIDEOGRAPHER:  Back on the record.

24   BY MS. GONZALES-MARTIN:

25        Q.    Did you text anyone the night of the
```

1    incident?

2         A.    No.

3         Q.    Did you call or text

4    Deputies Huddleston or Alexander after the

5    incident, either that night or in the days

6    following?

7         A.    No.

8         Q.    Do you still have text messages on your

9    cell phone.

10              First of all, do you have the same cell

11   phone that you had in August 2013?

12        A.    Same cell phone number, different

13   provider.

14        Q.    Same phone?

15        A.    No.  I had a flip phone.

16        Q.    Did anyone from the Hamilton County

17   Sheriff's Office ask you to retain your text

18   messages?

19        A.    No.

20        Q.    What did you have on your duty belt?

21        A.    Handgun, right hand; magazine next to

22   my handgun; taser on the left; baton on the left;

23   and then the radio on the far left.

24        Q.    Flashlight?

25        A.    Flashlight in the back, yes.  I'm

1   sorry.  Flashlight and a handcuff.

2       Q.   Did you use your flashlight the night

3   of the incident?

4       A.   Yes.

5       Q.   How did you use it?

6       A.   My smaller one, it was in my pocket.

7   It was in this hand.

8       Q.   At what point did you bring your

9   flashlight out?

10      A.   When I went to the back towards the

11  left side as I was running.

12      Q.   So -- who was your cell phone provider

13  on 2013?

14      A.   Verizon.  Now it's Sprint.

15      Q.   So you -- as you arrived on the scene

16  and you determined that you were going to go left

17  to go the long way around the building --

18      A.   Correct.

19      Q.   -- at that point you pulled out your

20  flashlight?

21      A.   It probably would be in my hand.  And

22  then when I came around the corner, I would do

23  this, I would turn it on.

24      Q.   Okay.  So you had it in your hand when

25  you made the decision to go - --

1      A.    Correct.

2      Q.    -- to the left?

3      A.    Right.

4      Q.    And at what point did you turn it on?

5      A.    The first two corners longways, turned

6    my light on, make sure nobody is around, and then

7    that's when, around the far right.

8      Q.    So it was on from that point --

9      A.    Yes.

10     Q.    -- until when?

11     A.    I believe I had it on the whole time,

12   but I don't recall when I turned it off.

13     Q.    You had it on when you first

14   encountered Mr. Roell?

15     A.    I had it on the first time when I went

16   around the corner.  It's a hand-held

17   flashlight.

18     Q.    Are you friends with

19   Deputies Huddleston and Alexander?

20     A.    Yes.

21     Q.    You socialize with them?

22     A.    Yes.

23     Q.    You've known them since working in

24   corrections together?

25     A.    Yes.

1       Q.   Did you know them before that?

2       A.   No.

3            MS. GONZALES-MARTIN:  No further

4       questions.

5            MS. SEARS:  Just a minute.

6                      EXAMINATION

7  BY MS. SEARS:

8       Q.   Deputy Dalid, you went over a little

9  bit with Ms. Gonzales-Martin your patrol academy

10  training, both at the highway patrol as well as

11  the sheriff's patrol academy.

12           Do you recall that?

13      A.   Yes, ma'am.

14      Q.   And you also mentioned to counsel

15  that you went through the corrections academy

16  with the Hamilton County Sheriff's Department.

17           Do you recall that?

18      A.   Yes, ma'am.

19      Q.   And you were here -- well, I should say

20  were you present when Deputies Huddleston and --

21  and Deputy Alexander gave their depositions?

22      A.   Yes, ma'am.

23      Q.   And do you recall that, in their

24  depositions, that we offered some curricula of

25  the corrections academy on interpersonal

1    communications training and the OPOTA academy on

2    crisis intervention in dealing with the special

3    needs population?

4            Do you recall my having that

5    conversation with Deputies Huddleston and

6    Alexander?

7        A.   Yes, ma'am.

8        Q.   And when you were speaking with

9    Ms. Gonzales-Martin -- Ms. Gonzales-Martin

10   concerning your OPOTA and academy training, would

11   you include those curricula, if you recall, to

12   your memory in those trainings that you had?

13       A.   Yes, ma'am.

14       Q.   That was a terrible question, so

15   thank you for answering it and acting like you

16   understood it.

17           And do you recall Deputy Huddleston

18   remarking on -- and Deputy Alexander remarking on

19   CERT and CERT training?

20       A.   Yes, ma'am.

21       Q.   And do you recall Deputy Huddleston and

22   Deputy Alexander remarking on their regularly

23   scheduled four-hour monthly CERT inservice

24   training?

25       A.   Yes, ma'am.

1       Q.    Did you also participate and experience

2   that training when you were on the CERT team?

3       A.    Yes, ma'am.

4       Q.    Now, I thought I heard, in response to

5   Ms. Gonzales-Martin's question regarding excited

6   delirium, that it was your testimony that you

7   recall receiving training on excited delirium

8   when you were in the patrol academy.

9           Is that your memory?

10      A.    Yes.

11      Q.    In 2005?

12      A.    No.

13      Q.    No?

14      A.    2005, no.

15      Q.    Okay.  And then when did you go through

16  the corrections academy?

17      A.    Oh, the corrections academy, I went in

18  2004, correct.

19      Q.    And then when did you go through the

20  Hamilton County Patrol Academy?

21      A.    Which was '05, right?  '05.

22      Q.    '05?

23      A.    Uh-huh.

24      Q.    So it's your memory that excited

25  delirium was in that OPOTA curriculum in 2005?

1          A.    I believe.

2          Q.    Are you certain?

3          A.    Yes.

4          Q.    And if you were to see a curriculum

5    from 2005 versus 2014, would the curriculum be

6    the best evidence of what was in the curriculum

7    or your memory?

8          A.    It would be the curriculum.

9          Q.    Okay.  Now, counsel -- opposing counsel

10    asked you several questions about excited

11    delirium, symptoms of excited delirium.

12              Do you recall having that conversation

13    with her?

14          A.    Yes, ma'am.

15          Q.    And particularly counsel was asking

16    you -- and I'll just paraphrase -- were you aware

17    of the extent to which a mental health diagnosis

18    translates into behavior.

19              Do you recall having conversations with

20    counsel about how a particular mental health

21    diagnosis might translate into behavior?

22          A.    Yes.

23          Q.    Do you know how a diagnosis of paranoid

24    schizophrenia with perhaps some histrionic

25    overlay and/or a history of noncompliance with

108

1    medication and a denial of mental illness -- can

2    you tell me how that might translate into

3    behavior?

4         A.    No.

5         Q.    Can you tell me how a diagnosis of a

6    manic depressive disorder with suicidal ideations

7    translates into behavior?

8         A.    No.

9         Q.    Can you tell me how a personality

10   disorder of narcissim, histrionics, and -- oh, my

11   favorite -- explosive impulsive disorder -- can

12   you tell me how that might translate into

13   behavior?

14        A.    No.

15        Q.    Are you aware that the current OPOTA

16   curriculum has moved away from officer -- police

17   officer identification of particular psychiatric

18   disorders and more toward control technique?

19        A.    Yes.

20        Q.    Are you trained to diagnose mental

21   health behavior, sir?

22        A.    No, ma'am.

23        Q.    Are you trained to recognize certain

24   behaviors as indicative of certain risk factors

25   for law enforcement and the public and the person

1     that you're coming into contact with?

2          A.   Yes, ma'am.

3          Q.   Now, counsel asked you some questions

4     along this same line about would it be -- what's

5     the adjective -- helpful, perhaps, would you have

6     appreciated -- I think that might have been

7     another term -- I didn't write them down, so it's

8     just off the top of my head -- knowing more about

9     a subject that you come into contact with.

10              For example, if he were suicidal, that

11    he had a firearm, that he was complaining that he

12    was being bugged and he was being monitored, his

13    TV was speaking to him, that sort of thing.

14              And you indicated that would be

15    helpful, right?

16         A.   Yes.

17         Q.   In terms of assessing a situation when

18    you come on scene and you first approach a

19    subject, right --

20         A.   Right.

21         Q.   -- you indicated if you're aware that

22    there's some sort of issue with reality, that

23    that would be helpful, right?

24         A.   Yes.

25         Q.   Does this person who has some sort of

1    issue with reality, from your perspective as a

2    law enforcement officer, is that person more

3    predictable or less predictable in terms of

4    whether they'll resort to some sort of

5    violence?

6         A.   Less.

7         Q.   Less predictable.

8              Is that person more predictable or less

9    predictable as to whether or not that person

10   might not act logically and force you into a

11   situation of lethal force?

12        A.   Less.

13        Q.   Less?

14        A.   Yeah.

15        Q.   Is that person more predictable or less

16   predictable in terms of whether that person will

17   put themselves in a position to hurt

18   themselves?

19        A.   Less.

20        Q.   Is that person more predictable or less

21   predictable, from your perspective, as to whether

22   that person will hurt someone else?

23        A.   Less.

24        Q.   Is it more likely, when you come into

25   that contact with that person, or less, that you

1    will get that person under control as quickly as

2    possible?

3         A.   Less.

4         Q.   More likely or less likely that you'd

5    try to get control of them?

6         A.   I would try to get control of them,

7    yes, as quick as I can.

8         Q.   And would the unpredictability of their

9    behavior -- would that be a variable that you

10   would consider as a law enforcement officer in

11   terms of whether you'd try to get them under

12   control?

13        A.   Yes.

14        Q.   I'm sorry?

15        A.   Yes.

16        Q.   So let's say that person is jaywalking

17   across the street.  That's a relatively minor

18   crime, right?

19        A.   Correct.

20        Q.   I've committed that crime, but I'm not

21   going to tell you when.

22             And, actually, there's a rule.  There's

23   so many feet you're allowed to do it.  I looked

24   it up once.  All right?  Just so you know.

25        A.   Yes, ma'am.

1          Q.    But in the scheme of things, that's a

2     relatively minor infraction; would you agree?

3          A.    Yes, ma'am.

4          Q.    If someone were jaywalking

5     across the street and you said, hey, and they

6     turned around and started running at you,

7     Officer, and you told them to stop and they

8     didn't stop and they kept coming at you and you

9     arced your taser at them and they didn't stop and

10    they kept coming at you and they got within that

11    reactionary gap, would you take control of that

12    person?

13         A.    Yes.

14         Q.    Would it matter one hill of beans to

15    you --

16         A.    No.

17         Q.    -- what the heck they were doing before

18    they came at you?

19         A.    No.

20         Q.    Would it matter one hill of beans to

21    you, sir, whether they were drunk?

22         A.    No.

23         Q.    Would it matter one hill of beans to

24    you whether they were high on PCP?

25         A.    No.

113

1       Q.  Would it matter one hill of beans to

2  you, sir, if, over a two-day period, they managed

3  to decompensate into an active psychotic state?

4       A.  No.

5       Q.  Would it have been helpful, sir, from a

6  law enforcement perspective, for you to

7  have -- well, I'll strike that.

8           Let me show you, this is our Exhibit K.

9  Can I show you our Exhibit K?  When I say, our, I

10  mean Defendants' Exhibit K.

11          Can I ask you to look at that first

12  picture there, sir, which is, I think, number 1

13  in your copy.

14       A.  Yes, ma'am.

15       Q.  Is that on the left-hand or right-hand

16  corner?

17       A.  Right-hand corner when -- if you're

18  looking at it, it's going to be on the left.

19       Q.  Okay.  Now, do you recall having a

20  conversation with opposing counsel concerning

21  when you arrived on the scene, what you did,

22  where you went, what you saw?

23       A.  Yes, ma'am.

24       Q.  And I believe, if I'm not mistaken,

25  that the picture number 3 might be the one

```
 1    that you discussed with Ms. Gonzales-Martin --

 2         A.    Yes.

 3         Q.    -- is that right?

 4         A.    Yes, ma'am.

 5         Q.    And if I recall your testimony, you

 6    didn't, at the time you pulled up on the scene,

 7    register that open door and that debris that's

 8    pictured next to 10927.

