# Sergeant Steers

June 17, 2015

NANCY ROELL

v.

HAMILTON COUNTY, OHIO/BOARD OF COMMISSIONERS, et al.

1:14-CV-637



513.233.3000
877.233.4403
Fax: 513.233.2310
depo@elitereportingagency.com

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                    WESTERN DIVISION

4

5    _____
                                    )
6    NANCY ROELL                    )
     as executrix of the estate of  )
7    GARY L. ROELL, SR.,            )
                                    )
8            Plaintiff,             )
                                    ) CASE NO.
9                vs.                ) 1:14-CV-637
                                    )
10   HAMILTON COUNTY, OHIO/BOARD OF )
     COMMISSIONERS, et al.          )
11                                  )
             Defendants.            )
12   _____)

13

14

15       Deposition of:  SERGEANT MIKAL STEERS

16       Pursuant to:    Notice

17       Date and Time:  Wednesday, June 17, 2015
                         11:12 a.m.
18       Place:          Hamilton County
                          Prosecutor's Office
19                       230 East Ninth Street
                         Suite 4000
20                       Cincinnati, Ohio  45202

21       Reporter:       Wendy Haehnle
                         Notary Public - State
22                                   of Ohio

23

24

25

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3          For the plaintiff:

 4               Alphonse A. Gerhardstein, Esq.
                      and
 5               Jacklyn Gonzales-Martin, Esq.
                      of
 6               Gerhardstein & Branch Co., LPA
                 432 Walnut Street
 7               Suite 400
                 Cincinnati, Ohio  45202
 8               513.621.9100, Ext. 13
                 agerhardstein@gbfirm.com
 9               jgmartin@gbfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1   APPEARANCES OF COUNSEL:

 2

 3        For the defendants:

 4                Jerome A. Kunkel, Esq.
                       and
 5                Pamela J. Sears, Esq.
                       of
 6                Office of Hamilton County
                    Prosecuting Attorney
 7                230 East Ninth Street
                  Suite 4000
 8                Cincinnati, Ohio  45202
                  513.946.3082
 9                pam.sears@hcpros.org
                  jerry.kunkel@hcpros.org
10                     and

11                Linda L. Woeber, Esq.
12                     of
                  Montgomery Rennie & Jonson, LPA
13                36 East Seventh Street
                  Suite 2100
14                Cincinnati, Ohio  45202
                  513.768.5239
15                lwoeber@mrjlaw.com

16

17        Also Present:

18                Andrea Neuwirth
                  Katie Cornelius
19                Nancy Roell

20

21                         -  -  -

22

23

24

25
```

4

```
 1                        I N D E X

 2

 3    SERGEANT MIKAL STEERS                    PAGE

 4        EXAMINATION BY MS. MARTIN              5
          EXAMINATION BY MS. SEARS              87
 5        FURTHER EXAMINATION BY MS. MARTIN     130

 6

 7    EXHIBITS                    MARKED    REFERENCED

 8        PLAINTIFF'S EXHIBIT  2     -           68
          PLAINTIFF'S EXHIBIT 17     -           29
 9        PLAINTIFF'S EXHIBIT 23    16           16
          PLAINTIFF'S EXHIBIT 24    50           50
10        PLAINTIFF'S EXHIBIT 25    54           54

11

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    SERGEANT MIKAL STEERS

 2    a witness herein, having been duly sworn, was

 3    examined under oath as follows:

 4                        EXAMINATION

 5           THE VIDEOGRAPHER:  We are on the

 6       record.

 7    BY MS. MARTIN:

 8       Q.    Could you please state your full

 9    name?

10       A.    Mikal Steers.

11       Q.    M-i-k-a-l?

12       A.    M-i-k-a-l, yes.

13       Q.    And I -- I'm Jaci Martin, one of the

14    attorneys who represents Mrs. Nancy Roell.

15       A.    Okay.

16       Q.    And I don't want to hear what you

17    talked about with your attorneys.

18       A.    Okay.

19       Q.    But could you tell me what you did to

20    prepare for today's deposition?

21       A.    I looked at the after-action report

22    that I wrote about this incident.  I also looked

23    at the filing that was made in regard to the

24    lawsuit and a CAD printout to try give me an idea

25    of time frames.
```

6

1      Q.   You said a CAD printout?

2      A.   Yes.  It's from dispatch.

3      Q.   You gave an interview with this -- as

4  part of the investigation of this incident,

5  right?

6      A.   Yes.

7      Q.   Did you review that?

8      A.   Yes, I did.

9      Q.   Did you review anything else?

10      A.   No.

11      Q.   Did you speak to Deputies Huddleston,

12  Alexander, and Dalid in preparation for today's

13  deposition?

14      A.   No, not in preparation.  I talked to

15  them to see when they were going to do their

16  depositions and asked them how they were doing,

17  and that's it.

18      Q.   Did you have the opportunity to read

19  the transcripts from their depositions?

20      A.   No.

21      Q.   Did you ask them what they talked about

22  in their depositions?

23      A.   No, no.

24      Q.   What is your highest level of

25  education?

1     A.   High school.

2     Q.   Where did you go?

3     A.   Roger Bacon.

4     Q.   When did you graduate?

5     A.   '92.

6     Q.   Did you have any law enforcement jobs

7 prior to working for the Hamilton County

8 Sheriff's Office?

9     A.   No.  I started at the sheriff's office

10 as a corrections officer.

11    Q.   And that was in 1995?

12    A.   That was in 1995, yes.

13    Q.   Did you go to OPOTA training before

14 that?

15    A.   I went to the sheriff's department's

16 corrections academy.  And while I was a

17 corrections officer I went to the OPOTA Police

18 Academy.  The sheriff's department put it on.

19    Q.   And that sheriff's office training, was

20 that patrol training?

21    A.   Well, you start off as a certified

22 corrections officer.

23       And while you're a corrections officer,

24 if you want to become a certified peace officer,

25 you have to go to the peace officer academy.

1                And so I went to the peace officer

2     academy while I was a corrections officer and was

3     certified as a peace officer.

4                And then I was promoted to a patrol

5     officer, I think, in '97 or '98.

6          Q.   For a while you were a patrol clerk,

7     correct?

8          A.   Yes.  When you first come to the patrol

9     division you start of as a patrol clerk.  Then

10    you become a patrol officer.

11         Q.   What's the difference between a clerk

12    and a patrol officer?

13         A.   A patrol clerk's duties are clerical

14    and administrative in nature for the most part.

15               You'll do prisoner transportation and

16    booking at the -- at the jail.  And there's a

17    24-hour holding facility at headquarters.  You

18    know, and they'll do booking there.

19               But for the most part, it's

20    transportation and clerical work, answering

21    phones, things like that.

22         Q.   In 2001 you were promoted to

23    corporal?

24         A.   That sounds right.

25         Q.   Is that your current position?

9

 1       A.    No.  I'm a sergeant now.

 2       Q.    When were you promoted to sergeant?

 3       A.    August 19th, I think, of 2013.

 4       Q.    That was just after the incident --

 5       A.    Yes.

 6       Q.    -- with Mr. Roell?

 7       A.    Yes, it was.

 8       Q.    On the night of the incident involving

 9    Mr. Roell, you were a corporal?

10       A.    That's correct.

11       Q.    What was your beat that night?

12       A.    9 Sam 33.

13       Q.    What does that mean?

14       A.    Sycamore is broken up into three

15    different beats.

16             The 9 Sam 31 beat is primarily the

17    southern car.  The 9 Sam 32 beat is primarily the

18    northern car.  And the 9 Sam 33 beat, usually

19    occupied by a corporal, is a cover car, usually

20    working in the south, but occasionally will cover

21    in the north, as well.

22       Q.    Corporal Gilliland was also working

23    that night, right?

24       A.    Yes, he was.

25       Q.    Where was his beat?

1        A.   I think Jeff was 9 Edward 32 that

2   night.  I'd have to look to see.  But I think he

3   was 9 Edward 32, which is a northern county-wide

4   beat.

5        Q.   Were you supervising Deputies

6   Huddleston, Alexander, and Dalid on

7   August 13th, 2013?

8        A.   Yes.

9        Q.   What were you doing before the

10  encounter with Mr. Roell?

11       A.   I was at our Kenwood Road substation

12  finishing up a crash report.

13       Q.   What was the first thing you heard

14  about the incident with Mr. Roell?

15       A.   The dispatch came out for a trouble

16  run.  The subject was known to the complainant,

17  because they provided a name.

18            The name ended up not matching.  But

19  they provided a name, so we knew the subject was

20  known, and that it was breaking windows and

21  trying to get into the house.

22       Q.   What else did you hear?

23       A.   The initial dispatch was for me and for

24  Deputy Alexander to be dispatched, because he was

25  9 Sam 32.

```
 1            I was given a disregard because there
 2    was a unit closer, and that was
 3    Deputy Huddleston.
 4        Q.   Who told you to disregard?
 5        A.   It was Deputy Huddleston that said he
 6    was right there with them and I could disregard.
 7            A short while later one of the deputies
 8    got on the air and asked for more cars.  I told
 9    dispatch to drop attendance for assistance.
10            And I was -- I was heading north at
11    that time with a code 3 response to get up to
12    that location.
13            Do you want me to keep going or --
14        Q.   Just a minute.
15        A.   Okay.
16        Q.   Sure.  Go on.
17        A.   As I was responding code 3 out to the
18    location, one of the deputies had advised that
19    you can slow everybody down.
20            So I stopped my code 3 response, but I
21    still responded.  You know, it was late enough I
22    could get there pretty quick.  And I slowed my
23    code 3 response, but I still got there pretty
24    quickly.
25            I heard them call for a squad.  And
```

1   then I heard them call for a squad a second time.

2         And a short time after that is when I

3   pulled up to the scene.

4      Q.   Which radio frequency were you on?

5      A.   Hamilton County East.

6      Q.   Is that the same frequency as

7   Deputy Alexander?

8      A.   Deputy Alexander would have been on

9   that frequency, yes.

10      Q.   What about Deputy Huddleston?

11      A.   Deputy Huddleston would have been on

12   northeast communications and then would have

13   switched over as soon as responding to the

14   Sycamore Township detail.

15         So he would have started on northeast

16   communications but then switched over.

17      Q.   Does that mean putting down one

18   radio --

19      A.   No, it's --

20      Q.   -- and picking up another radio?

21      A.   It's switching from channel 3 to

22   channel 1 on your radio.

23      Q.   So did you only have one radio or two?

24      A.   I probably had two radios.  I usually

25   carry two radios so that I can simultaneously

13

1    listen to both channels.

2        Q.    So you heard that a known subject, a

3    neighbor, was breaking windows?

4        A.    I don't know if they said a neighbor.

5    It was a known subject.

6              We had a name, so we knew it was a

7    known subject.

8        Q.    So Huddleston told you to disregard, so

9    you continued writing your report at the Kenwood

10   substation?

11       A.    No.  I was already in my car and had

12   pulled out when I got the disregard.  So I was on

13   Kenwood Road when they called for help, right in

14   front of the substation, but I hadn't gone back

15   into the substation.

16       Q.    And when you got the call for help, was

17   that from Deputy Alexander?

18       A.    I don't remember.

19       Q.    And you said you went code 3.

20             What does that mean?

21       A.    Code 3 means lights and sirens.

22       Q.    And what was the route you took?

23       A.    I took Kenwood north to Cross County to

24   I71 to 275 to the Montgomery Road exit, which

25   brings you out right there at Montgomery and

14

1    Hetz.

2         Q.   Where were you on that route when you

3    heard the dispatch about slowing down?

4         A.   Probably on -- I don't know exactly.

5              I was close so -- I don't know exactly

6    where I was.

7         Q.   How long was it from the time you heard

8    you can slow down to when you pulled into

9    Barrington Court?

10        A.   I don't know exactly, couple minutes.

11   I don't know.

12        Q.   Where were you on your route when you

13   heard the call -- the first call for the squad?

14        A.   I don't know.

15        Q.   Where you were when you heard the

16   second call for a squad?

17        A.   I don't know.

18        Q.   How much time elapsed between the first

19   and second call for the squad?

20        A.   I don't know.

21             There is a -- I mean, there's a record

22   you could check into that would show.  I just --

23   I don't know just pulling it out of my head what

24   time it was.

25        Q.   What is the address of the Kenwood

15

1    substation?

2        A.    8540 Kenwood Road.

3        Q.    What did you observe as you entered

4    Barrington Court?

5        A.    When I pulled onto Barrington Court, I

6    pulled into the back where the cruisers were.

7    And that's where the call was, too; got out of

8    the car, and there was somebody standing in front

9    of the residence.

10           I said, where are they, referring to

11   the officers.  They directed me around back.

12           So I ran around back and walked into

13   the patio area.  And that's where I saw Mr. Roell

14   and the officers.

15       Q.    Who was in front of the residence?

16       A.    I think it was a woman.  I don't

17   know.

18       Q.    Those -- when you heard the deputy's

19   call for a squad, what did they say?

20       A.    Dispatch a squad.

21       Q.    And the second call for a squad sounded

22   more urgent, right?

23       A.    I don't know if it sounded more urgent.

24   But it's unusual to have that asked twice.  And

25   that's why I was concerned that something was

1    wrong.

2        Q.   You were still en route when you heard

3    that second call --

4        A.   The second one, yeah.

5        Q.   -- in your car?

6        A.   In my car.

7        Q.   And the deputy sounded worked up in the

8    second call, right?

9        A.   No.  I -- I don't recall him sounding

10   worked up.

11           It's just unusual for me to hear a

12   second request for a squad.

13           (Plaintiff's Exhibit 23 was marked for

14           identification.)

15   BY MS. MARTIN:

16       Q.   Handing you what's been marked

17   Plaintiff's Exhibit 23.

18       A.   Okay.

19       Q.   This is a transcription of the

20   interview you gave on the date of the incident.

21       A.   Okay.

22       Q.   And you said you had an opportunity to

23   review this before your deposition, correct?

24       A.   Uh-huh.

25       Q.   Was that a yes?

1        A.    Yes.  I'm sorry.  Yeah.

2        Q.    If you turn to page 14, and you can

3    look at the bottom of page 13 if you need for

4    context.  But --

5        A.    Oh, I see.  Page 14 you said?

6        Q.    Yeah.  At the very top of page 14 it's

7    written, So he seemed a little worked up.

8        A.    Okay.

9        Q.    Take a minute to look at it.

10             But did I read that correctly?

11       A.    Yes, you did.

12       Q.    Does that refresh your recollection as

13    to whether the deputy seemed worked up when he

14    called for the squad?

15       A.    Yes.

16       Q.    So you were telling me about being

17    directed by someone in front of the house to go

18    around back?

19       A.    Uh-huh.

20       Q.    What did you observe when you got

21    around back?

22       A.    When I got around back, Mr. Roell was

23    on the ground, face-down, had his hands

24    underneath him.

25             Deputy Dalid was up by his head with

1   his hand on his shoulder.

2           I asked, who's hurt.  That was the

3   first thing I asked when I got back there,

4   because there had been two calls for a squad.

5           And Deputy -- I think it was

6   Deputy Huddleston said that he had a small cut,

7   that Deputy Alexander had been punched, and that

8   Mr. Roell had been tased.

9       Q.   What happened next?

10      A.   I told them to roll Mr. Roell over,

11  bring him into a recovery position.

12          When they did that, I noticed that he

13  didn't look good; went and checked for a pulse

14  and found none.  And I began CPR.

15          I told Deputy Alexander to advise the

16  squad that was already en route -- advise them

17  that CPR was already in progress.

18      Q.   What happened next?

19      A.   I told Deputy Dalid to go around to the

20  front of the house to direct the squad to the

21  back so that they knew where to go.

22          And I continued compressions until the

23  life squad got there.  There was a couple times

24  that I thought I had a faint pulse.  And then it

25  faded and I began again.

1            I continued compressions until Sycamore

2     Township EMS showed up.

3            They hooked up a monitor and then they

4     took over the compressions at that point and

5     transported him to Bethesda North.

6     Q.    When you first arrived at the patio

7     area --

8     A.    Uh-huh.

9     Q.    -- and observed Mr. Roell, did you

10    observe that he was naked from the waist down?

11    A.    Yes.

12    Q.    And who, other than Mr. Roell, was

13    there when you arrived?

14    A.    Deputy Sewall, Deputy Huddleston,

15    Deputy Alexander, Deputy Dalid.  Those were the

16    only ones that I saw.

17    Q.    And Mr. Roell was completely

18    motionless?

19    A.    He was.

20    Q.    And you said you learned that

21    Deputy Alexander had been punched, right?

22    A.    Uh-huh.

23    Q.    But there was no visible injury?

24    A.    Not that I noticed, no.

25    Q.    And you observed that Gary Roell was

20

```
1    handcuffed and shackled?

