Jayson Alderman

# July 21, 2015

NANCY ROELL

vs.

HAMILTON COUNTY, OHIO/BOARD OF COMMISSIONERS, et al.

Case Number: 1:14-CV-637



513-233-3000
877.233.4403
FAX: 513-233-2310
depo@elitereportingagency.com

www.elitereportingagency.com

```
 1              UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4

 5    _____
                                     )
 6    NANCY ROELL                    )
      as executrix of the estate of  )
 7    GARY L. ROELL, SR.,            )
                                     )
 8         Plaintiff,                )
                                     ) CASE NO.
 9              vs.                   ) 1:14-CV-637
                                     )
10    HAMILTON COUNTY, OHIO/BOARD OF )
      COMMISSIONERS, et al.,          )
11                                   )
           Defendants.               )
12    _____)

13

14

15    Deposition of:  JAYSON ALDERMAN

16    Pursuant to:    Notice

17    Date and Time:  Tuesday, July 21, 2015
                        12:35 p.m.
18    Place:          Office of Hamilton County
                        Prosecuting Attorney
19                    230 East Ninth Street
                      Suite 4000
20                    Cincinnati, Ohio  45202

21    Reporter:       Wendy Haehnle
                      Notary Public - State
22                                    of Ohio

23

24

25
```

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3           For the plaintiff:

 4               Alphonse A. Gerhardstein, Esq.
                    of
 5               Gerhardstein & Branch Co., LPA
                 432 Walnut Street
 6               Suite 400
                 Cincinnati, Ohio  45202
 7               513.621.9100, Ext. 13
                 agerhardstein@gbfirm.com
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1   APPEARANCES OF COUNSEL:

 2

 3       For the defendants:

 4               Jerome A. Kunkel, Esq.
                      and
 5               Pamela J. Sears, Esq.
                      of
 6               Office of Hamilton County
                   Prosecuting Attorney
 7               230 East Ninth Street
                 Suite 4000
 8               Cincinnati, Ohio  45202
                 513.946.3082
 9               pam.sears@hcpros.org
                 jerry.kunkel@hcpros.org
10
                      and
11
                 Linda L. Woeber, Esq.
12                    of
                 Montgomery Rennie & Jonson, LPA
13               36 East Seventh Street
                 Suite 2100
14               Cincinnati, Ohio  45202
                 513.768.5239
15               lwoeber@mrjlaw.com

16

17                         - - -

18

19

20

21

22

23

24

25
```

4

```
1                          I N D E X

2

3   JAYSON ALDERMAN                              PAGE

4       EXAMINATION BY MR. GERHARDSTEIN            5
        EXAMINATION BY MR. KUNKEL                 41
5
        FURTHER EXAMINATION BY MR. GERHARDSTEIN   62
6       FURTHER EXAMINATION BY MS. SEARS          70
        FURTHER EXAMINATION BY MR. GERHARDSTEIN   71
7       FURTHER EXAMINATION BY MS. SEARS          73

8

9   EXHIBITS                    MARKED      REFERENCED

10      PLAINTIFF'S EXHIBIT  17      -           24

11      DEFENDANTS' EXHIBIT   K      -           70
        DEFENDANTS' EXHIBIT   O      -           37
12      DEFENDANTS' EXHIBIT   S      -           38
        DEFENDANTS' EXHIBIT   T     49            -
13      DEFENDANTS' EXHIBIT   U     56           56

14

15                         - - -

16

17

18

19

20

21

22

23

24

25
```

```
 1                    JAYSON ALDERMAN
 2   a witness herein, having been duly sworn, was
 3   examined and deposed as follows:
 4                    EXAMINATION
 5   BY MR. GERHARDSTEIN:
 6        Q.   Thanks for your patience.
 7        A.   No problem.
 8        Q.   I know you had to wait today.  So I
 9   apologize for that.
10             State your full name, please.
11        A.   Jayson Alderman.
12        Q.   And where do you work?
13        A.   I am a police officer with the City of
14   Montgomery, assigned to the Drug Use Reduction
15   Task Force.
16        Q.   When did you start there?
17        A.   Started with Montgomery?
18        Q.   Yeah.
19        A.   2006.
20        Q.   What did you do before that?
21        A.   I -- prior to that, I worked almost two
22   years as a loss prevention manager.  And prior to
23   that for the military intelligence.
24        Q.   What's your highest level of education?
25        A.   I got an associate's degree in college.
```

1          Q.    Where?

2          A.    Central Texas College in -- through the

3     military, through the Air Force.

4          Q.    And what were your duties on

5     August 13th, 2013?

6          A.    Road patrol.

7          Q.    For Montgomery?

8          A.    Yes.

9          Q.    And when you did road patrol, did you

10    have a partner?

11         A.    We have other individuals on that shift

12    that are --

13         Q.    But you're in a cruiser alone?

14         A.    We are solo, correct.

15         Q.    What did you do to get ready for this

16    deposition?

17         A.    I met and reviewed some -- my statement

18    I provided a few days ago.

19              That was about it.

20         Q.    And who did you meet with?

21         A.    Ms. Sears and Mr. Kunkel.

22         Q.    They aren't representing you here

23    today, though, right?

24              MS. SEARS:  We aren't.

25              MR. GERHARDSTEIN:  You said --

```
1              MS. SEARS:  We are not.

2              MR. GERHARDSTEIN:  Oh.

3              MS. SEARS:  Yeah.  Sorry.  I didn't

4      want them to get confused.

5    BY MR. GERHARDSTEIN:

6         Q.   So when -- where did you meet with

7    them?

8         A.   Possibly this room -- prosecutor's

9    office.

10        Q.   Okay.  And what did you say to them and

11   what did they say to you?

12        A.   Basically, just provided my transcribed

13   audio statement that I provided to Hamilton

14   County detectives, as well as my sheet that was

15   given to my lieutenant right after the incident;

16   a pretty quick synopsis of the incident and just

17   kind of what time -- how to meet today, where to

18   meet.

19             I gave them just a quick rundown,

20   basically, nothing different or nothing other

21   than what was already provided in the statement.

22        Q.   The sheet you gave to your lieutenant,

23   was that a handwritten document?

