**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Nancy Roell,                          )
                                      )
                    Plaintiff,        )   Case No. 1:14-CV-637
                                      )
         vs.                          )
                                      )
Hamilton County Board of              )
County Commissioners, <u>et al.</u>, )
                                      )
                    Defendants.       )

O R D E R

This matter is before the Court on the motion to dismiss and/or for summary judgment filed by Defendants Matthew Alexander, Joseph Huddleston, Willy Dalid, Jim Neil, and Hamilton County, Ohio/Board of County Commissioners (Doc. No. 103) and Plaintiff Nancy Roell's motion to strike (Doc. No. 135).  For the reasons that follow, Defendants' motion to dismiss and/or for summary judgment is **GRANTED IN PART AND MOOT IN PART**.  Plaintiff's motion to strike is **MOOT.**

I. <u>Background</u>

Gary Roell suffered from schizoaffective disorder for many years.  He particularly suffered from paranoid delusions that his wife, Plaintiff Nancy Roell, was having extra-marital affairs with other men.  Roell had been involuntarily hospitalized multiple times and on two separate occasions physically assaulted complete strangers whom he believed were having affairs with Nancy.  Roell evidently did well while on psychotropic medications but he also had a history of non-compliance with his regimen leading to decompensation. Roell Dep. (Doc. No. 98), at 72-73, 81

1

In early June 2013, Roell stopped taking his medication again.  Id. at 229.  He began exhibiting signs of decompensation by early August 2013.  Id.  Nevertheless, on or around August 10, 2013, Nancy left town to participate in a church mission in New Jersey.  Id. at 231, 260.  Roell stayed behind by himself.  Id. at 234-36.  Sometime in the late evening hours of August 12 or the early morning hours of August 13, Roell entered into a state of excited delirium[1] and literally went berserk.  Doc. Nos. 77-4, 77-5, 77-6, 77-7.    In the kitchen of the Roells' condominium, Roell pulled food from the refrigerator and scattered it about everywhere.  He evidently carried potting soil into the kitchen and threw it about floor and counters and even put dirt in the microwave.  Roell scattered more dirt around the living room and pulled curtains from windows.  He went out to the patio area and pulled a garden hose into the living room.  He threw clothes and what appears to be trash all up and down the staircase leading upstairs and the staircase leading to the basement.  Roell scattered furniture and other items all around the basement.  Doc. No. 77-6.  He dumped and scattered food and household supplies throughout the utility room.  In one of the bathrooms, Roell stuffed the toilet and sink with toiletries and other items.  He stuffed clothes into the bath tub and scattered clothes throughout the bedrooms.  Doc. No. 77-7,

---

[1]The Eleventh Circuit has provided a comprehensive explanation of excited delirium:

> "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1299 n.4 (11th Cir. 2009).

2

at 1-12; Doc. No. 77-7, at 19-23.  Roell also scattered furniture, dirt, and garden hoses around the patio of his condominium.

At some point, Roell went out the front door where he apparently pulled a screen from the window.  He turned on the water faucet and left it running.  Roell threw cards from board games all around the condominium and in the parking lot. He stuffed more debris into a basement window well and threw mulch and mud against the side of building.  Roell put plant debris and soil in his neighbors' mailboxes.

At around 2:45 a.m. Roell went to the condominium of his neighbor, Rachana Agarwal, where he apparently ripped her doorbell and front porch light from the wall.  Roell then proceeded to the enclosed patio area of Agarwal's condominium at the rear of the building.  There, he picked up a flower pot and threw it through the dining room window.

Agarwal was awakened by the breaking window.  When she came downstairs, Roell was standing outside by the broken window.  Agarwal said that she asked Roell what was going on and he responded by saying, "Water, water, water."  She asked Roell again what was going on and he began trying to pull the curtain out through the broken window.  He then pulled the screen from the window and threw it at her.  At that point, Agarwal became scared, ran back inside, and told her son, Soham, to call 911.  Agarwal testified that all during this time Roell appeared to be angry, his face was red and his eyes were bulging, and he kept muttering unintelligible things about water.  Agarwal said that after she went back inside, Roell kept pacing back and forth in front of the broken window.  Periodically, he would look in through the broken window.

Agarwal told the 911 operator that her neighbor was "acting crazy."  The operator dispatched Hamilton County Sheriff's Deputies Matthew Alexander, Joseph Huddleston,

3

and Willy Dalid to the scene as a "neighbor trouble" call.  Huddleston Dep. (Doc. No. 77) at 58.  Alexander and Hamilton were working a motor vehicle accident together when the call came in and arrived at Agarwal's condominium at the same time.  Dalid was at the same location and arrived just after Huddleston and Alexander.

Agarwal met Alexander and Huddleston at the front door.  Huddleston asked Agarwal, "Where is he, what is he wearing?" and she responded, "He's in the back breaking things." Id. Huddleston and Alexander ran to the back of the building.  They both entered the enclosed and gated patio area and saw Roell standing by the broken window with a garden hose with a metal spray nozzle in one hand and the remnants of a hanging basket in the other.  Roell was wearing a T-shirt but was otherwise naked from the waist down. Huddleston Dep. (Doc. No. 77) at 65-66.  Huddleston testified that he entered the gate and asked Roell what he was doing.  Huddleston said that Roell immediately turned and approached him and Alexander in an aggressive manner.  Roell still had the hose and the garden basket in his hands. Id. at 67.

Alexander testified that Rachana Agarwal was "panicked" when the deputies made contact with her.  She directed the deputies to the rear of the condominium where they encountered Roell, half-naked, standing near the broken window.  Alexander testified that Roell was screaming "No" and something about water.  Dep. (Doc. No. 78) at 15-18. Alexander said that he and Huddleston told Roell to "show us your hands" and that Roell, "immediately, within seconds,"charged at them. Id. at 18.