 9               Was that your testimony?

10         A.    Yes, ma'am.

11         Q.    And if I could call your attention

12    to -- I can't see the numbers on this, so I'm

13    going to peek at yours if you don't mind, even

14    though I don't want to be on this videotape

15    particularly.  Is that 6?  Yes.  May I call your

16    attention to 6?  Thank you.

17               You indicated to Ms. Gonzales-Martin

18    that when you got on the scene you heard someone

19    say, hey?

20         A.    Yes, ma'am.

21         Q.    Could you recognize that voice?

22         A.    Yes, ma'am.

23         Q.    Whose voice was that?

24         A.    Deputy Huddleston's.

25         Q.    And when you heard that, were you in
```

1    visual contact?  In other words -- law

2    enforcement talk -- could you see Huddleston and

3    Alexander when you heard that?

4         A.   No, ma'am.

5         Q.   When you arrived on scene, did you see

6    them?

7         A.   No, ma'am.

8              When I arrived on scene, as I was

9    coming up, I saw a Deputy Huddleston go that --

10   go right.

11        Q.   So you did have a visual of them when

12   you got on scene?

13        A.   Right, as I was pulling up, correct.

14        Q.   And when you say, pulling up,

15   Ms. Gonzales-Martin talked to you about the fact

16   that there's a street and then there's a parking

17   area?

18        A.   Right.

19        Q.   So which was it?

20        A.   It was the parking area.

21        Q.   Okay.  So when you got to the parking

22   area -- in your cruiser, is that right --

23        A.   Yes, ma'am.

24        Q.   -- you saw Deputy Huddleston -- and I

25   don't want to put words in your mouth -- you said

1    it a couple of times -- go around the corner?

2          A.    Go around, yeah, to the right.

3          Q.    Can I have you flip back one picture?

4    This would be Exhibit --

5          A.    5.

6          Q.    -- 5, K-5, right?

7          A.    Yes.

8          Q.    Is this the direction that you saw

9    Deputy Huddleston going?

10         A.    Yes, ma'am.

11         Q.    At that point, did you know where

12   Deputy Alexander was?

13         A.    No, ma'am.

14         Q.    And when was it that you -- I don't

15   know if you can answer this.

16               How much time elapsed from the time you

17   saw Deputy Huddleston run around to when you

18   heard him say, hey?

19         A.    I don't -- it was -- I don't know.  I

20   don't know.

21         Q.    Can I ask you, were you still in your

22   cruiser or had you exited your cruiser when you

23   heard him say that?

24         A.    I was just exiting.

25         Q.    You were just exiting when you heard

1    him say that?

2        A.    Correct.

3        Q.    So is it fair, then, you pulled into

4    the, I guess, parking lot of the condo complex,

5    you saw Deputy Huddleston go around, you

6    stopped -- did you continue to pull your cruiser

7    up to where the other cruisers were before you

8    got out?

9        A.    No.  I stopped.

10       Q.    You stopped at that point?

11       A.    Yes, ma'am.

12       Q.    And got out?

13       A.    Yes, ma'am.

14       Q.    And then you heard, hey?

15       A.    Yes, ma'am.

16       Q.    And then I think you told counsel --

17   opposing counsel that you elected then to go

18   around the other way?

19       A.    Yes, ma'am.

20       Q.    What was your reasoning for doing

21   that?

22       A.    In case he ran, I could cut him off.

23       Q.    And so did you have to run the entire

24   length of the condo complex and back around the

25   side, the left-hand side as you face it, and then

```
 1    up the back of the condo complex as reflected in

 2    Exhibit 6?

 3          A.   Yes, ma'am.

 4          Q.   And were you running?

 5          A.   Yes, ma'am.

 6          Q.   Were you running fast?

 7          A.   As fast as my legs could take me.

 8          Q.   As fast as you could?

 9          A.   Yes, ma'am.

10          Q.   Why were you running so fast?

11          A.   So I can cut him off.

12          Q.   So when you came around that corner and

13    you were -- was it dark?

14          A.   Yes, ma'am.

15          Q.   When were you first able to observe

16    that gate area, if you recall?  Can you show us

17    on the picture where you were?

18          A.   Maybe three-quarters down.

19          Q.   Three-quarters down toward --

20          A.   Going towards the gate.

21          Q.   Okay.  So your testimony is you were

22    three-quarters toward the gate in that back area

23    when you --

24          A.   Right.

25          Q.   -- first saw them?
```

1       A.    Correct.

2       Q.    But you can't pick out anything on this

3  particular picture to help us with that?

4       A.    No.

5       Q.    And what did you first recall seeing?

6  What was your first visual?

7       A.    Deputy Huddleston I seen -- as I was

8  coming up, I seen the deputy try to get him right

9  outside of the gate, just kind of --

10      Q.    So your first visual was one of the

11 deputies, and you made a motion with both of your

12 hands, kind of a jerking motion.

13           And did they have contact with

14 Mr. Roell?

15      A.    I believe.

16      Q.    Were you able to see that or not?

17      A.    I wasn't close, but I could see that.

18      Q.    Is that what you thought was happening

19 or what you saw happening?

20      A.    What I saw happening.

21      Q.    Okay.  And so you think that was

22 Deputy Huddleston?

23      A.    I believe so, yeah.

24      Q.    And so you've described that as pulling

25 him out of the gate because that's how it looked

1  to you?

2      A.   Correct.

3      Q.   Did you observe anything that Mr. Roell

4  did prior to the time that you saw Mr. Roell at

5  that gate area with Deputy Huddleston and

6  Alexander?

7      A.   No, ma'am.

8      Q.   Now, since you're coming up along the

9  back of that gate, am I correct that they were

10  outside the gate area when you first saw them?

11      A.   Yes, ma'am.

12      Q.   I'm sorry?

13      A.   Yes, ma'am.

14      Q.   All three of them?

15      A.   Yes, ma'am.

16      Q.   So do you have any idea how it was that

17  Mr. Roell came to be on the outside of that

18  privacy fence?

19      A.   Walking.  Like, I guess right at the

20  edge of it.

21      Q.   Okay.  Do you have any idea how he came

22  to be at the edge of it --

23      A.   No.

24      Q.   -- since you didn't see it?

25      A.   No, I do not.

1       Q.   And I'm sorry if I'm repeating this.

2            Were you already heading in the

3   left -- in that direction before you heard

4   Deputy Huddleston say, hey?

5       A.   No.

6       Q.   Were you already -- no.  Okay.

7            You were just getting out of your car?

8       A.   Correct.

9       Q.   I couldn't remember that.  I apologize.

10           Did you have a plan with

11  Deputy Huddleston and Deputy Alexander that you

12  would go around the left side and they went

13  around the right side when you got there?

14      A.   No, ma'am.

15      Q.   How did you know to do that?

16      A.   Just instinct for -- instinct,

17  basically.  Just kind of training.  And you know

18  that an officer is down that way, he's got to go

19  out this way, there's an exit out on the left

20  side, so --

21      Q.   And in your -- in one of either the

22  interview or maybe it was when we were covering

23  your written statement or maybe it was in

24  Ms. Gonzales-Martin's question -- I'm not certain

25  now -- you indicated something about someone was

1    on the other side.

2          When you first saw -- and I think I'm

3    repeating myself now.  When you first saw

4    Mr. Roell -- you now know to be Mr. Roell and the

5    two deputies, were any of them inside the patio

6    area or were they outside the patio area as

7    you've described?

8        A.   You're talking about the victims or the

9    deputies?

10       Q.   I'm talking about the deputies, I'm

11   sorry, and Mr. Roell.

12         They were outside that gate?

13       A.   Correct.

14       Q.   And was one, Deputy Huddleston, on one

15   side and Deputy Alexander on the other side of

16   him, or do you recall that?

17       A.   I know Deputy Huddleston was to the

18   right of -- to the right of Mr. Roell.

19       Q.   And if you don't mind just looking at

20   Exhibit K again and just taking a few minutes to

21   just kind of go through those pictures, at

22   various times there are some debris and things

23   that look out of place and that may be out of

24   place or may not be out of place.

25         Have you had a chance to look through

1    those?

2         A.   Yes, ma'am.

3              Anything out of place out of it?

4         Q.   No, no, no.  I just wanted to make sure

5    you had an opportunity to look at those.

6              I realize now why I'm not seeing the

7    numbers.  Because I don't have the numbers on my

8    copy.

9              So I think we've talked about

10   pictures 1, 2, and 3 in terms of whether or not

11   you observed that debris; haven't we?

12        A.   Yes.

13        Q.   And the answer was no?

14        A.   Right.

15        Q.   And then if you could look at

16   pictures 8, 9, 10, 11, 12, 13, 14, if you recall,

17   is that the patio area of the complainant or the

18   person whose condo you arrived to where Mr. Roell

19   was located at the time?

20        A.   Yes, ma'am.

21             MS. GONZALES-MARTIN:  What page number?

22             MS. SEARS:  I'm sorry.  8 through 14.

23        And it would start with this picture.

24   BY MS. SEARS:

25        Q.   At the time when you arrived at the

1    scene and saw the three, Deputy Alexander,

2    Huddleston, and Mr. Roell, outside the patio,

3    outside the privacy fence, did you observe this

4    broken window?

5         A.   No, ma'am.

6         Q.   Did you observe what appears to be, I

7    guess, dirt or something under that window?

8         A.   No, ma'am.

9         Q.   Did you observe that screen out?

10        A.   No, ma'am.

11        Q.   Now, other than that, as you look

12   through these pictures, other than the broken

13   window and the dirt, do you see any other kind of

14   disruption or damage to this patio area?

15        A.   No, ma'am.

16        Q.   Huh?  What?

17        A.   No, ma'am.

18        Q.   Now, if you don't mind looking at

19   pictures 16 and 17 -- they're these pictures,

20   yes -- did you ever go inside the complainant's

21   residence?

22        A.   No, ma'am.

23        Q.   If you could look at pictures 18

24   through 23, did you ever see this area before?

25        A.   No, ma'am.

125

```
 1        Q.   Did you ever go in Mr. Roell's condo?

 2        A.   No, ma'am.

 3        Q.   Did you ever see Mr. Roell's patio?

 4        A.   No, ma'am.

 5        Q.   If you could look at Exhibit 25, 26,

 6   27, 28, 29, 30, 31, 32 -- keep going until I tell

 7   you to stop and come back -- I'm at 45 -- through

 8   47, let me know when you get there.

 9        A.   47?

10        Q.   47.

11        A.   Yes.

12        Q.   Did you ever see any of the images that

13   are reflected in those pictures you've just

14   looked at, in real life?

15        A.   No, ma'am.

16        Q.   Any of that parking lot debris or any

17   landscaping?

18        A.   No, ma'am.

19        Q.   No.

20             Have you ever had a dirty-house case,

21   what we commonly call a dirty-house case?

22        A.   Yes, ma'am.

23        Q.   And describe for me what you

24   found -- have you personally had a dirty-house

25   case?
```

```
 1        A.   Yes, ma'am.

 2        Q.   Was that person mentally ill?

 3        A.   No, ma'am.

 4        Q.   Did that person have a substance abuse

 5   problem?

 6        A.   Yes, ma'am.

 7        Q.   And in that dirty-house case, can you

 8   tell me what kind of situation you encountered

 9   in that dirty-house -- what we call a dirty-house

10   case?

11        A.   It had dishes all over the place on the

12   counters, mail.  Papers were on the floor.  I

13   mean, the bedrooms were pretty ransacked.

14        Q.   And in your dirty-house case, was the

15   person who was the subject of that dirty-house

16   case, was that person a hoarder?

17        A.   No, ma'am.

18        Q.   Did you ever have a dirty-house case

19   where someone hoarded garbage?