2         A.   Yes.

3         Q.   Now, Deputy Sewall said in his

4    interview that he heard you say, this looks like

5    excited delirium.

6              Do you recall that?

7         A.   Yes.  I think I said something to that

8    effect.

9         Q.   You knew to roll Mr. Roell over and sit

10   him up, right?

11        A.   I did.

12        Q.   And you were following the Hamilton

13   County Sheriff's Office policy about cuffing?

14        A.   Well, I just wanted to get a look at

15   him and get him in a recovery position.

16        Q.   Are you familiar with the Hamilton

17   County Sheriff's Office policy on cuffing?

18        A.   Yeah.

19        Q.   And it says to sit a person up after

20   they're cuffed?

21        A.   Yeah.  Well --

22             MS. SEARS:  Objection as to form of

23        what it says after they're cuffed.

24             You can answer.

25             THE WITNESS:  Okay.  Sorry.
```

1        A.   Once -- once they're under control, you

2   can put them in a recovery position.

3            When -- sometimes, when you're still

4   struggling with someone -- obviously, if you're

5   still struggling, you can't get them into a

6   recovery position.

7            So once the subject is handcuffed and

8   controlled, you put them in the recovery

9   position.

10  BY MS. MARTIN:

11       Q.   What is a recovery position?

12       A.   You can recover -- the concern when

13  putting someone into what we call a recovery

14  position is to avoid any type of positional

15  asphyxiation.

16            So you want to make sure that they're

17  able to expand their diaphragm.  You don't want

18  them spending extended periods of time flat on

19  their back or flat on their stomach.

20            What we like to do is get someone, roll

21  them to their side, then get their legs

22  underneath them and either sit them up or stand

23  them up.

24       Q.   If you don't mind, I'm going to ask you

25  to stand up then lay down and show us the

22

1    position that you observed --

2         A.   Okay.

3         Q.   -- Mr. Roell in.

4         A.   Where am I going for this?  Do I have

5    to be on camera or --

6         Q.   Yeah.

7              MS. SEARS:  I don't know where -- this

8         chair is --

9              THE WITNESS:  Let me take my coat

10        off.

11             MS. SEARS:  This time Ms. Martin is

12        going to pay for your dry-cleaning.

13             THE WITNESS:  What's that?

14             MS. SEARS:  I'm just -- no.

15        A.   This is the best representation I

16   can -- I can make.

17   BY MS. MARTIN:

18        Q.   Okay.  So you're laying flat on the

19   ground --

20        A.   Uh-huh.

21        Q.   -- face down, head straight, and your

22   hips are flat on the floor --

23        A.   Yes.

24        Q.   -- and your legs are out straight

25   behind you, and your arms are on -- are bent and

1   at your chest?

2        A.    Yes.

3        Q.    Where was Deputy Huddleston at this

4   point?

5        A.    He was -- can I stand up now?

6        Q.    Sure.  Thank you.

7        A.    Thanks.

8              Deputy Huddleston was -- would have

9   been standing behind him at his feet, behind

10  him.

11       Q.    Okay.  So --

12       A.    I'm sorry.

13       Q.    Pretend you're still laying on the

14  ground and put yourself where Deputy Huddleston

15  was.

16       A.    Actually, I'm not -- I'm not

17  100 percent sure where Deputy Huddleston was.

18             I know where Deputy Dalid was.

19       Q.    Where was Deputy Dalid?

20       A.    Deputy Dalid was at his -- at his head

21  with his hand on his shoulder.

22       Q.    Which shoulder?

23       A.    That would have been the shoulder --

24  the left shoulder.

25             The exact position of everybody else,

24

1    right now, I can't tell you.

2              I know they were there, but it all --

3    it happened very quickly, where we rolled him

4    over and CPR began.

5         Q.    Were the other deputies helping to

6    control Mr. Roell?

7         A.    Well, they -- they rolled him over when

8    I told them to.

9         Q.    And you said that Deputy Dalid was

10   controlling Mr. Roell --

11        A.    Right.

12        Q.    -- on his shoulder?

13        A.    There was a deputy -- I'm not sure

14   which one -- had ahold of his feet.  And I

15   believe there was another deputy on the other

16   side of his -- on the other side of his body.

17   But I couldn't tell you who it was or exactly how

18   they were.

19        Q.    In the initial dispatch about the

20   incident, did you hear that the suspect was

21   acting crazy?

22        A.    I -- I don't remember that.

23              If I listened to the dispatch, I could

24   tell you.  But I don't remember that.

25        Q.    How much pressure was being exerted by

25

1    Deputy Dalid?

2         A.   It didn't appear to be much.  It

3    appeared to be -- just sort of have -- have your

4    hand on there to make sure you're not raising up.

5         Q.   Did you see Mr. Roell push up?

6         A.   No.

7         Q.   Did you hear Mr. Roell say anything?

8         A.   No.

9         Q.   Did you see Mr. Roell kick?

10        A.   Nope.

11        Q.   How long did you observe Mr. Roell

12   before he was turned over?

13        A.   I couldn't tell you exactly.  It was a

14   very short amount of time, because I don't like

15   to see anyone face-down for any long period of

16   time.

17             So as soon as I saw things were under

18   control, we turned him over.

19        Q.   Why don't you like to see anybody

20   face-down for a long period of time?

21        A.   For positional reasons.  We don't want

22   to run the risk of someone having trouble

23   breathing.

24             Also, you can't evaluate injuries if

25   you can't see someone.  So --

26

```
 1        Q.   So as you started to get Mr. Roell up,

 2   you realized he wasn't breathing?

 3        A.   When we rolled him over, I noticed that

 4   he didn't look good.

 5             And I, right away, went down and

 6   checked for a pulse and didn't find one, and also

 7   noticed he wasn't breathing.

 8        Q.   What do you mean he didn't look good?

 9        A.   He didn't -- he didn't -- his face

10   didn't look good.  He didn't appear to be

11   breathing.  He didn't appear to be moving air.

12        Q.   And he had a gray appearance?

13        A.   He -- yeah.  He kind of looked ashen.

14        Q.   No pupil response?

15        A.   At one point during CPR, I asked one of

16   the deputies to -- to shine the light on his

17   pupils, and there was no response.

18        Q.   You also noticed that he was drenched

19   with either water or sweat?

20        A.   Right.

21        Q.   Approximately how long did you conduct

22   CPR?

23        A.   I don't know, until the life squad got

24   there.

25             I began shortly after arriving, and I
```

1    kept going until the life squad got there.

2        Q.    And you felt Mr. Roell's pulse come

3    back twice?

4        A.    I thought I did, yeah.  I stopped twice

5    and checked for a pulse.  One time I felt like I

6    had a pretty good pulse, and then it faded.

7             I stopped another time and checked for

8    a pulse, and I thought it was -- had a weak

9    pulse, and then that faded.

10            And then I didn't check again until the

11   life squad got there.  I just continued

12   compressions until the life squad got there.

13       Q.    What were the other officers doing

14   while you were conducting compressions?

15       A.    I had sent Officer Dalid out front to

16   direct the squad.

17            At one point, Deputy -- Deputy

18   Sewall -- one of the times that I stopped to

19   check for a pulse, he did a mouth sweep to make

20   sure that he wasn't choking on anything.  And he

21   wasn't.

22            And the other officers were just

23   standing there, just waiting for the squad to get

24   there.

25       Q.    You also ordered Deputy Dalid to start

28

1    getting crime scene tape up?

2         A.   Yes.  I don't know if I did that prior

3    to the squad getting there, or if I told him to

4    start doing that all at the same time.  I'm not

5    sure.

6         Q.   You realized that the CPR wasn't

7    working, and you told Deputy Sewall to start a

8    homicide log?

9         A.   Right.  Well, what I realized was it

10   was a -- a use of -- there was going to be a use

11   of force that resulted in, in the very least,

12   serious -- someone stopped breathing, someone's

13   heart had stopped.

14            In those instances, we treat the -- the

15   area as a crime scene until our criminal

16   investigation section has had a chance to come

17   out and conduct their investigation.

18            So we sealed that entire area as a

19   crime scene.

20        Q.   Did Deputy Sewall start the homicide

21   log?

22        A.   After he did a protective sweep of

23   Mr. Roell's residence he began a log.

24        Q.   Did he start that protective sweep of

25   Mr. Roell's residence while you were still

29

1    conducting CPR?

2       A.    No.   That was while the squad was

3    rolling away.

4       Q.    After EMS showed up, you said they

5    hooked him up to a machine?

6       A.    Uh-huh.

7       Q.    And they told you that Mr. Roell didn't

8    have a heartbeat?

9       A.    Right.   They said that he had asystole,

10    which, apparently, means that shocking wouldn't

11    work.   So they didn't order an electric shock.

12       Q.    And at that point, EMS took over

13    compressions?

14       A.    That's right.

15       I continued for a short time while they

16    were checking everything out.   But shortly after,

17    they took completely over.

18       Q.    I'll have you turn to

19    Plaintiff's Exhibit 17, please.   It's in this

20    white book.

21       A.    Oh, okay.

22       Q.    Do you recognize this exhibit?

23       A.    Yes.   It's a CAD printout.

24       Q.    Is this the CAD printout that you

25    reviewed for today's deposition?

1        A.    Yes.

2        Q.    Could you identify for me where you

3   first appear (inaudible)?

4              MR. KUNKEL:  Bless you.

5        A.    Let's see.  It looks to be the first

6   time that I'm on here is on the initial dispatch,

7   at 02:48.

8   BY MS. MARTIN:

9        Q.    Are you referring to the entry where it

10  says, Stat, HL/9S33?

11       A.    The first time I see myself is right

12  here.

13       Q.    Higher?

14       A.    Oh, yeah.  Okay.  It's the 02:48 entry,

15  yeah.  I see it.

16       Q.    I'm just trying to see where you are.

17       A.    Okay.  Right there, 02:48, 9 Sam 33,

18  and then just below that is the first time you'll

19  see my name, Officer 1.

20       Q.    Okay.  And in that first entry it says,

21  Stat, HL.

22             What's that mean?

23       A.    I don't know.

24       Q.    And then it says, ER.

25             Does that mean en route?

```
1        A.   Yes.

2        Q.   Then at 02:49 it says, Stat, HL, and

3   then it has your -- is that a unit number, car

4   number?  What do you call that?

5        A.   Yeah.  It's -- 9 Sam 33 is the unit

6   number.

7             And the next indication there is AV.

8   That means available.  That's when they were

9   letting me know to disregard.

10       Q.   The instruction to you to disregard

11  doesn't appear on this incident recall, right?

12       A.   It doesn't appear to, no.

13            But it does let me know they're

14  available.

15       Q.   Okay.  And the next time I see your

16  name is at 2:54 --

17       A.   Uh-huh.

18       Q.   -- is that right?

19       A.   Something that might help you clear

20  that up, though, if we want to move back for just

21  a second so -- on the instruction to disregard.