24        A.   No.  It was typed, I believe.

25             MS. SEARS:  Exhibit --
```

1    BY MR. GERHARDSTEIN:

2         Q.   Your incident report?

3         A.   It's not an incident report.  It's just

4    a memo, we'll call it.

5         Q.   Okay.  So let's go back to that day,

6    August 13th, 2013.

7              What happened that caused you to get

8    involved with Mr. Roell?  What was the first

9    thing?

10        A.   We were dispatched for an auto accident

11   on 275 -- Interstate 71 to 275, which was very

12   close to the incident.

13             It was, we'll call it middle of the

14   night.

15             I arrived with my -- the other

16   individual that worked at Montgomery, because it

17   was an auto accident.

18             We're out there on the scene.  A lot of

19   deputies are out there assisting with traffic,

20   because it is in a very bad location.

21             Shortly thereafter -- it was an OVI

22   auto accident.

23             Shortly thereafter, I heard come across

24   the radio -- and I don't remember the exact

25   call -- but burglary or disturbance -- some type

1    of disturbance dispatched to Sycamore Township

2    units to respond to the suspect's residence.

3              We remained there.  They left.  All the

4    sheriffs left, which left just Officer Shreve and

5    myself there on the scene of the auto accident.

6        Q.    Who's Officer Shreve?

7        A.    He's another Montgomery officer.  He

8    was the one handling the auto accident.

9        Q.    Okay.

10       A.    Shortly thereafter, after the deputies

11   arrived on scene, a call came across the radio.

12   And it was something of the nature, officer

13   assistance.  I can't remember the exact dispatch.

14   But it was basically saying that they needed more

15   help.

16             My proximity to the loc -- to the scene

17   was less than a minute, basically just right off

18   Montgomery Road.  I'm right there.  So I

19   responded to their assistance call.

20             When I arrived on scene, I saw their --

21   their cruisers parked out front.  They were

22   unoccupied.

23             So I got on the radio, and I asked,

24   basically, where they were at.  And they -- I

25   can't remember if they stated they were behind

1    the residence.  But I know one of the deputies

2    came out from behind the residence and met with

3    me, and we walked back to where the -- to the

4    back patio where the struggle occurred.

5          Q.   Do you know who came out and met you?

6          A.   I want to say it was Matt Alexander.

7    However, they were fairly new at the time.  And I

8    get him -- Matt Alexander and Joe Huddleston

9    mixed up all the time.

10         Q.   Okay.

11         A.   So I'm not sure which one.

12         Q.   And did they come out to meet you or

13   was he doing something else or --

14         A.   Well, they were on their way -- I don't

15   know if he was doing something else.

16              But when he came around the corner, he

17   met me.  We then turned and were walking back

18   towards the rear of the -- the condo.

19              And I noticed that as -- I believe it

20   was his left hand was bleeding.  And I told him

21   that his hand was bleeding and asked if it was

22   his blood or the suspect's blood.

23              And at that point, he said he didn't

24   know and that the guy was in the back and that he

25   punched one of the deputies in the face.

1          So he kind of escorted me to the back

2    of the residence.

3          Q.   And as you approached the back, was the

4    condo to your left?

5          A.   Yes.

6          Q.   All right.  So you went around to the

7    right?

8          A.   Right, right.  If you're looking at the

9    street, we came around the right.

10          Q.   Yeah.  I got you.

11              Okay.  Go ahead.

12          A.   Small privacy fenced-in area there in

13    the back.

14          Q.   Uh-huh.

15          A.   I immediately noticed that there was

16    some flower pots and items thrown throughout the

17    yard; appeared to be a disturbance.

18              As soon as we rounded that corner --

19    well, when I first arrived on scene, it was

20    obvious that there was a disturbance.  You could

21    see that there were beer cans broken in the

22    parking lot, like glass -- they threw some type

23    of glass jar up against the outside of the

24    building, up higher.

25              I could tell that this oriental grass

12

1   was ripped out and was thrown all over the

2   parking lot, stuffed in mailboxes.  So right away

3   I knew I was obviously in the right spot.

4          So after the deputy met me, we turned

5   around and went to the back.  The suspect was

6   already -- they were -- had him kind of on his

7   side.  They were struggling to keep him on his

8   side.

9          They said that his hands were

10  handcuffed in the front and that he was still

11  fighting and struggling.

12         I immediately noticed that he was nude

13  from the waist down and that there was one deputy

14  on his feet, trying to control his feet.  And the

15  deputy was unable to control his feet and kept

16  kick -- the suspect kept kicking him and pushing

17  him into the privacy fence, the back fence area.

18         So I went over and I held down the

19  right -- right calf, right ankle area.

20         During this time -- so at this point,

21  there has been four officers attempting to

22  control him.  It wasn't turning out very well.

23         There was one in the left front --

24  right front, left leg, right leg.  And we were

25  struggling to keep him on his left side, to keep

1    him off of his stomach.

2            However, he was fighting the entire

3    time.  And -- so it was very hard to keep him off

4    of his stomach, but we were attempting.

5            And I noticed that one of the deputies

6    did call for a life squad during this time.

7            A few seconds, a minute, I'm not sure

8    the exact time frame, the suspect went silent.

9    And the way he was laying, his face was facing to

10   the right, so my side.  I had a direct line of

11   sight to his face.

12           When I turned him to the side, I

13   immediately noticed that his eyes were rolled up

14   in his head, and they were partially open and

15   that he was blue around the mouth, which I

16   immediately told them that his eyes rolled up in

17   his head and his lips were blue.

18           They flipped him to his back and began

19   CPR immediately on him.

20           I left and went around to the front of

21   the building, back towards where the cars were,

22   because it was in kind of a difficult spot to

23   find if you didn't know what you were looking

24   for, because I couldn't find it.  So I went out

25   front to meet the life squad.

14

1          Five minutes later, whenever the life

2   squad arrived moments later, I briefed them, just

3   a real quick rundown on where he was at and what

4   we saw and kind of what they told me, just so

5   they could get the necessary equipment to provide

6   CPR.

7      Q.   How long were you actually with

8   Mr. Roell before you noticed that his eyes had

9   rolled up and that he had gone limp?

10      A.   It was just -- it was minutes.  I don't

11   know the exact time frame.  We're talking almost

12   two years ago.  I'm trying to recall from memory.

13          It was a short -- it was -- I don't

14   think it was a significant -- I don't think it

15   was ten minutes.  It was -- it was a shorter

16   amount of time.

17      Q.   Who was present from the time you got

18   there to the time he went limp, just the other

19   three officers?

20      A.   There was three deputies there.  One

21   was Deputy Dalid, Willy.

22      Q.   Yeah.

23      A.   And then the other two, like I said,

24   was Matt Alexander and Joe Huddleston.  But I get

25   them confused.

15

1        Q.   Did they tell you anything about

2   Mr. Roell's conduct prior to that point?

3        A.   Just to the fact that he punched one of

4   them in the face, as we were walking around the

5   back of the building.

6             But while we were back there,

7   Mr. Roell, the suspect, began -- he kept trying

8   to grab the garden hose.

9        Q.   Right.

10       A.   There was a garden hose, and he kept

11  pulling it out.  And he was saying something

12  along of lines water, I want water, I need water,

13  something along the lines of water.

14            So at this point, they were -- the one

15  deputy -- I believe it was the one on the left --

16  the left shoulder, read him his Miranda rights.

17            So I was just there basically as an

18  assistance officer.  We weren't really talking

19  about the case, because we were still attempting

20  to get him under control.

21       Q.   Did the officer who read him his rights

22  get through the whole Miranda rights?

23       A.   I do believe so.

24       Q.   And what was Mr. Roell's response as

25  the officer read him his rights?

16