Soham Agarwal was watching the events unfold from inside the house. Soham heard Roell screaming about "he didn't have water and we had water." S. Agarwal Dep. (Doc. No. 91), at 27.  Soham remembered that the deputies told Roell to calm down, to

4

stop resisting, to come over to them, and to drop whatever he had in his hands. Id. at 20. Roell kept saying that he did not have a weapon. Id. Soham, however, testified that as Roell approached the deputies, he was swinging the hose like he was trying to hit someone with it. Id. at 32; 50-51. Soham then heard what he recognized as a taser being activated and then there was "some commotion" and "some shouting" that he could not quite make out because it was too dark. Id. at 20.

Rachana Agarwal also watched from inside the house. She confirmed that the deputies told Roell to calm down, and that Roell had the hose in his hand and was swinging the nozzle around at the deputies. R. Agarwal Dep. (Doc. No. 90) at 38-42. Rachana said that the deputies and Roell approached each other, but that Roell was proceeding at somewhere between a walk and a sprint toward the deputies with the hose in his hand. Id. at 38, 44, 50, 56, 71. She also heard the click and buzz of a taser being activated as Roell neared the deputies. Id. at 50-51.

Huddleston had drawn his X2 Taser before he reached the patio area. Huddleston said that as Roell approached them he told Roell to stop, get on the ground, or he would be tased. Huddleston Dep. at 74-75. Huddleston testified that he deployed the taser's two-dot laser on Roell and then arced it as a warning. Id. at 75-76. Roell flinched but kept approaching. Huddleston arced the taser again. Roell again flinched but still kept approaching. Huddleston then holstered the taser and reached out to grab Roell's arm. Id. at 76, 79. Alexander also grabbed for one of Roell's arms. Alexander Dep. at 29.

5

Huddleston said that Roell swung the hanging basket at him as he grabbed Roell's arm. He, Alexander, and Roell all fell to the ground.[2] Huddleston said that Roell was wet and slippery, either from sweat or water, and managed to break free. As Roell tried to go back through the gate, Huddleston pulled out his taser and tased Roell. Huddleston said that it seemed like the taser had some effect because Roell buckled over a little bit. Roell continued on into the patio area, however. Roell closed the gate but the deputies followed him through while the taser was still on its five-second deployment cycle. Id. at 79-85.

By that time, Deputy Dalid reached the scene. All three deputies ran into the patio area and tried to gain control of Roell's arms. "It didn't go very well," however, because Roell was kicking and thrashing on the ground. Id. at 98. Huddleston tried to "drive stun" Roell with the taser in the back of the leg to complete the cycle necessary to achieve neuromuscular incapacitation.[3] Id. at 98-99. Using drive stun mode failed to complete the

---

[2] Plaintiff argues that the record shows that the deputies unnecessarily tackled Roell. The record does not support this argument, however. No witness testified that any deputy tackled Roell. The only evidence is that Roell fell when the deputies grabbed his arms. Alexander Dep. at 29-31. In fact, during Alexander's deposition, Plaintiff's counsel tried to suggest that Roell fell because he got tangled up in the garden hose. See id. at 30-31.

[3] The Sixth Circuit has explained a taser's two modes of operation:

The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.

In drive-stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock but does not cause an override of the

cycle, probably because one of the barbs was not connected to Roell. The other two deputies were trying to control Roell's arms, so Huddleston holstered his taser again and tried to control Roell's legs. Id. at 99.

Roell, however, again managed to escape from all three deputies, stood up, and was in a face-to-face position with Alexander with Alexander's back up against a tree. Huddleston tased Roell again in the back. Id. at 99, 117. The taser again did not take effect, but the deputies were able to get Roell on the ground and handcuff him. The deputies, however, had to use two sets of cuffs and were only able to cuff Roell in the front because he was resisting too much.

Deputy Alexander's recollection of the incident was substantially similar to Deputy Huddleston's account of events. Alexander related that when he and Huddleston first contacted Roell, he was standing facing the broken window and screaming unintelligible things about water, that Roell was holding the hose and flower pot in his hands, that he and Huddleston instructed Roell to empty his hands, and that Roell immediately turned and walked toward them in an aggressive manner. Somewhat similar to Rochana Agarwal, Alexander testified that Roell approached them at a "brisk walk." Alexander also recalled Huddleston arcing his taser as Roell approached, that Roell flinched at the arcing of the taser, but continued to approach them, and that they both grabbed Roell in an attempt to control him. Alexander Dep. (Doc. No. 78) at 19-29.

---

victim's central nervous system as it does in dart-mode.

Cockrell v. City of Cincinnati, 468 Fed. Appx. 491, 492 (6th Cir. 2012) (internal citations, brackets and quotation marks omitted). Huddleston was using an X2 Taser at the time, but it operates on the same principles as the X26. Huddleston Dep. at 28, 217.

Although the deputies had Roell "somewhat under control" once he was on the ground and cuffed, he continued to kick his legs and actually kicked Huddleston in the groin. Huddleston Dep. at 119. Huddleston sent Alexander to get leg shackles from the one of the patrol cars. Although Roell was "flopping everywhere" during the struggle on the ground, once the deputies restrained Roell's legs, they positioned him on his left side. Id. at 119-20. Dalid was trying to control Roell's upper body by holding on to his right shoulder. Dalid Dep. (Doc. No. 79) at 56. Both Huddleston and Dalid testified that once restrained, Roell went limp and began to snore. He would then wake up, thrash around again, and go limp again and lapse back into snoring. Huddleston Dep. at 141-42. Dalid testified that Roell did this twice before he noticed that Roell had no pulse and had stopped breathing. Dalid Dep. at 59-60, 191-92. By that time Corporal (now Sergeant) Mikal Steers had arrived on scene and began administering CPR until the life squad arrived. Id. at 192. Although Corporal Steers detected a faint pulse on several occasions, he was unable to revive Roell. Steers Dep. (Doc. No. 84) at 18-19. The emergency medical technicians were also unable to revive Roell and he was pronounced dead at the hospital emergency room.