20        A.   No, ma'am.

21        Q.   Or dirty diapers?

22        A.   No, ma'am.

23        Q.   Have you ever had a dirty-house case

24   where the only thing present in one of the rooms

25   where the children were living was a mattress and
```

1    feces all over the floor?

2         A.   No, ma'am.

3         Q.   So in your particular dirty-house

4    case -- have you only had one?

5         A.   Yes, ma'am.

6         Q.   So I'd like you to look at Exhibits 80

7    and -- I mean, you have looked at those already,

8    right?

9         A.   I just looked, yes, ma'am.

10        Q.   No, no, no.  I asked you to look

11   through all of them.  So start with 80.

12        A.   I'm sorry.

13        Q.   It's always my fault if you're

14   confused.  I'm pretty comfortable with that

15   concept.  All right.

16             So look at these pictures -- did you

17   ever see on the inside of the Roells' condo?

18        A.   No, ma'am.

19        Q.   If you saw the inside of this condo,

20   would you necessarily assume that someone had a

21   two-day decompensation into a psychiatric

22   emergency or a psychotic state?

23        A.   No, ma'am.

24        Q.   What could be other possibilities for

25   this, for the disarray that's reflected in these

```
 1   pictures, from your experience?

 2        A.   Either hoarding or somebody is on

 3   drugs.

 4        Q.   Ms. Martin-Gonzales -- or

 5   Gonzales-Martin -- I'm so sorry -- asked you a

 6   series of questions about excited delirium and

 7   some observations that you made about Mr. Roell

 8   the night you encountered him.

 9             Do you recall that conversation?

10        A.   Yes, ma'am.

11        Q.   And I think, if I recall, that the four

12   features that were discussed were aggressive,

13   combative -- and you had some conversation with

14   counsel about whether those might sort of

15   replicate one another, right?

16        A.   Yes, ma'am.

17        Q.   And the naked from the waist down,

18   right?

19        A.   Yes, ma'am.

20        Q.   And the strength that Mr. Roell

21   exhibited?

22        A.   Yes, ma'am.

23        Q.   When you first came into contact with

24   Mr. Roell, when you came upon him outside that

25   gate area with Deputies Alexander and Huddleston,
```

1    did you appreciate that he didn't have any pants

2    on and he was naked?

3         A.   No.

4         Q.   I got a little confused when you all

5    were talking about that.

6              And so when did you first observe that

7    Mr. Roell, in this encounter -- that Mr. Roell

8    didn't have pants on?

9         A.   When we were trying to get control of

10   him on the outside.

11        Q.   And I think you were asked specifically

12   if you recall Mr. Roell being hot to the touch,

13   and you said you did not recall that; is that

14   correct?

15        A.   No, ma'am.

16        Q.   And I think I recall you were asked

17   whether or not Mr. Roell was wet, and I believe

18   you said you didn't recall that --

19        A.   Correct.

20        Q.   -- is that correct?

21        A.   Yes, ma'am.

22        Q.   Now, I think that it was your testimony

23   that your perception, based on your experience,

24   was that you felt Mr. Roell might be on PCP?

25        A.   Yes, ma'am.

1      Q.   And in your -- have you had experience

2   with people that have ingested PCP before?

3      A.   No, just by looking through -- I

4   actually seen it on a video.  Just the strength

5   of, you know -- there's a video of a lady,

6   another officer, and a black male.  He was naked.

7   I mean, he was very agitated, did use a taser and

8   he didn't go down, beat up the lady, had the

9   officer --

10      Q.   Was this a training video?

11      A.   I believe it was.  I can't recall.

12      Q.   Was it a real-life incident that was

13   used in training or it was a mock?

14      A.   I think it was -- it was an incident,

15   but I don't know if it was --

16      Q.   If it's real or not?

17      A.   Correct.

18      Q.   Okay.  Fair enough.

19           And was this person aggressive?

20      A.   Yes.

21      Q.   And was this person in the video

22   combative?

23      A.   Yes.

24      Q.   And were they naked?

25      A.   Yes.

1      Q.   Some form of naked, some degree of

2   naked?

3      A.   Full naked.

4      Q.   Full naked.  They were completely

5   naked?

6      A.   Yes.

7      Q.   And in the video, did they appear to

8   have strength --

9      A.   Yes.

10      Q.   -- beyond what you would anticipate?

11      A.   Yes, ma'am.

12      Q.   Now let's take out the strength part

13   for a second.  In terms of someone being

14   aggressive, combative, and naked, is that -- does

15   that indicate to you what their mental health

16   state is?

17      A.   No, ma'am.

18      Q.   Does that indicate to you even that

19   they may be under the influence of something,

20   necessarily?  In other words, have you had

21   contact with people who were aggressive and

22   combative and maybe naked that were stone-cold

23   sober, to your knowledge?

24      A.   Somebody's on bath salt.

25      Q.   Oh, bath salts?

1      A.   Yes.

2      Q.   What effect can that have?  Now, that's

3   not stone-cold sober, right?

4      A.   No.  Just strength, the strength.  He

5   was very strong and he was kind of really -- what

6   do you call -- getting really spastic.  Two

7   officers couldn't hold him down.

8      Q.   Now --

9      A.   He was foaming.

10      Q.   I'm sorry?

11      A.   He was foaming at the mouth.

12      Q.   He was foaming at the mouth?

13      A.   Correct.

14      Q.   This strength that has been exhibited

15   in Mr. Roell's situation and in the situation

16   that you described where you personally

17   experienced it -- not the training, because you

18   didn't have your hands on that person, right?

19      A.   No.

20      Q.   So I just want to focus on Mr. Roell

21   and this other person.  The strength that he

22   exhibited, are you able to determine whether that

23   strength is being exhibited because they're

24   impervious to pain or because something about

25   their state of intoxication makes them actually

1    stronger?  Do you know what's going on with them

2    metabolically?

3        A.    No, ma'am.

4        Q.    Do you know what's going on with them

5    physically?

6        A.    No, ma'am.

7        Q.    Now, you had a conversation with

8    Ms. Gonzales-Martin about the gate shutting, the

9    going in after Mr. Roell at the time the gate is

10   shutting.

11           Do you recall that conversation?

12       A.    Yes, ma'am.

13       Q.    Now, Deputies Huddleston and Alexander

14   have testified and explained to us that the taser

15   was employed at the time -- just prior to

16   Mr. Roell going into that gate.

17           Do you recall that testimony?

18       A.    Yes, ma'am.

19       Q.    And that three of you continued on

20   after Mr. Roell after that tasing.

21           Do you recall that?

22       A.    Yes, ma'am.

23       Q.    The testimony thus far has been that

24   the taser was still cycling through its

25   five-second cycle as you guys -- meaning you,

1    Huddleston, and Alexander -- went into that gate

2    area behind Mr. Roell.

3            Do you remember that testimony?

4        A.   Yes, ma'am.

5        Q.   Is that your recollection, as well?

6        A.   Yes, ma'am.

7        Q.   So Ms. Gonzales-Martin asked you a

8    series of questions about -- for example, I think

9    one was, do you -- once that gate was shut, was

10   Mr. Roell -- and she didn't say, to your

11   knowledge, but I'll add -- to your knowledge,

12   hurting anyone?

13       A.   No.

14       Q.   Do you recall that conversation?

15       A.   Yes, I do.

16       Q.   And you said no?

17       A.   Correct.

18       Q.   Did Mr. Roell have an opportunity, once

19   he went through that gate, to have enough time

20   in that patio to hurt anyone?

21       A.   No.  We didn't give him enough -- try

22   to give him enough.

23       Q.   Did Mr. Roell, in your opinion, have an

24   opportunity to destroy any property?

25       A.   No.

1          Q.   Did Mr. Roell have an opportunity to

2     pick up any weapon?

3          A.   No.

4          Q.   Sir, was that part of the idea of going

5     in after him?

6          A.   Yes, ma'am.

7          Q.   Now let's play a little coulda shoulda

8     woulda.  Do you know the coulda shoulda woulda?

9     Have you heard of that before?

10         A.   Yes, ma'am.

11         Q.   My dad was a lawyer.  My mom was the

12    one with all the sense.  She never graduated from

13    high school, but I think she could have run the

14    world.

15              So she used to tell me, woulda coulda

16    shoulda.  Okay?  So I want to play a little

17    woulda coulda shoulda with you.  All right?

18              When Mr. Roell shut that gate, the

19    three of you stood outside the gate.  Okay?  Are

20    you with me?

21         A.   Yes, ma'am.

22         Q.   And you're talking about what you're

23    going to do.  Okay?

24         A.   Yes, ma'am.

25         Q.   How long does that take?

```
 1        A.   Don't know.

 2        Q.   And let's say -- well, let me ask you

 3   this.

 4             What's Mr. Roell doing inside that

 5   gated area while you all are standing out there

 6   making your plan?

 7        A.   I don't know.

 8        Q.   Is Mr. Roell going to damage any

 9   property while he's in there?  Do you know?

10        A.   No, I don't.

11        Q.   Is Mr. Roell going to go into that

12   house?

13        A.   I don't know.

14        Q.   If Mr. Roell goes into that house, is

15   he going to hurt anybody?

16        A.   If he goes -- once he goes in, yes.

17        Q.   How do you know that?  Do you know he

18   is?

19        A.   No, I don't know, I guess.

20        Q.   Who's in that house?

21        A.   I don't know.

22        Q.   You know there's a complainant in

23   there, right?