22            Right after it shows me as AV --

23       Q.   Uh-huh.

24       A.   -- if you look at the 02:50 entry, it

25  says 9P32 en route.
```

32

1         Q.    Uh-huh.

2         A.    That is 9 Paul 32.  That means that

3    they switched to the eastern frequency and let

4    them know that they were en route to that

5    dispatch.

6               So they put me available.  Then they

7    put 9 Paul 32 at the scene.

8         Q.    Okay.  So 9P32, en route, means

9    Huddleston is en route?

10        A.    They actually have him 27, which means

11   he's there.

12              So he may have said, I'm close, I'm

13   going with him, and they just went ahead and put

14   him on scene.

15              Oh, wait.  I'm sorry.  They do have him

16   en route.  And then after that -- yes.  That

17   means Huddleston.

18        Q.    Okay.  When you say they switched to

19   the eastern frequency, who is they?

20        A.    He, 9 Paul 32, switched; Huddleston.

21        Q.    And are you on the eastern frequency?

22        A.    Yes.

23        Q.    So Huddleston switched to the frequency

24   that you were on?

25        A.    Right; the frequency that primary

1    dispatch is using.  He switched to that to let

2    them know that he was the one that was going to

3    that detail, because he was close.

4         Q.   And then at 2:54 you're en route

5    again?

6         A.   Yep.

7         Q.   So that would be after one of the

8    deputies requested more cars?

9         A.   Yes.  That would be after they

10   requested cars and I told them to drop tone for

11   assistance.

12        Q.   And is the request for more cars on the

13   incident recall?

14        A.   I don't see it.  And I don't see

15   the all-county broadcast, either.

16        Q.   The all-county broadcast is where --

17   what you said dropping tones?

18        A.   Uh-huh.

19        Q.   Would that normally be on an incident

20   recall?

21        A.   Normally, yeah.

22        Q.   So you're --

23        A.   It looks like they've got one down at

24   2:56.  But it's below all that other stuff.

25        Q.   Where it says, ACB and --

34

1      A.   Uh-huh.

2      Q.   -- BC?

3           So that means all-county broadcast.

4  And what's the BC mean?

5      A.   Broadcast on the east.

6      Q.   But you believe that you were told

7  before 2:54 that more units were needed, and

8  that's why you're en route at 2:54?

9      A.   No.  I would have been told right at

10  2:54 that they needed more cars.  And I was

11  en route and -- during the all-county

12  broadcast.

13      Q.   So then what time did you arrive on

14  scene?

15      A.   Well, according to -- I couldn't tell

16  you exactly when I arrived on scene.

17           I can tell you when the CAD puts me on

18  scene if you give me a minute.

19      Q.   Sure.

20      A.   It appears that the CAD has me 27 at

21  3:00.

22      Q.   Where were you when you told dispatch

23  that you were on scene?

24      A.   I -- I don't know.  I -- I could have

25  hit my button.  I could done it over the air.  I

1    could have done it when I was driving up to the

2    scene.  I don't know.

3         Oftentimes, I'll put myself on scene as

4    I'm approaching the location that I'm headed to,

5    so that if something were to happen when you get

6    there, someone knows where you are.

7         So that's what I would do oftentimes.

8    I don't know if I did that in this case.

9    Q.   And what is the process for making CAD

10   entries?

11        For instance, if you're -- like you

12   just said, you're pulling up on a scene and --

13   and you push the button, tell the radio -- tell

14   the dispatch, I'm on scene.

15        Does then -- does dispatch then put in

16   the CAD entry?

17   A.   Right.  Dispatch then puts it in.

18        If you hit the on scene button on your

19   computer, if -- if it works properly, then

20   dispatch will put you on scene.

21        Or if you come over air and say that

22   I'm 27, on scene, or -- then dispatch will put

23   that as a CAD entry.

24   Q.   On the time that you pushed the button

25   or came on air --

1       A.    Right.

2       Q.    -- they'll put an entry for that time

3   you're on scene?

4       A.    Right.

5       Q.    Did you push the button on your

6   computer in this instance, or say --

7       A.    I don't know.

8       Q.    So if you do push the button, you're

9   talking about on your MDT?  Is that what you're

10  talking about?

11      A.    It's the MDC.  It's a touch-screen

12  computer.  And there's a button that says on

13  scene that you can hit that.  Or you can say, I'm

14  27, over the air.

15      Q.    Does that require -- if you push that

16  button on your MDC, does that require any typing

17  for the person doing the CAD entry?

18      A.    Oh, I don't know.  I don't know what

19  dispatch does on their end.  I just know what we

20  do on our end.

21      Q.    And what time did EMS arrive on

22  scene?

23      A.    I don't know what time they arrived.  I

24  can look on here and see what time the CAD has

25  them.  I think that might be on here.

1          Sometimes that's on a separate CAD

2     report.  It might be on the fire CAD.

3          Medic 93 at 3:07 is what it looks like.

4          But that is on police dispatch.  So

5     fire dispatch may have a different time.

6          They're two different channels.  Fire

7     dispatch dispatches fire and manages all the fire

8     runs.  And then once the fire department does

9     something, they would -- they can put it onto our

10    report.

11         So I don't know if these times are

12    factual or not.  I don't know if they're

13    representative or not of exactly when they got

14    there.

15    Q.   Just point to me -- I can't see where

16    you're pointing about medic.

17    A.   Right here at -- 03:07 would be the

18    time.

19    Q.   The first 03:07 entry?

20    A.   Yeah.  It says, first unit arrived,

21    M93.  That's medic 93.

22    Q.   Thank you.

23    A.   Okay.

24    Q.   Do officers report that EMS is on

25    scene?

38

1        A.    No.   The EMS makes a report to fire

2    dispatch when they get on scene.   And then --

3    which is all done through Hamilton County

4    Communication Center, it's just different desks.

5             Police and fire dispatch differently.

6        Q.    So EMS tells the fire dispatch --

7        A.    Uh-huh.

8        Q.    -- and then the fire dispatch

9    communicates --

10       A.    I don't know how they get that

11   information onto the -- onto our CAD.   I just

12   know it ends up there.

13       Q.    At 3:04, the first entry of the 3:04 --

14       A.    Uh-huh.

15       Q.    -- it says, CPR in progress per 9S32.

16       A.    Uh-huh.

17       Q.    Is 9S32 Deputy Alexander?

18       A.    Yes.

19       Q.    And do you think this is when -- you

20   told me about earlier, that you were doing CPR

21   and told Deputy Alexander to let the squad

22   know?

23       A.    Right.   That was when they made the

24   notation that -- he got on the air and advised

25   that CPR was progress.

39

1      Q.   At what point after you started the CPR

2   did you -- did Alexander make that --

3      A.   Very shortly after began CPR I looked

4   up and told him to notify dispatch that CPR was

5   in progress.

6      Q.   So after Mr. Roell was taken away by

7   EMS, what happened next?

8      A.   After he was taken away by EMS, I

9   notified the night watch commander, who was

10  Lieutenant Gramke, that we had a serious use of

11  force that may result in death.

12           I secured the crime scene there, had

13  them put up crime scene tape.

14           And I remained with Deputies Alexander,

15  Dalid, and Huddleston to ensure the integrity of

16  the interviews that would be coming.  We didn't

17  want anyone collaborating.

18           So, normally, what we'll do is, we'll

19  physically separate individuals involved in a

20  serious use of force.

21           Until I had more people there, I wasn't

22  able to physically separate them.  So I prevented

23  them from discussing the incident by keeping them

24  with me.

25           I explained to them exactly what was

40

1   going to be happening.

2          Prior to that, I had sent

3   Deputy Gilliland to the hospital to be with

4   Mr. Roell, to keep me updated on his status.

5          And then I explained to those three

6   officers what was going to be happening, that

7   there was going to be an investigation.  CIS and

8   Internal Affairs were going to come out and

9   conduct their investigation.

10          As soon as Sergeant Crock got on scene,

11   I was able to physically separate the officers by

12   putting them in separate patrol cars.

13          I did tell each of the guys, call home,

14   make sure that your family knows that you're okay

15   and you're -- it's going to be a long night.

16          And I told them not to make any other

17   calls besides that.

18      Q.   How long after you stopped compressions

19   did you tell Deputies Huddleston, Alexander, and

20   Dalid to not talk about the incident?

21      A.   I don't know.

22          Once Mr. Roell was gone and we had the

23   scene locked down, is when I had the chance to

24   calm them down.  Because they were -- they were

25   very shaken up by the whole incident.

1              So I had a chance to calm the officers

2    down and then begin explaining the process to

3    them.

4              I couldn't tell you exactly how long it

5    was.  Because it took a few minutes to get

6    everything under control.

7         Q.   What do you mean by, after the scene

8    was locked down?

9         A.   With the crime scene tape up, Mr. Roell

10   is transported to the hospital, I've got Deputy

11   Gilliland going to the hospital with him, I've

12   got tape up, and the scene's secure.

13        Q.   Someone had gone through the Roell

14   residence to do a sweep of that?

15        A.   Yes.  Deputy Sewall and

16   Officer Alderman from Montgomery.  Because there

17   was other agencies that were responding to the

18   officer-needs-assistance call.

19              Excuse me.

20              So Deputy Alderman from Montgomery was

21   with Deputy Sewall, and went in and cleared the

22   house to make sure there wasn't anybody injured

23   inside.

24        Q.   Was that part of what you referred to

25   as getting the scene locked down?

1      A.   That's -- well, it's all part of the --

2   the whole picture.  It was part of it, yeah.

3      Q.   Did you check in with the

4   complainant?

5      A.   I did not.  I don't remember who -- one

6   of the other officers was in talking with the

7   complainant.

8           I stayed back with the officers that

9   were involved in the use of force.

10          I -- I never did speak with the

11  homeowners that called us.

12     Q.   What was it that you observed on scene

13  after you arrived that caused you to say that

14  this looks like it could be excited delirium?

15     A.   Well, there's three healthy deputies

16  that had to fight to control this guy.

17          He'd been tased a couple times.

18  Apparently, the first one didn't take effect.

19          He was naked and soaked with water.

20          So those were all the things that came

21  into the equation, why I was thinking this could

22  be an instance like that.

23     Q.   Those are all symptoms of excited

24  delirium?

25     A.   They can be, yeah; none individually, I

1      mean, anything by itself.

2            But taken as a whole, it's -- it's

3      something to be concerned about.

4      Q.   At any point before Sergeant Crock came

5      on the scene, did Deputies Huddleston, Alexander,

6      and/or Dalid tell you what happened?

7      A.   Briefly.  They gave me a brief rundown

8      of what had happened.

9            I told them I didn't want -- I didn't

10     want them to go into full detail, but, you know,

11     a brief rundown of what happened.

12           And it was -- it's almost impossible to

13     have someone tell you a brief rundown of what

14     happened at that point, when the emotions are

15     running that high.

16           So I did get a brief rundown of the

17     encounter.

18           And right away, when I got there, they

19     told me that he had been tased.  So --

20     Q.   Where were you when you got this brief

21     rundown?

22     A.   Behind the fence of the victim's

23     residence there.

24           Mr. Roell's residence was over here.

25     Our victim called us to 10 -- I think it was

44

 1   29 -- okay -- behind their fence, in the grassy

 2   area back there.

 3        Q.   Outside the patio?

 4        A.   Right.

 5        Q.   And what did they tell you?

 6        A.   Just they had had one hell of a fight

 7   with him and that the Taser didn't seem to work

 8   and they couldn't even get him handcuffed behind

 9   his back and they finally got him handcuffed and

10   they can't believe that he stopped breathing.

11             That's -- they were just shocked.

12             When we rolled him over and he wasn't

13   breathing, they were shocked.

14             THE WITNESS:  Thank you.

15   BY MS. MARTIN:

16        Q.   Did they tell you anything else?

17        A.   Not that I can remember.

18        Q.   Did they say where on Mr. Roell's body

19   he was tased?

20        A.   I don't know.  I don't know if they

21   said that or not.  I don't think so, but I -- I

22   don't know if they mentioned that.

23        Q.   Did they say why they fought with

24   Mr. Roell?

25        A.   They told me that Mr. Roell attacked

1    them and swung a potted planted at them and

2    punched Deputy Alexander.

3         Q.   Did you see the Taser prongs?

4         A.   I saw spent Taser wire.  I don't

5    remember seeing Taser prongs.

6         Q.   While you were waiting for more

7    officers so that you could separate the three

8    deputies, what all did you do and say?

9         A.   I tried to calm them down and then

10   explain to them the process.

11            The process is there is going to be a

12   criminal investigation.  There's going to be an

13   internal investigation.

14            And that's it.

15        Q.   When Sergeant Crock showed up, he took

16   Deputy Huddleston into his cruiser?

17        A.   I don't remember who ended up in which

18   cruisers.  But we separated the three officers by

19   putting them in cruisers.

20        Q.   And I think that you said in your

21   interview that you had Deputy Alexander with

22   you?

23        A.   Okay.

24        Q.   Do you recall that?

25        A.   Well, he would have been in my cruiser

46

1    then.

2         Q.    Were you in the cruiser with him?

3         A.    No.  If -- if in the interview I said

4    that I had him, I meant that he had been put into

5    my cruiser.

6         Q.    Deputy Dalid went into his own cruiser.

7         A.    Okay.

8         Q.    Why couldn't you just put them all in

9    their own cruisers?

10        A.    We wanted them all in the same area.

11   But we wanted them all isolated so they weren't

12   speaking to each other.

13              Cruisers were all over the place.  So

14   we had cruisers right there; put them right here,

15   we can keep an eye on the guys.  And if they were

16   having trouble, we know that.  Let's keep them

17   isolated.

18              So it worked out really well to have

19   the three cars right there next to each other.

20   You can see the three guys in there and we can

21   ensure that they're isolated but still being

22   watched.

23        Q.    When you were calming them down and

24   getting a short rundown of what happened, was it

25   the four of you standing outside the fence

1    together?

2         A.   I think it was just the four of us.

3    Because I think Matt was -- no, Matt would have

4    been closer up to the front of the house.

5              I think he may have been -- Matt may

6    have been back there, also.  But I recall the

7    four of us standing back there.

8         Q.   Are you referring to Matt Sewall?

9         A.   Yes.

10        Q.   One of the deputies told you that when

11   they arrived, Deputy Alexander opened the gate

12   and said, hey, show me your hands, to Mr. Roell,

13   right?

14        A.   I'm not sure.  Is that my statement?

15        Q.   Page 37.

16        A.   Okay.

17        Q.   I'm looking at lines 2 through 4.

18        A.   Yeah, they did.

19             They explained to me the power display

20   of the Taser, that didn't have any effect on him.

21             And a power display -- what they do

22   is -- a lot of times someone who's -- anyone

23   familiar with the Taser, they see a power

24   display, sometimes they'll stop, they'll stop

25   fighting right there.

```
 1              That didn't -- that didn't work.  They
 2    didn't get any compliance with that.
 3              They tried to go hands-on.  So they put
 4    the Taser away and tried to go hands-on, tried to
 5    get him handcuffed.
 6              And that's -- that's when he punched
 7    Deputy Alexander.  And that's when
 8    Deputy Huddleston drew his Taser again and
 9    identified the Taser.
10        Q.   So the deputies didn't tell you
11    anything about Gary Roell running at them,
12    correct?
13        A.   They said he advanced on them, I
14    believe is what they told me.  Let me see.
15              No.  They didn't say anything about him
16    running at them, no.
17              MS. SEARS:  On that particular page?
18              THE WITNESS:  On this particular page,
19        yeah.
20        A.   I mean, I -- I do recall hearing that
21    he had advanced on them.  But I don't see it on
22    this page.
23    BY MS. MARTIN:
24        Q.   But, in fact, after they arced the
25    Taser, Mr. Roell took a step back.
```

1        A.   Well, yeah.  And these are the things
2    that they told me back there.
3             I don't know if these are the things
4    that I ultimately recall properly or not.
5             These are the things they gave me in a
6    brief rundown when I was trying to get them not
7    to tell me too much.
8        Q.   Are you aware the -- are you aware of
9    the Hamilton County Sheriff's Office policy that
10   requires for an investigation, that deputies
11   involved in a use of force fill out a written
12   narrative after the incident?
13       A.   No.  That's -- it's actually not always
14   the process.
15            Oftentimes, we do recorded interviews.
16   And the investigating supervisor will take that
17   recorded interview and -- and put it into
18   writing.
19            You can -- you can be required to do a
20   written statement at any time.  But often on our
21   use-of-force investigations, the supervisors, we
22   do the interview with the officers and with the
23   people involved with the use of force and record
24   it and digitally save it.
25            Then we just trans -- it's not an exact

1   transcription all the time.  But you've got that

2   file saved.  And you summarize the statements in

3   a -- in your use-of-force report.

4       Q.   So is that the process you used in this

5   instance?

6       A.   Well, I didn't do the use-of-force

7   investigation in this instance because of the

8   serious nature of it.

9       Q.   You said in your interview that you

10  hadn't dealt with Mr. Roell before?

11      A.   Uh-huh.

12      Q.   But do you know now that you did write

13  an incident report whenever he was a missing

14  person in 2009?

15      A.   No.  I didn't know that.  You're the

16  first -- you're the first to tell me that.

17          (Plaintiff's Exhibit 24 was marked for

18          identification.)

19  BY MS. MARTIN:

20      Q.   Handing you what's been marked

21  Plaintiff's Exhibit 24.

22      A.   Uh-huh.

23      Q.   Is that your signature at the bottom?

24      A.   Yes.  That's my report.

25      Q.   You can review it if you like.

1         But do you recall this incident now

2    that you've seen the report?

3         A.   I don't recall it, no.  I've taken

4    thousands of reports.

5         But there's no question this is a

6    report that I took.

7         Q.   So in October of 2009, Gary Roell, who

8    was on medication for paranoid psychosis, was off

9    his meds and in Nashville and needed medical

10   care?

11        A.   Uh-huh.

12        Q.   The next day -- it looks like on the

13   second page -- she reported that he returned home

14   and got treatment for his medical needs?

15        A.   Yep.

16        Q.   Is the fact that you did this report on

17   Roell something that you can look up in your

18   system in responding to a scene?

19        A.   I don't know if this would have shown

20   up on an address history or not.  A missing

21   person is not going to show up on a lot of

22   address histories.

23        But I wouldn't have an answer to that

24   question without running an address history and

25   finding out.

52

```
 1        Q.    It looks like Nancy Roell signed this

 2   incident report?