```
 1        A.   He was very -- he was mumbling,
 2   rambling on.  You couldn't understand much of his
 3   speech.  He was still very agitated and what I
 4   would call violent at the time.
 5             So he wasn't -- we'll just say he
 6   wasn't compliant.
 7        Q.   He wasn't armed, right?
 8        A.   Not that I observed.
 9        Q.   And would you say he was incoherent?
10        A.   He appeared to be incoherent,
11   correct.
12        Q.   Was he screaming --
13        A.   I don't know if you would call it
14   screaming.
15        Q.   -- or yelling?
16        A.   But it wasn't a normal inside voice.
17             He was very loud.  But I don't know if
18   you would classify it as screaming.
19        Q.   And you heard him say something about
20   water; and what else, if you recall?
21        A.   That's really all I recall.
22        Q.   And did that make any sense to you,
23   whatever he was saying about water?
24        A.   No, because I wasn't there prior.  And
25   I know that there was a garden hose.  And I know,
```

1    at this point -- I mean, I wasn't sure if it was

2    his house or not.  Like I said, I had just

3    arrived on the scene.

4            So I didn't know the events that had

5    led up to that.  I just knew he was -- I want

6    water, I need water, something about water.

7        Q.   And you were holding one of his legs?

8        A.   His right like lower calf, ankle

9    area.

10       Q.   Was that warm to the touch and clammy,

11   sweaty?

12       A.   I mean, I don't recall of any unusual

13   feelings.

14       Q.   He was naked from the waist down?

15       A.   Yes.

16       Q.   Did the officer say anything to

17   Mr. Roell other than to read him his rights?

18       A.   Not that I recall, no, not at that

19   time, not that I recall anyway.

20       Q.   Did you say anything to Mr. Roell,

21   other than what you've told us about?

22       A.   No.

23       Q.   Did you observe any evidence of the

24   deployment of a Taser?

25       A.   I remember seeing Taser barbs.  But I

18

1   cannot recall what side, either on the front or

2   back.  But I do remember -- or recall seeing

3   Taser barbs.

4        Q.   Did you see any aphids on the patio?

5        A.   None stood out to me.  But I wasn't

6   looking, either.

7        Q.   Did the officers tell you whether

8   Mr. Roell had been tased?

9        A.   Honestly, I don't recall.

10            Not prior to the scene.  I mean, after

11   everything was said and done -- I mean, there was

12   so many officers there.  I mean -- so I left.

13            But I don't recall them telling me he

14   was tased.

15        Q.   How long after you got there did

16   someone call EMS?

17        A.   It was very shortly -- as soon as I --

18   I got back there and I assisted and was helping

19   control him.  It was within a minute, maybe two

20   minutes.  It was very quickly.

21        Q.   And how long between the time -- what

22   was Mr. Roell doing at the time that they called

23   EMS?

24        A.   He was -- we were attempting to keep

25   him on his side.  He was still trying to struggle

1   with us, basically, trying to pull his arms and

2   legs away.  And his speech was very incoherent.

3   You couldn't really understand, nor was I paying

4   that close of attention to what he was saying.

5         But, like I said, it did take -- I did

6   have to jump in, because the deputy on the legs

7   could not control his legs.  So, yeah, they

8   obviously were unable to control him with just

9   three individuals.

10     Q.  Were the legs shackled?

11     A.  I don't recall if they were shackled or

12   not.

13     Q.  Did there come a time at all when the

14   legs were shackled?

15     A.  I don't recall.

16     Q.  Prior to that encounter, had you had

17   any experience with people suffering from excited

18   delirium?

19     A.  I have had people that have -- or I've

20   had an individual who possibly exhibited it.  But

21   I don't know for a fact that it was excited

22   delirium.

23     Q.  Tell me about that.

24     A.  It was an individual in Montgomery.

25   His name was Randall Hall, Randy Hall.

20

1          We've -- everyone at Montgomery -- not

2     everyone.  But most every -- all the patrol

3     officers knew Randy Hall from experiences when he

4     was younger.

5          He was a known alcoholic, known drug

6     user, and known to be suicidal.  He had numerous

7     suicidal runs at his house.

8          Well, there had been -- it wasn't a run

9     I was on.  But one of the times they used some

10    type of minor use of force.  And he went into

11    some type of, I believe, cardiac arrest, some

12    type of medical emergency.

13         However, EMS had him -- we're in close

14    proximity to Bethesda North Hospital.  They were

15    able to revive him.

16         So I -- like I said, I know that he's

17    experienced those signs before that people

18    classify as excited delirium.  But I mean, I was

19    never told by a doctor or something that it was

20    excited delirium.

21         Because he was a known alcohol and drug

22    user.

23     Q.   Did you observe him --

24     A.   Randy Hall?

25     Q.   Yeah.

1          A.    Yeah.  I've --

2          Q.    -- go into these signs that you say

3    could be excited delirium?

4          A.    I've seen those symptoms on him before,

5    correct.

6          Q.    So tell me what you consider to be the

7    symptoms of excited delirium.

8          A.    Just paranoia.

9          Q.    Okay.

10          A.    He was very -- like his speech was very

11    incoherent.  He seemed to -- unable to -- like he

12    could not be controlled, not that I ever went

13    hands on with him.  But he would always -- like I

14    said, just, you know, the paranoid, incoherent

15    speech.

16              He's known -- but never -- I wasn't on

17    those runs -- walk down Pfeiffer Road naked.

18              But, like I said, those are runs that I

19    know about just from reading the logs.

20              Because we are very familiar with him.

21    And the chance of us getting dispatched to his

22    house on a daily basis was very high.

23              So it -- I mean, more like the paranoia

24    and stuff.  But like I said, a lot of times it

25    was usually due to alcohol, almost always

1   related.

2       Q.   When you would get dispatched to

3   Mr. Hall's house, would you also ask for EMS to

4   be available?

5       A.   It would depend on the run.  It was

6   required to have two officers respond to his

7   house for any type of run, unless it was more

8   like a theft report or a minor-type report.

9            He lived there with just his mother.  I

10  believe his father lived in California.  So they

11  would always have a lot of domestic-type

12  situations, those type of runs.

13           We would always respond.  But EMS

14  wasn't called initially.  And at no -- I mean,

15  besides the suicidal runs.

16           I never dispatched EMS to have them out

17  there, unless, you know, it was a needed basis.

18      Q.   And in your experience with him, when

19  you saw him and observed him as paranoid and

20  difficult to control, would you have EMS come and

21  stage near you at those situations?

22      A.   No.

23      Q.   Have you been through any training on

24  excited delirium?

25      A.   It's been some time, but yes.

1      Q.    Where?

2      A.    In-house Montgomery.

3      Q.    In your training on excited delirium,

4  what have you been instructed to do with respect

5  to having EMS available to you as you engage with

6  people you suspect of having that?

7            MS. SEARS:  I'm just going to object to

8       this line of questioning.

9            But, obviously, go ahead and answer it.

10           I won't interrupt you again.

11     A.    Typically -- I mean, if you

12  know they're exhibiting some type of medical

13  emergency, you have the EMS there.

14           But a lot of times you don't know that

15  they're exhibiting the excited delirium.  I know

16  there's certain symptoms.  But those symptoms

17  also go hand in hand with drug and alcohol usage.

18           So it's more left up to the officer and

19  just more to be aware that that is a possibility

20  of what could happen.

21           But there is no set protocol to say,

22  you know, if this is what happens, you will have

23  this.

24  BY MR. GERHARDSTEIN:

25     Q.    Take a look at Exhibit 17.

1        A.    In the book here?

2        Q.    Yes.

3              That's the incident recall from

4    dispatch about this incident.  And it appears

5    that you come up at 2:55.

6        A.    Correct.

7        Q.    And that just has -- I see Officer 1,

8    Name, Jayson Alderman.

9        A.    Uh-huh.

10       Q.    Does that -- maybe you know more

11   reading this than I do.  Does that tell us

12   anything about whether you were dispatched then,

13   on scene, en route?

14             What can you tell me about that?

15       A.    I mean, it doesn't -- it doesn't say if

16   it's on scene or not.  But that's probably -- I

17   cannot remember when I got dispatched, because

18   like I said, I was en route and I don't know if I

19   just marked out on the scene.

20             But it's going to be at some point when

21   I keyed up on the radio.

22       Q.    Okay.

23       A.    Like I said, I don't know if -- when I

24   left the auto accident if I said I was en route.

25   Well, that probably -- because a minute later

1  there's another time, so --

2       Q.   Right.

3       A.   -- at 2:56.  And based on my proximity,

4  from the auto accident to the scene was about a

5  minute away.

6       Q.   Okay.  So what would be your typical

7  procedure when you're going to help somebody that

8  you heard about on the radio?  Would you get on

9  the radio and say you're en route?

10      A.   It just depends on the radio traffic.

11           I receive priority traffic.  If it

12  takes priority, I mean, if they're fighting with

13  someone, I don't need to tie up their air time --

14  because someone potentially got hurt or killed --

15  if I'm telling them I'm en route.

16           So if the radio traffic seems to be

17  open, then we would key up and say, we'll be

18  en route, just so other units know how many cars

19  are going, as well as the dispatchers know.

20           But if it's a -- you know, if they're

21  on the air or it seems like they need the air

22  more than I do, then we would just mark out on

23  scene.

24      Q.   But your take, looking at this, is

25  since you're listed twice, 2:55 is probably when

26

1    you were en route and 2:56 is probably when you

2    were on scene; is that fair?

3        A.   Yeah.  I would say at 2:55 was when I

4    keyed up and said I was en route or something

5    along those lines.  And 2:56 was probably on

6    scene or -- but it could also be -- 2:55 could be

7    when I was on scene, and 2:56 when I said, where

8    are they at?

9            Because I know I keyed up and asked

10   that.  Because I don't think it has -- I mean, it

11   could have been the end of the two minutes -- you

12   know, 2:55, closer to 2:56.

13           So, like I said, I -- unfortunately, I

14   would have to listen to the audio to tell you.

15       Q.   Okay.  I see that at 3:02 we have once

16   again that this is Officer 1, Jayson Alderman.

17           I don't know if that helps us.

18       A.   3:02?

19       Q.   Yeah.  I don't know if you can tell

20   anything from that entry or not.

21       A.   No.  Like I said, it -- it's hard to

22   tell.

23       Q.   Now, you say that you were at the side

24   of Mr. Roell when a request was made for EMS,

25   correct?

```
 1        A.    Correct.

 2        Q.    You heard someone get to the radio?

 3        A.    Yes.

 4        Q.    Who was that?

 5        A.    The top left.

 6        Q.    And that was -- was that at your

 7   request or --

 8        A.    Not at my request.  I was solely

 9   assisting.

10        Q.    Okay.  So I see a request, EMS, from an

11   officer labelled 9P31 at 2:57.

12              So that's consistent with you being

13   present in the back, at least with Mr. Roell at

14   2:56; is that fair?

15        A.    Yes.  Like I said, it was shortly

16   thereafter.

17              9P31 would be 9, Paul, 31, which would

18   be Symmes Township.

19        Q.    What did the officer who called for EMS

20   say when he got on the radio?

21        A.    I don't recall.

22        Q.    Prior to the time CPR was initiated,

23   were there periods when Mr. Roell just stopped

24   all resistance, then sort of reactivated again?