Dr. Jennifer Schott, the deputy coroner, ruled that Roell died from "excited delirium due to schizoaffective disorder" and that the manner of death was natural. Doc. No. 103-1, at 4-5. Her report also noted that Roell had various abrasions and contusions, injuries from the taser barbs, and four broken ribs. Id. at 4. The report, however, does not indicate that any of these injuries contributed to Roell's death. In her affidavit, Dr. Schott stated that the nature of the barb wounds, specifically the absence of electrical burns, indicated that no energy had been conducted to Roell. Id. Additionally, Dr. Schott did not find any evidence

that Roell had been asphyxiated, id., which is consistent with the absence of evidence that the deputies applied compressive force in attempting to restrain Roell.

In August 2014, Nancy Roell filed a complaint against Deputies Huddleston, Alexander, and Dalid, Hamilton County Sheriff Jim Neil, and the Hamilton County Board of Commissioners pursuant to 42 U.S.C. § 1983 for alleged civil rights violations.  Plaintiff's first cause of action alleges that the deputies violated Gary Roell's right to be free from the use of excessive force and that Sheriff Neal and the County Commissioners failed to train and supervise their deputies in their encounters with persons with mental disabilities and excited delirium.  Plaintiff's second cause of action is a state law wrongful death claim against all Defendants.  Plaintiff's third cause of action is state law assault and battery claim against the deputies.  Plaintiff's fourth and final cause of action alleges that the Defendants violated Title II of the Americans With Disabilities Act by not providing a reasonable accommodation for Gary Roell's disability when they allegedly used unreasonable and unnecessary force against him.

Following discovery, Defendants each moved for dismissal and/or summary judgment on each of Plaintiff's claims.  Doc. No. 103.  After the parties completed briefing on Defendants' dispositive motion, Plaintiff moved to strike alleged new evidence Defendants filed with their reply brief.  Doc. No. 135.  These motions are now ready for disposition by the Court.

## II. Standards of Review

### A. Rule 12(b)(6) Standard of Review

A motion to dismiss for failure to state a claim operates to test the sufficiency of the complaint.  The court must construe the complaint in the light most favorable to Plaintiff,

and accept as true all well-pleaded factual allegations. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983). The court need not accept as true legal conclusions or unwarranted factual inferences. Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 405 (6th Cir. 1998).

The complaint, however, must contain more than labels, conclusions, and formulaic recitations of the elements of the claim. Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The factual allegations of the complaint must be sufficient to raise the right to relief above the speculative level. Id. Nevertheless, the complaint is still only required to contain a short, plain statement of the claim indicating that the pleader is entitled to relief. Id. (citing Erickson v. Pardus, 551 U.S. 89, 93 (2007)). Specific facts are not necessary and the pleader is only required to give fair notice of the claim and the grounds upon which it rests. Id. To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Mere conclusions, however, are not entitled to the assumption of truth. Id. at 678-89. A claim is facially plausible if it contains content which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 678. Plausibility is not the same as probability, but the complaint must plead more than a possibility that the defendant has acted unlawfully. Id. If the complaint pleads conduct which is only consistent with the defendant's liability, it fails to state a plausible claim for relief. Id.

B. <u>Summary Judgment Standard of Review</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. <u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact

11

because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

## III. Analysis

Plaintiff's basic theory of the case is that when the deputies encountered Gary Roell, they should have recognized that he was in a state of excited delirium and that, therefore, he was extremely susceptible to suddenly dying during or right after any struggle with them. According to Plaintiff, before engaging Roell, the deputies should have attempted to de-escalate the situation with him before making any attempt to subdue him. Further according to Plaintiff, if de-escalation techniques failed, the deputies should have waited until the scene was properly staged with medical personnel and enough officers to quickly overwhelm Roell without an extended struggle. Plaintiff essentially contends that any force applied by the deputies to subdue Roell was excessive until the scene was properly staged, especially since, according to her, Roell had not committed any serious crime and did not pose a threat to anyone.

In their motion to dismiss and/or for summary judgment, the individual deputies argue they are entitled to qualified immunity because it was not clearly established at the time of the incident that their actions would violate Roell's constitutional right to be free from excessive force. The Sheriff and the Board of County Commissioners argue that they are entitled to judgment as a matter of law because Gary Roell did not die as a result of an official custom or policy of the Sheriff's Department or of Hamilton County. Defendants further argue that Plaintiff has failed to state a claim for a violation of the Americans With Disabilities Act.

12

## A. Excessive Use of Force

The Fourth Amendment prohibits law enforcement officers from using excessive force when they arrest someone.  <u>Smoak v. Hall</u>, 460 F.3d 768, 783 (6th Cir. 2006).  In order to comply with the Fourth Amendment, an officer's use of force must be objectively reasonable under the totally of the circumstances.  <u>Kent v. Oakland County</u>, 810 F.3d 384, 390 (6th Cir. 2016).  In evaluating whether a police officer used excessive force on a particular occasion, the court must view the situation from the perspective of a reasonable officer on the scene at the time and without the benefit of 20/20 hindsight.  <u>Id.</u>  To determine whether the officer's use of force was reasonable, the court must consider the severity of the crime at issue, whether the suspect posed a threat to the officers or others, and whether the suspect is actively resisting arrest or attempt to avoid arrest by fleeing.  <u>Id.</u>

## B. Qualified Immunity

A public official is entitled to qualified immunity and thus shielded from suit under § 1983, for his actions if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  The official, however, is only entitled to qualified immunity for actions taken in objective good faith within the scope of his duties.  <u>Id.</u> at 849 n.34.

Determining a public official's entitlement to qualified immunity presents a two-step inquiry.  First, the court must determine, judged in the light most favorable to the party

asserting the injury, whether the facts alleged show that the officer's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If no constitutional right would have been violated on the facts alleged, the inquiry stops and the officer will be entitled to qualified immunity.  Id.  If a violation can be made out based on a favorable view of the pleadings, the court must determine whether the right at stake was clearly established.  Id.  The trial court, however, has discretion to resolve the second question of the qualified immunity analysis before considering the first question.  Jones v. Byrnes, 585 F.3d 971, 975 (6th Cir. 2009).