24        A.   Correct, family.

25        Q.   Do you know of anybody else in there?
```

1       A.    No, I don't.

2       Q.    Are there any guns in that house?

3       A.    We don't know.

4       Q.    Are there knives in that house?

5       A.    I don't know.

6       Q.    Probably?

7       A.    I'm sure there is, kitchen.

8       Q.    Kitchen knives maybe.  Okay.

9             So you all are standing out there

10   making your plan, maybe make a plan to call EMS

11   maybe, wait for a couple other officers to get

12   there.

13            How long will you wait?

14      A.    I don't know.

15      Q.    What's Mr. Roell doing while you're

16   waiting?

17      A.    I don't know.

18      Q.    Is there another way -- let's say, for

19   example, if Mr. Roell were in that patio, is

20   there a way for him to get into that house?

21      A.    Yes.

22      Q.    Is there a way for him to get out of

23   that house?

24      A.    Yes.

25      Q.    Would one of your concerns be Mr. Roell

1    leaving the scene?  If he's in that patio, that

2    he could get out the patio and leave the scene?

3        A.    No.

4        Q.    It's not a concern of yours?

5        A.    That he might be able to, yes.

6        Q.    Why is that a concern?

7        A.    For the family and for him.  Let's say

8    he gets out the front door, you get hit by one of

9    the officers that was coming, and then we have a

10   problem; we didn't protect him.

11       Q.    Okay.  So I guess one of you could have

12   run around the front, right, and gone to the

13   front door to keep him from getting out, right?

14   I mean, you could have done that, right?

15       A.    Could have, yes.

16       Q.    Okay.  How long does that take?

17       A.    I don't know.

18       Q.    And what's Mr. Roell doing while you're

19   running around to the front of the house?

20       A.    Can't see.  I don't know.

21       Q.    Let's say you get to the front of the

22   house.  Is the door open?

23       A.    I don't know.

24       Q.    If it isn't open and it's locked, how

25   do you get in there?

1          A.    Knock on the door, but I don't know how

2     to get in there.

3          Q.    How long will it take the homeowner to

4     come and let you in?

5          A.    I don't know.

6          Q.    When you get in -- let's say you get in

7     the front door, where is Mr. Roell?

8          A.    We don't know.

9          Q.    Does he have a weapon?

10         A.    I don't know if he does or not.

11         Q.    Are you by yourself?

12         A.    I am.  I would be, yes.

13         Q.    Is that a tactical disadvantage in that

14    situation, to go from three officers to a

15    situation where you're potentially one-on-one

16    with Mr. Roell?

17         A.    Yes, I am.

18         Q.    Why is that a tactical problem?

19         A.    Because the strength that he had, you

20    know.  Just because you have two officers in the

21    back and then you have me, and now I don't know

22    what he's doing in the back yard because I can't

23    see.

24         Q.    Okay.  So let's say you get through

25    that house and you come to the back of that

140

1    house.  And let's say you see Mr. Roell on that

2    patio.  Let's just say that, okay --

3         A.   Yeah.

4         Q.   -- just because we're playing woulda

5    coulda shoulda?

6              Can I ask you to look at Exhibit K

7    again?  Could I ask you to look at picture 5,

8    K-5?  Is that 5?  Maybe it is.

9              How about 8?  That's the problem with

10   having old lawyers who can't see.  Picture 8.

11             Do you see that?

12        A.   Yes, ma'am.

13        Q.   You see those two windows?

14        A.   Yes, ma'am.

15        Q.   And you see that doorway?

16        A.   Yes, ma'am.

17        Q.   Look at picture 9.

18             Do you see that doorway?

19        A.   Yes, ma'am.

20        Q.   And in that doorway there's two other

21   windows.

22             Do you see that?

23        A.   Yes, ma'am.

24        Q.   Now, it seems to me that you could

25   see -- let's assume Mr. Roell is still in that

141

1    patio area.  You could see Mr. Roell from those

2    four windows and that door, perhaps, right?

3        A.   Yes, ma'am.

4        Q.   So would you strategically place

5    yourself behind any of those doors or windows,

6    Officer, to observe Mr. Roell while you're

7    waiting for whoever is coming?

8        A.   No.

9        Q.   Wny not?

10       A.   Because he could throw something at the

11   window and take you out himself.

12       Q.   In fact, when we look at -- I guess we

13   have pictures of a plant going through that

14   window, at least what appears to be.

15            If you find them before I do, you can

16   bail me out.  Oh, here they are.  Picture 16,

17   hold your place there.

18            Picture 16, do you see that?  Do you

19   see that pot on the floor, 16?

20            And then 17, do you see that pot?

21       A.   Yes, ma'am.

22       Q.   Does that look like a ceramic pot to

23   you?

24       A.   Yes, ma'am.

25       Q.   Now, Officer, if you're strategically

1   placed behind some of those doors and windows

2   watching Mr. Roell and a pot goes through that

3   window and maybe gets glass in your eye and

4   incapacitates you, is that a problem for you?

5        A.   Yes, ma'am.

6        Q.   And why would that be a problem for

7   you?

8        A.   Because then he has access to my

9   weapons.

10       Q.   Is that a problem for you?

11       A.   Yes, ma'am.

12       Q.   And why is that a problem for you?

13       A.   I would get hurt.

14       Q.   Potentially?

15       A.   Correct.

16       Q.   What about anybody else?

17       A.   Correct, with the other two deputies in

18  the back and the family.

19       Q.   So if you were not going to position

20  yourself behind any of these windows or doors,

21  how would you observe Mr. Roell in the back of

22  that patio?  Do you know?

23       A.   No, ma'am, I cannot.

24       Q.   Is it important to observe Mr. Roell

25  the entire time?

143

1       A.   Yes, ma'am.

2       Q.   Why is that?

3       A.   So we know what he's doing.

4       Q.   Why?

5       A.   To protect him and protect ourselves.

6       Q.   Now let's say you decide, for some

7    reason, to position yourself back there and there

8    is a way that you can see Mr. Roell in that patio

9    in a way that you think provides officer safety.

10           Let's just assume that's the case.  Are

11   you with me?  Because we're playing woulda coulda

12   shoulda, right?

13      A.   Yes, ma'am.

14      Q.   And you see Mr. Roell go take a

15   shoulder and do a football move through that back

16   gate.  Okay?

17      A.   Yes, ma'am.

18      Q.   Where are Deputy Huddleston and

19   Alexander at that point?

20      A.   At that gate.

21      Q.   How do you know that?

22      A.   Because I left them there.

23      Q.   What if they aren't still there?

24      A.   (No response.)

25      Q.   Okay.  So do you know where they are?

1          A.    No.

2          Q.    Let's assume you're right and you left

3     them there, so you're assuming they're staying

4     there.  Does one of them get knocked over by

5     Mr. Roell?

6          A.    Yes.

7          Q.    How do you know that?

8          A.    If he's -- he's back at the gate.

9          Q.    Okay.  It's possible?

10         A.    Possible, correct.

11         Q.    Okay.  Is it possible that one of the

12    deputies could get knocked down and incapacitated

13    by Mr. Roell?

14         A.    Possible, yes.

15         Q.    Is that a problem?

16         A.    Yes, ma'am.

17         Q.    Why is that a problem?

18         A.    It's a one-on-one again.

19         Q.    It's a one-on-one what?  What do you

20    mean?

21         A.    One-on-one fight for your life.

22         Q.    Okay.  So let's say Deputy Huddleston

23    is on the ground and now we got just

24    Deputy Alexander and Mr. Roell; is that right?

25         A.    Yes, ma'am.

1      Q.   Now, if Deputy Huddleston is on the

2   ground, is his weapon vulnerable?

3      A.   Yes, ma'am.

4      Q.   Does Mr. Roell grab his weapon?

5      A.   I'm sorry?

6      Q.   Does Mr. Roell grab his weapon in this

7   scenario?

8      A.   He --

9      Q.   Do you have any way of knowing whether

10   that is going to happen or not?

11      A.   I don't have -- a possibility, I guess,

12   but you don't --

13      Q.   But you don't know?

14      A.   I don't know.

15      Q.   Are you trained to avoid that

16   situation, sir?

17      A.   Yes, ma'am.

18      Q.   Now let's say -- we're playing woulda

19   coulda shoulda.  So now you're in the back,

20   guarding that door and protecting that family.

21           Well, here's a woulda coulda shoulda.

22   Why don't you just tell that family to go out in

23   the front yard and go out of their house?

24   Wouldn't that be the best way to protect them?

25      A.   No.

1        Q.    What?

2        A.    No.

3        Q.    Why?

4        A.    Let's say he gets out and deputies

5   weren't there and he ended up hurting his

6   family.

7        Q.    So, in your experience, just from a

8   tactical standpoint, where would you put the

9   family?  Let's assume that you get into that

10  situation, the family is inside the house.  Where

11  would you put them?

12       A.    I'd put them in the bathroom.

13       Q.    In the bathroom?

14       A.    Or a bedroom, yes, ma'am.

15       Q.    Is that something you've been trained

16  to do?

17       A.    Yes, ma'am.

18       Q.    Would that be sort of a hostage

19  training?  What kind of training would that be?

20  Subject control training?  Where would you have

21  that training, if you recall?

22       A.    I don't recall having it.  Common

23  sense.

24       Q.    Okay.  So now we have -- in my woulda

25  coulda shoulda, we have the back gate blowing

1    open from Mr. Roell putting a shoulder into it --

2    because we know he has a lot of strength at this

3    point, right?

4        A.   Yes, ma'am.

5        Q.   And he knocks over one of the deputies,

6    struggles with the other deputy, and takes off

7    running into the darkness, whatever is behind his

8    condo.  What is behind this condo complex?

9        A.   I don't know.

10       Q.   Is that a problem?

11       A.   Yes, ma'am.

12       Q.   Are any of these other condos

13   occupied?

14       A.   I don't know.  Possibly.

15       Q.   Does Mr. -- is Mr. Roell able to get

16   into any of these other condos?

17       A.   I don't know.

18       Q.   And then let's say Mr. Roell runs off

19   and he's starting to take off now.

20            You say that's a problem for you?

21       A.   Yes, ma'am.

22       Q.   Why is that a problem?

23       A.   For his safety.

24       Q.   Now let's say Mr. Roell, through no

25   part of his own -- through no fault of his own,

148

1    but because of your plan, puts himself in a

2    position where he's able to grab one of your

3    guns.

4            Is that a lethal force situation, sir?

5    A.   Yes, ma'am.

6    Q.   Would you shoot him?

7    A.   Yes, ma'am.

8    Q.   So in our conversation so far, in our

9    game of woulda coulda shoulda -- I think I

10   counted 22 I don't knows.  Okay?

11   A.   Yes, ma'am.

12   Q.   You didn't count them; I counted them.

13   But just for our conversation, let's say I'm

14   close.

15   A.   Yes, ma'am.

16   Q.   Close enough for jazz.

17           In your line of work, sir, how many I

18   don't knows does it take to get you killed or

19   someone else killed?

20   A.   One.

21   Q.   Just the other, maybe a week or so ago,

22   did you have an I-don't-know incident?

23   A.   Yes, ma'am.

24   Q.   Tell me about that.

25   A.   It was a noise complaint at Mason Way

    1    Court.  My partner and I responded.  We seen the

    2    vehicle, approached the vehicle.  There were

    3    three gentleman that was in the vehicle.  Asked

    4    for IDs, checked the backs, get back and see if

    5    he was okay.

    6         Q.   What do you mean you checked it?

    7    You're holding up your hand.  You have a

    8    flashlight in your hand?

    9         A.   I have a flashlight, yes, ma'am.

   10         Q.   What do you mean check it?

   11         A.   Check, you know, see who he is, what he

   12    looked like, if I can get information who's back

   13    there, if there was any kids, whatever.

   14              I checked back there, went back and

   15    talked to him, talked to the driver.

   16         Q.   And what were you investigating, a

   17    complaint?

   18         A.   Noise complaint.

   19         Q.   Noise complaint?

   20         A.   Right.

   21              And I explained to him, hey, we got a

   22    complaint here about the noise.  You guys are

   23    making too much noise.

   24              I asked for information, for IDs.

   25              My partner, Deputy Johnson, came up.

1    She smelled the odor of marijuana and then told

2    the driver, hey, who'se smoking marijuana?  Where

3    is it at?

4            And the driver said, we have it, I have

5    it.

6            All right.  We're going to search the

7    vehicle.

8            As I was pulling the driver out, the

9    rear passenger asked Deputy Johnson, hey, can I

10   talk to you?

11           And I wasn't listening, you know.  I

12   was kind of focused on the driver, patted him

13   down.  I sat him down next to his car.

14           And as Deputy Johnson was talking to

15   the gentleman, the rear passenger said that, I'm

16   under disability.  I have a firearm.  It's

17   underneath my seat.

18           I didn't know he had it in there.  It

19   wasn't seen.  And he did have a loaded .45.

20       Q.   Legally, you didn't have any reason at

21   that point necessarily --

22       A.   Correct.

23       Q.   -- until then to go in and sweep for

24   weapons necessarily?

25       A.   Correct.

```
 1        Q.   So this was a situation where you

 2   didn't know a firearm was present, right?

 3        A.   Yes, ma'am.

 4        Q.   And nothing happened; it ended all

 5   well, right?

 6        A.   Yes, ma'am.

 7             He made the decision not to shoot me,

 8   because he had ample time to shoot me.

 9        Q.   Now, you had a conversation with

10   Ms. Gonzales-Martin about the manner in which you

11   took Mr. Roell into control.

12             Do you remember that conversation that

13   you had?

14             I thought you mentioned arm bar

15   technique --

16        A.   Yes, ma'am.

17        Q.   -- and handcuff technique; is that

18   right?

19        A.   Yes, ma'am.

20        Q.   You heard -- I forget -- I think it was

21   Deputy Alexander -- I could be wrong -- but in

22   the last couple depositions explained to us their

23   view of the difference between subject control

24   and hard hands touching.