 3        A.    Uh-huh.

 4        Q.    Did you go to her house or did she come

 5   into the department?

 6        A.    I don't know.

 7        Q.    Could it have been either way?  Or how

 8   is it normally done?

 9        A.    It -- it all depends.  Sometimes we go

10   to people's house, sometimes they come to us.

11              I have no idea where this was done.

12        Q.    When you said you wouldn't know without

13   doing an address search if this would come up,

14   what do you -- what do you mean?

15        A.    We can run an address query sometimes,

16   and it will show past dispatch runs to that

17   location, you know, if they have a domestic

18   violence or something like that.

19        Q.    Is that in your MDC in your cruiser?

20        A.    Sometimes.  Oftentimes, it doesn't work

21   in that and dispatch has to do it.

22        Q.    Have you ever used defibrillation?

23        A.    No.

24        Q.    Do you know whether one would have been

25   appropriate to use after cardiac activity was
```

53

1    initially restored?

2        A.   Well, when the squad got there and

3    hooked him up, they said they weren't going to

4    shock him.  So I would say no.

5        Q.   But if cardiac activity was initially

6    restored, when you said that you -- you heard a

7    pulse --

8        A.   Oh, I don't know.  I have no idea if

9    that would have helped or not.

10       Q.   You said that you reviewed an

11   after-action report that you completed?

12       A.   Uh-huh.

13       Q.   What does that look like?

14       A.   An after-action report is -- that's a

15   document that we do on -- on major incidents.

16   It's kind of a self-critique.

17            And so when there's a -- a major

18   incident that occurs, the supervisor that was

19   working on that major incident will do an

20   after-action report.

21            It's a chance to take a look at

22   everything that you did and decide what we did

23   well, what we can do better.

24            That's it right there.

25            MS. MARTIN:  Can we go off the record?

54

```
 1                  THE VIDEOGRAPHER:  We're off the
 2         record.
 3                  (Off the record.)
 4                  THE VIDEOGRAPHER:  We're on the record.
 5                  MS. MARTIN:  Can I see that report?
 6                  (Plaintiff's Exhibit 25 was marked for
 7                  identification.)
 8   BY MS. MARTIN:
 9         Q.   I'm handing you what's been marked
10   Plaintiff's Exhibit 25.
11                  Is this the after-action report that
12   you were describing before we went off the
13   record?
14         A.   It was, yes.
15         Q.   And then it looks like it's five pages
16   long.
17                  Did you fill out all the information in
18   this report?
19         A.   I did.
20         Q.   When did you fill that out?
21         A.   I don't know exactly.  It was well
22   after the incident, maybe it could have been --
23   well, would have to be at least six days after
24   the incident, because I was sergeant when I did
25   it.
```

1       Q.   Where did you get the information to

2   fill out this report?

3       A.   Information both from speaking with the

4   detectives, from personal knowledge that I had,

5   the CAD record.

6       Q.   The detectives that were -- that you

7   spoke with, who were they?

8       A.   I don't remember if I got it from

9   Detective Bohan, or it might have been

10  Detective Pfaffl; information in order to write

11  the after-action report.

12      Q.   Bohan or --

13      A.   It could have been Detective Pfaffl.

14      Q.   How do you spell Pfaffl?

15      A.   P-f-a-f-f-e-l (sic).

16      Q.   And are those the detectives who

17  interviewed the deputies after the incident?

18      A.   No.  Detective Pfaffl interviewed me.

19  And I believe it was Detective Bohan's case.

20           And so that's why I could have -- it

21  would have been either of those two that I asked.

22      Q.   It was Bohan's case as far as a

23  criminal case or an internal investigation?

24      A.   Well, it's first investigated

25  criminally.  And then it goes internally.

56

1           So he's the one that looked at the

2  whole thing.

3      Q.   Did you take notes about the

4  incident?

5      A.   No, no.  This is the only -- only thing

6  written that I did about the incident.

7      Q.   Let me show you on my computer some

8  notes that are handwritten notes.  The page I'm

9  showing you is Bates Number 002396.

10         Do you recognize this handwriting?

11         And I can blow it up and make it a

12  little bit bigger for you.

13      A.   It's not mine.  I'm not sure whose it

14  is.  Yeah, I don't know whose it is.

15      Q.   Again, you don't recall making any

16  notes about this incident?

17      A.   I don't think I did.  Because I went

18  straight back -- I may have grabbed a notepad and

19  jotted a couple things down.

20         But I didn't have any detailed notes,

21  because Matt had the crime scene log.  And

22  that -- that would have been the more detailed

23  notes.

24         I don't think I had a notepad with

25  me.

57

```
 1        Q.    And, again, Matt is --

 2        A.    Deputy Sewall.

 3        Q.    Deputy Sewall.

 4              Did you learn any facts from the

 5    interviews of Huddleston, Alexander, or Dalid

 6    before you wrote Plaintiff's Exhibit 25?

 7        A.    Explain that.

 8        Q.    Did you learn anything about what

 9    Deputies Huddleston, Alexander, and Dalid said in

10    their interviews before you wrote this report,

11    Exhibit 25?

12        A.    Yeah.  I -- I saw their -- I saw some

13    of the statements they had made to the

14    detectives, the summaries of them, in order to

15    get timelines, to get exactly what happened.

16        Q.    How much time elapsed from when the

17    deputies were giving verbal commands to Mr. Roell

18    to when they went hands-on with him?

19        A.    I don't know.  I wasn't there.

20        Q.    You say in your report that officers

21    gave verbal commands.  That's the second line of

22    the third paragraph in your narrative.

23        A.    Okay.

24        Q.    So more than one officer gave verbal

25    commands?
```

 1        A.   I can't say for certain, because I

 2   don't have all the statements in front of me

 3   right now.

 4            But I would -- it's possible that more

 5   than one officer gave a verbal command.

 6        Q.   The third line down says, Roell charged

 7   the officers.

 8            What did you mean by that?

 9        A.   Advancing on the officers.

10        Q.   Where did you learn that information?

11        A.   I couldn't tell you exactly where it

12   came from.  It would have been one of the

13   summaries that I was pulling from.

14        Q.   A summary of one of the interviews that

15   the deputies --

16        A.   I would -- I would think so, yeah.

17            And that's, essentially, what this is,

18   a summary of those.

19        Q.   Where were the deputies located when

20   Mr. Roell supposedly charged them?

21        A.   I don't know.  I mean, I can go off

22   their statements.  I can't tell you personally

23   where they were.

24        Q.   Was Deputy Dalid there before anyone

25   went hands-on with Mr. Roell?

59

```
 1        A.   According to -- according to what they
 2   told me, the three of them were all there before
 3   anything got physical.
 4        Q.   The last page of your report, page 5 of
 5   five --
 6        A.   Uh-huh.
 7        Q.   -- you've got a map at the top.
 8             Is that something you do in your
 9   after-action reports, you put a map of the
10   area?
11        A.   Uh-huh.
12        Q.   And is that the location where this
13   happened, kind of right in the middle of that
14   map?
15        A.   It is.  It's difficult to see on here.
16             But there's a marking that shows where
17   the inner perimeter and outer perimeter of the
18   house was of the scene.
19        Q.   Oh, there's writing on this on another
20   copy, I just can't see it?
21        A.   You can see -- if you look real
22   closely, right there, you can see that's where it
23   indicates crime scene tape is.
24        Q.   Oh, the kind of a white line?
25        A.   Yeah.  Right here.  That indicates the
```

1    perimeter.  That is the patio where this all

2    happened.

3              MS. SEARS:  Can you highlight that?

4         Would that be all right with you, Jaci, if

5         he highlights it on the original exhibit?

6              MS. MARTIN:  Sure.

7         A.   And then this is the outer perimeter,

8    if you'd like me to highlight the outer

9    perimeter, as well.

10             So this was the inner perimeter that we

11   established right away.

12             And then when we found all the

13   destruction afterwards is when we extended the

14   outer perimeter.

15   BY MS. MARTIN:

16        Q.   When you look at this, you look at it

17   on a computer?

18        A.   Yeah.  It's on CAGIS maps.

19        Q.   And it's a program?

20        A.   Right.

21        Q.   And this is in color?

22        A.   It is.

23        Q.   You also have a legend with numbers.

24             Are there numbers that you could see

25   if --

1          A.    Uh-huh.  If this was in color, you'd be

2     able to see the 1, 2, and the yellow lines.

3          Q.    And below the map and the legend

4     there's a box that says, Critique Summary,

5     Lessons Learned.

6          A.    Uh-huh.

7          Q.    Can you tell me about that?

8          A.    The purpose of this -- this is a tool

9     for us to be able to look at things we've done

10    and try and figure out how we can improve on

11    them.

12          So on every after-action report we do a

13    self-critique.  And then when you determine what

14    you can do to improve, you put that in here.

15          Q.    Tell me about the critique of this

16    incident.

17          A.    It says -- do you want me to read it?

18          Q.    Sure.

19          A.    Okay.  It says, During the

20    investigation of this incident, it was determined

21    that there had been prior runs to this address

22    with this individual involving psychological

23    issues.

24          This information was not made

25    available to the officers at the time of

62

1    dispatch.

2         While unlikely that this information

3    would have changed the outcome, when this is

4    available, we should work with the Hamilton

5    County Communication Center to make sure that the

6    CAD has the information that's needed to assist

7    officers and dispatchers.

8         Q.   And you wrote that?

9         A.   Uh-huh.

10        Q.   Do you still agree with that?

11        A.   I do.

12        Q.   Do you have any other critiques?

13        A.   No, no.

14        Q.   Do you understand that Deputies

15   Huddleston, Alexander, and Dalid used force on

16   Gary Roell --

17        A.   Yes.

18        Q.   -- and that Mr. Roell died as --

19   following that use of force?

20        A.   Yes.

21        Q.   The coroner ruled the cause of death

22   was excited delirium.

23        A.   Yes.

24        Q.   You're aware?

25        A.   Uh-huh.

63

```
 1        Q.   Do you have any reason to disagree with

 2   that?

 3             MS. SEARS:  Objection.

 4        A.   No.  I'm -- I'm not a coroner or

 5   medical examiner.  No.

 6   BY MS. MARTIN:

 7        Q.   Did anyone follow up with you after you

 8   gave your interview?

 9        A.   Follow up in what way?

10        Q.   As a part of an investigation into the

11   incident?

12        A.   No.  After my interview was completed,

13   that was it.

14        Q.   Well, you filled out the after-action

15   report.

16        A.   Right.

17        Q.   And did you fill out any other

18   reports?

19        A.   I don't think so.

20        Q.   Did you answer any other questions from

21   anyone?

22        A.   No.

23        Q.   Who did you give the after-action

24   report to?

25        A.   The after-action report was presented
```

64

1    in staff.  That's the reason we do these, is we

2    will, like I said, self-critique.

3        Q.    What do you mean, presented in staff?

4        A.    During a staff meeting, when we have an

5    after-action report, the author of that report

6    presents the after-action report.  And we get

7    input as to whether we did things or did not.

8              And if you don't do well, sometimes

9    they can be pretty brutal.

10       Q.    Who's present at you staff meetings?

11       A.    A staff meeting -- these are presented

12   at joint staff meetings.  So this would be

13   sergeants and above from the entire enforcement

14   division and, occasionally, representatives from

15   corrections and core services, as well.

16       Q.    How often are those held?

17       A.    We have four of those a year, the joint

18   staffs.

19       Q.    When was the staff meeting where you

20   presented this after-action report?

21       A.    I don't remember.

22       Q.    Did you present this after-action

23   report in a staff meeting?

24       A.    I did.

25       Q.    Did you determine if Deputies

1    Huddleston, Alexander, and Dalid had identified

2    Gary Roell as an excited delirium subject?

3         A.   I didn't, no.  That investigation was

4    handled by someone else.

5              When there's -- when the use of force

6    results in serious physical harm or death, as a

7    first-line supervisor, we don't do that

8    investigation.

9         Q.   Whose job was it to do that

10   investigation?

11        A.   That would have been our criminal

12   investigation section.

13        Q.   Was that Detective Bohan?

14        A.   Whoever was assigned the criminal

15   investigation section.

16        Q.   Did you consider that question about

17   whether the deputies identified Gary Roell as an

18   excited delirium subject as part of your

19   after-action report?

20        A.   No, because what these are -- are

21   toward our actions and areas that we can improve.

22             Whether or not Mr. Roell was an excited

23   delirium case doesn't change our reaction to a

24   violent encounter.

25        Q.   Do you agree that, as a supervisor, you

66

1    want your officers to identify signs and symptoms

2    of excited delirium?

3              MR. KUNKEL:  Objection as to form.

4              You can answer.

5              THE WITNESS:  Okay.

6        A.    Absolutely.  I want people to be able

7    to recognize it, and I want people to be able to

8    identify it.

9              But you also have to respond to the

10   immediate threats that are there.

11   BY MS. MARTIN:

12        Q.   Were you counseled or disciplined by

13   the Hamilton County Sheriff's Office for your

14   role in the incident with Mr. Roell?

15        A.    No.

16             MS. SEARS:  Objection.

17             THE WITNESS:  Oh.

18             MS. SEARS:  Just give me a second.

19             That's all right.

20   BY MS. MARTIN:

21        Q.   Were you provided any retraining based

22   on the way you handled the incident of

23   Mr. Roell?

24        A.    No.

25        Q.   Are you aware of any policy changes at

67