25        A.    Not that I recall.
```

28

```
 1              I believe he -- okay.  What I recall
 2   is, he was fighting, he was violent, resisting.
 3   He then went silent, just -- then CPR.
 4              I don't remember any pauses and start
 5   up and stop again.
 6        Q.   Did you ever experience any snoring?
 7        A.   Not that I recall any.
 8        Q.   Did any of the officers indicate to you
 9   that they had experienced him completely calmed
10   down and then get agitated again before you got
11   there?
12        A.   Not that I recall.
13        Q.   Did any of the officers indicate that
14   he had engaged in any snoring before you got
15   there?
16        A.   Not that I recall.
17              Before -- I'm sorry.  Before I got
18   there?
19        Q.   Yeah, yeah.
20        A.   No.  They didn't --
21        Q.   As part of the history of their
22   encounter with him?
23        A.   No.
24        Q.   How did they describe their encounter
25   with him, you know, their experience with him
```

29

1    before you got there?

2           Did they ever relate that to you?

3        A.   Not really.  I mean, they just were

4    going around, like I said -- you know, the blood

5    on the hand, I asked the deputy if it was the

6    suspect's.  And they said they weren't sure and

7    that he punched one of the deputies in the face.

8           That was pretty much my only kind of

9    speaking with them prior -- or, you know, when

10   the incident was going on.  Because it was their

11   case.  I was solely there just to assist.  I just

12   held the foot down to stop that one deputy from

13   getting pushed back into the fence repeatedly.

14          So I just -- I just sat there,

15   basically.  I don't ask questions.  It's just

16   basically --

17      Q.   But you don't recall if that foot had a

18   shackle on it?

19      A.   I don't recall.

20      Q.   Was Mr. Roell in the same position the

21   whole time that you were trying to hold him on

22   the ground?

23      A.   We are trying to keep him in the same

24   position.  Like this is his head and this is his

25   stomach.  We were trying to keep him on his left

1    side.

2            But he kept fighting to go on his left

3    side of his stomach.  So we were trying to keep

4    him up on that left side.  But because of his

5    resistance and rolling around, it was hard to

6    keep him in that same position, other than flip

7    him on the back once he went -- at the time,

8    unconscious, then they flipped him on his back.

9        Q.   Did you talk to any of the other

10   officers about what position you were trying to

11   keep him in?

12       A.   No.

13       Q.   Was there any period when he was on his

14   stomach while you were there?

15       A.   Yeah.  I mean, I wouldn't say directly

16   on his stomach.  But there was times when he was

17   fighting back and forth, which -- I mean, you

18   would -- he -- the suspect under his own power

19   went down on his stomach.  But they were trying

20   to keep him off of his stomach.  So it was very

21   brief periods of time.

22       Q.   How hard were you pressing down on him

23   while you were holding his leg?

24       A.   Not very much.  Because he was actually

25   still pulling his leg up off the ground.  I was

31

1     just -- so he wouldn't kick.

2              I mean, I wasn't trying to pin it to

3     the ground.  It would have been -- he was still

4     lifting it up and sliding it from bending the

5     knee up and down.

6              So it wasn't very -- very hard.

7         Q.   As you observed the officers up on the

8     upper torso, what did you observe with respect to

9     the amount of pressure they were putting on

10    Mr. Roell?

11        A.   It didn't appear to be anything in

12    excess.  It was him -- proper -- not necessarily

13    to keep him on the ground from trying to get up

14    or roll away.

15             I mean, I didn't notice anything that

16    stood out in my mind.

17        Q.   And this exercise of trying to keep him

18    restrained went on for several minutes before

19    EMTs got there, right?

20        A.   Yes.  I mean, once he went unconscious,

21    I went around to the front of the house.

22             So I -- unfortunately, I don't know

23    what occurred when I left the scene and went to

24    the front.

25        Q.   Did you provide any of the CPR?

1      A.  No.

2      Q.  Did you leave Mr. Roell before the EMTs

3  got there or did you leave him after EMTs got

4  there?

5      A.  Well, I left him and went to the front

6  to meet the EMTs to escort them back to the

7  scene.

8      Q.  Tell me about that.  Tell me about what

9  happened when you returned with the EMTs to where

10  Mr. Roell was.

11      A.  I basically -- as soon as I -- or as

12  soon as I turned the corner to the gate and the

13  privacy fence, I basically pointed to -- that's

14  where he was at at this time.

15      Numerous other deputies were arriving

16  on scene, and I walked around in front.

17      You know, there was no other assistance

18  I could have rendered at that time, nor was it my

19  scene.  So I just went out in front and --

20      Q.  And what did you do when you were out

21  front?

22      A.  Basically just stood there.

23      I don't know if the suspect was gone

24  already or not, but at one point, a sergeant came

25  up -- the house, if you're looking at it from the

1    street, the house to the left had the front door

2    open.

3        Q.   Okay.

4        A.   And you could tell -- that was the

5    house that had all the stuff broken out front.

6            So you could kind of -- you could see

7    in the door.  And you could see things were just

8    thrown and everything.  So the sergeant asked

9    myself and another deputy -- I don't know who the

10   deputy was, but we cleared the house.

11           He wanted to go in there and just make

12   sure there were no other victims or individuals

13   needing assistance in there.

14           We went inside the house.  Once it was

15   cleared of all individuals, we backed out.

16           They didn't know who the suspect was.

17   And I sat in my car and ran some license plates

18   out front of the apartment in my computer, in-car

19   computer, and eventually came back with a return.

20           The picture matched the suspect's

21   picture.  And I wrote it down and gave it to one

22   of the sergeants and just said, here's his name.

23           At that point, I went available.

24           I went to the hospital just to see if

25   the deputy up there needed any assistance.  I

1    walked in.  He said he didn't need anything.  I

2    gave him my business card, said, if you need

3    something, give me a call.

4              Then I left there and completely went

5    available from the whole scene.

6         Q.   I see you're listed at 3:02 on

7    Exhibit 17, Bates page 2663, and then again at

8    3:32 and 3:35.

9              Any of those times suggest the time

10   when you helped clear the unit to the left of

11   where the suspect was?

12        A.   I don't recall if I keyed up on the

13   radio or if the deputy keyed up.

14             Like I said, unfortunately, if I

15   listened to the audio, it would make things more

16   clear.  But based off my memory, I mean, I don't

17   remember the exact times.

18        Q.   Tell me what you saw when you went

19   through the unit that you did clear.

20        A.   As soon as we walked in the front door,

21   I want to say the kitchen was off to the right,

22   and the family room/living room area was straight

23   ahead.

24             Basically, the way to describe it is,

25   if it could be torn up, it was torn up.  If it

35

1    could be flipped over, it was flipped over.  The

2    toilets were filled with clothes, the

3    refrigerator/freezer was open.  All the food was

4    thrown throughout the kitchen.

5            Like I said, all the -- clothes just

6    everywhere, table, chairs or something -- I mean,

7    if it was flipped over -- like I said, then we

8    went down to the lower level basement area.

9        Q.    Okay.

10       A.    Okay.  And everything was the same:

11   stairs were completely cluttered.

12           There was one door at the bottom of the

13   steps that was locked.  And the deputy I was with

14   made an announcement, sheriff's department,

15   something along those lines.

16           No one came, so he kicked the door just

17   to make sure there were no victims on the other

18   side of that door.

19           Once that room was secure -- I believe

20   it was a very small room.  I didn't even enter

21   that room.  I think he just looked in there.

22   It's pretty small.

23           Once it was secure in that area, then I

24   left, or, you know, we exited the residence.

25           And at that point, they were starting

1    to put up the yellow crime scene tape, police

2    line, do-not-cross tape.

3        Q.   Did you make any inventory or take any

4    pictures of whatever you saw in that unit?

5        A.   I did not do any of those.

6        Q.   Did you find any people in the unit?

7        A.   No.

8        Q.   Back when you were with Mr. Roell and

9    you noticed that his eyes had rolled back, did

10   you take any vital signs?

11       A.   I did not.

12       Q.   Are you trained in any CPR or that kind

13   of stuff?

14       A.   It's expired.

15       Q.   You said you went up to the hospital?

16       A.   I did.

17       Q.   What happened at the hospital?

18       A.   The suspect was in one of the emergency

19   rooms.  They had the curtain shut.

20            And the deputy that was there -- I just

21   said, hey, just common practice, I know they were

22   involved in a struggle, something like that,

23   just, if you need anything from me, since the

24   hospital is located in the City of Montgomery.

25            He said, nope.