In determining whether a constitutional right is clearly established, the court must find binding decisions from the U.S. Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decisions of other circuit courts.  Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993) (citing Daugherty v. Campbell, 935 F.2d 780, 784 (6th Cir. 1991)); Summar v. Bennett, 157 F.3d 1054, 1058 (6th Cir.1998).  It is only the extraordinary case that will require a reviewing court to look beyond Supreme Court and Sixth Circuit decisions.  Walton, 995 F.3d at 1336.[4]  The questions of whether the right alleged to have been violated is clearly established and whether the official reasonably could have believed

---

[4] Language in recent U.S. Supreme Court decisions casts doubt on whether a circuit precedent is sufficient to clearly establish a constitutional right.  Cf. Carroll v. Carman, 135 S. Ct. 348, 350 (2014)("Assuming for the sake of argument that a controlling circuit precedent could constitute clearly established federal law . . . ."); City & County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1776 (2015) (citing Carroll); Aschcroft v. Al-Kidd, 131 S. Ct. 2074, 2084 (2011) (stating that a footnote in a district court opinion is not "controlling authority in any jurisdiction, much less the entire United States[.])(emphasis added, internal quotation marks omitted).  In other words, Supreme Court dicta suggests that only a Supreme Court opinion is sufficient to clearly establish a constitutional right for purposes of the qualified immunity analysis.  Since, however, the Supreme Court has not actually held that circuit precedent is insufficient to clearly establish a constitutional right, the Court will continue to adhere to the rule that Sixth Circuit precedent can do so.

that his conduct was consistent with the right the plaintiff claims was violated, are ones of law for the court. Id. However, if genuine issues of material fact exist as to whether the official committed the acts that would violate a clearly established right, then dismissal of the claim is improper. Id.; see also Jackson v. Hoylman, 933 F.2d 401, 403 (6th Cir. 1991) (affirming district court's denial of summary judgment on the issue of qualified immunity where the parties' factual account of the incident differed). When a defendant raises qualified immunity as a defense, as the Defendants have done in this case, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009).

In order to deny public officials qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2083 (2011)(emphasis added). Additionally, when more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. Morrison v. Board of Tr. of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009). Finally, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way. Id.

### C. Analysis: The Deputies Did Not Violate Gary Roell's Right to Free from Excessive Force

In this case, viewing the facts in the light most favorable to Plaintiff, the evidence shows that that the deputies' application of force was reasonable under the totality of the circumstances. Therefore, the deputies did not violate Roell's right to be free from

excessive force.[5]  Moreover, existing precedent did not establish beyond debate that a police officer must employ de-escalation techniques before attempting to effect the arrest of a person suffering from excited delirium whom the officer otherwise has probable cause to arrest.  This is particularly true in this case because there is no evidence that the force employed by the deputies actually caused or contributed to Gary Roell's death.  As indicated above, the deputy coroner ruled that Roell died from natural causes.  There are no cases that establish, however, that a police officer will be liable for excessive use of force during a struggle to arrest the decedent when the decedent dies of natural causes.  Consequently, the deputies are entitled to qualified immunity.

The record shows that the force actually applied by the deputies did not cause Roell's death.  The undisputed evidence from the coroner's report is that Roell did not die from positional asphyxia (in other words, from the deputies piling on top of him and constricting his ability to breath) and that, although Deputy Huddleston deployed his taser several times, no electricity was conveyed into Roell from the barbs.  Doc. No. 103-1

_____

[5] Defendants have not specifically argued that the facts, when viewed in the light most favorable to Plaintiff, fail to establish a violation of Roell's constitutional rights. Defendants, however, have argued that the deputies' use of force was objectively reasonable and Plaintiff has argued the deputies' use of force was not reasonable.  See Doc. No. 103 (Defendants' MSJ) at 18 ("Plaintiff did not establish that the use of force by the officers was gratuitous and therefore objectively unreasonable."); id. at 21 ("The Actions of the Officers in this Case were Objectively Reasonable[.]"); id. at 32  ("This decision [to try to subdue Roell], based on the knowledge of the officers at the time, was objectively reasonable[.]"); Doc. No. 125 (Plaintiff's Memo in Opp.) at 17 ("The task in this case therefore is to apply the Graham factors to assess the reasonableness of the force used on Mr. Roell."); id. at 19 ("[A] jury could find that the officers' use of force was not reasonable under the circumstances[.]"); id. at 24-25 ("A reasonable jury could find that the failure to use verbal de-escalation was unreasonable and that the continued use of force without a plan was unreasonable[.]").  The Court, therefore, concludes that the parties have placed in issue and have had a full opportunity to argue whether the deputies actually violated Roell's right to be free from excessive force.

(Coroner's affidavit).  The deputies did not strike Roell with batons or closed fists and they did not deploy any pepper spray or OC spray in their attempts to control him.  The deputies essentially wrestled with Roell during the entire encounter.  Plaintiff basically concedes as much because she does not point to any acts of the deputies that caused Roell's death other than that they decided to engage Roell in the first instance and that they allegedly prolonged the struggle.  Because the deputies' application of force did not cause Roell's death, no Fourth Amendment violation occurred.  Cf. Gregory v. County of Maui, 414 F. Supp.2d 965, 968, 969 (D. Hawaii 2006) (finding no Fourth Amendment violation where suspect with excited delirium died from heart attack after struggle with arresting police officers; officers did not pepper spray or asphyxiate decedent but only used force reasonably necessary to gain control of decedent), aff'd, 523 F.3d 1103 (9th Cir. 2008).