25             Do you recall hearing that testimony?
```

152

1      A.   Yes, ma'am.

2      Q.   Would you agree there's a

3  distinction?

4      A.   Yes, ma'am.

5      Q.   And when you're talking about an arm

6  bar technique, is that a subject control

7  technique or is that a hard hands technique?

8      A.   Subject control.

9      Q.   What about your handcuff technique, is

10  that a subject control technique or is that a

11  hard hands technique?

12      A.   Subject.

13      Q.   Did you ever use any hard hand

14  techniques with regard to taking Mr. Roell into

15  custody?

16      A.   No.

17      Q.   And you had conversation with

18  Ms. Martin about Mr. Roell becoming calm,

19  snoring, agitated, calm.

20      Do you remember that conversation you

21  all had?

22      A.   Yes, ma'am.

23      Q.   I got a little confused, so I want you

24  to clarify for me, if you recall.

25      When you were at Mr. Roell's shoulder

1    as you've described, how many times did he become

2    calm, then was snoring, then got agitated then --

3    how many times did that occur, if you recall?

4         A.   Snoring, twice.  And I don't recall for

5    the other three.  I know the ones that -- I know

6    the snoring twice.

7         Q.   All right.  So he got calm, snored,

8    then got agitated again, got calm, and snored,

9    and got agitated again?

10        A.   Yes, ma'am.

11        Q.   Okay.  That's what I was confused

12   about.

13             When Mr. Roell would become calm, as

14   you all described it, what would be your reaction

15   to that -- or did you have a reaction, is a

16   better question?

17        A.   We had time to get ourselves together

18   and call for a squad.

19        Q.   And when -- you sort of made a motion

20   with yourself, like almost a sighing motion.

21        A.   Right.

22        Q.   Is that what you mean?

23        A.   Right.  Just, you know, he's calm.  You

24   know, we got to get ourselves together because

25   once -- you can try to control this, you know,

1    try to control Mr. Roell, you know, and it's

2    hard.

3        Q.   So you made the sort of sign of a

4    surrendering motion.

5             Was there a sense of relief then; you

6    got it under control; we don't have to have any

7    more physical confrontation?

8        A.   Yes, ma'am.

9        Q.   And then Mr. Roell became agitated?

10       A.   Yes, ma'am.

11       Q.   Now -- excuse me, pardon me -- by the

12   second or third time, did you still continue to

13   relax your hold on him when he would relax?

14       A.   Yes, ma'am.

15       Q.   There's been some testimony, and I

16   think Deputy Alexander, that someone was -- maybe

17   Deputy Alexander, I can't remember -- relax,

18   help's coming, relax.

19             Do you recall hearing that?

20       A.   I don't recall.

21       Q.   Do you operate in a perfect world,

22   sir?

23       A.   No, ma'am.

24       Q.   What?

25       A.   No, ma'am.

1      Q.   Can all the training in the world

2  necessarily prepare you for the things that you

3  come across?

4      A.   No, ma'am.

5      Q.   You had a conversation with

6  Ms. Gonzales-Martin about whether or not

7  Mr. Roell was on his stomach or how that all

8  occurred.

9          In your training, have you been exposed

10  to the concept of arrest-related deaths, people

11  that can die in your custody?

12      A.   You mean training-wise?

13      Q.   Yes.

14      A.   Yes.

15      Q.   Have you ever had an arrest-related

16  death before this?

17      A.   No.

18      Q.   Since this?

19      A.   No, ma'am.

20      Q.   Now, is your training designed to help

21  you try avoid arrest-related deaths?

22      A.   Yes, ma'am.

23      Q.   Was Mr. Roell ever on his stomach

24  with you sitting and exerting pressure on his

25  back in a way that would, from your training

156

1    perspective, potentially interfere with his

2    breathing and result in positional

3    asphyxiation?

4         A.   No.

5         Q.   How tall are you?

6         A.   4'11" and three-quarters.

7         Q.   We've had some conversation about your

8    weight.  Frankly, I'm glad I'm not being deposed

9    by Ms. Gonzales-Martin.  I lie on my driver's

10   license about my weight; I'll admit that, too.

11            How much did you weigh at the time of

12   this investigation, if you know?

13        A.   I don't know, 160.

14        Q.   I'm sorry?

15        A.   160 or so.

16        Q.   And you said -- in response to a

17   question about who opened the gate, you said, I

18   couldn't see, I couldn't reach it.

19            That gate, could you reach the latch to

20   unlock that gate?

21        A.   No, ma'am.

22        Q.   Did you try?

23        A.   You feel very small when you're

24   exerting energy and things like that, and you

25   look up and you're like, oh, boy, am I tall

1    enough to do this?  And, to me, I wasn't tall

2    enough to reach it.

3         Q.   So did you back off then?

4         A.   Yes, ma'am.

5         Q.   And someone else opened the gate?

6         A.   Yes, ma'am.

7         Q.   Now, if you could look at Exhibit 20,

8    that's the incident report that you were shown.

9              Is there a difference between an

10   incident report and a narrative, which is a part

11   of a report, sir?

12        A.   The incident report in front of me is a

13   summary of what happened instead of having the

14   whole thing.

15        Q.   And do we refer to that as a

16   narrative?

17        A.   (Nodding head.)

18        Q.   Now, when you're actually doing a

19   report, it consists of more than a narrative,

20   doesn't it, sir?

21        A.   Yes, ma'am.

22        Q.   Do you know if there's anything else

23   besides the narrative that you were asked to

24   do?

25        A.   No, ma'am.

```
 1          Q.   Ms. Gonzales-Martin asked you, how many

 2     times have you dealt with a subject where there

 3     was a loss of reality and loss of control.  And

 4     your first response was four.  And then you and

 5     she talked about some pink-slipping episodes.

 6               Do you recall that?

 7          A.   Yes, ma'am.

 8          Q.   In your law enforcement career, have

 9     there been four or five episodes where you've

10     dealt with a subject who's lost control?

11          A.   No.

12          Q.   What?

13          A.   No.

14          Q.   How many times have there been?

15          A.   You mean lost control of themselves?

16          Q.   Yeah, just lost control of themselves

17     for whatever reason.

18          A.   And not pink-slip them?

19          Q.   Yes, just somebody out of control.

20          A.   A lot.

21          Q.   What's disorderly conduct?

22          A.   It's out of control.

23          Q.   What's turbulent behavior?

24          A.   It's out of control, ma'am.

25          Q.   Okay.  So you talked about this
```

```
 1    situation where the person had the firearm and

 2    they were saying they were bugged, somebody is

 3    trying to kill them, right --

 4         A.   Yes, ma'am.

 5         Q.   -- and you ended up taking them to

 6    Deaconess --

 7         A.   Yes, ma'am.

 8         Q.   -- right?

 9         A.   Yes, ma'am.

10         Q.   Was that person combative?

11         A.   No, ma'am.

12         Q.   Was that person aggressive?

13         A.   No, ma'am.

14         Q.   Was that person hyperactive?

15         A.   No, ma'am.

16         Q.   Did that person rush at you?

17         A.   No, ma'am.

18         Q.   Did that person do as you asked them to

19    do?

20         A.   Yes, ma'am.

21         Q.   When you first approached that person,

22    where were they?