```
1    Hamilton County Sheriff's Office as a result of
2    the incident with Mr. Roell?
3              MS. SEARS:  Objection.
4         A.   I'm not aware of any.
5    BY MS. MARTIN:
6         Q.   So you've been trained on excited
7    delirium, right?
8         A.   I have.
9         Q.   And you're aware of the symptoms?
10        A.   Uh-huh.
11        Q.   And they can include when a person is
12   aggressive, correct --
13        A.   I'm sorry.  Yes.
14        Q.   -- and combative --
15        A.   Yes.
16        Q.   -- hyperactive --
17        A.   Hyper -- hyperactive, yes.
18        Q.   The person had unexpected strength --
19        A.   Yes.
20        Q.   -- incoherent shouting --
21        A.   Yes.
22        Q.   -- shedding of clothes --
23        A.   Yes.
24        Q.   -- wet from sweat?
25        A.   Yes.
```

68

1       Q.   And you knew prior to

2   August 13th, 2013 that excited delirium is a

3   medical emergency?

4       A.   Yes.

5       Q.   And for that reason, it's important to

6   have EMS ready immediately when you gain control

7   of a person?

8       A.   It's preferred.  But it's not always

9   practical or even possible.

10      Q.   There's training -- slides for a

11  training in Exhibit 2.

12           Did you take this training?

13      A.   Yes.

14      Q.   If you turn to -- there's Bates numbers

15  in the corner here.

16      A.   Okay.

17      Q.   If you turn to 004488, please, the

18  second sentence on this slide that starts with

19  Usually --

20      A.   Uh-huh.

21      Q.   -- do you see that?

22           It says, Usually within minutes of

23  being restrained the victim loses all vitals

24  signs.

25           Did I read that correctly?

1        A.    Yes.

2        Q.    For that reason, it's important to have

3   EMS nearby when you gain control of an excited

4   delirium subject, right?

5        A.    It would be preferred.

6              We -- we have to act on what EMS will

7   do, though.

8              If an excited delirium person is

9   combative -- which by the very nature of excited

10  delirium, oftentimes they're going to be

11  combative.

12             Anyone that's combative -- the life

13  squad will not respond until that person is

14  controlled.

15             The only way you can control somebody

16  that is combative is to restrain them.  So they

17  won't respond, they won't be there until you have

18  them under control.

19       Q.    In order to get EMS nearby, all you

20  have to do is push a button on your radio and

21  call for EMS, right?

22       A.    Right.

23       Q.    So you just move your hand to your

24  shoulder -- your radio is on your shoulder

25  usually -- and you say, EMS requested?

70

```
1          A.    Right.  You request a squad.

2          Q.    And the closer the squad is when you've

3    got the person under control, the better,

4    right?

5          A.    Yes.

6          Q.    In your excited delirium training, did

7    you do any hands-on scenario-based trainings?

8          A.    No, no.  It was web-based.

9          Q.    Were you trained to take a person's

10   mental health into consideration in deciding what

11   level of force to use?

12         A.    If you can, yes.

13               The level of force used is in response

14   to the force used against you.

15               So if you're able to take that into

16   account, you do, if you're not able to, you

17   don't.

18         Q.    And you were trained that you should

19   de-escalate a situation in which a person is

20   having a mental health crisis?

21         A.    Yes.  You're trained to try to do

22   that.

23         Q.    And if a person has excited delirium,

24   it's important to de-escalate, because the person

25   could die, right?
```

1       A.    Right.

2       Q.    Have you ever engaged with a mentally

3    ill subject?

4       A.    Yes.

5       Q.    Approximately how many times?

6       A.    I couldn't even give an estimate; many,

7    many, many times.

8       Q.    You know with a mentally ill person

9    it's important to de-escalate so you don't get

10   hurt, right --

11      A.    Yes.

12      Q.    -- and so the subject doesn't get

13   hurt?

14      A.    Right.

15      Q.    And it's especially important to

16   de-escalate when there's not a gun or a knife or

17   another serious weapon involved, right?

18            MR. KUNKEL:  Objection as to form.

19            Go ahead.  You can answer.

20      A.    De-escalation is important in

21   everything that we do.

22            It's important in mental health issues,

23   it's important in domestic issues, because it

24   does avoid an injury to you or to them.

25            But de-escalation only works if the

72

1   person isn't currently violent.  And you can't --

2   you can't talk someone's fist off of your face.

3           You -- you can only de-escalate someone

4   if they'll allow you to engage in a conversation

5   with them.

6   BY MS. MARTIN:

7       Q.   Your training is that a person's

8   behaviors when they are having a mental health

9   crisis are a result of their medical issue,

10  right?

11      A.   Yes.

12      Q.   And that's why you take that mental

13  illness into account --

14      A.   Yes.

15      Q.   -- in dealing with them?

16      A.   Yes.  When you can, yes.

17      Q.   It's especially important to take time

18  to de-escalate a situation with a mentally ill

19  person when the crime they committed is not a

20  very serious one, right?

21          MS. SEARS:  Objection as to form.

22      A.   I would agree that it's important to

23  take into consideration the totality of the

24  circumstances and all these things.

25          You want to look at what threat this

73

1    person poses to themselves and to others.  And

2    you want to look at if this person is going to

3    hurt themselves or someone else.  And you want to

4    take all that into consideration.

5            If you have to stop this person from

6    potentially hurting themselves or someone else,

7    you may not have time to de-escalate.

8    BY MS. MARTIN:

9        Q.   Do you know what positional

10   asphyxiation is?

11       A.   I do.

12       Q.   What is it?

13       A.   It's when a person is unable to breathe

14   due to their diaphragm not being able to

15   withstand a position that they're put in when

16   restrained.

17       Q.   Do you know some of the things to look

18   out for?

19       A.   Yes.  You don't want someone to spend a

20   lot of time either on their front or back.

21            You know, so you want to get someone

22   into a recovery position once they're restrained.

23       Q.   That's especially true if they're an

24   older person, right?

25            MS. SEARS:  Objection as to form.

74

1      A.   It's true with everyone.

2          Older people, overweight people, are

3   more susceptible to positional asphyxiation.

4   BY MS. MARTIN:

5      Q.   If a person is panicking, that might be

6   a sign that positional asphyxiation is -- is

7   imminent?

8      A.   I don't -- I don't know if panicking

9   would be a sign or not.

10     Q.   A person is struggling to breathe --

11     A.   Yeah.

12     Q.   -- that might be a sign?

13     A.   Yeah.

14     Q.   The person suddenly goes limp?

15     A.   Yes.

16     Q.   If the person is known or suspected to

17  be suffering from excited delirium?

18          MS. SEARS:  Objection.

19     A.   Well, I mean, those are two different

20  things.  Excited delirium and positional asphyxia

21  are not necessarily the same thing, if that's

22  what you're getting at there.

23  BY MS. MARTIN:

24     Q.   One reason for the handcuffing policy

25  at Hamilton County Sheriff's Office to put

1    someone in a recovery position, as you've

2    described it, after they're handcuffed is to

3    avoid positional asphyxiation, right?

4            MS. SEARS:  Objection.

5            Asked and answered.

6       A.   Okay.  Once someone is under control is

7    when we move them into a recovery position, and

8    then you're -- in your -- to avoid positional

9    asphyxiation.

10   BY MS. MARTIN:

11      Q.   Did you talk to Deputies Huddleston,

12   Alexander, and Dalid after the -- the

13   night of August 13th, 2013 about the incident?

14      A.   Yes.  When it was all said and done and

15   the investigation was complete, we talked

16   extensively about it.

17      Q.   When was that?

18      A.   I don't -- it was -- I don't know.  I

19   couldn't tell you anywhere near when it was done.

20           But when we were advised that the

21   investigation was complete, then, yes, I talked

22   to them.

23           They were -- yeah.  They were newer

24   officers.  They were very shaken up.  So I

25   wanted to check on how they were doing.

1      Q.   Where were you when you had this

2  conversation?

3      A.   I talked to them at -- excuse me -- at

4  the district.  I talked to them on the phone.

5      Q.   Did you talk to them all together?

6      A.   I don't think the three of us have ever

7  sat down and talked -- or the four of us, it

8  would be -- have ever sat down and talked at the

9  same time.

10      But I'm sure that I've -- I worked with

11  them.  So I'm sure the two or three of us have

12  sat around or -- I don't know.

13      Q.   So approximately on how many occasions

14  have you discussed the incident?

15      A.   I have no idea.  I mean, I don't

16  know.

17      Q.   More than 5, less than 20?

18      A.   I don't know.  I don't know.

19      We've talked about it.  It's something

20  that would come up relatively often when it

21  was -- when everything was fresh.

22      Q.   Are you friends with them outside of

23  work?

24      A.   No.  I don't socialize with them

25  outside of work or anything like that.

1           I don't dislike them.  We're just

2    not -- I don't hang out with too many police

3    officers outside of work.

4         Q.   Did you have crisis intervention

5    training?

6         A.   Yes.

7         Q.   When did you do that?

8         A.   I think it was in late 2013.

9         Q.   Before or after the incident?

10        A.   It would have been after.

11        Q.   Was it -- did you get that training in

12   response to this incident?

13        A.   No.  It was available.  And they had a

14   spot open for a sergeant, and I volunteered for

15   it.

16        Q.   Who put it on?

17        A.   Liz Atwell was the instructor's -- main

18   instructor's name.  But I can't remember the --

19   all the sponsoring agencies involved.  But

20   Springfield Township Police Department hosted it.

21             And it was a good class.

22        Q.   Was there scenario-based training?

23        A.   There was.  There was scenario-based

24   training.  We went out and spent a day working

25   with the social workers and things like that.

78

```
 1        Q.    Who does Liz Atwell work for?

 2        A.    I don't know, one of the -- one of the

 3   sponsoring organizations.

 4        Q.    Is there anything in those

 5   conversations you had with Deputies Huddleston,

 6   Alexander, and Dalid after the incident -- is

 7   there anything they told you that you haven't

 8   told us about here today?

 9        A.    Just they -- I mean, they were fearful.

10   You know, they were worried that, being new

11   officers, that someone -- that they might be

12   looked at differently.

13              It bothered them that Mr. Roell died.

14   They were -- they were shaken up for it.

15        Q.    They were fearful -- you said they were

16   fearful.  And you're referring to -- about --

17   they were fearful about the way they would be

18   perceived because of this incident?

19        A.    Well, with the investigation that was

20   going on, as a new officer, you're -- you're

21   nervous because you're part of a criminal

22   investigation.

23              I was -- as any officer, you're nervous

24   when you're part of a criminal investigation.  So

25   they were very nervous about that.
```

79

1        Q.   Is there anything else they told you

2    that you haven't told us about?

3        A.   Not that I can think of.

4        Q.   Did you talk to Deputies Huddleston,

5    Alexander, and Dalid after the complaint and this

6    case had been filed?

7        A.   I don't think I have talked to them,

8    except for a brief call to see how they're doing,

9    since -- since this has been filed, because I've

10   been promoted and transferred after that.

11       Q.   So you don't work with them anymore?

12       A.   No.

13       Q.   Did you only work with them for a few

14   days until you were promoted to sergeant?

15       A.   I had worked with them since they had

16   been promoted to patrol division.

17            And then shortly after this incident is

18   when I was promoted.  And that's when I was

19   transferred.

20       Q.   So you stopped working with them in

21   late August 2013?

22       A.   Yes, yes.

23       Q.   How long ago was that that you called

24   them to see if they were okay?

25       A.   I don't know.  I have no idea.

80

 1                    I just remember being surprised that

 2      there was a lawsuit and -- and calling to check

 3      on them and see how they felt.

 4            Q.    How did they feel?

 5            A.    They were shocked, also.

 6                    No one expected a lawsuit to come out

 7      of this.

 8            Q.    Before your 2013 crisis intervention

 9      training, had you had any other crisis

10      intervention training?

11            A.    Just whatever is taught in the academy.

12            Q.    Do you know, on August 13th, 2013, if

13      any officers had crisis intervention training at

14      the Hamilton County Sheriff's Office?

15            A.    The -- are you speaking of the class

16      that I went to, or --

17            Q.    Yes, that type of class.

18            A.    I don't know if anybody else had gone

19      to any of those classes or not.  So, no, I don't

20      know.

21            Q.    Was there any type of team that can be

22      called out for that --

23            A.    No, there's not.

24            Q.    Did you have a mobile crisis team from

25      another agency available to you if you needed

1   one?

2          A.   No.

3          Q.   Did you have a mental health hotline

4   available to you?

5          A.   Are you -- for this incident?

6          Q.   Yeah, on August 13th, 2013.

7          A.   Available to us, no.

8               I mean, there's -- yes, there's

9   hotlines.  But you don't have a chance to call

10  them when someone's fighting with you.

11         Q.   Is there a hotline specifically

12  available to Hamilton County Sheriff's Office

13  employees if they encounter someone with a mental

14  health crisis?

15         A.   It's not specific to just Hamilton

16  County, but there -- there are hotlines you can

17  call -- any police agency can call someone.

18         Q.   You ever utilized one?

19         A.   Yes, I have.

20         Q.   Tell me about that.

21         A.   It was a case in a different part of

22  Sycamore Township, in southern Sycamore Township,

23  where we had frequent runs to a -- to a house.

24              And the family there had asked for

25  help.  And we were able to get them some help.

 1        Q.    What was wrong with the person?

 2        A.    I don't remember the exact diagnosis.

 3   But they were -- it was a mental issue.

 4        Q.    What was the hotline able to do for

 5   you?

 6        A.    They sent somebody out from -- I think

 7   it was mobile crisis or one of those groups to

 8   meet with them.

 9        Q.    Was it a good result?

10        A.    I don't know.  They ended up -- we --

11   we left when mobile crisis took over.  So I don't

12   know how -- how it panned out.

13        Q.    Prior to August 13th, 2013, do you feel

14   that you had all the training you needed from the

15   Hamilton County Sheriff's Office?

16             MS. SEARS:  Objection.

17        A.    I -- I felt that I was trained properly

18   to do my job, yes.

19   BY MS. MARTIN:

20        Q.    Was there ever any training that you've

21   requested before or since August 13th, 2013 that

22   was not provided to you?

23             MS. SEARS:  Objection.

24             You can answer.

25        A.    I don't think I've been turned down for

83

1    any training since then.

2            Is that the -- that's the question

3    you're asking me, is if -- if I've been turned

4    down for any training?

5    BY MS. MARTIN:

6        Q.   Yeah.  I had asked before or since.

7        A.   I'm sure sometime in my career there's

8    been sometime that I was turned down for

9    training.  I don't think I've been turned down

10   for any recently.

11       Q.   What kind of training in your history

12   further back were you turned down for?

13       A.   I'm not sure what -- I'm -- I was --

14   I'm speculating that I have.  I know there's been

15   times when you can put in for something and you

16   don't get it.

17       Q.   Was there a period after 2008 and

18   before Sheriff Neil took office when training was

19   suspended at the Hamilton County Sheriff's

20   Office?

21           MS. SEARS:  Objection.

22       A.   There was a time when training was

23   drastically cut, yes, but -- not suspended, but

24   it was cut.

25   BY MS. MARTIN:

84

1      Q.   When was that?

2      A.   A budget crunch beginning right around

3   2009 when in-service training was shortened.

4      Q.   How did things change then?

5           MS. SEARS:  Objection as to form.

6      A.   We went from a -- five-days of

7   in-service training to two days, sometimes -- and

8   I believe one year we had just one day.

9           That would have been service training

10   for the year.

11   BY MS. MARTIN:

12      Q.   Is it still that way?

13      A.   No, no.  We have an entire week.

14      Q.   When did things change?  Was it after

15   Sheriff Neil took office?

16      A.   It was.

17      Q.   Was it before the August 13th, 2013

18   incident?

19      A.   Well, I'm not sure.  I'd have to look

20   and see when Sheriff Neil was elected and what

21   year that would have been.  I don't know.

22      Q.   How soon after he was elected did the

23   changes -- were the changes made to the

24   training?

25      A.   The very first year that Sheriff Neil

85

1    took office, we had a full week of in-service

2    training out here.

3         Q.   Was it something he instituted as soon

4    as he took office?

5         A.   Well, in-service training is done in

6    the late summer months.  Because you have to

7    schedule it when you're going to have people

8    there to attend it.

9              So in-service training, generally,

10   begins at the end of August, and it runs through

11   November.

12        Q.   You had some letters in your file that

13   were praising you for the way you handled mental

14   health subjects in the past.

15        A.   Uh-huh.

16        Q.   You're familiar with that?

17        A.   I haven't reviewed my file in a long

18   time.  But I've received some letters.

19        Q.   In 2008 you transported a mentally ill

20   person to the psych emergency room department and

21   received a letter from the family thanking you

22   for your service with that?

23        A.   Uh-huh.

24        Q.   Do you recall the details of that

25   incident?

86

```
1        A.   I don't.  I'd have to read it to recall

2   it.