```
 1              I gave him my business card.  I said,
 2   if you need anything, give me a call.  And then I
 3   left.
 4              I was probably not -- there less than
 5   five minutes.
 6        Q.   Did there come a time after that early
 7   morning series of events when you spoke with the
 8   officers about what had happened?
 9        A.   I don't know if it was that day or the
10   next night or one of the, you know, following
11   nights.
12              I don't recall calling them like
13   that -- that night or that day.
14        Q.   So whenever it was, who did you speak
15   to?
16        A.   I don't know.  I think -- I think I
17   gave them that memo, because of -- which, I think
18   I saw it, but I don't know where it went.
19        Q.   Yeah.  It was Defense Exhibit O.
20              MS. SEARS:  S.
21              MR. GERHARDSTEIN:  S?
22              MS. SEARS:  Yeah.
23   BY MR. GERHARDSTEIN:
24        Q.   And you gave whom that memo, one of the
25   officers?
```

38

1    A.    It would have been one of the Sycamore

2    cars.

3          You know, again, two years ago, I don't

4    remember exactly who I met up with.

5    Q.    Okay.  Did you give it to one of the

6    people you had seen at the scene?

7    A.    Yes, yes.  I would say that.  I want

8    to say it was Matt Alexander, but I'm not

9    100 percent positive on that.

10    Q.    And when did you write Exhibit S?

11    A.    That night or early morning, before

12    that shift was over, the night of the incident.

13    Q.    When you gave this to one of the

14    officers a couple days later, did you have

15    occasion just to chat with the officer about what

16    they had experienced?

17    A.    No, other than they said he had passed

18    away.  And I can't remember -- I mean, we were

19    all under the assumption at that time that he was

20    under some kind of narcotic.

21          But, you know, I try not to get into

22    details on these cases like that.

23          But I knew -- I was aware that the

24    suspect did pass away and there was probably

25    going to be an internal investigation, which I

1   try not to, you know, impede those investigations

2   at any point; so just a real quick, you know,

3   this is -- hey, this is what we saw, you know,

4   kind of, that was out of control, or, that was

5   messed up, that kind of stuff, and that we were

6   waiting for the autopsy to come back.

7           Because, like I said, you know, I was

8   under the assumption that he was under some type

9   of alcohol, drugs, or both.

10      Q.   Did you talk to the other officers

11  about Mr. Roell being under the influence of some

12  alcohol, drugs, or both?

13      A.   I mean, other than that brief

14  conversation that we had.  I mean, it wasn't

15  certain.  It was just like, hey, you know, that

16  guy was probably under alcohol or, you know, he

17  was probably high.

18      Q.   And that's the brief conversation you

19  had when you gave them Exhibit S --

20      A.   Right.

21      Q.   -- a couple days later?

22      A.   Yeah.  Because the night at the scene,

23  after everything was said and done, I think there

24  were broken beer bottles out in front of the

25  suspect's residence around a vehicle in the

40

1   parking lot.  They were broken on the pavement.

2       Q.   Did you yourself ever direct any

3   questions or statements to Mr. Roell?

4       A.   Ask him directly?

5       Q.   Yeah.

6       A.   No.

7       Q.   And did Mr. Roell ever direct any

8   statements on comments to you?

9       A.   No.

10      Q.   Your statement in the second paragraph

11  toward the end says, During this time -- it's

12  about three sentences up from --

13      A.   Are you referring to this?

14      Q.   Yeah, under the second -- Exhibit S.

15           During this time, EMS was notified to

16  respond to conduct a medical evaluation on the

17  suspect and to remove the Taser probes.

18           Did I read that correctly, the second

19  paragraph, about three sentences up?

20      A.   That's right.  I mean, yes, that's

21  what's written.

22      Q.   Does that refresh your recollection as

23  to what the purpose of calling EMS was?

24      A.   Again, a medical evaluation, as well as

25  remove Taser probes, that's typical -- that's

1    standard protocol for EMS, at least for

2    Montgomery it is.  I can't speak for other

3    departments -- but to have EMS remove Taser

4    probes.

5            But we are authorized at Montgomery to

6    remove them ourselves, as long as they're not in

7    a sensitive area.

8        Q.   Right.  I'm just getting back --

9        A.   Right.

10       Q.   -- to the call that was made and making

11   sure I know everything you know --

12       A.   Right.

13       Q.   -- about statements made to EMS during

14   that call.

15            Does that help you at all?

16       A.   I mean, it doesn't refresh anything I

17   haven't already said to you.

18            I just know, like I said, that EMS was

19   called right when I got there.

20       Q.   Okay.  All right.

21            MR. GERHARDSTEIN:  I don't have any

22       other questions.  Thank you.

23                    EXAMINATION

24   BY MS. SEARS:

25       Q.   Just following up on Exhibit S.

42

```
 1              I heard you explain to Mr. Gerhardstein
 2    that you weren't sure now, as you sit here today,
 3    whether the probes were in the back area or the
 4    front area, that you observed.
 5         A.   Right.  I don't recall which part of
 6    the body it was in.
 7         Q.   And you had indicated to
 8    Mr. Gerhardstein that the statement, which is
 9    marked as Exhibit S for purposes of these
10    depositions, is a statement that you made in
11    writing to your department during the same shift
12    that you responded to this incident; is that
13    right?
14         A.   Yes.  It was written on the same day.
15         Q.   To the extent that this statement has
16    more detail than you recall today, would you
17    agree with me that the statement is -- is likely
18    more accurate?
19         A.   Yes.
20         Q.   If I could call your attention to that
21    second paragraph that you were just looking at --
22         A.   Yes.
23         Q.   -- with Mr. Gerhardstein.
24              About halfway down it says, Once I
25    arrived and was in the rear -- advised me -- the
```

43

1    rear -- handcuffed and obscenities.

2              In the middle of that it says, he has

3    minor abrasions on his body and Taser probes in

4    his back area.

5              Do you see that?

6         A.   Minor abrasions.  Okay, yes.

7         Q.   Do you see that, in his back area?

8         A.   Upon entering the residence, the

9    subject was laying on his stomach side.

10             Is that what you are referring to?

11        Q.   Right here, this one that starts with

12   probes.

13        A.   Okay.  Yeah.

14        Q.   Do you see where I'm pointing there?

15        A.   Yeah.

16        Q.   That sentence that starts that -- the

17   sentence actually starts the line above that, He

18   had minor abrasions on his body and Taser probes

19   in his back area.

20             Do you see that now?

21        A.   Yes.

22        Q.   You wrote that?

23        A.   Yes.

24        Q.   Okay.  Does that refresh your

25   recollection independently, or just does the

1    document speak for itself?

2         A.   Just the document speaks for itself.

3    Again, it's not bringing back any memories

4    of --

5         Q.   That's fine.

6              In that same paragraph, right after

7    that, There were two deputies trying to hold him

8    down on his upper torso and one deputy trying to

9    hold his legs down.

10              Was that your observation?

11        A.   Yeah.

12        Q.   I held down his right leg to prevent

13   him from getting up and causing more injury to

14   himself.  He kept kicking and yelling that he

15   wanted his neighbor's water and that he did

16   nothing wrong.

17              Do you independently recall him saying

18   he did nothing wrong, or not?

19        A.   No.  Like I said, the thing that stands

20   out to me is about the water.

21        Q.   Okay.  But nevertheless, this statement

22   was written at the time, right?

23        A.   This was written within -- within

24   hours.

25        Q.   Uh-huh.  And it says, We kept trying to

1    keep him on his side to prevent positional

2    asphyxiation.  However, he kept rolling back onto

3    his stomach; is that right?

4         A.   Right.

5         Q.   When he was rolling back onto his

6    stomach, did it appear to you that he was trying

7    to get some leverage to stand up by using his

8    arms or his legs to give him leverage?

9         A.   Yes.

10        Q.   And did it appear to you that the goal

11   at that point, in terms of subject control, is to

12   keep him on the ground and not allow him to get

13   up?

14        A.   Correct.

15        Q.   And you said you were aware at that

16   point, or at least had been told, that he had

17   assaulted a police officer already?

18        A.   Correct.

19        Q.   And that -- would that be an

20   appropriate tactical approach, at that point, to

21   keep the subject on the ground, in your

22   experience?

23        A.   Yes, absolutely.

24        Q.   And have you been trained in positional

25   asphyxiation?

```
 1          A.    We have.

 2          Q.    And is -- one of the goals to prevent

 3    positional asphyxiation is to prevent someone

 4    from being prone, that is, fully on their

 5    stomach --

 6          A.    Right.

 7          Q.    -- for an extended period of time, or

 8    any period of time, correct?  You seek to avoid

 9    it.

10          A.    Yes, yes.  With -- with their hands

11    being -- with them being able to use their hands

12    to keep that pressure off that area.

13                So, yes, they do tell you to try to

14    keep them off their stomach for an extended

15    period of time because of possible

16    asphyxiation.

17          Q.    Asphyxiation?

18          A.    You got it.

19          Q.    Is there a distinction for you between

20    if someone is prone with their hands cuffed

21    behind them, being completely prone, as opposed

22    to having their hands underneath them in a prone

23    position, in terms of the possibility of

24    asphyxiation?