Additionally, it was not clearly established, that law enforcement officers cannot use any force to arrest, subdue, or control a suspect suffering from excited delirium, particularly where, as in this case, the force actually applied by the deputies has not been shown to have actually caused the suspect's death.  Cf. Rucinski v. County of Oakland, ___Fed. Appx.___, No. 15-1844, 2016 WL 3613396, at *3 (6th Cir. July 6, 2016)(noting with approval out-of-circuit precedent supporting the proposition that a police officer may use deadly force against a mentally ill person who poses an imminent threat of serious physical harm to his person).  Thus, the fact that Roell's resistance was probably caused by his excited delirium did not preclude the deputies from using a reasonable amount of force to bring him under control.  And, the record does show that Roell was actively resisting the deputies' efforts to control him as opposed to trying to extricate himself from the deputies' application of excessive force.  Cf. Brown v. Chapman, 814 F.3d 447, 460 (6th Cir. 2016)

17

(reasonable juror could conclude that decedent broke away in order to avoid being injured further by police officers); Martin v. City of Broadview Heights, 712 F.3d 951, 961 (6th Cir. 2013) (reasonable juror could conclude that decedent was not resisting officers but rather was "struggling to cast the officers' weight from his back so he could breathe").

The cases cited by Plaintiff in support of denying Huddleston, Alexander, and Dalid qualified immunity are distinguishable on their facts.

In Martin, the decedent became psychotic after taking LSD.  He took off all of his clothes and tried to enter a neighbor's apartment.  The police were summoned.  When an officer arrived, the decedent ran up to the officer, put his hands behind his back, and asked to be taken away.  As the officer began to cuff the decedent, he broke away and trotted off about 20 feet.  The officer tackled the decedent.  Another officer arrived on the scene and kneed the decedent to keep him on the ground.  The second officer delivered one or two "compliance body shots" with his knee and the first officer punched the decedent in the face twice.  The second officer then used full force to strike the decedent in the face, back, and ribs at least five times.  A third officer arrived, grabbed the decedent's legs and wrapped his arm around the decedent's neck.  After the officers were able to handcuff the decedent, they continued to hold him in a face-down position.  The decedent then made a gurgling sound, became unresponsive, and died.  An autopsy concluded that the decedent died from asphyxia caused by the officers' actions.  712 F.3d at 954-56.

The Martin Court concluded that the officers used excess force to subdue the decedent and that they should have known that their actions would violate his constitutional rights.  The Court found that the force the officers used was "severe" in the light of the minimal threat the decedent posed - in fact, the officers used "gratuitous violence" to arrest

the decedent.  Id. at 960, 962.  The Court concluded that it was clearly established that "subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's right to be free from excessive force."  Id.

Here, in contrast to Martin, Roell did possess at least one object that he could have used as a weapon and there is some evidence that he was in fact using it as a weapon. Thus, the threat Roell posed to the deputies, while not extreme, was more than minimal. More importantly, however, the deputies did not administer the kind of severe beating the decedent suffered in Martin, nor did they apply any compressive body weight that caused Roell to asphyxiate.  Deputy Huddleston did tase Roell several times, but without effect, and there is no evidence that the tasing caused any life-threatening injuries to Roell.  At worst, the officers grappled with Roell's arms and legs to try to control him, which they eventually did.  In no way, however, did the deputies use severe or gratuitous violence to subdue Roell.

While the Martin Court said that officers must try to de-escalate the situation with a mentally disturbed suspect and adjust the use of force downward, 712 F.3d at 962, the record shows that in this case there was little time for the deputies to de-escalate the situation with Roell before the struggle began.[6]  Moreover, the Martin Court's statement that officers must de-escalate the situation with a mentally disturbed suspect must be viewed

_____

[6] This conclusion is supported by each deputy's testimony.  As indicated by the Court's recitation of the relevant facts, Dalid arrived at the scene just after Huddleston and Alexander.  By the time Dalid ran back to the patio, however, Huddleston and Alexander were already struggling to get Roell under control.  See, supra, at 6; see also Huddleston Dep. at 81-82; Alexander Dep. at 25; Dalid Dep. at 37.

in the context of the facts of that case in which the officers' use of force was severe. Martin does not, as Plaintiff's brief implies, stand for the proposition that officers must try and fail to de-escalate the situation with a mentally disturbed individual before applying any force to subdue the suspect. More reasonably, Martin stands for the proposition that officers should try to de-escalate the situation with a mentally disturbed suspect before resorting immediately to severe force to subdue him.

Champion v. Outlook Nashville, Inc., 380 F.3d 893 (6th Cir. 2004), involved police officers' use of force against a severely autistic man who became unruly with his caretaker and was taken into custody by the officers. Champion, however, concerned only the force applied by the officers after they had handcuffed and restrained the decedent with leg shackles. See id. at 897 ("The Plaintiffs have not suggested that the Officers acted improperly before Champion was handcuffed and hobbled."). The officers continued to pepper spray the decedent even though he was not resisting. Additionally, all three officers continued to put pressure on the decedent's back even though he had stopped resisting. Id. at 898. The decedent suffered a cardiac arrest and died en route to the hospital. Id. In contrast, in this case, there is no evidence, and Plaintiffs do not allege, that the deputies created asphyxiating conditions for Roell or that the deputies continued to apply force against Roell once he was handcuffed and hobbled. This case, rather, involves the deputies' actions leading up to and concluding at the point when they had Roell in handcuffs and restrained. In other words, Champion only picks up where this case left off.

Landis v. Baker, 297 Fed. Appx. 453 (6th Cir. 2008), is also distinguishable. In Landis, the decedent was evidently undergoing some sort of mental crisis and had blocked a highway with a bulldozer. When police officers arrived, he ran away. Officers struggled

to subdue the decedent and managed to get one handcuff on him. The decedent tried to choke one of the officers during this encounter.  Somehow the decedent managed break free and he walked into a nearby patch of woods.  The officers called for another officer with a taser.  When they found the decedent again, he was standing in about an 11-inch-deep water hole.  The decedent was unresponsive to the officers' commands to take his hands out of his pockets and come out of the water.  Despite having the decedent surrounded on all sides, and despite the fact that he was not threatening anyone, the officers tased and then rushed him.  As they struggled to subdue him, the officers pushed the decedent's face into the water and mud.  One of the officers hit the decedent in the legs with his baton approximately ten times.  At some point during the struggle, the decedent stopped breathing.  An autopsy found thick mud in the decedent's airway and lungs and determined that he had drowned.  Id. at 455-58.