23         A.   They were in their room.

24         Q.   They were what?

25         A.   Inside their room.
```

1     Q.   Who let you in their apartment or

2  condo?

3     A.   He was inside the Comfort Inn.

4     Q.   Oh, a Comfort Inn?

5     A.   Yes.

6     Q.   He was in a hotel?

7     A.   Hotel, yes, ma'am.

8     Q.   And how were you able to get in the

9  room?

10    A.   We talked.  He called us from the front

11  desk.  We talked to him from the front desk.

12    Q.   So you talked to him over the

13  telephone?

14    A.   Correct.

15    Q.   So when you first spoke to him,

16  were you physically with him?

17    A.   No.  When we spoke to him the first

18  time, we tried to get him out from his room to

19  the lobby area, and then he refused.  He said,

20  somebody is out there going to try to kill me.

21         So we had to do another tactic.

22    Q.   And what was that?

23    A.   That would be trying to see, you know,

24  can we come up and talk to you?  Can you tell

25  us -- if we tell you who we are when we get

1    there, will you open the door?

2          That's what happened.

3    Q.   And what kind of tactical

4    considerations were you making about the fact

5    that you realized he had a firearm?  Were there

6    tactical considerations around that point?

7    A.   Just talking to him.  Is it secured?

8    Don't point it at us.

9          You know, when we got to the hallway,

10   it was a long hallway, so we had no cover.  We

11   were just praying and hoping that he doesn't come

12   out -- even though he was calm and talking to

13   people, talking to us, we still weren't sure if

14   he was just going to come out and start shooting

15   at us.

16   Q.   Right.

17         So what happenes?  Did he come out?

18   A.   He did.  We got close, two doors down

19   from him.  We yelled out his name and told him

20   who we are.  I went across underneath on the

21   floor, kind of on the other side, so when he

22   opens the door, we could talk to him.

23         And he opened the door and we told him,

24   let's see your hands, let's see your hands, and

25   we talked to him.

1      Q.   So he showed his hands to you?

2      A.   Correct.

3      Q.   Did you have your guns drawn?

4      A.   No.

5      Q.   So in this situation you had a

6 conversation with him and you were able to find

7 out a little bit about him?

8      A.   Yes, ma'am.

9      Q.   And you were able to use that?

10     A.   Yes, ma'am.

11     Q.   Were you able to determine if he was

12 suffering from excited delirium?

13     A.   No, ma'am.

14     Q.   Were you able to determine whether he

15 was suffering from some other psychosis?

16     A.   No.

17     Q.   You had a conversation with

18 Ms. Gonzales-Martin about use of force and your

19 use-of-force history?

20     A.   Yes, ma'am.

21     Q.   There are certain times, when you put

22 your hands on someone and use force, that there's

23 a use-of-force report; is that fair?

24     A.   Yes, ma'am.

25     Q.   And are there other times when you

1    touch people where there's no use-of-force report

2    that's mandated by your policies?

3         A.   Yes, ma'am.

4         Q.   And would a hard-hands technique, would

5    that require a use-of-force report?

6         A.   Yes, ma'am.

7         Q.   And are those done by your

8    supervisors?

9         A.   Yes, ma'am.

10        Q.   And what about subject control; do

11   those require a use-of-force report?

12        A.   No, ma'am.

13        Q.   Did I hear you correctly in your

14   testimony that, since you've been on patrol,

15   other than -- and let's take out this Roell

16   situation -- have there been any occasions where

17   a use-of-force report was done regarding a

18   subject interaction that you've had?

19        A.   I believe one, but I don't know if that

20   was -- I don't recall if that was during the

21   beginning of my training.  I don't know if the

22   sarge did a -- I know I did an incident report

23   when it happened.

24        Q.   You know you did an incident report?

25        A.   Correct, I did a report of what

 1    happened and that was it.  I don't know if he did

 2    a use-of-force or not.

 3          Q.   So the incident report is different

 4    than a use-of-force report; is that correct?

 5          A.   Yes, ma'am.

 6          Q.   Is an incident report different than a

 7    taser electric stun device report, as you guys

 8    call it?

 9          A.   Yes, ma'am.

10          Q.   Okay.  Let's look at Exhibit 22.

11               Do you recall talking to

12    Ms. Gonzales-Martin about this?

13          A.   Yes, ma'am.

14          Q.   Now, Ms. Gonzales-Martin said that you

15    were disciplined for your use of force in this

16    case.

17               Is that your understanding?

18          A.   Yes, ma'am.

19          Q.   Were you disciplined because you used

20    your baton or were you disciplined because you

21    didn't report it to the right person?

22          A.   With this one, because I didn't report

23    it to the right person.

24          Q.   So you weren't disciplined for using

25    the baton?

1     A.   Correct.

2     Q.   So in your mind, because -- if I'm

3  understanding you correctly, because you were

4  disciplined for failing to follow this policy of

5  reporting it to the right person, that was a

6  discipline for excessive force?

7     A.   Yes, ma'am.

8     Q.   What?

9     A.   Yes, ma'am.

10    Q.   All right.  Because when I hear you say

11  that, I thought you meant you were disciplined

12  because you chose to use intermediate force of

13  using your baton in this particular incident.

14    A.   Right, I used it.

15    Q.   You did use it?

16    A.   Right, right.

17    Q.   But were you disciplined because you

18  chose to use it or were you disciplined because

19  you didn't report it correctly?

20    A.   I was disciplined because I didn't

21  report it correctly to the person.

22    Q.   Now, who did -- did you report it to

23  anyone?

24    A.   Yes.  The patrol officer that came on

25  did the report and took the gentleman down, and

 1   also a UC officer while he was handcuffed.

 2        Q.   Okay.  So let me understand.

 3             Were you on a detail?

 4        A.   Yes, ma'am.

 5        Q.   Where was your detail?

 6        A.   Kingsgate Hotel.

 7        Q.   Where?

 8        A.   Kingsgate Hotel.

 9        Q.   And what does it mean to be on a

10   detail?

11        A.   Off-duty is hired by either a promoter

12   to basically just be there, be a presence.

13        Q.   Now, are you in uniform?

14        A.   Yes, ma'am.

15        Q.   And you have all the equipment that you

16   and Mrs. Gonzales-Martin went over; is that

17   right?

18        A.   Yes, ma'am.

19        Q.   You're a peace officer, but on private

20   detail?

21        A.   Yes, ma'am.

22        Q.   Do you have arrest powers?

23        A.   Yes, ma'am.

24        Q.   And so this was someone at the hotel?

25        A.   It was a party that they had.  There

1    was over 300 people, I believe.

2         Q.    Wow.

3               How did you get involved?

4         A.    A gentleman was very drunk and we tried

5    to escort him out.

6         Q.    Who's we?

7         A.    My partner and I.

8         Q.    Who's that?

9         A.    I think it was Jacob Richmond.

10        Q.    Was he on a detail, as well?

11        A.    Yes, he would be.

12        Q.    So you tried to escort him out because

13   he was disorderly?

14        A.    Yes, he was disorderly, very drunk.  He

15   was grabbing other patrons.  The promoter asked

16   us, hey, he's over there, you know --

17        Q.    So you tried to --

18        A.    -- hitting on --

19        Q.    Oh, hitting on women?

20        A.    Yeah, grabbing them by --

21        Q.    What?

22        A.    Grabbing them by the buttocks.

23        Q.    So he's grabbing women's butts?

24        A.    Yeah.

25        Q.    Okay.  So they wanted him out?

1     A.   Yes, ma'am.

2     Q.   He's not part of the party at this

3  point?

4     A.   Yes, ma'am.

5     Q.   So you guys try to escort him out?

6     A.   Yes, ma'am.

7     Q.   What did you do?

8     A.   Grabbed him by his left arm --

9     Q.   Uh-huh.

10     A.   -- and he resisted.

11     Q.   What did he do?

12     A.   He tried to come around me --

13     Q.   Uh-huh.

14     A.   -- and he tried to do a bear hug.

15     And I'm short, so I just kind of went

16  underneath his arms and did an arm bar and put

17  him on the ground.

18     Q.   Okay.  Then what happened?  How was it

19  that you took out your baton?  Tell me about

20  that.

21     A.   I was trying to get -- his arms was

22  underneath, and I was trying to get the baton

23  right between his arms so I can put his arms back

24  there.

25     Q.   Is that a subject-control technique --

1       A.   Yes, ma'am.

2       Q.   -- with the use of your baton?

3       A.   Yes, ma'am.

4       Q.   So that's not a hard-hands technique

5   yet?

6       A.   No, ma'am.

7       Q.   Is that something you're trained to

8   do?

9       A.   Yes, ma'am.

10      Q.   So you were attempting to do that?

11      A.   Right.

12      Q.   Then what happened?

13      A.   And I couldn't get it on there and I

14  tried to hit him on his common peroneal.

15      Q.   What's the common peroneal, for --

16      A.   Side --

17      Q.   What?

18      A.   The side of the thigh.

19      Q.   Okay.  Is that someplace you're trained

20  to hit people?

21      A.   Yes, ma'am.

22      Q.   And how did you hit him?

23      A.   Tried to hit him in a striking

24  motion.

25      Q.   With your baton?

1        A.    Yes, ma'am.

2        Q.    Is that a hard-hands technique you're

3    trained to use to get a subject under control?

4        A.    Yes, ma'am.

5             I tried to get him down.  And when he

6    swung, he turned --

7        Q.    Uh-huh.

8        A.    -- and I got him in the buttocks.

9        Q.    You got him in the butt?

10        A.    Correct.

11        Q.    All right.  So you hit him in the butt

12    and then what happened?

13        A.    And he fell -- not fell, but kind

14    of did a kind of thing.

15             And he finally got his arm up and I was

16    able to grab his arm.  And that was it.

17        Q.    Okay.  So the hard-hands technique of

18    using the baton worked?

19        A.    Yes, ma'am.

20        Q.    Up until the point where you elected to

21    use the hard-hand technique, were the other

22    subject-control techniques that you were trained

23    to use -- were they working?

24        A.    No.

25        Q.    Now, once you got him under control,

1     did you continue to beat him about the head and

2     person with your baton, sir?

3         A.   No, ma'am.

4         Q.   Once you got him under control, did you

5     pepper spray him?

6         A.   No, ma'am.

7         Q.   Once you got him under control, did you

8     hit him in any way?

9         A.   No.

10        Q.   So at this point you said you reported

11    this to someone, someone from the patrol?

12        A.   Patrol, yes, ma'am.

13        Q.   So am I to understand that someone from

14    the sheriff's department responded to the

15    scene?

16        A.   Yes, ma'am.

17        Q.   Why was that?  Did you call them?

18        A.   Yes, ma'am, so we can get them down to

19    the justice center.

20        Q.   So since you had elected -- had you

21    elected to charge him with something, sir?

22        A.   Yes, ma'am.

23        Q.   But were you able to leave the detail

24    and transport him downtown to be processed

25    through the justice center?

```
 1         A.    Yes, ma'am.

 2         Q.    You could leave?

 3         A.    No, I couldn't leave.   The patrol

 4    officer did.   Sorry.

 5         Q.    So you called the patrol officer to

 6    effectuate the processing of the prisoner?

 7         A.    Yes, ma'am, transport him.

 8         Q.    Do you remember who that was, the

 9    patrol officer?   It's okay --

10         A.    I don't remember.

11         Q.    So he gets there, and you said you

12    reported this use of the baton by him.

13               What do you mean by that?

14         A.    Told him what happened with the

15    incident.

16         Q.    Now, on this particular incident that

17    we're talking about, were you on duty with the

18    sheriff's department?

19         A.    Yes, ma'am.

20         Q.    But who were you being paid by?

21         A.    By the promoter.

22         Q.    By the promoter?

23         A.    Yes, ma'am.

24         Q.    When I say on duty, you still have your

25    responsibilities to the department?
```

```
 1      A.   Right.

 2      Q.   Was this a regular beat?

 3      A.   No.

 4      Q.   Do you have a regular supervisor?

 5      A.   Right now, yes, ma'am.

 6      Q.   Well, back in the day?

 7      A.   Back then, no, ma'am.

 8      Q.   You didn't have one?  Were you only on

 9   a detail at that point?

10      A.   Corrections.

11      Q.   Oh, you were in corrections.

12      A.   Yes, ma'am.

13      Q.   So your supervisor would have been a

14   corrections officer?

15      A.   Yes, ma'am.

16      Q.   Did you know who the supervisor was

17   that would have supervised the patrol officer

18   that you reported this to?

19      A.   No.

20      Q.   Did the patrol officer you reported

21   this to, did he say to you, hey, hey, we need to

22   get my supervisor here to do a use-of-force

23   report?  Did he tell you that?

24      A.   I don't belive so.

25      Q.   Did he appreciate, even though you were
```

1    on a detail, that a use-of-force report was

2    necessary?

3         A.   No.

4         Q.   Huh?

5         A.   Did he appreciate it?

6         Q.   Yeah.

7         A.   No.

8         Q.   Or do you know?

9         A.   I don't know if he did or not.

10        Q.   You were in corrections.  Did you know

11   that a use of force report would be necessary?

12        A.   Right.

13        Q.   Okay.  Did you know, other than this

14   patrol officer, who to contact about doing

15   that?

16        A.   No.

17        Q.   At any time during this discipline, did

18   anyone indicate to you that your subject-control

19   technique of using the baton was excessive

20   force?

21        A.   No.

22        Q.   Now, you discussed with

23   Ms. Gonzales-Martin another situation where you

24   were guarding someone at the hospital.

25             Was that at UC?

1      A.   Yes, ma'am.

2      Q.   And what was that subject arrested for,

3   if you recall?

4      A.   I don't remember what his arrest were,

5   but there was two officers.  Normally, if there's

6   two officers, they're a risk to something, if

7   they've done something that was more violent than

8   normal.

9      Q.   So it could have been a risked flee or

10   it could have been a violent situation; you don't

11   recall?

12      A.   I don't recall.

13      Q.   You were there with another officer?

14      A.   Yes, ma'am.

15      Q.   And were you by yourself with the

16   prisoner when he managed to scoot into a room or

17   was the other officer there with you?

18      A.   The other officer was by the door.

19      Q.   By what door?

20      A.   The C-pod door, the entrance to the

21   pod.

22      Q.   To the pod?

23      A.   Right.

24      Q.   Where are you?

25      A.   University ER.

```
 1          Q.    ER?

 2          A.    Yes, ma'am.

 3          Q.    So they have pods there?

 4          A.    Yes, ma'am.

 5          Q.    Were you in a room or behind one of

 6    those curtains?

 7          A.    Behind curtains, yes.

 8          Q.    So where was the person who was in your

 9    custody?  Was he on the gurney?  Was he standing

10    up?  Where was he?

11          A.    He was going to the bathroom.

12          Q.    He was going to the bathroom?

13          A.    Yes.

14          Q.    Had you escorted him to the bathroom?

15          A.    Yes.

16          Q.    So he was no longer behind the curtain;

17    he was actually inside the restroom?

18          A.    Inside the restroom, yes.

19          Q.    With the door shut?

20          A.    Yes.

21          Q.    You didn't go in there with him?

22          A.    No.

23          Q.    So you were standing at the door?

24    Where were you?

25          A.    The door was here, here was a counter,
```

1    and right across the door, basically.

2         Q.    I'm sorry.  Do that for me again.

3         A.    The bathroom was here, the counter is

4    here, and I was right here.

5         Q.    So there was a counter between you and

6    the bathroom, the door?

7         A.    Yes, ma'am.

8         Q.    And you indicated to

9    Ms. Gonzales-Martin that you were texting about

10   an overtime slip?

11        A.    Yes, ma'am.

12        Q.    So you didn't know he did it?

13        A.    No.

14        Q.    The door was still closed?

15        A.    Yes, ma'am.

16        Q.    How is it that you came to know he left

17   the bathroom to go into this other room?

18        A.    One of the ladies that was -- there's a

19   room next door, bathroom.  One of the ladies said

20   that -- told the nurse, hey, someone was in my

21   room, I believe, and then -- I don't recall -- he

22   was gone already.  And he was still in the

23   bathroom.

24             And that's when we said, hey, I think

25   this guy went to his room and I want to talk to

1    him.  I said, did you leave it all?  Because I

2    didn't leave the door open.  And he said, no, I

3    didn't go anywhere.

4            And what happened was -- he told me

5    after the fact -- when I looked down, he timed it

6    right off the bat where the cart was coming,

7    another gurney was coming through, he slipped

8    out.  He knew he couldn't go out this way.  He

9    thought it was another room that had a door and

10   he realized, oh, crap, there's nothing, can't go

11   out there, and went back in the bathroom.

12       Q.   So that happened in 2010?

13       A.   Yes.

14       Q.   And the Roell incident was in 2013,

15   right?  I mean, the Roell incident was in 2013,

16   right?  This happened in 2010?

17       A.   Yes, ma'am.

18       Q.   So is it fair to say at least in 2010

19   you got a real quick lesson in how quickly

20   somebody can slip out of your control?

21       A.   Yes, yes.

22       Q.   You looked down, you looked back up,

23   the back door was still shut?

24       A.   Yes, ma'am.

25       Q.   So was that a matter of how long?

1        A.    Seconds.

2        Q.    He went into someone else's room and

3   could have hurt somebody?

4        A.    Yes, ma'am.

5        Q.    What did you learn from that?

6        A.    Oh, shit.

7        Q.    Uh-huh.  A couple times you described

8   requals, r-e-q-u-a-l-s.  I'm spelling it for the

9   court reporter and for the record.

10             Were you just meaning requalifications?

11        A.    Yes, ma'am.

12        Q.    Okay.  Let's look at Exhibit 21.

13             Do you recall discussing the Linsley

14   incident with Ms. Gonzales-Martin?

15        A.    Yes, ma'am.

16        Q.    Now, can you tell me, is it correct

17   that you were disciplined in this case for

18   failing to complete a use-of-force --

19   use-of-force incident report while you were in

20   corrections?

21        A.    Yes, ma'am.

22        Q.    Mr. Linsley had -- isn't it correct

23   that Mr. Linsley had some head injuries?

24        A.    That's what they said, yes.

25        Q.    That's what they said?

1      A.   Yes, ma'am.

2      Q.   Did you ever observe any head injuries

3  to Mr. Linsley?

4      A.   No, ma'am.

5      Q.   When you placed Mr. Linsley in the

6  cell, could you describe for us how you do

7  that?

8      A.   We had him under control.

9      Q.   Who's we?

10     A.   Deputy Worley and I.

11     Q.   Worley?

12     A.   Worley, yes.

13     Q.   When you had him in control, what do

14  you mean by that?

15     A.   Handcuffed.

16     Q.   Okay.  Behind his back or in front,

17  if you remember?

18     A.   You know what?  I don't believe he was

19  handcuffed.  I can't remember.

20     Q.   Okay.  That's fair.

21          But when you say you had him in

22  control, what's your memory of that.

23          And if you don't remember, that's

24  fine.

25     A.   Just arm bar technique.  I'm using the