3        Q.   Looks like you had two in 2008.

4             Do you recall that?

5        A.   I know we had one -- there was a

6   suicidal person that I got rescue accommodations

7   for.  And I -- I'd have to -- if you want me to

8   look at it, I can probably remember it.

9        Q.   Sure.  Here, I'll show you, tab

10  2008, 1; 2008, 2.  And then there's 2011 at the

11  bottom.

12       A.   The 2011 was the suicidal -- oh, I

13  remember these vaguely but not -- the 2011 one, I

14  remember pretty detailed.  But the other two, I

15  remember vaguely.

16       Q.   In the 2008 incidents, did you use your

17  training on de-escalating a mental health issue

18  with these people?

19       A.   I don't remember if I had to -- I

20  certainly didn't escalate the situation.

21            I don't remember if I had to

22  de-escalate the situation.  It was more a matter

23  of convincing her to go to the hospital with me.

24            Instead of having to force her, you

25  know, grab ahold of her, I was able to convince
```

1    her to go to the hospital with me, because she

2    wasn't violent or anything like that.

3         Q.   But you had to use special care with

4    these people, right, because they were suffering

5    from a mental illness?

6              MS. SEARS:  Objection as to the form

7         and to the extent he understands it.

8              So go ahead and answer.

9    A.    Yeah.  We -- we always do the best we

10   can to make sure that people are taken care of.

11   BY MS. MARTIN:

12        Q.   Did you utilize a mental hotline or

13   mobile crisis unit with any of these incidents?

14   A.    No.  I didn't have to.  They had family

15   members that were there with them that were able

16   to explain the health problems that the person in

17   crisis was dealing with.

18             MS. MARTIN:  Nothing further.

19                       EXAMINATION

20   BY MS. SEARS:

21        Q.   So you had some conversation with

22   opposing counsel about the mobile crisis unit and

23   the extent to which you've utilized it personally

24   in these instances that you've been involved in.

25        A.   Uh-huh.

1      Q.   Can you tell me what, if any,

2   perspective you have on the use of the mobile

3   crisis unit in the scope of the assisting county

4   agencies with incidents outside the city, inside

5   the county?

6      A.   Right.  There -- mobile crisis is --

7   the primary area where they respond is inside the

8   City of Cincinnati limits.  And they work with

9   teams in the City of Cincinnati to do those

10  things.

11           It's rare to be able to get them to

12  come out to the county.  You can, and in those

13  instances, they're very, very, helpful.  But it's

14  not a resource that's always available to you.

15           Normally, what we have to do is handle

16  the -- handle the situation the best way possible

17  and then transport that person to Deaconess or

18  one of the other psychiatric facilities.

19     Q.   What's your experience with the

20  response time of mobile crisis to a county -- a

21  county call, a call in -- in the scope of your

22  employment, what's your personal experience?

23     A.   It takes quite a bit of time.

24           Like I said, they're generally focusing

25  inside the City of Cincinnati limits and by the

89

1    nature of our contract service, we're spread out,

2    and the -- the township's pretty far.

3            So in order to get them to come, if

4    they're available to come from in the heart of

5    the city to out in Sycamore Township, it's going

6    to maybe be an hour response.

7        Q.   And I thought in response to one of

8    Ms. Martin's questions, you had indicated in the

9    particular case that you recall them responding,

10   they were -- they took over and you left?

11       A.   Right.  This was at the request of the

12   family.  But they just didn't know where to go.

13           So a lot of times people don't know

14   what to do.  They called the police, and we went

15   there.

16           And we were able to get ahold of mobile

17   crisis and hang out with the family until mobile

18   crisis got there to handle the situation.

19       Q.   And so this particular person, were

20   they combative?

21       A.   No.

22       Q.   Were they aggressive?

23       A.   Suicidal, depressed.

24       Q.   So the antithesis of being combative?

25       A.   Right.

1       Q.    More of a depressive affect?

2       A.    Right.

3       Q.    So am I correct then they were not

4   hyperactive?

5       A.    No.

6       Q.    And they were not naked?

7       A.    No.

8       Q.    And did this person charge at anyone,

9   any law enforcement officer?

10      A.    No.

11      Q.    And family was present?

12      A.    Yes.  Yeah, the family was there and

13   knew what was going on.

14      Q.    And then if someone were presenting as

15   combative or aggressive, in that scenario, would

16   you have -- would you have left the scene?

17      A.    No, absolutely not.

18            If -- and if someone was combative or

19   aggressive, we couldn't have called the mobile

20   crisis, either.

21      Q.    Oh, really?  Why?

22      A.    Because they're not going to go in on a

23   combative person.

24            We -- mobile crisis respond --

25   they're -- they're able -- their resources are

91

1   there for us once we've got the situation

2   controlled.

3          If -- if we're called for someone

4   that's out of control and violent, it's our job

5   to get them under control and nonviolent before

6   any of the other resources that could possibly

7   help this person could be used.

8      Q.   And in your experience with the mobile

9   crisis, what kind of resource do they bring to a

10  scene?

11         Let's just say you have someone who is

12  combative and out of control.  You place them

13  into custody and get them under control and you

14  call mobile crisis.

15         What resource do they bring to you at

16  that point that you don't already have?

17     A.   Sometimes they'll -- well, when I

18  worked with them in the city -- because I worked

19  in Over the Rhine for a few years on a task

20  force.  So I worked with them in the city.

21     Q.   Uh-huh.

22     A.   And oftentimes in the city, the mobile

23  crisis was familiar with them.

24     Q.   Familiar with the person?

25     A.   With the individual, yes.

92

1                    And so that was helpful.

2                    In the county, though -- really the

3     only one I can think of is that one I was talking

4     about earlier, where -- and what they brought to

5     the scene there was just someone that was --

6     excuse me -- that was better at talking to this

7     depressed person than I was.

8          Q.    You're not a therapist.

9          A.    Right.

10         Q.    Once you get someone who is combative

11    and aggressive out of control -- in custody and

12    under control -- okay?

13         A.    Uh-huh.

14         Q.    Do you then, as law enforcement, have

15    to determine what in the heck you're going to do

16    with them?

17         A.    Yes.

18         Q.    Is one of your options charging them

19    with a crime?

20         A.    Yes.

21         Q.    And is one of your options taking them

22    for a hospitalization either in lieu of charging

23    them or prior to charging them?

24                    Are those options for you?

25         A.    Those are all options.  And sometimes

93

1    you may do them all.

2              It's -- depending, if we determine that

3    this person -- his actions were the result of a

4    mental illness and he wasn't deliberately trying

5    to hurt someone, that person is probably going to

6    be just given an involuntary admission into the

7    hospital.

8              Sometimes it will be an involuntary

9    admission into the hospital and there will be

10   criminal charges that are filed, also.

11             But, yes, once the person is under

12   control, then you start making that

13   determination.

14             So what do we have?  Do we have a

15   crime, or do we have a medical issue?

16   Q.    And would the EMT be a resource in

17   determining whether there is a medical issue or

18   not?

19   A.    At times.  There have been instances

20   where we had a situation where there was a use of

21   force.  And the EMS got on the scene after we got

22   the person under control.

23             We found out that he was in a diabetic

24   crisis.  And he -- he did not face any charges,

25   you know, because the EMTs were able to explain

94

1   what was going on.

2           When they got him the medicine he

3   needed, he was fine.  So we didn't press any

4   charges on him, even though there had been a use

5   of force.

6       Q.   And even though there was probable

7   cause?

8       A.   Right.

9       Q.   Oh, I know what I was going to ask you.

10          So in terms of mobile crisis or the

11  EMTs, do you order them on scene, or do they have

12  the discretion whether to come on scene and

13  approach a subject?

14      A.   They now have the discretion.  We -- we

15  can't order them into any scene.

16          We can ask for mobile crisis.  And

17  they're not usually very available for us in the

18  county.  And we ask for a squad to respond.

19          But the squad has their rules on when

20  they can approach scene and what type of scenes

21  they're going to go to.

22      Q.   And would you -- would you have any --

23  would you be able to say whether your experience

24  with mobile crisis, the ones you've personally

25  described to us, is that an experience that's

1    known by your coworkers?

2        A.    Not much, because they're not seen in

3    the county very often.  So people don't call

4    them, because they're not -- you don't see them

5    out there.

6            And unless you've worked in the city,

7    you probably don't even know about them.

8        Q.    You indicated you've taken this crisis

9    intervention training, right?

10       A.    Yes, uh-huh.

11       Q.    And was NAMI one of the entities that

12   presented at this training?

13       A.    Yes.

14       Q.    You're familiar with NAMI?

15       A.    I am familiar with NAMI.

16           There were several different

17   organizations that were involved.  I know NAMI

18   was one of them.

19       Q.    Okay.  And then with regard to this

20   training, was excited delirium the topic of the

21   crisis intervention?

22       A.    I don't believe it was.  We went over

23   mostly schizophrenia, other psychoses, and how

24   to -- how to recognize issues and how to talk to

25   people who are having issues and what resources

96