25          A.    Right.  We've always been trained that
```

1    the risk is greater when their hands are in the

2    back.  That way their full body weight is now

3    laying on their chest cavity, where in the front,

4    you know, even if your arms are this way, you

5    still have the opportunity to use your arms to

6    create that distance between the ground and your

7    chest area.

8        Q.   And I know you're on video, but I --

9    this is Mr. Gerhardstein's video.  I don't

10   know the extent in which this may come into

11   evidence.

12        So, for the record, I saw you clasp

13   your hands in front of your chest area --

14        A.   Yeah.

15        Q.   -- and sort of move them forward as if

16   you were raising your torso up using your hands.

17        A.   Correct.  Yes.

18        Q.   Is that the position you've been

19   trained is -- I guess, if you had a preference --

20   not that you prefer either prone position --

21        A.   Okay.

22        Q.   But in terms of prone positions, that

23   second position of having your hands underneath

24   you is less likely to result in asphyxiation?

25        A.   Yes.

1        Q.   We've had some testimony from officers

2    that putting someone prone in order to handcuff

3    them is not an unusual experience.  In fact, it's

4    a manner of handcuffing; is that right?

5        A.   Correct.  It is.

6        Q.   So if you cuff somebody behind their

7    back, would it be your experience or your

8    practice that you try to get them in a recovery

9    position as soon as possible?

10       A.   Yeah.  As soon as we get that

11   individual under control --

12       Q.   Yeah.

13       A.   -- we then try to turn them onto their

14   side in a -- put them in a seated position or put

15   them in the back of a car.

16            But, yeah, we do try to keep them off

17   their chest.

18       Q.   And is it an acceptable recovery

19   position in your department to lay on the side --

20   lay a person on their side?

21       A.   It is.

22       Q.   And then at some point you sit them up

23   and then get them up, right?

24       A.   Correct.

25       Q.   You indicated to Mr. Gerhardstein you

49

1   didn't discuss positional asphyxiation with the

2   other deputies.  It was just -- was it just,

3   that's what you guys were doing, right?

4        A.   Yeah.  It was just unspoken tactics

5   being used.

6             Like I said, we -- you know, that

7   wasn't what they were intending.  That's what it

8   came off to me as what they were trying to do.

9        Q.   And did you say it was taking all four

10  of you to prevent Mr. Roell from rolling over

11  onto his stomach using his legs and arms to -- to

12  attempt to get up?

13       A.   Absolutely.

14            (Deposition Exhibit T was marked for

15            identification.)

16  BY MS. SEARS:

17       Q.   The first couple pages is a summary

18  of -- purports to be by Detective Shawn Cox.

19            Have you ever seen this document

20  before, the first two pages?

21       A.   I have seen it once.

22       Q.   Oh, you have?  Okay.

23            Do you recall when you heard -- did you

24  actually hear Deputy Alexander come on the radio

25  and call for assistance?

```
 1        A.   I don't know if it was

 2   Deputy Alexander.  Again --

 3        Q.   Or whoever you heard, it was --

 4        A.   I heard the deputy come up, yes.

 5        Q.   And could you tell from your hearing of

 6   that deputy's voice that -- whether he was under

 7   any distress or not?  Do you remember having that

 8   sense?

 9        A.   When he made the call for assistance?

10        Q.   Yes.

11        A.   Absolutely.  That is why I left the --

12   the auto accident.

13             Like I said, it wasn't -- it was an OVI

14   auto accident and --

15        Q.   Which is a DUI?

16        A.   A DUI, correct.

17             So it typically requires two officers.

18   But at that point, on that scene, Officer Shreve

19   had everything under control.  The guy was very

20   compliant.  He had just put him in handcuffs.  He

21   was just, basically, waiting for the tow truck to

22   arrive.

23             Based on my experience, you know,

24   listening to the radio eight hours a day, six or

25   seven years at that point, you can tell in
```

 1    someone's voice when -- when they mean it, when

 2    it's just not the normal regular call.

 3             So I immediately knew that it was

 4    something that -- you know, very unusual; wasn't

 5    the routine call, so to speak.

 6        Q.   We don't have the benefit today of the

 7    audio.  I'm sorry.

 8             But in listening to it, the sort of

 9    regular sort of routine stuff seems pretty

10    monotone, kind of emotionless.  There's no

11    emotion in it.

12        A.   Correct.

13        Q.   And the -- the conversation is fairly

14    deliberate, you know --

15        A.   Right.  It's nice and to-the-point.

16        Q.   Yes.

17        A.   Right.

18        Q.   And how would you differentiate that,

19    what you would normally hear, which wouldn't

20    cause you any -- any feeling that you needed to

21    do something quickly, as opposed to what you

22    heard that night?  How would describe that; just

23    sounded different to you?

24        A.   Yeah.  I mean, you could tell

25    adrenaline was pumping.  You could tell that it

52

1    was very chaotic.  It wasn't very monotone.

2            The pace or -- was very rapid.  It

3    wasn't like, you know, hey, I'm on scene, can you

4    have a car on the way?

5            It was more of a, I'm on scene, get me

6    another car.

7            I'm not saying that's what he said.

8        Q.   Yeah.

9        A.   You could just tell that -- that there

10   was definitely some type of distress, some type

11   of assistance needed immediately, right away.

12       Q.   And I again apologize for not having

13   the benefit of it, but I'm just trying to, I

14   guess, get a sense from you.

15       A.   That's fine.

16       Q.   You haven't listened to it, have you?

17       A.   No.

18       Q.   And so you're just testifying from

19   memory?

20       A.   Correct.

21       Q.   And when you said, from listening to

22   the radio eight hours a day, would you have a

23   sense that, because this is part of your job and

24   this is what you do eight hours a day every day,

25   that you would hear something that -- maybe a lay

53

1    person wouldn't necessarily appreciate it?

2         A.    Absolutely.

3               You know, we work with all these

4    deputies, same group all across Hamilton County

5    East, that portion of -- that the county is

6    broken up into.

7               So you understand certain people get

8    more amped up than other people in certain

9    situations.

10              But, you know, no one in our

11   Montgomery/Blue Ash -- you know their voice and

12   you hear them all night, all day long.  You can

13   tell when something's out of the usual.

14        Q.    On the second page of this summary

15   report, Detective Cox says, Officer Alderman

16   entered the residence, it was in disarray, had

17   been flipped over.

18              We've had it described as appearing as

19   if there was intentional destruction.

20              Would you agree with that

21   characterization of the inside the home?

22        A.    One hundred percent intentional.

23        Q.    It appeared to you?

24        A.    Correct.

25        Q.    Now, the next few pages in this exhibit

54

```
 1    appears to be a transcript of your statement?

 2        A.    Yes.

 3        Q.    Have you had an opportunity to look at

 4    that?

 5        A.    One other time, yes.

 6        Q.    Okay.  If you know, did it appear to be

 7    fair and accurate from the --

 8        A.    It did.

 9        Q.    -- from the interview that you gave?

10        A.    That's what I recall.

11        Q.    Nothing jumped out at you like --

12        A.    Nothing jumped out at me.

13        Q.    If you look on page 2 -- pages are on

14    the top there.

15        A.    Yes.

16        Q.    There's an answer and then a -- I see

17    you answer, okay, and then another answer:  He

18    came back.

19              Are you with me?

20        A.    Yes.

21        Q.    Okay.  About, I guess, halfway down

22    here, They were putting the handcuffs, they could

23    only get him in front, as well his legs were

24    already shackled.

25              Do you see that?
```

1      A.   Yes.

2      Q.   Again, was -- well, let me ask you

3  this, because I don't know if we established

4  that.

5           Do you recall how -- do you recall

6  when, in relation to the incident, you gave this

7  interview?

8      A.   It was a few days later.

9      Q.   Okay.  And as we kind of did with

10  Exhibit S, to the extent that this interview

11  contains detail that you don't recall today,

12  would you agree with me that the interview is

13  more likely to be accurate?

14      A.   Absolutely.

15      Q.   But as you sit here today, you don't

16  independently recall the shackling?

17      A.   Correct.

18      Q.   And then if you look down at the bottom

19  answer, the answer you give here, He was -- he

20  was very violent, so I assisted holding his right

21  leg down.

22           That would be your -- that would be

23  your memory; is that right?

24      A.   Correct.

25      Q.   And then on page 3 you're continuing to

1    describe the situation, much like you've

2    described it here today.

3             You said, he was just kind of yelling

4    as I was sitting there holding it for him, you

5    know, he just kept trying to get up.  We were

6    holding him down, he was fighting on the ground.

7    They were trying to keep him on his side to stop

8    positional asphyxiation, but his hands were

9    underneath him.

10            And then a little further down a couple

11   sentences you say, So they were trying to keep

12   him on his side, but like I said, he was

13   fighting, so it was kind of -- kind of hard to

14   keep him in one position.

15            Is that your memory --

16   A.    Yes.

17   Q.    -- as you sit here today?

18            (Deposition Exhibit U was marked for

19            identification.)

20   BY MS. SEARS:

21   Q.    Can you identify what's been marked as

22   Exhibit U for purposes of your deposition?

23   A.    It appears to be my application.

24            MS. SEARS:  Oh, I know what this was.

25            (Inaudible.)