The Landis Court ruled that the officers' use of force was unreasonable and that they were not entitled to qualified immunity:

> Although Keiser's second alleged crime, of attempting to choke Trooper Galarneau and/or evade the officers, was more severe and would constitute a felony under Michigan law, see, MCLS § 750.479 (a person shall not knowingly and willfully resist or obstruct an officer in the discharge of his duty), the evidence tends to show that at the time of the fatal struggle, Keiser was no longer a threat to the officers nor was he actively attempting to flee. See Frazell v. Flanigan, 102 F.3d 877, 885 (7th Cir. 1996) (the fact that a certain degree of force may have been justified earlier in the encounter to restrain the suspect does not mean that such force still was justified once the suspect had been restrained), overruled on other grounds by McNair v. Coffey, 279 F.3d 463 (7th Cir. 2002).  After Keiser released Galarneau and walked into the woods, there was no longer a threat to any of the officers.  Keiser was not belligerent or verbally resistant.  He was not wielding a weapon.  He was moving lethargically and appeared to be unaware of his surroundings.  He was standing in at least a foot of muddy and cold water, surrounded by at least four officers who were aware that Keiser was behaving in a manner that could indicate a mental illness.

Id. at 461.

In this case, however, as already mentioned, Roell did have in his hand at least one object that could have been used as a weapon and there is evidence that he was using it as a weapon. Therefore, Roell presented at least some threat to the deputies. Additionally in contrast to Landis, Roell was resisting the deputies' efforts to control him. Finally, and importantly, unlike Landis, the deputies did not beat Roell, create asphyxiating conditions, or employ any of the extreme measures employed by the officers in Landis, such as shoving his face into the ground.

The Court could go on distinguishing cases, but the salient point is that the deputies used the force reasonably necessary to bring Roell under control and no more. Under Plaintiff's theory, any force applied by the deputies was excessive until de-escalation techniques failed and the scene was properly staged with medical personnel standing by and there were enough officers on hand to subdue Roell quickly. According to Plaintiff, in other words, the deputies should have waited until conditions were optimal before attempting to take Roell into custody. But police officers are not required to make perfect decisions, only reasonable ones. Campbell v. Bastin, 998 F. Supp.2d 572, 590 (E.D.Ky. 2014), aff'd sub nom., Cook v. Bastin, 590 Fed. Appx. 523, 528 (6th Cir. 2014) ("The Fourth Amendment . . . does not require police officers to take the better approach. It requires only that they take a reasonable approach."). And law enforcement officers will not be held liable for a Fourth Amendment violation for not employing tactics that would have avoided a confrontation. Sheehan, 135 S. Ct at 1777; Rucinski, 2016 WL 3613396, at *4.

Similarly, earlier Sixth Circuit precedent rejects Plaintiff's contention that the deputies are liable for allegedly creating the circumstances that required the application of force.

Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2007).  Here, under the totality of the circumstances, it was objectively reasonable for the deputies to try to subdue Roell rather try to de-escalate the situation or wait for additional officers.  The deputies reasonably believed that Roell presented some threat to themselves, if not to others, and he did not comply with any of their commands to drop the items in his hands and to cease resisting.  And, again, the force the deputies actually employed against Roell was not severe or gratuitous.  Finally, and importantly, it is only speculative whether employing de-escalation techniques would have prevented Roell's death, a point essentially conceded by Plaintiff's use of force expert, Dr. Michael Lyman.  See Lyman Dep. (Doc. No. 122), at 141.[7]

Campbell and Cook actually illustrate that the deputies in this case did not violate Roell's right to be free from excessive force.  Additionally, these cases demonstrate that the deputies are entitled to qualified immunity because it was not "beyond debate" that their actions would result in a violation of Roell's right to be free from excessive force.  Indeed, Campbell is in many ways indistinguishable from this case.  Campbell involved a severely autistic young man who, like Roell, experienced an episode of excited delirium.  Campbell was a resident at an adult care center.  One day, Campbell became agitated and refused to dress.  He began destroying furniture in his room. He pulled the toilet from the floor and

---

[7]    Q. Another assumption it appears to me you're making is that deescalation [sic] efforts would have been differential; they would have made a difference because they would have worked.  Is that correct?

A. Well, I'm not saying that with certainty, no.  I'm just saying that the protocols say that you at least attempt deescalation [sic] to calm the person rather than take actions to excite them.").

turned over his refrigerator and a television. He broke light fixtures and pulled the shower head from the wall. When a staff member tried to calm Campbell down, he grabbed the staff member and tore his shirt. Attempts to medicate Campbell only agitated him further; he began ripping down curtains and broke a light fixture and a wall socket.

The staff member called for the police to assist getting Campbell under control. When the officers arrived, Campbell was in his room, completely nude. The room was in complete disarray. Campbell was fidgeting with a wall socket. The officers acknowledged that Campbell was not a danger at the time, but they were concerned that he could become one based on their observations of him and the state of the room. The officers were actually able to coax Campbell into handcuffs and they cuffed him loosely and sat him on the floor.

Campbell, however, became agitated again and tried to stand up. Officers applied pressure on Campbell's shoulder to keep him down. Campbell rolled over on his side and began to struggle and thrash and kick his legs. Campbell tried and eventually succeeded in freeing himself from one of his handcuffs. He began to scoot toward the hallway on his chest. The officers tried to control Campbell's arms and legs but did not apply any pressure or weight on Campbell to hold him down. Campbell eventually made it to the hallway, lifted himself and all three deputies three or four inches into the air, and then collapsed and became non-responsive. Campbell was later pronounced dead at the hospital. The cause of death was listed as acute cardiorespiratory failure, acute hypoxia, dehydration, physical exhaustion, acute symphathomimetic intoxication, and autism-induced excited delirium during prone restraint. Campbell, 998 F. Supp.2d at 577-81.