```
 1    arms.  I was the right side of his arm.  We kind
 2    of pushed him into the cell itself.
 3        Q.   I'm good at faking this, but I really
 4    don't have any idea what arm bar means.
 5            So can you tell us what you mean by the
 6    arm bar technique?  I'm not going to let you do
 7    it to me.  I've seen somebody make those
 8    mistakes.
 9        A.   You grab the arm and shoulder at the
10    same time and you're basically here.  You're
11    controlling the arm.  So wherever he goes, you
12    go.  You can move the person pretty well with the
13    arm bar as long as he doesn't swing with the
14    other hand.
15        Q.   Okay.  Okay.  So am I then correct in
16    having the view that the arm bar is basically
17    you're taking the arm and you're controlling it
18    so it becomes one unit like a bar --
19        A.   Yes, ma'am.
20        Q.   -- and you can move people around?
21        A.   Yes, ma'am.
22        Q.   Okay.  I don't know anything about it,
23    but I'm kind of a quick study.  All right.
24            So you had him in the arm bar and you
25    and Worley were controlling him?
```

         1        A.    Yes, ma'am.

         2        Q.    What happened then?

         3        A.    We had him in an arm bar.  He went to

         4    the back, like back of the wall.  There's a cell

         5    right there by the window.  And when he hit, he

         6    kind of went down a little bit.

         7             So I kind of grabbed him.  And instead

         8    of trying to put cuffs on him in the back, which

         9    I was trying to, which there was a wall there, so

        10    I pulled him this way, away from the wall.

        11             And then I put my head down so in case

        12    he does try to spit, because he's been spitting

        13    already.

        14        Q.    Right.

        15        A.    I put my head right close to his head

        16    about right here --

        17        Q.    Uh-huh.

        18        A.    -- so if he spits, he's not going to be

        19    able to get me.

        20        Q.    Uh-huh.

        21        A.    And then I was controlling the arm.  I

        22    couldn't remember who the other person was

        23    controlling the other arm.

        24             And then he kind of went up like this

        25    from the wall -- or from the floor.  And then all

1    of a sudden he, you know, kind of went like, oh,

2    cool, grab him, grab him.  Put him back in the

3    cell.  That was it.

4         Q.   When Mr. -- excuse me -- when

5    Mr. Linsley hit his head -- or I should say when

6    Mr. Wheeler went against the wall, did he hit his

7    head?

8         A.   No.

9         Q.   Did you observe any bleeding or head

10   injury to him?

11        A.   No, ma'am.

12        Q.   Did you later on discover that at some

13   point Mr. Linsley was taken to the medical unit

14   and that he had a head injury?

15        A.   Yes, ma'am.

16        Q.   Now, what was your understanding of the

17   policy in corrections?  When you took Mr. Linsley

18   under control, would that be an incident that you

19   would write an incident report about?

20        A.   Just controlling him, no.

21        Q.   Just controlling him, no?

22        A.   No.

23             Use of force would be punching,

24   hitting, or using an open-hand technique trying

25   to get him down.

1      Q.   So you're making a movement with the

2  heel of your hand against the other hand?

3      A.   Yes, ma'am.

4      Q.   Would that be considered a hard-hands

5  technique?

6      A.   Yes, ma'am.

7      Q.   So your understanding of the policy was

8  that if you used a hard-hands technique, that

9  would trigger an incident report; is that

10  right?

11     A.   It would, and police report, yes,

12  ma'am.

13     Q.   So it was your understanding of the

14  policy at the time that you're taking control of

15  Mr. Linsley and putting him in the cell -- it was

16  your understanding that that should have

17  triggered an incident report for you?  Did you

18  think that that should have?

19     A.   No, it shouldn't.

20     Q.   I think I just asked you this, but did

21  you ever use any hard-hands control techniques

22  with Mr. Linsley?

23     A.   No.

24     Q.   Who's Lieutenant Tudor?

25     A.   He is -- he was in charge of the

1    internal affairs.

2        Q.    And was it Lieutenant Tudor who did

3    this investigation that resulted in your

4    discipline?

5        A.    Yes, ma'am.

6        Q.    Were you aware that Lieutenant Tudor

7    testified that he considered any touching, even

8    in the jail environment, a touching that would

9    trigger an incident report?

10       A.    I heard that, yes, ma'am.

11       Q.    I beg your pardon?

12       A.    I heard that, yes, ma'am.

13       Q.    And were you aware that, in the course

14   of Lieutenant Tudor's investigation, that he

15   actually was unaware that there were different

16   use-of-force policies in the corrections

17   department versus the patrol department?

18       A.    Yes, ma'am.

19       Q.    What?

20       A.    Yes, ma'am.

21       Q.    And were you aware that, in his

22   investigation of this incident, that

23   Lieutenant Tudor used the excessive-force policy

24   in effect in the patrol division to evaluate the

25   situation instead of that in effect in

1   corrections?

2         A.   Yes, ma'am.

3         Q.   Were you aware that Lieutenant Tudor

4   testified in his deposition in that case that he

5   had not attended any of the use-of-force updates

6   because he didn't think it was necessary because

7   he didn't deal with the public?

8         A.   Yes, ma'am.

9         Q.   I beg your pardon?

10        A.   Yes, ma'am.

11        Q.   Were you aware that in investigating

12  this use-of-force incident, that Lieutenant Tudor

13  testified that he didn't think it was his

14  responsibility to determine how Mr. Linsley was

15  injured and how he, in fact, received that head

16  injury?

17        A.   Yes, ma'am.

18        Q.   Were you aware that Lieutenant Tudor

19  testified in his deposition in that case that he

20  didn't interview Sergeant Menkhaus?

21        A.   Yes, ma'am.

22        Q.   Were you aware that, in his

23  deposition testimony, Lieutenant Tudor testified

24  that he didn't interview any of the fact

25  witnesses that might have given him information

1   as to how, in fact, Mr. Linsley received that

2   head injury?

3       A.   Yes, ma'am.

4       Q.   Were you aware in that case, the

5   Linsley case filed in federal court, that

6   Judge Beckwith ruled that Lieutenant Tudor's

7   testimony could not come into evidence because it

8   was unreliable?

9       A.   Yes, ma'am.

10      Q.   And were you aware in that prior

11  incident, that federal court case, that

12  Judge Beckwith ruled that Lieutenant Tudor could

13  not testify in that case because his conclusions

14  were unreliable?

15      A.   Yes, ma'am.

16      Q.   Were you aware in Mr. Linsley's case in

17  the Sixth Circuit, that there was mediation, and

18  that mediation was actually canceled because the

19  Sixth Circuit mediator was concerned about her

20  safety and the safety of the other court

21  personnel as a result of Mr. Linsley's combative

22  behavior?

23      A.   Yes, ma'am.

24      Q.   Were you aware, in that litigation that

25  was filed in federal court in front of

1    Judge Beckwith, that the court clinic

2    psychiatrist was prepared to testify that

3    self-harm, including head banging, is a

4    characteristic of paranoid schizophrenics that

5    are subject to confinement?

6         A.   Yes, ma'am.

7         Q.   And were you aware that Mr. Linsley's

8    forensic history included prior occasions in

9    which he had banged his head?

10        A.   Yes, ma'am.

11        Q.   If there had been a situation where, in

12   your experience, an incident report for use of

13   force was called for in the jail, in corrections,

14   when would the policy indicate that you would

15   have to prepare that report?  Was there a time

16   frame?

17        A.   No, ma'am.  As soon as -- at the end of

18   your shift.

19        Q.   At the end of your shift, that's what I

20   meant.

21        A.   Yes, ma'am.

22        Q.   So, for example, this incident with

23   Mr. Linsley, did this happen at the end of your

24   shift?

25        A.   No, ma'am.  It was the beginning.

189

1        Q.   At the beginning of your shift?

2        A.   Yes, ma'am.

3        Q.   And by the time you were, I guess,

4    addressed about the fact that you hadn't done

5    this incident report, was that within the same

6    shift?

7        A.   Yes, ma'am.

8        Q.   So even if this were a situation where

9    you had to do an incident report, the time frame

10   in which you would have had to do it had not

11   lapsed yet?

12       A.   No, ma'am.

13       Q.   But, nevertheless, you were

14   disciplined; is that correct?

15       A.   Yes, ma'am.

16       Q.   You said you had your flashlight out

17   that night?

18       A.   Yes, ma'am.

19       Q.   Was it dark out there?

20       A.   Yes, ma'am.

21            MS. SEARS:  If I could have a minute,

22       please.

23            VIDEOGRAPHER:  We're off the record.

24            (A recess was taken from 1:31 to 1:42.)

25            VIDEOGRAPHER:  We're on the record.

1  BY MS. SEARS:

2      Q.   Deputy Dalid, my colleagues alerted me

3  to something I'd like to ask you about.

4          In your first conversation with

5  Ms. Gonzales-Martin about the Linsley incident,

6  there is some memory that -- in response to the

7  question of, did you know you were supposed to

8  write a report, some memory of a response having

9  to do with the end of your shift.

10     A.   Yes, ma'am.

11     Q.   In my conversation with you about that

12  same incident, I asked you whether or not the

13  incident itself, in your view at the time, gave

14  rise to an incident report, and you said, no.

15     A.   Right.

16     Q.   So those answers seem to be

17  conflicting.  So what I'd like to do is ask you,

18  if you could, to explain that.

19          At some point in the shift, did you

20  have a conversation with Sergeant Menkhaus?

21     A.   Yes, ma'am.

22     Q.   Could you tell us about that, please?

23     A.   When I was eating my lunch, he brought

24  it to my attention that the gentleman,

25  Mr. Linsley, had injuries on him and he had to go

1    to the hospital.

2         Q.    Okay.

3         A.    And I told him, I didn't know that; I

4    didn't see anything.

5         Q.    Okay.  And then what?

6         A.    And he said, well, go ahead and write

7    an incident on it, what happened, and we'll go

8    from there.

9         Q.    And did you?

10         A.    Yes, ma'am.

11         Q.    But, nevertheless, were you disciplined

12    for not writing an incident report at the time

13    the incident occurred?

14         A.    Yes, ma'am.

15         Q.    By Lieutenant Tudor?

16         A.    Yes, ma'am.

17         Q.    And then one other thing I forgot to

18    ask you was, after -- can you tell me -- as

19    Mr. Roell went into cardiac arrest and then as he

20    was attempted to be resuscitated and then

21    ultimately it turned out that he could not be

22    revived, can you tell me how you were feeling at

23    the time of that incident about everything that

24    had happened?

25         A.    Well, when I didn't feel any pulse on

1    him and, you know, my first instinct was, you

2    know, oh, shit, you know, he's not breathing,

3    we got to get something going on.  I was, you

4    know, very shocked, like, you know -- and that's

5    when Sergeant Steers -- or Corporal Steers at

6    that time, said, get out of the way.  Started

7    doing CPR.  That's when he started doing it.  He

8    said, go get the squad; make sure he knows

9    exactly where we're at.

10          You know, any incident, you don't want

11   to lose anybody, anybody to die from an incident.

12   You know, I felt like crap, you know.

13          Q.   Were you shaken up by the experience?

14          A.   Yes, ma'am.

15          Q.   Did it emotionally affect you, sir?

16          A.   Yes, ma'am.

17          Q.   And how did it emotionally affect

18   you?

19          A.   Just with my kids and, you know, my

20   family.

21          And the wife seen it.  And when they

22   saw it on the news, that's why I called my son

23   and I said, hey, tell Mom I won't be home, tell

24   Mom I'll be home late.

25          You know, told him what happened.  I

1    said, just tell her that I'll be home late.  And

2    that's when she found out on the news.

3            And it's been a wreck.  It's been

4    stress ever since.  It's not -- that's the way I

5    feel about it.

6            MS. SEARS:  Nothing further.

7                    FURTHER EXAMINATION

8    BY MS. GONZALES-MARTIN:

9        Q.   Please turn to Plaintiff's Exhibit 2.

10           These are some slides from the Hamilton

11   County Sheriff's Office training.  And you could

12   flip through it if you'd like.

13           I'd like to know if you had taken this

14   training.

15       A.   Yes, ma'am.

16       Q.   When?

17       A.   I don't recall when.

18       Q.   What about Plaintiff's Exhibit 6 -- I'm

19   sorry -- Plaintiff's Exhibit 7.

20           This is slides from an online course

21   called Deescalating Mental Health Crises.

22       A.   Uh-huh.

23       Q.   Have you taken this training?

24       A.   Yes, ma'am.

25       Q.   When?

1       A.   I don't remember what year.

2       Q.   I want to ask you about the commands

3   that you heard given.

4            You heard Deputies Huddleston or

5   Alexander command Mr. Roell to get out of the

6   back yard, right?

7       A.   I did not hear that.

8       Q.   You wrote in your narrative the night

9   of the incident that you heard them give verbal

10  commands for the subject to get out of the back

11  yard, right?

12      A.   I --

13      Q.   You can turn to Plaintiff's Exhibit 20.

14      A.   I must have.

15      Q.   And you heard -- well, you said that,

16  we gave verbal commands to give up his hands.

17           You heard that command, right?

18      A.   Right.

19      Q.   And you heard the command to roll to

20  his stomach, right?

21      A.   Correct.

22      Q.   You didn't hear a command to stop,

23  correct?

24      A.   Stop at --

25      Q.   You didn't hear a command for

1   Gary Roell to stop at any point, right?

2       A.   No, not when we were controlling

3   him.

4       Q.   You didn't hear a command for

5   Gary Roell to stop at any point in the

6   interaction with Mr. Roell, right?

7       A.   Right.

8       Q.   One point where I just read from your

9   narrative, you said, We gave verbal commands.

10          So you gave commands, also, right?

11      A.   Which was during the first contact,

12  yes.

13      Q.   A call to request EMS only takes a

14  second or two, right?

15      A.   It depends.

16      Q.   Well, you take your hand and put it on

17  your shoulder at your radio and ask -- push the

18  button and ask for EMS, right?

19      A.   Correct.  And it also has a

20  second delay of a beep before it comes up,

21  correct.

22      Q.   Okay.  So you push the button --

23      A.   It beeps, and then you talk.

24      Q.   -- it beeps, and then you say, request

25  EMS?

1       A.   Uh-huh.

2       Q.   So in a perfect world, in a coulda

3  woulda shoulda instance, you could have pushed

4  the button, taken a second or two to ask for EMS,

5  so that as soon as you got Mr. Roell under

6  control, EMS would be there, right?

7       A.   In a perfect world, yes.

8       Q.   And in those many scenarios that you

9  went over with your attorney, this coulda woulda

10  shoulda game that you played, all those scenarios

11  are speculation, right?

12       A.   Yeah.  I mean, coulda shoulda woulda.

13       Q.   Please turn to Plaintiff's Exhibit 15.

14            This is a photo of the patio that was

15  involved in the incident, right?

16       A.   Yes.

17       Q.   And you heard the other deputies

18  testify that the fence around the patio is about

19  6-feet tall, right?

20       A.   Right.

21       Q.   Would you agree that's an accurate

22  estimate?

23       A.   I don't know.  I guess, yeah.

24       Q.   And you can see in this photo,

25  Plaintiff's Exhibit 15, that the latch for the

1  door is about a little more than halfway up the

2  fence, right?

3        A.   Right.

4        Q.   So it's about 4-feet high, max,

5  right?

6        A.   Right.

7        Q.   So you could have reached that latch,

8  right?

9             MS. SEARS:  Objection.

10       A.   I could not.

11  BY MS. GONZALES-MARTIN:

12       Q.   You're 4'11", right?

13       A.   Correct.

14            But when you're in a hightened state,

15  going 90 miles per hour, you're breathing and

16  everything else, you tend to focus on one thing

17  and you're looking at something that might be a

18  little higher or a little shorter and you start

19  looking at it and you say, oh, well, maybe I

20  can't reach that.

21       Q.   Did anyone -- did you or

22  Deputy Huddleston or Deputy Alexander order the

23  family inside of this residence into a bathroom

24  or bedroom?

25       A.   No.  We didn't have time.

198