```
1    to reach out to when you're dealing with someone.
2         Q.   And then you had indicated that kind of
3    prior to this incident with Mr. Roell, you
4    experienced roll call or an on-line excited
5    delirium training; is that correct?
6         A.   Yes.
7         Q.   And did you become aware in the excited
8    delirium training that persons in the throes, if
9    you will, of an excited delirium episode do not
10   respond to verbal de-escalation techniques?
11            Were you aware of that?
12        A.   I -- I know that they don't speak
13   coherently.  They don't respond to much of
14   anything.
15        Q.   In terms of -- oh, and anything -- by
16   anything, what do you mean?
17        A.   They don't respond to physical force,
18   verbal force.
19            It's one of the main things of excited
20   delirium, is that just nothing's working on them.
21        Q.   And in your excited delirium training,
22   did you become aware that law enforcement is to
23   get the person physically restrained as soon as
24   possible to end the physicality of the -- the
25   person and the person's physical interaction?
```

1     A.   Yeah.  If this person is violent toward

2     themselves or others, you have to get them

3     restrained right away.

4             And then we get them medical

5     treatment.

6     Q.   In your crisis intervention training

7     that you discussed, the one that NAMI was

8     present, you said you discussed some

9     de-escalation kind of things in that training; is

10    that right?

11    A.   Yeah.

12    Q.   Was there any discussion of this

13    suspension of that sort of technique when the

14    person was combative or violent toward you?

15    A.   Yes.  That's one of the things that

16    they -- they brought up right away:  We want to

17    teach you how to help deal with people in crisis,

18    but you need to be safe, to take care of yourself

19    first.

20            If someone is violent, they're

21    combative, you have to get them restrained.

22            If they're nonviolent and they're just

23    off, or maybe they're screaming but they're not

24    violent, then that's when you can you employ some

25    of the techniques they were teaching us.

1           But if someone is using violence, you

2    have to stop that violence.  You have to counter

3    the force.

4         Q.   And in terms of law enforcement, does

5    law enforcement -- are you trained to wait until

6    someone actually uses force, or are you trained

7    to assess the risk of harm and to prevent harm

8    from happening?

9         A.   We're trained to respond to the threat

10   that is presented to us, that is either presented

11   to us or to someone else.

12           And whatever the threat poses, we -- we

13   do what we have to do to neutralize that threat.

14        Q.   So we've heard some mention of

15   something called the reaction gap, or I'm not

16   sure exactly what the right term is.

17        A.   Reactionary gap.

18        Q.   Reactionary gap.

19           Do you have some -- are you trained in

20   law enforcement not to allow a subject within the

21   reactionary gap?

22        A.   Yes.  And there's several different

23   areas of reactionary gap.

24           The initial encounter with someone, you

25   need to have a good five, six feet between you

1   and that person.

2         If someone's armed with any type of

3   weapon, the reactionary gap is 20 feet.  So --

4         Q.   Depending on the weapon?

5         A.   Depending on if someone has a weapon of

6   any type.

7         For example, a person 20 feet away from

8   you with a knife or rock can hit you with that

9   before you can draw your pistol and fire.

10        So the reactionary gap was different

11  with an armed subject as opposed to someone who

12  is unarmed.

13        Q.   And are these basically split-second

14  assessments that a law enforcement officer must

15  make at the time when you perceive the subject

16  and then evaluate the potential threat?

17        A.   Right.  When you -- when you first

18  encounter someone, you have no idea what you have

19  until you encounter them.  The only way you can

20  figure out if this is a threat or not is to

21  encounter the person.

22        And so once you make that encounter,

23  then you have to make the determination, is this

24  person a threat to me or someone else; and then,

25  am I in the proper placement; and then, take

1    immediate action.

2         And that all has to happen within a

3    split second to prevent someone from getting

4    hurt.

5    Q.   And even if you have -- well, let me

6    ask you this.

7         Let's say you had a fairly extensive

8    relationship and history with someone, not a

9    personal situation, but you're going to the same

10   place for a D&D run about every day of the week

11   and you always find Martha and Fred and they're

12   usually drunk and it's usually blah, blah,

13   whatever it is.  Okay?

14   A.    Right.

15   Q.    Tell me about responding to that

16   situation.

17        Are there some concerns or limitations

18   in assuming too much about a situation that might

19   cause a tactical problem for a law enforcement

20   officer?

21   A.    Well, you can get complacent.  And if

22   you continue to show up at that same house time

23   and time again, and this time you tell your

24   partner, hey, I'll handle this one by myself, and

25   you go in and all of a sudden things blow up on

1    you, maybe this time it's a worse fight than it's

2    ever been before; that's a danger from being

3    complacent.

4             Is that what you meant?

5         Q.   Yes.  I was wondering about -- we've

6    had a lot of conversation about if you had known

7    this and if you had this information and if you

8    had this premises history -- and, in fact, I'll

9    get to your critique in a second.

10            And then I was wondering about the

11   distinction -- or how you as a law enforcement

12   officer maintain your vigilance when you might

13   have information that a situation could blow up

14   on you, like you suggested.

15            So that's what I was wondering about.

16        A.   Yeah.  And it happens.  Sometimes you

17   get complacent.

18        Q.   Is that something that -- that you're

19   trained to guard against?  Or is it something

20   that you train your supervisees or, you know,

21   your young officers to guard against?

22        A.   It's something you are trained to guard

23   against because, again, there's a saying:

24   complacency kills.

25            So it's something that you --

1       Q.   There's a saying that

2    complacency kills?

3       A.   Complacency kills.

4            It is something that you train yourself

5    to guard against.

6            It's something that -- the reasons I

7    was a field training officer for many years was

8    that it kept me sharp.  By training the newer

9    cops, I stayed sharp.

10           And that's -- if you ask a lot of

11   different field training officers, they'll tell

12   you the same thing.  That's why they enjoy field

13   training, because it keeps them sharp.

14      Q.   So for example, in this situation, with

15   regard to Mr. Roell -- and I know you weren't

16   there, so this is a hypothetical.

17           But let's say that you knew Mr. Roell,

18   and you had responded there on a prior occasion,

19   and you were able to speak with him and talk with

20   him and get him to go to the hospital.  All

21   right?

22      A.   Uh-huh.

23      Q.   And then you respond this time to his

24   residence, and he starts running at you.

25           Is there -- is that what you're talking

1    about, some complacency might let him get too

2    close to you before you react to him?

3         A.   No.  In that case, it -- it doesn't

4    matter if I know the person or not.  If someone

5    starts running at me or if someone is posing a

6    threat to me, I'm going to take appropriate

7    action on that.

8              Where the complacency comes in, is if

9    you -- if you have a familiarity with someone

10   because of prior runs --

11        Q.   Uh-huh.

12        A.   -- and you're not prepared for

13   anything, you're not ready for the one part

14   that -- you know, the guy that you've known all

15   these years, all of a sudden, he pulls a knife

16   out.

17        Q.   Yeah.  I was thinking of one example.

18             Fred has a gun this time --

19        A.   Yeah.

20        Q.   -- and never --

21        A.   And never had one in the past.

22             And that's -- that's when complacency

23   gets you.  It's -- you know, reacting to the

24   imminent or the immediate threat, that -- that

25   really doesn't change.

1          It's just not being prepared for the

2     immediate threat that might change.

3          Q.   I see.  Okay.

4               Can we just look at Exhibit 17 --

5     Plaintiff's Exhibit 17?

6          A.   Is that in here?

7          Q.   Yes, it is.

8               This is the incident recall history or

9     report.  I don't know what the term is for it.  I

10    always think of it as a CAD report.  So I didn't

11    know it had another name.

12              You had discussed with Ms. Martin the

13    two requests for EMS.

14         A.   Uh-huh.

15         Q.   On this CAD report, I see one request

16    for EMS at 2:57.

17         A.   9 Paul 31, request EMS.

18         Q.   And then the next is 2:58, looks like

19    the fire unit was dispatched, right?

20         A.   Looks like a fire dispatch at 2:58,

21    yes.

22         Q.   Uh-huh.  And then it looks like the

23    next time there's a fire-related dispatch or

24    entry on this report is at 3:04.

25              And that looks like it was an update --

1     an update, I guess, in response to the CPR in

2     progress --

3          A.    Uh-huh.

4          Q.    -- right?

5          A.    Yes.

6          Q.    Could it be that one of the officers'

7     initial call for EMS was on the east channel, and

8     then called the second time on the county

9     channel?

10         A.    That's possible.

11         Q.    You had both radios with you, you

12    said?

13         A.    I did.

14         Q.    And you'd have both of them -- you'd be

15    keyed in to each channel?

16         A.    I would have one on northeast and one

17    on -- yeah.

18         Q.    That's a bad question.

19               Your answer is right.  My question

20    is -- so you had -- you were listening to both

21    channels simultaneously?

22         A.    Correct.

23               It's also possible that, since EMS had

24    already been requested, that they just didn't

25    make an entry for it.

1     Q.   They didn't dispatch it again.  So

2  that's another possibility.

3     A.   Right.

4     Q.   Okay.

5     A.   Since they had already made a dispatch

6  to that address, a second request for dispatch

7  might -- probably wouldn't generate a second

8  dispatch.

9     Q.   Okay.  Fair enough.  So it could be

10  either of those things?

11     A.   Right.

12     Q.   All right.  And did you later -- you

13  talked with Ms. Martin about who was there when

14  you got there.  Were you aware how -- how

15  Sewall's arrival was in relation to yours at the

16  time?

17     A.   At the time, I didn't know.

18  Afterwards, I learned that he arrived just

19  seconds before I did.

20     Q.   When you arrived on scene, you didn't

21  see him?

22     A.   When I arrived on scene, I did see

23  Officer Sewall.

24     Q.   Oh, when I say on scene -- I meant like

25  when you pulled into the complex.

1     A.   Okay.

2     Q.   I'm sorry.

3     A.   When I think of the scene, I picture

4  myself at the --

5     Q.   Yeah.  I'm sorry.

6     A.   That's okay.

7     Q.   We've had some conversation of being on

8  scene and not really being -- in this case, by

9  the patio area.

10        So I was just using that terminology.

11        Let me re-ask it, because I didn't ask

12  you very well.

13        When you arrived at the condo complex

14  in the front of the complex, before you went

15  around to the back, did you observe

16  Officer -- Deputy Sewall?

17     A.   No.

18     Q.   And did you see a car that you knew was

19  his?

20     A.   There were cars there.  I didn't know

21  whose was whose, though.

22     Q.   And when you got to the back patio

23  area, were you aware at the time that

24  Corporal Gilliland was there?

25     A.   I was not.

1      Q.   Did you later find out that he arrived

2    before you?

3      A.   Yeah.  When I was doing CPR on

4    Mr. Roell, that's when Gilliland came out from

5    inside of the residence.

6          And that was the first time I learned

7    Corporal Gilliland was on scene.

8      Q.   You discussed with Ms. Martin the

9    performance of CPR, right?

10     A.   Yes.

11     Q.   And were you doing chest compressions?

12     A.   Chest compressions, yes.

13     Q.   And can you just describe for me those

14   chest compressions?

15     A.   You place the heel of your hand, two

16   fingers above the xiphoid process, put your other

17   hand on top of your hand, your weight over your

18   hands, straighten your shoulders, and you use the

19   weight of your chest and body to compress the

20   chest two inches, two-and-a-half inches.

21     Q.   And how much do you weigh?

22     A.   About 220 pounds.

23     Q.   And is that CPR process, I guess -- is

24   it a fairly violent process?

25     A.   It is.  It is.

1          I've performed CPR many times on my

2     job.  And it oftentimes it results in broken

3     ribs.

4          Q.   I've heard that you're not doing it

5     right sometimes if you aren't breaking some ribs.

6               Have you heard that?

7          A.   That's what my wife tells me.

8               My wife's an emergency room nurse.  And

9     she says if you -- if you're not breaking ribs,

10    you are not getting a good enough compression.

11         Q.   So you're coming down with your full

12    weight on Mr. Roell's chest?

13         A.   Well, your upper body -- you're

14    straightening your arms out.  And then that way,

15    it lessens fatigue.

16              If you try to push like this, you're

17    going to end up thrusting upwards.  And it's not

18    going to get a good compression, and it's also --

19    you're going to fatigue very fast.

20              So you're taught to get that weight and

21    just let your body push it forward.

22         Q.   You said to Ms. Martin the filling out

23    of what was called a, quote, homicide log; is

24    that right?

25         A.   Yes.

1      Q.   And can you explain to us the term --

2   why you use the term homicide log?

3      A.   Yes.  We use a crime scene log in --

4   almost exclusively in our homicide cases.

5   Homicide and suicide is when we use the crime

6   scene log.

7           We very rarely are going to do the

8   crime scene log for -- for -- sometimes an

9   aggravated robbery we may use one.

10          But it's almost exclusively used for

11   homicides and suicides.  So that's why I refer to

12   it as a homicide log.

13     Q.   And so when you said homicide log

14   instead of crime scene log, the two terms are

15   fairly interchangeable in your -- in your --

16     A.   The two terms are synonymous.

17          It's -- and Deputy Sewall understood

18   exactly I meant when I -- when I said it.

19     Q.   So the use of the word homicide was --

20   you weren't assuming at that point that you had a

21   homicide or someone had purposely killed someone

22   else?

23     A.   Right.  That was just assuming -- and

24   rightfully -- that we had a crime scene that we

25   needed to secure.

 1      Q.   Speaking of that, in your conversation

 2   with Ms. Martin, I got a little confused.

 3           Was -- when -- after Mr. Roell was

 4   taken to -- by the EMTs and after the care of

 5   Mr. Roell was overtaken by the EMTs, you

 6   indicated that you took some steps to make sure

 7   that Officers Dalid -- or Deputies Dalid,

 8   Alexander, and Huddleston were kept from -- from

 9   speaking about the incident; is that correct?

10      A.   Right.

11      Q.   And then you had a conversation with

12   Ms. Martin about the crime scene and securing the

13   crime scene.

14           So I was a little confused.  So let me

15   ask you, was there a time where those three

16   deputies were outside your physical presence?

17   Other than Officer -- Deputy Dalid going to alert

18   the EMTs to the location, was there a time those

19   three men were outside of your presence prior to

20   them being separated and placed in separate

21   cruisers?

22      A.   No, not all three of them.  The only

23   one that was out of my presence was Dalid.  And

24   that was just to go out and locate the squad.

25      Q.   And was that purposeful on your part?

 1       A.   Yes.   That's -- that's why I was

 2    directing all those people to do these things,

 3    because I was keeping them with me.

 4            It wasn't that -- it wasn't that I was

 5    just standing there barking orders.   I was -- the

 6    reason I was directing other people to do

 7    different things was that I wanted them there

 8    with me.

 9       Q.   And I think -- I thought I heard you

10    say to maintain the integrity of the

11    investigation --

12       A.   Yes.

13       Q.   -- the integrity of their statements --

14       A.   That's right.

15       Q.   -- not have them tainted by having some

16    conversations that someone was not aware of --

17       A.   Right.

18       Q.   -- regardless of whether they talked

19    about the incident, right?

20       A.   Well, yeah.   Because what we found in

21    interviewing people is, when three people are

22    involved in the same incident -- or four people

23    involved in the same incident start talking to

24    each other about it, everyone remembers things a

25    little bit differently.

1        And you end up contaminating someone

2   else's memory, and you're telling their story

3   instead of your story.

4        So it's important to keep everybody --

5   and to keep them from talking as much as possible

6   so that everybody is giving their own statement,

7   instead of an accumulation of their statement

8   with their statement with their statement.

9   Q.   So you want their memory, not someone's

10  else's memory?

11  A.   Exactly.

12  Q.   You also responded to Ms. Martin and

13  told her about some conversations that you had

14  with -- a little bit of a conversation you had

15  with them after the incident.

16       When you all three were standing there,

17  they sort of told you some things.  And you

18  related to Ms. Martin what those things were,

19  right?

20  A.   Right.

21  Q.   Prior, though, to coming on scene, you

22  indicated to Ms. Martin you had a -- I guess, a

23  suspicion that you could be dealing with an

24  excited delirium situation.

25       So prior to doing the chest

1   compressions on Mr. Roell, what information did

2   you get, if anything, from the officers about

3   what was happening during that time -- you came

4   around to the patio --

5        A.   Uh-huh.

6        Q.   -- and you were at the patio before you

7   were performing chest compressions?

8        A.   Well, right when I got to the back

9   patio and I said -- the first thing I said is,

10  who's hurt --

11       Q.   Right.

12       A.   -- because of the squad.

13       Q.   Right.

14       A.   And when they began describing injuries

15  and the fact that he had been tased, I look at

16  him and I see that he's naked.  I see that he's

17  wet.  I've got three young, strong police

18  officers who had to struggle mightily with this

19  guy.  He's naked from the waist down.  There's

20  water everywhere.  And they had to tase him, and

21  that didn't have effect.

22       So that's what had me thinking excited

23  delirium.

24       Q.   And, I guess, were you able to sort of

25  survey the whole scene when you were in that

1  patio and take all of those things in as they

2  were -- as they were giving you all this

3  information?

4      A.   Right.  I arrived to a controlled

5  scene.

6           When I got there, Mr. Roell was not --

7  was not mobile at all.  He was lying still.

8           And I was able to take a look around

9  the patio and see the destruction, see the

10  injuries, have them give me a very quick

11  description of what happened, and then make a

12  determination that this could be an excited

13  delirium case.

14      Q.   And at that point, did you know the

15  EMTs were responding?

16      A.   Yes.  I knew the EMTs were responding

17  before I even got at the scene, because they had

18  already been called for twice.

19      Q.   You had some conversation with -- well,

20  you indicated in response to one of Ms. Martin's

21  questions that you -- there was a name that came

22  out over the radio, but it ended up not being the

23  correct name; is that correct?

24      A.   Yes.

25      Q.   And do you recall what name came out

1    over the radio?

2         A.   I didn't have a recollection, but I saw

3    it on here on the CAD printout.

4         Q.   You say on here, you're looking at

5    Exhibit 17?

6         A.   Exhibit 17, yes.

7              I knew it was -- it was a name that

8    ended up being not the right name.

9              They said Gary Royal.

10        Q.   And when you heard that name, did

11   you -- did you recognize that name?

12        A.   No.

13        Q.   And you were responding to

14   10929 Barrington Court, correct?

15        A.   That was the dispatch address, yes.

16        Q.   When you got to the scene of 10929 and

17   10927 Barrington Court, did that scene look

18   familiar to you?  Had you been there before?

19        A.   No.  And even -- those apartment

20   complexes all look extremely similar.  So even if

21   I had been there several times, it would be hard

22   to make it out.

23        Q.   When you say all those complexes, do

24   you mean Barrington Court complexes or do you

25   mean complexes that look like Barrington Court?

1   What do you mean?  --

2      A.   On Hetz Drive there's several different

3   streets, Barrington Court is one of them.  And

4   there's apartment complexes or apartments back

5   there.  And they all look very, very similar, the

6   condos, apartments, yeah.

7      Q.   -- I mean, are they -- I've never been

8   back there.  Are they similar to -- like do they

9   look like they were built by the same builder?

10     A.   Yes.

11     Q.   Oh, okay.

12     A.   The only reason that the name stood out

13  to me on dispatch was because it told us the

14  suspect was known to the victim.

15     Q.   And the fact that the victim and the

16  suspect know each other, is that of significance

17  to the law enforcement officer?

18     A.   It can be.  You've got someone that

19  knows the victim, breaking out their window.

20        So we don't know if this is a domestic

21  situation or a maybe a neighbor trouble that's

22  gone wrong.  You're not sure what's going on.

23        All you know is that someone who is

24  known to the victim is breaking out their window.

25  And the victim is concerned enough that they're

1  calling 911.

2       Q.   If I can have you look at Exhibit 24,

3  which is the missing persons report.  And it may

4  not be in there yet.

5            Do I put it in there?  Yeah.  There it

6  is.

7            You indicated to Ms. Martin you don't

8  independently recall this incident.

9       A.   That's right.

10      Q.   But is it -- is it fair to assume that,

11 because this was a missing persons report, that

12 you never came into contact -- contact with

13 Mr. Roell in this report or its aftermath?

14      A.   It's possible because --

15      Q.   What's possible?

16      A.   It's possible I did not ever meet him.

17           I have the cancellation here.  And it

18 says that on 10/20/09 the victim returned home in

19 good health and is being treated for his mental

20 issues and I cancelled the missing.

21           So that could very well mean that

22 Mrs. Roell called me and told me that he was

23 back, and so I cancelled it.

24           I don't have to physically see him in

25 order to cancel it.