```
 1            I'm sorry, Wendy.
 2            THE WITNESS:  No, you're fine.
 3            MS. SEARS:  I got (inaudible).
 4    BY MS. SEARS:
 5       Q.   I'm sorry.  I interrupted you.
 6            So this is your application for
 7    employment; is that what you said?
 8       A.   It appears to be.
 9       Q.   I'd just like to call your attention
10    down to -- down here where it says, Military
11    Police.
12            Do you see that?
13       A.   Right.
14       Q.   Did you have a top secret security
15    clearance when you were working in the military?
16       A.   I did.
17       Q.   And what did that allow you to do,
18    without telling us any top secrets --
19       A.   It just allowed us to access --
20       Q.   -- because I don't have the clearance?
21            I'm sorry.
22       A.   It allowed us to access and be involved
23    in military operations and military intelligence
24    that the normal individual, without that
25    clearance, was able to hear, understand, or be
```

58

1    present during.

2         Q.   And how is it that you're selected to

3    have that kind of clearance?

4         A.   Based on my career field of being in

5    intelligence, it's required that you do have a

6    top secret security clearance to enter in that

7    career field.

8         Q.   And is there any kind of background

9    checks and all kinds of, I guess, things that you

10   have to comply and be cleared of in order to have

11   this kind of clearance?

12        A.   Yes.  It's very -- very thorough.  It's

13   conducted through the FBI.

14             It started while you were in basic

15   training.  And I know they went back and talked

16   to my kindergarten teacher about me.

17             My mom worked for Milford Schools.

18             That's why -- I mean, they went and

19   talked to neighbors, whatever else they did.  But

20   it was extremely thorough.

21             I had to provide every doctor I've ever

22   seen from birth until the time I applied for it,

23   every dentist, countless number of like

24   neighbors, friends, family, those -- so it was

25   very, very, very detailed.

1          And a lot of people get disqualified

2    from it.

3          Q.   So would it be your understanding that,

4    in order to get this type of clearance, that you

5    would have to exhibit a high integrity and that

6    sort of thing --

7          A.   Correct.

8          Q.   -- character traits for truthfulness --

9          A.   Yes.

10         Q.   -- and honesty and a high integrity?

11         A.   Yes.

12         Q.   Now, you indicated to Mr. Gerhardstein

13   that you were under the impression that Mr. Roell

14   may have suffered from alcohol or some alcohol

15   consumption or narcotics consumption; is that

16   right?

17         A.   Yes.

18         Q.   At some point, did you determine -- did

19   you understand that he actually had a cause of

20   death by the coroner that was determined to be

21   excited delirium?

22         A.   I don't think I heard it called that.

23         Q.   Oh, okay.  At some point, did you come

24   into some information that he was not -- didn't

25   have any narcotics in his system?

1       A.   Yeah, at some point.  I mean, again, I

2  don't remember, could have been a month or two

3  months or six.  I don't recall.

4            But I do remember them saying he had

5  nothing in his system.

6            And what was your reaction to that?

7       A.   I was very surprised.

8       Q.   Why was that?

9       A.   Just based on, you know, being present

10  at the scene, seeing the alcohol bottles, his

11  behavior, his mood, I thought it was indicative

12  of alcohol and drugs.

13      Q.   How long, if you can quantify it, how

14  many seconds elapsed or what time frame was it

15  from the time that you observed Mr. Roell stop

16  struggling to going very still and quiet?

17      A.   Fifteen seconds.  I mean, it was very

18  quickly.

19      Q.   Okay.  And then how much time elapsed

20  from -- when you saw him go silent or still --

21      A.   Correct.

22      Q.   -- did you -- is that when you noticed

23  his lips were blue and you -- was that immediate,

24  or some time elapse?

25      A.   A few seconds.

1      Q.    A few seconds?

2      A.    Right.

3      Q.    How many police officers in your -- in

4  the Montgomery department?

5      A.    Twenty, I believe, 25.

6      Q.    And how big of a community is

7  Montgomery?

8      A.    Five -- roughly five square miles.

9            I believe the sleeping population is

10  10 to 12,000.  That's not counting the daytime

11  population, with the hospital and --

12      Q.    Regarding Exhibit 17 -- you were

13  looking at that with Mr. Gerhardstein -- that's

14  the dispatch recall incident?

15      A.    Oh, yes.

16      Q.    Are you 4NORA32, 4N32?  Is that your

17  unit?

18      A.    That night, 4NORA, 3 is third shift,

19  2 is which beat you run.  We have a north and a

20  south beat.

21      Q.    Is 4 -- is 4NORA32, is that a

22  Montgomery car?

23      A.    It is.

24      Q.    And is that a beat that you run?

25      A.    Yes.

62

1        Q.    So if there is a 4NORA32 on this

2   incident detail, and no other Montgomery car on

3   that detail, that would be your car; is that

4   right?

5        A.    Yes.

6        Q.    Okay.

7             MS. SEARS:  If I could just have a

8        second?

9             (Off the record.)

10            MS. SEARS:  That's all I have right

11       now.

12            I know you can't probably believe

13       that.

14            MR. GERHARDSTEIN:  Yeah.  Okay.

15            A couple more questions.

16                 FURTHER EXAMINATION

17  BY MR. GERHARDSTEIN:

18       Q.    The -- you're still on 17?

19       A.    Yes.

20       Q.    After the indication that you were en

21  route at 2:55 --

22       A.    Okay.

23       Q.    -- there is a broadcast at 2:55, One in

24  CUST; custody I assume?

25            Do you see that one in caps?

```
 1        A.    I'm on the wrong page.

 2              Yes, one in custody.

 3        Q.    And then request, REQ, Units continue.

 4              Do you know what that means?

 5        A.    It appears to me one in custody,

 6   request units continue.

 7              That is typically what I've seen

 8   written on other incident reports.  When the

 9   officer -- when we key up -- any officer keys up

10   and says, we have -- you know, we have one in

11   custody, which means the individual is in

12   custody.

13              Now, it differentiates between each

14   person what you're going to qualify as custody.

15   And then, request two units continue.  We still

16   need more cars, keep them coming

17        Q.    Okay.  And then at 2:56 ACB and BC on

18   east to update.

19              Do you have any clue as to what that

20   means?

21        A.    Yeah.  It appears that, like I said on

22   the other ones, all county broadcast and

23   broadcast on east to update.

24              East would be the Hamilton County East.

25   That's the frequency that that portion of
```

64

1    Hamilton County is on at dispatch.

2           But I don't know --

3    Q.    So update, just like everybody check in

4    to say where they are or --

5    A.    That -- I mean, that seems like it's

6    more -- I mean, ACB is an all-county broadcast,

7    which typically an officer-needs-assistance type

8    of call, that they put it out to all.

9           But where it says, to update, I mean,

10   that looks like it might be something the com

11   center would put on their records, but not

12   broadcast over the radio.  So --

13   Q.    Okay.  So that doesn't tell us

14   anything about the content of the all-county

15   broadcast?

16   A.    No.

17   Q.    All right.  And then at 9:57 --

18   A.    9:57.

19   Q.    9S32 ADV to slow units.

20          MS. SEARS:  2:57.

21   A.    2:57.

22   BY MR. GERHARDSTEIN:

23   Q.    I'm sorry -- 2:57.

24   A.    Yeah.  9S32 would 9, Sam, 32, which

25   would be the northern Sycamore Township car.

65

```
1          Q.   So that's one of the sheriff
2     deputies?
3          A.   It's a sheriff, yes.
4               It's, advise to slow units.
5               Since the one above it where it says
6     request units to continue -- typically, they
7     indicate that when they want the cars to still
8     come, but possibly not going lights and sirens
9     or not going as fast.  Slow down -- keep
10    coming, but, you know, take a little bit more
11    time.
12         Q.   And then that same message goes as an
13    all-county bulletin at 2:57?
14         A.   That's what it appears.
15         Q.   Okay.  You mentioned that while you
16    were present with Mr. Roell before he went limp,
17    he was struggling.  And you talked something
18    about using his arms as leverage.
19              Was he having any difficulty
20    breathing?
21         A.   It didn't appear, because he was very
22    vocal.
23         Q.   And as he struggled, was he talking
24    about water and these other sort of disjointed
25    statements?
```

66