24

Campbell's estate sued the officers for violating his constitutional right to be free from excessive force. Campbell's estate asserted many of the same theories for recovery asserted by Plaintiff in this case. The estate argued that the officers should not even have taken Campbell into custody because he committed at worst a minor offense and the officers had admitted that he did not present a threat of harm to himself or others when they first encountered him. The estate also argued that the officers were liable for creating the situation that required the use of force, i.e., they unnecessarily escalated the situation. The estate argued that the officers should have taken more time to learn about Campbell's mental condition before taking action to restrain him.

The district court, however, rejected those arguments. The court noted that the situation had to be viewed from the prospective of the officers on the scene at the time. The court observed that even though Campbell's offense was potentially minor, and he was not a threat when the officers first encountered him, the destruction he had caused indicated that he had been a threat and it was reasonable for the officers to believe that he could become a threat again. Therefore, the court concluded that it was reasonable for the officers to restrain Campbell. Id. at 584-85.

The court also rejected the estate's contention, based on the testimony of its police practices expert, that the officers should have taken more time to learn about Campbell and his disability and attempt to de-escalate the situation before taking action. The court noted that prior Circuit precedent only required the officers to use reasonable techniques, not the best available practice, and concluded that it was objectively reasonable for the officers to restrain Campbell under the circumstances. Id. at 585.

25

Relatedly, the district court held that the officers could not be liable for allegedly escalating the situation or creating the circumstances that required the application of force. The court noted that officers are sworn to take action when called upon and, according to Sixth Circuit precedent, they will not be held liable for taking action if they do not exceed constitutional limits.  Reiterating Campbell's agitated state and the destruction he had already wrought, the court held that it was objectively reasonable for the officers to detain Campbell to protect him and others, and to facilitate his transportation to the hospital.  Id. at 585-86.

Finally, the district court distinguished its case from both Champion and Martin, principally on the basis that the officers only used the amount of force reasonably necessary to restrain Campbell.  The court noted that unlike the officers in Champion and Martin, the officers in its case did not apply compressive force on Campbell, nor did they strike, pepper spray, or tase him.  The court said that "[t]he uncontroverted testimony of all who were present at the time of the incident does not reveal a picture of aggressive police officers unnecessarily beating up a cognitively disabled child, but an attempt by the Police Defendants to bring Campbell under control and take him to receive treatment so that he would not pose a further threat to himself or others." Id. at 590.  On direct appeal, the Sixth Circuit affirmed the district court's judgment and  reasoning, including the manner in which Champion and Martin were distinguishable from case before it.  Cook v. Bastin, 590 Fed. Appx. 523 (6th Cir. 2014).

In this case, the scene the deputies observed was similar to the one in Campbell. While the deputies were not aware of the full extent of Roell's destructive behavior, they could see that Roell had terrified his neighbors, had thrown a flower pot through his

neighbor's window, and had tried to a pull curtain out through the broken window. Even if Roell was not a threatening presence when the deputies first encountered him, it was not objectively unreasonable for them to conclude that he had been a threat to others and could become a threat again. Moreover, the evidence shows that the deputies reasonably believed that Roell was a threat to them. The undisputed evidence shows that Roell approached the deputies in a very quick and aggressive manner that does not square with Plaintiff's attempt to characterize Roell's actions as simply complying with their orders to come over to them. Additionally, Roell had a least one object in his hand that could be used as a weapon to cause injury[8] and he did not obey the deputies' commands to empty his hands. Accordingly, it was objectively reasonable for the officers to use some force to restrain Roell and to protect themselves.

Once the struggle ensued, it was objectively reasonable for the deputies to continue to attempt to subdue Roell even after he momentarily broke away. Plaintiff suggests that Roell was contained within the patio area and presented no threat at that point and that the deputies should have left him alone for the time being. Plaintiff overlooks, however, that when Roell crawled back into the enclosed area, he was still attached to the taser and

---

[8] Even viewing the facts in the light most favorable to Plaintiff, it is not accurate to argue, as she does, that Roell was unarmed and only presented a minimal threat to the deputies. True, Roell did not have a gun or a knife. But he did have in his hand a garden hose with a metal nozzle attached. It may at first seem silly to say that a hose with a nozzle on it can be a weapon, but Soham Agarwal testified that Roell was swinging the hose as if he were trying to hit someone with it. Doc. No. 91, at 33. Additionally, Huddleston agreed that he nozzle could be used as a weapon to hit someone. He also indicated that the hose could have been used as a choke weapon if Roell had gotten close enough to him. Doc. No. 77, at 235; cf. Gregory v. County of Maui, 414 F. Supp.2d 965, 968 (D. Hawaii 2006)("While a pen is not normally a deadly weapon, officers have been trained (rightly) that such an object can be used as a weapon."), aff'd, 523 F.3d 1103 (9th Cir. 2008).

within the 5-second charge cycle when officers are trained to move in to cuff the suspect when he is supposed to be incapacitated from the taser. Huddleston Dep. (Doc. No. 77) at 96-99; 268.  Deputy Huddleston was also reasonably concerned that Roell presented a threat to the Agarwals if they did not gain control of Roell.  Id. at 101 ("So if we leave him there, who knows? Then he could break into their house.  And then you've got a possible hostage situation with the family inside that can get hurt.").  It was, therefore, objectively reasonable for the officers to try to take advantage of an opportunity to quickly subdue Roell even if the opportunity did not actually materialize.  After that point, the deputies were locked in a physical struggle with Roell with no chance to safely disengage from the encounter.  However, unlike the officers in Champion and Martin, the deputies here only tried to gain control of Roell's arms and legs.  Huddleston did drive-stun his taser on Roell's legs but without causing any obvious injury to Roell.  The deputies, however, did not beat Roell, pepper spray him repeatedly, or employ compressive force.  Like the officers in Campbell, the amount of force they applied to gain control of Roell was objectively reasonable.