```
 1          Q.   Your attorney asked you about the times
 2    that Mr. Roell got calm or snored and then would
 3    get agitated again.
 4               Do you remember that?
 5          A.   Yes.
 6          Q.   And you said that he snored twice?
 7          A.   Correct.
 8          Q.   But did he also get calm other times
 9    without snoring?
10          A.   The first time of the incident with the
11    snoring when I tried to get him controlled and he
12    snored and I looked at him like, oh, shit, what's
13    going on, that's when I called EMS.
14               And then once I called, everything was
15    calm, he got agitated again, and then I had to
16    control him again.
17               And then after that, he snored again
18    and he kept on being combative.
19          Q.   Were there any other times of calm, but
20    he just didn't snore?
21          A.   Correct.
22          Q.   But you're not sure how many?  A few
23    times?
24          A.   No, I don't know how many.
25          Q.   When he -- the two times that you said
```

1  he snored, was Mr. Roell already cuffed and

2  shackled?

3     A.  He was cuffed in the front, not -- I

4  don't recall if he was shackled or not.  I can't

5  remember.

6     Q.  He may have been shackled?

7     A.  He might have been shackled.  I don't

8  know.  I know he was cuffed in the front this

9  way.

10     MS. GONZALES-MARTIN:  Nothing further.

11           FURTHER EXAMINATION

12  BY MS. SEARS:

13     Q.  I have a couple of things.

14        Officer, is there a difference between

15  being in custody and under control?

16     A.  In custody is when you have

17  everything -- there is a difference between those

18  two.

19     Q.  What is it?

20     A.  Under control is when you have somebody

21  and he's not fighting anymore, he's not

22  resisting, he's not doing anything.  That's when

23  you have somebody under control.

24        When he's in custody is when you

25  already have him up, sat him in a cruiser, and

1   good to go.

2        Q.   In your experience, have you had

3   experience involving EMTs responding to a scene

4   and treating subjects?

5        A.   Yes.

6        Q.   And will an EMT treat a subject who is

7   in custody, but not under control?

8        A.   No.

9        Q.   And who determines if the EMT will

10  approach a subject in terms of whether the EMT is

11  under -- excuse me -- the subject is under

12  sufficient control or not?  Do you determine that

13  or does the EMT determine it?

14       A.   We have to determine, make sure that

15  the safety -- you know, everything is secure and

16  safe for them to approach.

17       Q.   But if the EMT says, I'm not going

18  near it, can you make the EMT go near the

19  subject?

20       A.   No.

21       Q.   And how much time -- if you can,

22  tell me, if you can -- how much time elapsed

23  between the last time Mr. Roell got calm and

24  the time in which you determined that there

25  was no pulse?  Do you have any sense of

1   that?

2          A.   No, ma'am, I don't.

3               MS. SEARS:  That's it.

4               Did it cause anything on your side

5        there?

6                    FURTHER EXAMINATION

7   BY MS. GONZALES-MARTIN:

8          Q.   Would you agree that it's easier to

9   get prompt medical service if EMT is on the

10  scene?

11         A.   Do I agree what?  I'm sorry.

12         Q.   It's easier to get prompt medical

13  treatment if EMTs are on the scene?

14              MS. SEARS:  Objection.

15         A.   No.

16              MS. SEARS:  But you can answer.

17         A.   No.  We still have to control them

18  and get them together before they even come

19  out.

20  BY MS. GONZALES-MARTIN:

21         Q.   But you would agree that if EMTs

22  are on the scene when you have them under

23  control, it's easier to get prompt medical

24  treatment?

25         A.   Yes.

```
 1                    FURTHER EXAMINATION
 2   BY MS. SEARS:
 3        Q.   Is there a difference between being on
 4   scene and staging?
 5        A.   Correct.
 6        Q.   Will an EMT come on scene if a subject
 7   is under control, in your experience?
 8        A.   No.
 9        Q.   Will they stage?
10        A.   They will stage, yes.
11        Q.   And where will they stage?
12        A.   They will stage maybe, you know, a
13   block down over.  And then after they stage and
14   we tell them, all right, he's in custody, we got
15   him together, we got him in control, then they
16   come up and be on the scene.
17                    FURTHER EXAMINATION
18   BY MS. GONZALES-MARTIN:
19        Q.   Would you agree that it's easier to get
20   prompt medical treatment if EMTs are staged?
21             MS. SEARS:  Prompt?  Objection.
22        A.   Prompt?  Like, well, okay, they're here
23   so -- yes.
24             MS. GONZALES-MARTIN:  Nothing further.
25             MS. SEARS:  Nothing further.
```

203

1        VIDEOGRAPHER:  We're off the record.

2        MR. GERHARDSTEIN:  I assume you're

3    going to have him sign.

4        MS. SEARS:  Yes.

5

6        _____
         WILLY J. DALID

7

8

9               - - -

10   DEPOSITION ADJOURNED AT 1:55 P.M.

11              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

204

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO          :
                             :  SS
 4    COUNTY OF HAMILTON     :

 5

 6              I, Kelly A. Graff, the undersigned, a

 7    duly qualified and commissioned notary public

 8    within and for the State of Ohio, do certify that

 9    before the giving of his deposition, WILLY J.

10    DALID was by me first duly sworn to depose the

11    truth, the whole truth and nothing but the truth;

12    that the foregoing is the deposition given at

13    said time and place by WILLY J. DALID; that I am

14    neither a relative of nor employee of any of the

15    parties or their counsel, and have no interest

16    whatever in the result of the action.

17

18              IN WITNESS WHEREOF, I hereunto set my hand

19    and official seal of office at Cincinnati, Ohio,

20    this 19th day of June 2015.

21

22    _____

                 Kelly A. Graff
23               Notary Public - State of Ohio
                 My commission expires October 16, 2016.

24

25
```

205

```
 1                E R R A T A   S H E E T

 2             DEPOSITION OF:  WILLY J. DALID

 3                    TAKEN:  June 10, 2015

 4   Please make the following corrections to my
     transcript:
 5

 6   Page  Line Number           Correction Made

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____        _____

25   Witness Signature            Date
```