```
 1        Q.    Okay.  And what about in order to take

 2    the report, do you physically have to see

 3    Mrs. Roell to take the report at all, or can that

 4    report be taken over the telephone?

 5        A.    Oh, I would have to see her.  We don't

 6    do reports over the phone.

 7        Q.    And she could have came -- and she

 8    could have come in to see you or you could have

 9    responded to her, you don't recall?

10        A.    That's correct.  I have no idea.

11        Q.    So you don't recall how concerned

12    Mrs. Roell was at the time about her husband?

13        A.    No, I don't.

14        Q.    And the lady sitting to

15    Mr. Gerhardstein's right, the lady right here,

16    that's Mrs. Roell.

17              Do you recognize Mrs. Roell today?

18        A.    I don't, no.  Sorry.  I meet a lot of

19    people.

20        Q.    Let's look at Exhibit 25, which is your

21    after-action report.

22              Are these -- are these after-action

23    reports, are they done routinely?

24        A.    No.  They're done on critical

25    incidents.
```

```
1        Q.   And who determines that -- that one is
2   going to be done?
3        A.   Usually a lieutenant, one of the
4   lieutenants will determine if an after-action
5   should be done.
6        Q.   Did a lieutenant determine that this
7   should be done?
8        A.   I believe it was Lieutenant Daugherty
9   who told me to do this one.
10       Q.   But you're not certain?
11       A.   I am not certain, no.
12            I didn't just decide to do it on my
13  own, though.  I get instructed to do them.
14       Q.   Okay.  In your after-action report and
15  in your analysis of this incident, did you have
16  any criticisms of the tasings that were deployed
17  in this incident with Mr. Roell?
18       A.   No, no criticism at all.
19            I thought that the officers did a good
20  job of moving up and down the use of force
21  spectrum as they were dealing with the struggle
22  of the subject.
23            You know, when Mr. Roell first
24  approached them and they tried the power display,
25  that didn't work.
```

1    But, you know, he started to back down,

2  they thought, so they put the Taser away and went

3  hands-on.  That didn't work.

4    So they used the Taser until that

5  didn't work, and then went back to hands.

6    I thought they did an excellent job

7  of -- of using the tools that they had and the

8  minimal force necessary to get him into custody.

9    Q.   And was it your understanding that when

10  the deputies in this case went hands-on, that

11  they did not use hard hands techniques, that they

12  maintained subject control techniques?

13    A.   It's my understanding that there was

14  not any punches or kicks thrown by the

15  deputies.

16    Q.   And was it your understanding that they

17  chose -- the levels of force they chose, even in

18  the context of your understanding of Mr. Roell

19  striking them -- striking the deputies?

20    A.   Right.  And you really don't choose the

21  level of force.  The level of force is chosen for

22  you by the person resisting.

23    And I thought that they did an

24  excellent job in responding to the force that was

25  being used against them with the proper amount of

122

1    force.

2         Q.   Did you, in your after-action report or

3    in your analysis of this incident, have any

4    criticisms of the subject control techniques that

5    the officers used, to the extent you're aware of

6    what they did?

7         A.   No, no.  I thought that they did

8    everything well.  And once he was in control, was

9    right when I showed up, and that's when we moved

10   him into a recovery position.

11        Q.   And in your after-action report or in

12   your analysis of this incident, were you critical

13   of any decisions that Deputies Huddleston,

14   Alexander, and/or Dalid made in terms of their

15   assessment of the threat, their judgment about

16   what was appropriate, and then the response to

17   it?

18        A.   No.  They responded to a woman calling

19   for help that someone was breaking out windows to

20   her house.  And then they were confronted by

21   someone violently attacking and resisting.

22             They didn't have any options but to do

23   with they did.

24        Q.   In your critique, if I could call your

25   attention to the last page, which I think is

1    Bates 2013.

2         A.   Uh-huh.

3         Q.   You said, It was determined that there

4    had been prior runs to this address range.

5              Where did you get that information?

6         A.   I did not get the information.  Someone

7    else had gotten the information.  And I'm not

8    sure where it was -- I can't tell you right now

9    where I learned it.  But I know that I was told

10   by someone else there had been prior runs there.

11        Q.   What address range was used to make

12   this determination that prior runs had been made,

13   do you know?

14        A.   Mr. Roell's address.

15        Q.   So when you said address range, I

16   got -- I got a little confused.

17             When you said range --

18        A.   It should have just said address.

19        Q.   Oh, so there are two addresses involved

20   in the legend:  10929 Barrington and 10927,

21   Roell's residence, right?

22        A.   Uh-huh.

23        Q.   So when you said address range, did you

24   mean Mr. Roell's address, 10927?

25        A.   Right.  Because that's the information

124

 1   I had gotten was that there had been prior runs

 2   to Mr. Roell's address, apparently through

 3   probate and things like that.

 4           So I should have -- I should have left

 5   the word range off of there.

 6       Q.   Oh, yeah.  This information was not

 7   made available to the officers at the time of the

 8   dispatch; that's correct, right?

 9       A.   That's correct.

10       Q.   And what address were the officers

11   dispatched to?

12       A.   Well, they were dispatched to the

13   victim's address, which was the 10929.

14       Q.   And when you do a premises history, do

15   you know, is that dependant upon the address?

16       A.   It is dependant upon the address, yes.

17       Q.   So if -- let's just say Mrs. Roell had

18   called from 10927 and said that her husband was

19   out of control and she needed some help, and

20   someone ran a premises history, then they -- they

21   would have gotten potential -- a premises history

22   of prior runs to 10927 Barrington?

23       A.   They may -- they may have, either the

24   officer in the car or the dispatcher has much

25   more success doing that.

1    Q.   And in order to run a premises

2  history in this incident, let's say the

3  dispatcher did it, the dispatcher would have to

4  know that Mr. Roell was the person involved and

5  that Mr. Roell's actual address was

6  10927 Barrington?

7    A.   That's right.

8    Q.   And they would have to know that

9  10927 Barrington was -- I guess they didn't have

10  to know.

11         I was thinking they would have to know

12  that the two addresses were in close proximity,

13  but maybe not.

14         Without the information that it was

15  Mr. Roell and that his address was 10927, there

16  would not be a premises history that would be

17  helpful in this incident.

18         Is that -- am I right?

19    A.   Yes.  That would be correct.  Because

20  the person whose windows were being broken called

21  from her house.  So that was the dispatch

22  address, not Mr. Roell's.

23    Q.   And you say, While unlikely this

24  information would have changed the outcome.

25         Now -- now I'm a little -- now that we

1   cleared up the address range part I'm a little

2   confused.

3           Can you tell me what it was that

4   caused you to conclude that a premises history

5   to     Mr. Roell's address, even if it had

6   revealed prior runs for psychological problems,

7   would not have changed the outcome in this

8   particular case?

9       A.   Because even if we had known going in

10  that this was someone that had a history of

11  psychological issues, we still have to respond to

12  the threat at hand today, right now.

13          And the threat and the problem that

14  night was Mr. Roell breaking out windows, acting

15  violent, and confronting our deputies with

16  violence.

17          So even knowing everything, we can't

18  wait for him to get into this house that he's

19  breaking the window out and potentially harm

20  someone there or further harm himself by breaking

21  glass.

22          We don't have the luxury of waiting.

23  We have got to take action right now to stop

24  someone who is acting violent.

25      Q.   So this critique, When the

1    information's available, we should work with

2    Hamilton County Communications to make sure that

3    CAD has the information needed to assist officers

4    and dispatchers.

5              What -- do you have any idea what, I

6    guess, the action plan might be to implement

7    your -- your suggestion that --

8         A.   Yeah.  I've actually talked to some of

9    the court service supervisors about that, and

10   trying to get them to put information into the

11   CAD, get with the communication center when

12   they're on their probate runs and stuff like

13   that.

14             Because that's not always in the radio

15   and it's not always in dispatch.

16        Q.   So with some of the court services

17   folks that might make a probate pink slip run, to

18   enter that into the CAD system for that -- for

19   that premises history?

20        A.   Right.  To have our dispatch have that

21   information, that would be helpful.

22             And like I said, in this instance,

23   I don't think it would have made any

24   difference.

25             But in other instances -- you know,

1  maybe if we get there and right away Mr. Roell

2  stops being violent, then maybe the officers,

3  knowing this information, determine that it's a

4  health issue and not an arrest issue.  That's

5  good information to have.

6          Because there -- you know, we didn't

7  have any other way of getting information about

8  Mr. Roell.  There was no one else to get any

9  information from.

10     Q.   And -- so am I understanding your

11  testimony correctly that it's your understanding

12  that some of this information on someone's

13  psychological well-being or a call to a

14  particular address that sometimes that makes it

15  into CAD or doesn't make it into CAD, or what's

16  your experience with that?

17     A.   Sometimes it can, sometimes it doesn't.

18  It all depends if it goes over the main dispatch

19  channel then they create a detail for it.  You

20  can be what's called code 6, which is an

21  investigation.  That's not a detail.

22          And if the communication center puts

23  you out code 6 to a location and they don't

24  create a detail for it, it wouldn't go into the

25  premises history.

129

1              So the only way that the dispatch would
2     have a premises history is if they created a
3     detail for it.
4              Q.    If dispatch created --
5              A.    If dispatch created a detail for it,
6     yes.
7              Q.    The Hamilton County Communication
8     Center, is it -- is it run by the sheriff?
9              A.    No.
10             Q.    You discussed positional asphyxiation
11    with Ms. Martin.  And I thought I understood you
12    to say -- and I want you to correct me if I'm
13    wrong -- that when attempting to prevent the
14    possibility of positional asphyxiation, that
15    having someone on their side or having them
16    sitting up, would be two positions that would,
17    from your perspective as a law enforcement
18    officer, help to prevent the susceptibility of
19    asphyxiation --
20             A.    That's correct.
21             Q.    -- in that position, right?
22             A.    Yes.
23             Q.    And I thought what you indicated you're
24    trying to avoid is the inability of the diaphragm
25    to expand and contract; is that right?

1      A.   That's correct.

2           MS. SEARS:  Can I just have a second?

3           THE VIDEOGRAPHER:  We're off the

4      record.

5           (Off the record.)

6           THE VIDEOGRAPHER:  We're on the record.

7           MS. SEARS:  Nothing further.

8                FURTHER EXAMINATION

9  BY MS. MARTIN:

10     Q.   In responding to your attorney's

11  questioning, you said that you showed up onto the

12  scene as soon as Mr. Roell was under control?

13     A.   Well, when I showed up to the scene he

14  was under control.

15     Q.   So you don't know how long he had been

16  under control before you arrived at the scene,

17  correct?

18     A.   Not -- I don't have personal knowledge,

19  no.  I just go off of what the officer directives

20  before me said.

21     Q.   You said that you were trying to get

22  information about prior runs to someone's

23  residence into the CAD system, right?

24     A.   No.  I said we had discussed ways to

25  get that done.

1     Q.   When did you discuss that?

2     A.   I don't know the date.  It's -- it was

3  all part of -- we were talking about things that

4  would -- could have been better in this

5  instance.

6     Q.   Had you talked with anyone about

7  doing -- making that improvement in your system

8  before August 13th, 2013?

9     A.   Well, we've talked about making a lot

10 of improvements to our communication center and

11 our CAD system many, many times.

12          There's -- there's things that --

13 that we like that we wish we had and don't have

14 and so there's constant talk about ways to

15 improve it.

16    Q.   Is this specific critique about not

17 having information about prior runs to a

18 residence one that you had prior to

19 August 13th, 2013?

20    A.   Yes.  It's common not to have enough

21 information, whether -- whether because you don't

22 have an address history or the caller doesn't

23 give correct information.

24          MS. MARTIN:  Nothing further.

25          MS. SEARS:  Nothing.

132

```
1              THE REPORTER:  Signature?

2          THE SEARS:  Signature, yeah.

3          THE VIDEOGRAPHER:  We're off the

4    record.

5

6                    _____

7                    SERGEANT MIKAL STEERS

8

9

10                       - - -

11       DEPOSITION ADJOURNED AT 1:56 P.M.   _____

12                       - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

133

```
 1                C E R T I F I C A T E

 2

 3     STATE OF OHIO        :
                            :  SS
 4     COUNTY OF HAMILTON   :

 5             I, Wendy Haehnle, the undersigned, a

 6     duly qualified and commissioned notary public

 7     within and for the State of Ohio, do certify that

 8     before the giving of his deposition, SERGEANT

 9     MIKAL STEERS was by me first duly sworn to depose

10     the truth, the whole truth and nothing but the

11     truth; that the foregoing is the deposition given

12     at said time and place by SERGEANT MIKAL STEERS;

13     that I am neither a relative of nor employee of

14     any of the parties or their counsel, and have no

15     interest whatever in the result of the action.

16             IN WITNESS WHEREOF, I hereunto set my hand

17     and official seal of office at Cincinnati, Ohio,

18     this 26th day of June 2015.

19

20                    _____

21                    Wendy Haehnle
                      Notary Public - State of Ohio
22                    My commission expires September 3, 2017

23

24

25
```

134

1                E R R A T A   S H E E T

2          DEPOSITION OF:  SERGEANT MIKAL STEERS
                  TAKEN:   JUNE 17, 2015
3
    Please make the following corrections to my
4   deposition transcript:

5

6   Page  Line Number          Correction Made

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____        _____
    Witness Signature                    7/17/15
25  Witness Signature                Date