```
 1          A.   Right.  I mean, like I said, I keyed
 2     in -- I remember about the water.
 3               But, basically, he didn't shut up until
 4     he went silent.
 5          Q.   Was he reaching for the -- trying to
 6     reach for this hose?
 7          A.   He -- I mean, with his hands --
 8          Q.   Yeah.
 9          A.   -- they were handcuffed.  I mean, he
10     was going -- and it appears to me -- because the
11     hose was a foot away, a few inches away, two feet
12     away.
13               It was kind of, I'm going that way,
14     but, I mean, it appeared to me he was looking for
15     water.  But he could have also been up here, you
16     know, using his hands as leverage to get up.
17     But --
18          Q.   You mentioned you found some beer
19     bottles.  Were they cans or bottles?
20          A.   They were glass bottles.
21          Q.   And were they broken?
22          A.   Yes.
23          Q.   And where were they located?
24          A.   Out in the parking lot.
25               If you exit the suspect's residence and
```

1    walk straight down the path like into the parking

2    lot where the cars were, they were right around a

3    car parked.  And I want to say -- I can't

4    remember.  But I think it was his car that they

5    were broken around.

6        Q.   About how many?

7        A.   I don't recall.  I remember at least

8    seeing one.

9            MS. ROELL:  Probably not.  He used

10       cans.

11   BY MR. GERHARDSTEIN:

12       Q.   Do you know what type of beer it was?

13       A.   I don't recall.

14       Q.   So you saw at least one broken beer

15   bottle?

16       A.   There was a broken beer bottle.

17       Q.   Was it broken on the car or on the

18   asphalt near the car?

19       A.   On the asphalt.

20       Q.   Did you see any beer bottles in the

21   unit?

22       A.   Not that I -- I mean, I, again, wasn't

23   looking for beer bottles.

24            We were primarily focused on people.

25       Q.   Were there any broken bottles in the

68

1    unit?

2         A.    Again, I don't know.

3         Q.    You mentioned that in the unit, you

4    thought it was 100 percent intentional

5    destruction.

6               Do you recall that testimony?

7         A.    It appeared to be.

8         Q.    So you weren't present when the

9    destruction was occurring, right?

10        A.    No.

11        Q.    So if he was delusional and disturbing

12   his own property in a delusional state, you have

13   no idea whether that was the motivation for

14   disturbing his property or not, right?

15        A.    No.  But it would still be intentional

16   if you're --

17        Q.    Well, what do you mean by intentional?

18        A.    I mean, I've been in houses before.

19   Like I said, I live in a house.

20              His things were, you know -- a typical

21   person doesn't stuff a toilet full of clothes.

22   They typically don't throw everything out of the

23   refrigerator and freezer.

24              And like I said, it appeared to be

25   intentional.  It did not appear to be any type of

1    burglary or anything of that nature.  Because

2    I've responded to burglaries and I've watched

3    enough TV, where I've never seen a burglar throw

4    your clothes into a toilet.

5              So just based on my life experiences

6    and my professional experiences, it appeared to

7    be intentional.

8         Q.   Okay.  But that -- that conclusion of

9    yours doesn't say anything about his mental

10   state --

11        A.   Yeah.

12        Q.   -- right?

13        A.   Right.

14        Q.   Okay.  And all those houses you've been

15   in, it's pretty rare to see the level of

16   disturbance that you saw in this house, right?

17        A.   Correct.

18        Q.   You may have testified to this and I

19   just don't remember.

20              After he went limp, did you witness a

21   second call to EMT or not?

22        A.   I want to say I heard them say, step it

23   up, or something along those lines, which is

24   typically the slang for, have EMS respond a

25   little quicker.

70

```
1              It's just to let them know that they're
2    needed.  It's not more of a routine call, it's,
3    we need you here now.
4         Q.   But you're not sure?
5         A.   Not 100 percent positive.
6         Q.   So do you have a recollection of a
7    second call to the EMT?
8         A.   Well, I remember -- I remember
9    someone -- the front left -- deputy on the front
10   left shoulder --
11        Q.   Okay.
12        A.   -- front top left shoulder saying that
13   CPR is in progress.
14             And, again, I don't remember if they
15   said, step it up.  But I do remember the, CPR in
16   progress.
17        Q.   And you heard that being broadcasted?
18        A.   Yes.
19             MR. GERHARDSTEIN:  I don't have
20        anything else.
21                    FURTHER EXAMINATION
22   BY MS. SEARS:
23        Q.   I just want to show you what was marked
24   as Exhibit K in a prior deposition.  And I don't
25   want to ask you questions about all these
```

71

1    pictures.  But I would like to show you

2    Exhibit K, starting with -- do you see that

3    little number at the bottom there?

4         A.   I do, yeah.

5         Q.   50 through -- pictures 50 through 87.

6    If you don't mind, just sort of rifle through

7    those. And then after you've done that, I just

8    want to ask you some questions.

9              MS. SEARS:  So 50 through 87, Al.  Can

10        you see that little number in the corner?

11   BY MS. SEARS:

12        Q.   Do those pictures accurately and fairly

13   depict what you saw, what you described to Mr.

14   Gerhardstein and me today --

15        A.   Yes.

16        Q.   -- about the interior of the condo?

17        A.   Yes.

18             MS. SEARS:  That's all.

19                  FURTHER EXAMINATION

20   BY MR. GERHARDSTEIN:

21        Q.   There were no beer bottles in those

22   pictures, right?

23        A.   I wasn't looking.  But there was a

24   bar --

25        Q.   Yeah.

```
 1        A.   -- in the pictures.  But I wasn't --
 2   I've seen numerous bottles of alcohol.  I've not
 3   come across signs of a beer bottle.
 4        Q.   Right.  And then if you look at
 5   Exhibit 30 -- in that same exhibit, pictures 39,
 6   40, I see that is an object near the car.  But
 7   that doesn't appear to be a beer bottle, right?
 8        A.   Unfortunately I'm --
 9        Q.   You can see it better in 50 -- or 40.
10        A.   Yeah.  I don't -- I don't know what
11   that is.
12        Q.   Okay, and then at 41 and 42, that
13   doesn't appear -- and it's bigger in 43.
14             That's some sort of hot sauce or
15   something, right?
16        A.   Number 7 is what I was referring to --
17   or item --
18        Q.   Yeah.  You can look at picture -- yeah,
19   43; looks like a sauce of some kind.
20        A.   It was -- there -- at the rear end of
21   the car, there was a glass bottle.
22        Q.   All right.  But it wasn't a beer
23   bottle?
24             MS. ROELL:  Hot sauce of some kind,
25        mustard.
```

73

 1    BY MR. GERHARDSTEIN:

 2         Q.   In fact -- yeah, if you look at 44, you

 3    can see the labels.

 4         A.   Okay.  Yeah.  It appears to be a --

 5         Q.   All right.  Well, it says mustard on

 6    the label, right?

 7         A.   Yes.

 8         Q.   And that's what you were thinking of?

 9         A.   That's what I was referring to.  The

10    rear of the car, I knew there was a glass

11    container broken.

12         Q.   All right.  And that's not a beer

13    bottle, right?

14         A.   No.

15         Q.   Is that correct?

16         A.   It -- yeah.  I mean, it's -- that's not

17    a beer bottle.

18         Q.   Okay.

19              MR. GERHARDSTEIN:  All right.  I don't

20         have anything else.

21                    FURTHER EXAMINATION

22    BY MS. SEARS:

23         Q.   At the time of incident, that's what

24    you thought it was, though, right?

25         A.   That's what I thought, correct.

74

1      MS. SEARS:  Okay.

2      MR. GERHARDSTEIN:  All right.  I don't

3   have any more.

4

5                  _____

                   JAYSON ALDERMAN
6

7                       - - -

8

      DEPOSITION ADJOURNED AT 1:54 P.M.
9
                        - - -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

75

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF OHIO        :
                            :  SS
 4     COUNTY OF HAMILTON   :

 5              I, Wendy Haehnle, the undersigned, a

 6     duly qualified and commissioned notary public

 7     within and for the State of Ohio, do certify that

 8     before the giving of his deposition, JAYSON

 9     ALDERMAN was by me first duly sworn to depose the

10     truth, the whole truth and nothing but the truth;

11     that the foregoing is the deposition given at

12     said time and place by JAYSON ALDERMAN; that I am

13     neither a relative of nor employee of any of the

14     parties or their counsel, and have no interest

15     whatever in the result of the action; that I am

16     not, nor is the court reporting firm with which I

17     am affiliated, under a contract as defined in

18     Civil Rule 28(D).

19              IN WITNESS WHEREOF, I hereunto set my hand

20     and official seal of office at Cincinnati, Ohio,

21     this 31st day of July 2015.

22

23

24     _____
       Wendy Haehnle
       Notary Public - State of Ohio
25     My commission expires September 3, 2017
```



7733 Beechmont Avenue, Suite 100
Cincinnati, Ohio 45255
www.elitereportingagency.com
depo@elitereportingagency.com
877.233.4403 (toll free)
513.233.3000 (office)
513.233.2310 (fax)

February 17, 2016

In    Craig Short, Officer Jayson Alderman, Lt. Jay Gramke
Re:    Nancy Roell, as executrix of the estate of Gary L. Roell, Sr. v. Hamilton County, Ohio/Board of
       Commissioners, et al.


Linda L. Woeber, Esq.
Montgomery Rennie & Jonson, LPA
36 East Seventh Street, Suite 2100
Cincinnati, Ohio 45202

Re: Depositions of Craig Short and Jayson Alderman
July 21, 2015
Nancy Roell v. Hamilton County, Ohio/Board of County Commissioners, et al.

Dear Ms. Woeber:

This letter is to inform you that as of today, Craig Short and Jayson Alderman have not returned the original signature page and errata sheet from their depositions taken on July 21, 2015 within 30 days as required by Rule 30(e) of the Federal Rules of Civil Procedure.

Pursuant to this rule, the original deposition transcript may be used as fully as if it were a signed transcript.

*Brenda Keyser*

Brenda Keyser - Notary Public - State of Ohio
My Commission Expires: September 21, 2017

No. 106865
Enclosures

cc:
Alphonse A. Gerhardstein, Esq.
R. Douglas Miller, Esq.
Jerome A. Kunkel, Esq.
Pamela J. Sears, Esq.