The opinions of Plaintiff's use of force expert, Dr. Lyman, do not create a material issue of fact as to the reasonableness of the force employed by the deputies in this case. Dr. Lyman faults the deputies for not recognizing that Roell was experiencing excited delirium when they encountered him, for allegedly escalating the situation with Roell, for tasing Roell in the chest area, and for allowing Roell to be positioned on his stomach at the conclusion of the incident.  Doc. No. 123-2, at 23.  As already explained, however, Sixth Circuit case law precludes Plaintiff from recovering under a theory that police officers unnecessarily created the situation that required the use of force.  See, supra, at 22.  And,

as again already discussed, there is no evidence that the alleged improper deployment of the taser or the alleged improper positioning of Roell on the ground contributed to causing his death.  See, supra, at 16.  Dr. Lyman more or less conceded this much in his report. Doc. No. 123-2, at 23.  To the extent that Dr. Lyman criticizes the deputies for violating their training, procedures, and nationally-recognized standards for use of force, taser deployment, and/or encounters with mentally ill citizens, there is no issue of fact because officers will not be held liable under § 1983 for violating procedures.  Sheehan, 135 S. Ct. at 1777.[9]

In summary, Deputies Huddleston, Alexander, and Dalid are entitled to dismissal and/or summary judgment on Plaintiff's excessive use of force claims.  First, the evidence does not establish that the force employed by the deputies caused or contributed to Gary Roell's death.   Second, the deputies cannot as a matter of law be held liable for allegedly escalating the situation with Gary Roell.  Third, the force actually applied by the deputies to control Gary Roell was reasonable under the circumstances.  Consequently, Plaintiff has not adduced any facts from which a reasonable juror could conclude that the deputies violated Gary Roell's right to be free from the application of excessive force.  The deputies, therefore, are entitled to judgment as a matter of law on that ground alone.  Fourth, however, even if the deputies did violate Gary Roell's right to be free from excessive force, existing precedent did not establish beyond debate their actions would violate Roell's

---

[9] The testimony and opinions of Plaintiff's other use of force expert, Dr. Douglas Smith, on these points are substantially the same and fail to create a genuine issue of fact on the reasonableness of the force employed by the deputies.

constitutional rights.  The deputies, therefore, are entitled to qualified immunity on Plaintiff's excessive use of force claim.  <u>Ashcroft</u>, 131 S. Ct. at 2083.

### D. <u>Municipal Liability</u>

Plaintiff claims that the Sheriff in his official capacity and the Hamilton County Board of Commissioners are liable for Gary Roell's death under § 1983 under theories of failure to train and ratification of the deputies' alleged unconstitutional conduct.  Since, however, Plaintiff has not established an underlying violation of Roell's constitutional rights, the county defendants are entitled to judgment as a matter of law on Plaintiff's § 1983 claims against them.  <u>Blackmore v. Kalamazoo County</u>, 390 F.3d 890, 900 (6th Cir. 2004)("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.").

### E. <u>Americans With Disabilities Act</u>

Plaintiff claims that the Defendants violated Title II of the Americans With Disabilities Act by not accommodating Gary Roell's disability in the provision of public services.  In order to establish a violation of Title II of the ADA, the plaintiff must show that the defendant intentionally discriminated against him because of his disability.  <u>Anderson v. City of Blue Ash</u>, 798 F.3d 338, 356-57 (6th Cir. 2015).  In this case, however, Plaintiff has not adduced any evidence to suggest that Defendants intentionally discriminated against Gary Roell because of his disability or that the manner in which they handled the unfortunate incident with Gary Roell was in any way motivated by his mental disability.

Accordingly, Defendants are entitled to dismissal or summary judgment on Plaintiff's ADA claim.

### F. <u>Supplemental State Law Claims</u>

Finally, Plaintiff has asserted state law claims against Defendants for wrongful death and assault and battery. Plaintiff has abandoned her state law claims against Hamilton County. Doc. No. 125, at 9 n.1. Accordingly, the Sheriff in his official capacity and Hamilton County are entitled to summary judgment on those claims. Having concluded, however, that the individual Defendants are entitled to judgment as a matter of law on Plaintiff's federal constitutional claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims against them. See Hankins v. The Gap, Inc., 84 F.3d 797, 802-03 (6th Cir. 1996).

Accordingly, Defendants' motion to dismiss or for summary judgment on Plaintiff's state law claims is **GRANTED IN PART AND MOOT IN PART.** Defendants' motion for summary judgment is well-taken and **GRANTED** as to Plaintiff's state law claims against Hamilton County and the Sheriff in his official capacity. The state law claims against Hamilton County and the Sheriff in his official capacity are **DISMISSED WITH PREJUDICE.** Defendants' motion is **MOOT** as to the state law claims against the individual Defendants in their individual capacities. Plaintiff's state law claims against the individual Defendants in their individual capacities are **DISMISSED WITHOUT PREJUDICE.**

## Conclusion

For the reasons stated above, Defendants' motion to dismiss or for summary judgment is **GRANTED IN PART AND MOOT IN PART.** Defendants' motion to dismiss or for summary judgment is well-taken and is **GRANTED** as to Plaintiff's federal constitutional and ADA claims. Those claims are **DISMISSED WITH PREJUDICE**. Defendants' motion for summary judgment is well-taken and **GRANTED** as to Plaintiff's

state law claims against Hamilton County and the Sheriff in his official capacity.  The state law claims against Hamilton Count and the Sheriff in his official capacity are **DISMISSED WITH PREJUDICE.**  Defendants' motion is **MOOT** as to the state law claims against the individual Defendants in their individual capacities.  Plaintiff's state law claims against the individual Defendants in their individual capacities are **DISMISSED WITHOUT PREJUDICE.**

In granting Defendants' motion to dismiss or for summary judgment, the Court has not relied on the alleged new materials Defendants filed with their reply brief.  Accordingly, Plaintiff's motion to strike is **MOOT**.

**IT IS SO ORDERED**

Date August 16, 2016                              s/Sandra S. Beckwith
                                                  Sandra S. Beckwith
                                                  Senior United States District Judge